1                        - VOLUME 1 -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                          - - -

5

   TEVA PHARMACEUTICALS            :    CIVIL ACTION
6  INTERNATIONAL GMBH,             :
   CEPHALON, INC., and EAGLE       :
7  PHARMACEUTICALS, INC.,          :
                                   :
8                   Plaintiffs,    :
                                   :
9       vs.                        :
                                   :
10 SLAYBACK PHARMA LIMITED         :
   LIABILITY COMPANY, et al.,      :
11                                 :
                    Defendants.    :   NO. 17-1154-CFC
12

13                          - - -

14                          Wilmington, Delaware
                            Monday, September 9, 2019
15                          9:57 o'clock, a.m.

16                          - - -

17 BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

18                          - - -

19 APPEARANCES:

20
                  SHAW KELLER LLP
21                BY:  KAREN E. KELLER, ESQ. and
                       NATHAN R. HOESCHEN, ESQ.
22

23                       -and-

24

25                            Valerie J. Gunning
                              Official Court Reporter

1   APPEARANCES (Continued):

2

3               WILLIAMS & CONNOLLY LLP
                BY:  DAVID I. BERL, ESQ.,
                     ADAM HARBER, ESQ.,
4                    ELISE BAUMGARTEN, ESQ.,
                     SHAUN P. MAHAFFY, ESQ.,
5                    BEN PICOZZI, ESQ. and
                     MATTHEW LACHMAN, ESQ.
6                    (Washington, D.C.)

7

8                    Counsel for Plaintiff
                     Teva Pharmaceuticals International GmbH
                     & Cephalon, Inc.
9

10

11              LATHAM & WATKINS LLP
                BY:  DANIEL G. BROWN, ESQ.,
                     MICHELLE L. ERNST, ESQ.,
12                   KENNETH SCHULER, ESQ. and
                     MARC ZUBICK, ESQ.
13                   (New York, New York)

14

15                   Counsel for Defendant
                     Eagle Pharmaceuticals, Inc.

16

17              FARNAN LLP
                BY:  BRIAN E. FARNAN, ESQ.
18

19                       -and-

20

21              SCHIFF HARDIN LLP
                BY:  IMRON ALY, ESQ. and
                     ARUN J. MOHAN, ESQ.
22

23                   Counsel for Defendant and Counterclaim
                     Plaintiff Fresenius Kabi USA LLC
24

25

1     APPEARANCES (Continued):

2

3                    SMITH KATZENSTEIN & JENKINS LLP
                     BY:  EVE ORMEROD, ESQ.

4

5                              -and-

6                    WINDELS MARX LANE & MITTENDORF LLP
                     BY:  JAMES P. BARABAS, ESQ.

7

8                          Counsel for Defendants
                           Slayback Pharma Limited Liability Company,

9                          et al.

10

11                   FLASTER GREENBERG P.C.
                     BY:  JEREMY S. COLE, ESQ.

12

13                             -and-

14

15                   FLASTER GREENBERG P.C.
                     BY:  JEFFREY A. COHEN, ESQ.
                          (Chicago, Illinois)

16

17                             -and-

18

19                   HAHN LOESER & PARKS LLP
                     BY:  STEVEN FELDMAN, ESQ.,
                          SHERRY L. ROLLO, ESQ.

20                        DANIEL CHERRY, ESQ. and
                          JOHN CRAVERO, ESQ.

21

22                         Counsel for Defendant
                           Apotex Inc. and Apotex Corp.

23

24

25

```
 1    APPEARANCES (Continued):

 2
                  THE DEVLIN LAW FIRM LLC
 3                BY:  JAMES M. LENNON, ESQ.

 4
                            -and-
 5

 6                WILSON SONSINI GOODRICH & ROSATI
                  BY:  NICOLE STAFFORD, ESQ.,
 7                     DENNIS GREGORY, ESQ.,
                       DAVID STEVER, ESQ. and
 8                     ADEN M. ALLEN, ESQ.

 9
                       Counsel for Defendant
10                     Mylan Pharmaceuticals

11
                         -   -   -
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4    beginning at 9:57 a.m.)

 5

 6              Good morning.  Please be seated.

 7              All right.  I guess we should have introductions

 8    first, so let's see.

 9              MS. KELLER:  Good morning your Honor.

10              THE COURT:  Oh, okay.

11              MS. KELLER:  Sorry.

12              THE COURT:  That sounds good.  I've got so many

13    lawyers here.

14              MS. KELLER:  That's what I figured.  I think I'm

15    the last one on the sheet.

16              THE COURT:  There you are.  All right.  Sorry.

17              MS. KELLER:  Karen Keller from Shaw Keller on

18    behalf of the plaintiffs in this case.

19              With me today on behalf of Teva pharmaceuticals

20    and Cephalon is David Berl, Adam Harber, Elise Baumgarten,

21    Shaun Mahaffay, benefit Picozzi and Matt Lachman all of

22    Williams & Connolly.

23              Also from Teva today is Stacy Julie, Coleman

24    Reagan, Lori Wolfe and Sharon Hausdorf.

25              THE COURT:  All right.
```

1          MS. KELLER:  And on behalf of Eagle, we have Dan

2     Brown, Michelle Ernst, Ken Schuler and Marc Zubick of Latham

3     & Watkins.

4          THE COURT:  All right.  Thank you.

5          MR. LENNON:  Good morning, your Honor.

6          THE COURT:  Good morning.

7          MR. LENNON:  Jim Lennon on behalf of Mylan, and

8     in the interests of time, I'm just going to introduce the

9     two counsel that may be addressing the Court today.

10          THE COURT:  Very well.

11          MR. LENNON:  So with me today are Nicole

12     Stafford from Wilson Sonsini and David Stever from Wilson

13     Sonsini on behalf of Mylan.

14          THE COURT:  All right.  Thank you, Mr. Lennon.

15          All right.  Ms. Ormerod?  Well, come on up.

16     Sorry.

17          MR. COLE:  Good morning, Your Honor.  My name is

18     Jeremy Cole here on behalf of the Apotex defendants, and I

19     have with me Jeffrey Cohen, also from Flaster Greenberg,

20     Steve Feldman from Hahn Loeser, Sherry Rollo from Hahn

21     Loeser, Dan Cherry from Hahn Loeser and John Cravero from

22     Hahn Loeser.

23          THE COURT:  Okay.  All right.  Ms. Ormerod?

24     Good morning.

25          MS. ORMEROD:  Good morning, Your Honor.  Eve

1    Ormerod of Smith Katzenstein on behalf of Slayback.  I have

2    with me today James Barabas.

3               THE COURT:  Mr. Farnan?

4               MR. FARNAN:  Good morning, Your Honor.

5               THE COURT:  Good morning.

6               MR. FARNAN:  Brian Farnan on behalf of

7    Fresenius.

8               With me is Imron Aly, Kevin Nelson, all of

9    Schiff Hardin.

10              THE COURT:  All right.

11              MR. FARNAN:  Thank you.  All right.

12              So before, let's see.  Before we get started,

13   the first thing is, I just was told there's an issue.

14   Somebody has brought another court reporter in, so I guess

15   we need to talk about that.

16              Ms. Baumgarten?

17              MS. BAUMGARTEN:  Yes, Your Honor.  Thank you for

18   raising it.

19              The parties have discussed this issue.  One of

20   our two, our two fact witnesses we intend to plan on today,

21   he's an inventor of many of the patents-in-suit and he is of

22   an age where his hearing is challenged and he can only hear

23   out of one ear well and it was a challenge at the

24   deposition.  We thought through the layout of the courtroom,

25   it might be a challenge here.  So one of our proposed

1    solutions that the defendants say they are okay with is to

2    have a court reporter specifically for his testimony simply

3    to take realtime of the questions, not the answers, so that

4    if he has trouble hearing the questions, he can simply read

5    the question to ease the flow.

6              THE COURT:  So this request, request came to me,

7    a request came to me awhile back, I think in August, about I

8    assume it's this witness having challenges with hearing, and

9    I thought we had resolved it by making arrangements for the

10   court reporter to use realtime, which she is using, and it's

11   available to the parties.

12             My concern is, I don't think we want competing

13   court reporters.  I think it just begs for an issue before

14   the Federal Circuit as to what is the accurate text, what

15   was provided to the witness and whatnot.  So I think we need

16   to have one court reporter, and it's the official court

17   reporter.

18             MS. BAUMGARTEN:  That's fine with us.  The only

19   concern defendants raise is that I think they wanted only

20   the questions shown to the witness, not his answer, and we

21   didn't see a way to have the official transcript shown to

22   the witness without showing him the answers as well.

23             We're happy to do whatever the Court would

24   prefer.  I just am expressing why we went with this option.

25             THE COURT:  Does anybody recollect how it was

1   communicated by the Court to the parties that we would use

2   realtime and when?

3           MS. BAUMGARTEN:  I believe it was the end of

4   last week, after we submitted -- in this case?

5           THE COURT:  So, in other words, and my deputy is

6   going to try and track this down.  There was a time period

7   when this request came to me, and the way it was presented

8   to me, not necessarily by you all, but at least internally

9   by the Clerk's Office, was, are we going to use realtime or

10  can we use some special equipment and I made the decision to

11  use realtime because I like to use realtime.

12          Then it was communicated to me -- hold on one

13  second.  And owe my understanding is on August 23rd in

14  response to the question or the request put to me, the

15  Clerk's Office -- somebody's computer went on off.  We've

16  got a crowded courtroom.  We've got the marshals standing at

17  the door.  If a phone goes on, the person will be removed

18  from the courtroom and will not be welcome back.

19          If a computer or an iPad goes off, you'll be

20  removed from the courtroom and you will not be welcome back.

21  I have a zero tolerance rule for this.  We've just got to

22  become a more polite society.  Okay.  This is a courtroom.

23  Other than a place of worship, it's one of the most

24  important institutions in our culture.  Turn your phones off

25  and computers down.  I have zero tolerance.

1           All right.  Now, so this request was put to me

2    and so I responded -- apparently, the Clerk's Office

3    responded on August 23rd and notified the parties we would

4    use realtime.  So now we're on the eve of trial.  Nobody

5    mentioned it at the pretrial conference.

6           So, Ms. Baumgarten, when did you first become

7    aware -- and actually, and I will withdraw the question to

8    you, because frankly, this request came from the plaintiffs.

9    Correct?

10           MS. BAUMGARTEN:  Yes.

11           THE COURT:  All right.  So let's hear from the

12   defendants why I'm hearing about this for the first time at

13   10:00 o'clock.  And we are allocating time.

14           MR. ALY:  All I can say, Your Honor -- it's

15   Imron Aly.  All I can say is plaintiffs came with some

16   proposals.  We said we're fine with any proposal that works,

17   and if they want to have a separate court reporter, we don't

18   object.  If it's the realtime, we don't object.  Our

19   position is just we don't object at all.  We're happy to

20   work with the convenience of the witness.

21           THE COURT:  So then why did we just waste time?

22   I can't believe Ms. Baumgarten is going to raise this issue

23   unless there was an objection.

24           MR. ALY:  Well, the agreed part was that if we

25   could avoid having the answer presented, that then witness

1  couldn't read the answer and go back and fix things.   That

2  doesn't matter anymore.   That's not the priority.   The

3  priority was taking care of the witness' concern.

4              MS. BAUMGARTEN:   If that's the case, we're happy

5  to use the official realtime, Your Honor.

6              THE COURT:   Okay.

7              MS. BAUMGARTEN:   That was not our understanding.

8  We're happy to do it.

9              THE COURT:   Then that makes sense to me.   I

10  didn't see somebody stand up from the defense either when

11  this issue was raised and say, look, we didn't have an

12  issue, we can use the official realtime.   So frankly, I

13  don't understand your position, but it's resolved and

14  let's move on.   That time will count against the defendants.

15              All right.   Mr. Berl, do you have some issues

16  you want to raise?

17              MR. BERL:   No.   I thought we were ready for

18  opening statements.

19              THE COURT:   The other thing is, I understand

20  there were a number of stipulations filed that are going to

21  narrow the case.   I have not had a chance to read them and I

22  will just, I will read them and we'll do it at the break.

23  And then any other pretrial issues we need to raise from the

24  defense?

25              All right.   Mr. Berl?

1              MR. BERL:  Your Honor, we have some hand ups.

2    With permission, could I bring some up?

3              THE COURT:  Please.  Thanks.  Oh, wait.  Nobody

4    mentioned this.  Two minutes before I came out, I was handed

5    a letter from the plaintiffs, so I thought there was a

6    dispute.

7              MR. BERL:  So, Your Honor, I think it's very

8    unlikely that witness is going to testify today.

9              THE COURT:  Okay.

10             MR. BERL:  We can deal with it at the end of the

11   day.

12             MR. ALY:  Fine.  However you want to do it.

13             MR. BERL:  I don't know how many you want

14   (handing slides to the Court).

15             Good morning, Your Honor.  David Berl on behalf

16   of Teva and also speaking for Eagle.

17             Your Honor, this case relates to bendamustine, a

18   leading therapy for the treatment of chronic lymphocytic

19   leukemia and non-Hodgkin lymphoma.  The active ingredient in

20   Bendeka called bendamustine was first invented in East

21   Germany in the 1960s and used in that country starting in

22   the 1970s.

23             The structure of bendamustine is shown here.

24   Bendamustine is a nitrogen mustard, which means it has a --

25   a nitrogen attached to a carbon chain attached to a chlorine

1    on both sides.  This is called a nitrogen mustard group.

2              There are some problems with nitrogen mustard

3    compounds like bendamustine.  First, familiarly, they're

4    poisons.  They were first used as chemical warfare agents in

5    World War I.  They bind the DNA, which is in every cell,

6    thereby killing cells.  That's both a feature.  They kill

7    cancer cells.  DNA is in every cell, so they kill healthy

8    cells as well and there by cause toxicities.  So while

9    bendamustine was known to be a useful cancer agent, it was

10   important that blood levels not get too high so as not to

11   cause undue toxicity to cancer patients.

12             The second problem with bendamustine is more

13   pronounced than with other nitrogen mustards.  When it's

14   stored as a liquid, it degrades into lots of different

15   compounds.  Why does that matter?  It matters for two

16   reasons.

17             First, when bendamustine degrades, there's less

18   of it around to treat cancer.  If you need a dose of

19   360 milligrams to treat cancer and ten percent has gone

20   away, then you don't have enough.  It won't be effective to

21   treat.  FDA won't let you sell it.

22             Second, these degradants themselves can be very

23   toxic and harmful, so their formation must be avoided to the

24   extent possible.

25             Now, how are these problems of the instabililty

1    and toxicity of bendamustine addressed in the approximately

2    50 years between the invention of bendamustine and the 2010

3    priority date?

4            The instabililty problem was addressed by

5    storing bendamustine as a freeze-dried powder called a

6    lyophilate that would be dissolved in water called

7    reconstituted on the day of its use and then would be

8    diluted in saline, sodium chloride and water, before

9    administration to the patient.

10           Storing as a powder addresses the instabililty

11   problem because molecules move and react much more slowly in

12   powder than they do in liquid.  Storing in a powder is not

13   ideal.  It requires pharmacists to reconstitute and there by

14   can cause errors in dosing, among other problems, but for

15   the first 50 years bendamustine was known, it was the best

16   that scientists could do.

17           There were many proposals and efforts to try to

18   make bendamustine products that were not lyophilized, that

19   were not powders, including oral formulation.  That would be

20   ideal.  And various liquid formulations that would have to

21   be diluted but not reconstituted before use.

22           As of the priority date, none of them were

23   available.  All that was available in the United States or

24   anywhere else was the lyophilized products called Treanda in

25   the United States.  As to the toxicity concerns about

bendamustine, this was always addressed in the same way in

the prior art as well.  By administering the clinically

effective dose of bendamustine in a high volume of saline so

that it could be introduced in a low concentration less

likely to cause harm to patients.

The other advantage of using a large volume is

that the concentration of bendamustine is low enough that it

will all dissolve.  If it doesn't all dissolve, particles or

precipitates will be present, which can do major harm to

patient's veins and organs when administered IV.  Every

clinical use of bendamustine to treat CLL and NHL between

its discovery and the priority dates approximately 50 years

later followed this strategy of using a large volume, low

concentration infusion of bendamustine.

The two families asserted in this case deviated

wildly from the consistent practice and conventional wisdom

of making and using bendamustine products built over

decades.

In addressing the stability issue, the

inventors, Ph.D. chemists, Nagesh Palapu and Christopher

Buxton, figured out a way to make a liquid product, Bendeka,

in which bendamustine is both completely dissolved and

stable.  They did this by experimenting with numerous

approaches and using their expertise in formulation science

and organic chemistry, developed over approximately six

1  decades combined in the pharmaceutical industry to figure

2  out which degradation products were forming and by what

3  chemical mechanism so they could try to stabilize

4  bendamustine by slowing down or avoiding these reactions.

5  The stability problem was confounding because

6  bendamustine behaves and degrades very unpredictably in

7  different solvents.  The goal here is to slow down all of

8  the reaction, and there are more than those shown on the

9  screen.  But there are so many reactions that a strategy

10  that slows down one set of reactions often accelerates other

11  reactions, there by creating different degradants.  Some of

12  the reactions degrade bendamustine at the nitrogen mustard

13  site shown here on the left while others degrade on the

14  right and create esters at the carboxylic acid COOH site on

15  the right where it turns into COH and something else other

16  than H.

17  This is a game of chemical Whack-a Mole and the

18  only solution is for every single reaction to be slowed down

19  so that the bendamustine remains at high levels all while

20  ensuring that it remains in solution.

21  Dr. Palepu will explain how he and Dr. Buxton

22  solved what he considered to be one of the most challenging

23  problems he has ever encountered.  They did so by using a

24  particular combination of liquid solvents in a particular

25  ratio -- polyethylene glycol and propylene glycol in a ratio

1    of 90 to 10 along with an antioxidant called

2    monothioglycerol that could produce a product that would

3    maintain the stability of bendamustine with a very low level

4    of degradant.

5              These are the claims and they're long and

6    complicated, but defendants do not dispute that their

7    products meet all of these limitations.  Defendants only

8    dispute induced infringement of one claim because their

9    labels do not instruct physicians to store the accused

10   products at the recited temperatures and measure the recited

11   impurities.  The claims, of course, do not require doctors

12   to conduct a purity test, as Judge Andrews explained in the

13   Orexagen case directly on point.  The purity limitations

14   here simply describe the product being administered and

15   defendants do not dispute that those products meet the

16   requirements.  That induces infringement.

17             Defendants' principal attack on these patents is

18   that the solvents and ingredients and ratios would have been

19   obvious in view of the prior art.  Let's be clear.  There is

20   not a single prior art reference that defendants assert that

21   discloses all of the claim limitations or even multiple

22   references that are combined to disclose all of the

23   limitations.  The prior art is nowhere close to this

24   invention.  The use of PEG to PG in a 90 to 10 ratio to

25   improve stability is taught nowhere let alone with

1   bendamustine or with the required monothioglycerol and

2   purity recited in the claims.

3            This is a highly unusual obviousness case.

4   Unlike the typical case, even by combining references and

5   defendants are asserting 31 of them in new combinations that

6   were first disclosed last night, they cannot find all the

7   limitations in the prior art.

8            Defendants' theory of motivation that the POSA

9   would use 90 percent PEG based on a so-called OH group

10  concentration is taught absolutely nowhere in the art, so

11  defendants call this motivation background knowledge and

12  seek to invalidate these claims on the basis of their

13  expert's say so alone.

14           The reason their theory is not reflected in the

15  prior art is that it's wrong.  Defendants arrive at the

16  claimed invention not through the prior art prospectively

17  evaluated at the priority date, but by hindsight guided

18  explanations of what a POSA would have done that appear

19  nowhere in the art, and in many cases violate the principles

20  of conventional science that the POSA is supposed to follow

21  rather than ignore.

22           The path to the invention shown on this chart

23  that our experts will explain is anything but simple and the

24  POSA never would have arrived there to the claimed invention

25  without the path being illuminated by hindsight.

1          At nearly every point where the POSA would have

2    had to make a decision, the prior art did not support

3    following the path for the invention.  There is no dispute

4    that unless the POSA would have made each and every decision

5    set forth here, they would not have arrived at the claimed

6    invention.

7          This is harder than filling out a perfect NCAA

8    tournament bracket and without using hindsight knowledge of

9    the results, just as unlikely.

10          We can start with the first decision the POSA

11    would have faced:  What general formulation approach to

12    take?  As our expert, Dr. Juergen Siepmann, a professor of

13    pharmaceutics at the University of Lille in France will

14    explain, there are many options here, including the

15    lyophilized kind of product used for decades, an oral

16    formulation that would have been most convenient and best

17    tolerable.

18          These would have been two of many options and

19    the POSA would not have considered the liquid approach of

20    the claims to be desirable and therefore would not have

21    arrived at the claimed invention.

22          The POSA next would have had to consider what

23    liquid formulation strategy to use even if he chose the

24    liquid approach suggested by the defendants.  The ideal

25    liquid formulation is an aqueous or water based formulation.

1    Water is not a foreign substance obviously and it's the best

2    tolerated.  There were many strategies that the POSA could

3    have used to try to stabilize bendamustine in water.  In

4    fact, this was the inventor's initial approach before they

5    shifted gears.

6            The POSA would have considered many of these

7    approaches, including using the dendrimers that Dr. Siepmann

8    will explain.  They would all have been preferable to the

9    approach chosen by defendants using hindsight of using

10   non-aqueous solvents as the claims require.

11           The defendants assume the POSA would have made

12   this decision.  Not so.  But even if the POSA had wanted to

13   make a non-aqueous liquid formulation, the complexity is

14   just beginning.  There was very little prior art to guide

15   scientists in the realm of liquid non-aqueous bendamustine

16   formulations, but the most thorough, recent and important

17   piece of prior art was the Drager '006 patent, which

18   reflects some of the research conducted by Teva's

19   predecessor Cephalon shortly before the priority date.

20   Though the product described in this patent was not

21   available until after the priority date, the patent itself

22   is prior art.  You'll hear directly from Dr. Drager, a

23   chemist will who explain Cephalon's considerable research,

24   but his prior art patent is very clear about what solvents

25   and combinations of solvents should and should not be used

1    in a liquid bendamustine formulation.

2              Let's go through his disclosure.  First, Drager

3    refers to an old East German patent, apparently the only

4    property right ever recognized by that regime, which

5    contains the only disclosure of liquid bendamustine

6    formulation.  Olthoff's formulation described 30 years

7    earlier, never had been used in a commercial product despite

8    being disclosed as soluble and very stable at least when

9    measured using outdated techniques.

10             So Drager made one of these formulations that

11   contained bendamustine and propylene glycol and he sought to

12   replicate the high purity results reported by Olthoff, but

13   he couldn't.  Instead of seeing a stable formulation as

14   reported by Olthoff, when Drager used the technique

15   ubiquitously recognized as the standard technique for

16   impurities, called HPLC, Drager saw lots and lots of

17   degradation.  That's what he tells the world in text.

18             Olthoff's formulation is not feasible and that's

19   what he shows graphically.  You'll see a lot of graphs like

20   this in the next week, but it's actually quite simple.  The

21   goal here is to stay as close to 100 percent as possible of

22   bendamustine over time.

23             Here, even in the refrigerated conditions less

24   likely to cause degradation, it's degrading far too fast and

25   in room temperature conditions, it falls apart completely

1    and very quickly.

2         This shows that the data and conclusions Olthoff

3    claimed to have were unreliable, not surprisingly, because

4    he uses a very outdated, unsuited technique to look for

5    impurities.  Drager then proposes a solution to deal with

6    this instabililty problem.  He clearly teaches that there

7    are two kinds of solvents, polar protic solvents and polar

8    aprotic solvents.

9         Polar protic solvents are solvents that

10   generally have an OH group where the solvent can donate a

11   proton in the form of a hydrogen atom.  Polar aprotic

12   solvents cannot react this way.  Importantly, the PEG and PG

13   recited in the claims asserted here are both polar protic

14   solvents.  Drager teaches clearly that these polar protic

15   solvents are best to avoid because they form potentially

16   undesirable degradants and degrade bendamustine.

17        Drager therefore teaches that polar aprotic

18   solvents alone or in combination should be used and he lists

19   lots of possibilities for a POSA to pursue consistent with

20   his teaching.

21        As an alternative, Drager teaches that an

22   aprotic solvent or that an aprotic solvent or a mixture of

23   aprotic solvent can be combined with a polar protic solvent,

24   a combination of both, and there are many choices of polar

25   protic solvents to be used here.  But Drager is clear that

1   these protic solvents should not be used without one of the

2   polar aprotic solvents.  In order to maintain the stability

3   of the bendamustine, the protic solvent must be kept within

4   the scope of the current invention.

5           The POSA reading Drager, the latest and most

6   thorough prior art disclosure about non-aqueous bendamustine

7   formulations, would have five options at this point:  Use an

8   aprotic solvent, a mixture of aprotic solvents, a mixture of

9   aprotic and protic solvents, or only protic solvents as in 4

10  and 5.

11          Drager teaches that you can use option 1 or 2

12  and you can even choose option three, but you cannot choose

13  option 4 or 5.  Guided by hindsight rather than the prior

14  art, defendants argue and must prove that the POSA would

15  have chosen option 5.  That alone dooms their obviousness

16  case.

17          But even if the POSA had chosen to use only

18  protic solvents, the POSA would not have arrived at the

19  claimed invention.  There are many polar protic solvents to

20  use and literally thousands of combinations of them.

21  There's no disclosure anywhere in the prior art that the

22  particular combination of PEG and PG solves the bendamustine

23  stability problem.  That is why defendants are now relying

24  on prior art regarding compounds other than bendamustine,

25  like cyclophosphamide, whose degradation pathways are

completely different and totally irrelevant.  In fact,
rather than providing a reason to use PEG, the prior art
provided many reasons not to use PEG.

First, it was unknown whether bendamustine was
sufficiently soluble in PEG to even make these liquid
formulations, let alone stable ones.  Again, if bendamustine
is not soluble enough, precipitates or particulates will
form, which all parties agree is dangerous.

The POSA would have used one of many solvents
that the prior art disclosed could dissolve bendamustine.
PEG wasn't one of those.

Second, the POSA would have expected that PEG
would accelerate degradation at the nitrogen mustard site of
bendamustine.  I promise this is the hardest chemistry
concept you'll have to understand in this case.  As our
expert, Dr. Eric Anslyn from the University of Texas will
testify, the prior art such as this article by Maas tests
the thought that how fast bendamustine degrades at the
nitrogen mustard site depends on how quickly a compound
called the aziridinium intermediate will form.  In other
words, the kinetics of these reactions, how fast they happen
depends on how quickly that aziridinium compound, the one
with the triangle, forms.  In chemistry, that formation of
the aziridinium is called the rate determining step.  It
determines the rate of a reaction, the rate of degradation

of bendamustine at the nitrogen mustard site.  And the reason is that this aziridinium is very reactive, so once it forms, it will react to form lots of different degradant compounds, some of which are shown in Drager.

Dr. Anson will explain that basic rules of chemistry taught in his book to first year graduate students dictate that solvents like PEG will favor the formation of this aziridinium and therefore would have been expected to accelerate degradation at the nitrogen mustard site.  Even the POSA who ignored Drager's instruction not to use protic solvents would have rejected PEG out of hand in favor of solvents that do not favor the formation of this aziridinium.  Defendants ignore entirely the expected effect of PEG on degradation at the nitrogen mustard site and focus only on the other side of the molecule, where esters can form.  The POSA would not have done that.

But even defendants' theory about ester formation is wrong.  Nothing in the prior art suggests that PEG would reduce ester formation.  Without a shred of basis in the prior art, defendants assert that PEG would cause less formation of esters because it has fewer OH groups, hydroxyl groups per unit weight than PG, propylene glycol. One of the solvents used in Drager in combination with an aprotic solvent.

This theory is driven entirely by hindsight, but

 1    it also wrong.  The POSA who focused only on how much ester

 2    degradant was expected to form never would have used PEG.

 3            First of all, if the POSA wanted to use a

 4    solvent with fewer hydroxyl groups, the clear choice would

 5    have been the aprotic solvents disclosed by Drager.  Those

 6    as you see have zero hydroxyl groups unlike PEG, which has

 7    two of these OH groups.

 8            Second, defendants' OH theory makes a basic

 9    fundamental error in chemistry.  It incorrectly treats each

10    of these OH groups as identical for purposes of forming

11    ester degradants.  Here's the last chemistry concept I will

12    address today.  As Dr. Anslyn will explain, sometimes the

13    carbon attached to the OH group is attached to one other

14    carbon.  This is called a primary alcohol.  Both of the OH

15    groups in PEG are attached to primary alcohols, carbons that

16    are attached to one other carbon.

17            PG, the protic solvent used in Drager with an

18    aprotic solvent, has one primary alcohol shown in green, but

19    it also has another alcohol in which the carbon is bonded

20    not to one carbon, but two other carbons.  This is called a

21    secondary alcohol.  It reacts with bendamustine to form an

22    ester called PG-2.  PG primary alcohol reacts with

23    bendamustine to form an ester impurity called PG-1.  What

24    does Drager say about the rate at which primary and

25    secondary alcohols react with bendamustine to form esters?

1    What it says is that at five degrees after 12 months, the

2    primary alcohol will cause four times as much ester

3    degradation as the secondary alcohol, 1.09 for PG 1 and .27

4    for PG-2 caused by the secondary alcohol.  This is

5    undisputed and important.  It shows that not all OH groups

6    are the same.  In terms of creating the undesired ester

7    degradants, the PEG OH groups, the primary alcohols, are

8    worth four times as much as the secondary alcohol on

9    propylene glycol, and when that react differs is accounted

10   for, as it must be, the 90/10 pH PEG solvent system of the

11   claims actually would have a higher OH group concentration

12   than the Drager formulation that the defendants modified on

13   the basis that the OH group concentration is too high.

14           In other words, the proposed solution of 90/10

15   in our claim goes in the wrong direction, dooming

16   defendants' motivation theory even on its own flawed terms

17   of only looking at ester formation.

18           And even worse as I explained before, PEG would

19   have been expected to accelerate degradation of bendamustine

20   at the nitrogen mustard site by accelerating formation of

21   the aziridinium.

22           After learning enough about chemistry to be

23   motivated by this flawed OH group theory, defendants' POSA

24   apparently stops reading the textbook and doesn't learn the

25   chemistry that dictates degradation at the nitrogen mustard

site.  But there's actually another reason that the POSA
would not use PEG and PG together, and defendants
acknowledge it.  The POSA would have been concerned that PEG
and PG together will breakdown themselves into other acidic
molecules that will react with bendamustine to cause
degradation.

　　　　　If the POSA would have expected this as
defendants assert, then the POSA simply would not have
used PEG and PG.  They would have removed the offending
solvent and returned to find a new one that doesn't cause a
problem.

　　　　　Defendants, again guided by hindsight, choose a
different path.  They assert that the POSA would have
selected a solvent expected to create a degradation problem
and then try to solve it by using an antioxidant.  That
makes no sense.  Formulators don't create problems in order
to solve them.  Rather, they use solvents that aren't
expected to create new problems in the first place.

　　　　　But even if the POSA wanted to create this
problem in order to solve it, using an antioxidant would not
have been the choice.  The prior art disclosed several known
techniques to solve oxidation problems with bendamustine
formulations, including as shown here in Olthoff using
nitrogen gas.  In contrast to these techniques, the prior
art did not disclose that an antioxidant would be effective.

1    Antioxidants are known to be unpredictable and undesirable.

2    The conventional wisdom reflected here in the guidelines on

3    the subject issued by the European union are that an

4    antioxidant should be used only once it has been shown that

5    their use cannot be avoided.  Here, it easily can be avoided

6    by not using PEG in the first place or by using other

7    techniques that the prior art disclosed to be affected.

8              Defendants' theory is that the defendants would

9    have used PEG and then as a matter of course, to stop its

10   oxidation, added an antioxidant.  If the foregoing

11   disclosures weren't enough to dispute this theory, consider

12   this.  Though PEG had been used in formulations in the prior

13   art with other drugs, there is not a single marketed

14   formulation that had PEG with an antioxidant.  It had never

15   been done before.  And as of the priority date in the long

16   history of the pharmaceutical industry, PEG had never been

17   used with a product like bendamustine that was expected to

18   undergo ester reaction, esterification.  Defendants' theory

19   is that the POSA would have done something wholly

20   unprecedented and contrary to accepted practice.

21             And even if, contrary to the prior art, a POSA

22   decided to use an antioxidant, he would have had many

23   choices, all of which would behave unpredictably.  As

24   defendants' own witnesses agreed, antioxidants are

25   unpredictable and the antioxidant chosen in the invention,

1    monothioglycerol, would have been considered especially

2    unsuitable.  The prior art disclosed that monothioglycerol

3    was not effective in acidic environments like liquid

4    bendamustine formulation.  Moreover, based on its chemistry,

5    monothioglycerol would have been expected to react with

6    bendamustine, and therefore cause additional degradation

7    rather than preventing degradation.  It again goes in the

8    wrong direction.

9            The POSA therefore, had they even gotten to this

10   place, would have used an antioxidant that would have been

11   expected not to cause these problems.  The law requires

12   prospective consideration of the prior art as a whole to

13   determine whether the POSA had reasons to make each and

14   every decision to arrive at the claimed invention.

15           Defendants' motivation theory relies on the POSA

16   making numerous choices unsupported by the prior art or

17   scientific principle.  Defendants cannot prove by clear and

18   convincing evidence that the POSA would have made every one

19   of the choices on the path to the invention and defendants,

20   if defendants are wrong as to even one choice, their

21   obviousness argument fails.  They're wrong as to all of

22   them.

23           But, of course, motivation is not the only part

24   of the obviousness inquiry.  Achieving an expectation of

25   success is an element, too, and defendants also fail there.

1    As I noted, there was no information whatsoever

2    in the prior art about the solubility of bendamustine in PEG

3    let alone in a ratio of 90 to 10 to PG that defendants

4    assert to be obvious.  The prior art therefore provided no

5    basis to expect that a formulation containing the

6    bendamustine concentration all parties agree is desirable,

7    25 milligrams per milliliter could be made as a solution in

8    this solvent mixture.  The defendants have no answer to

9    this, so they invent a new legal theory.

10    Their expert uses solubility data from internal

11    Eagle testing, admittedly not in the prior art and not

12    available to the POSA, and argues that if the POSA had

13    possessed this data, he would have put it into a model that

14    would have predicted sufficient solubility.  No case

15    supports the use of non-prior art data to provide a

16    reasonable expectation of success and the law, of course,

17    precludes it.  In any event, we'll show that this argument

18    is factually wrong.

19    Moreover, the claims require certain impurity

20    levels.  For example, claim 2 of the '831 patent requires

21    less than .18 percent total PG esters after 12 months and

22    5 degrees.  Those are the PG-1 and PG-2 impurities I talked

23    about earlier.

24    Defendants' expert never testified that if the

25    POSA would have used ten percent PG rather than the

1   34 percent PG used here in Drager, that they would have had

2   an expectation of getting down to less than .18 percent

3   total PG esters or to meet the other impurity requirement in

4   the claim.  We've gone down from 34 percent in the prior art

5   to ten percent in the claims, 90/10 PEG PG, but there's way

6   less total PG esters that's required by the claim.

7   1.36 percent versus 18 percent.  There's no expectation of

8   success and defendants marshal no evidence to the contrary.

9         Rather what they do is assert that these purity

10  limitations are met inherently.  That is wrong legally.  The

11  law does not permit inherency to establish an expectation of

12  success.  And it is wrong factually, too, because the

13  inherency standard is high.  The limitation must always

14  necessarily be present and defendants cannot prove that all

15  of the formulations within the claim or even those that they

16  assert to be obvious will always meet these purity

17  requirements.  That likewise is fatal to defendants'

18  obviousness case.

19        Now, defendants may also advance sundry 112

20  arguments, almost all of them without any expert evidence.

21  We don't know which ones they're running.  We asked

22  yesterday and they still won't tell us, but I will briefly

23  address two of them.

24        First, defendants claim that the asserted claims

25  are not enabled because sodium hydroxide, which is not

1    recited in the claim, is required in order to meet the

2    purity limitation.  Defendants rely on a subsequent patent

3    application for this argument, asserting that this

4    application admits that NaOH is required to practice

5    the invention and therefore the asserted claims are not

6    enabled.

7              The later application shown here does not say

8    that NAOH is required to achieve the claimed purity.  On the

9    contrary, it makes clear repeatedly that the problem that's

10   being solved is batch to batch variability.  Without NAOH,

11   most batches are pure but some are not.  Enablement does not

12   require that every batch of material work.  The law is clear

13   on that.  But more fundamentally, there's no dispute that

14   adding NAOH is trivial to the POSA and would not require

15   undue experimentation.  Defendants don't have an expert who

16   says otherwise.  Everyone who has testified about this,

17   including defendants' experts and their own scientists,

18   agree, there's no basis whatsoever for finding

19   nonenablement.

20             Also, it should not none escape the Court's

21   notice that the defendants' enablement argument that the

22   claimed formulations are not stable without the unclaimed

23   NAOH is irreconcilable with their similarly flawed argument

24   that the formulations are always inherently necessary

25   stable.  They're irreconcilable.

1         The second 112 argument involves the phrase

2   stabilizing amount of an antioxidant, which appears in all

3   the claims.  Defendants assert that this is indefinite and

4   not enabled.  It is neither.  The written description

5   defines a stabilizing amount of antioxidant.  Those amounts

6   that enhance or increase the stability of bendamustine in

7   the compositions described here in.  If the amount of

8   antioxidant increases or enhances the stability, it's a

9   stabilizing amount.  There's no lack of clarity.

10        Likewise, the written description lists

11  antioxidants that can be used to stabilize the claimed

12  formulation, and it provides evidence that the exemplified

13  monothioglycerol antioxidant is stabilizing.  There's

14  no basis whatsoever to conclude that the POSA would be

15  unable to practice this invention without undue

16  experimentation.

17        Now I will turn to the second family of claims.

18        THE COURT:  On that, I mean, that's just going

19  to boil down to whatever expert I find more credible.

20  Right?  That's just tautological.  I'm going to need

21  somebody to come in and tell me that there's no undue

22  expectation.  I really wanted to resolve that.

23        MR. BERL:  Yes.

24        THE COURT:  Your point is they don't have an

25  expert.

1          MR. BERL:  They don't have an expert who comes

2   in and says that.

3          THE COURT:  Right.

4          MR. BERL:  They can try it.  If they do, we'll

5   respond.

6          THE COURT:  Right.

7          MR. BERL:  The second family of claims address

8   how bendamustine is administered.  For at least four decades

9   before the priority date, bendamustine had been used to

10  treat CLL and NHL using low concentrations in high volumes

11  administered in 30 or 60 minutes.  Not only was that the

12  typical conventional use of bendamustine to treat those

13  diseases, it was the only use.  Treating NHL and CLL in the

14  manner claimed in the second family was unprecedented and it

15  was unprecedented for a reason.  At the priority date, the

16  claimed treatment would have been considered both infeasible

17  and undesirable.

18          First, let's discuss infeasibility, expectation

19  of success.

20          The second family claims treating CLL and NHL in

21  specific dosing regimens.  Then it claims diluting the

22  liquid formulation containing PEG and PG in a very small

23  volume, 100 milliliters or less or even 50 milliliters or

24  less, using a concentration of 5.6 milligrams per

25  millimeter, an order of magnitude higher than the

1    concentration previously used, and about ten times less

2    volume than previously used.  To administer to the patient

3    product in about ten minutes or less rather than the

4    30 minutes or 60 minutes in the prior art.

5              Why would Eagle have done this?  Why would these

6    concentrations in time matter?  There are two reasons.

7    First, it matters because, sadly, with so many cancer

8    patients, there is a shortage of infusion chairs, so

9    patients often have to wait to get started with their

10   therapy after diagnosis among other problems.  And that's

11   also sub optimal for the providers who run the infusion

12   centers.  But the real reason it matters is for patients.

13   As Your Honor surely knows, a diagnosis of CLL or NHL is

14   devastating for patients, their family and their friends.

15             Chemotherapy treatment is grueling and often

16   disheartening.  Aside from the miserable and sometimes

17   dangerous toxicities associated with cancer treatment,

18   sitting in an infusion center with a needle in your vein

19   surrounded by other cancer patients is demoralizing.  It's

20   so difficult that quite often, patients are accompanied by

21   family and friends to provide support.

22             Eagle had the idea, quite serendipitously, that

23   maybe the 30 and 60-minute infusions that had been used with

24   bendamustine for decades could be shortened to ten minutes

25   or less.  Initially, Eagle had no basis to believe and did

1   not believe that it was possible to create an infusion with

2   the required clinical dose in sufficient concentrations to

3   permit that short infusion using its PEG PG formulation or

4   that such treatment would be sufficiently safe to

5   administer.  In fact, Eagle's initial experimentation

6   confirmed the long odds of even being able to prepare this

7   formulation of the claim with the high concentration.  This

8   invention requires diluting in 100 milliliters or less or

9   50 milliliters or less, again, ten times higher than the

10  concentrations of the existing Treanda product in the prior

11  art.

12          The solubility of bendamustine in a mixture of

13  PEG, PG and saline depends on the solubility in each of

14  those three solvents alone, but the solubility of

15  bendamustine in PEG was not known and the solubility of

16  bendamustine in saline was not known.  Their solubility in

17  the mixture was totally unpredictable and could not have

18  been expected without more information.

19          So the inventor, Dr. Sundaram, who left Eagle

20  years ago and cannot testify because he's away in India,

21  performed solubility experiments to determine whether this

22  would be workable.  In his initial experiments, he concluded

23  that dilution into 100 milliliters is not possible for the

24  present Eagle formulation, the PEG PG formulation.  To be

25  clear, dilution into 100 milliliters is easy compared to

1    the claims requirement to dilute into a smaller

2    50-milliliter saline, thereby approximately doubling the

3    concentration.  But even after conducting the experiments,

4    the inventor did not even think 100 milliliters is possible.

5    It turns out, of course, that it is possible.  Otherwise, we

6    wouldn't be here.  But no prior art disclosure suggests that

7    making the low volume high concentration composition of

8    these claims was possible let alone reasonably expected to

9    succeed.

10           So how do defendants try to satisfy their burden

11   of showing an expectation of success?  Without exaggeration,

12   with the most shameless hindsight use of an inventor's

13   experimentation I've seen in two decades of doing this job.

14   Defendants and their expert, Dr. Pinal, do not even try to

15   obscure their reliance on the inventor's non-public

16   information.  Their argument literally lists the results of

17   Dr. Sundarum's later solubility studies from Eagle's

18   confidential file and places it in the prior art.  Based on

19   the solubility data, indisputably not in the prior art, Dr.

20   Pinal asserts that the POSA would have had a reasonable

21   expectation in making the high concentration composition and

22   practicing the claim.

23           Defendants justify their brazen violation of the

24   law by asserting bendamustine's solubility in various

25   solvents is a property of the compound.  Even if true, those

excuses do not justify reliance on non-prior art data.  The
claims are not directed to solubility.  They are directed to
a treatment regimen using a high concentration, low volume
composition that defendants admit the POSA would not have
reasonably expected to make without data unavailable to the
POSA.

Nor does the assertion that the data could be
obtained by easy experimentation permit use of non-prior art
results to satisfy the reasonable expectation requirement.
It's easy to sit on the couch and watch the Powerball
drawing, but that does not provide a reasonable expectation
of success of winning the lottery before the drawing occurs.
They are two different inquiries, expectation of success and
how hard it is to do the experiment.

Given this fatal flaw in defendants' theory, a
trial should not even be necessary as to these families.
But defendants' obviousness theory failed for another reason
as well.  Even with the unavailable data in hand, the POSA
would not have had a motivation to make and use this
formulation in a high concentration.

Here is the prior art defendants cite in favor
of their motivation theory, in favor of the idea that the
POSA would have deviated from the consistent clinical
practice and longstanding conventional wisdom of using 30 to
60-minute infusions of low concentrations of bendamustine.

1    This is very old prior art, long before the priority date,

2    disclosing small studies of short infusion into a small

3    number of patients.  It is not even close to demonstrating

4    the obviousness of the invention.  Just the comparison to

5    the claims demonstrates how hard it is.

6              The limitations that are missing are no minor

7    matter.  They relate to the dosing regimens and patient

8    populations at issue, which affect whether the high

9    concentration, short infusion, is expected to be

10   sufficiently tolerable to be a good idea.

11             For example, as our pharmacokinetics expert, Dr.

12   Derendorf from the University of Florida will explain, the

13   toxicity analysis for a single infusion is quite different

14   than the toxicity analysis for a repeated cycle regimen as

15   required by the claim.  The bendamustine doses likewise

16   differ.

17             More fundamentally, Dr. Derendorf will explain

18   that these experiments from the prior art are directed to a

19   completely different purpose than the claimed treatment of

20   CLL and NHL and are not intended or understood by the POSA

21   to convey an appropriate regimen for treatment.  But the

22   Court does not need to decide whether these studies alone in

23   isolation render the claims obvious, because the law demands

24   exactly what the defendants and their experts avoid

25   studiously, an examination of the prior art as a whole.  And

1    the prior art defendants ignore demonstrates clearly without

2    any doubt that the low volume, high concentrations infusions

3    of bendamustine was a bad idea and bendamustine should be

4    administered in 30 to 60 minutes in a low concentration, not

5    the high concentrations in ten minutes or less as Eagle

6    later claimed.

7              Here's the Ruffert article, PTX-260.  This

8    study, a short infusion in the patient population.  There

9    are two important things about this study.  First, not a

10   single one of defendants' experts considered it in

11   concluding that the claims were obvious and there was no

12   justification for that.

13             Second, they just whistled past the graveyard

14   and ignored this evidence.

15             Second --

16             MR. ALY:  Objection, Your Honor.  That's

17   argumentative.  This is an opening statement.

18             THE COURT:  It's a bench trial.  The whole thing

19   has been argument for the most part and I'm assuming you're

20   going to stand up and do the same.

21             MR. ALY:  I will try not to.  I guess it's open

22   now.

23             THE COURT:  Within limits.  Right?

24             MR. ALY:  Understood.

25             THE COURT:  It's a bench trial.

1          MR. ALY:  I've got it.

2          THE COURT:  All right.

3          MR. BERL:  Second, Ruffert teaches clearly that

4   a short infusion is a terrible idea.  An outstanding

5   percentage of the patients, 35.4 percent got phlebitis, a

6   painful inflammation in the vein, and approximately one in

7   six patients, five out of 31, got thrombophlebitis.  Dr.

8   Agarwal, an oncologist in the largest oncology practice in

9   the United States will explain that thrombophlebitis is a

10  very dangerous blood clot in the veins that can cause stroke

11  or even death in CLL patients.

12          Balanced against the convenience of a shorter

13  infusion, the answer is clear, these risks are intolerable

14  and the POSA never would have pursued a high concentration

15  less than ten-minute infusion disclosed to cause phlebitis

16  in one and three patients and thrombophlebitis in one in

17  six, especially when the prior art taught clearly how to

18  solve this problem.  Use the short infusion of 30 to

19  60 minutes.

20          But that was not all.  Even the author of

21  the defendants' prior art references thought that the

22  idea --

23          THE COURT:  Can you go back for a minute?

24          MR. BERL:  Sure.  So are you looking at

25  short-term.

1          THE COURT:  Yes.

2          MR. BERL:  This is a little confusing.

3    Short-term will show in this study it's referring to up to

4    60 minutes, not the short-term as I've been using it, and

5    this here is about bolus infusion, IV.  Bolus, which is a

6    really short, fast infusion.

7               So it's a little confusing.  I'm glad Your Honor

8    brought that up.  Short-term in the Ruffert article is

9    defined in the article as up to 30 to 60 minutes and it's

10   being distinguished from this bolus infusion of a short

11   amount of time that clauses this phlebitis and it says that

12   phlebitis after IV.  Bolus injection, that's seriously

13   problematic and it's much less frequently observed when

14   using the short-term 60-minute infusion.

15          THE COURT:  All right.

16          MR. BERL:  Thanks for having me clarify that.

17               Second, even the author of the defendants' prior

18   art references thought that the idea of infusing

19   bendamustine in ten minutes or less was unwise.

20               Here is an article co-authored by Dr. Merkle,

21   one of the authors of defendants' prior art references,

22   reporting on their decision about how to infuse bendamustine

23   clinically following all of the studies defendants cite.

24   They note that their earlier infusion studies have a problem

25   with neurotoxicity that is not observed in a 30-minute

1     infusion.

2              Everyone would prefer their Aunt Florence to sit

3     in the infusion chair for 20 extra minutes rather than

4     potentially suffer dangerous nerve system toxicity.  So it

5     was no surprise that when it came to treating actual NHL and

6     CHL patients with clinically effective doses, scientists all

7     over the world looked at the same prior art Your Honor will

8     be asked to evaluate and reached the same conclusion.  Treat

9     at low concentrations in 30 to 60 minutes at high volume,

10    not the high concentrations in ten minutes or less.

11             Usually these cases are hard.  Courts have to

12    choose between experts who dispute how artisans would have

13    interpreted the prior art years earlier.  Here, actual

14    artisans interpreted all of the art before the Court and

15    demonstrated by their choices what infusion times the prior

16    art taught were appropriate and inappropriate.  This is

17    important pre-litigation evidence about what the prior art

18    contemporaneously meant.  There was not one company or

19    person making these decisions.  Bendamustine was not

20    patented, so different companies around the world developed

21    products and reached this conclusion independently.

22             You will hear from the person in charge of the

23    project in the United States, Dr. Lorenzo Leoni, who worked

24    at Salmedix in San Diego.  He evaluated all the prior art at

25    issue, including the references cited by defendants early in

the 2000s, and chose that the same cost benefit analysis
that the POSA would be required to conduct here leads in
favor of the high volume, low concentration, 30 to 60-minute
infusions for CLL and NHL.  He rejected the 30 to 60, he
rejected the short infusions of the claims out of hand.  It
was not a close call for Dr. Leoni and it shouldn't be a
close call here.  The risk-benefit analysis just isn't there
for the short infusion.

          Here's what he wrote in 2005 in the
investigator's brochure for the clinical studies that led to
the approval of Treanda.  He said that phlebitis was
observed primarily after bolus injections and he therefore
recommends 30 minutes or 30 to 60 minutes.  The German label
says the same thing.  The risk-benefit ratio isn't there.
The benefit of the shorter infusion, smaller, shorter chair
time, was nice, but you're not curing cancer patients any
more effectively.

          This label is from a company called Ribosepharm
that conducted the studies conducted by Preiss and Schoffski
on which the defendants rely, the key prior art studies they
cite.  This same company confirmed that 30 to 60-minute
infusions reflect the proper way to administer bendamustine
to CLL and NHL patients, not the shorter infusions
Ribosepharm scientists had rejected long before the priority
date, but defendants now pluck the hindsight out of the

1    prior art.  The concern about thrombophlebitis make this a

2    no-brainer, can say nothing about the concerns about other

3    toxicities, like neurotoxicities and nausea.

4         So every company and scientist who decided how

5    to induce bendamustine to treat NHL and CLL according to the

6    dosage regimens in the claim, the clinically effective

7    regimen, over many decades on multiple continents made the

8    same decision.  Infuse in 30 minutes or more and that

9    infusion had been used clinically in thousands of CLL and

10   NHL patients around the world without objection.

11        Now, faced with this overwhelming evidence,

12   defendants again resort to their same legally foreclosed

13   tactic, relying on the inventor's statements about the prior

14   art.  Setting aside this legal problem and the fact that the

15   inventor as we saw a moment ago didn't even think this

16   invention could be practiced because of the solubility let

17   alone that it would be a good idea.  His statements to FDA

18   that defendants rely on are unavailing for two additional

19   reasons.

20        First, the inventor, of course, looked at the

21   prior art through his own lens as someone who already had

22   this inventive idea and had overseen experiments that were

23   not in the prior art.  Unlike the POSA, he performed studies

24   showing the concentration could be reached.  He assessed the

25   concerns about vein toxicity that I had been discussing by

1    performing rabbit studies specifically designed to predict

2    whether this would be a problem, studies that yielded

3    favorable results not available in the prior art.  He

4    commissioned experts to perform a so-called Monte Carlo

5    modeling analysis, an analysis not available in the prior

6    art.  Eagle told FDA about all of this, so after being

7    convinced that his idea was good and based on much evidence

8    that the POSA would not have had, the inventor looked at the

9    prior art differently, of course, and tried to find using

10   hindsight support for his idea in the prior art.

11              His writing cannot be shorn of this context.

12   The inventor's analysis of the prior art is neither relevant

13   nor persuasive.  As the Federal Circuit held in the Neptune

14   versus Eli Lilly case just a few months ago.

15              Second, Dr. Sundaram did not analyze the prior

16   art as a whole as the POSA must.  He addressed only systemic

17   toxicity, not the local vein issues I've been discussing

18   based on certain references that defendants' rely on, but he

19   does not address the rest of the picture, including the

20   Ruffert reference that raises the concern about

21   thrombophlebitis.  There's no evidence that Dr. Sundaram was

22   even aware of the Ruffert reference when he wrote this

23   literature review to FDA.  The POSA as a matter of law must

24   consider all of the evidence in the prior art but only the

25   information in the prior art.  Dr. Sundaram, the inventor,

1   did not consider information that was in the prior art and

2   considered a lot of information that was not in the prior

3   art.  His analysis is irrelevant for that reason as well.

4           As you will hear in a moment from the founder of

5   Eagle, Mr. Scott Tarriff, to whom Dr. Sundaram reported,

6   everywhere Eagle turned, they were met with resistance to

7   this idea of a high concentration, ten-minute or less

8   infusion.  Indeed, this belief that the benefits of the

9   short infusion were insubstantial continued even after

10  Eagle performed its studies and even after the drug was

11  approved.

12          Soon after approval, what you see here is FDA

13  addressing an issue totally distinct from obviousness,

14  whether Eagle's Bendeka was clinically superior to Treanda

15  for purposes of orphan drug designation.  FDA's belief was

16  that the benefits of the shorter infusion were minor and

17  that continued to be the pervasive view.  The market

18  ultimately disproved FDA's belief at the time.  Doctors and

19  patients, rather than regulators, made Bendeka a smashing

20  success.  It has sold more than $2 billion since its launch

21  a few years ago.  Commercial success expert John Jarosz will

22  explain that bendamustine has succeeded in the increasingly

23  complex and competitive market for CLL and NHL drugs, and

24  that that success is attributable to the features of the

25  claimed invention, the stable liquid formulation and the

1    short infusion.

2              Defendants' response, aside from casting a lot

3    of aspersions against plaintiffs, is that Bendeka did not

4    sell more than the lyophilized product that Teva sold many

5    years ago into a different, less competitive market.  This

6    is the argument that the iPhone 10 is not a commercial

7    success because it doesn't sell anything more than the

8    iPhone eight.  That's actually not an exaggeration from

9    defendants' argument.  That's precisely the legally improper

10   rubric that their expert agrees he was applying to this

11   case.

12             The commercial success further demonstrates the

13   nonobviousness of the invention and the objective indicia

14   and prima facie case both point in the same way.  These

15   inventions are not obvious and defendants cannot come close

16   to meeting their clear and convincing burden.

17             Thank you very much.

18             THE COURT:  All right.

19             MR. ALY:  Your Honor, if it may please the

20   Court, and now it is time for the rest of the story.  We had

21   viewed opening statements a little bit differently, but I'm

22   happy to dig into, but not all of the evidence that Mr. Berl

23   has addressed and explain what the physicians, doctors and

24   testimony of the experts is expected to provide.

25             But before I do that, I just wanted to make sure

1    some simple ideas were clear.  One, bendamustine is a great

2    drug, but this case is not about the invention of that drug

3    as Mr. Berl agreed.  That drug has been existing for over

4    50 years to treat cancer.  Specifically, the exact same kind

5    of cancer that Bendeka treats.  This drug is not about

6    something new that it does.  It's not about something new as

7    a new chemical entity.  This is about a formulation that has

8    a higher concentration slightly than the other prior art

9    product, and then taking that product and administering it

10   faster, which goes hand in hand with it being a higher

11   concentration product.

12              Now, plaintiffs obviously would like to make

13   this a very complicated case about chemistry, about

14   reactions, and about anything else that could go wrong

15   except for the obvious formulation at hand.  It's kind of

16   like the start of a joke, I don't know the punchline to it,

17   but it's if a chef, or baker and a chemist walk into a

18   kitchen, what would happen?  A chemist might talk about

19   things like Maillard reactions, oxidation and mold, but the

20   baker would say, this is what I do every single day.  I bake

21   a cake.  Maillard reaction means that the sugar is going to

22   form a crust.  Oxidation means I am going to cover it when

23   it's done, and to prevent mold, I'm going to put it in the

24   frig.  This case is no different, Your Honor.  Although a

25   chemist may view this as a world of problems, a formulator

1    views this as away to get to the formulation that's obvious

2    and taught by the prior art.

3              Dr. Pinal is that formulator with 15 years of

4    experience in-house.  Plaintiffs don't have a formulator

5    with in-house experience.  Dr. Siepmann, who will testify

6    about the problems, had six months when he started his

7    career at a company as an internal.  So you're going to have

8    to weigh these evidentiary issues, Your Honor, and the

9    evidence will show, as Dr. Pinal will explain, every drug

10   has a shelf life.

11             So this is not about making something infinitely

12   acceptable for use in the world.  This is about figuring

13   out, what are the main problems that I have to solve and how

14   do I solve them?  And if the prior art taught it, and it did

15   here, then that is what their invention is supposed to be,

16   and that's why we will show that it is obvious.

17             Your Honor, if I may address these in two

18   separate issues, but first I want to start, which is Family

19   One, which is the formulation itself, and Family Two, which

20   is the method that allowed it to come faster because it's a

21   smaller volume.  Those two are the steps that I'm going to

22   do, but I would like to start where Mr. Berl left off, and

23   that is with the commercial success.

24             Mr. Berl claimed that there was a commercial

25   success.  The evidence will show something entirely

1    different.  And I'm going to get back to those.

2            Your Honor, the evidence will show that Teva

3    owned both Treanda, which was the lyophilized freeze-dried

4    products, and Bendeka, which is their new formulation, and

5    all that happened was in the market, one for one, Treanda

6    swapped out a Bendeka sale for a Treanda sale.  This didn't

7    increase the market at all and the evidence will show that

8    those are converging lines and all Teva was trying to do is

9    convert the market.

10           Did it do that because it's a better product and

11   people were willing to pay more for it like they would for

12   an iPhone ten over an iPhone nine?  No.  They sold it at a

13   discount.  On slide 5 it shows Bendeka's price, 14 to

14   16 percent lower than Treanda.  This is the new product, the

15   new iPhone being cut cost.  Why would somebody do that?

16   It's because a product isn't better, but there are no

17   patents on Treanda, and there are patents on Bendeka, 12 of

18   them.

19           And so by investing in this patent thicket but

20   still pricing the market so that no one can buy Treanda any

21   more, then they protect their product and protect their

22   empire.  This is how this really happened and that's why for

23   the secondary considerations analysis and also for the

24   passage of time that has been put into issue from the prior

25   art to today, Treanda had all of the market and they swapped

1    it over.  Teva owned both products and that's what they

2    chose to do.

3              Teva can do that, Your Honor, because a

4    simplification here in slide two is just to show a common

5    strategy.  It's a common strategy for somebody to own a drug

6    that has an exclusivity that no one else can compete in that

7    market and then when there's about to be a time when that

8    competition is opening, to form a new dosage that is exactly

9    the same, but they sell it as something different.  And I

10   know that's a simplification, but that's exactly what the

11   FDA said as well.

12             And Mr. Berl ended with this, which I was

13   surprised to see, that Bendeka is the same drug as Treanda

14   within the meaning of the regulations and approved for the

15   same indication as Treanda, meaning that the FDA is saying,

16   I hear you, Eagle, that you think there are better

17   improvements and differences, but there are not.

18             So what happened?  On slide 6, this is from an

19   internal Teva meeting minutes and we will hear about this

20   today.  And the evidence, Eagle, which is one of the

21   plaintiffs, is sitting in a conference room and sees that

22   there's a critical file date, March 13th -- March 2013.

23             Now, what does that mean?  It's an NCE new

24   chemical entity.  That date is saying, no one can file at

25   the FDA for any drug with bendamustine in it until that

1    date.  No one in the -- no one could file.  Even if they

2    wanted to and they had no reason to do it, there's no

3    economic incentive because even if someone comes up with a

4    formulation in the new invention and any time before then,

5    they just couldn't make any money out of it, and that's why

6    that 2013 date was identified by Eagle.  That's the only

7    thing that motivated anybody to do anything.

8              The other benchmark is Treanda, the generic

9    drug, hopefully, the lyophilized drug, the freeze-dried drug

10   Treanda, was available and approved in the United States in

11   2008.  Until then, there was no bendamustine.  So the window

12   for improvement is 2008 to 2013.  That's the window that

13   anybody would look at this, but that's exactly the window

14   that we're in here.

15             Eagle started this work in July 2009, and

16   according to these same meeting minutes, this is DTX-956,

17   and they agree that it's ongoing, but in January 2010,

18   six months later, they already identified the lead

19   formulation, and this isn't to say, backtracking the steps.

20   This is to say the roadmap that Mr. Berl said was so

21   complicated really isn't, and the reason for that is there

22   are already a very small world of options when we're

23   considering what the FDA has already approved.  What is the

24   most obvious thing to do has already been laid out.

25             And then eight days later, Eagle files a patent

1    application.   This is not a matter of patenting inventions.

2    This is a matter of inventing patents to protect

3    exclusivity.

4              That brings us to the patents, Your Honor.

5    There are two families that are presented here.   Family Two

6    is the formulation, as I generally mentioned, and family

7    three is the method, generally speaking.   Now, I've put a

8    slash here because last week plaintiffs submitted to the

9    Patent Office a terminal disclaimer.

10              One of the arguments that defendants had, was,

11   look, these patents are really no different, the ones that

12   expire in 2033 than the ones that expire in 2031.   We had

13   argued that issue for years.   Plaintiffs did finally send

14   something to the Patent Office saying, we disclaim any gap

15   between 2031 and 2033, meaning all the patents will expire

16   at the same time.   But we still have these five patents out

17   of 12 and we'll have 11 claims to talk about.

18              Now I'm not going to go into all of the claims,

19   but I am going to explain why the Family Two patents are

20   obvious.

21              The Family Two patents are obvious because Mr.

22   Berl had a fancier demonstrative than this one, I agree, but

23   the point is the same.   There's a freeze-dried product in

24   the prior art called a lyophilized or lyo for short and

25   that's Treanda.   How that is viewed is at the hospital or

1    clinic, reconstituting it by putting it with water and then

2    administering it to a patient.

3              Now, just from looking at the fact that Treanda

4    was freeze-dried, a person of ordinary skill in the art, the

5    evidence will show, already knows that drug does not like

6    water.  Water and that drug do not mix and the reason for

7    doing freeze drying in the first place is the drug is not

8    very stable in water and yet the first thing that their

9    expert is going to say somebody would try is water.  It

10   makes no sense when the prior art already had as a

11   commercial product and taught in all the references that

12   this drug and water do not get along.  That's why it was

13   freeze-dried in the first place.

14             So a formulator looking exactly at what happened

15   with the prior art would say I can't use water.  What can I

16   use if I want a liquid and I want to save this step that Mr.

17   Berl pointed out might cause some confusion, might cause

18   some safety issues in some cases because of the dosing and

19   just makes it easier basically for the clinic to use a

20   reconstituted product.

21             If I want to skip the step, the POSA would look

22   at the world of formulation and say, this has been done

23   already.  The problem has been solved by using solvents,

24   liquids, that aren't water.  And there happened to be a

25   world of liquids that aren't water, and then when you narrow

1   that by what has been approved by the FDA, it becomes a

2   very, very short list.

3               Now when you filter that by the prior art, which

4   is what we're supposed to look at, not just the world of

5   imagination, what somebody can dream up, but the prior art,

6   there are three options.  Polyethylene glycol, PG, and

7   glycerol.  Those are this three options that a person of

8   ordinary skill in the art would be directed to.  That's what

9   the evidence will show.

10              So the question here, speaking about basketball,

11  is not who is going to win the game.  The news in the prior

12  art has told us who has already won.  That brings us to

13  slide nine, which explains that in terms of the 1983

14  reference, Olthoff, that we will hear a lot about, that is

15  the reference that in Germany had already solved the

16  problem.

17              Olthoff explained, as we'll see, that the drug

18  was not happy in water and that to solve that problem, you

19  use a non-water liquid.  But there's a lot of other prior

20  art that has taken place and transpired since the

21  origination of bendamustine in the 1970s and then the

22  development of liquid bendamustine in '83 and all through

23  the timeline through 2009 with Drager.

24              I've already mentioned it's not the passage of

25  time that no one else could have done it.  It's the passage

1   of time that no one else would be incentivized to do it

2   until 2008, when there's a bendamustine drug now on the

3   market, and to improve that would be this window between

4   2008 and 2013, when the NCE expired, and that's the window

5   that we're in.  But by that time, all of the prior art had

6   already solved the problem.  There was nothing new.

7           The Family Two patents have a formulation and

8   what we're highlighting here is the formulation components

9   on slide ten, which is you have to have the drug and you

10  have to have some propylene glycol, which is B-1, and you

11  have to have some polyethylene glycol, which is B-2.  And

12  then B-3, some stabilizing amount of an antioxidant.  That's

13  the formulation component of that claim.  We'll talk about

14  the implications of the other element in a moment.  But if

15  that's the formulation, it has been done.

16          Slide 11 is the Olthoff reference excerpt that

17  is explaining that bendamustine, this is in 1983,

18  bendamustine is an in stable compound and its

19  mustard-halogen groups, which Mr. Berl and I agree, is the

20  business end of the molecule, are almost completely

21  hydrolyzed in aqueous solutions after a short period of

22  time.  They go away.  So that is the state of the art before

23  1983.

24          In Olthoff, what they are trying to do to be

25  objective of the invention is to produce a stable and ready

1     to use injection solution out of N-mustard compounds, which

2     explains that these are related because this mustard halogen

3     group that is the business end of the any nitrogen mustard,

4     has the same problem.  They all break apart in water.  And

5     so Olthoff is saying, we would like to avoid the technical

6     solution of a dry ampoule, referring back to the

7     freeze-dried product.  They not only identify the problem,

8     but Olthoff in 1983, identifies the solution, which is to

9     use, to dissolve the active not in water, but in polyols.

10                So bendamustine should be dissolved in polyols.

11    What are polyols?  The evidence will show that is

12    polyethylene glycol, propylene glycol and glycerin, those

13    exact same three things.  And the example they use in

14    Olthoff is propylene glycol, one of those exact three.  So

15    the answer is already here and a POSA just looking at

16    Olthoff already has the idea of what to do and how to do

17    it.  A POSA is not -- a POSA can look at the prior art, sees

18    what's being done and then apply it.

19                I will stop here and make an important point.

20    This is not an anticipation case.  We agree, this is not an

21    anticipation case that somebody has done exactly everything

22    that's in one of the claims that has been asserted against

23    us, but that's not what the law is limited to.  This whole

24    Section 103, as Your Honor knows, about obviousness, this is

25    an obviousness case.

1          A prior art is not limited to exactly what is

2    written on the page, but what does it teach to a person of

3    ordinary skill in the art, and that is what Dr. Pinal will

4    explain.  What Olthoff just stopping right here would have

5    taught is that the patent here is obvious, because give me

6    this instruction, and I can run with it and come up with a

7    formulation.

8          But there's more.  Alam is another reference

9    from 1989.  It's a different nitrogen mustard.  It is

10   cyclophosphamide.  It has the same mustard and has the same

11   problem.  It has an allergic reaction to water.  It says,

12   the liquid formulations of the present invention have the

13   organic polyol again, the same teaching as Olthoff had, and

14   that's exactly because it increases the shelf life and

15   allows for greater ease of administration.  This is the skip

16   a step issue.

17         What does Alam do to solve that?  They use

18   polyols again.  It says what I will say and the expert says,

19   that is limited to propylene glycol, PG, polyethylene

20   glycol, PEG, or glycerol, which they spell differently,

21   but glycerol.  Those are the option that they had to play

22   with.

23         Alam goes on in its examples and the evidence

24   with show that it tests ratios of PEG and PG and says PEG

25   and PG are the two ingredients to use and tests those

1    ratios.  Does it disclose exactly the same ratio that's done

2    here?  No, it doesn't, but there are reasons to change it

3    and the world is not limited to just the fact if they claim

4    a ratio than the broader one in the prior art, they get a

5    patent.  No.  Range claims, and this is a range claim, would

6    be inclusive of what the prior art already taught, and the

7    prior art taught way more than what is now claimed.  The

8    answer was already there.  Plaintiffs simply re-invented the

9    wheel.

10             Now, slide 14 we're showing now, why is it that

11   a person of ordinary skill in the art would arrive at the

12   claimed invention and the rest of the components?  After

13   having the base formulation of PG and PEG, the idea there is

14   that we know will work.  Now, how long can we keep it

15   stable?  What's the maximum thing we can do to make that

16   shelf life work?  We can use things like an antioxidant.  We

17   can add sodium hydroxide.

18             And what's very interesting from the evidence

19   that Mr. Berl is expecting to present, he's saying one of

20   those is obvious, sodium hydroxide, even though it's not in

21   the patent.  An antioxidant is not obvious even though that

22   is what they propose in the patent.  Plaintiffs are the ones

23   that can't have it both ways.  From a defendants' point of

24   view, it's either obvious or it isn't, and that is going to

25   be one of the issues in the case.

1                   At this point I would like to address some of

2       the plaintiffs' slides.  If the plaintiff wouldn't mind

3       putting up slide 18.

4                   Now, slide 18, Your Honor, this is from the

5       plaintiffs' opening and it's citing to the Drager reference,

6       DTX-73.  And, again, what Drager does versus what it teaches

7       and what a POSA takes away from it, we agree, it's not

8       anticipation, it's unobviousness.

9                   What Drager is teaching here, if you have a

10      compound with no OH groups on it, that will be pretty good

11      for the PG problem.  That's a good solution.  Then it goes

12      on to test.  It doesn't really have DMA by itself in a

13      formulation that it later develops or claims.  It says will

14      combine it with PG to do some experiments on that.

15                  The problem is, PG is very small, so if you are

16      going to fill a jar with PG, you're going to have a lot of

17      OH groups.  PEG, P-E-G, which Drager does not use, is very

18      big.  Fill the same jar with PEG and you have a lot fewer OH

19      groups.  The way they drew it here, the size is about the

20      same, but actually a PEG is going to be six to seven times

21      larger.  You can see there's an M, meaning that there's

22      going to be a chain, a number of them right where that N is

23      written on plaintiffs' slide.

24                  So it's a matter of basic math and a POSA would

25      take the teachings of Drager and say, okay.  I'm learning to

1    reduce the number of OH's and I can do that.  I could do it

2    by going straight to DMA, which doesn't have any, but

3    there's reasons I wouldn't do that, including what

4    plaintiffs have left out, that DMA tends to melt plastic if

5    you try to put it into a delivery device and it could harm

6    people as well.

7              So the teaching is here, minimize OH groups, but

8    that doesn't mean somebody has to copy this and can't think

9    about what is being taught instead of just using exactly the

10   words on the page.  A POSA would use the words on the page

11   and learn from them and apply those learnings.

12             And go back to defendants.  That brings us to

13   the PG esters limitation then, Your Honor.  It's exactly

14   what Drager was explaining you could minimizing by

15   minimizing the OH.

16             So what plaintiffs have done in addition to the

17   formulation is added a limitation on all the limitations

18   that they had and said, now we get less than .18 percent,

19   but the key here is, Your Honor, the plaintiffs didn't do

20   anything more than the formulation work to get that result.

21   The two go hand in hand and patentability is not imparted by

22   claiming a number, a property, that goes hand in hand with

23   the formulation if it's obvious.  If the evidence can show

24   that the invention is obvious except for this particular

25   property or there's an embodiment that is obvious, one

1      example that's obvious, and each and every time that has a

2      number less than .18, then that is an inherent property and

3      the claim is obvious.

4            Now, what Mr. Berl was saying is, we also have

5      an enablement argument and we can't -- meaning that maybe

6      this doesn't happen all the time, but it's actually

7      defendants who can have it either or both ways and not

8      plaintiffs.  Let me explain.  If it happens because you

9      follow the teachings of the invention and come up with the

10     formulation that we say it's obvious, then it's going to

11     happen, and that's our primary position.  It's going to

12     happen.  Hand-in-hand property.

13           But if plaintiffs say, no, it isn't.  You don't

14     always get it.  We left out some other teachings, we left

15     out some other things and how to do it and we didn't tell

16     you everything we were supposed to tell you.  Well, then

17     something is missing more than you need what you taught to

18     get to this magic number of .18.  That's why we can have it

19     both ways, but plaintiffs do not, Your Honor.

20           THE COURT:  Do I have to make a decision on that

21     or can I just rule you can't have it both ways?

22           MR. ALY:  You could rule both ways, but the

23     evidence will show one is more likely than the other I

24     expect, Your Honor, in terms of what Your Honor would find

25     is a factual finding in the case about what the evidence

1    showed.

2              And as an example of inherency, the principle is

3    on slide 17.   The common example is, which is, if somebody

4    were to teach a person of ordinary skill in the art to put

5    water in the freezer and it would form ice, and if they took

6    it out, it would melt.   That doesn't mean somebody can put

7    it in a freezer and claim the number 32 and that imparts

8    some special patentability because they found that number

9    goes hand in hand with putting water in the freezer.   It

10   always goes together hand in hand.

11             And on the Family Two section, my last slide is

12   18, and that is the focus on the phrase stabilizing amount.

13   What Mr. Berl just said is, they were the only ones, the

14   first ones to use an antioxidant with PEG.   If that is so,

15   Judge, they need to tell us what the stabilizing amount

16   means.   Is it just a drop of antioxidant?   Is it a liter?

17   How much is it to stabilize?   And the definition that is the

18   one they put up on the screen is tautological, it's

19   circular.   It says a stabilizing amount is an amount that

20   stabilizes.   If that's what they invented just putting a

21   dash in, they should put us that, but otherwise, nobody

22   would know in the prior art from reading the specification

23   and from trying to figure out whether they infringe or not

24   how much antioxidant makes it a stabilizing amount.

25             And this is a problem fatal to all five asserted

1   claims from Family Two and so that's why plaintiffs had been

2   debating with defendants, what do they need to do in their

3   phase first of infringement because in their infringement

4   report, they acknowledge, this is part of their burden to

5   prove that a stabilizing amount of antioxidant is in

6   defendants' product, but now they would like to make that

7   only an invalidity issue.  That's one of the issues that

8   will come up when the testimony arrives later today, but the

9   stabilizing amount of an antioxidant is important because

10  that is what they say is their invention that's new and

11  different.  So the more new and different it is, their

12  expectation would be more definition and more teaching about

13  how to know what to look for.

14          At this point I'd like to refer to plaintiffs'

15  presentation at slide, well, I think 25.

16          And this is the definition that plaintiffs

17  showed from the screen and it's the stabilizing amount is an

18  amount that increases or enhances the stability.  It doesn't

19  tell us anything really about what to look for or what to

20  do.  And so that's a problem because that makes the claim

21  indefinite, which means if we don't know what it covers,

22  it's difficult to prove infringement.

23          Now, one thing plaintiffs have is --

24          THE COURT:  If you have an expert who testifies

25  that -- I agree, it's tautological, but if they say, yes,

1   but you don't need undue experimentation to know that

2   looking at the prior art, an expert testifies to that,

3   doesn't get over the hurdle that you just identified?

4            MR. ALY:  No, Your Honor, that addresses a

5   different problem, which is enablement.  I will explain the

6   distinction now.  Indefiniteness is do we have a definition

7   here?  What is it?  What's the target?  Enablement is how do

8   I get to that target.

9            THE COURT:  Okay.

10           MR. ALY:  And, Your Honor, if somebody says,

11  yes, that's how to get to it, that's where you could answer

12  the question, but what the target is, they have to look at

13  this and tell us, and that's the difference here.  That is

14  an infringement question as well as it is an invalidity

15  question.  In fact, it's also in some cases a claim

16  construction issue.

17           And I should probably take this time to remind

18  Your Honor, Judge stark had entered an oral order saying

19  that although he was happy the parties worked out claim

20  construction issues except indefiniteness, but tabled

21  indefiniteness to trial.

22           So another issue that's on here is the claim

23  construction of this particular stabilizing amount word,

24  phrase, and that's going to be something actually more

25  important than plaintiffs have so far given attention to

1    because it addresses a lot of issues.

2              And I understand the accusation.  There's a lot

3    of arguments that are involved surrounding this term, but

4    that's because it's confusing.  If we knew what the

5    definition meant, then we wouldn't have so many issues with

6    it, but we have a problem if we don't know what it means and

7    under one world we would say we don't infringe.  Under

8    another world, it's invalid.  Under a third world, it's

9    indefinite because we can't figure out what the definition

10   is.  It's an important term and that's why we spent time

11   talking about it.

12             I will turn from there, Your Honor, to the

13   family three patents.  These are the ones that now take that

14   same formulation, but the formulation is now prior art.  So

15   now we're in a world where two years have passed Eagle.

16   They already have that formulation with the concentration.

17   They are saying what can we do with it?  Now that it's a

18   higher concentration, they can administer it faster or with

19   less volume.  All of those properties go hand in hand and

20   that's what they did.  Look at one example claim from family

21   three, claim 11 of the '568.  It's a method of treating

22   chronic lymphocytic leukemia.  It's a type of blood cancer,

23   but it's the same type of cancer that Treanda, the

24   freeze-dried product, was used for.  In fact, Eagle used the

25   exact same studies that show Treanda worked to say to the

1    FDA that Bendeka is going to work.  They didn't redo all of

2    the tests with the Phase 3 study.  They didn't need to

3    because they were using the same thing the Treanda article

4    was showing them to do.

5              What they did change, though, they changed it to

6    ten minutes.  As counsel said, there are volume changes

7    along with it because you can't administer a whole lot of

8    volume in a short amount of time, so it's the ten minutes

9    instead of what the prior art teaches, which is 30 minutes.

10   That isn't a difference, but it is an obvious difference.

11   And at this point when we're talking about the method versus

12   the formulation that I will introduce one claim, which we

13   have shown is called the Slayback claim.

14             Slayback is differently situated than the other

15   three defendants because it has one and only one claim

16   asserted against it.  There are ten against the other three

17   defendants.  The one claim against Slayback is the '887

18   patent claim 13.

19             And what they will be presenting is that if you

20   look at the prior art, which was the 2011, now, this is

21   basically the invention, the prior art now, the same patent

22   Eagle had, we compare it to the claim that's now in the

23   Family 3 patent of claim 13 of the one claim.  There are

24   method parts to this which a physician would cover, but as

25   far as the formulation is concerned, that is exactly the

1   same formulation that is later claimed in claim 13, and

2   there's a stability component in Palepu 2011, this is a

3   prior art, paragraph 33, which is word for word the same as

4   the later claim in the patent limitation C from claim 13 of

5   the '887 patent.  So that is what Slayback will be

6   presenting to Your Honor.

7            As far as the other defendants are concerned, we

8   will show that the ten-minute regimen didn't change anything

9   else at all.  The labels are the same because they have the

10  same indication, the same usage and Eagle cannot say and

11  Teva cannot say there are fewer side effects with it.  They

12  take credit for what was already done even though it's

13  reinventing the wheel again.  The difference is the ten

14  minutes.  The schedule of administration is also the same,

15  which is giving it at the same time and days as Treanda.

16           And there's a lot of prior art again here that

17  had been developed.  There's no reason for somebody to have

18  changed or modified the label of Treanda.  People could

19  already use Treanda with faster infusions if they wanted to.

20  A physician is one who has options.  They can do what the

21  label says.  They don't have to do what the label says.

22  They read publications and treat patients individually.

23           And the prior art all uniformly said if you want

24  to go faster, go faster.  If you don't want to go faster,

25  don't go faster.  It's an option.  It's a choice.  It

1    doesn't make one patentable and one not.   The field of the

2    invention is that it was already done.

3             That is where I will show Your Honor the Preiss

4    1985 article.   This is the one where certainly, we were

5    talking about the article but Mr. Berl is confusing two

6    different concepts.   One is a three-minute intravenous drip.

7    That's a slow infusion or fast infusion, but it's not a

8    bolus, which is pumping it all at once immediately.   There's

9    two different concepts here.   Three-minute intravenous drip

10   and then there's a slower one that's at ten minutes, which

11   is the one that's claimed, and then there's 30 minutes,

12   which is in the prior art.

13            But what Preiss showed, even if it's three

14   minutes at a pretty high dose, which we're talking about

15   with Treanda and bendamustine, despite the high dosage, only

16   rather mild side effects occurred.   This was already known

17   in 1985.   It's an option.   The doctor wants to go faster or

18   higher, they can do that in a case by case basis.   It

19   doesn't make that patent all that they put that number, or a

20   number higher than that, in a particular claim.

21            I will go back to plaintiffs' presentation to

22   make this clear.   On slide 34, please.   On slide 34, Mr.

23   Berl talked about this slide about a prior heart Ruffert

24   article, and that article has some somebody's with it for

25   plaintiffs' point of view.   They want to blame

1     bendamustine's speed for the problem, but there are some

2     issues here.  One is that they were actually combining

3     bendamustine with another drug, vincristine, in this

4     particular article, and vincristine is the one that causes a

5     problem, not bendamustine.  So there's a causation issue

6     that will be discussed with this particular article.

7              And, second, if we consider what is being

8     disclosed here, this is again going to a bolus application

9     and referring to it as being a very fast administration.

10    And that's the distinction that we're going to be discussing

11    as well.  So when we're talking about slow administration of

12    3 to 30 minutes, all of those were on the table.  A POSA

13    could have done any of those and that's what the prior art

14    taught.

15             Going back to more prior art, as far as volume,

16    people around the world even wondered, questioned, as shown

17    in slide 26, why don't we all go slower -- go faster and

18    with less volume?  We should all go faster and with less

19    volume because then volume for injection into 100 to 250

20    milliliter bag, we can use that instead of the

21    500 milliliters that was the standard.

22             This is not an international agreement that was

23    some accord that was reached to say never go faster or

24    slower.  To the contrary, the prior art expressly taught you

25    can go faster if you want.  You can go slow if you want.

1    You can go high or low.  The options were all on the table

2    and they re-invented the wheel.

3              As far as the dilution factors and internal

4    calculations that they did over at Eagle, those were just

5    wrong calculations, and the calculations turned out if

6    they followed the prior art instead, they would have seen

7    what the prior art had already showed, minor side effects,

8    which is exactly what they told the FDA.  They didn't share

9    those calculations with the FDA.  What they shared with the

10   FDA was the same prior art that we are now talking about

11   here today, and that is shown on their internal memo, Slide

12   39.

13             On Slide 39, thank you, what we so here is Mr.

14   Berl highlighted this sentence here that says, the faster

15   infusion is within the range of clinical experience and it's

16   because the three-minute infusion was already safe.  So, of

17   course, ten minutes is going to be fine because three

18   minutes is fine.

19             And what do they cite for that when submitting

20   it to the FDA to say, hey, let me do this?  Preiss 85, the

21   unhighlighted portion right there.  Same thing.

22             When it comes to administration, there will be

23   some testimony about the quality of life as well, but there

24   are two sides to that point as well.  There are people who

25   will benefit from it, but there are people who won't benefit

1   from it either, and that's up to a physician.  And

2   internally at Eagle and at Teva, what they did were studies,

3   and they found there's a limited impact of ten-minute

4   infusion versus 30 or even 60-minute infusion on quality of

5   life.

6          Why is that the case?  It's basically the same

7   as if when we get to an airport early, our flight comes in

8   20 minutes early, you still have to wait for a gate, still

9   have to wait for people to get off the plane, still have to

10  wait for your baggage, much the same way infusion centers

11  worked.  We've created here on slide 27 an excerpt from a

12  Teva presentation.

13         What that presentation shows is a check-in for

14  these unfortunate patients.  They've got to spend time at

15  the check-in.  They have to be spending time with an

16  infusion, which includes pre-medication, another drug

17  typically, and then Treanda, and then a post infusion

18  checkup monitoring.

19         So this is not about taking 20 minutes out of 30

20  and saying, hey, we solved the problem.  This is about not

21  solving a problem at all.  It takes a whole day sometimes

22  for these poor patients, but the 20-minute difference that

23  they are claiming is already an option if they wanted to do

24  it, but it's not a game changer if they don't.

25         And so the evidence will show three experts in

1    our invalidity case, Your Honor.

2            Dr. Pinal.  Again, he has experience with

3    15 years at Hoffman-La-Roche developing formulations, will

4    testify and explain why this is an obvious formulation based

5    on the prior art.

6            Dr. Thirman is a physician.  He's a specialist

7    oncologist in blood cancers and has treated thousands of

8    patients in contrast to plaintiffs' expert, who is a general

9    oncologist, but for the blood cancers we're talking about

10   here, maybe done a hundred over the last ten years.

11           And then there is Dr. Yates, an expert that's

12   offered by Apotex and Slayback, and he has been the head of

13   research and development at Takeda and other companies and

14   will explain what a company will do and the physicians and

15   why they guide the decisions to make when they know about

16   the situation that Treanda had and what they could do about

17   the prior art as a company and plaintiffs don't have a

18   rebuttal expert for that.

19           THE COURT:  Only two of the defendants are

20   presenting Dr. Yates.  Is that right?

21           MR. ALY:  Yes, Judge.  And in conclusion, Your

22   Honor, we would ask, and thank you for your time and we

23   would ask at the end that Your Honor find all the patents,

24   the 11 asserted claims invalid so that these drugs can be on

25   the market as generics before 2031.

1          THE COURT:  I just want to, since you closed

2     with Dr. Yates, I just want to understand that.  So then

3     with respect to the other defendants, I'm not to consider

4     him.  Is that right?

5          MR. ALY:  That's right.  I guess it's Your

6     Honor's option on how it affects the case overall, but

7     that's not testimony proffered by the other defendants.

8          THE COURT:  But not only is it not proffered, I

9     couldn't consider it?

10         MR. ALY:  That's right.

11         THE COURT:  Thank you.

12         MR. ALY:  Thank you.  And, Your Honor, for the

13    record, I have copies of the slide to hand up.

14         THE COURT:  Please do.

15         MR. ALY:  I neglected to hand up.

16         THE COURT:  So how many copies did you all bring

17    of the presentations?  I know normally, it's like me and the

18    clerk, but --

19         MR. BERL:  We brought lots.

20         THE COURT:  So what I'd like to do, try to get,

21    I don't want people to go out and make other copies, but if

22    you already have them, we should have one for the official

23    record, and then I'd like three.

24         MR. ALY:  Okay.

25         THE COURT:  So it would be for everybody if

                              Tarriff - direct

1      that's okay.

2                 MR. BERL:  Did I give you four?  Yes.  We're

3      good.

4                 THE COURT:  Okay.  You gave me four.

5                 MR. ALY:  May I approach?

6                 THE COURT:  Please.  Thank you.

7                 (Mr. Aly handed slides to the Court.)

8                 THE COURT:  All right.  What's next?

9                 MR. BROWN:  Plaintiffs call Mr. Scott Tarriff.

10                THE COURT:  All right.

11                          PLAINTIFFS' TESTIMONY

12                      ... SCOTT TARRIFF, having been

13           duly sworn/affirmed as a witness, was examined

14           and testified as follows ...

15                THE COURT:  Just give me one second, please.  Is

16     this the witness for whom you will use realtime?

17                MR. BROWN:  No.

18     BY MR. BROWN:

19     Q.    Good morning, Mr. Tarriff.  Could you please introduce

20     yourself to the Court?

21     A.    Yes.  I'm Scott Tarriff, CEO of Eagle Pharmaceuticals.

22                MR. BROWN:  Your Honor, we have binders to hand

23     up of exhibits.

24                THE COURT:  Okay.

25                (Mr. Brown handed binders to the Court and to

Tarriff - direct

1    the witness.)

2    BY MR. BROWN:

3    Q.    And, Mr. Tarriff, what is your current title?

4    A.    I'm CEO of Eagle Pharmaceuticals.

5    Q.    And how long have you been CEO of Eagle?

6    A.    I've been CEO since I founded the company about

7    13 years ago.

8    Q.    And what year was that?

9    A.    2007.

10   Q.    What was your job before you founded Eagle

11   Pharmaceuticals?

12   A.    I was CEO of Par pharmaceuticals, a mid-sized

13   pharmaceutical company.

14   Q.    And what did you do before you worked at Par?

15   A.    I was at Bristol-Myers Squibb in various different

16   positions for about 11 years.

17   Q.    All told, how long have you been working in the

18   pharmaceutical industry?

19   A.    A little bit more than 30 years now.

20   Q.    And could you tell the Court about how you started

21   Eagle Pharmaceuticals?

22   A.    Yes.  I left my previous company and I had some

23   thoughts about how to improve the way drugs are delivered in

24   the United States and I started a company in my home about

25   13 years ago.

Tarriff - direct

1    Q.    And how many employees did you have when you started?

2    A.    We had two, myself and my former admin.

3    Q.    And where is Eagle currently located?

4    A.    In New Jersey.

5    Q.    And how many employees does Eagle have today?

6    A.    We have about 106 employees now and we're hoping to

7    hire another 30 or so in the next few months.

8    Q.    And could you briefly describe your educational

9    background, Mr. Tarriff?

10   A.    Sure.

11              THE COURT:  Did you say 130 or 30?

12              THE WITNESS:  No.  30.

13              THE COURT:  30.  Sorry.

14   BY MR. BROWN:

15   Q.    And can you briefly describe your educational

16   background?

17   A.    Sure.  I have a Bachelor's degree in marketing from

18   Penn State and an MBA from Rider College.

19   Q.    Do you have any scientific training?

20   A.    No, not any formal training.  My degrees are in

21   marketing and business, but I've just been around the

22   industry for 30 years.  I have had scientific people, R&D,

23   formulations, manufacturing people reporting to me much of

24   that time.  So I've picked up enough along the way, but no

25   formal training.

1    Q.    And, Mr. Tarriff, I'd like you to discuss the early

2    days at Eagle Pharmaceuticals.  What was your plan when you

3    started Eagle?

4    A.    Well, the whole concept, the idea was to find gaps in

5    the way drugs were delivered in the country and to listen to

6    people and find out where the problems were and the whole

7    concept was we would go back and reformulate drugs and try

8    to make improvements and fix those problems that we were

9    finding.

10   Q.    And was there any particular part of the healthcare

11   industry that you wanted to be the focus of the drugs you

12   would develop?

13   A.    Yes.  We started to focus and our main focus all

14   these years has been on drugs delivered inside of the

15   hospital.

16   Q.    Can you describe how Eagle went about determining what

17   problems there were with drug products that were available

18   on the market?

19   A.    Yes.  It's interesting.  So what we did, you know,

20   you'd be surprised that more people aren't doing it, but

21   what we set out to do is we met with all the stakeholders.

22   So who is that?  It would be physicians and pharmacists and

23   nurses and patients, the people that paid for the drugs.  We

24   paid attention to what the FDA was doing and we'd meet these

25   people individually, these groups of people, and we got

1    ideas from everybody's perspective, and then we developed

2    lists of ideas that we felt that we needed to go out and

3    fix.

4    Q.   And was what Eagle was doing different from what other

5    pharmaceutical companies were doing at that time?

6    A.   Yes.  I don't know too many people that were

7    reformulating drugs specifically to help these different

8    patient groups.

9    Q.   And so I'd like -- could you turn in your binder to

10   PTX-723.

11   A.   Yes.

12   Q.   And what is this document, Mr. Tarriff?

13   A.   This is a presentation that I made to the JP Morgan

14   conference.  It's the industry conference that takes place

15   in San Francisco every year.  All the companies, the

16   investors would come in.  We would meet and talk about our

17   products and we'd make presentations to investors.

18   Q.   And could we go to slide 6, please.

19            And, Mr. Tarriff, do you recall how many

20   different drug products Eagle was working on at this point

21   in 2009?

22   A.   Yes.  So early on in the company, what we had is, we

23   had 25 products that we had ideas for that we had licensed

24   or developed internally and we had 18 of them that we were

25   actually working on.

Tarriff - direct

1    Q.    Did Eagle end up bringing all of those products to the

2    market?

3    A.    No, unfortunately.  We brought very few of those to

4    the market.

5    Q.    And why did so few of them make it to the market?

6    A.    You know, it just turned out that it was a much harder

7    undertaking than we thought.  It was more expensive.  It

8    took more time.  We had a number of, you know, a lot to

9    learn along the way and at the end of the day, we brought a

10   couple of those products to the market.

11                MR. NELSON:  Your Honor, I would object to

12   relevance.  It's not background to the company.  It's not

13   relevant to the company at all.  Who knows what these drug's

14   properties are.  It's irrelevant.

15                THE COURT:  Overruled.

16   BY MR. BROWN:

17   Q.    Did Eagle try to avoid working on drugs that would be

18   difficult to develop?

19   A.    No.  It was just the opposite.  Our thought process

20   was there was a reason that the drugs were in the form that

21   they were in.  We tried very hard to find what we thought

22   were going to be difficult products to undertake and we

23   would just focus on more difficult projects and that's what

24   we ultimately wound up doing.

25   Q.    So we can now go to slide 7 of PTX-723.  And what is

1    shown here, Mr. Tarriff?

2    A.    This is early on, these are the ideas that we had on

3    how to improve these drugs.  We thought we had some ideas in

4    improving safety, bioavailability, how do you reconstitute

5    drugs, the shelf life.  This is the list of what we tried to

6    tackle at the beginning.

7    Q.    And I'd like to focus on the third bullet point down

8    which reads burdensome reconstitution, e.g., lyophilized

9    powders.  What is a lyophilized powder?

10   A.    Yes.  It's a fancy name really for freeze-dried.

11   Essentially, these drugs have difficulty being in liquid

12   form and so you put them in lyophilized powder and that's

13   the way they stay stable more frequently.

14   Q.    And what did you learn about lyophilized drug products

15   from your research with the key stakeholders you discussed a

16   moment ago?

17   A.    Yes.  It's interesting.  Right.  So these lyophilized

18   powders, what winds up happening is when a lot of these

19   drugs, when you liquefy them, when you put it in a liquid

20   form, they start to degrade pretty quickly, and they have

21   short shelf life and so you put a lot of these products into

22   the lyophilized state but the problem is it now needs to be

23   reconstituted.

24            So how do you do that?  You have to be in what

25   is called a gown, what looks like a spacesuit.  You go into

1    these hoods, and the whole idea is you're -- you just can't

2    let these lyophilized powders.  A lot of these come in

3    contact with the people who are doing the reconstitution.

4    So it's just a laborious state that you have to go through

5    in order to reconstitute them.

6    Q.    And what are cytotoxic drugs?

7    A.    Yes.  So, a cytotoxic drug is a drug that kills cells.

8    Typically, cancer cells.  Unfortunately, the way

9    chemotherapy works and these products work, not only do they

10   kill the bad cells, the cancer cells, they also have a

11   tendency to kill the good cells and that's why healthy

12   individuals aren't supposed to come in contact with these

13   products.

14   Q.    And looking again at the list of issues that you

15   wanted to address shown here on slide 7 of PTX-723, how

16   could you go about making products to address these

17   issues when Eagle was such a small company at the beginning?

18   A.    Yes.  So we had, you know, by now, I don't recall

19   specifically, we had probably 18, 19, 20 people at this

20   time.  We had Ph.D.s.  We had R&D people.  We had a bunch of

21   people that wore lab coats.  We just had no place for them

22   to wear them, so we started to partner with people who had

23   what we didn't have.  We had ideas but we needed R&D teams

24   to help us work on them.

25   Q.    And, Mr. Tarriff, I'd like to turn to the reason we're

Tarriff - direct

1    here today, which is Eagle's Bendeka product which contains

2    the active ingredient bendamustine.  Did Eagle develop

3    the formulation of bendamustine that's used in Bendeka on

4    its own?

5    A.    No.  We collaborated with a company named SciDose.

6    Q.    And why did Eagle team up with SciDose to perform the

7    research and development for this drug?

8    A.    I was at a conference and I reoriented myself with the

9    co-founder of SciDose, Joe Bohan.  I have known Joe over the

10    years.  He was successful.  He explained to me he had an R&D

11    team in India that he had established and they were doing

12    the kind of work that we needed to have done.  He had two

13    product ideas to start with, so we teamed up with him and

14    started the relationship.

15    Q.    And why did you choose to team up with SciDose

16    specifically for bendamustine?

17    A.    Well, we had worked with them on the first two

18    products.  One was successful, one failed.  But I came to

19    realize that they were a pretty talented group of people, so

20    we had this idea on bendamustine and we decided after

21    working with them for a while to add that to the agreement

22    and we got going with that project as well.

23          MR. BROWN:  Your Honor, would you like us to

24    move the exhibits one by one into evidence or to do it at

25    the end of the examination?

Tarriff - direct

1          THE COURT:  However you want to do it.

2    BY MR. BROWN:

3    Q.     What was your initial plan for the bendamustine

4    project?

5    A.     Well, it was a cytotoxic product and what we were

6    trying to do is turn this lyophilized cytotoxic powder into

7    a ready-to-dilute liquid, which would avoid the pharmacist

8    having to do that reconstitution step where they potentially

9    come in contact with those powders.

10   Q.     And what was the powder product that was currently on

11   the market at the time called bendamustine?

12   A.     It was called Treanda.

13   Q.     And during what approximate time frame was the initial

14   work done to develop the liquid formulation of bendamustine?

15   A.     It was about 2009.

16   Q.     And, Mr. Tarriff, were Eagle and SciDose eventually

17   successful in developing a stable liquid formulation of

18   bendamustine?

19   A.     We were.

20   Q.     And who at SciDose was the principal scientist with

21   whom you worked?

22   A.     Dr. Nagesh Palepu.

23   Q.     Dr. Palepu is going to be testifying next about the

24   details of the formulation development work, but can you

25   explain, what did Eagle do next after SciDose finished

1   developing the stable liquid bendamustine formulation?

2   A.    Yes.  Well, then we had a lot of work to do after that

3   as well.  We had to make an FDA submission and that's not

4   easy.  That takes up, you know, documents to fill a room.

5   We were a young company.  We had to scale it up.  We had to

6   learn how to manufacture.  We had to find manufacturing

7   sites and manufacturing partners.  We had to file with the

8   FDA.  So it was a lot of work to do.

9   Q.    And I'd now like to discuss the Treanda lyophilized

10  product that was on the market back in the 2009 time frame

11  and how -- could you explain how that product was

12  administered to patients?

13  A.    Yes.  The way Treanda is administered.  So as I

14  mentioned, you have this lyophilized powder.  You then

15  liquefy that powder.  Then you take that liquid and you put

16  it in a 500 mL bag of saline, and that 500 mL bag is infused

17  as a chemotherapy agent into a cancer patient for either

18  30 minutes for one of the cancers and 60 minutes for the

19  other cancer.

20  Q.    And at the time that you received the liquid

21  formulation from SciDose, how did Eagle plan for that

22  formulation of bendamustine to be used?

23  A.    Yes.  So what we needed to do, the plan was to do

24  exactly what Treanda was doing.  The FDA had already

25  determined that putting 500 mL's into a cancer patient for

1    either 30 or 60 minutes was safe and effective, and so what

2    we're trying to do is eliminate that reconstitution stage

3    and ultimately have the drug delivered into the patient the

4    same way as Treanda was.

5    Q.    And, Mr. Tarriff, did there come a point in time when

6    the focus of Eagle's development of bendamustine changed?

7    A.    Yes.

8    Q.    And can you explain what happened?

9    A.    Yes.  We then had the idea of shortening the infusion

10   time down from this 30 or 60 minutes and that happened in

11   about 2012.

12   Q.    And could you explain for the Court how that idea came

13   about?

14   A.    Yes.  So I was in the office one day, and I overheard

15   a conversation with our chief scientific officer at the

16   time, Dr. Sri Sundaram.

17              MR. NELSON:  Your Honor, I object.  Hearsay.

18   He's going to talk about a conversation --

19              THE COURT:  I mean, it's hard for me to

20   understand right now whether it's objectionable or not

21   because I don't know what is about to be said.  For all

22   I know, this is a third party who is an out-of-court

23   declarant is going to just give context and then this

24   witness is going to say he had the idea.  I mean, and it's a

25   bench trial, so it makes it very unusual.  So let's see how

1   it unfolds.

2           MR. NELSON:  I just want to be clear on what the

3   ground rules are.  I'm sure we'll get objections to other

4   documents.

5           THE COURT:  I understand why you are objecting.

6   In a jury trial we would figure it out and decide what the

7   jury would hear and decide whether it's permissible.

8           MR. NELSON:  Thank you, Your Honor.

9           THE COURT:  Go ahead.

10          THE WITNESS:  I overheard Sri having a

11  conversation with his team that he had a problem, that he

12  had less liquid, less volume of bendamustine than Treanda

13  did and that that was a difficult situation for him and he

14  was trying to figure out how to get through that problem.

15  Q.    And who is Dr. Sundaram?

16  A.    He was the chief scientific officer at the time.  He

17  had a Master's degree from MIT and he was with us for many

18  years.

19  Q.    And what was Dr. Sundarum's role in the bendamustine

20  project at the time?

21  A.    He was our lead in developing the drug along with

22  SciDose.

23  Q.    What was your reaction when you heard Dr. Sundaram

24  mention the smaller volume of Eagle's product as compared to

25  Treanda?

Tarriff - direct

A.     I didn't think a heck of a lot of it at the time.  I
think I was having one of those busy days.  When I got home
and went to sleep, a lot of times these things come to me.
I started thinking, oh, we have less volume.  Then I started
thinking about all of these different stakeholders that
we've spoken to over the years.

          One of the big problems when you go and speak to
oncologists, it's surprising, but in the United States,
there's still a shortage of infusion chairs.  And so if you
need your chemotherapy, it may take you longer to get into a
hospital to get your treatment than you would like.

          So part of the problems that we heard in
speaking to everybody, there's just not enough chair time.
And so people have tried to tackle it in different ways, but
it just started to come to me, if we really had less volume,
we could infuse that drug into people in less time, and
maybe we can get them out of the chair and you can get an
extra person in the chemotherapy center in a day and we'd be
solving this problem that everybody has been telling us that
they were having.

Q.     Had you ever heard of a pharmaceutical company trying
to solve the chair shortage problem by shortening the
administration time for a chemotherapy drug?

A.     No.  As far as I know, we're the only ones that have
done that.  The whole concept of fixing chair time has been

1    tackled.  How people have been trying to do it, smaller

2    chairs, so you get more chairs in a room, so you can fit

3    more people in.  You know, obviously, building out a

4    facility and making it bigger.  You have longer hours.  Can

5    you get nurses to work more time in the day.  Can you open

6    up on weekends.  But I don't think anybody attacked that

7    issue by reformulating the drug to get somebody out of the

8    chair quicker.

9    Q.    Did you discuss your idea with Dr. Sundaram?

10   A.    I did.  I had a sleepless night.  I was pretty

11   excited.  I'm an early person.  Sri is an early person.  I

12   got into the office, paced around a while waiting for him to

13   come in and we spoke about it the first thing in the

14   morning.

15   Q.    Did Dr. Sundaram share your excitement?

16   A.    No, he did not.  He went on to tell me all of the

17   problems.  The first thing he informed me of was that he

18   only had a little minor change in the amount of drug that he

19   had a problem with.  It wasn't anything significant, and

20   that I just misunderstood what he was talking about and

21   basically told me I should go away.

22              MR. NELSON:  Your Honor, that's clearly hearsay.

23   He's telling him what Sundarum's criticisms were and his

24   thought process.  That's clearly hearsay.

25              THE COURT:  And I think it's just a state of

Tarriff - direct

1    mind.  It's not admitted for anything else.  I'm going to

2    overrule the objection.

3    BY MR. BROWN:

4    Q.    And, Mr. Tarriff can you go to PTX-589?

5    A.    Yes.

6    Q.    And what is this document?

7    A.    This is a memo that Sri wrote to me, and this is where

8    he is explaining to me why the idea of a higher concentrated

9    product and short infusion time just wouldn't work.

10   Q.    And I'd like to go to the -- blow up the last e-mail

11   in the chain at the very bottom.

12            What were you trying to convey to Dr. Sundaram

13   in this e-mail on February 18th, 2012?

14   A.    So from my standpoint, I'm rather excited about the

15   opportunity.  I just think this is, and it turned out to be

16   a really important undertaking for these chemo patients and

17   I was just trying to convey to him that it's really

18   important, that it would be a great opportunity if we can

19   get this done, and don't give up, and just keep plugging

20   away and make sure we understand the situation as best we

21   can.

22   Q.    And now I'd like to go to the last, the most recent

23   e-mail in the chain.  And we'll blow that up for a second.

24            And in the first line of that it says, Please

25   see the attached slide deck I put together based on my

Tarriff - direct

1    calculations.

2              And I would like to have a look at that

3    document.  Can you please turn to PTX-590 in the binder in

4    front of you.

5              And what is this document?

6    A.    This is a presentation that Sri made to me, trying to

7    explain to me all the problems with the idea of being able

8    to accomplish this.

9    Q.    And could we go to slide 4, please.  And it has

10   production number ending 183290.

11             And this slide entitled Treanda local tolerance,

12   could you please explain what you understood from this part

13   of the presentation?

14   A.    Yes.  So this is, this was very important what Sri was

15   trying to show me.  So he takes this chart from the FDA

16   correspondence between the people who developed Treanda and

17   the FDA.  And so this is the summary basis of approval that

18   is available publicly, and there's tremendous amount of data

19   that you can get for any drug that's approved, the

20   interaction between the sponsor and the FDA.

21             What he's doing here, he's showing me there

22   could be perivenous, these local side effects, these

23   problems when you dose Treanda and that's what he's showing

24   me here in this slide.

25   Q.    And I'm highlighting the bullet point now that says,

1    treatment related effect at 0.6 and 1.0 milligrams per

2    milliliter.

3              What did you take from that part of the

4    presentation?

5    A.    Yes.  So what he's showing me here, that as you have a

6    higher concentration of Treanda, there's an increase in the

7    incidence of these side effects or these adverse

8    perivascular events.

9    Q.    And where did Eagle obtain the information that is

10   reported in the table on the left-hand side here?

11   A.    Yes.  This came from publicly available information.

12   It's one of the first things you do.  You download this.

13   It's amazing how much information you can wind up finding in

14   the correspondence.

15             So this came right from the FDA.  You go to

16   their website to get this.

17   Q.    And let's turn to page 6 of PTX-590.  It ends in

18   production number 183292.

19             And this is entitled Treanda concentrations, 250

20   mL.  And I'd first like to discuss the first bullet point

21   where he says, dilution into 250 mL is likely not limited by

22   solubility of BDM.

23             What did you understand from that?

24   A.    Yes.  What Sri is doing here, now we're trying to have

25   less volume so we can infuse the product more quickly.  What

Tarriff - direct

1     he does now --

2                    THE COURT:  Hold up one second.

3                    MR. NELSON:  Sorry, Your Honor.  This is getting

4     into expert testimony.  Now on top of that, he's relying on

5     somebody else's communication to him of what these mean, so

6     I have two problems with this.  He's getting this

7     information from someone else, relying on it for the truth,

8     and now he's trying to establish expert testimony through a

9     witness, clearly not qualified.  He said he has no

10    scientific background.

11                   THE COURT:  What is this?

12                   MR. BROWN:  We are not relying on this for the

13    truth of the matter asserted.  We're relying on this in part

14    for Dr. Sundarum's initial skepticism.

15                   THE COURT:  Why is that relevant and why then

16    not present it through him?

17                   MR. BROWN:  It is relevant, first of all, it's

18    relevant to, in the obviousness analysis, the skepticism of

19    the idea, independently relevant, and there's case law --

20                   THE COURT:  All right.  Let's stop with that.

21                   MR. BROWN:  Yes.

22                   THE COURT:  Don't you need an expert to

23    establish that?

24                   MR. BROWN:  Our experts will be discussing this

25    at length.

Tarriff - direct

```
 1              THE COURT:  Why are you doing it through him?

 2   Not only the weight, through a hearsay declarant through the

 3   witness who said he's not a scientific expert.  You just

 4   said it's relevant for the proposition that you admit you

 5   need an expert to testify about.

 6              MR. BROWN:  There are separate issues about what

 7   we need the expert for and what we don't need the expert

 8   for.  The fact of the communications of skepticism is an

 9   independently relevant factor that is not hearsay because

10   it's not offered for the truth.

11              It's simply offered for the matter of the

12   communication and this is also important for -- well, what

13   we're principally offering this for is the initial

14   conclusion by -- the initial conclusion, the initial

15   communication to Mr. Tarriff from Mr. Sundaram of skepticism

16   about this idea.

17              THE COURT:  Sustained.  Move on.

18              MR. BROWN:  Could we turn to slide 9 of the

19   presentation, and that is on page 183295.  And the title of

20   this slide is EGL 25-milligram per milliliter formulation,

21   100 mL.

22   BY MR. BROWN:

23   Q.   Now, Mr. Tarriff, what did you understand from this

24   slide?

25   A.   So now what Sri is presenting to me is he's asking the
```

Tarriff - direct

1    question, can we go from 500 mL down to 100 mL and --

2                    THE COURT:  All right.  Hold up.  There's an

3    objection.

4                    So just in the future, just for the record, so

5    the Federal Circuit doesn't think -- you're standing up and

6    the record reflects why I have interjected.  I'm not just

7    responding to defense counsel.  For all counsel, just

8    object.  Stand up, say objection, and then I don't have to

9    be the one that looks like to the Federal Circuit I'm just

10   interrupting these witnesses.

11                   MR. NELSON:  In light of the first objection

12   where you wanted to hear it, I was giving the opportunity

13   to --

14                   THE COURT:  All right.

15                   MR. NELSON:  I will be happy to interrupt.  I am

16   not shy about this.  This is the same thing.

17                   THE COURT:  You've got a slide -- for the

18   Federal Circuit's benefit, we have a slide that has a lot of

19   scientific data and bullet points that reflect scientific

20   determinations by concentrations.

21                   So the proponent, can you explain to me why this

22   is admissible?

23                   MR. BROWN:  Your Honor, this is a presentation

24   that was made to Dr., to Mr. Tarriff that was part and

25   parcel of his decision to proceed with this development

Tarriff - direct

1    efforts and his decision, the face of this evidence we're

2    submitting is directly relevant to the issue.

3              Plaintiffs are presenting evidence that skilled

4    artisans would not have been motivated to do the invention,

5    that it would not have been obvious, and the fact of these

6    communications, not the truth of the matter, whether they're

7    truthful or not, it doesn't matter whether the science is

8    good.  The fact of these communications is independently

9    relevant and it's independent to Mr. Tarriff's mind in

10   pursuing these, pursuing the development of this, of this

11   invention.

12             THE COURT:  All right.  So let me ask you this.

13   Let's suppose -- is Eagle's motivation to market this

14   relevant?

15             MR. BROWN:  No.  Eagle's motivation is not

16   relevant.

17             THE COURT:  Now, this witness is testifying on

18   behalf of Eagle.  Is that correct?

19             MR. BROWN:  Correct.

20             THE COURT:  So if Eagle's motivation isn't

21   relevant, why is this slide relevant?

22             MR. BROWN:  This slide is simply relevant for

23   the expression of the inventor himself, the expression of

24   the inventor.

25             THE COURT:  Just to be clear, the witness is not

Tarriff - direct

1     the inventor.

2               MR. BROWN:  Correct.

3               THE COURT:  So why is it admissible?

4               MR. BROWN:  It's admissible -- it's admissible

5     again.  There's Federal Circuit case law on skepticism.  It

6     is not -- it's not hearsay.  It's not offered for the truth

7     of the matter asserted.  The fact that when Mr. Sundaram

8     being presented with this initially came back with his

9     office and presented the fact that the invention would not

10    be possible, is the expression of the idea about is it not

11    truthful.  The invention was possible.

12              But --

13              THE COURT:  The skepticism has to be present in

14    the prior art?

15              MR. BROWN:  Absolutely not.  It's a secondary

16    consideration and it's considered after the date of the

17    invention, skepticism.  It's typically when the inventor

18    goes and presents this idea to someone and people say, no,

19    that's a crazy idea.  That's exactly what is going on here.

20    Even the inventor being initially presented with the idea

21    comes back and expresses to his boss, I don't think we can

22    do this.

23              THE COURT:  All right.  So then you're bringing

24    it in to show that Dr. Sundaram, that's the correct

25    pronunciation?

1                    MR. BROWN:  Yes.

2                    THE COURT:  That Dr. Sundaram was skeptical?

3                    MR. BROWN:  Yes.

4                    THE COURT:  Okay.  So isn't it hearsay?

5                    MR. BROWN:  No, it's not hearsay.  It doesn't

6      matter whether it's truthful or not.  It's not offered for

7      the truth of the matter asserted.  The fact of the

8      skepticism, the fact of the statement -- we have a bench

9      memo I can hand up.  It has been held.

10                   All of these secondary considerations, the fact

11     of the communication is what's relevant.  It's not offered

12     for the truth of the matter asserted and it's held to be

13     admissible a number of times.

14                   THE COURT:  All right.  Let me see the case law.

15                   MR. NELSON:  Your Honor, may I respond while

16     they're bringing case law that I've never seen or heard of?

17                   THE COURT:  Sure.

18                   MR. NELSON:  First, the case law is relevant to

19     third parties.  Not the inventor's skepticism.  His

20     skepticism is completely irrelevant.

21                   Secondly, we never saw a disclosure from

22     plaintiffs at all that they are relying on skepticism of the

23     inventor.  This is brand-new stuff that has come out for the

24     first time.

25                   Very clearly --

Tarriff - direct

1          THE COURT:  Wait.  Let's stop.  Dr. Sundaram is

2     the inventor.

3          MR. BERL:  Yes.

4          THE COURT:  Hold on.  Okay.  So here's where I

5     am.  It makes sense to me that as a general proposition,

6     skepticism in the industry before the invention is, A,

7     relevant.  B, could be established by hearsay.

8          The fact that the inventor is being proffered as

9     the out of Court declarant about that skepticism within the

10    industry to me isn't very probative.  We've got all sorts of

11    issues like bias.  I mean, is the inventor truly reflective

12    of the industry standard?

13          So I'm going to overrule the objection, allow it

14    to come in.  I'm not going to give it much weight.  I think

15    it's very self-serving.  I was letting it in because of

16    background information, but if you want to proceed, go

17    ahead.

18          What I think will be probative is for an expert

19    to come forward and rely on hearsay evidence of what the

20    industry thought and I mean, I have no idea if Dr. Sundaram

21    is truly reflective of the industry.  I'm not sure if the

22    industry has established what the relative industry is.  I'm

23    just going to overrule it.  It's plaintiffs' time.  They can

24    choose to spend it how ever they wish.

25          MR. NELSON:  Thank you, Your Honor.

1      MR. BROWN:  Thank you, Your Honor.

2   BY MR. BROWN:

3   Q.    And, so, Mr. Tarriff, could you explain what you

4   understood from the slide, slide nine that ends in 183295?

5   A.    Sure.  So what Sri is telling me here, that we do not

6   have the ability to take our formulation and put it in a 100

7   mL bag.  That this wouldn't work.  You can see it at the

8   bottom of the bullet points.

9   Q.    And can you find the small binder in front of you?

10  It's PTX-350.

11  A.    Yes.

12  Q.    And earlier, when we had slide 4 up and there was a

13  table in Dr. Sundarum's presentation -- well, can you tell

14  us what PTX-350 is?

15  A.    Yes.  This is the summary basis of approval that I was

16  speaking about earlier that you can download from the FDA

17  that provides all this information about the original filing

18  of Treanda.

19  Q.    And do you have an understanding where the table on

20  slide 4 on the local tolerance issues came from?

21  A.    Yes.  It came from this document.

22  Q.    Thank you.

23          Now, how did you respond to Dr. Sundarum's

24  initial conclusions regarding the local irritation issues

25  and Dr. Sundarum's response that it would not be possible to

Tarriff - direct

1    get Eagle's product into a small volume?

2    A.    I just wasn't willing to give up.  I thought it was

3    just too good of an invention and too good of an idea for

4    these cancers patients.  So I just asked him again, you

5    know, we just need to make sure we're right and not relying

6    on our previous experiences and getting us there and

7    figuring this out once and for all.

8    Q.    As of the date of this presentation in 2012, how long

9    has Dr. Sundaram been working with bendamustine?

10   A.    Several years.  I think more than three or close to

11   four years.

12   Q.    I'd like now to go to PTX-725.  Can you tell us what

13   this document is, Mr. Tarriff?

14   A.    Yes.  This is an e-mail that I wrote where I started

15   a task force at Eagle to figure out how to solve the

16   problems that we had and figure out how to get this product

17   to work.

18   Q.    And I'd like to blow up in the middle the sentence

19   that starts, the early objective of the bendamustine task

20   force and also the first two bullet points.

21         Can you describe the substance of your e-mail to

22   these individuals?

23   A.    Yes.  So, you know, first off, it was obviously very

24   important to me to figure this out and find a way to get

25   this done.  And so I created a task force and I put some

Tarriff - direct

1    very key people on it and the objective was pretty clear.

2    Right.  Let's determine the optimal final concentration and

3    infusion time in the volume that would be required, and

4    then we had all of these issues that we were concerned

5    about, the injection site problems, these perivascular

6    problems and to then tackle that as well to get through

7    these two issues and see if we couldn't figure out a way to

8    develop this drug.

9    Q.    Mr. Tarriff, have you ever created another task force

10   for a project at Eagle?

11   A.    No.  I think this is the first time.  It's just

12   indicative of how important this was to me.

13   Q.    And can you explain what the first objective here

14   listed is?

15   A.    Yes.  So now we just need to find out how we can get

16   the drug into less volume and so we need the task force to

17   tackle that issue.

18   Q.    All right.  And after you had formed the task force,

19   did Dr. Sundaram do subsequent work to address the

20   solubility issue?

21   A.    He did.  He did quite a bit of work.

22   Q.    And what was the outcome of that work?

23   A.    Well, finally, what we know now is we had the product

24   down to 50 mL's, which is the product that's currently on

25   the market.

Tarriff - direct

1    Q.    And what was your reaction to learning that Dr.

2    Sundaram was able to get the volume down to 50 mL's?

3    A.    Well, it was exciting when we achieved the first

4    hurdle that we had.  I think we celebrated for about a day

5    or so.  Then we had to tackle all of the other issues that

6    we had in front of us.

7    Q.    And I'd also now like to talk about the second issue

8    that was raised in the initial PowerPoint presentation, the

9    local tolerance issue.

10        How did you respond to that issue?

11   A.    Well, the same.  We just needed to -- you know, we had

12   all of these people that and all of these reasons to think

13   it's a problem.  We just needed to tackle it and do whatever

14   work it took to find out one way or another how to handle

15   the situation or if the situation would allow for a product

16   that would infuse in less time.

17   Q.    And did Dr. Sundaram do additional work to address the

18   local tolerance issue?

19   A.    Yes.  Ultimately, we wound up doing some pre-clinical

20   work, which is animal work.  We did work in rabbits to

21   ultimately figure out how to handle the situation.

22   Q.    And could we go to PTX-726.  And, Mr. Tarriff, what is

23   this exhibit?

24   A.    This is a presentation that we made to the Board of

25   Directors of Eagle back in September of 2012.

1  Q.    And I'd like to go to slide 14 of PTX-726 and I'd like

2  to highlight two major bullet points, April 2012 rabbit

3  tolerance study, and August 2012 rabbit tolerance study.

4        What's being communicated to the board in this

5  part of the presentation?

6  A.    Well, so now, we had all of these hurdles that we

7  needed to get through on the project and so now we're making

8  a presentation to the board and we're explaining to them

9  that we've done these two pre-clinical animal studies in

10 rabbits and from what we've seen from those two studies,

11 that we may be able to go forward with a lower infusion

12 product.

13 Q.    And let's turn to slide 15.  And I'd like to highlight

14 the bottom bullet point, preliminary conclusion, and then

15 the first sub bullet point there, 50-milliliter infusion

16 product shows manageable PV effects.

17       What were you communicating to the Board of

18 Directors here?

19 A.    Well, this is a period of time where I had a very

20 skeptical board that would, you know, give me difficulty

21 about going forward on the study.  I didn't have a lot of

22 support from them.

23       And so what I'm doing here is providing them the

24 data from the animal studies and I'm explaining to them at

25 50 mL's, it appears though we have manageable perivascular

Tarriff - direct

1    effect and we may be able to develop product.

2    Q.    And now, Mr. Tarriff, I want to go back a couple of

3    days before this particular board meeting to discuss a

4    meeting you had with one of the board members in particular,

5    and let's look at DTX-1158.

6          And can we go to the bottom e-mail in the chain?

7    And what's being described in this e-mail?

8    A.    So this is where we had made a presentation to doctor

9    Alain Schreiber, who was one of my board members at the time

10   and reviewing the information that we had on the project

11   prior to the main board meeting the next day or so.

12   Q.    And who is Alain Schreiber?

13   A.    Dr. Schreiber represented the largest investment group

14   in Eagle at the time.  He was an M.D.  He was a formulator

15   himself.  He had run, you know, medical and science for a

16   large pharmaceutical company for a number of years, and

17   unfortunately, he was pretty skeptical about this program at

18   the time.

19   Q.    I'd like to go -- I would like to go within DTX-1158

20   to the page ending 1669.

21          Can you explain what was being presented to Dr.

22   Scheiber on this slide?

23   A.    Yes.  So I'm meeting with Alain to try to, you know,

24   work with him before we go to the board member, to the board

25   meeting, to try to gain his support to go forward with the

Tarriff - direct

1    project.

2                And so this slide, potential concerns with Eagle

3    formulations, I just felt even though I was the champion of

4    the project, and I wanted to go forward with it, I thought

5    it was important to provide the proper balance.  And so in

6    this slide, I'm talking about the concerns that we have with

7    the project.

8    Q.    And if we can go down to the third bullet point,

9    tolerability of faster infusion, what were you communicating

10   to Dr. Scheiber here?

11   A.    Well, so one is you can see from the task force and

12   the other work that we've done, that tolerability was one of

13   the significant concerns that we had in going forward and

14   spending the money and working on the project.

15               And so I'm going through the data with him and

16   as we get down to the bottom, you can see that we have these

17   articles coming out of the Preiss group and I'm explaining

18   to him a little bit about the situation and what we thought

19   about it.

20   Q.    And what were you describing to him about the Preiss

21   reference?

22   A.    That it was a concern to us.  That when we look at,

23   again, the header on the table, potential concerns, what we

24   see is to point out what's important here.  That the way the

25   drug is delivered in the United States, it's either

1   100 milligrams per meter squared or 120 milligrams per meter

2   squared.

3                And so now what we see from this is that a

4   three-minute bolus, the tolerated dose could be anywhere in

5   the range from 215 but all the way down to 85.

6                So 85 milligrams per meter squared is

7   significantly less than the way you would need to deliver it

8   into patients here.  And so obviously, you're concerned

9   about the fact that patients may not be able to tolerate

10  what we're trying to develop.  And I shared that with him so

11  he understood the situation completely.

12  Q.   And I'd like to turn ahead to page 1673 and I'm

13  focusing on the chart in the middle of the page.

14                What is shown here?

15  A.   This is the details behind the two bullet points that

16  I showed him on previous, previous slides.

17  Q.   And going to the bullet point below the table, it

18  says, anticipated clinical activity.  The first bullet point

19  says address PK safety.  What are you communicating to him

20  there?

21  A.   Here the situation is that we now know that there's a

22  potential difficulty in developing a product in a

23  three-minute bolus, and it may result in having a product

24  that just can't be delivered to cancer patients because of

25  the tolerability.  And so what I'm explaining to him here is

1    that it's clear that we're going to need to, we're going to

2    likely need to run a clinical trial in cancer patients, and

3    that's the way, the only way we're going to find out if we

4    have a safety issue or not.

5    Q.   And, Mr. Tarriff, were you the one who would have --

6    who compiled the information that's presented in this chart

7    here?

8    A.   I would have put the slide together, but, no.  I

9    certainly reviewed these documents and presented to Alain.

10   Q.   And what happened in your meeting with Dr. Scheiber?

11   A.   Unfortunately, I wasn't able to convince him and he

12   voted against going forward with the project.  He did not

13   believe after seeing all of this that the risk reward

14   profile of spending the money in the company that we didn't

15   have was warranted.  He suggested that I just divest the

16   product.  He was hoping I could get about $10 million for it

17   and that's how the meeting started.

18   Q.   And how did you respond to Dr. Schreiber's suggestion?

19   A.   Well, I dug in.  I've still been the champion of this.

20   And ultimately, we settled for allowing me to go to the FDA

21   and see what they thought.  Then we would regroup as a group

22   after that.

23   Q.   Mr. Tarriff, how big of a deal was it for Eagle to

24   consider doing a clinical trial in humans at this point in

25   its history?

Tarriff - direct

1    A.    Look, you know, we're a small company.  We don't have

2    a lot of revenue.  We don't have -- just happen to be a

3    period of time where we didn't have much money in the bank.

4    This would have been a very expensive study.  You know, they

5    didn't feel that the risk reward profile was reasonable and

6    so I was asking my board, you know, for a pretty big deal at

7    the time.

8    Q.    And, Mr. Tarriff, after your Board of Directors

9    meeting, did you proceed to request a meeting with FDA?

10   A.    We did.

11   Q.    And I'd like to go to PTX-950.  And what is this

12   document?

13   A.    This is the meeting request that we made to the FDA.

14   This is a meeting that you would have with the FDA, where

15   you ask them permission to go forward with a clinical trial.

16   You need to do that before you put drugs into humans.

17   Q.    And I would like to go to page 7.  And under

18   administration and usage, there's a paragraph in the middle

19   that the begins, the new Eagle bendamustine.  What were you

20   asking for permission to do in a clinical trial in your

21   request to FDA?

22   A.    We were asking them two things.  We were first asking

23   for them to permission to do what was defined there as a

24   slow IV push, which was a three-minute push of bendamustine.

25   We were asking for permission to go ahead and run that

Tarriff - direct

1   study.

2          And then the second item, we were asking them to

3   also allow us to run the study where we would deliver the

4   drug as an IV over somewhere between 5 and 20 minutes.

5   Q.   And in what volume would that presentation be?

6   A.   Oh, that would be, you know, from the 500 mL bag down

7   to 50 mL.

8   Q.   And by the time of the FDA meeting, had you settled on

9   an infusion time that you requested permission for?

10  A.   Yes.  Ultimately, we settled on a ten-minute infusion.

11  Q.   I'd like to go now to exhibit PTX-746.  And what is

12  this exhibit, Mr. Tarriff?

13  A.   This is the minutes.  We went to the meeting and this

14  is the meeting minutes of the FDA after the meeting.

15  Q.   And what was the date at the FDA meeting?

16  A.   It was January 15, 2013.

17  Q.   And did you review these minutes when Eagle received

18  them?

19  A.   I did.

20  Q.   And did you attend the meeting?

21  A.   I did not.

22  Q.   And if you look at -- excuse me.  I want to discuss

23  the outcome of the meeting.  If we could turn to page 7 of

24  PTX-746.  And I would like to blow up the question and FDA

25  response under question seven.

Tarriff - direct

1            And what did you understand to be the FDA's

2     response to Eagle's proposal to perform clinical study on

3     the two presentations that you requested?

4     A.    Yes.  I thought it was rather clear.  The FDA response

5     to the question was, no.  We do not agree with your plan to

6     evaluate the IV.  Push method of administration.  We are

7     concerned about safety risks of infusion reactions that may

8     be exacerbated by rapid infusion of bendamustine.

9     Q.    And what was their response with respect to the

10    15-milliliter 10-minute infusion?

11    A.    Yes.  So now fortunately, they do allow us to go

12    forward with the 50 mL product in ten minutes.  They go on

13    to say, we do not agree with the dosage you selected.  They

14    go on to say, you need to test your product at the highest

15    dose over ten minutes.

16    Q.    And now, Mr. Tarriff, I would like to discuss some of

17    the responses and reactions you received from other people

18    about the idea of doing the clinical study, and so let's

19    look at PTX-729.

20            And what is this document, Mr. Tarriff?

21    A.    This is now December 3rd of 2012 and Dr. Palepu, who

22    was the key developer of the product at SciDose is

23    explaining to me why he just doesn't think that we can go

24    forward and a low volume bendamustine product would work.

25    He's sending me a note and copying team members of his

Tarriff - direct

1    conclusion.

2    Q.    And was Dr. Palepu knowledgeable about bendamustine's

3    liquid formulation?

4    A.    Yes.  He developed it along with us for years.

5    Q.    And after you received FDA authorization to proceed

6    with the clinical study, was there any cancer center that

7    you approached about doing the clinical study?

8    A.    I did.

9    Q.    And who did you first approach?

10   A.    I approached Hackensack University Medical Center.  I

11   had been -- I still am a board member of Hackensack for many

12   years.  I think I was on about 15 years for now.

13            We do, we're one of the hospitals that does the

14   most number of oncology procedures in the country,

15   particularly the density of patients up in North Jersey.

16   Q.    And who did you speak to at Hackensack about doing the

17   study?

18   A.    I spoke to two people, Dr. Pecora, who was the founder

19   of the Cancer Center at Hackensack and I spoke to Dr. Andre

20   Goy, who was the chairman of the Cancer Center.

21   Q.    What was Dr. Procora's response when you asked him

22   about doing the study?

23            MR. NELSON:  Objection.  Hearsay, Your Honor.

24   This is a third-party statement.  Now, they can possibly

25   address the industry issue, but I can't possibly

1    cross-examine him.  They're obviously going for the truth of

2    the matter asserted here.

3                MR. BROWN:  It's not relevant for the truth of

4    the matter asserted.  This is purely a fact of the statement

5    itself and it falls squarely within the Federal Circuit case

6    law that statements of individuals in the industry are

7    relevant to skepticism.

8                This is something we've clearly identified in

9    the case as skepticism that was able to be expressed by Dr.

10   Pecora.  They've known about this since at least

11   Mr. Tarriff's deposition in January.

12               MR. NELSON:  Those are statements that are

13   recorded somewhere.  This is some conversation that happened

14   on the phone.  How can I possibly cross-examine him?

15   There's no reliability to that.  That's not at all what the

16   Federal Circuit case law is contemplating when it comes to

17   skepticism in third party industry.

18               THE COURT:  What's the industry?

19               MR. BROWN:  This is healthcare oncology and

20   cancer treatment.

21               THE COURT:  So it's any oncologist for

22   skepticism?

23               MR. BROWN:  I think skepticism from an

24   oncologist would be relevant.  Skepticism from a number of

25   different people could be relevant, but skepticism from an

Tarriff - direct

1    oncologist that treats people in this could be relevant.

2              THE COURT:  Did your expert rely on this?

3              MR. BROWN:  Our expert does not rely on this

4    item of skepticism.

5              THE COURT:  So does that change the calculus as

6    to whether it's admissible or not?

7              MR. BROWN:  It's simply fact testimony about a

8    communication and it's available to the Court for whatever

9    weight the Court would choose to give it.

10             MR. NELSON:  Fact testimony they're seeking to

11   use the truth of the fact.

12             MR. BROWN:  Just the fact of the communication,

13   not the truth of whatever his reasons may be.  That's not

14   relevant.  Only the fact that he was told that.

15             MR. NELSON:  Your Honor, Mr. Brown is drawing an

16   academic distinction there.  He's trying to say that this

17   particular doctor was skeptical to prove skepticism, the

18   truth of skepticism.  Now he's trying to say it was merely a

19   statement that he made.  I just want to get the statement

20   in.  That's an academic line he's drawing right there.

21             THE COURT:  Are you going to present an expert

22   who is going to rely on or address purported industry

23   skepticism?

24             MR. NELSON:  We're going to show there's no

25   skepticism in the art.  In fact, we're going to show the

1    exact opposite.

2                   THE COURT:  Yes.  I mean, I will allow it.  I

3    mean, at some point -- well, I'm just going to allow it.  I

4    think the fact that their own expert doesn't rely on it

5    tells me a lot.  Go ahead.

6    BY MR. BROWN:

7    Q.    And the other individual you talked to at Hackensack

8    you mentioned was Dr. Goy.  Can you describe to the Court

9    who Dr. Goy is?

10   A.    So Dr. Goy is one of the country's leading experts on

11   the cancers that bendamustine is used to treat.  He has been

12   trained first in Europe.  He was trained at Memorial Sloan

13   Kettering in New York, MD Anderson in Texas.  Came to

14   Hackensack as the chair of the department.  He's considered

15   to be one of the leading experts in Non-Hodgkin's lymphoma

16   and he has been a lead investigator of a number of products

17   that are used to treat these cancers.

18   Q.    And let's go to PTX-736.

19                   And what is this document, Mr. Tarriff?

20   A.    This is an e-mail that Andre writes to me, telling me

21   that, you know, they're not going to go forward and run the

22   study at Hackensack, but he's nice enough to conclude at the

23   end, he will continue to think if there is another place

24   that could do that for us.

25   Q.    I'd like to go backwards in the chain now to the first

Tarriff - direct

1    e-mail in the chain, and this is an e-mail you sent to

2    Dr. Goy on October 24th, 2012.  This is before the FDA

3    meeting.

4             What was the purpose of this e-mail?

5    A.    In this e-mail, I'm trying to give Andre some type of

6    background as to what we're trying to do.  I'm asking him if

7    he, if he would be able to run, or willing to run the study

8    for us.

9    Q.    And I'd like to blow up a paragraph in the middle of

10   this document that says, we will meet with FDA on

11   January 15th.

12            What was the purpose of this discussion?

13   A.    I'm just explaining to him that we're going to be

14   meeting with the agency.  We're probably going to need to

15   run a PK study.  He's aware of the fact that our product

16   has a higher Cmax, and that may cause difficulty, and I'm

17   just trying to give him, you know, the totality of

18   everything that I know in order to get him to agree to work

19   with us.

20   Q.    And I'd like to focus on the second sentence first.  I

21   think the third sentence.  We believe we will need to

22   conduct a PK study to review the adverse events of the

23   higher Cmax.

24            What were you communicating to Dr. Goy there?

25   A.    We're concerned about what happens when you dose

Tarriff - direct

1    products like this and create a higher Cmax.  We're worried

2    about those adverse events and I'm explaining to him that

3    we'd need to run a study that would, you know, show the

4    outcome of that type of event.

5    Q.    And then in the next sentence you state:  There is

6    good literature mostly from Europe where the product has

7    been dosed as a bolus without adverse events.

8              Could you explain the context of that statement?

9    A.    Yes.  Again, I'm trying to show him everything that we

10   have in totality so that he can review it and give me his

11   decision.

12   Q.    Did this letter convince Dr. Goy run the study?

13   A.    He turned me down unfortunately.

14   Q.    Did Hackensack ultimately participate in Eagle's

15   clinical study?

16   A.    Yes.

17   Q.    What convinced them to participate in the clinical

18   study?

19              MR. NELSON:  Objection.  That's hearsay.

20              MR. BROWN:  I will we reword that question.

21   That is legitimate.

22   BY MR. BROWN:

23   Q.    What information did you give them before they agreed

24   to participate the in clinical study?

25   A.    Ultimately, we gave them quite a bit of information,

1    including all of that animal work, that pre-clinical work

2    that we had discussed previously.

3    Q.    A few minutes ago we discussed your September 12th

4    board meeting and your meeting with Dr. Scheiber.  Did you

5    have any interactions with the board after the FDA approval,

6    after the FDA approved your request to do the ten-minute

7    infusion study?

8    A.    I did.  We went back to them again after we had the

9    outcome from the meeting.

10   Q.    And what was the, what was the result of that

11   discussion?

12   A.    Again, the board did not want to go forward even

13   with the FDA meeting.  They just did not agree with me and

14   they thought the risk/reward of spending that money, money

15   that we didn't really have on a project like this, where the

16   outcome was uncertain.  They didn't allow me to go forward.

17   Q.    Was Eagle a public company in January 2013?

18   A.    We were not.

19   Q.    Can you explain to the Court what types of investors

20   you were trying to get money from?

21   A.    Yes.  So now at this time in the company's history, I

22   need to go and raise money in order to be able to ultimately

23   run the, run the study.  And so we went out to the, there's

24   a large contingency of healthcare only investors.  These are

25   people that for a living, they invest in these types of

1    projects and companies like Eagle.  It's typically run by

2    people who have been operators in the industry before,

3    Ph.D.s, formulators, M.D.s.  it's across the board.  But

4    they're usually pretty sophisticated people that their whole

5    business is to invest in these types of companies.

6    Q.    All right.  I would like to go to PTX-730.  And what

7    is this document?

8    A.    Now we go back to the JP Morgan conference again now

9    in January of 2013.  And this is a presentation that I was

10   making to the investors there, hoping to be able to raise

11   money for the company.

12   Q.    And this is dated January 7th, 2013.  When was this

13   relevant to your -- when was this presentation relative to

14   your FDA meeting?

15   A.    It's just before we go to the FDA.

16   Q.    And I'd like to go forward to the page ending in

17   production number 145336.

18              And what were you telling potential investors on

19   this slide?

20   A.    Well, for now, you know, I'm now trying to raise money

21   for the company.  This is one of those periods of time in

22   the company where we, you know, we're nervous.  We didn't

23   have a lot of cash in the company.  And so what I'm doing

24   here is, we had gone out to 92 oncologists and we polled

25   them on the product opportunity and that's the chart that we

Tarriff - direct

1   have here.

2           And then what I do, because I just felt, you

3   know, I just needed to bring balance to everybody, I

4   brought out the good and the negative when I was approaching

5   them.

6   Q.   And can you explain what the negative you were

7   presenting to the investors?

8   A.   Yes.  So now it's before we get to the FDA meeting,

9   we're, you know, obviously worried about the adverse events

10  that would occur from the higher Cmax that we have.  We're

11  worried about the possibility of increased nausea from the

12  Cmax, and we're obviously still concerned about the pain at

13  the injection sites.  In this case, the extravasation that

14  could occur.

15          MR. NELSON:  Your Honor, I object.  I think

16  there's a motion in limine relating to nausea and vomiting.

17  If that's what counsel is seeking to introduce here, that's

18  in violation of the Court's order.  If they are not, I don't

19  really know what this goes to.

20          MR. BROWN:  Your Honor, we're not introducing

21  any evidence of, this is purely what he's presenting to

22  about his concerns at the time.  It's not presenting

23  anything about the outcome and we don't intend to present

24  anything about the outcome on those issues, which is what

25  was agreed.

1            MR. NELSON:  Your Honor --

2            THE COURT:  Isn't the gist of everything that is

3    done for the last 20 minutes unexpected results?

4            MR. BROWN:  Absolutely not, Your Honor.

5    Unexpected results is a very specific item.  Unexpected

6    results is you compare the actual results you get from your

7    product at the end of the day with the closest prior art and

8    you have an expert say those results would be unexpected.

9    This is entirely different.  This is skepticism by various

10   individuals that this idea would work.  It's completely

11   independent, secondary consideration.  It's proven by

12   different evidence.

13           THE COURT:  So Mr. Berl was candid enough at the

14   motion in limine argument to admit that unexpected results

15   can be a secondary consideration, they can be used to rebut

16   a prima facie case.  Whether you want to -- I mean, it seems

17   to me skepticism, going to whether it's unexpected.

18           Now, you may want to say you're not doing it as

19   a secondary consideration.  You are doing it to rebut an

20   anticipated prima facie case.  You are saying skepticism is

21   something else you're trying to prove.

22           MR. BROWN:  I would like to address this,

23   because this is very important.  It's very important to our

24   case.  I would like to take a couple seconds to address it.

25           So unexpected results is a particular secondary

Tarriff - direct

1    consideration that's shown by particular evidence and that

2    is I have to show --

3              THE COURT:  I've heard that before.

4              MR. BROWN:  Yes, yes.

5              THE COURT:  But that is in the context of

6    secondary consideration.  We've spent a lot of time talking

7    in the pretrial conference about unexpected properties and

8    unexpected results.

9              MR. BROWN:  Yes.

10              THE COURT:  Skepticism, being probative of

11   whether or not a prima facie case was established, and that

12   there were two different things.  And I was going to

13   strictly enforce this reply brief issue because, frankly,

14   the defense admitted that in their opening, they had

15   addressed both teaching away and unexpected results.  That

16   was the basis of my ruling.  I said, you know what, you

17   raised it in the context of your prima facie case.  I go

18   with Mr. Berl on these two doctrines are sometimes secondary

19   considerations, sometimes rebuttal of a prima facie case.

20   I'm going to go with Mr. Berl.  I'm going to enforce the

21   order.  That's kind of where I was.

22              Now, you spent all of this time talking about

23   these things and that's why I'm letting it in, because it

24   seems to me it's relevant to the prima facie case under that

25   argument that I agreed to go with.  But then I also thought

1    we excepted out nausea and fatigue from that, and so I'm

2    having a really hard time understanding why -- first of all,

3    since you raised it, let's go back.

4              For the last 20 minutes, you're saying that has

5    nothing to do with whether this is unexpected, that people

6    would have been -- would not have anticipated the results of

7    this.  This is skepticism and that's somehow different.

8              MR. BROWN:  Yes.

9              THE COURT:  Flesh that out.  I don't understand

10   that.

11             MR. BROWN:  So skepticism is different.  They

12   don't even have to know the results.  They can be skeptical

13   of the idea when it's presented.

14             THE COURT:  Isn't the whole thing about

15   unexpected results?  They don't expect the results.  And I

16   know the time frame.  Unexpected results is going to be

17   later.

18             MR. BROWN:  Yes.

19             THE COURT:  But --

20             MR. BROWN:  So skepticism is just plain and

21   simple.  The inventor or the company presents the idea to

22   someone.

23             THE COURT:  Right.

24             MR. BROWN:  And I believe it's a Judge Stark

25   decision very recently that considers this very type of

Tarriff - direct

1    information wherein investors could have invested in this

2    early on and made a lot of money.  They saw it and they

3    decided not to invest.

4                    THE COURT:  Right.

5                    MR. BROWN:  There's a case --

6                    THE COURT:  And that's relevant to what?

7                    MR. BROWN:  That's a separate independent

8    secondary consideration called skepticism.  It can happen

9    before the date of the invention.  It can happen after the

10   date of the invention.  It is not locked in time and it's

11   its own separate prong.  It's one of the listed things and

12   it's different, different type of evidence than unexpected

13   results.

14                    Unexpected results have to rely on evidence of

15   the product.  We tested it.  We got a result.  We tested the

16   prior art, we got a different result.  You never would have

17   thought these would be so different.  That's a very specific

18   thing.

19                    This is different.  All it requires --

20                    THE COURT:  Skepticism is a secondary

21   consideration?

22                    MR. BROWN:  Yes.

23                    THE COURT:  Okay.  It's not a model of a prima

24   facie case?

25                    MR. BROWN:  It's a secondary indicia of

Tarriff - direct

1   obviousness.

2            THE COURT:  Can it also be rebuttal of a prima

3   facie case?

4            MR. BROWN:  Well, secondary considerations I

5   think are -- I don't think they go to the prima facie case.

6   I think it goes to --

7            THE COURT:  I'm going to finish with him, Mr.

8   Berl.

9            MR. BERL:  Sorry.

10           THE COURT:  What I want to know is, skepticism,

11  is it limited to me considering it as a secondary

12  consideration?

13           MR. BROWN:  I believe it is, yes.  And I will

14  happily withdraw --

15           THE COURT:  Hold on.

16           MR. BROWN:  Sorry.

17           THE COURT:  So it cannot be considered in the

18  context of a prima facie case and as rebuttal evidence of a

19  prima facie case?

20           MR. BROWN:  I do not believe it's evidence on

21  the prima facie case.

22           THE COURT:  Okay.  Can unexpected properties, is

23  that -- the first question:  Is unexpected properties a

24  secondary consideration?

25           MR. BROWN:  Yes.

                          Tarriff - direct

1              THE COURT:  Can it be considered in rebuttal of

2      a prima facie case?

3              MR. BROWN:  Only in the sense that secondary

4      considerations are weighed against the evidence in the prima

5      facie case, but if it goes into that part of the analysis.

6              MR. NELSON:  Your Honor --

7              THE COURT:  Hold on.

8              MR. NELSON:  Sorry.

9              THE COURT:  Just let him finish.

10             MR. NELSON:  All right.

11             THE COURT:  So I need to understand more.

12             So secondary considerations, are they rebuttal

13     of a prima facie case?

14             MR. BROWN:  The language of the Federal Circuit

15     is that you have to weigh secondary considerations after you

16     consider the prima facie case.  Usually, the prima facie

17     case itself is centered around the idea of, is there a

18     motivation to combine these various references in a

19     particular way, and so that is focused on the motivation of

20     a person of ordinary skill in the art at the time.

21             Secondary considerations are considering real

22     world evidence to then also look at that issue and see,

23     well, you know, is that the right outcome?  And so

24     it's separately looked at and go, well, it's commercial

25     success.

Tarriff - direct

1                    THE COURT:  Is what the right outcome?

2                    MR. BROWN:  Is the initial view on the prima

3      facie case the right outcome?  If you initially conclude

4      there was a prima facie case of obviousness, you would then

5      come over and look at these other secondary considerations.

6      Oh, commercial success.  Why is that relevant?  Someone

7      could have made a lot of money if they came up with this

8      idea before these guys.

9                    THE COURT:  So that helps rebut the prima facie

10     case?

11                   MR. BROWN:  Yes.

12                   THE COURT:  So is a secondary consideration

13     effectively the same thing as just rebutting a prima facie

14     case?

15                   MR. BROWN:  I think the distinction --

16                   THE COURT:  First of all, the distinction is --

17     help me out if you can.  It just helps me if you said yes or

18     no or sometimes.

19                   So are secondary considerations anything other

20     than theories to rebut a prima facie case of obviousness?

21                   MR. BROWN:  So I think they are theory to rebut

22     a prima facie case of obviousness, but there is a different

23     issue that has been discussed in front of the Court that I

24     don't want there to be confusion, which is you have this

25     initial tug of war over this hypothetically skilled artisan

Tarriff - direct

1    at this particular date in history, the date before the

2    invention is made with all the prior art around them and

3    what would that motivation be?

4         So the prima facie case is focused on that

5    moment and that time and the tug of war and there's a

6    separate rebuttal issue there, which is, there's different

7    prior art, there's different things you should have

8    considered in the total tug of war and so you conclude, no,

9    he wouldn't have been motivated or, yes, he would have been

10   motivated.  But that's a separate rebuttal element on, no,

11   there is not a prima facie case.

12        So you rebut the prima facie case.  Your

13   conclusion would be, there is -- the prima facie case has

14   not been established.

15        Secondary considerations, you would say, the

16   prima facie case was established, but I'm persuaded by this

17   skepticism.  I'm persuaded by secondary, by commercial

18   success.  I'm persuaded by any of the other list of things

19   in the Federal Circuit that it's non-obvious.

20        THE COURT:  I apologize.

21        MR. BROWN:  Sorry.

22        THE COURT:  No.  It's not you, it's probably me.

23   I'm just having a hard time, to be candid, but I want to try

24   my best to understand it so I can be fair.

25        MR. BROWN:  Yes.

Tarriff - direct

 1                THE COURT:  All right.  So the initial inquiry

 2    is whether or not there was a motivation to combine various

 3    references in the prior art such that the invention would be

 4    obvious.

 5                MR. BROWN:  Yes.

 6                THE COURT:  Is that right?

 7                MR. BROWN:  Yes.

 8                THE COURT:  All right.  And in making that

 9    initial inquiry, the first step is, because the burden is on

10    the defense.  They have to come forward with some

11    combination of prior art.  Correct?

12                MR. BROWN:  Yes.  Correct.

13                THE COURT:  All right.  And they have to

14    establish that there would have been, among other things, a

15    motivation to combine those prior art references such that

16    it would have been obvious.  Correct?

17                MR. BROWN:  Correct.

18                THE COURT:  And for the Court in making that

19    determination, A, I look to the prior art references

20    themselves?

21                MR. BROWN:  Yes.

22                THE COURT:  Right?

23                MR. BROWN:  Yes.

24                THE COURT:  And, B, I can consider expert

25    testimony --

Tarriff - direct

1          MR. BROWN:  Yes.

2          THE COURT:  -- about what a POSA would have

3    thought when she looked at the prior art references.  Right?

4          MR. BROWN:  Correct.

5          THE COURT:  And the prior art reference and the

6    prior art in its entirety.  Is that correct?

7          MR. BROWN:  Yes.

8          THE COURT:  Okay.  And so that prima facie case

9    was made.

10         Now, what's the next step for the Court?

11         MR. BROWN:  The next step for the Court is, was

12   there evidence proffered of secondary considerations?  So

13   commercial success.

14         THE COURT:  Well, so I don't get into evaluating

15   the prima facie case.  I go right away to secondary

16   considerations?

17         MR. BROWN:  I think the way it works is, after

18   you conclude a prima facie case was made, then you move and

19   evaluate the secondary considerations.

20         THE COURT:  Okay.  Let's step back.

21         MR. BROWN:  Yes.

22         THE COURT:  We'll get to the secondary

23   considerations.

24         In deciding whether a prima facie case was made,

25   what should the Court consider?

1          MR. BROWN:  In deciding whether a prima facie

2     case was made, you consider the various prior art, the

3     totality of the prior art that was available to a skilled

4     artisan.  You consider the level of ordinary skill in the

5     art at the time.  You consider the differences between the

6     prior art and the claims.  And you consider whether a person

7     of ordinary skill in the art would have been motivated to

8     combine the prior art to get all of the elements of the

9     claim together at that point in time.

10          THE COURT:  All right.  Now, in deciding whether

11    that last thing existed, whether a POSITA would have been

12    motivated, do I consider skepticism?

13          MR. BROWN:  I do not believe you consider

14    skepticism at that time.  Skepticism is, you move to, you

15    consider skepticism, you consider commercial success.  If

16    somebody proffered a case on unexpected results --

17          THE COURT:  Stay with SKEPTICISM.  Do I consider

18    TEACHING away?

19          MR. BROWN:  Skepticism is the whole --

20          THE COURT:  Let's not confuse it by going back.

21    Let's focus on present.  Do I consider teaching away?

22          MR. BROWN:  There's very complicated law on that

23    and teaching away is considered as part of the first battle

24    because it goes to whether the person motivated on that day

25    or not.  There are some scenarios where the Federal Circuit

 1    presumes, for example, a prima facie case, and then you

 2    could bring in also the secondary consideration teaching

 3    away.  So you consider it on both sides.

 4              THE COURT:  Teaching away considered on both

 5    sides.  Skepticism you're telling me I can't consider on

 6    both sides?

 7              MR. BROWN:  I think as a legal matter, you only

 8    consider it in the secondary considerations.

 9              THE COURT:  Do you have a case that says that?

10              MR. BROWN:  I don't.  I was not prepared for

11    this particular argument, but that's my understanding of the

12    law.

13              THE COURT:  All right.  Unexpected properties.

14    All right.  Do I consider that in the context of assessing

15    the prima facie case or do I wait until I determine first a

16    prima facie case was established?

17              MR. BROWN:  That is considered in the secondary

18    considerations part of the case.

19              THE COURT:  And only in the secondary

20    considerations?

21              MR. BROWN:  That's my understanding.  I don't

22    want to run afoul.

23              THE COURT:  I want you to focus on me.

24              MR. BROWN:  All right.

25              THE COURT:  All right.  I will hear from the

Tarriff - direct

1    defendants.

2              MR. NELSON:  Your Honor, I not quite sure where

3    you want to start.  I will start with skepticism first,

4    particularly with this particular reference.  We're talking

5    here about the witness' skepticism and conveying to

6    investors.  Mr. Brown already said the relevant industry

7    here is oncologists, not investors.  They're out.

8              When we talk about teaching away and unexpected

9    results, you heard Mr. Brown say clear for teaching away,

10   that's in a gray area.  That can go one way or another.

11   When it comes to unexpected results, first he says it's a

12   gray area.  Then he said it's not in a gray area.  It's

13   secondary considerations.

14             Your Honor, I'm happy to open this wound again

15   right now or we can do it later.  With all due respect,

16   that's where the misconception of Your Honor fell upon, is

17   teaching away and unexpected results is in this gray area,

18   in that middle area.

19             And when they tell us in their interrogatory

20   responses, before we write our expert reports, these are

21   secondary considerations, they're going in this bucket,

22   our experts are not going to address issues on that

23   until they are supposed to in that secondary considerations

24   realm.

25             Now, did we put in evidence in the reports that

Tarriff - direct

 1   relate to the same factual and legal bases?  Yes.  For

 2   instance, adverse events.  Our experts looked at the prior

 3   art that they were relying on and said, let's talk about the

 4   adverse events issue.

 5            I believe that's what Mr. Feldman was talking

 6   about, is the underlying information that relates both to

 7   the prima facie case and the secondary considerations when

 8   it comes to things like teaching away.  That's in the expert

 9   report.

10            Now, when it comes to these references that have

11   nothing to do with the prior art or that teach-away, those

12   are secondary considerations.  That's where they are coming

13   in and saying, your prima facie case, that's fine.  You have

14   those references.  Fine.  Those references, fine.  Let's

15   look somewhere else.  Let's look at what somebody else is

16   doing.

17            Our prima facie case is set.  They are saying,

18   these other references from a secondary considerations

19   perspective teach-away.  That Ruffert reference that Mr.

20   Berl so heartily relied upon, Your Honor, and that Mr. Aly

21   firmly addressed doesn't even involve bendamustine as

22   causing those adverse events.  That's not something a person

23   of ordinary skill in the art would consider in a prima facie

24   case.  That's why they are relying on teaching away.  When

25   Your Honor excluded that, you excluded our expert's ability

1  to respond to that evidence.

2          You talk about fairness and taking the fairness

3  from the perspective of today.  Like what counsel said, that

4  evidence should be back in the case, Your Honor.

5          THE COURT:  What was your understanding of what

6  the plaintiff said as far as nausea and fatigue?

7          MR. NELSON:  I'm going to be very clear.  I

8  should let Ms. Stafford address it because I was not here.

9  My understanding --

10          THE COURT:  Well, since you weren't here, let's

11  have her address it.

12          MS. STAFFORD:  Sure, Your Honor.  It was my

13  understanding that Mr. Berl said that they would not be

14  relying upon nausea and fatigue and any comparison that

15  involved data that happened after the priority date.  That's

16  what you have been hearing for 20 minutes.  All stuff that

17  happened after the invention, after the priority date.  This

18  is dated in September of 2013.

19          THE COURT:  All right.

20          MS. STAFFORD:  Moreover, they brought up in

21  their opening a reference, Ruffert reference and they bring

22  up other references in their expert reports that are not

23  prior art that were ever considered as part of our prima

24  facie case.  And moreover, that were never disclosed in

25  their interrogatories.

Tarriff - direct

1          So what they are trying to do is foreclose us to

2     be able to rebut prior art that we didn't know was relevant

3     because our experts don't think they are.  They are trying

4     to be the only one that is allowed to give any sort of a

5     statement with respect to those references.

6               THE COURT:  All right.  The issue presently

7     before me is the admissibility of the highlighted bullet

8     point on slide 21?

9               MR. NELSON:  21.

10              THE COURT:  Wait.  I think the issue before me

11    is the admissibility of the three bullet points on slide 21

12    of exhibit what?

13              MR. BROWN:  This is exhibit PTX-730, Your Honor.

14              THE COURT:  Okay.  All right.  Thank you.

15              MS. STAFFORD:  The other issue, they appear to

16    have gone back about the representations about how they are

17    going to rely upon post invention date about what would have

18    been unexpected because people were skeptical about it.  We

19    think they've now opened the door to allow us to present

20    that rebuttal.

21              THE COURT:  All right.

22              MS. STAFFORD:  Your Honor, thank you.

23              MR. BROWN:  Your Honor, if I can just move this

24    along.  I'm happy to withdraw this reliance.  I didn't

25    realize this was going to cause that issue for them.

Tarriff - direct

1           THE COURT:  So it's a good time for a lunch

2  break.  We've been going for almost three hours.  I want to

3  think about this and I want to think about if it has opened

4  the door about information I previously excluded with the

5  motion in limine.

6           It's a good time for a break.  How much time do

7  we need?

8           MR. NELSON:  It's your time, Your Honor.  We'll

9  take whatever time you'll give us.

10           THE COURT:  Well, I mean, do you all have rooms

11  in the building?

12           MR. NELSON:  We're not in the building, but

13  we're close.

14           THE COURT:  Why don't we break.  Well, we'll

15  break for an hour.

16           MR. BROWN:  Your Honor, I would like to address

17  one thing Ms. Stafford just mentioned.  There are no results

18  here.  This is before any study has been done.  This is

19  not -- this does not represent or in any way run afoul of

20  Mr. Berl's statements regarding results of anything.  This

21  has nothing to do with that issue.

22           That's it, Your Honor.

23           MR. NELSON:  Your Honor, I will take umbrage

24  with that.  Mr. Berl clearly stood up here and said he's

25  providing results to investors.  Now he's saying they're not

Tarriff - direct

 1    results.  So, Your Honor, there's no boundary on this

 2    whatsoever.

 3                THE COURT:  Well, I think plaintiffs' word is

 4    unexpected properties in their motion any way.  So anyway,

 5    food for thought.  We'll see you at 2:00.

 6                The witness is on direct.  He's free to speak

 7    with his counsel.  He hasn't started cross-examination yet.

 8                (Luncheon recess taken.)

 9                          -   -   -

10                Afternoon Session, 2:03 p.m.

11                THE COURT:  All right.  Please be seated.

12                All right.  Let's deal first of all with the

13    evidentiary dispute that was pending before we left.  So a

14    couple of things.

15                For starters, my recollection about what Mr.

16    Berl said as far as nausea and fatigue, although if you

17    remember, Mr. Berl, you initially, by accident or mistakenly

18    said neurotoxicity.

19                MR. BERL:  Correct.

20                THE COURT:  You were clear.  You said in an

21    effort to propel the case, we get within seven days, we

22    would be willing to even limit those.  Actually, let me

23    preface it my saying, two of our experts give unexpected

24    opinions about unexpected properties, unexpected nausea and

25    neurotoxicity, which later you on confirmed and your papers

1    said it was fatigue.  In order to propel the case and get

2    within seven days, we would limit those and say those

3    experts won't testify about those as long as defendants

4    can't respond to those opinions, as long as it goes both

5    ways.  And so we'll take all of the unexpected properties

6    off the table.

7                    MR. BERL:  Absolutely right.

8                    THE COURT:  All right.

9                    MR. BERL:  Absolutely correct.  Can I explain

10   for one moment what I understood that to mean?  I hope Your

11   Honor understood it the same way, which is the unexpected

12   pros of nausea and fatigue are off the table.  So whether

13   the prior art suggested there would be nausea and fatigue,

14   that's part of motivation, that's part of the prima facie

15   case.

16                    We can't come in and say, there was no nausea

17   with our product.  You won't know at the end of the trial

18   from us whether our product caused lots of nausea or no

19   nausea.  We won't tell you.  It doesn't matter.  It would

20   matter for unexpected properties.  It doesn't matter for

21   motivation.  And we're not going to tell you because we're

22   not doing a comparison of our product, what the result was

23   with are what one would have expected.

24                    THE COURT:  So why do you need to bring nausea

25   in at all?  What is then the reference to nausea show?

Tarriff - direct

1            MR. BERL:  Motivation.  The prior art

2    demonstrated that if you have a higher maximum drug

3    concentration, you would expect nausea, the person of skill

4    wouldn't have wanted to do that.  He would have thought it

5    it's a bad idea.

6            THE COURT:  It's an unexpected result.

7            MR. BERL:  No, no, no, Your Honor.  It's a

8    completely different inquiry.  Motivation looks at the prior

9    art only.  What would the POSA have thought as of the prior

10   art?  What would he or she have wanted to do and would he or

11   she have expected success?  That's it.  Unexpected results

12   of a property is, hey, surprisingly, it does X or Y or Z.

13           THE COURT:  I get that.  I get that.  I mean,

14   the problem is I think, there's overlap among these

15   doctrines is the real problem.  You know, if you could limit

16   your facial reaction.

17           MR. BERL:  Sorry.  I was just thinking.

18           THE COURT:  Yes.  So there's just, there's

19   overlap.  So you're right, reasonable expectation of success

20   is sometimes treated doctrinally different from unexpected

21   results.  Right?  That's a linchpin of your argument?

22           MR. BERL:  I think always treated differently.

23           THE COURT:  Right.  Well, I'm not so sure.  You

24   know, I just went and did a word search in Westlaw over

25   break and just put skepticism in the same sentence with

Tarriff - direct

1    obvious or nonobvious and prima facie case, and skepticism

2    the Federal Circuit explicitly at times was treating as a

3    secondary consideration.  Okay.  And yet I think we've had

4    cases where you all cited in the pretrial conference where

5    it looks like they're treating it as part of the prima facie

6    case.

7              Oh, you've already got teed up here something on

8    skepticism.  Okay.  It seems to me that there's overlap,

9    because if I'm going to look, not compare the prior art,

10   right, not do that comparison between prior art and the

11   results but I want to know what a POSA would have thought at

12   the time in question, that POSA that has in his or her brain

13   the prior art and the fact that they say I don't expect I am

14   skeptical of the result, I don't expect what's down the

15   line, that seems to me to be also relevant to the prima

16   facie inquiry.

17             MR. BERL:  What the POSA would have expected

18   based on the prior art, whether he or she would have had an

19   expectation of success is the prima facie inquiry along with

20   motivation.

21             THE COURT:  Okay.  All right.

22             MR. BERL:  It's limited to what's in the prior

23   art.  And it has nothing to do with what the result

24   ultimately was.

25             THE COURT:  Okay.  So then that makes sense to

1    me.  All right.

2              MR. BERL:  And that's what we are putting in in

3    our case.  That's what we are arguing, that there would have

4    been no motivation and no expectation of success.  We are

5    not arguing unexpected properties.  Unexpectedly, this has

6    no fatigue or less fatigue or less nausea.

7              THE COURT:  Now, what is it that your motion in

8    limine then, the opinions of the expert that were excluded?

9    And to the extent they just address skepticism generally,

10   what somebody would have expected but don't do a comparison

11   between the prior art and what the accused product -- not

12   the accused product, Bendeka.  The claimed invention.  Then

13   their expert should be allowed to testify then.

14              In other words, the defense expert now can come

15   in and testify about whatever they want except they just

16   can't do the last part, which is do a comparison of test

17   results.

18              MR. BERL:  I don't think so, and here's why.

19              THE COURT:  Okay.  Why not?

20              MR. BERL:  They can't talk about the comparison

21   because we've dropped those arguments and Your Honor is

22   right, they can't talk about the comparison because they can

23   only respond to us and if we don't say anything, they can't

24   respond.  They can't talk about the prima facie case because

25   Judge Sleet's order said they can't talk about the prima

1  facie case.  They can't put in a reply report which is where

2  we started with our motion in limine about the prima facie

3  case.

4         So with unexpected properties out, all that's

5  left is exactly what Your Honor said, prima facie evidence

6  of expectation, which they're not allowed to do, and as I've

7  said the other day --

8         THE COURT:  Here's my problem and I go back to

9  this though.  Granted, I did rule your way, but I went back

10  and looked at the transcript and I didn't focus before on,

11  did you tell me at the hearing, is this correct, that

12  everybody is limited to 40 pieces of prior art?  Is that

13  right?

14         MR. BERL:  So we had a --

15         THE COURT:  There's a reference in the

16  transcript to they were limited to 40.

17         MS. STAFFORD:  Just us, not then.

18         MR. BERL:  We don't assert prior art.

19         THE COURT:  They were limited.

20         MR. BERL:  Well, that was, that was by order.

21  If you recall, we all had a hearing.  We had too many claims

22  they said.

23         THE COURT:  Yes a simple yes, they were limited

24  to 40 references?

25         MR. BERL:  As part of the case management,

1    that's right.

2                THE COURT:  All right.

3                MR. BERL:  From the 86 that they originally

4    started with.

5                THE COURT:  Right.  Now, does your expert in

6    your expert's opening report or responsive report on

7    validity cite any prior art references beyond those 40?

8                MR. BERL:  Yes.  Prior art references, but let's

9    be clear, and this is what I think Ms. Stafford respectfully

10   didn't get right.  Let's say there was a reference that

11   wasn't even in their original 86 before they were limited to

12   40 by the Court's order and they ignored it.

13               That is part of a -- that's reference No. 87

14   that they should have -- they should have talked about

15   because it's part of the motivation.  It's part of the prior

16   art as a whole and they didn't.  It was their burden to come

17   forward and say, here's why we think it's obvious and they

18   ignored evidence.  We then come back and say, you ignored

19   something that says a third of patients get this bad side

20   effect and therefore, because of that side effect, the POSA

21   wouldn't have been motivated to practice this invention.  So

22   that's all part of the prima facie motivation case.  And

23   they should have put all of that in their report.

24               We said in our interrogatory response, I will

25   give it to you on prima facie, 55 and 56, the POSA would

1   have been concerned about these local toxicities.

2            We cite this rival label that I put on the

3   screen earlier this morning that cites the Ruffert data, the

4   very data we're relying on.  They should have accounted for

5   it.  Their experts messed up and now they want their experts

6   to do it in the third round and the order didn't allow for

7   that.

8            As I said, we would have put in a different

9   second round if they were responding in the third round.

10  They didn't do that.  We limited our second round

11  accordingly.

12            MS. STAFFORD:  Your Honor, can I respond?

13            THE COURT:  Yes.

14            MS. STAFFORD:  Yes.  So a number of references

15  that they put in their first round on validity or responding

16  to validity are not included in their interrogatories.

17  Their bendamustine that they point to cites to Ruffert, but

18  they didn't cite to Ruffert.  They didn't put us on notice

19  they were going to rely on these references.  There were

20  hundreds of thousands of references we could have

21  considered.  At the time we submitted our initial expert

22  reports, they were asserting 240 claims, 15 patents against

23  us.  The very day that we filed our opening reports, guess

24  how many claims they covered in theirs?  Ninety.

25            You want to talk about gamesmanship and

Tarriff - direct

1    sandbagging?  We did the best we could.  How are we supposed

2    to read their minds and know out of the thousands of

3    references they're going to focus on Ruffert?  Now they want

4    to basically preclude us, including proper rebuttal, whether

5    we fully disclosed our experts.  They deposed all of our

6    experts on everything.

7              MR. NELSON:  Your Honor, if I might add to that

8    before.  As I said before, Mr. Nelson.

9              Again, when they put something in a specific

10   bucket, secondary consideration bucket, like teaching away

11   or unexpected results, our experts, yes, they're going to

12   look at the scope and content of the prior art, but when

13   there's prior art that our experts say would not be

14   something that a POSA would consider, we can't pre-conceive

15   that and respond to it affirmatively.

16             THE COURT:  Right.  I do want to say on that, I

17   mischaracterized Mr. Berl's statement earlier in the morning

18   before we broke for lunch.  Mr. Berl did distinguish.

19   Teaching away he said was in the gray area but unexpected

20   results was not.

21             Now I understand, especially with the

22   clarification here, what he's basically saying is,

23   unexpected results, as long as you don't do the testing

24   comparison, the fact that a POSITA, without doing the

25   comparison, would not have expected it, that's relevant to

1     the prima facie inquiry.  Right.

2                 MS. STAFFORD:  It's also relevant to skepticism

3     and unexpected results.

4                 THE COURT:  Here's the problem, you know.  This

5     is where the case law isn't very helpful to a District Court

6     Judge.  I found in the hour break, and it literally took me

7     five minutes, three cases that say skepticism is a secondary

8     consideration.

9                 MR. NELSON:  Including this one they put up on

10    the screen.

11                The case they're about to rely on in front of

12    you clearly says all of those are secondary considerations.

13    The problem we have with the testimony that was elicited on

14    direct examination is what they are trying to do is set up

15    the unexpected results as a secondary consideration.

16                THE COURT:  There's no way he's going to get in

17    the test result comparison, so let's dispense with that.

18    Okay?

19                MR. NELSON:  I agree, but that's what they were

20    trying to do.

21                THE COURT:  I disagree with you.

22                Now, having said that, I think they're taking

23    advantage of the fact that the doctrine says there's overlap

24    and so skepticism is relevant to unexpected results, that

25    it's also relevant, or it's treated as a matter that's

1    considered within the prima facie inquiry.  So that's also

2    why it's hard.

3              And I also, I'm a little afraid because of the

4    manner in which these patent cases are reviewed de novo, I'm

5    just setting this up to retry again if I don't let this

6    evidence in.  That's what I'm really worried about.

7              MR. BERL:  Your Honor respectfully held as a

8    case scheduling matter, Your Honor enforced the scheduling

9    order that they clearly violated.  There's no question that

10   they violated the scheduling order.

11             THE COURT:  Well, I do think -- I mean, what's

12   very frustrating is I was left with this procedure that you

13   all agreed to.

14             MS. STAFFORD:  Can I respond to the last point?

15             THE COURT:  No.  Let's just stop.

16             MS. STAFFORD:  Because we didn't agree.

17             THE COURT:  No.  I said no.

18             MS. STAFFORD:  Sorry.

19             THE COURT:  All right.  Well, I am re-thinking

20   this, which isn't great for you all, but, you know, I do

21   have concerns about this.

22             Now, where I think the easy thing to do to

23   resolve the immediate issue before us is, Mr. Berl took

24   nausea and fatigue off the table, so --

25             MR. BROWN:  I will happily withdraw the bullet

Tarriff - direct

1    point.

2              THE COURT:  I think Mr. Berl wants to say that

3    was limited, it sounds like to a result comparison.  Is that

4    the point?  Right?

5              MR. BERL:  Correct.

6              THE COURT:  Yes.

7              MR. BERL:  For unexpected properties.

8              MS. STAFFORD:  Your Honor --

9              THE COURT:  Just give me a second.  All right?

10   It's a lot to digest.

11             So let me ask you:  Why is nausea, the bullet

12   point for nausea, relevant?

13             MR. BROWN:  The only reason I was positing it as

14   relevant is that Mr. Tarriff told individual investors the

15   pros, the cons as he understood them at the time.  They saw

16   this information and they decided not to invest.

17             THE COURT:  Okay.  But --

18             MR. BROWN:  And we have no results.

19             THE COURT:  Clearly, it's before you have

20   results.  So there was an expectation that the invention

21   could cause nausea.  Right?

22             MR. BROWN:  I had not intended that.  I had not

23   intended that and with that understanding, I'm happy to pull

24   it off.

25             THE COURT:  No.  What else would you have

Tarriff - direct

1    intended?  You didn't say people may not want to invest.

2    You said in a bullet point, it says nausea.  What was the

3    expectation and what was the communication made to the

4    potential investors as to why nausea was bullet pointed?

5              MR. BROWN:  Well, this is just, it's the fact

6    that this information going to the investors, the investors

7    are very sophisticated.  They look very hard.  They kick the

8    tires hard before they send the money and they looked at

9    this company in the time frame and said no.  So that's --

10   yes.

11             THE COURT:  So what is the word nausea there?

12   What is that communicating?

13             MR. Brown:  That's communicating to them at that

14   point in time that Mr. Tarriff was raising, these are

15   potential negatives of our, of our invention.  We're going

16   to have a higher Cmax.  He has the bullet point that says

17   nausea and he has a third bullet point.

18             THE COURT:  So the bullet point means and the

19   drug may cause nausea?

20             MR. Brown:  I believe that's a fair inference to

21   that bullet point.  Yes.

22             THE COURT:  Okay.  So what I'm going to do is,

23   I'm going to allow the document in.  I'm going to allow you

24   notwithstanding Mr. Berl's representation about nausea and

25   fatigue, to refer to nausea and fatigue.  You may not refer

1    to test results, but your proffering that exhibit and

2    proffering that line of argument opens the door for the

3    defense now to have their experts offer their opinions on

4    their, their expectation of success relative to nausea and

5    fatigue.

6            They cannot offer expert opinion on results,

7    test results comparing the patented product to the claims,

8    or the plaintiffs' product to the claims of the invention.

9    Can't look at test results after the fact.  But this does

10   open the door to skepticism or lack of skepticism or

11   expectation about the product.  All right?

12           MS. STAFFORD:  Thank you, Your Honor.

13           THE COURT:  All right.

14   BY MR. BROWN:

15   Q.    Mr. Tarriff, earlier when we were discussing Dr.

16   Sundarum's initial PowerPoint presentation, PTX-590 to you,

17   and he raised two concerns at the outset of the project,

18   solubility of the drug product and a risk of local tolerance

19   sissues, why weren't those risks identified to your

20   investors in PTX-730?

21   A.    Well, by the time we got to that period of time, we

22   had already worked through those issues and that was no

23   longer one of the negatives that we were very concerned

24   about.

25   Q.    And did any of the potential investors who received

1    the information in PTX-730 at the JP Morgan conference

2    decide to invest?

3    A.    No, not at that time.

4    Q.    And moving forward to after the FDA authorized your

5    clinical study, how did receiving the FDA authorization

6    affect your ability to raise money?

7    A.    Well, finally, my board gave me permission to go out

8    and look to raise money and we continued to meet with people

9    and we finally wound up with one company, a Japanese, large

10   Japanese company by the name of JAFCO came in and invested.

11   Q.    And before JAFCO invested, how many funds did you talk

12   to that declined to invest?

13   A.    At least a couple, I'm sure.

14   Q.    And I would like to put up PTX-737.  And what is this

15   document, Mr. Tarriff?

16   A.    This is the clinical study report.  This is the

17   conclusion after we filed the clinical trial.

18   Q.    I just want to ask you one question.  What was the

19   date of the final report?

20   A.    It was January 29th of '15.

21   Q.    So that was about two years after, two years after the

22   FDA gave you the authorization.  Why did that take so long?

23   A.    First of all, these are very hard studies to run and

24   time-consuming studies.  So the first part of it was

25   finding, getting protocols written.  Then we had to go out

Tarriff - direct

1  and find sites that would run the study for us, so that took

2  quite awhile.

3       We ultimately wound up with ten sites.  We ultimately

4  wound up with about 80 subjects.  So it just took a long

5  time to get people to recruit this type of a cancer.  We

6  got about eight cancer patients to agree to the study per

7  month.  It took a long time to recruit and run these

8  studies.

9  Q.    Mr. Tarriff, as Eagle was working on developing its

10  bendamustine product, did you engage in discussions with

11  other companies about possibly taking a license to the

12  product?

13  A.    We did.

14  Q.    And who was the first company that you approached

15  about that?

16  A.    We went to Cephalon first.

17  Q.    And why did you go to Cephalon first?

18  A.    Well, they were, they knew the most about

19  bendamustine.  They were the leaders.  They had, you know,

20  so much skill that we didn't have.  They had the clinical

21  groups and they had scientists and they had all the data

22  with the FDA.  They had commercial teams.  So we approached

23  them.

24  Q.    And I would like to focus then on the time frame after

25  Eagle began working on the short infusion concept.  Did you

Tarriff - direct

1   go back to Cephalon at that point in time?

2   A.    We did.  We went back again, yes.

3   Q.    And I would like to put up PTX-905.  And what is this

4   document?

5   A.    This is a letter from Bill Marth to me expressing

6   interest that he wanted to potentially license some of our

7   products, including the bendamustine product.

8   Q.    And what was your relationship with Mr. Marth?

9   A.    Bill and I have been long term friends.  A long time

10  ago in our careers, I actually hired Mr. Marth into the

11  industry.  We worked together at Bristol-Myers and later

12  he became the president and CEO of Teva North America.

13  Q.    And so after this letter, what's the date of this

14  letter?

15  A.    May 1st, 2012.

16  Q.    And after this letter, how did the process work with

17  Teva to evaluate a potential transaction?

18  A.    I guess they have a specific diligence team.  They

19  brought in tremendous number of people.  We had a data room

20  set up with all of our data and all of our information.

21  They brought in countless people.  They just reviewed all of

22  our records and spoke to all of our team and they went

23  through a due diligence process.

24              THE COURT:  Can you hold up one second?  What

25  exhibit is this?

 1                    MR. BROWN:  This is PTX-905.

 2                    THE COURT:  All right.  Thank you.

 3        BY MR. BROWN:

 4        Q.    And now I'd like to go to DTX-1169.  And can you tell

 5        the Court what this document is?

 6        A.    Yes.  This is a memo from one of our executives, Guy

 7        Goldberg, and it is a, the final version of a presentation

 8        that we had sent to Teva as part of this diligence.

 9        Q.    And I'd like to -- and what is the date of this

10        exhibit?

11        A.    May 17th, 2012.

12        Q.    And if we could turn to slide 21 of this presentation.

13        And can you explain what is shown here?

14        A.    Yes.  This is the same table that we had discussed a

15        little bit earlier in my discussions with Dr. Schreiber on

16        my board showing the Preiss information and then letting

17        Teva know that we needed to do a clinical study in order to

18        ultimately have a drug approved.

19        Q.    And so just to go over it.  If we could highlight the

20        lower bullet point, anticipated clinical activity and

21        address PK safety.  What was that intended to convey?

22        A.    Well, once again, we needed to go run a clinical

23        trial, and we had to determine once and for all the safety

24        of doing it.

25        Q.    Now, we looked earlier at the presentation of Dr.

1    Schreiber.  There was a citation to Preiss directly on the

2    slide.  Was there any citation to Preiss anywhere in this

3    document?

4    A.    Not that I can see on this page.

5    Q.    Now, let's go to DTX-969.  And what is this e-mail?

6    A.    That's an e-mail.  I sent a note out to Carl

7    Strohmeier, who is on the Teva team.  Some questions had

8    come up and I'm sending him now, you know, that same

9    information to give him the information that would help him

10   in diligence.

11   Q.    And what are you attaching to this e-mail?

12   A.    It's the same data we had been looking at, the Preiss

13   article.

14   Q.    And why were you sending him the Preiss reference?

15   A.    They had questioned it.  They had seen it in the

16   presentation and he wanted more detail, I believe.

17   Q.    And I'd like now to go to PTX-752.  And I'd like to

18   blow up just the top e-mail.

19         What is this e-mail?

20   A.    Yes.  This is another e-mail that I had sent to Sri

21   and I've had conversations with the diligence team at Teva.

22   I was saying, I think the best way to handle Teva is to

23   provide a detailed response to local irritation issues

24   surrounding the bolus product.

25   Q.    Why did you want to send detailed information about

1    the local irritation issues?

2    A.    They had a number of questions about irritation and we

3    were trying to give them as much information as we possibly

4    can to make a decision.

5    Q.    What was the ultimate outcome of Teva's diligence on

6    your bendamustine product in 2012?

7    A.    They, too, turned us down.  I spoke to Bill and he had

8    a similar response.  He said, after all the diligence that

9    they did, they just had questions and did not think that the

10   risk reward of spending the money to do the study made sense

11   for them and they decided to pass.

12   Q.    Did you ever take -- sorry.  Did Teva ever take a

13   license to Eagle's bendamustine product?

14   A.    They did ultimately, yes.

15   Q.    And let's go to PTX-408.  And what is this document?

16   A.    This is the license agreement we finally signed with

17   Teva and Cephalon.

18   Q.    What is the date of this agreement?

19   A.    February 13, 2015.

20   Q.    And earlier we looked at the final clinical study

21   report, PTX-737, and that clinical study report, if you

22   recall, was dated January 29th, 2015.  Did the timing of the

23   clinical study report have anything to do with your ability

24   to finalize the license with Teva?

25   A.    Yes.  I think so.  I mean, after all this time, all

Tarriff - direct

1   the questions they had and all of the uncertainty they had

2   that we would be successful, it finally passed the study and

3   we got the license.

4   Q.    Did Bendeka ever reach the marketplace in the United

5   States?

6   A.    Yes.

7   Q.    And who markets Bendeka under this agreement?

8   A.    Teva.

9   Q.    And who is currently the manufacturer of Bendeka?

10  A.    We, Eagle.  We do the manufacturing.

11  Q.    And under this agreement, what royalty does Eagle

12  receive from Teva?

13  A.    Teva keeps 75 percent of the revenue and we keep

14  25 percent of it.

15  Q.    Why didn't Eagle just launch the product on its own?

16  A.    For a number of reasons.  I guess we could have if we

17  had to.  Here we are a small company and Teva had all of the

18  resources that we didn't have.  They had all the experience

19  dealing with drugs.  They had all the experience with the

20  FDA.  They knew all the issues surrounding it.

21          They were the expert.  They had a commercial

22  team that we didn't have that we would have to build.  It

23  just seemed like the best opportunity for us was just to

24  team up with them.

25  Q.    And how much has Teva paid Eagle under the agreement?

1    A.    I think so far we've received over half a billion

2    dollars from them over the years.

3    Q.    And thinking back to your negotiations with Teva in

4    2012, do you recall how much you were asking from Teva to

5    acquire the bendamustine product in total?

6    A.    I did.  The conversations I had with Bill Marth were

7    $100 million between up front payments and long-term

8    milestone payments.

9    Q.    How important is Bendeka to Eagle?

10   A.    It's really pretty much everything.  It is more than

11   90 percent of the revenue we have coming in.

12   Q.    Now, what did Eagle do with the revenue stream from

13   Bendeka?

14   A.    We put a lot of it into our R&D programs and we have,

15   you know, truly, it's great.  We think we may have one of

16   the best products in development now.  We hope to go to

17   clinical work shortly for metastatic breast cancer and

18   post-menopausal breast cancer patients.

19             We're working with the Department of Defense on

20   a drug to treat radiation exposure if there's a dirty bomb

21   or a nuclear power plant leakage.  We have another product

22   we're working with the Department of Defense for heat stroke

23   and another one for brain injury.  So we're pretty excited

24   about the pipeline.

25   Q.    And, Mr. Tarriff, did Eagle obtain any patents

1    covering its short infusion, low volume bendamustine

2    product?

3    A.    We have.

4    Q.    And were you excited for Eagle to obtain those

5    patents?

6    A.    Yes, we were.  It was a great accomplishment for all

7    of us, for the staff.  It was obviously very important to

8    us.

9    Q.    Now, we discussed the Teva exclusive license to the

10   Eagle product in the United States.  Has Eagle licensed the

11   Bendeka technology outside of the U.S.?

12   A.    We have.  We licensed it in Japan to a company by the

13   name of Symbio and we received a $10 million payment from it

14   so far.

15   Q.    Now, I just want to move the exhibits into evidence

16   now?

17            THE COURT:  Sure.

18            MR. BROWN:  And we would like to move into

19   evidence PTX-723, PTX-589, PTX-590, PTX-350, PTX-725,

20   PTX-726, DTX-1158, PTX-950, PTX-746, PTX-729, PTX-736,

21   PTX-730, PTX-737, PTX-905, DTX-1169, DTX-969, PTX-752, and

22   PTX-408.

23            MR. NELSON:  No objection, Your Honor.

24            THE COURT:  All right.  They're admitted.  Thank

25   you.  I appreciate, counsel, the way you did that.  That's

Tarriff - cross

1    an efficient way to do that.

2                      (PTX-723, PTX-589, PTX-590, PTX-350, PTX-725,

3    PTX-726, DTX-1158, PTX-950, PTX-746, PTX-729, PTX-736,

4    PTX-730, PTX-737, PTX-905, DTX-1169, DTX-969, PTX-752 and

5    PTX-408 were admitted into evidence.)

6                      MR. NELSON:  Your Honor, may I approach with

7    exhibits?

8                      (Mr. Nelson handed exhibits to the Court and to

9    the witness.)

10                     MR. NELSON:  May I proceed, Your Honor?

11                     THE COURT:  Yes.

12                     MR. NELSON:  Kevin Nelson, Your Honor.

13                     THE COURT:  I'm sorry?

14                     MR. NELSON:  Kevin Nelson.

15                     THE COURT:  That's what I was going to do.

16                     MR. NELSON:  I anticipated it.  May I proceed?

17                     THE COURT:  Please.

18                           CROSS-EXAMINATION

19   BY MR. NELSON:

20   Q.    Mr. Tarriff, thank you for your time.  I appreciate

21   you being here.

22                 You were not involved in the SciDose testing of

23   the formulation; is that correct?

24   A.    No.

25   Q.    I'm sorry.  Can you speak into the microphone so the

1    court reporter can hear you?

2    A.    Yes.

3    Q.    Thank you.

4    A.    How is that?

5    Q.    Better.

6           And the scientists at SciDose I think you

7    testified had come up with the formulation that's currently

8    being used; is that correct?

9    A.    It was done collaboratively between Eagle and SciDose.

10   Q.    You wanted SciDose to use ingredients that had been

11   approved by FDA for human use; is that correct?

12   A.    That would have been helpful.

13   Q.    Can we turn --

14           THE COURT:   Wait.   Sorry.   So is that yes or no?

15           THE WITNESS:   I'm sorry.   That's a yes.

16           THE COURT:   Okay.   Thank you.

17           MR. NELSON:   Thank you.   Can we turn to DTX-956,

18   please?

19   BY MR. NELSON:

20   Q.    And it's in your binder, sir.

21   A.    Mm-hmm.

22   Q.    And this is an e-mail that you received.   If you look

23   at the middle portion.   And this is similar to the project

24   pipeline meetings that you had with SciDose that you looked

25   at earlier?

Tarriff - cross

1    A.    Correct.

2    Q.    And if you can turn to page 6 of that document, and we

3    saw something similar in your direct examination to this

4    document as well.  Is that correct, sir?

5    A.    I believe so.

6    Q.    And Eagle's filing strategy here was a 505(b)(2)

7    strategy; is that correct?

8    A.    That's correct.

9    Q.    You understood that Eagle couldn't file a patent --

10   couldn't file a 505(b)(2) application until March of 2013;

11   is that correct?

12   A.    Where do we see that?

13   Q.    If you look at the filing, critical file date there in

14   the box.  Sorry.

15   A.    Let me just find that.  I'm sorry.

16   Q.    No problem.  There's a target timeline.

17   A.    Yes.

18   Q.    Critical filing date, 3/13 NCE?

19   A.    Yes, I see that.

20   Q.    And your experience in the industry, an NCE

21   exclusivity would prohibit any filing of an application by

22   anyone competing with that product; is that correct?

23   A.    Where do you see that here?

24   Q.    I'm asking about your experience in the industry.  An

25   NCE exclusivity would prohibit the filing of a 505(b)(2)

1    until the expiration?

2    A.    I'm not positive but I think that may be correct.

3              THE COURT:  So for my benefit because I'm a

4    fact-finder, what did you say?  An NCE?

5              MR. NELSON:  I apologize.

6              THE COURT:  You don't have to apologize.  I'm

7    not in the weeds like you guys are.  I've got about

8    500 cases across the board on all sorts of different things.

9    I don't specialize like you do.

10             MR. NELSON:  That was going to be my next

11   question, so thank you.

12   BY MR. NELSON:

13   Q.    An NCE is a new chemical exclusivity?

14   A.    Correct.

15   Q.    And that exclusivity is a period of time during which

16   a competing product cannot even file an application with FDA

17   to compete; is that correct?

18   A.    I believe so.  I'm not sure if it includes 505(b)(2).

19   Q.    You've been in the industry for several decades?

20   A.    Yes, but I'm not an expert in this:  I'm sorry.

21   Q.    This was your filing strategy, 505(b)(2).  You said

22   you looked at opportunities in the market?

23   A.    I still don't have a detailed understanding of the

24   details of NCE exclusivity.

25   Q.    Okay.  And if we look at the next box, if we keep that

1    box up and -- if we keep that timeline box up and go to the

2    next section, Eagle understood that it wouldn't be able to

3    get approval or launch the product until March of 2015; is

4    that correct?

5    A.    I don't recall that and that does not sound familiar

6    to me.

7    Q.    You recognize ODE there to be an orphan drug

8    exclusivity?

9    A.    Yes.

10   Q.    An orphan drug exclusivity prohibits a filer who files

11   their application from getting approval and launching their

12   drug for a seven-year period?

13   A.    That's correct.

14   Q.    And this is anticipating Eagle is anticipating it

15   couldn't even launch a product until March of 2015; is that

16   correct?

17   A.    Yes.  That is what it says.  I don't have a

18   recollection on the timeline, however.

19   Q.    And if we go to the bullet points that are below the

20   timeline, the fourth one talks about a provisional patent

21   application that was filed in January of 2010; isn't that

22   right?

23   A.    I see that, yes.

24   Q.    And just below that in the developmental portion, it

25   says, developmental work was initiated on 7/09 and is

1    ongoing; is that correct?

2    A.    That's correct.

3    Q.    So a patent application had been filed post the

4    developmental work but that developmental work was still

5    ongoing even though a patent application was filed; is that

6    right?

7    A.    I don't know what the ongoing work is that's indicated

8    here.

9    Q.    Well, you participated in this meeting; is that

10   correct?

11   A.    I don't know if I did or did not.  I went to some of

12   these meetings.  I did not go to all of them.

13   Q.    So if we look a couple bullet points below that, if we

14   look at the one, two, three, the third arrow there, it was

15   discussed, and you can see if we go all the way through

16   non-IIG 2, by lipoic acid.  Eagle discussed using lipoic

17   acid; is that correct?

18   A.    At some point we did.

19   Q.    The reference to non-IIG 2 means that that component

20   is not FDA approved?

21   A.    I have no idea what that means.  I'm just not an

22   expert on the detail.

23   Q.    You provided extensive formulation in different

24   testimony that formulations that Eagle and SciDose made; is

25   that correct?

Tarriff - cross

1    A.    Generally, I understand some of this.  I'm not a

2    formulator.  I'm not a scientist.  I don't get involved with

3    any of the detailed formulation or how they are developed,

4    so I'm just not skilled or able to comment on this type of

5    topic.

6    Q.    Now, you do know, however, that Eagle did not use

7    lipoic acid in its product.  It used a different

8    antioxidant?

9    A.    I believe that's the case.

10   Q.    That's monothioglycerol?

11   A.    I don't recall.

12   Q.    You personally looked at the Treanda label when

13   developing bendamustine, deciding that bendamustine would be

14   a product that Eagle would focus on?

15   A.    I did.

16   Q.    You testified today you wanted to do exactly what

17   Treanda was doing, the same schedule, same dosing, same

18   active ingredient; right?

19   A.    For the lyophilized powder product, that's correct.

20   Q.    And Treanda?

21   A.    That's Treanda.

22   Q.    When Eagle was working on bendamustine, its goal was

23   to turn an already marketed lyophilized product into a ready

24   to use product?

25   A.    That's correct.

Tarriff - cross

1    Q.    You're aware of many of drugs that have been taken

2    from a powder, lyophilized powder and turned into a liquid

3    form?

4    A.    That's correct.

5    Q.    You would agree that in 2009, people believed that

6    there was a preference to have a liquid product over a

7    powder if the product was a cytotoxic drug; is that correct?

8    A.    That is correct.

9    Q.    And you testified earlier, bendamustine is a cytotoxic

10   drug; is that correct?

11   A.    It is.

12   Q.    And that was known to be a cytotoxic drug?

13   A.    That's correct, yes.

14   Q.    In 2009, pharmacists generally preferred a liquid

15   cytotoxic drug over powdered cytotoxic drugs in order to

16   preparer comfort that they would not come in contact with

17   the cytotoxic vapors that are associated with that drug; is

18   that correct?

19   A.    Certainly, they were, there was always a benefit for

20   having liquid product in the market over a powder product.

21   It takes less time to reconstitute.  It's less costly.  Yes.

22   For the most part, people would rather have a liquid over a

23   powder.

24   Q.    And you had experience in your career in working on

25   and filing 505(b)(2) products; is that correct?

Tarriff - cross

1   A.    That's correct.

2   Q.    In fact, Eagle itself files a lot of 505(b)(2)

3   applications?

4   A.    We do.

5   Q.    A 505(b)(2) application, it's not a full new drug

6   application; is that correct?

7   A.    What a 505(b)(2) formulation, whatever change you'll

8   make to an NDA, the FDA asks you to prove the safety and

9   efficacy of the change that you are going to make.  That's

10  the definition of a 505(b)(2).

11  Q.    You knew that going from a lyophilized product to a

12  liquid product would require the filing of a 505(b)(2)?

13  A.    That's correct.

14  Q.    You knew that filing the 505(b)(2) application as

15  opposed to a new drug application means you could avoid the

16  expense for a costly Phase 3 study?

17  A.    Not necessarily, no.

18  Q.    That's what you were hopeful for?

19  A.    In the original formulation of the lyophilized liquid

20  ready-to-use did not require a clinical trial.

21  Q.    You knew that Eagle would be able to perform

22  bioequivalency studies that would compare the blood levels

23  of the bendamustine product with the Treanda product and it

24  could rely on the already established safety and efficacy

25  that Treanda already had disclosed; correct?

1    A.    Yes.  It's 505(b)(2) work, I believe.

2    Q.    You expected that Bendeka would be just as effective

3    as Treanda for treating cancer patients without doing any

4    efficacy testing?

5    A.    That's correct.

6    Q.    That's because the dose is the same and active

7    ingredient is the same?

8    A.    For the original benefit that we developed, that's

9    correct.

10   Q.    Now, Cephalon was the original manufacturer of the

11   Treanda product; is that correct?

12   A.    Yes.

13   Q.    And they used a 30 or a 60-minute infusion time for

14   the bendamustine product depending on the specific

15   indication; is that right?

16   A.    That's correct.

17   Q.    And I would like you, please, to turn in your binder

18   to DTX-960, please.  And this is an e-mail communication

19   throughout between you and a Dr. Peter Grebow.

20         Do you see that?

21   A.    I do.

22   Q.    And Dr. Grebow was a consultant that Eagle used to

23   work on the bendamustine product; is that correct?

24   A.    Correct.

25   Q.    Dr. Grebow was originally working for Cephalon; is

1    that right?

2    A.    Yes.  He was with Cephalon for quite a number of

3    years.

4    Q.    And he actually worked with Cephalon on bendamustine;

5    is that right?

6    A.    He did.

7    Q.    At the time of had communication, he was working for

8    Eagle; is that correct?

9    A.    I believe so.

10   Q.    Dr. Grebow is extremely well-known and respected in

11   the industry; is that right?

12   A.    Peter Grebow had been in the industry for quite

13   awhile, yes.

14   Q.    You considered it fortunate for Eagle that they had

15   retained him; isn't that right?

16   A.    I did.

17   Q.    If you could turn to the fifth page of this document,

18   this is the e-mail from you to Dr. Grebow, and in that

19   middle portion there, you ask Dr. Grebow about whether he

20   has any insight as to why Treanda was infused with a

21   30-minute infusion rate; is that right?

22   A.    I do.

23   Q.    And if we can flip to Dr. Grebow's response, which is,

24   which spans pages 2 to 3, and he tells you that the

25   30-minute infusion time for Treanda was driven by, that's

1    how the clinical studies were done and they didn't want to

2    touch it.  Correct?

3    A.    That's what he said.

4    Q.    And, in fact, he said it was his decision to keep it

5    at a 30-minute infusion time and not change it; is that

6    correct?

7    A.    I don't know if it was.  Let me read that.  Yes,

8    that's what he says.

9    Q.    He said he didn't want to screw around with the

10   infusion time; is that right?

11   A.    That was why we did not screw around with the infusion

12   time.

13   Q.    That is what he informed you?

14   A.    That's what he says here.

15   Q.    And if we can go to the very first page of this

16   exhibit, and if we look at another communication from Dr.

17   Grebow at the bottom, he again reiterates that the 30-minute

18   infusion time was merely to be consistent with the previous

19   30-minute infusion that was done in the clinical studies and

20   to be consistent from a regulatory perspective; is that

21   correct?

22   A.    Let me take a moment and read this.

23   Q.    Sure, please.

24   A.    If you don't mind.  What is your question?

25   Q.    The question is:  He merely reiterates again they

1   didn't want to change from the 30-minute infusion already

2   used in clinical studies?

3   A.    I think he says a lot in this sentence, in this

4   paragraph, but, yes.

5   Q.    Okay.  And if we go to the sentence that's about

6   three-quarters of the way down, in this case, he said.  He

7   says, in this case, going from a 30 to 15-minute infusion

8   would most likely not have an effect.  That's what Dr.

9   Grebow told you; is that correct?

10  A.    Yes.  I don't know what he's referring to effect on

11  what, but that's what he's saying to me.

12  Q.    Okay.  Now, you received this information, and if we

13  go to the very top, you conveyed it to another Eagle

14  employee named Ken Degan; is that correct?

15  A.    Yes.

16  Q.    Okay.  And you told Ken that you don't anticipate any

17  infusion site problems; right?

18  A.    In this, that's what the word say.  That's what they

19  say, at that time.

20  Q.    Now, at some point in time in its project, Eagle

21  decided it was going to reduce the administration of

22  bendamustine to ten minutes?

23  A.    That's correct.

24  Q.    You don't know why Eagle shortened the infusion time

25  to ten minutes; right?

Tarriff - cross

1    A.    No.

2    Q.    Can we go to DTX-969, please.  And I believe you

3    looked at this document during your direct examination; is

4    that correct?

5    A.    I did.

6    Q.    And Carl Strohmeier is a Teva employee; is that

7    correct?

8    A.    Correct.

9    Q.    And you specifically are providing some information

10   about the Preiss article that you attach in here with

11   respect to the milligram and kilogram or milligram per

12   meter squared that were dosed in this article; is that

13   correct?

14   A.    Yes.

15   Q.    You don't speak German, do you, sir?

16   A.    No, I do not.

17   Q.    Let's go to the next page, which is the attached

18   article.  And this is the Preiss 1985 article that you

19   provided to Mr. Strohmeier; is that correct?

20   A.    Yes.

21   Q.    Okay.  And it's for the most part in German; is that

22   right?

23   A.    Yes.

24   Q.    Okay.  So you obtained this 215-milligram per kilogram

25   information in the calculation from someone else do I

Tarriff - cross

1    assume?

2    A.    I would assume so, yes.

3    Q.    I'd like to look at the section that says

4    pharmacokinetics of bendamustine.  And this information is

5    actually English; is that correct?

6    A.    Yes.

7    Q.    It's a little hard to read.  This is how we got it

8    from you.

9              This article, the Preiss 1985 article that you

10   provided, talks about bendamustine; is that correct?

11   A.    It does.

12   Q.    Okay.  And if we look, the bendamustine in this

13   product was infused over three-minute periods; is that

14   correct?

15   A.    It is.

16   Q.    So you would agree with me that in 1985, a published

17   article, one that you found and sent over to a colleague,

18   another professional colleague, had discussed intravenous

19   administration of bendamustine that was less than

20   30 minutes; is that correct?

21   A.    It was three minutes, correct.

22   Q.    Okay.  And you agree with me then that Eagle was not

23   the first to infuse bendamustine in less than 30 minutes; is

24   that correct?

25   A.    No.  What this does if I recall is what they did is

1    they infused once a day at three minutes.

2    Q.     Sir, my question was:  Eagle was not the first to

3    administer bendamustine in less than 30 minutes; is that

4    correct?

5    A.     Preiss here did infuse a three-minute product.

6    Q.     And that's less than 30 minutes?

7    A.     Three is less than 30.

8    Q.     Thank you.

9           Let's turn to DTX-1398, please.  And this is an

10   e-mail correspondence with you and Dr. Sundaram, who we

11   heard about before and Dr. Grebow along with some others and

12   the date is May 23rd, 2012; is that correct?

13   A.     I'm sorry.  What document number is that?

14   Q.     I apologize.  DTX-1398.

15   A.     All right.  Let me just take a second to find that.

16   Q.     Please.

17   A.     Okay.  Go ahead.

18   Q.     So 1398 is an e-mail correspondence with you, Dr.

19   Sundaram, Dr. Grebow and some others; is that correct?

20   A.     Yes.

21   Q.     And it's dated May 23rd, 2012; is that correct?

22   A.     Yes.

23   Q.     And we can look back, but that's the same date as the

24   document we just looked at that you forwarded to

25   Mr. Strohmeier; is that correct?

1   A.   Yes.

2   Q.   Now, if we look at Dr. Sundarum's e-mail at the top

3   and we look at that second paragraph, that mentions a

4   Schoffski 2000b article that he's attaching?

5   A.   It does.

6   Q.   And that article, according to Dr. Sundaram, also

7   mentioned this 215 milligrams per meter squared clinically

8   tolerated dose; right?

9   A.   That's what he said.

10  Q.   It's the clinically tolerated dose for a bolus?

11  A.   That's what he said.

12  Q.   You said Dr. Sundaram was your lead scientist for this

13  project?

14  A.   He was.

15  Q.   So he knows what he's doing; is that right?

16  A.   He should.

17  Q.   He should or he does?

18  A.   He does in most instances, yes.

19  Q.   And he's obtaining that information and Schoffski is

20  obtaining that information from the Preiss article; is that

21  correct?

22  A.   I believe so.

23  Q.   So let's keep that on there but let's look at his

24  further discussion, and if you look at the next portion, the

25  215 milligrams per meter square, the Schoffski article says

1    that the adverse events were related to the dose right

2    underneath there; right?

3              So Schoffski, or Dr. Sundaram is telling you and

4    others that Schoffski says that 215 milligrams per meter

5    squared adverse events are related to the dose; is that

6    correct?

7    A.    Let me take a look at that if you don't mind.

8    Q.    Sure, please.

9    A.    Where did you see that?  I'm sorry.

10   Q.    It's highlighted on the screen if you want to take a

11   look there, more convenient.  He says the 215 per millimeter

12   squared, he provides some adverse events that the article

13   reported.  He said those adverse events are related to the

14   dose; is that correct?

15   A.    That's what he says.

16   Q.    He further says, they're not related to dose and not

17   necessarily the infusion duration, because it goes on to say

18   that the 30-minute infusion (at lower doses) also results in

19   similar effects.

20             That's what Dr. Sundaram says; is that correct?

21   A.    That's what he says.

22   Q.    He goes on to quote actually from the Schoffski

23   article to say, in accordance with the three-minute single

24   IV infusion data, our 30-minute infusion schedule also

25   resulted in the same adverse events; right?

Tarriff - cross

1    A.    That's what he said.

2    Q.    So Eagle was aware in 2012 that as of at least 2000,

3    it would have known that the three-minute infusion of

4    bendamustine had similar adverse events to the 30-minute

5    infusion of the drug; is that correct?

6    A.    I don't believe that's, that's true.

7    Q.    That's what Dr. Sundaram is observing from the

8    Schoffski article; is that correct?

9    A.    Where does he say the 30 minutes, please?

10   Q.    Right --

11              THE COURT:  So we have a rule in the courtroom.

12              THE WITNESS:  Yes.

13              THE COURT:  The person at the podium asks the

14   questions.  The witness answers them.

15              THE WITNESS:  Sorry.

16              THE COURT:  And I don't take offense.  Don't

17   worry about that.  There's no negative on you, but let's

18   play by the rules.  Thanks.

19   BY MR. NELSON:

20   Q.    Again, where he quotes from the article, he says, in

21   accordance with the three-minute single infusion data, our

22   30-minute infusion schedule also resulted, and he provides

23   the adverse events; is that correct?

24   A.    That's what he said, yes.

25   Q.    That was known to Eagle?

Tarriff - cross

```
 1   A.     At that time.

 2   Q.     That was known in the industry at that time; is that

 3   correct?

 4   A.     I don't know what was known in the industry.

 5   Q.     It's reported in published articles?

 6   A.     Yes.

 7   Q.     Ones that Dr. Sundaram looked at and considered?

 8   A.     Yes.

 9   Q.     Thank you.

10          Now, I would like to look at the next document,

11   which is one that you looked at during your direct

12   examination.  If we can pull up DTX-1158, please.

13          And you recall testifying about this during your

14   direct examination; is that correct?

15   A.     I do.

16   Q.     And if we can go to page 6 of this document, which is

17   DTX-1158, page 6.

18              THE COURT:  Is this in the notebook?

19              MR. NELSON:  It's in his notebook, the direct.

20              THE COURT:  The direct?

21              MR. NELSON:  Yes.

22              THE COURT:  Thanks.

23              THE WITNESS:  I will find that, too.  What

24   number is it?

25              MR. NELSON:  1158.
```

1              THE WITNESS:  Thank you.

2              MR. NELSON:  You're welcome.

3   BY MR. NELSON:

4   Q.    And go to page 6, please.  And you spoke a little bit

5   about this slide.  And if we look at the tolerability

6   aspect, your slide says the clinically tolerated dose for a

7   single three-minute bolus is reported in Preiss; is that

8   correct?

9   A.    Correct.

10  Q.    Now, you said during your direct examination that

11  Preiss was a concern because it wasn't tolerated by

12  patients.

13            Do you recall your testimony there?

14  A.    I do.

15  Q.    But here, in fact, Eagle is saying that the dose for

16  the three minutes was clinically tolerated; is that correct?

17  A.    Yes.

18  Q.    Okay.  I'd also like to look at the next page, which

19  is the seventh page.  And here is the discussion of the

20  rabbit tolerance study that you discussed a little bit on

21  your direct examination.

22            Do you recall that testimony?

23  A.    I do.

24  Q.    And you said the rabbit tolerance study was concerning

25  to a lot of people; right?

1   A.    I don't recall saying that.

2   Q.    You said that you provided that information to

3   investors and that concerned them, correct, because it

4   showed irritation?

5   A.    I don't believe that's what I said.

6   Q.    Okay.  Is that wrong?  Rabbit tolerance study did not

7   show irritation?

8   A.    No.  We gave people quite a bit of data.  They

9   reviewed it and then they turned us down.  I don't recall

10  saying specifically that they saw the animal data and that

11  concerned them.

12  Q.    The testimony will bear out what it was correctly, one

13  way or the other way.

14          But if we can look at the results for the rabbit

15  tolerance study, and it says there that all formulations

16  were well tolerated via IV; is that correct?

17  A.    That's correct.

18  Q.    So the rabbit tolerance study showed no irritation and

19  it was well tolerated; is that correct?

20  A.    That's what it says.

21  Q.    This would not have concerned investors; is that

22  correct?

23  A.    Not specifically.

24  Q.    And this was the only animal data you testified about

25  on direct examination?

1    A.    That's correct.

2    Q.    You didn't testify about any other animal; is that

3    correct?

4    A.    No, I don't believe so.

5    Q.    So this would have been the one that you would have

6    shown to investors; right?  I will withdraw that.

7    A.    No.

8    Q.    I will withdraw it.  You don't have to answer that.

9    That's okay.

10            Go to DTX-1176, please.  Now I'm back on the

11   cross-examination binder.

12            And very briefly, I just want to tie this point

13   up.  This is an e-mail, DTX-1176, from Dr. Sundaram to you

14   and Dr. Grebow; is that correct?

15   A.    Correct.

16   Q.    And it says, he's including a slide on potential

17   issues suggested by you; is that correct?

18   A.    Correct.

19   Q.    And if we look at the slide, this is the same slide we

20   were just looking at with respect to a report that

21   clinically tolerated doses were found in the Preiss article;

22   is that correct?

23   A.    That's correct.

24   Q.    That was your suggestion; is that right?

25   A.    To put the presentation together.  I don't know if I

1   consistently mentioned these slides, but I did suggest

2   putting the presentation together.  I agree.

3   Q.    I want to switch gears a little bit, sir, and talk

4   about some chair time issues that you talked about during

5   your direct examination.

6           You testified that your belief that there's some

7   chair time benefit is based on conversations you had with

8   people in the industry; is that correct?

9   A.    That's correct.

10  Q.    If we could look, please, at DTX-959.  And this is an

11  e-mail correspondence forwarded to you Dr. Ken Degan.  Ken

12  Degan is an employee to Eagle?

13  A.    He was.

14  Q.    No longer there.  And Jim McAllister is a consultant

15  for Eagle; is that right?

16  A.    He was.

17  Q.    Okay.  And Mr. McAllister was corresponding with Dr.

18  Grebow, who is also working on behalf of Eagle at the time;

19  is that correct?

20  A.    Correct.

21  Q.    Now, Mr. McAllister reports on some communications he

22  had with nurses and pharmacists and oncologists; is that

23  correct?

24  A.    Correct.

25  Q.    Number four, he states that since the drug is

1    administered only twice every 28 days, a faster

2    administration time wasn't seen as having a significant

3    impact on throughput; is that correct?

4    A.    That's what he says at this time, yes.

5    Q.    So these are industry people telling Eagle that chair

6    time and faster administration, not an issue for them; is

7    that correct?

8    A.    To these particular people, through the report he

9    submitted.

10   Q.    And at the bottom of Mr. McAllister's e-mail, he says

11   that from his point of view -- and he's your hired

12   consultant; is that correct?

13   A.    He was a consultant to us, yes.

14   Q.    And he had lots of experience doing clinical study

15   work and assisting companies with FDA issues; right?

16   A.    He was a pharmacist by training.

17   Q.    From his point of view, the only reliable advantage

18   for the new formulation is elimination of waste; is that

19   correct?

20   A.    That's what he says.

21   Q.    Go to DTX-968.  And you'll have to -- excuse me.  Is

22   it Dr. Goy?

23   A.    Goy.

24   Q.    Okay.  Thank you.

25         This is an e-mail communication between you and

Tarriff - cross

 1    Dr. Goy; is that correct?

 2    A.    Correct.

 3    Q.    And we did look at this during your direct

 4    examination; isn't that right?

 5    A.    Correct.

 6    Q.    Now, doctor Goy in his communication with you --

 7    let's -- first, let's go to your initial communication.  Go

 8    to page 3.

 9              Now, if we go to the second paragraph of your

10    e-mail to Dr. Goy, you're describing to him conception of a

11    five-minute infusion or a three-minute infusion; is that

12    right?

13    A.    Yes.

14    Q.    Okay.  And at first Dr. Goy didn't substantively

15    respond to you; is that right?

16    A.    I don't recall.  It took him awhile.

17    Q.    If we go to your next e-mail, which is on page 2, and

18    if we look at the second paragraph under, hi, Andre?

19    A.    Yes.

20    Q.    Now you're proposing an eight-minute infusion to him?

21    A.    Right.

22    Q.    He didn't raise any question about the infusion.

23    That's right?

24    A.    I don't see that.

25    Q.    Okay.  And if we go to his response on the first page,

1    he tells you that bendamustine is never given alone at his

2    facility.  Rather, always in combination.  So the shortening

3    of IV time might not be appealing; is that correct?

4    A.     That was his opinion as to time, yes.

5    Q.     And you asked for his opinion; right?

6    A.     I asked him to run the clinical trial for me, yes.

7    Q.     Because you wanted, you wanted him to take in a study

8    of shorter infusion time?

9    A.     I wanted him to run the study for us, yes..

10   Q.     You couldn't quite get right whether it was three

11   minutes or five minutes or eight minutes; is that correct?

12   A.     We had -- we had different durations of a time across,

13   you know, as we were working on the project.

14   Q.     But Dr. Goy never tells you he had a concern of

15   adverse events with a faster administration; is that

16   correct?

17   A.     I don't believe he does in this e-mail.

18   Q.     He just says he has no need for a shorter infusion

19   time product; right?

20   A.     I would have to read through the entire comments from

21   him, but I don't see that here, no.

22   Q.     Right there in black and white, doesn't he say the

23   shorter IV time is not appealing because it's

24   co-administered with another product?

25   A.     That's what he said.

1    Q.    The other product takes a much longer administration

2    time; is that correct?

3    A.    Yes.  He says, the shortening of the of the IV time

4    might not be as appealing, question mark?

5    Q.    If you want to step back to your original e-mail on

6    page 3.  And in the fourth paragraph, you're telling Dr. Goy

7    about the faster infusion, that there's good literature

8    mostly from Europe where the product has been dosed as a

9    bolus without adverse events; is that right?

10   A.    That's what I'm saying.

11   Q.    And that's the Preiss reference that we looked at

12   earlier; right?

13   A.    I think it is.  What I'm doing in this letter, I'm

14   just giving him quite a bit of information and I'm trying to

15   give him the totality of everything that we have to try to

16   get him to run the study for me.

17   Q.    You're also giving him information that's hopefully

18   available in the literature; is that correct?

19   A.    I am, yes.

20   Q.    And that information is that a three-minute infusion

21   caused no adverse events with bendamustine; is that correct?

22   A.    What I'm saying here, I can -- right.  There's good

23   literature mostly from Europe.

24   Q.    And now you're aware that bendamustine is frequently

25   administered with a drug called Rituxan; is that correct?

1   A.    That's correct.

2   Q.    Rituxan is another chemotherapeutic agent?

3   A.    It is.

4   Q.    And the administration time of Rituxan is significant

5   and longer than Treanda; is that correct?

6   A.    It is.

7   Q.    You don't know of any patient surveys regarding the

8   difference between a ten-minute infusion and a 30-minute

9   infusion; is that correct?

10  A.    Can you expand that?  I'm sorry.

11  Q.    Sure.  Eagle has never done any surveys that showed

12  whether there was any actual difference in patient

13  experience between the ten-minute and the 30-minute

14  infusion; is that correct?

15  A.    Since the product was launched?

16  Q.    Yes.

17  A.    That would not be our responsibility to do that.

18  Q.    And so you've never done it; is that correct?

19  A.    We have not done it.  I don't know if Teva has or not.

20  Q.    And you're not aware of any clinics across the country

21  that have been able to treat more patients after Bendeka has

22  become available on the market?

23  A.    I have not discussed that, no.

24  Q.    Let's go to DTX-1171, please.  This is an e-mail from

25  Ken Degan to you and some others at Eagle; is that correct?

Tarriff - cross

1    A.    Correct.

2    Q.    And this is a market research report; is that right?

3    A.    Yes.

4    Q.    Okay.  And you commissioned this report to be done; is

5    that correct?

6    A.    I believe so, yes.

7    Q.    All right.  We can take that down now.

8              I want to go to -- I want to go to, to talk

9    about another issue here and that involves your

10   communications with the Hackensack organization and Dr.

11   Goy.

12             You had said that Dr. Goy initially turned you

13   down to do a clinical study; is that correct?

14   A.    That's correct.

15   Q.    And we saw that e-mail.  It wasn't because of adverse

16   events that he turned you down; is that correct?

17   A.    I don't know why he turned us down, but he turned us

18   down.

19   Q.    But you didn't think it had anything to do with

20   adverse events because you knew Preiss already said there's

21   no problem with adverse events?

22   A.    I don't believe that's what I thought.

23   Q.    Let's turn to DTX-314, please.  And this is a document

24   that Eagle submitted to FDA; is that correct?

25   A.    Yes.

Tarriff - cross

1  Q.    And this is called a pre-IND -- pre-IND meeting

2  background materials.

3              Do you see that?

4  A.    I do.

5  Q.    And you've been involved in IND filings; is that

6  correct?

7  A.    I have.

8  Q.    An IND filing is Investigational New Drug Application;

9  is that correct?

10  A.    That's correct.

11  Q.    That's the request for a first opportunity to put a

12  drug in a human patient; is that correct?

13  A.    That's correct.

14  Q.    Before that, it can't be put in a human patient?

15  A.    Correct.

16  Q.    This is before Eagle has ever put bendamustine in its

17  proposed formulation in any person; is that correct?

18  A.    That's correct.

19  Q.    So let's look at page 20 of the document.  And if you

20  look at that section, detailed review of literature.

21              And here, Eagle is telling FDA that when

22  administered as a three-minute bolus at the 215 microgram

23  per milliliter well above what Eagle's proposed product

24  is -- let's stop right there.  That's the first thing that

25  FDA is telling, or that's the first thing Eagle is telling

Tarriff - cross

1    FDA; is that correct?  That there's clinically tolerated

2    doses that were administered at the three-minute bolus at

3    215 milligrams per meter squared?

4    A.    I can see that's what we have in the document.

5    Q.    You have no reason to believe Eagle would tell

6    something incorrect to FDA?

7    A.    I don't think so, no.

8    Q.    You don't think so?

9    A.    I'm sure we would do everything we can to be truthful.

10   Q.    And if we could just flip to page 25 very quickly.

11            And if we look at line 13.  Eagle is providing

12   FDA with the Preiss 1985 article that we looked at earlier;

13   is that right?

14   A.    That's correct.

15   Q.    And that's that three-minute bolus injection?

16   A.    It has allotted the three-minute, yes.

17   Q.    That's the one that's clinically tolerated in

18   patients; is that correct?

19   A.    In that particular study that he ran.

20   Q.    And if you go back to page 20 and that same paragraph,

21   and at the bottom it says, based on the published exposure

22   date, the predicted Cmax for Eagle's faster infusion and/or

23   IV push product is within the range of bendamustine

24   exposures demonstrated to be well tolerated in clinical

25   experience.

1              Do you see that?

2      A.    I see what it says.

3      Q.    So you would agree with me that Eagle knew again

4      before putting the drug in single person, that a

5      three-minute infusion would be clinically well tolerated; is

6      that correct?

7      A.    I don't believe that's what it says.

8      Q.    It says Eagle's faster infusion and or IV push product

9      is within the range of bendamustine exposures demonstrated

10     to be well tolerated in clinical experience?

11     A.    I see what it says.

12     Q.    You have no reason to disagree with that statement;

13     right?

14     A.    No.   There were a lot of documents that went to the

15     FDA.

16     Q.    You guys wanted the FDA to approve either a

17     three-minute or 10-minute infusion at this point in time;

18     correct?

19     A.    We were hoping they did.

20     Q.    And you wanted them to do it without having to run

21     both --

22              MR. BROWN:   Objection.   He cut off the answer.

23              MR. NELSON:   I don't believe I did.

24              THE WITNESS:   Can you just repeat the question?

25     BY MR. NELSON:

Tarriff - cross

1    Q.    I first asked, you don't have any reason to doubt the

2    statement to the FDA?

3    A.    I see what it says.  I think there was just a lot more

4    in there.  Yes, I believe that is detailed.

5    Q.    Okay.  And you wanted FDA to approve either a

6    three-minute or a ten-minute infusion of bendamustine; is

7    that correct?

8    A.    I did, yes.

9    Q.    And you wanted that approval without having to do

10   large scale clinical studies testing that three-minute and

11   ten-minute infusion?

12   A.    No, that's not true.  We wound up doing a clinical

13   trial to prove this.

14   Q.    Sir, I'm not asking what you wanted us to do.  I'm

15   asking at this point in time before putting it in a human

16   being, you wanted to avoid those clinical studies?

17   A.    No, that's not correct.

18   Q.    You testified earlier that the 505(b)(2), you wanted

19   to file with the hope of not having to do large scale

20   clinical studies; is that correct?

21   A.    No.  I don't believe that's what I said.

22   Q.    I apologize.  Go ahead.

23   A.    Throughout my testimony, we knew we needed to run

24   clinical trials for this drug and that's exactly what we

25   wound up doing.

Tarriff - cross

1   Q.    On direct examination, you said Eagle is a small

2   company and couldn't afford that; is that correct?

3   A.    We ultimately raised the money and ran that study.

4   Q.    You testified during your deposition that in the 2012

5   time period around when this was, you had a hard time

6   raising payroll sometimes?

7   A.    We did and we raised the money and did a clinical

8   trial which ultimately led to the approval of the product.

9   Q.    But you couldn't have done a clinical trial at this

10  time which is why you were telling the FDA a three-minute

11  infusion already reported was well-known to be well

12  tolerated in clinical experience?

13  A.    I don't believe that to be correct.

14  Q.    So Eagle ultimately only performed one clinical study

15  to test its ten-minute hypothesis?

16  A.    That's very typical in the industry, yes.

17  Q.    But that's correct?

18  A.    We ran one study in cancer patients, yes.

19  Q.    Let's look at the -- let's look at DTX-1399.  This is

20  an e-mail communication with you and Foma Rashkovsky?

21  A.    Correct.

22  Q.    It's Mr. Rashkovsky?

23  A.    Yes.

24  Q.    Mr. Rashkovsky is or was your head of regulatory

25  affairs; is that correct?

Tarriff - cross

1    A.    He was.

2    Q.    He's your conduit with FDA; is that correct?

3    A.    Yes.

4    Q.    All right.

5    A.    Along with Dr. Bruinberg.

6    Q.    On the first page of the exhibit, both Dr. Grebow and

7    Mr. Rashkovsky state that Eagle, that the Eagle study is not

8    tolerated to show differences between the Eagle product and

9    Treanda product; is that correct?

10   A.    I see what that is what he says, yes.

11   Q.    Okay.  And you would rely on his determination as a

12   conduit to the FDA; is that correct?

13   A.    Yes.

14   Q.    Let's go to DTX-949.  Now, this is the submission to

15   FDA by Eagle for a pre-NDA meeting; is that correct?

16   A.    Correct.

17   Q.    Now, so at this time, FDA, I'm sorry, Eagle had

18   completed its one clinical study; is that correct?

19   A.    I believe so.

20   Q.    Okay.  And the NDA is a new drug application or a

21   505(b)(2), which would be a paper NDA; is that correct?

22   A.    No, that's not correct.

23   Q.    You don't -- I'm sorry.

24   A.    Go ahead.  Can you repeat your question?

25   Q.    I was going to say, you understand that to be a

Tarriff - cross

1    meeting before Eagle had file its application to FDA for

2    approval?

3    A.    Yes.

4    Q.    And it dated December 17th, 2014; is that correct?

5    A.    That's correct.

6    Q.    If we can go to page 12 of the document.  And this

7    discusses that 1301 study that you conducted or you

8    testified about on direct examination; is that correct?

9    A.    Correct.

10   Q.    And the second line from the bottom, what's blown up

11   here, refers to this as a pharmacokinetic evaluation.

12            Do you see that?

13   A.    I don't remember seeing this before.  I may have to

14   take a little time to look at it.

15   Q.    Sure.

16   A.    All right.  Go ahead.

17   Q.    So this refers to the 1301 study is a pharmacokinetic

18   evaluation; is that correct?

19   A.    Yes.

20   Q.    And it's comparing the administration of the Eagle

21   product over ten minutes versus the Teva product over

22   60 minutes; is that correct?

23   A.    I think this is described.  Sorry.  I have not seen

24   this before.  I'm not familiar with this.

25            This looks like it's just explaining to the FDA

Tarriff - cross

1    the study design of what we did.

2    Q.    Okay.  And as you testified earlier, you're frequently

3    involved with the communication.  While you might not be at

4    the meeting, but the communication with the FDA?

5    A.    Specifically not at this detail.

6    Q.    The detail I'm just asking is right on the screen?

7    A.    I see that, yes.

8    Q.    And if we can go to pages 34, 35 of this document, and

9    here, Eagle is reporting the adverse events that it found in

10   its clinical study; is that correct?

11   A.    Yes.

12   Q.    And it says that the incidences, at the very bottom,

13   the incidences of TEAE, and that's treatment emerging

14   adverse events between treatment groups was generally

15   similar; any differences were not clinically significant; is

16   that correct?

17   A.    That's correct.

18   Q.    And that's consistent --

19            MR. BROWN:  Objection.  Objection, Your Honor.

20   I don't object to this testimony coming in, but I don't want

21   some argument that this cross-examination testimony opens

22   the door to, it opens the door to anything else in the case

23   he's eliciting the results of the clinical study.

24            THE COURT:  Wait.  Okay.  So you don't want --

25   if you are worried that your silence puts evidence in front

1    of me, you object.  I guess I don't understand your comment,

2    something about opening the door.

3              MR. BROWN:  Certainly.  What counsel is

4    eliciting right now are the results of the clinical study

5    and we agreed not to elicit that.  He's eliciting it.  I

6    don't want an argument that by me not objecting to this

7    evidence coming in that we have opened the door to

8    responding to this, to this evidence.

9              THE COURT:  So --

10             MR. BROWN:  This is the exact issue we just

11   talked about over the break.

12             THE COURT:  Okay.  Then you need to object, and,

13   in fact, there's already a motion in limine that was

14   granted.  I modified my ruling on the motion in limine

15   because of the offering by you of the PowerPoint referencing

16   nausea and I've already dealt with that.  I've modified my

17   ruling, but I was explicit that unexpected results is still

18   off the table.  It's not to be admitted.  I'm taking Mr.

19   Berl at his word and, in fact, I objected to the defense

20   characterization that I shouldn't take him at his word.

21   You're not putting in the test result, and I thought it was

22   clear, you're not putting in the test result.  This is

23   referring to then test results for unexpected results?

24             MR. NELSON:  Well, so, first of all, Your Honor,

25   maybe I misunderstood.  First of all, the answer is no.  I'm

Tarriff - cross

1    not using that to compare test results.  I'm merely

2    reporting what they had been telling industry people all the

3    skepticism, which, quite frankly, is brand-new to us, was

4    not what they were telling FDA inconsistent.

5                    And, second --

6                    THE COURT:  Wait, wait.  Slow down.

7                    MR. NELSON:  Sure.

8                    THE COURT:  I don't see that.  Flush that out.

9    I didn't get it.

10                   MR. NELSON:  Sure.  So let me back up a little

11   bit.

12                   THE COURT:  So before we get too far down the

13   road, so test results I thought were off the table.

14                   MR. NELSON:  I guess I should have started with

15   that first.  And this is not what I was getting at but I

16   want to make sure we're all on the same page here.

17                   You had said test results on plaintiffs' testing

18   compared to the claims.  If you meant test results of

19   plaintiffs' products compared to prior art, that's something

20   different, but I want to make sure I understand what the

21   Court's ruling was, because this is, this is not compared to

22   the claims.  This is compared to the prior art.  That would

23   be responsive to their prima facie issue, so not unexpected

24   results.  This is prima facie testimony.

25                   So if they get prima facie testimony, I can

Tarriff - cross

```
 1    bring it in and they opened the door talking about the 1301

 2    study, which this is what that is.  They opened the door

 3    about some of the things they said to the FDA and some of

 4    these related to adverse events.  I don't think they should

 5    be able to get their cake and eat it too, Your Honor.

 6              MR. BROWN:  Your Honor, I specifically did not

 7    go into the results of the clinical study on direct.  I did

 8    not realize what counsel was going to do with this document

 9    until he just started doing it now.

10              And so --

11              THE COURT:  All right.

12              MR. BROWN:  Again, if there's no door opening, I

13    don't object to him eliciting the testimony, but I don't

14    want me -- I don't want us to have been considered to have

15    acquiesced into, into allowing this testimony to come in.

16              MR. NELSON:  One last point, Your Honor.  The

17    testimony and the evidence that he had up before on the

18    nausea came in.  It wasn't stricken.  I understand your

19    ruling that they're not going to be to be doing it as an

20    unexpected result.  If they are doing it as prima facie, I'm

21    up here to respond to it on cross-examination.

22              So if any door was opened, I don't think it was,

23    but they presented their prima facie evidence.  Yes, they

24    didn't go into great detail, but they presented it.  I'm

25    entitled to dig into that exactly within the scope of that
```

1     cross-examination.

2               MR. BROWN:  We did not introduce any evidence

3     whatsoever of what the results were of the clinical study.

4               THE COURT:  All right.

5               MR. NELSON:  I --

6               THE COURT:  I can't think when you talk.  All

7     right.  Why did you introduce the 1301?

8               MR. BROWN:  Which one is the 1301?

9               THE COURT:  I thought that you that you

10    referenced.  You're all referring to 1301, TAEA?  I have no

11    idea what you are talking about.

12              MR. BROWN:  I introduced the date of the study

13    and when it was finished.

14              THE COURT:  Which study?

15              MR. BROWN:  There's one clinical study that

16    Eagle did.  I introduced, I had Mr. Tarriff testify what the

17    date of the study completed.  Showed that it took a long

18    time and to show Teva executed the license about two weeks

19    after the clinical study was done and so Teva's previous

20    skepticism was now overcome and they, after the study was

21    done.  Whatever was in it, we didn't introduce that

22    evidence, but Teva changed course and executed the

23    agreement.  We didn't put any of the results in, any of this

24    medical evidence of what the results were.  We did not put

25    it into evidence.

Tarriff - cross

1           Again, I don't object to him going into it,

2    but I don't want any subsequent argument we opened the

3    door or are subject to waiver of this issue coming into the

4    case.

5           THE COURT:  And so the reason why you introduced

6    the study was to show that Teva Cephalon, changed his mind,

7    was no longer skeptical?

8           MR. BROWN:  Yes.

9           THE COURT:  Okay.  And that's relevant?  That's

10   relevant?

11          MR. BROWN:  And, in fact, I think we will object

12   now, this is not relevant to any, to any issue in the case

13   and we would object to this line of questioning coming in.

14   This is within the motion in limine.

15          THE COURT:  Okay.  So just again, the way I'm

16   sure the transcript is going to read now, it's going to have

17   a declarative statement from me saying that was relevant or

18   that's relevant a couple of times.  I want to make clear I'm

19   actually asking questions.

20          MR. BROWN:  Yes.

21          THE COURT:  So the reason why it's relevant that

22   you adduced testimony relative to this study is to explain,

23   you said, Teva's change of mind, an endorsement of the

24   product?

25          MR. BROWN:  Yes.

1          THE COURT:  All right.  And why is that

2    relevant?

3          MR. BROWN:  That is, that is simply relevant to

4    the fact we have a license here today and Teva did not

5    believe in the product based on all of the prior art that

6    was -- we saw, the prior art that plaintiffs are relying on

7    in this case.  We sent them a lot of other information.

8    They didn't believe in the product.  They got clinical study

9    results and they changed their mind, executed the license

10   two weeks later and it has become a very, very successful

11   product.

12         THE COURT:  So the transcript is going to

13   reflect this, but I understood your statement to say, the

14   transcript will reflect what it reflects.  Here's what I

15   heard you say.  That it's relevant to this case that Teva,

16   based on the prior art, initially didn't think or didn't

17   support this process, and then they were shown test results

18   of a clinical study and they changed their mind and they

19   believed that this product was worth embracing.  Is that

20   correct?

21         MR. BROWN:  Yes.

22         THE COURT:  And that's relevant in your mind

23   because it rebuts the prima facie case of obviousness?

24         MR. BROWN:  The initial skepticism and plus the

25   second part is licensing and commercial success, which is a

1    separate and independent, separate and independent secondary

2    consideration.

3              THE COURT:  So again forgive me because I've

4    only been at this a year.

5              Commercial success I would have thought is

6    focused on post-invention events.

7              MR. BROWN:  That is correct.  It can occur --

8    post-invention events, correct.  Yes.  But it can occur at

9    any time relative to the patent, but after the invention,

10   yes.

11             THE COURT:  It can occur before?

12             MR. BROWN:  Yes.

13             THE COURT:  It can occur before the issuance of

14   a patent, commercial success?

15             MR. BROWN:  Yes.  It can occur before the filing

16   of the patent.  This timeline here, this is now, this is now

17   well after the priority date.  The patents have been filed.

18   The patent were filed in early 2013.  And now the clinical

19   study results come in in 2015, so this is much -- the patent

20   have already been filed.  They've been issued.

21             We have clinical study results come in as early

22   as 2015 and now Teva does a license and we have licensing,

23   we have commercial success.

24             THE COURT:  And that's one thing.  And by

25   commercial success, the commercial success evidences the

1    licensing.  It's not ultimate use of the drug and purchasing

2    by hospitals of the drug.  Right?  It can include that?

3                MR. BROWN:  Right.

4                THE COURT:  But your point would be the

5    licensing itself, the fact that Teva has said I'm going to

6    pay for this, that's commercial success?

7                MR. BROWN:  Absolutely.

8                THE COURT:  All right.  So it's post invention,

9    but it could be preissuance of the patent?

10               MR. BROWN:  Yes.

11               THE COURT:  All right.  And unexpected

12   properties or unexpected results, you're telling me that --

13   where is that?

14               MR. BROWN:  Unexpected results have to come

15   after the invention and you have to then test the invention

16   and they can be any time once you have the invention.  You

17   have to test the invention.  You have to compare it to the

18   closest prior art.  You have to identify a difference in

19   results, and that difference in results has to be surprising

20   or unexpected to a skilled artisan.  Those are all the

21   elements of that.

22               THE COURT:  It just has to postdate the

23   invention?

24               MR. BROWN:  Yes.

25               THE COURT:  That's really it?

Tarriff - cross

1            MR. BROWN:  That's really it.  But by law, it

2     can be 20 years later.  It can be after the patent.  It can

3     be something no one envisioned, but obviously, you have to

4     have something to compare, so it has to be after the

5     invention.  Again, there's no restriction on timeline when

6     that occurs.

7            THE COURT:  Right.  And you agree that

8     reasonable expectation of success, temporally I look at

9     factors that predate or postdate the invention?

10           MR. BROWN:  No.

11           THE COURT:  You would say only predate?

12           MR. BROWN:  Yes.  For reasonable expectation of

13    success, you get the defined priority date.  You have the

14    hypothetical imaginary person of ordinary skill in the art

15    sitting with all of the prior art in front of them and

16    reasonable expectation of success is judged on that date in

17    view of all of that art at that moment in time.

18           THE COURT:  All right.  And long-felt need.

19    What evidence do I look at for that?  Pre post, both?

20           MR. BROWN:  The long-felt need had to occur

21    before the invention, and the meeting of the long-felt need

22    has to be by the invention after the date of invention

23    obviously.

24           THE COURT:  Right.

25           MR. BROWN:  But then otherwise like most

Tarriff - cross

1      secondary considerations, there's no temporal restriction.

2                THE COURT:  All right.  Now, why do you want to

3      introduce the study?

4                MR. NELSON:  So, Your Honor, first things first

5      for some non-patent issues.

6                One, counsel just said that the results of the

7      study are what induced Teva to invest in it.  First of all,

8      they've opened the door to results.  Just because he doesn't

9      talk directly about them, he can't come in and say, the

10     results did it and now I can ask him about results.  Par

11     second of all --

12               THE COURT:  Let's slow down.

13               MR. NELSON:  All right.  Sorry.

14               THE COURT:  I do want to think about that.  The

15     thought occurred to me when I heard about it in a certain

16     sense, it's kind of cute.  But let's just leave that aside

17     for right now.

18               MR. NELSON:  Okay.

19               THE COURT:  And what else did you want to argue?

20     Why are you introducing it?

21               MR. NELSON:  Well, one, because they said it

22     induced them.  I want to investigate that.  Whether it's an

23     opening the door issue or not, investigate that, show the

24     actual evidence was from the results of the trial.

25               Secondly, what counsel has talked about, now

1    when we're getting into patent law issues.  When we're

2    talking about things like skepticism and whatever, that's

3    what they were getting at with this.

4            So these adverse events issues are what they are

5    saying was the skepticism and so I'm getting merely down to

6    the factual aspect of what those results actually were.  Our

7    experts will talk about that later in the context of the

8    response of prima facie, just like they did in their opening

9    report.

10           Like I talked about earlier, they did talk about

11   some stuff in their opening report on prima facie when it

12   came to stuff like skepticism and unexpected results and

13   prima facie when it talked about these adverse events,

14   because that was proper to do it at that time because it was

15   connected to their opinion.

16           Now, they're introducing this for, I still don't

17   understand the concept how this is skepticism, but at the

18   very least, our experts are going to be able to talk about

19   this stuff in the context of responding to prima facie

20   properly like they did.

21           They should also be able to respond to things

22   like the skepticism that they're bringing up here, which

23   again was never disclosed to us, whether the industry

24   skepticism from investors, which we never heard about

25   before, or whether it be skepticism of Teva, which we never

Tarriff - cross

1    heard before either.  These are all brand-new things.

2            So I want to be able to the a least get the

3    foundational information from a witness who clearly said on

4    direct examination that the test results are what induced

5    something to happen.  Ask him about those results.

6            MR. BROWN:  Your Honor, first of all, the

7    skepticism he's talking about was discussed throughout

8    Mr. Tarriff's ten-hour deposition in this case, and so that

9    was fully disclosed, which we incorporated into our

10   interrogatory responses.  But something that happened after

11   the date of the invention, and this is long after the date

12   of the invention, cannot be relevant.  Facts that happen

13   afterwards cannot be relevant to the prima facie case.

14           These test results, the skilled artisan in 2012,

15   in March of, or in July of 2012 or March of 2013 could not

16   have looked at these clinical results and they could not

17   have informed their decision about whether there was a

18   reasonable expectation of success.

19           So these cannot be relevant to that inquiry.

20   That's the simple inquiry on that date.  So they didn't

21   exist on that date, so they can't be relevant.

22           MR. NELSON:  Your Honor, that's the point.

23   These results are consistent with what's in the prior art.

24           MR. BROWN:  That's unexpected results.

25           MR. NELSON:  No.  It's not unexpected results.

Tarriff - cross

1    It's what they would have expected.  That's what our experts

2    talk about and it's consistent.  What they expected from

3    Preiss, this witness just testified, is no adverse results

4    from the low infusion product.  That's our prima facie case,

5    and the attempt to mischaracterize what we're doing here is

6    not well-taken, because it's very clear in our expert report

7    that whether something would have been expected or not or

8    would have been surprising or not, what Preiss does is it

9    takes that expectation and sets it, and that expectation is

10   short infusion, no problem with adverse events.  That is the

11   expectation, not the adverse event.

12             MR. BROWN:  And, Your Honor, there's a clear

13   delineation, are you talking about whether the test results

14   from our invention were or were not what is expected from

15   Preiss, that is 100 percent within the ambit of unexpected

16   results, which are out of this case.  So they cannot use

17   that information.  There is no other relevance to that

18   information.

19             THE COURT:  All right.  So here's where we are.

20   I think again, I will repeat, I think there's overlap among

21   the issues.  My decision to grant the motion in limine was

22   based on a case management decision to do my best to

23   interpret and apply the procedure put in place by my

24   predecessor.

25             I think, as I've expressed, and you can all take

Tarriff - cross

1    this up to the Federal Circuit, did problem with the

2    management order that was in place is I do think it creates

3    a potential for sandbagging precisely because somebody can

4    characterize something in a way that would not -- that is

5    not a secondary consideration but is part of the prima facie

6    inquiry.  But we crossed that bridge and I ruled that based

7    on case management and my best interpretation of the order

8    and given the plaintiffs' reliance on that order, that the

9    right thing to do was to grant the motion in limine.  I'm

10   going to keep with that.

11             I modified it because I do think the plaintiffs

12   opened the door with the nausea and I've let in, and I will

13   let in from the defense discussion that I think, to the

14   extent I can, I will cabin it to reasonable expectation of

15   success.  And one though line of demarcation that I'm pretty

16   confident about is that the test results relate solely to

17   the secondary consideration of unexpected property and that

18   therefore it should come in.

19             So, now, that's where I am.  I think that means

20   that this paragraph you've got up on the screen should not

21   be admitted into evidence.  All right?

22             MR. NELSON:  If it's not admitted, am I still

23   allowed to ask the witness to verify the information?

24             THE COURT:  It doesn't go to anything that's

25   relevant given my ruling.

Tarriff - cross

1           MR. NELSON:  Again, Your Honor, I respect your

2    ruling, but it does go to the fact, not the unexpected

3    result, but the expected result is consistent with these

4    results.

5           THE COURT:  Well, the problem is the law is just

6    not perfectly consistent, and so, you know, I'm going to

7    just, I'm going to sustain the objection.  Move on.

8           MR. NELSON:  Let's go to DTX-981.

9    BY MR. NELSON:

10   Q.    And you talked earlier about the concept of an orphan

11   drug exclusivity.

12           Do you recall that?

13   A.    I do.

14   Q.    And Eagle requested --

15           THE COURT:  So actually, again, what's an orphan

16   drug?

17           MR. NELSON:  That's exactly what I was going to

18   ask him.  That's exactly what I was going to ask him.  I can

19   tell you or the witness.

20           So an orphan drug --

21           THE COURT:  No.  You can ask the witness.

22           MR. NELSON:  We'll see if he has an

23   understanding.

24   BY MR. NELSON:

25   Q.    Let me ask you this:  An orphan drug is one that FDA

1    gives a certain incentive for a company to develop that is

2    associated with treating certain rare or more rare

3    conditions in a certain patient population; is that correct?

4    A.    That's correct.

5    Q.    Okay.  And Eagle applied for the FDA exclusivity

6    that's associated with an orphan drug; is that correct?

7    A.    We applied for, yes, the orphan drug designation,

8    which we received and then the process of going through the

9    exclusivity.

10   Q.    And this is a March 24th, 2016 letter to attorneys at

11   Latham & Watkins who are representing Eagle with respect to

12   their request?

13   A.    That's correct.

14   Q.    And Latham & Watkins is the law firm that's here

15   representing you today?

16   A.    That's correct.

17   Q.    And in this letter, FDA denied Eagle's request for

18   orphan drug exclusivity?

19   A.    That's correct.

20   Q.    If you can turn in this letter to page 22 of the

21   document.

22           THE COURT:  All right.  Let me ask the witness.

23   What do you think orphan drug means?  Does it basically mean

24   a drug that wouldn't be sponsored by somebody unless the

25   incentives were offered by congressional act?

Tarriff - cross

1          THE WITNESS:  Part of that.  Patient population

2      is less than 200,000.

3          THE COURT:  So nobody wants to pay for it

4      because the money may not be there in the end.

5          THE WITNESS:  Yes.

6          MR. NELSON:  That was a big cross, Your Honor.

7          THE COURT:  It was direct.

8          MR. NELSON:  Shall I object as leading?

9          THE COURT:  It was open-ended.

10     BY MR. NELSON:

11     Q.    Let's look at the FDA statement on Eagle's statement

12     that its product would provide reduced infusion time.

13          Do you see that section?

14     A.    I do.

15     Q.    And this was Eagle's statement that its ten-minute

16     infusion would provide a reduced chair time for patients; is

17     that correct?

18     A.    That's correct.

19     Q.    And FDA notes that the overall time for patients at

20     the infusion site is not the an all reduced by Eagle's

21     product?

22     A.    I'm sorry.  Where is that?

23     Q.    It says while overall infusion chair time may be

24     reduced from 30 to 60 minutes with Treanda to ten minutes

25     with Bendeka, a savings of 20 to 50 minutes, the overall

1    number of treatments has not changed with Bendeka, as

2    patients still must receive the same number of infusions

3    within the treatment regimen?

4    A.    It says that.

5    Q.    If we go to where it says additionally in that same

6    part.  It says, additionally, the time required by patients

7    at the infusion center is not just limited to the time it

8    takes to infuse the drug; patients have to be checked in,

9    have title signs checked prior to infusion, prepped for

10   infusion, and be monitored after infusion for adverse

11   events.  Right?

12   A.    That's what they say, yes.

13   Q.    These are chemotherapy patients that are being infused

14   with the drug?

15   A.    Yes.

16   Q.    They are very sick patients?

17   A.    Yes.

18   Q.    And the center is not just kicking them out of the

19   chair as soon as an infusion is done; right?

20   A.    If you are asking me what the FDA is saying, that's

21   what they are saying.

22   Q.    And I'm asking you as well.  You're aware that these

23   patients, when their infusion is done, they are just not

24   tossed out of the chair?

25   A.    In some instances, they are, because you need the next

Tarriff - cross

1   person in there, so I can't agree to that, no.

2   Q.    Let's look at the next page.  And here in this

3   paragraph, FDA states that --

4               MR. BROWN:  Your Honor, we object.  This is

5   again going into the clinical study results.

6               MR. NELSON:  This is relating to infusion site

7   irritation, which is not nausea or vomiting or anything of

8   that.

9               THE COURT:  All right.  Hold up.  What page are

10  we on?

11              MR. NELSON:  We are on 23.

12              THE COURT:  So why is this relevant?

13              MR. NELSON:  Again, this is not relevant to the

14  nausea or any of those issues.  This is the infusion time

15  issue relating to site limitation.  It's also related to Mr.

16  Berl had this document up during his opening statement.  So

17  it goes to the nexus of commercial success, because there

18  has to be a nexus between whatever they are saying is the

19  benefit and the claims themselves.  So this goes to that

20  issue.

21              And --

22              THE COURT:  Slow down.

23              MR. NELSON:  Sure.

24              THE COURT:  What's the first reason it's

25  relevant?

1          MR. NELSON:  The first reason it's relevant is

2     it goes to their position that the infusion time or rate is

3     going to have some issue with irritation.  It has nothing to

4     do with nausea.

5          THE COURT:  Hold up.

6          MR. NELSON:  Right.

7          THE COURT:  It's relevant to -- they've asserted

8     that the infusion time?

9          MR. NELSON:  They say that the infusion time --

10    in this document, FDA is saying that infusion time showed no

11    problem with irritation.

12         MR. BROWN:  What we were talking about with the

13    rabbit ear that they brought up earlier.  It first said, the

14    witness said the rabbit ear caused irritation.  When we saw

15    in the second document, there was no cause with irritation.

16    That's what they were placing up in their sides, there was

17    so much concern about irritation.  That issue goes to

18    several secondary considerations, including a commercial

19    success and long-felt need.

20         THE COURT:  Okay.  You did cite in our

21    PowerPoint, rather, in direct examination, you put up the

22    PowerPoint that was presented at is San Francisco conference

23    to potential investors that cited the rabbit study.

24         My recollection, it had something to do with --

25    well, let's get I what was on that PowerPoint page?  What

1   exhibit was that?

2           MR. BROWN:  I think the one with the rabbit

3   study was not the one that was shown in San Francisco.  It

4   was the one, DTX-1158?

5           THE COURT:  All right.  Let me look at that.

6           MR. BROWN:  I think it's slide 21 in the

7   presentation.

8           THE COURT:  Slide what, sir?

9           MR. BROWN:  No.

10          THE COURT:  Here it is.  Slide 70.  So I thought

11  instead of 1158 is what was presented to the potential

12  investors, and consistent with my recollection, on page

13  1670, reference is made to the April 2012 rabbit tolerance

14  study.

15          MR. BROWN:  Yes, correct.

16          THE COURT:  And it also says results.  You put

17  that up on the screen.

18          MR. BROWN:  Yes.

19          THE COURT:  It says, all formulations well

20  tolerated via IV.  Right?

21          MR. BROWN:  Correct.  Correct.

22          THE COURT:  Okay.  And --

23          MR. BROWN:  These are the rabbit studies that

24  were put into the patent that formed the basis of the

25  examples in the patent-in-suit.

Tarriff - cross

1              THE COURT:  Okay.  I get that.  Oh, and you're

2      saying, so this paragraph is not rebutting this study, the

3      rabbit study?

4              MR. BROWN:  Correct.

5              THE COURT:  It's rebutting a later study?

6              MR. BROWN:  Yes.

7              THE COURT:  I'm sorry.  I get it.  I apologize.

8      You agree it's a different study?

9              MR. NELSON:  What it is, it's consistent,

10     it's consistent with what they told some people about the

11     rabbit study and it's inconsistent with what they told other

12     people about the rabbit study, but it's definitely

13     consistent with what our experts have said again in the

14     prima facie case.

15              I'm not sure why we're being limited to our

16     cross-examination both on what he was directly asked, so he

17     can follow that.

18              THE COURT:  But you referenced the rabbit study

19     and I was with you on that because that's what made me think

20     this paragraph that's on the screen, which is in the FDA

21     letter, referenced the rabbit study but apparently, it

22     doesn't reference the rabbit study.  It references a

23     subsequent study.  Is that right?

24              MR. NELSON:  Yes.  It does not reference the

25     rabbit study.

1              THE COURT:  Okay.

2              MR. NELSON:  What it is, it's consistent with

3    what they have said in their internal documents is the

4    results of the rabbit study now applied to human beings.

5              MR. BROWN:  Your Honor, again -- sorry.

6              MR. NELSON:  It goes again to what they elicited

7    on direct examination and it's not nausea and vomiting.

8              THE COURT:  Wait, wait.  When did they elicit on

9    direct examination what the results of the subsequent study

10   were?

11             MR. NELSON:  Again, when they talked about the

12   rabbit study, the irritation of the rabbit study.

13             THE COURT:  Right.

14             MR. NELSON:  That's one of the things they want

15   to talk about.

16             THE COURT:  They were talking about that in the

17   context, I think it was January of 2015.  When was that?

18             MR. BROWN:  That was the September 2012 board

19   meeting.  That was presented to the board and also there's a

20   single, the doctor that's on the board, and the point was

21   that -- well --

22             THE COURT:  Okay.

23             MR. BROWN:  But those rabbit studies are part of

24   the invention and to go back to Your Honor's questions about

25   the timeline, the unexpected results issue and which has

1    been precluded, precludes things after the invention.   And

2    so these -- includes things only that are after the

3    invention.

4              So this document here is talking about results

5    of the clinical studies submitted to FDA and FDA's

6    evaluation of that and the document after 2016, which

7    is well after, well after the timeline that would be

8    relevant.

9              MR. NELSON:   That's the secondary consideration

10   point, Your Honor.   The first point is, again, it's -- this

11   is not nausea, first of all.   So that's what we were all on

12   board with that.   This is something different.   So that

13   bridges us to the secondary consideration.   Okay.   Because

14   they're going to say that there was a long-felt need for a

15   product that would infuse fast, didn't cause a skin

16   irritation.   Again, a rabbit study didn't show it.   This

17   study didn't show it.

18             Then we can go to later stuff like Mr. Brown

19   stood up here and told you that when we're talking about

20   things like long-felt need, that's after the fact.   That's

21   later data.   We can look at that.   This verifies that there

22   was no long-felt need because this doesn't fulfill that

23   long-felt need.

24             THE COURT:   Okay.   So then if they have an

25   expert on the stand to talk about long-felt need, I guess

Tarriff - cross

1  you cross-examine about this.  But was it relevant at this

2  stage and with this witness?

3          MR. NELSON:  First of all, one of the things

4  this witness talked about was looking for gaps.  He talked

5  about how increase in perivascular events was an increase in

6  concentration.  That was the rabbit study.  When it comes to

7  people, okay, that's not what shook out.  So I'm

8  cross-examining on that exact point.

9          Perivascular events, sorry.  Again, the

10 irritation, injection on the skin.  That's what this is

11 about.  It's not about nausea.

12         When he talked about that, again, now we're

13 talking about humans at this point.

14         MR. BROWN:  Now we're mixing apples and oranges.

15 Mr. Tarriff originally testified about the date that came

16 from the Treanda publicly available document.  There was a

17 rabbit study that showed local irritation.

18         Then Eagle did their own rabbit study with the

19 higher concentration and they found it was acceptable and

20 that was the time, point in time at which they have an

21 invention.

22         And so, and it was part of the process of making

23 the invention despite what was shown to the Teva jury.  So

24 he's mixing the different testimonies.

25         MR. NELSON:  The reason I'm mixing it, their

Tarriff - cross

1    arguments keep shifting between what's prima facie and what

2    is secondary indicia.  Which secondary considerations are

3    in?  I can't get this testimony from this fact witness that

4    talked about this stuff, the same subject matter.  You know,

5    their experts are going to be on the contact, their experts

6    are going to be in context.

7              This witness talked about the subject matter.

8    He talked about skin irritation issues.  This is exactly

9    what this is.  This is not nausea.  I'm not going into

10   that.

11             THE COURT:  What is the date of the invention

12   again?

13             MR. BROWN:  The two relevant priority dates I

14   believe are July 2012 and March of 2013, where there was

15   additional information that went in during that time period.

16   So it varied from claim to claim, but those are the two.

17             THE COURT:  But the earliest one was July of

18   2012.

19             MR. BROWN:  Those are the patent filing dates.

20             MR. NELSON:  The priority dates are --

21             MR. BROWN:  For the rapid infusion patents, the

22   two relevant ones that are at issue here I believe are July

23   of 2012 and March of 2013.

24             THE COURT:  Okay.  I'm going to sustain the

25   objection.  Move on.

Tarriff - cross

1    BY MR. NELSON:

2    Q.    Let's look at DTX-347, please.

3                 THE COURT:  Actually, hold on.  I'm curious,

4    before you move on, what are you all doing about when you

5    have an exhibit, and this is a good example.  Portions of it

6    are put in front of the witness.  The witness is questioned

7    about it.  Portions of it I'm not allowing the witness to be

8    questioned about.

9                 What do you all intend to do in terms of

10   admitting the document into evidence?

11                MR. NELSON:  We just had a conversation about I

12   guess these category of documents, so I can't talk broadly

13   about them, but these correspondences to and from FDA with

14   Eagle or its agents, we talked outside in the hall.  There

15   won't be foundational objections from the witness.  I think

16   for that purpose --

17                MR. BROWN:  I would trust that the Court will be

18   aware of its own orders and can follow them in determining

19   what parts to rely on and what parts not to rely on.  We can

20   object if somebody relies on an improper part in the

21   post-trial briefing or otherwise.  I would assume, I think

22   that for --

23                THE COURT:  I don't think that's a fair

24   assumption.  You know, when this trial is all said and

25   done, how many documents are going to be introduced into

Tarriff - cross

1    evidence?

2                 MR. BROWN:  300, maybe.

3                 THE COURT:  I'm not going to have my law clerk

4    and I have to figure out -- I mean, when we're writing the

5    brief or writing an opinion, however, whether we can rely on

6    a sentence in a document or not.  So if you are going to

7    introduce a document and because of rulings I have made, I'm

8    not supposed to read portions of the document, it needs to

9    be redacted at the end of the day.  I mean, otherwise, how

10   am I going to figure this out?

11                I mean, I do think to a certain extent, this has

12   gotten to the level of absurd, and I don't fault anybody in

13   the room because of that, but that's just where it is.

14                MS. STAFFORD:  Your Honor, just one point of

15   clarification to make sure we understand your ruling.  My

16   understanding on the motion in limine, the sole basis, is we

17   weren't allowed to have certain experts provide opinions

18   that were in their responsive expert reports on secondary

19   considerations because maybe they should have been in the

20   first round.  And so I'm trying to understand.  Does this

21   mean we're not allowed to elicit any facts that are relevant

22   to the issue?

23                THE COURT:  That's not how I understand the

24   order.

25                MS. STAFFORD:  It is not that we didn't disclose

1   facts enough.  It's that we didn't have certain opinions in

2   the initial round of reports.  It was only eliciting expert

3   testimony.

4           We want to make sure we can understand

5   everything Your Honor --

6           THE COURT:  That's fine.  My understanding is

7   that secondary considerations only come into play after the

8   prima facie case is established and therefore they are

9   properly, they are first raised in the exchange of expert

10  reports when the plaintiff or the patentee filed a

11  responsive expert report to the defendants' expert

12  invalidity report.

13          Do you agree with that, Mr. Berl?

14          MR. BERL:  Yes.

15          THE COURT:  Right?  And therefore what the order

16  that was in place provided for was that the only thing that

17  could be brought up in a reply brief was the defendants'

18  response to secondary consideration arguments that were

19  raised in the first instance by the plaintiff in the

20  plaintiffs' expert response on invalidity.

21          And I'm not going to go over my -- I would not

22  have that order in place as I've discussed, but that's what

23  we have, and parties relied on it for years in litigating

24  this case.

25          And the first time it was brought to my

Tarriff - cross

1      attention is where there was an objection that was going to

2      cause something at trial was in the pretrial conference, and

3      it was too late at that point for us to go back and delay

4      this trial and put in place a new scheduling order, so we

5      left it as it was.

6              And so therefore if there was no secondary

7      consideration argument raised in the responsive expert

8      report by plaintiffs, the defendant can't have an expert

9      testify about secondary consideration arguments that, you

10     know, that's where it is because it's new.

11             Now, when we get to the overlap problem is, like

12     unexpected results, the motion specifically was directed to

13     teach-away an unexpected property.  Correct?

14             MR. BERL:  I believe that's right.

15             THE COURT:  All right.  And the problem there

16     was, teach-away, everybody I think, both sides now agree,

17     sometimes it's secondary considerations, sometimes it's not.

18     I think the case law is pretty clear, unexpected results is

19     secondary consideration only, so therefore you can't bring

20     in results for the first time.  You can't hear about that

21     now.

22             But it seems to me that within consideration of

23     unexpected results, there's some overlap about skepticism or

24     reasonable expectation of success.  That's part of the prima

25     facie case.  To that extent, you can respond to arguments

1    about skepticism and as a case management issue, the

2    plaintiff agreed at the pretrial conference that they were

3    going to take off the table and not adduce evidence about

4    nausea and fatigue.  They brought up nausea.  So I'm saying

5    you can respond to that as well.

6                MS. STAFFORD:  Okay.  I guess I'm a little bit

7    unclear because they raised long felt but unmet need.  Are

8    they dropping that?

9                THE COURT:  How do I know?  I don't know if it's

10   in the expert reports or not.  I don't know the list of

11   secondary considerations that were identified by the

12   plaintiff in their responsive expert report.  I don't know

13   what -- I don't remember.  You know, I read what I had to

14   read to decide what was in front of me.

15               MS. STAFFORD:  Yes, Your Honor.

16               THE COURT:  That's not in front of me yet.

17               MS. STAFFORD:  I guess the point of confusion is

18   that the facts can come in through fact witnesses.  The

19   parties have agreed that that witness just shows up once,

20   they can be cross-examined outside of the issues on which

21   they have knowledge.  If they are going to rely on, for

22   example, long felt but unmet need, how they would show that

23   need arguably is through a relied upon testing showing that

24   they actually met a need.  That testing would have to be

25   after the invention.

1          So how are we going to be able --

2          THE COURT:  Let's make it really practical.

3     What secondary considerations did your expert respond to?

4     What secondary considerations were raised by the plaintiff

5     in the plaintiffs' responsive expert report to your initial

6     invalidity report?

7          MS. STAFFORD:  There's a whole host of them.  I

8     think there's long-felt need.  There's commercial success.

9     There's failure of others.  All of these things -- and a

10    whole host of other ones and a lot of those go to nexus,

11    showing that a benefit was provided that relates to, that

12    relates to whatever their claimed invention is.

13          The only way to show that is by looking at

14    results that relate --

15          THE COURT:  Did you argue that in your response

16    to the motion in limine?

17          MS. STAFFORD:  They didn't argue, they didn't

18    try to strike that information.  They only tried to strike

19    expert reports.  They didn't try to limit the scope of

20    issues that could be raised on cross with the fact witness.

21    Their expert report was limited.  Their motion in limine was

22    limited to just striking portions of our responsive report,

23    not our --

24          THE COURT:  Hold up.  Hold up.

25          MS. STAFFORD:  Thank you.

1              THE COURT:  That's okay.  Hold up.  Hold up.

2              Okay.  So their motion asked that I order, and I

3    did, that defendants and defendants' experts may not present

4    any evidence or argument at trial relating to opinions to

5    the defendants' reply expert reports except in response to

6    evidence adduced by plaintiffs regarding asserted objective

7    indicia of nonobviousness.

8              So that's what the order is.  So if they are

9    arguing long-felt need and you want to bring in something to

10   respond to long-felt need, I mean, I don't think their order

11   precludes you from doing that.

12             MS. STAFFORD:  That's what we're trying to do.

13   They are claiming --

14             THE COURT:  You didn't make that argument.  I

15   didn't hear him argue for long-felt need.

16             MR. NELSON:  Your Honor, I did say long-felt

17   need and --

18             THE COURT:  Until the last ten minutes.  Sorry.

19   Fair enough.  If you did raise it, that was news to me, so

20   that's fair.

21             MR. NELSON:  Like I said, these are all new

22   arguments for us, so I'm just responding to what I'm hearing

23   today in court today.

24             Now, again, our experts have addressed this

25   issue and so that's why we're bringing it.  This is the

1    evidence -- yes.  This is what we're relying on.  That's why

2    I'm trying to cross-examine the witness.

3                THE COURT:  Give me an example.  What's one

4    thing you never heard of until this morning?

5                MR. NELSON:  Again, some of the things --

6                THE COURT:  Give me one thing.

7                MR. NELSON:  I'm telling you.  Skepticism from

8    investors.  Never heard that.  Never heard that.

9                THE COURT:  Did you hear skepticism?

10               MR. NELSON:  Yes.  Skepticism.  They talk about

11   a bunch of skepticism.  A bunch of different skepticism.  We

12   address that.

13               THE COURT:  But you've never heard skepticism

14   from --

15               MR. NELSON:  Not that I recall.  Not that I

16   recall.

17               THE COURT:  Yes.  Mr. Berl?

18               MR. BERL:  The long-felt need, and this is in

19   our disputed issues of fact in the pretrial order, the only

20   long-felt need that remains relevant is chair time, which

21   was paragraph 117 with respect to this patent family.

22               The other one is 118 and 119, relate to --

23   relate to issues that have been dropped since then by the

24   narrowing of claims.

25               THE COURT:  Okay.  Mr. Berl, do you mind, what

Tarriff - cross

1    exhibit are you on?

2              MR. BERL:  It's our disputed issues of fact.

3    Exhibit 2.  Plaintiffs' issues of fact.  And if you look

4    at --

5              THE COURT:  Exhibit 2.  What page?

6              MR. BERL:  27.

7              THE COURT:  Thanks.  Administration time.  On

8    that page you're looking at?

9              MR. BERL:  I'm not sure where you are.  Page 27.

10             THE COURT:  I'm in Exhibit 2-D.

11             MR. BERL:  2-P.

12             THE COURT:  Oh, 2-P.  Sorry.  Page 27.  Hold on.

13             MR. BERL:  And page 27 is where we get the

14   long-felt, unmet need.  And 116 is about the first family.

15   You know, avoiding the need for reconstitution.  That's the

16   liquid family.

17             117 is the long-felt need that we're asserting,

18   reduced chair time.  The 118 and 119 relate to a claim that

19   was in the case that has since been dropped, a patent that

20   we narrowed out.

21             THE COURT:  So 118 and 119 are on the table?

22             MR. BERL:  Correct.  That's the end of the

23   long-felt need.  So they're not asking Mr. Tarriff about

24   long-felt need relating to chair time.  They are now getting

25   into the results of the studies about skin irritation

1    patients, they say.  There's no long-felt need about skin

2    irritation.

3              MS. STAFFORD:  Your Honor, the paragraph that

4    was in issue expressly goes into chair time.  The FDA found

5    there was no benefit or anything met with respect to chair

6    time and it does it in the context of a bunch of different

7    factors, but it references chair time expressly and --

8              MR. NELSON:  I didn't get to that.  I started

9    with the irritation.  That goes to a different secondary --

10   I was trying to go in order.

11             Your Honor, I could put it back up for you.  I

12   talked about how DTX-981, page 23.  It talks about these

13   patients already have a central line.

14             THE COURT:  Show me where you are.

15             MR. NELSON:  It's the however right after the

16   140.  140.

17             THE COURT:  Okay.

18             MR. NELSON:  Combination of chemotherapies.

19   However, because bendamustine is frequently used in

20   combination with other chemotherapies.  What they're talking

21   about, there is no evidence to support shorter

22   administration time.  I didn't get a chance to get that.  It

23   was talking about prima facie.  This paragraph, which was

24   the one --

25             THE COURT:  Okay.  The highlighted sentence, I

1    have heard multiple times that point, and I found it frankly

2    to be a probative point.  It has come out before.  So I

3    don't even know if they are objecting to that sentence.  I

4    don't think they were.

5                    So are you objecting to that?

6                    MR. BROWN:  No, Your Honor.

7                    THE COURT:  Okay.  So let's go -- what's next?

8    That's in.  It's unobjected to.  I hear the point.

9                    What's the next point?

10                   MR. NELSON:  That's it for this.  Again, I can

11   do extravasation with another document or I can skip it.

12                   THE COURT:  So we just spent ten minutes on this

13   whole paragraph.  You're telling me it's not an even issue.

14                   MR. NELSON:  That's where I was going with it

15   eventually.  Again, I had two points to make.  I'm willing

16   to skip the first with this but I would go into the second.

17   Skip that as well.

18                   THE COURT:  So you're not going to then put this

19   in?

20                   MR. NELSON:  I can ask him about this now.

21                   THE COURT:  I'm not inviting it.  I'm asking you

22   what you want to do.

23                   MR. NELSON:  No.  I was going to move on from

24   this point.  Again, I had two points to make.

25                   THE COURT:  Okay.  Then I will just sustain the

Tarriff - cross

1    objection and I'm cognizant of a highlighted sentence which

2    comes after footnote 140 of the FDA document.  Mr. Brown, do

3    you have anything else?

4              MR. BROWN:  My only other point is we disclosed

5    skepticism from investors explicitly in our February 8th

6    interrogatories responses and it was discussed in

7    Mr. Tarriff's deposition as well.

8              THE COURT:  Okay.

9    BY MR. NELSON:

10   Q.   So moving on, if you could pull up plaintiffs'

11   examination binder PTX-590 at 183295.  And these were

12   results that you talked about during direct examination

13   regarding concentration issues; is that correct?

14   A.   That's correct.

15   Q.   Okay.  And you said that these are results that Dr.

16   Sundaram got through; is that correct?

17   A.   Yes.  He made these calculations.

18   Q.   Okay.  And you relied and talked about PTX-350, which

19   is the summary basis of approval for the Teva Treanda

20   product; is that correct?

21   A.   I'm sorry.  Can you restate that?

22   Q.   Sure.  You relied on PTX-350, which is the approval

23   document for the Treanda product.  You said that's where

24   this information came from; is that correct?

25   A.   No.  This is now the Eagle formulation.  What I

1     testified before it was the first slide that was labeled

2     Treanda.   That came from the summary basis approval.   These

3     are a proprietary calculation.

4     Q.    And the summary basis approval, you never saw; is that

5     correct?

6     A.    I understand what is in it.   I don't think I pulled it

7     out of the website myself, but people have discussed it with

8     me.

9     Q.    Your testimony was you never saw that document; is

10    that correct?

11    A.    The document itself, I don't believe so.

12    Q.    Dr. Sundaram provided you with the information?

13    A.    Mm-hmm.

14    Q.    I didn't hear you.

15    A.    He did.

16    Q.    Okay.   Thank you.

17    A.    Yes.

18    Q.    With the concentration data, concentrations data in

19    mind, let's go to DTX-314, please.

20            And this is, and we looked at this earlier.

21    This is the pre-IND document.   If you go to page 16.   And at

22    the top, Eagle is saying that bendamustine is classified as

23    an irritant.

24            Do you see that first small paragraph?

25    A.    I do.

Tarriff - cross

1    Q.     Small paragraph?

2    A.     I'm sorry.  Can we go back to the front of the page.

3    Remind me what this document is.

4    Q.     Sure.  This is the pre-IND document that we discussed

5    earlier.

6    A.     Okay.  Thank you.

7    Q.     No problem.

8           If we go to 16, that first full small paragraph,

9    the small paragraph, the full one.  One below it, please.

10   There we go.

11          Eagle is reporting that bendamustine is

12   classified as an irritant.

13          Do you see that.

14   A.     I do.

15   Q.     And if we go to the next paragraph, the third sentence

16   starts, the primary etiologies.

17   A.     I see it.

18   Q.     The primary etiologies for peripheral extravasations

19   are vein wall puncture, piercing, or trauma (due to poor

20   technique such as probing during catheter insertion or

21   inadequately secured catheter, or use of rigid IV devices).

22          Do you see that?

23   A.     Where it says primary etiology?

24   Q.     Yes.  That's one of the things Eagle reported to the

25   FDA?

Tarriff - cross

1   A.    That's one of the things.

2   Q.    Turn to DTX-347, please, in your binder.  This is the

3   form 8-K that Eagle filed with the SEC; is that correct?

4   A.    Correct.

5   Q.    And if you go on page 3.  There's a signature on page

6   3; is that correct?  Electronic signature?

7   A.    It is.

8   Q.    And if we go to page six of the document, there's a

9   quote from you on the very bottom; is that correct?

10  A.    Let me find that, please.

11  Q.    Yes.

12  A.    I see that.

13  Q.    And continue on with your quote to the to the next

14  page.  I'm sorry.  If we continue onto the next page, it

15  says in this press release that, as part of the agreement,

16  Teva will waive it's orphan drug exclusivities for NHL and

17  CLL with respect to EP-3102.

18        Let me break that down just for a minute.  NHL

19  and CLL are the indications for which bendamustine is

20  approved to treat patients; is that correct?

21  A.    That's correct.

22  Q.    Those are cancers; correct?

23  A.    That's correct.

24  Q.    And EP-3102, that's Eagle's bendamustine product?

25  A.    Correct.

Tarriff - cross

1   Q.     The orphan drug exclusivity, that's what we talked

2   about, that period of exclusivity that no competing product

3   was allowed on the market; is that correct?

4   A.     Correct.

5   Q.     And the agreement that's referenced there is a

6   settlement agreement between Eagle and Teva that resulted

7   after Teva sued Eagle for patent infringement for its

8   bendamustine product?

9   A.     I do not recall the details of what was in play, with

10  what orphan drug exclusivities were still open at that time,

11  but I can see the quote.  It says if they're going to waive

12  their orphan drug exclusivities.

13  Q.     Let me back up for just a minute.  Teva sued Eagle for

14  patent infringement for Eagle's bendamustine product?

15  A.     Yes.

16  Q.     That was the Treanda lyophilized product?

17  A.     Yes.

18  Q.     And the parties settled that patent infringement

19  lawsuit; is that correct?

20  A.     Yes.

21  Q.     And part of that settlement, Eagle, or Teva agreed to

22  waive its orphan drug exclusivity; is that correct?

23  A.     Yes.

24  Q.     It goes on to say under the terms of the exclusive

25  license agreement, Eagle received an upfront cash payment;

1   is that correct?

2   A.    Yes.

3   Q.    Had it not been for the orphan drug exclusivity

4   waiver, Eagle would not have been permitted to go on the

5   market as soon as it did; is that correct?

6   A.    I did not recall when the exclusivities ended in that

7   situation.

8   Q.    Can you turn to DTX-348 in your binder.  This is a

9   capital call called transcript of a capital call that you

10  participated in?

11  A.    Correct.

12  Q.    And if we go to page 3 of the document.  If we go to

13  that first paragraph under your name, and you state that

14  launched in January 2016 with our commercial partner Teva,

15  Bendeka now commanding a 92 percent share of the

16  bendamustine market, exceeding our joint goal of 90

17  percent.

18          Do you see that?

19  A.    I see that.

20  Q.    You say, we are pleased with Teva's ability to rapidly

21  convert the market to Bendeka; is that correct?

22  A.    That's correct.

23  Q.    And you agree that in a licensing deal, Eagle gave

24  away 70 percent value of its product by licensing it?

25  A.    We did.

Tarriff - redirect

```
 1              MR. NELSON:  Your Honor, may I have one minute?

 2              THE COURT:  Yes.

 3              MR. NELSON:  That's all.  Thank you.

 4              THE COURT:  Any redirect?

 5                       REDIRECT EXAMINATION

 6    BY MR. BROWN:

 7    Q.    Just a couple more minutes, Mr. Tarriff.

 8              Could we go back to PTX-590 and slide 6.  Can we

 9    go back one more.  One more.  This one.

10              I just want to clear up any confusion about what

11    was public and what was not public.

12              So this is in the page ending 183290.  So where

13    did this chart on this slide come from, Mr. Tarriff?

14    A.    This comes from publicly available data from the FDA

15    website.  This is part of the documents between the FDA and

16    the sponsor summary basis of approval.

17    Q.    And was it from this -- was this publicly available

18    information, was that where Eagle concluded that there would

19    be a treatment related effect for the low volume?

20    A.    Yes.

21              MR. NELSON:  Leading, Your Honor.

22              THE COURT:  Sorry?

23              MR. BROWN:  I will restate the question.

24              THE COURT:  Wait.  I didn't hear the objection.

25    Leading?
```

 1              MR. BROWN:  Leading.  Yes.

 2              THE COURT:  Sure.  If you want to restate it, go

 3      ahead.

 4      BY MR. BROWN:

 5      Q.    And Eagle's bullet point 2, treatment related effect

 6      at 0.6 and 1.0 milligrams per millimeter, where did that

 7      conclusion come from?

 8      A.    From the chart on the left.

 9      Q.    Now, if we could go to the chart a little bit later

10      with the red and the green.  This one.

11              Where did this information come from?  Was this

12      public or was this from Eagle?

13      A.    This was proprietary to Eagle.

14      Q.    Now I would like to go to DTX-1158.  And could we go

15      within that document to page, to -- actually, want to go

16      instead to PTX-726 and to slide 14.

17              And the two rabbit studies shown here, were

18      those -- who conducted those studies?

19      A.    We did.  Eagle did.

20      Q.    Let's go to DTX-959.  And if we could blow up all of

21      paragraph 4 on the first page.

22              And defendants' counsel asked you questions

23      about the first couple, but they didn't -- where the

24      highlighting stopped, I would like to continue.  The

25      sentence says, in addition, they thought.

Tarriff - redirect

1   A.   I'm sorry?

2   Q.   About midway through.  It starts with, in addition.

3   A.   Yes.

4   Q.   Can you highlight that?

5   A.   Yes.

6   Q.   What was being communicated in that part of the

7   document?

8   A.   That they thought, again, no science, just academic

9   discussion, that a final product more concentrated than the

10  range mentioned above would likely increase localized side

11  effects.

12  Q.   And if we could go to DTX-968.  This is your e-mail

13  from, your e-mail from Dr. Goy.

14  A.   Yes.

15  Q.   Again, I would like to focus on one sentence that

16  counsel didn't highlight.  It starts, did you get any

17  pre-clinical data on the activity of bendamustine in that

18  setting?

19            What is -- what is pre-clinical data?

20  A.   That would have been data in this case similar to the

21  animal study that we conducted, the two rabbit studies.

22  Q.   And what did you send Dr. Goy after this letter?

23  A.   Ultimately, we sent them all of that information, all

24  the animal studies that we had been talking about.

25  Q.   And I would like to go to DTX-314 and go to page

Tarriff - redirect

1   140159.

2            And as you recall, defendants' counsel asked you

3   some questions about whether you are asking FDA to approve

4   the product without the need for a safety study, and I would

5   like to go to page 140159.

6            MR. NELSON:  Necessarily Your Honor, I will

7   object.  That mischaracterizes what I asked.  I asked about

8   page 2, and --

9            THE COURT:  Sorry.  What did -- what did you

10  even say?  I didn't hear you -- a transition statement.

11           MR. BROWN:  Sorry.  Mr. Feldman asked him on

12  direct --

13           MR. NELSON:  Mr. Nelson.

14           MR. BROWN:  Mr. Nelson.  I apologize.  Mr.

15  Nelson asked him on direct or in cross-examination whether

16  in this exhibit they were trying to get FDA to approve the

17  drug without a clinical study.

18           THE COURT:  Okay.

19           MR. BROWN:  And so --

20           THE COURT:  Hold up.  And you object to the

21  characterization?

22           MR. NELSON:  Yes.  I said specific clinical

23  study, not all clinical studies.

24           THE COURT:  I'm going to overrule the objection,

25  because who knows, but I kind of remember it and who really

1    cares.  Go ahead and ask the question.

2              MR. BROWN:  I would like to blow up question

3    seven here in that same document, DTX-314.

4    BY MR. BROWN:

5    Q.    And this says, does the agency agree that the proposed

6    pharmacokinetic bioequivalency study based on area under the

7    concentration time curve (AUC) and safety study is the

8    appropriate bridging study for this proposed 505(b)(2)?

9    What's your understanding of what that means?

10   A.    We are asking them if we need to conduct a clinical

11   trial specifically in cancer patients to test the PK and the

12   safety of our product.

13   Q.    Did you ever have any intention or thought that you

14   would at this point in time when you were submitting this

15   document, that you would get approval without doing a safety

16   clinical study?

17   A.    No, never.

18             MR. BROWN:  No further questions.

19             MR. NELSON:  Very limited, Your Honor.  Just a

20   couple questions.

21             THE COURT:  I don't have re-redirect.

22             MS. STAFFORD:  Recross.

23             MR. NELSON:  Recross.

24             THE COURT:  What I meant by that, recross.  I

25   mean, it gets a little complicated.  Because you all agreed

Tarriff - redirect

1    helpfully to not object to scope, you know.  If there was a

2    new topic raised, which I didn't think there was, then you

3    could have something.  If there's not a new topic raised?

4                  MR. NELSON:  Fair enough.

5                  THE COURT:  All right.

6                  MR. NELSON:  I would like just like to move in

7    some documents.  DTX-956, DTX-960, DTX-1398, DTX-1176,

8    DTX-959, DTX-968, DTX-1171, DTX-314, DTX-1399, DTX-949,

9    DTX-981, DTX-314, DTX-347, and DTX-348.

10                 MR. BROWN:  No objection subject to Your Honor's

11   ruling that we're going to have to go back and redact some

12   things.

13                 THE COURT:  Okay.  Then they're admitted with

14   that caveat.

15                 MR. NELSON:  Thank you.

16                 (DTX-956, DTX-960, DTX-1398, DTX-1176, DTX-959,

17   DTX-968, DTX-1171, DTX-314, DTX-1399, DTX-949, DTX-981,

18   DTX-314, DTX-347 and DTX-348 were admitted into evidence.)

19                 THE COURT:  You may step down.

20                 THE WITNESS:  Thank you.

21                 THE COURT:  Thank you.

22                 (Witness excused.)

23                 THE COURT:  All right.  What's next?

24                 MR. BERL:  We're going to call Dr. Palepu.

25                 THE COURT:  All right.  We've been going since

```
 1    2:00, so maybe you folks want to take a little bit of a
 2    break.  Ten minutes.  Does that work?
 3                MR. BERL:  Yes.
 4                THE COURT:  And we'll go late.
 5                MR. BERL:  Sure.  In sense of the timing, how
 6    late?
 7                THE COURT:  What do you think?
 8                MR. BERL:  I think it will be an hour and ten
 9    maybe for direct.
10                THE COURT:  All right.  So how about the cross?
11                MR. FELDMAN:  Your Honor, about an hour.
12                THE COURT:  Do you all want to keep going, plow
13    through it or do you want to take a break after direct?
14                MR. BERL:  We can see how he's doing.  He's an
15    elderly gentleman.
16                THE COURT:  Maybe we should do that then.  Let's
17    just do his direct.  That gives you time to prepare.  So
18    we'll go through the direct.  Is that fair?
19                MR. BERL:  Actually, I just learned he would
20    much rather finish today if possible.  He has something
21    tomorrow.  We didn't think it would go this long.
22                THE COURT:  Hold on a second.  Okay.  We'll plow
23    through.
24                So let's take -- then since we're going to do
25    that, why don't we take a 15-minute break and come back at
```

```
 1    20 of and then we'll continue.

 2                 (Short recess taken.)

 3                       -   -   -

 4                 (Proceedings resumed after the short recess.)

 5                 THE COURT:  All right.  Please be seated.

 6                 All right.  Before we continue, the

 7    stipulations.  Can you all hear me better?  I heard there's

 8    a problem hearing me.

 9                 MS. STAFFORD:  I can hear you.

10                 THE COURT:  Is it too loud?  All right.  There's

11    a stipulation regarding Grebow.  Has that been withdrawn?

12    Is that with a what I was told?

13                 MR. FELDMAN:  No, Your Honor.  I'll believe it

14    was filed twice.  Messerschmitt --

15                 THE COURT:  I just want to make sure I'm not

16    signing the wrong stipulation is the problem.

17                 MR. FELDMAN:  I believe Ms. Keller filed it.

18                 MS. KELLER:  I think it was Friday.  My

19    paralegal inadvertently filed the Grebow stipulation again

20    instead of the Messerschmitt one.  So Grebow is still an

21    active stipulation and would need your signature as well as

22    the Messerschmitt stipulation.

23                 THE COURT:  Okay.  I did sign them on

24    September 4th.

25                 MS. KELLER:  Right.  Earlier last week.
```

```
 1                    THE COURT:  Did we enter it or not?
 2                    MS. KELLER:  I don't know that you entered it.
 3      I signed it right around the pretrial conference.
 4                    THE COURT:  So it hasn't changed?
 5                    MS. KELLER:  Correct.
 6                    THE COURT:  I'm not going to enter something and
 7      find out --
 8                    MS. KELLER:  Correct.
 9                    THE COURT:  So I will enter the Grebow.  I'm
10      going to date it September 9th.
11                    All right.  Then we've got the Messerschmitt.  I
12      will enter that.  Got a confidential one under that.  We
13      have a stipulation and order as to Slayback and plaintiffs.
14      We'll enter that.
15                    Does that take care of all the stipulations?  I
16      believe it does.
17                    MS. KELLER:  Yes, Your Honor.
18                    THE COURT:  Thank you.  Then realtime.  I just
19      want to make sure mine works.  You will have to forgive me
20      for a minute.  We're going to use realtime I understand.
21      Correct?  We're ready to go.
22                    MR. BERL:  Plaintiffs call Dr. Nagesh Palepu.
23                        ... NAGESH PALEPU, having been
24            duly sworn/affirmed as a witness, was examined and
25              testified as follows...
```

Palepu - direct

1              MR. BERL:  Your Honor, may I approach with

2     binders?

3              THE COURT:  Please.  All right.  Can you still

4     hear me?

5              MR. HARBER:  Still hear you.

6              THE COURT:  It seems very loud.  Folks back

7     there, can you hear me?

8              MR. BERL:  Ready?

9              THE COURT:  Yes, please.

10                        DIRECT EXAMINATION

11     BY MR. BERL:

12     Q.    Good afternoon, Dr. Palepu.  Could you please

13     introduce yourself to the Court?

14     A.    My name is Nagesh Palepu.

15     Q.    Are you able to understand me?

16     A.    Yes, I am.

17     Q.    Have you ever testified at trial?

18     A.    No.

19     Q.    Dr. Palepu, I'd like to begin by exploring your

20     educational background.  What degree did you obtain after

21     your Bachelor's degree?

22     A.    M.S. in physical chemistry.

23     Q.    What is physical chemistry?

24     A.    Physical chemistry is the -- studying the physical

25     chemical properties of a compound.

Palepu - direct

1  Q.    Does physical chemistry study how compounds interact

2  with each other?

3  A.    Yes.   That influences the component interacting with

4  the different solvent, other compounds.

5  Q.    From where did you obtain your Master's degree?

6  A.    I got my Master's degree from Indian Institute of

7  Technology, Bombay, known as IIT Bombay.

8  Q.    When was that?

9  A.    1970, '72.

10  Q.    When did you come to the United States?

11  A.    1974, January.

12  Q.    What did you do when you arrived?

13  A.    I worked at Pfizer pharmaceuticals as a research

14  scientist.

15  Q.    For how long?

16  A.    For five years.

17  Q.    What did you do next?

18  A.    After that I joined the University of Iowa to pursue

19  higher studies in Ph.D. program.

20  Q.    What was your area of research at University of Iowa?

21  A.    My Ph.D. thesis is kinetic, hydrolysis kinetic

22  characteristics of alpha, known as almost LAAM.

23  Q.    What is kinetics?

24  A.    Kinetics is the understanding the, how fast or how

25  slow a molecule, a component is degrading.

Palepu - direct

1   Q.    Was your Ph.D. in pharmaceutical sciences?

2   A.    Yes, it's in pharmaceutical sciences.  Also

3   pharmaceutical chemistry, also known as pharmaceutics.

4   Q.    Why was kinetics relevant to pharmaceutical sciences?

5   A.    Because any component we study, we wanted to make sure

6   the component, how stable it is.

7   Q.    Why is that relevant to kinetics?

8   A.    Because if you understand how fast the product is

9   degrading, okay, it will help us to understand how we can

10  stabilize that so that it can be formulated at a stable

11  dosage form.

12  Q.    When did you obtain your Ph.D. from Iowa?

13  A.    1983 February.

14  Q.    Did you get a job after completing your Ph.D.?

15  A.    Pardon me?

16  Q.    What did you do after you got your Ph.D.?

17  A.    I joined Bristol-Myers in Syracuse, New York.

18  Q.    And what was your job at Bristol-Myers?

19  A.    I was a senior research scientist responsible for

20  developing injectable products for anti-cancer drugs and

21  anti-infective drugs.

22  Q.    How long did you work at Bristol-Myers?

23  A.    Three-and-a-half years.

24  Q.    And where did you go next?

25  A.    I joined Adria Laboratories in Columbus, Ohio, which

1   is a division of Pharmacia.

2   Q.   And how long did you stay at Adria?

3   A.   I stayed there five years.

4   Q.   And what did you work on while at Adria?

5   A.   I was a section head of the formulations group.  It

6   was both injectables, new chemical entities.

7   Q.   What was -- what did you do after Adria Laboratories?

8   A.   After Adria Laboratories, I joined SmithKline Beecham

9   in Philadelphia as a developer, pharmaceutical product

10  development.

11  Q.   What was the nature of your work?

12  A.   Pardon me?

13  Q.   What was the nature of your work at SmithKline

14  Beecham?

15  A.   At SmithKline Beecham I predominantly work around

16  solid dosage forms.

17  Q.   And how long did you stay at SmithKline Beecham?

18  A.   I stayed '91 to 1999.

19  Q.   And can you summarize your work in the years following

20  1999?

21  A.   After SmithKline Beecham, I joined Geneva

22  Pharmaceuticals as a vice president of research and

23  development.

24  Q.   And then what after that?

25  A.   After that I joined a drug delivery company called

Palepu - direct

1    Soris pharmaceuticals in Seattle, which is specializing in

2    injectable emulsion.

3    Q.    Doctor, did there come a time that you started a

4    company called Therdose?

5    A.    Therdose I started in 2003.  I started a company

6    called, and I usually get a lot of consulting work and I'm

7    there.  Consulting work.  People asked me to see if I can --

8    R&D, formulation, development studies.  So started a company

9    called Therdose.

10   Q.    What year did you start Therdose?

11   A.    2004.

12   Q.    And did you -- whom did you consult for?  Was it other

13   pharmaceutical companies?

14   A.    Yes.

15   Q.    How many employees were at Therdose when you started

16   it?

17   A.    When we started it, there were five employees.

18   Q.    As I understand it, companies often have their own

19   formulators.  Why would they come to Therdose?

20   A.    Because I'm an expert in formulation.

21   Q.    Are you familiar with SciDose?

22   A.    Yes, I do.

23   Q.    Can you explain what SciDose is and how that relates

24   to Therdose?

25   A.    SciDose is scientific, responsible for doing research

```
 1    and development and I'm a scientist.  I needed somebody to
 2    help me with development.  Joined my friend Joe Bohan.  We
 3    both jointly formed SciDose.
 4    Q.    Dr. Palepu, you've worked at a number of companies,
 5    including your own.  How many compounds have you worked with
 6    in your career?
 7    A.    Over a hundred compounds.
 8    Q.    And if we limit that to just trying to formulate
 9    injectable compounds, how many products have you worked on?
10    How many compounds?
11    A.    About 80 percent.
12    Q.    Are you familiar with Eagle Pharmaceuticals?
13    A.    Yes, I am.
14    Q.    What was the nature of your relationship with Eagle?
15    A.    We have a multi-product development contract with
16    Eagle.
17    Q.    And did SciDose and Therdose work with companies other
18    than Eagle as well?
19    A.    Yes, we do.
20    Q.    How were the products, you said you had a multi
21    product relationship with Eagle.  How were the products
22    chosen?
23    A.    Products were chosen, initially, the portfolio
24    management team, then we will have special development.
25    They would say we can develop, which we cannot develop.  So
```

Palepu - direct

1    based on all of the situations and analysis, then the

2    products will be selected.

3    Q.    Generally speaking, what types of projects did

4    Eagle ask SciDose to develop easy products or hard products?

5              MR. FELDMAN:  Objection.  Leading.

6              THE WITNESS:  Hard products.

7              THE COURT:  What was the objection?

8              MR. FELDMAN:  Leading.

9              THE COURT:  Overruled.

10   BY MR. BERL:

11   Q.    You can answer, Doctor.

12   A.    Hard products.

13   Q.    Who else worked with you on the scientific aspects of

14   the drug development products you worked on for Eagle?

15   A.    Dr. Buxton.

16   Q.    Who is Dr. Buxton?

17   A.    Dr. Buxton, okay.  When I was at SmithKline Beecham,

18   in '97, I was -- I went to England to develop some of their

19   products, so Dr. Buxton is one of the managers working in my

20   group.

21   Q.    What is Dr. Buxton's specialty or expertise?

22   A.    Dr. Buxton's Ph.D. is in synthetic organic chemistry,

23   however mostly degradation mechanism, understanding the

24   mechanistic path.

25   Q.    Where is Dr. Buxton now?

Palepu - direct

1    A.    He's in England right now.

2    Q.    How is his health?

3    A.    Well, he had a major operation.  He's recovering very

4    slowly.

5    Q.    Was one of the projects you worked on with Eagle about

6    bendamustine?

7    A.    What?  Pardon?

8    Q.    Was one of the projects you worked on with Eagle about

9    bendamustine?

10   A.    That is correct.

11   Q.    When did you initiate work on the bendamustine

12   project?

13   A.    Sometime early 2009.

14   Q.    Did you work with Dr. Buxton on that project?

15   A.    Yes.  We worked together on that project.

16   Q.    And why did you work with him on this project?

17   A.    Well, as you know, class of compounds called nitrogen

18   mustards.  These are extremely reactive molecules.  So

19   definitely we needed somebody who understands the

20   degradation chemistry.

21   Q.    Who else worked on the bendamustine project for

22   Therdose?

23   A.    There were scientists on that project.

24   Q.    Do you recall how bendamustine first came up as an

25   idea for a drug development project?

Palepu - direct

1   A.    I'm sorry.  I'm not hearing.

2   Q.    Sure.  I will try again.  Do you recall how

3   bendamustine first came up as a development project with

4   Eagle?

5   A.    I think, yes, I do.  Scott had one time asked me can

6   you develop bendamustine, liquid bendamustine, and I went

7   and looked at the structure and everything from physicians

8   desk reference, package insert of bendamustine, and then

9   looking at that, I thought we might not -- the product I

10  worked at Bristol-Myers.  The degradation looked similar, so

11  I said, it is possible, Scott, it is possible.  We can work

12  on this project.

13  Q.    And for how long did you want this liquid bendamustine

14  product to be stable?  For what period of time?

15  A.    I did not understand the question properly.

16  Q.    For what period of time did you want the bendamustine

17  liquid product to be stable?

18  A.    Ideally, we prefer to have 24 months.

19  Q.    You mentioned stability?

20          THE COURT:  34?

21          THE WITNESS:  24.  24.

22  BY MR. BERL:

23  Q.    You mentioned stability.  Can you explain what you

24  mean by stability in this context of a pharmaceutical

25  product?

Palepu - direct

1  A.    The stability means suppose, take example of

2  bendamustine.  If I put the bendamustine in a solution form,

3  it has -- it's activity.  Did not degrade.  If it degrades,

4  but not more than that.

5  Q.    What's the problem with it degrading?

6  A.    Well, you don't get a complete dose of the drug.

7  Q.    And is there a problem with the things that it

8  degrades into potentially?

9  A.    Sorry.

10  Q.    Sure.  Now --

11  A.    You're talking very loud.

12  Q.    Too loud.  Let's try it this way.  Okay.  Let's try it

13  now.  Can you hear me now?

14  A.    Yes.

15  Q.    Good.  Is there a problem with the things that it can

16  degrade into?

17  A.    Yes.  If the molecule is degrading, the degradative

18  product is without degradant, they can be toxic.  They have

19  a very adverse effect in the patient.

20  Q.    You mentioned that you were trying to develop a liquid

21  product of bendamustine.  What was the existing bendamustine

22  product at that time, 2009?

23  A.    The marketed bendamustine product at that time is a

24  lyophilized product.  That means solid bendamustine inside a

25  vial.

Palepu - direct

1   Q.    What was the name of that product?

2   A.    Treanda.

3   Q.    Dr. Palepu, if you could turn in your binder to the

4   first document.  It's PTX-757.

5           Can you explain what this document is,

6   generally?

7   A.    When I look at this molecule, as I mentioned earlier,

8   it reminded me of another product I was --

9           MR. FELDMAN:  I object, Your Honor.  It's

10  previously marked as an exhibit.

11          THE COURT:  Wait.  I don't understand the

12  objection.

13          MR. FELDMAN:  Objection, Your Honor.  Leading.

14          MR. BERL:  We can take it down.  I'm trying to

15  move it along so it's somewhat efficient.

16          THE COURT:  It's leading.  Did he underline

17  something in the document?

18          MR. FELDMAN:  Before we even talked about it.

19  We can do it.  That's fine.

20          THE COURT:  I've got to say, I'm confused.

21  We've got a document.  Everybody puts documents in front of

22  witnesses.

23          What's the question?

24          MR. BERL:  Well, I just asked him about the

25  document.  I will ask him about the line and underlining.

Palepu - direct

1        If you don't want me to do that, it will take more time.

2                    THE COURT:  Just go ahead and ask the question.

3        We'll see.

4        BY MR. BERL:

5        Q.     Doctor, can you explain what this document is?

6        A.     Can I explain what?

7        Q.     What this document is that we're looking at?

8        A.     The document, the bendamustine.  On the left side of

9        the structure, I refer to the butyl -- the right side of the

10       ring is the carboxylic acid.  So what the carboxylic acid

11       and the, the mustard ring have, will undergo degradation in

12       the presence of different formulas of water.  And water,

13       when you put bendamustine in water, it's replaced by water

14       molecules.

15       Q.     So --

16       A.     When the -- you need to keep it intact with that.  So

17       this is what I did when I worked with cisplatin, which is a

18       cancer drug.  Lyophilized cisplatin.  Converted it into a

19       liquid cisplatin.  Looking at it, degradation

20       chemistry-wise, it is similar to cisplatin.  So that's how

21       we started working.

22       Q.     Okay.  Now, just to be clear, who are you e-mailing in

23       this document?

24       A.     I was sending it to Professor Flanagan, my research

25       professor, because if cisplatin in his Ph.D. at Michigan.

Palepu - direct

```
 1    Q.    And this information that you were conveying about
 2    bendamustine, where did you obtain this information?
 3    A.    I was available -- I got this from Treanda package
 4    insert.
 5    Q.    And it says here, the package insert says that the
 6    lyophilized product must be diluted in the infusion bags
 7    within 30 minutes after reconstitution and the diluted
 8    solution is stable for 24 hours at five degrees C and three
 9    hours at 25 degrees C.
10          Can you explain why you were telling that to Dr.
11    Flanagan and Dr. Buxton?
12    A.    Well, because it -- the bendamustine molecule is very
13    unstable and the stability has improved in the presence of
14    the product.  So that -- that is -- it would stabilize the
15    molecule.  So at that time I was discussing with professor
16    Buxton and Dr. Flanagan.
17    Q.    If we go to the next e-mail --
18          THE COURT:  Before you do --
19          MR. BERL:  Yes.
20          THE COURT:  Two questions.  One is, when you
21    referred to stability previously and I thought I heard 34.
22    I thought I heard 34 months.  Is there a different type of
23    stability, the 24-hour stability that's referred to in this
24    e-mail.
25          MR. BERL:  I think it was 24 months.
```

Palepu - direct

```
 1              THE COURT:  It was months.  I didn't mishear

 2    that.  You corrected me and said 24.  I thought it was

 3    months.  I want to make sure that testimony was accurate.

 4              MR. BERL:  Yes.

 5              THE COURT:  It sounds like I'm conflating two

 6    different things.

 7              Secondly, can you get clarity on, do I

 8    understand correctly that everything that follows the word

 9    "follows" in the ellipses is basically copied from the

10    label, the entirety of it?

11              MR. BERL:  No.  I think this is, and this was

12    written by --

13              THE COURT:  No, not the bold.

14              MR. BERL:  Yes.

15              THE COURT:  But that part right there is just

16    copied?  Right?  I want to make sure.

17    BY MR. BERL:

18    Q.    So, Dr. Palepu, you said the diluted solution is

19    stable for 24 hours.  What does diluted solution refer

20    to?

21    A.    During the -- the bendamustine reconstituted with

22    water, 100 milligrams per vial, reconstituted with water to

23    give you 35 milligrams.

24              This degradant now in saline.  So

25    2.5 milligrams.  And this diluted solution in the bag is the
```

Palepu - direct

1    one at --

2    Q.    When you said you wanted to be stable for 24 months,

3    what was that?

4    A.    Well, if I develop a liquid product, the product

5    should be stable for 24 months.

6    Q.    If we can go to the next e-mail in the chain, you say

7    at the end, if we formulate the drug solution in a high

8    chloride containing medium, we may stabilize the molecule.

9            Can you explain that idea?

10   A.    As I mentioned earlier, the -- the sodium chloride.

11   So you have sodium chloride competing with water and

12   allowing the molecule.  So you're not changing the molecule.

13   So that is the idea.

14   Q.    Had you used this idea before to stabilize any other

15   product in your career?

16   A.    As I mentioned earlier, we did this with cisplatin.

17   Q.    Now, did you and Dr. Buxton report to Eagle on the

18   progress of your research?

19   A.    Yes, we did.

20   Q.    Let's turn to the next exhibit.  It's PTX-761.

21           What is this exhibit, Dr. Palepu?

22   A.    This is the progress report we submitted to Eagle

23   summarizing all of the work we have done and to -- end up

24   doing end of July 2009.

25   Q.    Did you have a role in preparing this report?

Palepu - direct

1    A.    Did I what?

2    Q.    Did you play a role?  Did you participate in the

3    report?

4    A.    Well, the report -- played a role.  Why we see

5    Professor Buxton's name, also my English is not very good,

6    grammar is not good.  Chris collects everything to make it

7    look very good.

8    Q.    What was the purpose of these progress reports you

9    sent to Eagle?

10   A.    The purpose of the progress reports I sent to Eagle is

11   to let them know where we stand on the project, what could

12   be -- how it can welcome the issues.

13   Q.    Did you share these reports or your ideas or data with

14   anyone other than Eagle?

15   A.    No.  Very confidential what we were doing with Eagle.

16   Q.    Let's turn to pages 3 and 4 of this report.  Can you

17   describe generally, you don't need to go into detail, but

18   generally what is shown here?

19   A.    Generally, what -- I was explaining earlier verbally

20   that when you put bendamustine in water, water with

21   bendamustine.

22         As you see here, from there to there,

23   bendamustine is present.  From there, the second water,

24   displaces the second chloride.  One dispenses with the will

25   two water molecule, the hydrolysis product, too.  We call it

Palepu - direct

1    **HP-2.**

2    Q.    **Okay.**

3    A.    **One molecule causes hydrolysis.**

4    Q.    **Okay.**

5    A.    **These two are degradations, but whether we study this,**

6    **and the next slide is -- explains the potential secondary**

7    **degradant product.**

8    Q.    **So are these some of the mechanisms by which**

9    **bendamustine degrades?**

10   A.    **This is some of the mechanisms by which bendamustine**

11   **degrades.**

12   Q.    **Why were you and Dr. Buxton analyzing the mechanisms**

13   **by which bendamustine degrades?  How was that relevant to**

14   **your job?**

15   A.    **Well, my understanding the degradation mechanism**

16   **will -- to improve.  For example, the chloride.  So how we**

17   **give the chloride back into the moiety.  So since we noticed**

18   **this is happening, so we can come up with a procedure, an**

19   **idea to prevent that disassociation of chloride from the**

20   **degradant moiety.**

21   Q.    **I see there's one impurity identified here that says**

22   **dimers.**

23          **Do you see that?**

24   A.    **This is the molecule, one hydroxy molecule to form a**

25   **dimer.**

Palepu - direct

1   Q.    Okay.  Does that degradation happen at the nitrogen

2   mustard side or at the ester side?

3   A.    It happened on the nitrogen mustard side.

4   Q.    Okay.  And, doctor, let's take a look at your initial

5   studies on page 2.

6         Can you explain the study that is described

7   here, your initial studies in the bendamustine project?

8   A.    Here, we wanted to see how bendamustine would behave

9   in chloride containing medium.  So what we did, we used, has

10  X amount of chloride, and did the study, and then the

11  second, we added sodium chloride and as seen here, specific

12  milligrams of a certain product.  So then the potency after

13  20 hours.

14  Q.    Okay.

15  A.    So as you see, in the bendamustine column, we have

16  bendamustine, but we have a limited here.  83 percent.  That

17  means the initial quantity is a hundred, we, 83 percent, we

18  lost 17 percent of the drug.  When you put 36 milligrams, it

19  lost only two percent.  So that validates a hypotheses that

20  the chloride containing media would improve the stability of

21  bendamustine.

22  Q.    In the last column here, you said you are measuring

23  the amount of bendamustine remaining; is that right?

24  A.    That's right.

25  Q.    Okay.  And how did Therdose scientists measure the

Palepu - direct

1   amount of bendamustine and its impurities in stability

2   tests?

3   A.    By high performance liquid chromatography.

4   Q.    Why did you choose high performance liquid

5   chromatography, HPLC, to measure bendamustine and its

6   impurities?

7   A.    High performance liquid chromatography is used by all

8   pharmaceutical companies, because it is very specific.  It

9   will separate all the degradants of products, so you know

10  you made a degradation peak.  Give you very quantitative

11  numbers of what it is.

12  Q.    Are you familiar with a different technique called

13  TLC, thin layer chromatography?

14  A.    Yes.  It's used a long time ago.

15  Q.    Have you ever used it?

16  A.    Yes, I did.  So 40 years ago when I was at Pfizer.

17  Q.    Why didn't you have the Therdose scientists use TLC to

18  test for degradants during your work on the bendamustine

19  project?

20  A.    Many scientists don't know TLC.  It's like new

21  millennial people won't know anything other than a

22  cellphone.  Just like that, TLC is an old technology.  They

23  do not know TLC.

24  Q.    In your experience in pharmaceutical companies after

25  the 1970s, have you heard of companies using TLC to test for

1   stability and impurities?

2   A.    Not to my knowledge.

3   Q.    All right.  Let's look at the observations and

4   conclusions you made about the experiment that we looked

5   at.

6           What was your first observation?

7   A.    It's a very interesting thing.  What we thought is,

8   when you put sodium chloride, we may adjust the stability

9   because of the -- salting out effect.

10          THE COURT:  Sorry.  Can you say that again?

11          THE WITNESS:  Salting out effect.  We have --

12  the salt concentration is high.  It brings the drug out.

13  That's what this point is.  Drug in the presence of sodium

14  chloride.

15  BY MR. BERL:

16  Q.    So bendamustine has a chloride and sodium chloride has

17  a chloride?

18  A.    That's right.

19  Q.    The salting out effect you're describing is when you

20  have more sodium chloride in the solution, the solubility

21  goes down and you get precipitation?

22  A.    That's correct.

23          MR. FELDMAN:  Objection, Your Honor.  Leading.

24          THE COURT:  It's a fine line.  It's hard.  It's

25  a challenge, but stakes are high, so, Mr. Berl, try not to

Palepu - direct

1    lead.

2                    MR. BERL:  I was trying to clarify context.

3                    THE COURT:  I know.  Let's just go.

4    BY MR. BERL:

5    Q.    What was your third observation, Doctor?

6    A.    As I said before, the presence of sodium chloride

7    enhances the stability of bendamustine solution by about 15

8    to 25 percent.

9    Q.    And did you do further experiments using chloride

10   ions?

11   A.    I believe we did.

12   Q.    All right.

13   A.    We also -- yes, we did.

14   Q.    Let's go to the next document, page 5 of the same

15   exhibit.  There's a heading called further studies.

16   A.    Yes.

17   Q.    And it says, the question of whether the improved

18   stability in hydrochloric acid observed in the initial

19   experiments was due to the low pH or the presence of

20   chloride ions.

21                    Can you explain this experiment to the Court?

22   A.    As you saw earlier table, there is stability, less

23   degradation of bendamustine.  It's one, then two.  We want

24   to know that is it the pH that is causing the stability of

25   the bendamustine product.

Palepu - direct

1              So to prove it, what we have done here, we've

2     taken other acids that does not contain chloride and then

3     the stability.  And in the case of lactic acid, we take the

4     pH of lactic acid and we also added lactic acid with the

5     sodium chloride.

6              As you see here, the acid, lactic acid.

7     Completely degraded the bendamustine.  Impurities.  100

8     percent of degradation.

9              So we have completely converted everything to

10    the degradation product.  And as you see, bendamustine 009

11    and 010.  Lactic acid, 5.25.  Contained sodium chloride, and

12    you see only -- I can't see that.  Only 80 percent instead

13    of a hundred percent, excuse me.

14    Q.    Okay.

15    A.    It's really telling that pH is not the factor, but it

16    is the presence of chloride ions that is improving the

17    stability of bendamustine solution.

18    Q.    Okay.  And let's go to pages 5 and 6, the bottom of

19    page 5.

20              Do your experiments show that the presence of

21    chloride ions would be sufficient to make a stable liquid

22    bendamustine formulation?

23    A.    Right.

24    Q.    Was the chloride ion enough?  Was using chloride ions

25    enough to stabilize bendamustine?

Palepu - direct

1    A.    No.   Chloride ions are not enough.   We need more to

2    get a stable product.

3    Q.    You also mentioned a reduction in solubility by the

4    salting out effect that you described a moment ago.   Why

5    would reduced solubility be a problem for an injectable

6    product?

7    A.    Well, two reasons.   One is, if you're giving a very

8    valued solution, you have a patient, so you need more

9    concentrated solution.   Also, if you have this -- sodium

10   chloride, lack of sodium chloride, you keep on.   So we may

11   produce the solid particles, which is not allowable for an

12   injectable product.

13   Q.    You mentioned your work on the drug cisplatin.   At

14   this point, how did the bendamustine project compare to your

15   work on cisplatin?

16   A.    It's like day and night.   In cisplatin, sodium product

17   concentration, we were able to convert to a liquid product

18   without compromising the solubility.   In this case, we

19   are -- the salting out effect, causing bendamustine,

20   precipitating in chloride mixed media.

21         So the concentration is going down.

22   Q.    Doctor, if we turn to page 6, there's a discussion

23   about trying to improve solubility.   What was your idea to

24   try to improve solubility?

25   A.    Okay.   Up until now, we were hoping to develop a

Palepu - direct

1    completely water based formulation.  So based on the data we

2    were given, we know that it's difficult to develop a water

3    based formulation.  So we know that we can stabilize with

4    the sodium chloride, but solubility was an issue, so we're

5    using some organic solvent.  Bendamustine is highly soluble.

6    We thought combination of water and organic solvent would

7    solve the solubility problem.

8    Q.    Did you have any concerns about using ethanol in a

9    formulation?

10   A.    No.  It's widely used in many injectable formulations.

11   Q.    Let's turn to page six further down in your

12   experiments with co-solvents to combine water and improve

13   the solubility.

14          What results did you obtain with your experiment

15   with water and ethanol?

16   A.    We had a great improvement compared to earlier

17   experiments with sodium chloride alone.

18   Q.    Were the results good enough?

19   A.    No.  Not good enough because you're losing -- what is

20   the time here?  You're still losing some drug.  Ideally, we

21   don't want to lose any drug.

22   Q.    Doctor, if you were using non-water solvents like

23   ethanol, why did you continue to include water in your

24   formulation?

25   A.    You need to give -- that's compatible with the blood.

Palepu - direct

1    Q.      I see that it says NACL in these formulations.  What

2    did you believe about chloride ions and their importance in

3    stabilizing bendamustine at this point?

4    A.      As I mentioned earlier, we are -- the chloride ion

5    must be, is a must in order to improve the stability of that

6    nitrogen mustard ring.

7    Q.      Is that what you thought at this time?

8    A.      Yes.

9    Q.      If we go to page 7 of the same document, PTX-761, did

10   you try other solvents as well in addition to ethanol?

11   A.      Well, we tried many and lactic acid is one of them.

12   And interesting thing with lactic acid is, lactic acid is

13   widely used in pharmaceutical products.  And also lactic

14   acid, 88 percent of lactic acid, only 12 percent water.

15   We know we need water and we wanted to prevent the

16   formation of the hydrolysis product one and hydrolysis

17   product two.

18             So what we did, we took the lactic acid and good

19   data.  Still not enough to develop an RTU.  But reducing the

20   water significantly would provide a stable -- would

21   stabilize the nitrogen mustard ring and form a stable

22   product.

23   Q.      Okay.  And you said not good enough for RTU.  What's

24   RTU?

25   A.      RTU means ready to use formulation.

Palepu - direct

1   Q.    Okay.  And it mentions here a new, a major degradation

2   product had changed to the unknown at RRT 1.2.

3                Do you see that?

4   A.    Yes.

5   Q.    And initially, did you know what this degradant was?

6   A.    We did not clearly, but specifically -- of

7   bendamustine.  Remember left side is the nitrogen mustard.

8   Right side is the carboxylic acid.  So the lactic acid is

9   selected as the --

10  Q.    Did you try to determine what that degradant was that

11  was caused by lactic acid?

12  A.    We did later.

13  Q.    How did you do that?

14  A.    Well, we did by LCMS, which is liquid chromatography,

15  mass spectrometer.

16  Q.    Did you also use your expertise in chemistry, or just

17  those tools?

18  A.    Pardon?

19  Q.    Did that require you to use your expertise in

20  chemistry along with Dr. Buxton to identify the impurities?

21  A.    That's completely Dr. Buxton.  He is the physical

22  organic chemist and he understands this much better than I

23  do.

24  Q.    Is that organic chemistry relevant to identifying the

25  impurities?

Palepu - direct

1  A.    Yes.

2  Q.    Now, Doctor, if we go down to page 8, there's a

3  heading entitled non-aqueous optimization.

4         Can you describe to the Court what you are

5  telling Eagle you had concluded generally by that point?

6  A.    I just said, I said the data, data that's lactic acid

7  and currently.  We just can't have a process of water.  We

8  need to have preferably a non-aqueous solvent to stabilize

9  bendamustine.

10 Q.    And what solvents were you considering here in your

11 report?

12 A.    Consists of several solvents like propylene glycol,

13 glycerol, lactic acid.  In other contexts, if we use the

14 organic solvents, then we know they need protecting on the

15 mustard side.  You have this organic solvent.  Not able to

16 provide chlorine involvement and chlorine product.

17 Q.    All right.  I think, I just want to be clear, Doctor.

18        If you were using these non-aqueous solvents,

19 did you think that the nitrogen mustard group still had to

20 be protected?

21 A.    That's right.  That's what I explained earlier.

22 Q.    CO?

23 A.    Nitrogen mustard group has to be protected.

24 Q.    Okay.  And let's take a look at the tables of

25 experiments you performed per this idea.  They're tables 8

1    through 10 beginning on page 9.

2              Generally, what are these formulations, Doctor?

3    A.   Oh, thank you so much.  Bendamustine ten-milligram per

4    mL in lactic acid and bendamustine, lactic acid and

5    chloride.  Then chloride product protecting bendamustine

6    molecule.

7    Q.   Did you still think chloride was protecting the

8    bendamustine molecule even though you weren't using water?

9    A.   Yes.

10   Q.   Okay.  And if we go to the other tables, are those

11   other solvents that you tried?  Here we see glycerol or

12   propylene glycol and glycerol.

13   A.   Propylene glycol also, it was very encouraging data.

14   Glycerol showed poor stability.

15   Q.   And if we go to the next one, what solvents are you

16   trying here?

17   A.   We use benzyl alcohol and DMSO.

18   Q.   How frequently have you seen DMSO used in

19   pharmaceutical products?

20   A.   DMSO is not used in pharmaceutical products.

21              THE COURT:  Sorry, Doctor.  Can I just ask:  Is

22   DMSO dimethyl sulfoxide?

23              THE WITNESS:  Yes.

24              MR. BERL:  My fault.  I apologize.

25              THE COURT:  No problem.  I just want to make

Palepu - direct

1    sure.  Okay.

2    BY MR. BERL:

3    Q.    How often was DMSO used in pharmaceutical products?

4    A.    DMSO was not an approved solvent in the pharmaceutical

5    product.  The reason we used DMSO here is, in fact, maybe

6    degradation in DMSO may be different from glycerol, may be

7    different than propylene glycol.  As we see here, DMSO

8    showed no degradation at ten milligrams.

9              So that means DMSO is reacting very differently

10   from propylene glycol.  It's reacting different from

11   glycerol.

12   Q.    Was bendamustine behaving predictably in these

13   solvents that you were using?

14   A.    No.

15   Q.    No?

16   A.    All the solvent, to understand how each solvent is

17   interacting with the bendamustine molecule.

18   Q.    You mentioned that DMSO had not been used in a

19   commercial product.  Does that mean you could not have used

20   it if it had worked and given the stability and solubility

21   you wanted?

22   A.    Well, no.  You have to qualify it.

23   Q.    Okay.

24              THE COURT:  I'm sorry.  What?  You have to

25   qualify it did you say?

Palepu - direct

1           THE WITNESS:  You have to qualify it to show

2   that it is not toxic.

3   BY MR. BERL:

4   Q.    If we look to page 11, Doctor, it showed that you are

5   providing two options to Eagle.  Can you explain what you're

6   providing?

7   A.    Bendamustine, 100 milligrams bendamustine included in

8   a solvent.  Okay.  That solvent will be diluted with 18 mL

9   of water, five mg.  Same as marketed product.

10  Q.    Okay.

11  A.    The two options here is the formulation with choline

12  chloride.  Other one is without choline chloride.

13  Q.    Now, in 2009 at this time, did you or anyone from

14  Eagle suggest changing the administration volume as compared

15  to the Treanda product?

16  A.    No.

17  Q.    Was there a time much later when you heard that Eagle

18  was considering changing the volume and administration of

19  the product?

20  A.    Yes.

21  Q.    And when did you hear that?

22  A.    I heard that in 2013, when I was in Las Vegas at the

23  American association of hospital pharmacists meeting.

24  Q.    If you could turn in your binder, Doctor, to PTX-729.

25  It's the next document.  I think it's just before 2013, in

Palepu - direct

1    December 2012.

2                    Is that an e-mail from you to Dr. Sundaram,

3    Scott Tarriff and Ken Degan?

4    A.    Which one?

5    Q.    The next one, PTX-729, the next document in your

6    binder.

7    A.    Oh, okay.  Got it.

8    Q.    Is that an e-mail that you wrote to Dr. Sundaram,

9    Scott Tarriff and Ken Degan on December 3rd, 2012?

10   A.    That's right.

11   Q.    And what are you telling them about this idea that you

12   heard?

13   A.    Okay.  Well, when Scott discussed this idea with me, I

14   said, Scott, I'm not comfortable because you're having a

15   hundred percent organic solution, that's the value that

16   responds back.  The concentration could be very high and may

17   cause problems at the injection site.  I'm not really very

18   comfortable.  Then I discussed it with Scott, the chief

19   executive at Eagle.

20   Q.    Are these problems what you are referring to in your

21   e-mail about the fast infusion will have some adverse

22   effects?

23   A.    That's right.

24   Q.    Okay.  Now, let's turn back to 2009 again and back in

25   the binder to the exhibit we were looking at before, 761.

Palepu - direct

1    And, in particular, page 14.

2              Now, in all of the formulations we've looked at

3    so far, Dr. Palepu, what was the concentration of

4    bendamustine you were using?

5    A.    Ten milligrams per mL.

6    Q.    Was that high enough?

7    A.    No.

8    Q.    Why not?

9    A.    Because as I mentioned earlier, smaller the volume, if

10   you use small volume, high concentration, the volume is

11   small.  100 milligrams, ten milligrams per mL, I'm getting

12   ten mL solution.  If it's 50 milligrams per mL, I'm giving

13   two.  Smaller the volume, better for the patient.

14   Q.    And, again, what you're talking about in terms of the

15   volume is not the diluted solution, it's the liquid

16   formulation that will be diluted?

17   A.    Right.  Yes.

18   Q.    Okay.  Now, what was the concentration you wanted?

19   A.    50 milligram per mL.

20   Q.    And what did you think would happen if you increased

21   the concentration of bendamustine from ten milligrams per

22   milliliter to 50 micrograms -- milligrams per milliliter?

23   A.    We found --

24   Q.    What did you think would happen?

25   A.    That is something we are not expecting.  That's

Palepu - direct

1    something we're not predicting.

2    Q.    So what was your prediction to be clear?

3    A.    Our prediction would be that the higher the

4    concentration, better the stability.

5              THE COURT:  Hold up for a second.

6              MR. FELDMAN:  I object, Your Honor.

7              THE COURT:  State the objection.  Then we'll

8    have a clear record.

9              MR. FELDMAN:  I believe he's now testifying

10   about unexpected results, Your Honor.

11             MR. BERL:  No.

12             THE COURT:  So I think we're still at the,

13   there's no test results.  Right?  He's just testifying about

14   his expectation?

15             MR. BERL:  We have not gotten to Bendeka at all

16   yet.  We are still ways away from that.  They're trying all

17   sorts of stuff.  This is not the invention.  We're on the

18   road.

19             THE COURT:  Yes.  I mean, my understanding was

20   this is a line of demarcation as the invention.  Go ahead,

21   Mr. Feldman.

22             MR. FELDMAN:  I believe Mr. Aly may speak.

23             MR. ALY:  Your Honor, while we are taking a

24   break, I just had another objection.  That's to relevance.

25             We heard from the inventors that the inventors'

Palepu - direct

```
 1    pathway to the injection is not relevant.  I know it's late
 2    in the night and Your Honor is spending time with us.  I'm
 3    not sure what the relevance of the inventor's testimony was.
 4    It's not background for sure.
 5              THE COURT:  There is some irony that your
 6    inequitable conduct defense has been completely jettisoned
 7    by my granting the motion.  I think it's the right result.
 8              MR. BERL:  If I may respond, Your Honor, this
 9    was addressed in paragraph 39 of our statements of law.
10              There is clear Federal Circuit authority for the
11    proposition that while the inventors' path to the invention
12    cannot be used against the invention, the fact that the
13    inventor tried and failed a lot of times is relevant to
14    prima facie obviousness and can favor nonobviousness.
15              That's the Endo case decided just a few months
16    ago by the Federal Circuit, 922 F.3d, 1377.  I apologize we
17    cited it as 1373 in the pin cite in the pretrial order.  I
18    don't want to be the pig hunting for truffles, or whatever
19    you put in your order.  But that --
20              MR. BERL:  And we cite another case that stands
21    for the same proposition.  I'm happy to hand it up.  But
22    this is clear and controlling law.
23              THE COURT:  Mr. Feldman?
24              MR. FELDMAN:  I have nothing.
25              THE COURT:  I'm going to let it in.  What I'm
```

Palepu - direct

1    interested in at the end of the day is what you all have to

2    say about the weight I give this because my inclination, as

3    somebody who has not had to do this before, is to not give a

4    lot of weight to the testimony which can be very self

5    serving of the patentee and to put a lot more weight on

6    what's in the prior art.

7                And I mean, I'm not making a definitive

8    statement or saying I've made that decision, but that's just

9    kind of what makes sense to me, and I expect I'm going to

10   hear a lot from experts about what the prior art universe

11   is.

12                MR. BERL:  Absolutely you will, Your Honor.  I

13   just want to note that I was told today that these people

14   are just bake errs in some kitchen or something.  I think

15   that's a punchline of that joke, but this is all sort of

16   easy like baking a cake or something like that and there's

17   no chemistry going on.  So it seems reasonable.

18                MR. ALY:  But there are experts for that

19   obviously, Judge.  There are going to be experts.  And, in

20   fact, right now Dr. Stevens in plenty of his expert report

21   is about the same work that the inventors did.

22                THE COURT:  They only have limited time.

23                MR. ALY:  Right.

24                THE COURT:  And so --

25                MR. ALY:  I didn't mean to interrupt further.

Palepu - direct

```
 1                  THE COURT:  That's fine.  So the objection is

 2      overruled and the testimony may continue.

 3      BY MR. BERL:

 4      Q.    Doctor, if we go to the bottom of page 14, there's a

 5      list of actions for the next month.

 6                  Do you see that?

 7      A.    Yes.

 8      Q.    And one of them says complete LCMS work to identify

 9      degradants.

10                  Do you see that?

11      A.    Yes.

12      Q.    Why were you doing LCMS work at this time to identify

13      degradants?

14      A.    As I mentioned earlier, we saw different degradation

15      peaks in different solvents.  That means bendamustine is

16      reacting differently in different solvents.  So it's really

17      important to understand the degradants and seek out why

18      that's happening.

19                  If we know what degradants in each solvent we

20      try, it will help us understand with all the data, it will

21      help us understand what exactly is happening in terms of

22      degradation.

23      Q.    Could you turn to the next exhibit, Doctor, PTX-591?

24      A.    Yes.

25      Q.    Is this the October 2009 progress report?
```

Palepu - direct

1    A.    Right.

2    Q.    Did you perform experiments using higher

3    concentrations of bendamustine with some of the non-aqueous

4    formulations we discussed in your previous report?

5    A.    You talk too fast.

6    Q.    Sorry.  Did you perform experiments with the higher

7    concentrations of bendamustine?

8    A.    Yes, we did.

9    Q.    Okay.  And what was the result of increasing the

10   concentration of bendamustine generally?

11   A.    Increasing the concentration of bendamustine increased

12   the degradation of bendamustine also.

13   Q.    Let's take a look at page ten and we'll compare two

14   formulations, number 28 and number 45.

15          Do both of these have propylene glycol?

16   A.    Yes.  The both have the same amount of propylene

17   glycol.

18   Q.    And do they both have chloride?

19   A.    Yes.  One has 215 milligrams and 250 milligrams.

20   Q.    BDM 45 has more bendamustine; is that right?

21   A.    Pardon me?

22   Q.    BDM 45 on the bottom, does that have a higher

23   concentration of bendamustine?

24   A.    That's correct.  50 milligrams per mL.

25   Q.    What was the effect of increasing the concentration to

Palepu - direct

1    50?

2    A.    It was the less stable.  For example, 40 degrees.  Ten

3    milligrams per mL.

4            74.7 degradation for the formulation with the

5    50-milligram bendamustine.

6    Q.    What was your understanding about the effect that

7    chloride was having on these formulations?  Was it

8    stabilizing or destabilizing?

9    A.    Chloride will at this stage, stability of chloride is

10   stabilizing.

11   Q.    And let's take a look at BDM 43, another formulation

12   you made.  Is this one in propylene glycofurol as well?

13   A.    Yes.

14   Q.    And have you used less chloride here than we saw a

15   moment ago?

16   A.    Right.

17   Q.    And what's the effect of using propylene glycol with

18   less chloride in bendamustine?

19   A.    We have more degradation in this product.  I think

20   this chloride in stabilizing the bendamustine molecule, a

21   solvent.

22   Q.    After one month at 25 degrees, how much instabililty

23   do you have in how much degradation do you have?

24   A.    The total degradant, we have 24.10.

25   Q.    Doctor, if we go to page 15, I'm showing a part that

Palepu - direct

1    says stability of bendamustine at high concentrations.

2              Can you explain to the Court the main

3    observation from your experiments?

4    A.    Yes.  As I mentioned, that we had stability of

5    bendamustine at 50 milligrams per mL.

6    Q.    At the bottom you say, overall the stability is not

7    sufficient for either solvent, ethanol and propylene glycol,

8    to maintain a viable product at room temperature.

9              Do you see that?

10   A.    Yes.  Even at five degrees.

11   Q.    Why is that?

12   A.    Because the level of degradation, we're finding it in

13   such a short time.

14   Q.    Did you try other solvents as well?

15   A.    Yes, I think we tried after other -- we tried glycol

16   and we tried polyethylene glycol 400.

17   Q.    Let's take a look at page 17 of the same exhibit.

18   What are you testing here?

19   A.    We are testing bendamustine at 20 milligrams per mL

20   and polyethylene glycol.

21   Q.    And that's PEG; right?

22   A.    That's PEG 400.

23   Q.    Was there any particular reason you used PEG?

24   A.    No.  As I mentioned earlier, we're trying to see,

25   understand the degradation in different solvents, how each

Palepu - direct

1   solvent is varied.  So the same thing we use.

2   Q.    At this point, Doctor, did you have any theory about

3   why PEG would work where other solvents had failed?

4   A.    No.

5   Q.    I see that you're using 20 milligrams per milliliter

6   in PEG even though you've been using 50 milligrams per

7   millimeter of bendamustine in other solvents.  Why?

8   A.    That is the reason PEG is not -- bendamustine is not

9   very soluble in PEG.  That's the reason they have the

10  maximum milligrams.  Will anything higher --

11  Q.    You said maximum was 30?

12  A.    20.

13  Q.    30 or 20?

14  A.    Solubility around 30.  Any time you do the study, you

15  do 30 percent, 30 percent below the solubility.  So the drug

16  will not precipitate out.

17  Q.    What do these data show for PEG?

18  A.    The data shows that at five degrees, it will show

19  degradation products.  As you see in the table, LOD.  LOD

20  stands for limit of detection.  It's below detection.  We

21  can't put a percent in.

22  Q.    Okay.  If we go to page 18, Doctor, are you testing

23  yet another solvent now?

24  A.    This is the, as I mentioned, the glycofurol.

25  Q.    Why did you test that?

Palepu - direct

1   A.      More specifically, we wanted to try a solvent to find

2   out how this solvent is interacting with the different

3   molecules.

4   Q.      How are your results are glycofurol?

5   A.      Worse.

6   Q.      Okay.  And if we go to page 21, if we turn to page 21,

7   here you're testing magnesium chloride rather than a new

8   solvent.

9            Was your experimentation limited just to trying

10  different solvents?

11  A.      Not only different solvents.  We wanted to try

12  different chloride media.

13  Q.      And what was the result of this experiment?  Did this

14  strategy of using magnesium chloride work?

15  A.      It didn't work because we saw the participation,

16  probably due to the bendamustine.

17  Q.      Now, let's go to page 22, Doctor.  There's a heading

18  titled formulation ramifications of LCMS data.

19            Do you see that?

20  A.      Yes.

21  Q.      Can you explain what you are doing in this section,

22  what the purpose of this is?

23  A.      Okay.  What we're trying to do in this section is I

24  can find degradation product in each solvent system.  What

25  the degradation products are.  Okay.

Palepu - direct

1          So we put an article into the degradation and

2     try to come up with a hypothesis to explain why it's

3     behaving like this in a particular solvent, why it's

4     behaving differently in another solvent.

5          So to come up with an interpretation of drug in

6     each solvent.

7     Q.    And is this hypothesis that the stability would be

8     improved if we could minimize the presence of alcohol groups

9     within a non-aqueous environment, is that the hypothesis you

10    were mentioning?

11    A.    Definitely, that is the hypothesis.  Okay.  This is

12    completely, that the function has done this.

13         So that is the hypothesis.  It is possible it

14    will happen, but when we are explaining the data.

15    Q.    To be clear, did you have this hypothesis before you

16    obtained all of the data about PEG?

17    A.    No.

18    Q.    And does this hypothesis about hydroxyl groups, does

19    that explain all the data you had?

20    A.    No.

21    Q.    Why not?

22    A.    Because you see benzyl alcohol and if you see

23    glycofurol, they're one hydroxy group.  Okay.  But the

24    bendamustine degraded rapidly in those solvents.

25    Q.    And so what if you account for molecular weight as we

Palepu - direct

1    say at the bottom, because the molecular weight is much less

2    for glycofurol than 400 for PEG?

3    A.    I --

4    Q.    Does it explain your data if you account for molecular

5    weight?

6    A.    Then here, what's missing here, if the -- hydroxide, I

7    am.  The PEG has one molecule of hydroxide in PEG and

8    glycofurol has the same.  Very close.  So that doesn't

9    explain why in glycofurol, it degraded so rapidly.

10   Q.    Now, let's go to page 23, where you're discussing the

11   results of an experiment with PEG.  And the results say that

12   degradation is accounted for by the formation of a

13   deschlorethyl product rather than one of esterificatoin.

14            Do you see that?

15   A.    Yes.

16   Q.    Is that deschlorethyl product you had seen in high

17   quantities with other solvents?

18   A.    We have seen deschlorethyl with propylene glycol and

19   other solvents, but if I remember, we had much lower value,

20   polyethylene glycol, five degrees.

21   Q.    How did you know it was a deschlorethyl product that

22   was forming?

23   A.    That's the, that's the, again, that's the theory, is

24   because the deschlorethyl, once it oxidizes, it has the

25   byproduct.  In fact, we saw that.  So based on that, Dr.

Palepu - direct

1    Buxton concluded deschlorethyl is a oxidation product from

2    the, again, coming from the nitrogen mustard moiety.

3    Q.    So just so I'm clear, the idea that this deschlorethyl

4    product is being caused by oxidation, that was based on Dr.

5    Buxton's analysis of the reaction?

6    A.    That is correct.

7    Q.    Okay.  It says that it therefore might be expected

8    that the presence of an antioxidant might be beneficial.

9          Do you see that?

10   A.    Yes.

11   Q.    Now, before you detected this deschlorethyl impurity

12   and identified it, did you believe it was worthwhile to use

13   antioxidants in your bendamustine formulation?

14   A.    No.

15   Q.    Was it predictable to you that you would get high

16   levels of a deschlorethyl product using PEG?

17             MR. FELDMAN:  Objection, Your Honor.  It's the

18   same objection that I had before.  We're getting into expert

19   testimony.

20             THE COURT:  I think where I've drawn the line

21   is, you get to say reasonable expectations.  You don't get

22   to follow up to compare the prior art.

23             MR. FELDMAN:  Now he's testifying as an expert,

24   Your Honor.

25             MR. BERL:  I said was it predictable to you.

Palepu - direct

1          MR. FELDMAN:  You didn't say to you.

2          MR. BERL:  If I didn't, I will withdraw the

3    question and ask it differently and resolve Mr. Feldman's

4    concern.

5    BY MR. BERL:

6    Q.     Was it predictable to you, sir, that using PEG would

7    cause the deschlorethyl product to form?

8    A.     I would not have predicted that.

9    Q.     Based on this theory that it may be oxidation, was it

10   your understanding that an antioxidant definitely would work

11   to solve the problem?

12   A.     It's neither my understanding or Professor Buxton's

13   understanding.  Deschlorethyl is taking place,

14   anti-oxidizing agent may, not definitely, may have, because

15   use of an anti-oxidizing agent will help.  Sometimes it

16   won't help.

17   Q.     Okay.

18   A.     But you have the testing.

19   Q.     Let's take a look at the test.  Page 23, table 18.

20          What do these experiments show generally about

21   the effect of antioxidants in your formulation with PEG and

22   bendamustine?

23   A.     By using two different antioxidants, one with lipoic

24   acid, another one with cysteine.  We did see that sort of

25   product completely eliminated.

Palepu - direct

1   Q.     All right.  Let's turn to the next exhibit, Doctor,

2   PTX-588.

3          Is this the December 2009 progress report?

4   A.     That is correct.

5   Q.     Okay.  And if you go to page 26, it says, in order to

6   raise the solubility a level of propylene glycol was

7   introduced.

8          Can you explain what your idea was here?

9   A.     The idea was if you wanted to go --

10         MR. FELDMAN:  Objection, Your Honor.

11  Foundation.  This was written by Dr. Buxton, not Dr. Palepu.

12  There's no foundation that this is his idea.

13         THE COURT:  Okay.  Before I rule, I want to make

14  sure I'm not missing something here.

15         Ultimately, the inquiry into whether there was

16  a reasonable expectation of success is an objective.

17  Right?  It's an objective inquiry.  Right?  It's reasonable?

18  Yes?

19         So at the end of the day, I guess going back to

20  the point I raised with the parties earlier, perhaps this is

21  informative, but don't I really have to rely on the experts

22  and their assessment of the prior art and whether or not

23  that a reasonable expectation of success --

24         MR. BERL:  I think you do, Your Honor.  To be

25  clear, Your Honor, this hydroxyl theory that you saw in the

Palepu - direct

1    last document, that is what defendants have plucked as their

2    motivation theory, and so they are sort of using that, what

3    the inventor came up with after having the data, to say, oh,

4    it would have been obvious.

5            Look, even the inventor said that this hydroxyl

6    theory is not predictive.  They didn't say that, as he just

7    explained.  He was just explaining the data rather than

8    using it to predict what would happen or to choose different

9    solvents.

10           But in a sense, we're responding to the idea

11   that they have advanced, their expert has advanced, that the

12   hydroxyl theory is the theory and they're relying on the

13   fact that they found it in an inventor's document and

14   actually added it to their case after they found it in these

15   documents.

16           So it's important for us to be able to explain

17   that's not what it is.  It wasn't like they had this theory

18   and all of a sudden figured out PEG, PG, we're done and we

19   can go home for lunch.  They tried a lot of things and they

20   hadn't gotten to that theory until after they had a lot of

21   data, not the prior art.

22           That's basically what we're explaining here to

23   pre-rebut what we knew was coming.

24           MR. ALY:  Mr. Berl is wrong about how that

25   unfolded, first, and if he wants to cross-examine, that's

1    for the expert, not laying a foundation through their own

2    inventor testimony.  They can cross-examine to find out how

3    the inventor came up with the theory.

4              THE COURT:  Is it the defense's position that

5    this is an admission by a party opponent?

6              MR. ALY:  It can be used as an admission by a

7    party opponent, but it's our choice to use it that way.

8              THE COURT:  I agree as a matter of general

9    evidence.

10             MR. ALY:  Yes.

11             THE COURT:  Are you going to use the in the case

12   as an admission by an authorized agent or a party opponent?

13   Are you going to proffer these statements in that way?

14             MR. ALY:  Yes, yes.  I believe so.

15             THE COURT:  What's your response if they say

16   this is an admission by a party opponent?  What's your

17   response?

18             MR. BERL:  We don't have an admissibility

19   response.  Our response is it's not an admission of really

20   anything bad.  We embrace this story.

21             THE COURT:  Well, it could be.  So you are not

22   going to object to the defense using this statement or any

23   of the other statements that you say they used as evidence

24   of obviousness?

25             MR. BERL:  It's admissibility.  I think the

1      Federal Circuit makes clear, you can't use it against the

2      invention.  The statute itself makes that clear, that

3      obviousness cannot be negated by the inventor's work.  So

4      it's sort of a one-way hatch.  We can use it as evidence of

5      nonobviousness.  They can't really use it as evidence of

6      obviousness.  That's not an admissibility hearsay issue.

7      That's a substantive law issue.

8                    MR. ALY:  Here we are again with --

9                    THE COURT:  Let me just ask.

10                   MR. ALY:  Right.

11                   THE COURT:  Is that true?  So, in other words --

12                   MR. ALY:  I've never heard that before, but he

13     did cite a case that I need to look at.  He said it was a

14     few months ago.  We'll look at it and discuss it.

15                   MR. FELDMAN:  Your Honor --

16                   MR. ALY:  I'm sorry, Mr. Feldman.  He did say

17     that is true.

18                   We would still be able to rebut then the very

19     proposition that their witnesses are putting forward by

20     saying on cross-examination as a minimum, that they're

21     wrong.  Right?  So when they put up the proposition that

22     here's the hard work that we did and it was really,

23     really hard, if that's the argument that plaintiff is

24     making based on the cases they cited, then cross-examination

25     should be able to show, it's not very hard.  It was really

1    very easy.

2              THE COURT:  Basically, there are these

3    statements in these documents by the entity that was

4    retained by Eagle and to work with Eagle to develop

5    ultimately its product.  And at various points in these

6    documents, Therdose, at various points in it, Therdose

7    hypothesized or at least there's language that could be

8    probative of a theory that they thought about this

9    possibility, and you all, you, the defendants, are going to

10   use those statements as evidence that the invention was

11   obvious?

12             MR. ALY:  Yes.

13             THE COURT:  Right.  Okay.  And, Mr. Berl, you're

14   going to say they cannot use those particular statements as

15   a matter of substantive law by the Federal Circuit to show

16   that somebody would have thought about putting these things

17   together?

18             MR. BERL:  That's exactly right.

19             THE COURT:  Even though ultimately, they reject

20   what they were -- some at least they reject.

21             MR. BERL:  I think they're mischaracterizing the

22   evidence.  Even if they said what they misinterpreted it to

23   mean, I would say exactly right, Your Honor.  It's not

24   relevant.  The Federal Circuit has said it's not relevant.

25             MR. ALY:  There's more case law on that and

1    that's what makes it confusing in result.  They could have

2    also said where the inventor's work doesn't depart from what

3    any person of ordinary skill in the art would do.  In other

4    words, you're using those tests together, then it is still

5    obvious, because what a person can say is and the ruling

6    request say that what the inventor did matches up with the

7    person of ordinary skill in the art.  That's possible, too,

8    and there are rulings on that.

9                    THE COURT:  Do you have a case, Mr. Berl?

10                   MR. BERL:  Which one?  You mean for the

11   proposition that we can use it as evidence of

12   nonobviousness?

13                   THE COURT:  And they can't use it?

14                   MR. BERL:  Well, the Endo case says they can use

15   it.  The statute itself says that obviousness cannot be

16   negated by the inventor's path.

17                   We have -- you know, five years ago, I could

18   have given you a case off the top of my head.  I'm getting

19   older, to be honest.

20                   THE COURT:  That's all right.

21                   MR. FELDMAN:  Your Honor, Pfizer v. Apotex.

22                   THE COURT:  Hold on.  Let me just look at the

23   statute first.

24                   MR. BERL:  Yes, that's right.  I can --

25                   THE COURT:  Hold up, please.

Palepu - direct

```
 1                    MR. BERL:  Sure.

 2                    THE COURT:  Well, I guess I'm going to have to

 3      learn what patentability shall not be negated by the

 4      invention means.

 5                    MR. BERL:  I can commend a few cases if you

 6      would like.  They're cited on page 37 of our Exhibit 3-P.

 7                    THE COURT:  Well, why don't we do this.  Let's

 8      just admit it and then it can always be struck after we

 9      resolve this issue.  I'm going to admit the testimony for

10      now.

11                    MR. ALY:  Thank you, Your Honor.

12      BY MR. BERL:

13      Q.    Doctor, if we could turn to page 24.  Is this testing

14      of formulations with PEG and PG?

15      A.    Right.

16      Q.    And is the first one of these is BDM 62.  What does

17      that mean?

18      A.    BDM entitles, each molecule.  BDM stands for

19      bendamustine.  62 it means there was 62 experiment that had

20      been carried out.

21      Q.    And what ratio of PEG to PG did you find worked best?

22      A.    9 to 1.

23      Q.    90 to what?

24      A.    9 to 1.

25      Q.    9 to 1?  Just so that it's clear, 9-P -- 9 PEG, one
```

Palepu - direct

1  PG?

2  A.    Sorry.  Nine PEG, 1 PG.

3  Q.    Okay.

4  A.    Sorry.

5  Q.    If we look at the footnotes of this, there's a double

6  asterisk in some of them, and it says, includes a

7  contribution from RRT .69, PG ether of BDM.

8        Do you see that?

9  A.    Yes, I do.

10  Q.    What is this impurity that's being referenced here?

11  A.    This is a degradation product that is happening.  The

12  reactions have been propylene glycol on the nitrogen mustard

13  side of the ring.  This is exactly what I was explaining.

14  Each solvent is giving a different interaction.  Carboxylic

15  group as the nitrogen mustard.

16  Q.    This is a PG ether, not a PG ester; is that right?

17  A.    PG ether.

18        THE COURT:  Is it ether or ester?

19  BY MR. BERL:

20  Q.    Is it an ether or ester?

21  A.    Sorry.  Ether.

22  Q.    Ether degrades at the nitrogen mustard or the

23  carboxylic acid?

24  A.    Nitrogen mustard.

25  Q.    All right.  Let's go to the next exhibit.

Palepu - direct

1   A.      Ether can't form on the carboxylic side.

2   Q.      Let's go to the next exhibit, PTX-505, and in

3   particular, the next page, which we'll blow up here.

4   They're showing BDM 077.

5               Do you see that?

6   A.      Yes.

7   Q.      This says thioglycerol, 5 milligrams per millimeter.

8   PEG 400 to PG 9 to 1.

9               Do you see that?

10  A.      Yes, I do.

11  Q.      And are those the ingredients in Bendeka?

12              MR. FELDMAN:   Objection, Your Honor.

13  Foundation.

14              MR. BERL:   He invented the product.

15  BY MR. BERL:

16  Q.      Do you know what the ingredients in Bendeka are, sir?

17  A.      Bendeka contains bendamustine and mannitol.   Bendeka.

18  Q.      Okay.

19  A.      Bendeka contains here bendamustine 50-milligram per

20  mL.   No.   Ingredients contained, Bendeka ingredients contain

21  bendamustine, in nine parts PEG and one part PG solvent.

22  Q.      Is that the same as, are those the same ingredients as

23  shown here, BDM 707?

24  A.      They're the same as shown here.

25              MR. FELDMAN:   Objection, Your Honor.

Palepu - direct

1          THE COURT:  Okay.  Sorry.  Excuse me.  The basis

2     of the objection?  I am kind of confused.  He is the

3     inventor.

4          MR. FELDMAN:  Right.

5          THE COURT:  You might want to cross-examine him

6     on all sorts of things, but I'm confused about, as a

7     foundational objection, he can't testify to what the

8     ingredients of the chemical or whatever, the molecule he

9     invented.  What am I missing?

10         MR. FELDMAN:  That's not the formulation for

11    Bendeka.

12         MR. BERL:  We're not saying it is.  I said is it

13    the same ingredients.  Bendeka has a lower concentration of

14    bendamustine.

15         MR. ALY:  That's the objection.

16         MR. BERL:  I didn't ask him.

17         THE COURT:  I'm just going to overrule the

18    objection.

19         MR. BERL:  Okay.

20    BY MR. BERL:

21    Q.    And what, just to be clear, what's the number of this

22    formulation, sir, BDM what?

23    A.    BDM 77.

24    Q.    Doctor, we've tried to compress this and go as fast as

25    possible.  Have we discussed all of the experiments that you

Palepu - direct

1   conducted on this project?

2   A.    No.

3   Q.    How did you feel about developing this formulation?

4   A.    Well, when we got the formulation resolved, we were

5   relieved because this is very complex chemistry and it's

6   very -- it took a lot of time to understand, and finally, we

7   were happy that we were able to develop a good, robust

8   formulation, and also I would say that of all the products I

9   developed, several products in the market, I would put this

10  in the top five percent.

11               MR. BERL:  Thank you very much, Dr. Palepu.

12               THE COURT:  Cross-examination.

13               MR. FELDMAN:  May I approach, Your Honor?

14               THE COURT:  Please.

15               (Mr. Feldman handed binders to the Court.)

16               MR. FELDMAN:  May I approach the witness as

17  well?

18               THE COURT:  Sure.

19               (Mr. Feldman handed binders to the witness.)

20               THE WITNESS:  Thank you.

21               MR. FELDMAN:  Your Honor, if it's okay, I have

22  one more exhibit that I need to give.  It's similar to the

23  exhibit the plaintiffs just use, except we put it out bigger

24  so it's readable, but if we could use that, I will hand it

25  up.  It's produced as a native document.

Palepu - cross

```
 1                THE COURT:  Well, have you run it by them?
 2                MR. BERL:  I don't know what you are talking
 3     about.
 4                MR. FELDMAN:  It's the same as yours.
 5                (Mr. Feldman handed documents to the Court and
 6     to the witness.)
 7                THE COURT:  All right.  Just so I'm clear,
 8     defense Exhibit 46.  Is this just the same tables that are
 9     included in the Buxton report of progress?  Is that what it
10     is?
11                MR. FELDMAN:  Your Honor, I believe it's the
12     same as PTX-505.  I think there are some cutoffs in 505 and
13     this one is a more complete cutout.
14                THE COURT:  Defendants' Exhibit 46 is the same
15     as PTX-505?
16                MR. FELDMAN:  That's correct.
17                THE COURT:  It's a complete version of the data
18     files as produced.
19                MR. FELDMAN:  It's bigger.
20                THE COURT:  It's not just bigger?
21                MR. FELDMAN:  It's the same.  Content-wise, it's
22     the same.
23                THE COURT:  Okay.  It's just bigger.
24                MR. FELDMAN:  It's just more legible.
25                THE COURT:  Okay.
```

Palepu - cross

1              MR. FELDMAN:  We think.

2              THE COURT:  Sounds good.  Go ahead.

3                     CROSS-EXAMINATION

4    BY MR. FELDMAN:

5    Q.    Good afternoon, Dr. Palepu.  Steven Feldman.  I

6    represent Apotex.  I'm speaking on behalf of all of the

7    other defendants here.

8              Dr. Palepu, you testified that you started this

9    project in early 2009; is that correct?

10   A.    Could you talk slowly, please?

11   Q.    Sure.

12   A.    Until I get used to you.

13   Q.    Okay.  I'm sorry.  You began the Bendeka project in

14   early 2009; is that correct?

15   A.    Early 2009, that's correct.

16   Q.    So like around March or April of 2009.  Is that around

17   the time frame?

18   A.    It was ten years ago.  All I can tell you, early 2009.

19   I don't know.  At least 2009.

20   Q.    You were approached by Mr. Tarriff about this project,

21   is that correct, from Eagle?

22   A.    Pardon?

23   Q.    You were approached by Mr. Tarriff from Eagle about

24   this project?

25   A.    That is correct.

Palepu - cross

1    Q.    When he first approached you, you said you looked at

2    the Treanda label?

3    A.    Yes.

4    Q.    And you looked at the structure of the bendamustine

5    molecule?

6    A.    That's right.

7    Q.    And then you told Mr. Tarriff that you could formulate

8    this product; is that correct?

9    A.    I could develop this product.

10   Q.    In fact, you told him it was a slam dunk to develop

11   this product?

12   A.    I didn't hear you properly.

13   Q.    Sure.  You told Mr. Tarriff that it would be a slam

14   dunk to formulate this product; is that correct?

15   A.    I told who?

16   Q.    Mr. Tarriff that it would be a slam dunk to formulate

17   this product?

18   A.    I don't know if I said Mr. Tarriff or Dr. Buxton,

19   because Buxton has the American flag.  I use that word with

20   Chris Buxton.  I'm not sure that I said that to Mr. Tarriff.

21   I said to Mr. Tarriff, if I recall, ten years ago I had a

22   lot of black hair at that time.

23   Q.    Right.  Right.

24   A.    So I don't know, but that it's just Chris Buxton.

25   Q.    You told Dr. Buxton it would be a slam dunk to develop

Palepu - cross

1    this product?

2    A.    Probably slam dunk to Dr. Buxton.

3    Q.    Okay.  And then while Mr. Berl was examining you, you

4    talked about some of the difficulties you had in formulating

5    this product; is that correct?

6    A.    Yes.

7    Q.    And so the difficulties occurred probably in the

8    months of what, April and May and June of 2009; is that

9    correct?

10   A.    Would you please repeat it?  Can you talk slowly.

11   Q.    Sure?

12   A.    Can you, please?

13   Q.    I will slow down if I can.

14   A.    All right.

15   Q.    So you began formulating the product around

16   April 2009; is that correct?

17   A.    I can't tell exact month.  Again, I said it's ten

18   years ago.  Okay.  All I know is, I started this project

19   beginning of, beginning of 2009.  If you are asking me day,

20   month, I can't tell you, because I don't remember.

21   Q.    Okay.  But as of July, you still didn't have the

22   formulation; is that right?

23   A.    As of July, we just still didn't have formulation.

24   That's correct.

25   Q.    Okay.  But that had only just been a few months of

Palepu - cross

1   development; is that right?

2   A.    You have to repeat the question again.

3   Q.    Sure.

4   A.    Can you type the questions here at least I can see?

5   I'm not getting any questions here.  We don't have it.  My

6   hearing aid is not picking up properly.

7                   THE COURT:  So just for the record, I never had

8   real time.  We'll have to -- what about the lawyers?

9                   MR. NELSON:  No, Your Honor.

10                  MR. BERL:  If I may, I think it works better

11  without the microphone maybe and if you just talk really,

12  really loudly.

13                  THE WITNESS:  Yes.  Maybe we should try it

14  without microphone.

15                  THE COURT:  Okay.

16  BY MR. FELDMAN:

17  Q.    Let me try it this way.  Is that better?

18  A.    I have --

19                  THE COURT:  All right.  We'll try it.  Maybe

20  move the microphone away.

21                  Mr. Feldman, repeat your question.  If you need

22  the court reporter to repeat it.  I think the question was

23  clear.  I think it's fair just to repeat it.

24  BY MR. FELDMAN:

25  Q.    Okay.  Dr. Palepu, even though you didn't have the

Palepu - cross

1    formulation as of July, you had only worked on the project

2    for a few months at that time; isn't that correct?

3    A.    That is correct.

4    Q.    And then in July, you became aware of an East German

5    patent; isn't that correct?

6    A.    That is correct.

7    Q.    And that East German patent happened to be a

8    non-aqueous liquid dosage form of bendamustine; isn't that

9    right?

10   A.    That's correct.

11   Q.    Okay.  And when you found that patent, you sent an

12   e-mail; isn't that right?

13   A.    What?

14   Q.    When you found that patent, you sent an e-mail to Dr.

15   Buxton; isn't that correct?

16   A.    No.  When I look at the patent, I got the patent

17   number.  I couldn't get the patent, so I asked the person at

18   the University of Iowa whether he can do the same thing, get

19   me the patent.  He struggled.  Finally, he got the patent

20   and he sent me an e-mail.  So I forwarded that e-mail to

21   Chris Buxton.

22   Q.    Okay.  Please turn in your book to Defendants' Exhibit

23   DTX-1120 and so the tabs in your book are in numerical

24   order.

25   A.    DTX-1130.  Right?

Palepu - cross

1    Q.    1120.

2    A.    Excuse me.

3    Q.    If it's easier, you can just use the screen.

4    A.    Right.  Yes.  Yes.  This is the e-mail from me to

5    Chris Buxton.

6    Q.    All right.  It's dated July 12th, 2009; is that

7    correct?

8    A.    That's correct.

9    Q.    And you sent it around 12:22 p.m.; is that right?

10   A.    Pardon?

11   Q.    You sent it around 12:22 p.m.?

12   A.    That's what it said.

13   Q.    Again, the subject is eureka; is that correct?

14   A.    Yes.

15   Q.    Okay.  And then you write, gentlemen, here is the

16   German patent, exclamation point.  It is in German.

17   Whatever little I gathered from this patent is that they use

18   propylene glycol, 25 to 100 mg per mL to make a solution of

19   bendamustine.

20          Do you see that?

21   A.    Yes, I do.

22   Q.    And then you said, I believe that we are on the right

23   track with our lactic acid formulation.  Correct?

24   A.    Right.

25   Q.    Okay.  Now, Dr. Palepu, the German patent is attached

1  to that e-mail; is that correct?

2  A.    What is that?  What is the question?

3  Q.    And you attached the German patent to this e-mail and

4  then you told Teja to get the patent translated; is that

5  correct?

6  A.    Yes, that's correct.

7  Q.    Okay.  So let's turn to the patent, if we can.  And if

8  we turn to page DTX-1120_0009, so it's page 9 of the

9  exhibit.

10         Do you see there that there are several solvents

11  listed there in the middle where it says ethanol, propylene

12  glycol and glycerol?

13  A.    Yes.

14  Q.    Do you see that?  And so that's something that you

15  looked at; is that correct?

16  A.    That's something that I tended to look at the number.

17  Q.    Okay.  Just so we're clear, let's turn to page 4 of

18  the patent document.  Page 4, please, of the exhibit.  Can

19  you blow up the name?

20         And just so it's clear, in line 72, the first

21  inventor is named Olthoff.

22         Do you see that?

23  A.    What is that?

24  Q.    Do you see that the first named inventor on line 72 is

25  Olthoff?

Palepu - cross

1    A.     Yes.

2    Q.     We're going to refer to this as the Olthoff patent.

3    Okay?

4    A.     Okay.

5    Q.     Okay.  And so then you told Mr. Teja to get this

6    patent translated; is that right?

7    A.     That's correct.

8    Q.     Okay.  Now, please turn to DTX-119.

9    A.     Could you, could you -- I can't see this.

10   Q.     Okay.  We'll blow it up, please.  Okay.

11            So exhibit DTX-1119, this is another e-mail from

12   you, Dr. Palepu, and you're sending it to, again, Mr. Teja

13   and Dr. Buxton; is that correct?

14   A.     Yes, that's correct.

15   Q.     Okay.  And the date is also July 12th, 2009; is that

16   correct?

17   A.     That is correct.

18   Q.     And you sent this one about 1:29 p.m.; right?  So

19   about an hour later?

20   A.     Yes.  That's what it says.

21   Q.     Okay.  And you write, gentlemen, bendamustine has

22   shown excellent solubility in PG.  Then you write 125 mg per

23   mL.

24            Do you see that?

25   A.     Yes.

Palepu - cross

1  Q.   And PG is propylene glycol; is that correct?

2  A.   Correct.

3  Q.   And then ethanol, and the solubility value for ethanol

4  is 50 milligrams per milliliter; is that correct?

5  A.   Correct.

6  Q.   And then for glycerin, it's 50 milligrams per

7  millimeter; is that correct?

8  A.   Right.

9  Q.   And PEG, PG, and glycerin are all polyols; isn't that

10  right?

11  A.   PEG, ethanol, glycerin?

12  Q.   So PEG, polyethylene glycol, propylene glycol and PEG

13  are all polyols?

14  A.   Yes.

15  Q.   And so after seeing this solubility information from

16  the Olthoff patent, literally a couple hours after getting

17  the document, you tell your colleagues to re-examine the

18  solubility of PEG 400; is that correct?

19  A.   Here, I need to explain.

20          MR. FELDMAN:  Your Honor, can I get an

21  instruction on that?

22          THE COURT:  You mean for him to answer the

23  question?

24          MR. FELDMAN:  Correct.

25          THE COURT:  Sure.  You can explain, but you

Palepu - cross

```
 1    first have to answer the question.

 2                THE WITNESS:  Okay.

 3                THE COURT:  So --

 4                THE WITNESS:  Okay.

 5                THE COURT:  You have not answered the question.

 6                THE WITNESS:  I want you to re-examine.  Okay.

 7                THE COURT:  All right.

 8                THE WITNESS:  Now can I explain?

 9                THE COURT:  Yes.

10                THE WITNESS:  As I mentioned earlier, my English

11    is bad sometimes.  I shoot an e-mail.  Here, what I want it

12    to read, these are the numbers from the German patent.

13    Okay.  Re-examine the numbers and also do it with PEG 400.

14    That's what I meant here.

15    BY MR. FELDMAN:

16    Q.    Okay.  So you didn't want them to re-examine PEG.

17    You wanted them to examine PEG.  Is that what you are

18    saying?

19    A.    We examined all of this, because at the time we wanted

20    to confirm this number that it is.  Right number.  Okay.

21                So that's what I meant.  And then when I said

22    re-examine all this and also do PEG 400.  That's what I

23    meant.

24    Q.    Okay.  And so after you saw Olthoff, it only took you

25    another three months to get to what Mr. Berl termed the
```

Palepu - cross

1   Bendeka formulation; is that correct?

2   A.   That's not true.

3   Q.   All right.

4   A.   We were talking about this propylene glycol,

5   polyethylene glycol, all of this earlier, because I remember

6   really well, since we wanted to use this solvent, a separate

7   state of development, we wanted to measure the solubility in

8   this solvent.  So we had this even before this patent is

9   there, we have all of the planned solubility of

10  bendamustine, the quality of the solvent.

11  Q.   All right, doctor.  Can you please turn to Exhibit 577

12  in your book.

13  A.   Yes.

14  Q.   Okay.  So this is the October bendamustine infusion

15  cumulative progress report that you were testifying about

16  earlier; is that correct?

17  A.   Right.

18  Q.   Right.  Can you turn to the second-to-last page?  So

19  it's page 24 of the document.

20          THE COURT:  So, Mr. Feldman, how much longer do

21  you need?  You had said an hour, so I'm assuming you're just

22  barely in.

23          MR. FELDMAN:  Yes.

24          THE COURT:  I mean, the direct went much longer

25  and I am just worried about security in the building and the

Palepu - cross

1    Marshals.  I think we're going to have to stop here.

2    Originally, I said 6:00, 6:30.  And I don't think we're

3    going to finish today.  And I understand the witness wanted

4    to avoid having to spend the night, but it just took longer,

5    so we're going to break for the day.

6              Now, there were no exhibits moved into evidence,

7    and that is actually good.  We can do that in the morning by

8    the plaintiff.

9              Just one second.  So we'll break, and if you

10   want to ask like a question or two before you break this

11   evening, I'm going to let you pick up wherever you want.

12             MR. FELDMAN:  Your Honor, I'm fine breaking now.

13             THE COURT:  Are you sure?

14             MR. FELDMAN:  Yes.

15             THE COURT:  When do you want to start tomorrow

16   morning?  8:30, 9:00?

17             MR. FELDMAN:  Your Honor, the only issue I think

18   is security.  It was really long getting in this morning.

19   There are two other trials, I understand.

20             THE COURT:  Yes.  I don't think it's realistic

21   then to start before 9:00 unless you all want to cut down

22   the number of lawyers in the case.  Okay.  Then let's

23   adjourn for the evening and we'll start at 9:00 tomorrow

24   morning.

25             MR. FELDMAN:  Thank you, Your Honor.

1              MR. ALY:  Your Honor, I really apologize.  We

2      can do this tomorrow morning.  It affects one of our

3      witnesses.  This is a letter the plaintiff sent today about

4      the scope.

5              THE COURT:  Why don't you all start packing up

6      and come up to the podium.  Go ahead.

7              MR. ALY:  Thank you, Your Honor.  The letter

8      that was sent this morning had to do with the expert

9      testimony of Dr. Pinal.

10             MS. KELLER:  I don't mean to interrupt.  Is it

11     okay if the witness steps down?

12             THE COURT:  You may step down.

13             THE WITNESS:  Thank you.

14             (Witness excused.)

15             MR. ALY:  And the objection is that the

16     combinations, which we sent them over the weekend, three

17     combinations and the objection is that they are not fully

18     disclosed in the report.  The report is attached, and all I

19     need to do is walk through the report to show where those

20     combinations are.

21             I don't know why this is a letter.  I don't know

22     why this is a concern, but I'm happy to take that exercise

23     now so that when we prepare with the expert, he will know

24     what his testimony is going to be.

25             THE COURT:  Okay.

1          MR. ALY:  Alternatively, we is send him a letter

2     and say whatever it is.

3          THE COURT:  No.  Hold up.  Maybe we can resolve

4     this.

5          MR. HARBER:  Your Honor, we asked them last

6     night to send us where these combinations were identified

7     and they have not responded, so if they have some

8     information, we can look at it overnight, but this is, as

9     our letter sets out, this was the issue that we raised back

10    in May, where we set out, here's what we understand the

11    disclosed combinations in Dr. Pinal's report to be.  If

12    you're going to rely on any other ones, let us know.

13          Your Honor gave them an opportunity in this

14    courtroom to do that.  They declined and we, until last

15    night, literally the eve of trial, I don't want to use that

16    figure a lot, it was literally the eve of trial where we

17    got a disclosed set of demonstratives that identified a

18    number of combinations, Reference A plus Reference B plus

19    Reference C, that as far as we are concerned, are not in the

20    report.

21          You may be able to use a favorite phrase like a

22    pig hunting for truffles, but there is not a portion in the

23    report where it said we believe these patents are invalid or

24    these claims are invalid over these three references in

25    combination as they are now asserted.

1          MR. ALY:  Judge, I can go to the table of

2    contents?

3          THE COURT:  Okay.

4          MR. ALY:  I mean, really.

5          THE COURT:  Hold on.  Since it's that easy, I

6    think we'll be able to resolve it.

7          Here's what we'll do.  Why don't we have whoever

8    will make the argument come early and it doesn't sound like

9    it will take me very long.  What do you think?

10         MR. HARBER:  I have no idea what they're going

11   to say.

12         THE COURT:  I say everybody is going to have to

13   proceed at their own risk and that I will hear this argument

14   at 8:45.  Actually, I will hear the argument at 9:00 o'clock

15   just like everything else.

16         MR. ALY:  Okay.

17         THE COURT:  Depending upon how many people are

18   here.

19         I will find out about the status of the other

20   two trials.  We will lead with this issue at 9:00 o'clock

21   and people will prepare at their own risk.

22         Have a good evening.  Thank you.

23         (Court recessed at 6:38 p.m.)

24                    -  -  -

25