```
1                        - VOLUME 2 -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                          - - -

5

   TEVA PHARMACEUTICALS          :   CIVIL ACTION
6  INTERNATIONAL GMBH,           :
   CEPHALON, INC., and EAGLE     :
7  PHARMACEUTICALS, INC.,        :
                                 :
8                 Plaintiffs,    :
                                 :
9       vs.                      :
                                 :
10 SLAYBACK PHARMA LIMITED       :
   LIABILITY COMPANY, et al.,    :
11                               :
                 Defendants.   :   NO. 17-1154-CFC
12

13                          - - -

14                       Wilmington, Delaware
                         Tuesday, September 10, 2019
15                       9:00 o'clock, a.m.

16                          - - -

17 BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

18                          - - -

19 APPEARANCES:

20
            SHAW KELLER LLP
21          BY:  KAREN E. KELLER, ESQ. and
                 NATHAN R. HOESCHEN, ESQ.
22

23                    -and-

24

25                       Valerie J. Gunning
                         Official Court Reporter
```

1    APPEARANCES (Continued):

2

3              WILLIAMS & CONNOLLY LLP
               BY:  DAVID I. BERL, ESQ.,
4                   ADAM HARBER, ESQ.,
                    ELISE BAUMGARTEN, ESQ.,
5                   SHAUN P. MAHAFFY, ESQ.,
                    BEN PICOZZI, ESQ. and
6                   MATTHEW LACHMAN, ESQ.
                    (Washington, D.C.)

7

8                   Counsel for Plaintiff
                    Teva Pharmaceuticals International GmbH
9                   & Cephalon, Inc.

10

11             LATHAM & WATKINS LLP
               BY:  DANIEL G. BROWN, ESQ.,
12                  MICHELLE L. ERNST, ESQ.,
                    KENNETH SCHULER, ESQ. and
13                  MARC ZUBICK, ESQ.
                    (New York, New York)

14

15                  Counsel for Defendant
                    Eagle Pharmaceuticals, Inc.

16

17             FARNAN LLP
               BY:  BRIAN E. FARNAN, ESQ.
18

19                      -and-

20

21             SCHIFF HARDIN LLP
               BY:  IMRON ALY, ESQ. and
22                  ARUN J. MOHAN, ESQ.

23                  Counsel for Defendant and Counterclaim
                    Plaintiff Fresenius Kabi USA LLC
24

25

```
 1    APPEARANCES (Continued):

 2
              SMITH KATZENSTEIN & JENKINS LLP
 3            BY:  EVE ORMEROD, ESQ.

 4
                     -and-
 5

 6            WINDELS MARX LANE & MITTENDORF LLP
              BY:  JAMES P. BARABAS, ESQ.
 7

 8                 Counsel for Defendants
                   Slayback Pharma Limited Liability Company,
 9                 et al.

10

11            FLASTER GREENBERG P.C.
              BY:  JEREMY S. COLE, ESQ.
12

13                   -and-

14
              FLASTER GREENBERG P.C.
15            BY:  JEFFREY A. COHEN, ESQ.
                   (Chicago, Illinois)
16

17                   -and-

18
              HAHN LOESER & PARKS LLP
19            BY:  STEVEN FELDMAN, ESQ.,
                   SHERRY L. ROLLO, ESQ.
20                 DANIEL CHERRY, ESQ. and
                   JOHN CRAVERO, ESQ.
21

22                 Counsel for Defendant
                   Apotex Inc. and Apotex Corp.
23

24

25
```

```
 1    APPEARANCES (Continued):

 2
                THE DEVLIN LAW FIRM LLC
 3              BY:  JAMES M. LENNON, ESQ.

 4
                        -and-
 5

 6              WILSON SONSINI GOODRICH & ROSATI
                BY:  NICOLE STAFFORD, ESQ.,
 7                   DENNIS GREGORY, ESQ.,
                     DAVID STEVER, ESQ. and
 8                   ADEN M. ALLEN, ESQ.

 9
                     Counsel for Defendant
10                   Mylan Pharmaceuticals

11
                        -  -  -
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4     beginning at 9:00 a.m.)

 5

 6              THE COURT:  All right.  Good morning.  Please be

 7     seated.

 8              Mr. Aly?

 9              MR. ALY:  Good morning your Honor.

10              THE COURT:  Good morning.

11              MR. ALY:  We had reserved for this morning an

12     issue regarding Dr. Pinal's testimony and the parties have

13     agreed that there will be two combinations that may be

14     presented.

15              THE COURT:  Okay.  Great.

16              MR. HARBER:  Just to be clear on agreement, we

17     agreed they dropped some combinations, but we still reserve

18     the right to object.  We don't know what Dr. Pinal is going

19     to say to the extent he's offering something outside the

20     scope of his report.

21              MR. ALY:  We know they're going to object no

22     matter what we do.  They're the two combinations we've got.

23              THE COURT:  You're okay with them bringing in

24     two combinations?

25              MR. HARBER:  Yes, though we don't know what he's
```

```
 1    going to say about those combinations.  I want to be clear
 2    we're not waiving any objection to him discussing those
 3    combinations in his testimony depending on what he says.
 4               THE COURT:  Perfect.  All right.
 5               A couple other housekeeping items.  So I was
 6    going over the PTO last night.  Where are we on the '270
 7    patent, the '270 patent as far as judgment?  My
 8    understanding from the PTO is that judgment has been entered
 9    with respect to certain parties but not all parties on the
10    '270 patent.
11               MR. NELSON:  As to Slayback, there's a consent
12    judgment.
13               THE COURT:  Okay.
14               MS. STAFFORD:  There has been a judgment for
15    Mylan.  I'm not sure --
16               MR. BERL:  I don't believe it's an outstanding
17    issue for us.
18               THE COURT:  Okay.  What it brings up to, is, it
19    might be helpful because of the last minute stipulations and
20    whatnot if somebody maybe could put a chart together or
21    something so that I understand what's left with respect to
22    infringement on all patents and all the claims.  Does that
23    make sense?
24               MR. FELDMAN:  Yes, Your Honor.
25               THE COURT:  I think it would be helpful to all
```

1    the parties.

2                MS. STAFFORD:  Yes, Your Honor.

3                THE COURT:  And on the next break I will go back

4    and find what I'm thinking about in the pretrial order that

5    made me think there was an issue.  It's in the paragraph

6    what's being described in the '270 patent.  It leads to

7    judgment.  I want to say it leaves Apotex out there as far

8    as summary judgment.

9                MR. FELDMAN:  I believe there's a dismissal as

10   to Apotex based on a covenant not to sue, Your Honor.

11               THE COURT:  There's no judgment?

12               MR. BERL:  I believe that to be true.

13               THE COURT:  Okay.  So I don't need to do

14   anything?

15               MR. FELDMAN:  That's correct, Your Honor.

16               THE COURT:  All right.  That's taken care of.

17   Great.

18               Then the second thing is, I'm just skimming, I

19   have not gone through the transcript.  Part of the problem,

20   our court reporter is phenomenal, but unfortunately for her

21   and for probably you all, at times I move back in my chair

22   and the microphone is very, very forward, so some of what I

23   say is sometimes lost.  And it's not a final transcript, but

24   so there will be some typographical things that will be

25   addressed in a final transcript, but there's one I did want

1   to point out at least in terms of the draft transcript on

2   page 214 and where I'm quoted on line 14 as saying, "And one

3   though line of demarcation that I'm pretty confident about

4   is that the test results relate solely to the secondary

5   consideration of unexpected properties and that therefore it

6   should come in," and that's "it should not come in."  I

7   think that's clear from the context, but just so we're clear

8   on that.

9              And then I just want to also address, Mr. Berl,

10  you cited the Endo case and paragraph 39 of your statements

11  of the law.  And this is kind of discussed at the end of the

12  day about the one-way street that the inventor's efforts

13  cannot be considered as I understand your theory under the

14  last sentence of Section 103.  And I looked at the cases and

15  I didn't see any case that says that, the cases that you

16  cited.

17             Can you point me to any language?  I understand

18  the last sentence of 103 to address the flash of creative

19  genius language that was in the Hotchkiss Supreme Court

20  decision and it's really a 101 consideration.  I did not, I

21  do not, having kind of thought about it last night and read

22  a little bit about it, and looked at the cases you cited, I

23  don't see that if an inventor made comments about the prior

24  art, what would be expected, what would not be expected,

25  that the defense can't use that.

1           MR. BERL:  So the cases we cite included the

2    Oxsuba (phonetic) case.  They say the inventor's own patent

3    never leads to a conclusion of obviousness.  That is

4    hindsight and there are other cases.

5           THE COURT:  So, wait.  You've got the case in

6    front of you?

7           MR. BERL:  I do not.

8           THE COURT:  Well, why don't you be prepared to

9    discuss it.  I didn't see that's what the case said.  I

10   thought that case, and I may be recalling a different case,

11   but that's a review of a board decision.  Correct?

12          MR. BERL:  I don't believe it is.

13          THE COURT:  No?  A report?

14          MR. BERL:  Yes.

15          THE COURT:  Then why don't you have the cases

16   ready and we can discuss it.  I didn't see a case which said

17   it.  I see a case which at best for you said that a board,

18   or maybe it was a Court, didn't err, did not -- not

19   addressing it.  But I didn't see where there's a decision of

20   the Federal Circuit which said, district courts should not

21   consider in rendering an obviousness decision statements by

22   an inventor about expectation.

23          MR. BERL:  Well, we'll discuss that later

24   perhaps, that case.

25          THE COURT:  All right.  That would be good.  All

1    right.

2              Then is there anything else we need to address

3    before we continue with the cross-examination?

4              MR. FELDMAN:  I could just cite you the cases or

5    we can handle it later on this exact issue, because the

6    Federal Circuit has, in fact, relied on inventor testimony.

7    I can cite you to our Pfizer v. Apotex case, 488 F.3d, 1348,

8    and then also paragraph 84, I believe, in our defendants'

9    Exhibit 3D, defendants' statement on issues of law.  We cite

10   to a District Court case where admissions by an inventor

11   were used just in this very way.

12             THE COURT:  Okay.  So if you want to get copies

13   of those cases at a break or something?

14             MR. FELDMAN:  Sure.

15             THE COURT:  I can read it.

16             And then the last thing I want to do then is you

17   don't have anything else to raise?  You don't have anything

18   else to raise?

19             So the last thing I want to do is just ask the

20   parties, and I'm going to cite In re Cyclobenzaprine

21   Hydrochloride Extended Release Patent Capsule Litigation at

22   676 F.3d 1063.  So I went back and read that last evening

23   and this morning and I would point the parties to that case,

24   and I would ask if anybody has any reason to believe that

25   that case is not binding or something I should not adhere to

1    as we move forward.

2              What I take from that case that's relevant to

3    the many issues that we've discussed over yesterday and at

4    pretrial is that it's really not so clear-cut as to when the

5    secondary considerations are considered.  There's certainly

6    case law in the Federal Circuit that talks about secondary

7    considerations being considered as rebuttal to an already

8    established prima facie case, but I think that the

9    Cyclobenzaprine case suggests that the secondary

10   considerations are to be considered in the initial

11   assessment of the prima facie case.

12             So what I want to just make clear that at the

13   end of the day, obviously, I'm going to have the benefit of

14   post-trial briefing and the benefit of more time to digest

15   these cases, but any comment I've made should not be

16   interpreted to date as to when I will consider the secondary

17   considerations in my overall assessment of either a prima

18   facie case or ultimate determination as to obviousness.  But

19   my ruling as to the motion in limine to preclude teaching

20   away and unexpected results being opined upon by the defense

21   expert is a case management decision, and even there though,

22   as I've said, I think it was difficult to make that decision

23   because the Federal Circuit case law at times characterizes

24   things as secondary considerations and at times differently,

25   something different from secondary considerations.  But I've

1    done the best that I can to determine whether teaching away

2    and unexpected results in the context of this case should be

3    considered secondary consideration and therefore I use that

4    in interpreting Judge Sleet's order and in making the

5    decision the way I did.  All right.

6              MR. BERL:  Would it be helpful if the parties

7    submitted something, maybe two pages or something like

8    that?

9              THE COURT:  No.  I'm good on it now.

10             MR. BERL:  Okay.

11             THE COURT:  I think where we are is that

12   skepticism sometimes is characterized as secondary

13   consideration, sometimes it's not.  Unexpected results

14   seems, I think the parties agree to be uniformly

15   characterized as secondary consideration.  Teaching away is

16   sometimes characterized that way, sometimes not.  And I'm

17   good with where my ruling is and as modified yesterday

18   orally, but I just want to make sure that you all understand

19   that regardless of how the, how I characterize it for the

20   purposes of the case management decision, granting in part

21   the motion in limine, when it comes to the final decision of

22   making an obviousness determination, I'm going to be

23   following in re cyclobenzaprine unless you all tell me I

24   shouldn't.

25             All right.  Let's go.  Bring the witness back to

Palepu - cross

```
 1    the stand, please.

 2                   ... NAGESH PALEPU, having been previously

 3               duly sworn as a witness, was examined and

 4               testified further as follows ...

 5               THE COURT:  Good morning.

 6               THE WITNESS:  Good morning.

 7               THE COURT:  All right, Doctor.  You remain

 8    under oath and continue with your cross-examination.  All

 9    right?

10               THE WITNESS:  Okay.

11               MR. FELDMAN:  May I proceed, Your Honor?

12               THE COURT:  Yes, please.

13                   CROSS-EXAMINATION, Continued.

14    BY MR. FELDMAN:

15    Q.    Good morning, Dr. Palepu.

16    A.    Good morning.

17    Q.    Can you hear me okay?  Yes?

18    A.    Yes.  A little bit.

19    Q.    Okay.

20    A.    Well, if I don't hear, I will ask you to repeat.

21    Q.    Okay.  Thank you.

22               Dr. Palepu, when we left off yesterday with

23    exhibit DTX-577, I would ask you to turn in your book to

24    DTX-577.

25    A.    577.
```

1    Q.    And we'll bring it up on the screen as well.

2    A.    Okay.

3    Q.    Okay.  And so this is a cumulative progress report for

4    October of 2009 that you spoke to Mr. Berl about yesterday;

5    correct?

6    A.    Yes, that is correct.

7    Q.    Okay.  And I would like to refer you to the

8    second-to-last page of that exhibit, DTX-577-244 at the

9    bottom.  And if we look at Table 19, you see some stability

10   data for various formulations that you were testing around

11   October of 2009; correct?

12   A.    Excuse me.  I'm kind of lost because it's too fast.

13   Q.    Okay.  If you can look at either your screen or up

14   there, you'll see -- Table 19?

15   A.    Can you enlarge this, please?  Okay.

16           THE COURT:  Actually, before we go on, I

17   understand that it's a couple of people thought there's a

18   problem with the screen, the clarity of the screen.  Is that

19   true from yesterday?  Nobody?  This gentleman is nodding his

20   head.

21           A VOICE:  Yes.  The Court tech resolved it this

22   morning.

23           THE COURT:  Is it resolved now?

24           A VOICE:  Yes, sir.

25           THE COURT:  Thank you.

Palepu - cross

```
 1            THE WITNESS:  Okay.  The question is?
 2    BY MR. FELDMAN:
 3    Q.    Yes.  So for BDM 62, do you see that one?  That's the
 4    first one.
 5    A.    62.  Okay.
 6    Q.    Okay.  And so you have 50 milligrams per milliliter of
 7    bendamustine; is that correct?
 8    A.    Yes.
 9    Q.    And then you have five milligrams per milliliter of
10    alpha lipoic acid?
11    A.    That's correct.
12    Q.    Alpha lipoic acid is an antioxidant?
13    A.    Correct.
14    Q.    You have PEG and PG in a nine-to-one ratio?
15    A.    That's correct.
16    Q.    Okay.  And then if we move to the right, on the top
17    you have percent RRT, and that's the HPLC relative retention
18    time; is that correct?
19    A.    That is correct.
20    Q.    And that's a measure of impurities; is that correct?
21    A.    Those are the degradants.
22    Q.    Okay.  And then there's one listed at 1.10; is that
23    correct?
24    A.    1.10, correct.
25    Q.    And that's a PG ester impurity; is that correct?
```

Palepu - cross

1    A.     That's correct.

2    Q.     Okay.  And then at five degrees C, the relative

3    retention time 1.10, you have an entry below the limit of

4    detection; is that right?

5    A.     That's correct.

6    Q.     Okay.  So as we talked about yesterday, about three

7    months after you had seen the Oltholff reference, you

8    had all the basic ingredients for Bendeka; is that

9    correct?

10   A.     The experimental, Bendeka, your question is other than

11   Bendeka; right?

12   Q.     No.  It's the same question that Mr. Berl asked you.

13   So these are the same basic types of ingredients.  You had

14   the bendamustine.  You had 90:10 PEG PG and you had an

15   antacid; is that correct?

16   A.     Brick, that --

17   Q.     For Bendeka, the antioxidant is monothioglycerol; is

18   that correct?

19   A.     That is correct.

20   Q.     The reason that you switched from lipoic acid to

21   monothioglycerol is because that was not an FDA approved

22   ingredient at that time whereas monothioglycerol was?

23   A.     That's correct.

24   Q.     Okay.  Thank you.

25          Dr. Palepu, now I would like you to turn in your

Palepu - cross

1    book to DTX-1112.  And DTX-1112 is an e-mail from Chris

2    Buxton to you and to Lenore Witchey and it's dated March 16,

3    2012; is that correct?

4    A.    Yes.

5    Q.    And Dr. Buxton writes, after three years on this

6    project with the basic formula being available after about

7    three months, I regret to say Eagle has driven themselves

8    into this dead-end.

9               Do you see that?

10   A.    Yes, I see that.

11   Q.    And he's responding to your e-mail dated March 16th,

12   2012, which is below that.  And in that e-mail, in some

13   colorful language, you express some frustration with Eagle,

14   what you called I think the land of the project; is that

15   right?

16   A.    That's right.

17   Q.    All right.  Now, I would like you to turn next to

18   the -- remember that we had this big chart of data that we

19   handed you?  So we're going to put it up on the screen so

20   you don't necessarily have to look at it that way, but that

21   I'm referring to, and this is DTX-46.

22              And as you talked about yesterday with Mr. Berl,

23   this is just a bigger compendium of the same sorts of data

24   that we've just been talking about, and I would like to draw

25   your attention to BDM 172.

Palepu - cross

1    A.    172, yes.

2    Q.    Now, for BDM 172, what we see is that the amount of

3    bendamustine is 25 milligrams per milliliter.

4              Do you see that?

5    A.    Mm-hmm.

6    Q.    And then the antacid is five milligrams per milliliter

7    of thioglycerol.

8              Do you see that?

9    A.    Yes.

10   Q.    And then the ratio of PEG to PG here is 9010.

11             Do you see that?

12   A.    Yes.

13   Q.    All right.  And then if we move over to the right,

14   again, in the area of percent of degradant, you see two

15   values, 1.10 and 1.13 is what I would like you to refer to.

16   And those are both PG esters; is that correct?

17   A.    Yes, that's correct.

18   Q.    Okay.  And then if we look at below there at the entry

19   corresponding to 25 degrees at one month, again, if you go

20   over, the values are 1.66 and .66; is that right?

21   A.    Yes, that's correct.

22   Q.    Okay.  Thank you.

23             And now let's go to the -- and so just to be

24   clear, that is the total amount of PG esters at that time in

25   this formulation; is that right?

1    A.     In this particular summary, that's the PG levels we

2    found.

3    Q.     Okay.  Thank you.

4           And then let's refer to --

5           THE COURT:  I'm sorry.  I'm sorry.  What did you

6    say, sir?

7           THE WITNESS:  In this particular experiment, the

8    PG ester we observed.

9           THE COURT:  Okay.  Thank you.

10   BY MR. FELDMAN:

11   Q.     Okay.  And then if we could look down at BDM 173.

12   A.     Yes.

13   Q.     Okay.  So the BDM 173 formulation is the same as the

14   BDM 172 except with a formulation with one exception.  In

15   BDM 173 it says the PEG 400 was treated with NaOH.

16          Do you see that?

17   A.     Yes.

18   Q.     NaOH stands for sodium hydroxide; is that correct?

19   A.     That is correct.

20   Q.     Okay.  And if we go ahead and look for 25 degrees at

21   one month, at the same PG esters level of 1.10, 1.13 for the

22   relative retention time, we see different values; right?  We

23   see 0.08 for the 1.10 relative retention time and BDL for

24   the 1.13 relative retention time.

25          Do you see that?

Palepu - cross

1   A.     Yes, I see that.

2   Q.     Okay.  And BDL stands for below detection limit; is

3   that right?

4   A.     Below detection limit.

5   Q.     Okay.  And then at three months, just below there, the

6   amount of PG ester has gone up slightly so that you have .21

7   at the 1.10 relative retention time and still below

8   detection limit for the 1.13 relative retention time.

9          Do you see that?

10  A.     Yes, I see that.

11  Q.     Okay.  And that's the effect that the NaOH had on that

12  formulation as it reduced the amount of the PG esters at

13  those time periods; is that correct?

14  A.     Yes, but I have explained why the NaOH added to this

15  formulation, because we just can't take a formulation in

16  isolation and discuss about the peak level.

17         What happened here is, as you see here at the

18  bottom, the source from BSP Pharma.  This is the time where

19  we finish, identify our formulation using polyethylene

20  glycol source for months.  And these two particular

21  formulations you're referencing will be relative to the

22  formulations.  We change it to the different source chosen

23  by Eagle Pharmaceuticals, where those are the USP grade

24  material.

25         So when we made the material, we unusually found

1    high level of ester at -- higher.  And so that is the

2    difference on old formulation and new formulation.

3    Bendamustine is the same.  And measured, constitutes of this

4    formulation, polyethylene glycol which is 90 percent, and

5    propylene glycol, which is ten percent.  So the varied

6    changes in degradation, it could be due to something in

7    this.

8            So what we did, we measured, we went through the

9    specification, and we found out the polyethylene glycol had

10   pH's different from the USP and polyethylene glycol is out

11   of the specification.  pH is high.  So we thought because

12   of the acidity of polyethylene glycol in the BSP material

13   caused it.

14           So we -- so that you can bring the pH down and

15   then -- and that's here, because the source of the material,

16   the polyethylene glycol 400 from BSP is different from what

17   we stated earlier in our formulation development study and

18   we saw with the, with the -- so that's the reason we use the

19   sodium hydroxide.  Just the acidity of polyethylene glycol

20   in the BSP source material.

21           THE COURT:  Okay.  Hold up a second.

22           All right.  Doctor, I'm going to ask you to step

23   down out of the courtroom.  I need to address something with

24   the lawyers.

25           THE WITNESS:  Okay.  No problem.

Palepu - cross

1                    (Judge Connolly conferred with the Court

2        Reporter.)

3                    THE COURT:  Thank you very much.

4                    (Witness excused.)

5                    THE COURT:  Okay.  The record shall reflect that

6        after the last answer from the witness, I conferred with the

7        court reporter, who confirmed what my fear is, and I based

8        it not only on the last answer, but also on the responses

9        the witness gave yesterday.  It is virtually impossible and,

10       in fact, that last sentence, it was impossible to understand

11       what the witness was saying.

12                   Mr. Berl, what is the native tongue of the

13       witness?

14                   MR. BERL:  It's some Indian language.  I'm not

15       sure exactly what it is.

16                   THE COURT:  Right.  So I do think the burden is

17       on you, who has presented the witness.  You made a decision

18       not to have an interpreter.  I mean, I can't also, you know,

19       understand the extent to which this is a linguistic issue or

20       is it a hearing, an auditory issue, or some combination of

21       both, although it seems clear to me given the manner in

22       which the individual speaks and his ability to at times be,

23       or his word choice, I will say, at times, that there's

24       elements of both.  But the court reporter was not able to

25       transcribe what the witness just said, and we have a

1        wonderful court reporter.  I worked with her as a lawyer and

2        as a judge for many years, and I've seen her do incredible

3        work under challenging circumstances.  I've never seen

4        anything like the circumstances presented by this witness.

5                    It's very unfair to the court reporter and Court

6        and it's not going to allow us to have a truth-finding

7        determination made with any kind of confidence because the

8        witness is just not understandable.

9                    MR. BERL:  I think in my experience with him,

10       when he slows down, he's easier to understand.  Perhaps

11       if --

12                   THE COURT:  Well, why didn't you have an

13       interpreter?

14                   MR. BERL:  Because honestly, I've been able to

15       understand him and interact with him perfectly well.  I

16       mean, he has been in the country for 40 years and he can

17       converse.  I think part of it is an auditory issue that the

18       interpreter frankly wouldn't be able to help with and I

19       think his speech gets a little slurred and he has trouble

20       hearing sometimes, so I didn't think an interpreter would

21       help for what the underlying problems were.  And I could

22       understand especially when he speaks more slowly that I

23       think his words start to run together and it can be hard.

24       Just an idea to suggest that maybe he try to speak very

25       slowly and try to enunciate for the court reporter and maybe

Palepu - cross

1    that will help.

2                THE COURT:  What do you think he just said?

3                MR. BERL:  So what he just said was that the

4    reason that they added NaOH to this formulation was that

5    they used PEG from a different source, the BSP Pharma

6    source, and that that PEG was outside of the specification.

7    It was too acidic and that's what was causing the PG esters

8    to form, so they added NaOH to change acidity of that PEG.

9                I probably explained it more clearly than he

10   did, I will grant that, but I think that's what he was

11   trying to present.

12               THE COURT:  You certainly explained your

13   client's position more clearly than he did.  But I'm going

14   to strike the answer as indecipherable and we will try again

15   and we'll instruct the witness to speak more slowly.  We

16   will do the best we can.  I don't know what else to do, so I

17   mean, does any party wish to speak?

18               MR. BERL:  I know he's on cross and I'm not

19   supposed to talk to the witness.  If I can maybe talk to him

20   for 30 seconds and tell him to slow down.

21               THE COURT:  I will talk to him.

22               MR. BERL:  Okay.

23               THE COURT:  I will do that.  I appreciate that.

24   All right.  Let's bring the witness back in.

25               THE COURT:  Have a seat.  Doctor, I asked us to

Palepu - cross

```
 1    take a break because I'm having a hard time hearing,

 2    understanding what you are saying.

 3                 Let me ask you a couple of questions.  So how

 4    long have you spoke in English?

 5                 THE WITNESS:  Since I've been in the country.

 6                 THE COURT:  And I forget.  You've been here

 7    many, many years.

 8                 THE WITNESS:  Many, many years.  1974.

 9                 THE COURT:  What is your native language?

10                 THE WITNESS:  Telutu.

11                 THE COURT:  How do you spell that?

12                 THE WITNESS:  T-e-l-u-t-u, Telutu.  That's my

13    native language.  Background India.

14                 THE COURT:  Have you ever used as interpreter?

15                 THE WITNESS:  No.  I have to speak slowly.

16    That's all.  I don't use an interpreter.  I talk to people.

17                 THE COURT:  Okay.  From your e-mails, you

18    understand English.

19                 THE WITNESS:  Yes.

20                 THE COURT:  I can tell that and you're able to

21    write English clearly, but it's very, very difficult to

22    understand what you're saying.  How about your hearing?  You

23    have two devices it looks like on that you're wearing around

24    your neck.  Is that correct?

25                 THE WITNESS:  That's correct.
```

Palepu - cross

```
 1                    THE COURT:  Tell me about those two devices.
 2                    THE WITNESS:  The device is to -- it's a
 3      microphone inside the hearing aid, but that microphone is
 4      not very effective to pick up distance, so these two
 5      devices, it was to pick up the signal and transfer the
 6      signal to the hearing aid so that I can hear.
 7                    THE COURT:  Okay.  What I'm going to ask you to
 8      do is, if you could try to speak very slowly.
 9                    THE WITNESS:  Okay.
10                    THE COURT:  So that I can understand what it is
11      you're saying.
12                    THE WITNESS:  Okay.
13                    THE COURT:  And so that the lawyers can
14      understand what it is that you're saying.  Could you do
15      that, please?
16                    THE WITNESS:  Absolutely no problem.
17                    THE COURT:  All right.
18                    THE WITNESS:  In case if I'm going fast, please
19      tell me slow down.  I will just slow down.  I will slow down
20      because I'm a scientist.  When I try to explain things,
21      sometimes I get excited.  When I get excited, naturally, I
22      tend to speak fast.
23                    THE COURT:  So that's part of it.  I think also
24      if you can be very conscious about trying to pronounce
25      syllables.
```

Palepu - cross

1              THE WITNESS:  Yes.

2              THE COURT:  And consonants, that would help as

3     well.

4              THE WITNESS:  Okay.

5              THE COURT:  It's not just speed, but I think

6     speed is a big part of it.

7              THE WITNESS:  Okay.

8              THE COURT:  All right?

9              THE WITNESS:  Okay.

10             THE COURT:  Okay.  Now, we're going to then move

11    back in time and the lawyer, Mr. Feldman, he's going to get

12    to re-ask some of the questions he put to you.

13             THE WITNESS:  Okay.

14             THE COURT:  All right?

15             THE WITNESS:  Okay.

16             THE COURT:  All right.  But before we do, I

17    need to do something on the computer, so just give me one

18    second.

19             Okay.  Mr. Feldman?  Thank you.

20    BY MR. FELDMAN:

21    Q.    Dr. Palepu, when we left off, I believe we were

22    discussing the differences or the effects of the NaOH on the

23    stability of the various formulations and, in particular,

24    how the NaOH affected the esterification formations in these

25    various formulations; correct?

Palepu - cross

1    A.    That is correct.

2    Q.    And I believe what you were trying to say was that

3    depending on the acidity level of the PEG that was being

4    used, it would affect the stability level and the ester

5    formation of the particular formulations; is that correct?

6    A.    That is what our experiment --

7                THE COURT:  Mr. Feldman, could you also please

8    slow down.

9                MR. FELDMAN:  I'm sorry, sir.

10               THE COURT:  Thank you.  For the witness.

11   BY MR. FELDMAN:

12   Q.    Please turn in your book now to DTX-1349.

13   A.    Thank you.

14   Q.    And what DTX-1349 is is another patent application

15   that was filed where you're named as an inventor; is that

16   right?

17   A.    Yes, that is correct.

18   Q.    And this is -- we'll do it by publication numbers.

19   The publication number there at the top is U.S.

20   2013/0210879.

21               Do you see that?

22   A.    Yes, I see that.

23   Q.    Okay.  And we're going to refer to it as the '879

24   publication.  Okay?  So I'm going to refer to this --

25               THE COURT:  Mr. Feldman, you're going to have to

Palepu - cross

1   slow down.

2               MR. FELDMAN:  Yes.  Talking like you're from

3   Chicago, where you're from, not New York.  Slow it down.

4               MR. FELDMAN:  I get excited when I talk about

5   science, too.

6               THE COURT:  I don't.

7   BY MR. FELDMAN:

8   Q.    Dr. Palepu, we're going to refer to this as the '879

9   publication.  Okay?

10  A.    Okay.

11  Q.    All right.  And the application was filed on

12  February 14th, 2013; correct?

13  A.    Yes.  Application filed February 14th, 2013.  Correct.

14              MR. FELDMAN:  Was the court reporter able to

15  hear that?

16              COURT REPORTER:  Yes.

17  BY MR. FELDMAN:

18  Q.    And what this application is about is how to make

19  reproducible long-term storage stable

20  bendamustine-containing formulations; right?

21  A.    That is correct.

22  Q.    And the way you teach to do that in this application

23  to through the addition of some sodium hydroxide; is that

24  correct?

25  A.    I did not understand your question clearly.  Could you

Palepu - cross

1    just elaborate your question, please?

2    Q.    Sure.  What this patent is about is --

3              THE COURT:  Mr. Feldman, I'm sorry.  I'm going

4    to keep doing it.  You've got to slow down.

5              MR. FELDMAN:  All right.

6              THE COURT:  We all have to try to make this

7    work, so just instead of -- what I find you're doing is, you

8    say a clause and you take a breath and say a clause.  Just

9    do the clauses slower.  Okay?  Do it by words.

10             MR. FELDMAN:  Okay.

11   BY MR. FELDMAN:

12   Q.    What we were talking about a few minutes ago was the

13   effect of NaOH on the stability of the formulation; is that

14   correct?

15   A.    NaOH, to -- not the stability of the formulation, to

16   reduce the level of esters.

17             THE COURT:  Is it to reduce or adjust the level

18   of esters?

19             THE WITNESS:  To reduce the levels of the ester.

20             THE COURT:  Okay.

21             THE WITNESS:  Because we're seeing higher ester

22   formation with higher, with the lower pH, so we add sodium

23   hydroxide to increase the pH.  So that would reduce the

24   levels of the ester formation.

25             THE COURT:  Okay.

Palepu - cross

1    BY MR. FELDMAN:

2    Q.    Okay.  And, in fact, this patent has some data to show

3    that.  Please turn to page 4 of DTX-1349 and we'll bring it

4    up on the screen.

5              MR. BERL:  Objection.  Mr. Feldman said patent.

6    This is not a patent.

7              MR. FELDMAN:  Sorry.  Application.

8              THE COURT:  Okay.  Thank you.

9    BY MR. FELDMAN:

10   Q.    And like we saw before here, like we saw before here

11   in Table 3, again, looking at the first entry, we have

12   bendamustine 25 milligrams, thioglycerol five milligrams,

13   PEG 400 and PG in a 90:10 ratio.  And, again, when we look

14   at the PG esters to the right, we see high PG ester levels.

15   Right?

16   A.    Correct.

17   Q.    And also at 25 degrees.  Correct?

18   A.    25 degrees, correct.

19   Q.    And I just want to be clear in case it's confusing, so

20   the relative retention times for the PG esters in this chart

21   show up at 1.11 and 1.14; correct?

22   A.    Correct.

23   Q.    And that's just a function of the HPLC machine that's

24   being used; right?

25   A.    Yes, that's correct.

Palepu - cross

1   Q.     So sometimes they show up as 1.10 and 1.13, and

2   sometimes they shift over to 1.11 and 1.14; correct?

3   A.     Yes, depending on the HPLC conditions at the column.

4          THE COURT:  Okay.  You've got to slow down.

5   Depending on what?

6          THE WITNESS:  Sorry.  Depending on HPLC

7   conditions at the column we use in the HPLC.  The column,

8   and time passes the column.  When the column, the material

9   in the column deteriorates, we retain the retention time a

10  little bit.

11         THE COURT:  Attrition time?

12         THE WITNESS:  Retention time.

13         THE COURT:  Retention time.  Okay.  Thank you.

14  BY MR. FELDMAN:

15  Q.     Okay.  And if we can turn the page.

16  A.     Excuse me.

17  Q.     Sure.

18  A.     I have one question here.  Why you didn't put the --

19         THE COURT:  He gets to ask the questions.

20         THE WITNESS:  Okay.  I'm sorry.

21  BY MR. FELDMAN:

22  Q.     There was no five degree stability data listed for

23  that entry; right?

24  A.     Okay.

25  Q.     Can we turn the page to Exhibit 4A.

Palepu - cross

1   A.     Okay.

2   Q.     We again see this phenomena.  So the first entry is

3   25 milligrams bendamustine, five milligrams thioglycerol,

4   and then PEG PG in the 90:10 ratio.

5          And, again, if we go to the PG ester values, at

6   25 degrees at three months, the value is 1.37 for PG ester

7   one and 0.69 for PG ester two.

8          Do you see that?

9   A.     Mm-hmm.

10         THE COURT:  And, Doctor, if you could please

11  answer yes or no, not mm-hmm.

12         THE WITNESS:  Yes.

13         THE COURT:  Thank you.

14  BY MR. FELDMAN:

15  Q.     And then for five degrees at six months, you see .11

16  for PG ester one and below the limit of detection for PG

17  ester two.

18         Do you see that?

19  A.     I see that.

20  Q.     And then if we can turn to paragraph 135 in the

21  document, that reads, also shown in Figures 4A and 4B in

22  tables four A and 4B, the control sample, which did not

23  include NaOH, did not provide long term storage stability.

24         Do you see that?

25  A.     Yes.

Palepu - cross

1    Q.      And it states, the pH of the control sample is ranges

2    from 3.17 to 3.25.  And this sample exhibited more than

3    28 percent total esters compared to initial after six months

4    at 25 degrees C.

5    A.      Yes.

6    Q.      And that concludes bendamustine-containing

7    compositions with such high levels of degradation would not

8    be long term storage stable.

9            Do you see that?

10   A.      Yes, I see that.

11   Q.      Okay.  Now, Dr. Palepu, I would like to draw your

12   attention to Exhibit 6.  And this is a patent case.  I

13   thought it would be finally nice to show someone a patent.

14           So this is U.S. Patent No. 9,265,831.

15   A.      Okay.

16   Q.      And you are named as an inventor on this patent; is

17   that correct?

18   A.      That's correct.

19   Q.      And you would have read this patent; correct?

20   A.      Yes.

21   Q.      But this patent does not identify anything about PEG

22   acidity, does it?

23   A.      Yes.  That is correct.

24   Q.      And you don't mention adding NaOH to the formulation

25   in this patent; is that correct?

Palepu - cross

1    A.    That is correct.

2    Q.    All right.  I would also like to next refer you to

3    DTX-008, and this is another one of your patents.  This is

4    U.S. Patent No. 9,572,797.

5              Do you see that?

6    A.    I saw that.

7    Q.    And you're again a named inventor on this patent?

8    A.    That is correct.

9    Q.    And as of the last patent we talked about, there's no

10   mention of PEG acidity in this patent; is that correct?

11   A.    That is correct.

12   Q.    And there's no mention of sodium hydroxide in this

13   patent; correct?

14   A.    That is correct.

15             MR. FELDMAN:  Thank you.  I have no further

16   questions at this time.

17             THE WITNESS:  Can I -- I'm a little confused

18   here because Mr. Feldman is asking questions in isolation.

19             THE COURT:  That's okay.  That's the way the law

20   works.

21             MR. FELDMAN:  Shall I move exhibits in nor or

22   wait until the end?

23             THE COURT:  Why don't you wait until the end.

24             MR. FELDMAN:  Okay.

25                        REDIRECT EXAMINATION

Palepu - redirect

1    BY MR. BERL:

2    Q.    Just a few questions, Dr. Palepu.   Okay?

3    A.    Okay.

4    Q.    You were asked about an e-mail in which you received a

5    German patent yesterday.

6              Do you remember that?

7    A.    Yes, I remember.

8    Q.    Did you receive that German patent in German or in

9    English?

10   A.    German.

11   Q.    Do you speak German?

12   A.    No.

13   Q.    Do you read German?

14   A.    No.

15   Q.    Were you able to read and understand that patent in

16   German?

17   A.    No.

18   Q.    Did that patent from East Germany have anything to do

19   with the solvents you selected in your research?

20   A.    No.

21   Q.    You were just asked questions about PG esters in

22   various batches that Mr. Feldman showed you.

23              Do you remember that?

24   A.    Yes, I do.

25   Q.    Did you have a problem with PG esters when you did not

Palepu - redirect

1   use the PEG from Eagle's source?

2   A.      No, we never had any problem when we used PEG of a

3   source from Merck, which was the basis for the two patents

4   that Mr. Feldman was referring.

5   Q.      Even when you used the PEG from Eagle's source, did it

6   always create a PG ester problem or only sometimes create a

7   PG ester problem?

8   A.      Sometimes.

9   Q.      Was it difficult for you to determine that you could

10  solve the problem with the Eagle PEG material using sodium

11  hydroxide?

12  A.      No, it was not difficult because earlier I said, the

13  Judge couldn't understand because I mumbled too much

14  probably.

15          What I said at that time is -- I will be very

16  slow, very careful.  What I said at that time is, we have,

17  we had this prior formulation with the PEG, using the PEG

18  source for months showing excellent stability.  That's what

19  the patent, those two patents are based on.  Then all of a

20  sudden when Eagle supplied the source material, we found

21  esters, high level of esters at 25.  That allowed.

22          Why is it happening?  We have so many batches

23  made, the stability was steady and we have excellent

24  stability.  What happened?  Why this deviation?

25          So we said, okay.  What could be the factor?

Palepu - redirect

1    Bendamustine.  API --

2              THE COURT:  Sorry.  Bendamustine what?

3              MR. BERL:  API.

4              THE WITNESS:  API.

5              THE COURT:  Hold on.  Sorry.

6              THE WITNESS:  API.

7              THE COURT:  API.  Right.  Okay.

8              THE WITNESS:  API is the same.  Okay.  We

9    changed.  Propylene glycol is different.  Polyethylene

10   glycol, different source.  These are the two major

11   components in the bendamustine formulation.

12             So we checked with the company.  PG

13   specification supplied from our source and supplied from

14   Eagle source are the same whereas polyethylene glycol 400

15   supplied from our source has higher pH than the polyethylene

16   glycol supplied by Eagle.  Okay.  It could be the problem.

17   PH six, pH eight, just an example.

18             So what happens with just the pH of this

19   polyethylene glycol sourced from Eagle, okay.  So what we

20   did, we took the polyethylene glycol source from Eagle the

21   same pH as the other material and then we made another

22   batch.  Bingo.  All degradation disappears.  So the

23   instabililty is due to the higher pH of polyethylene glycol

24   supplied by Eagle.

25   BY MR. BERL:

Palepu - redirect

1    Q.    And just to clarify, was it the -- did Eagle's pH have

2    a higher or lower pH?

3    A.    Eagle's pH is acidic.

4    Q.    Acidic?

5    A.    Lower, lower.

6    Q.    Mr. Feldman showed you a patent application a moment

7    ago.

8              Do you remember that?

9    A.    Yes, I do.

10   Q.    Was that patent application granted as a patent?

11   A.    No.

12   Q.    Okay.

13             MR. BERL:  That's all the questions I have.

14   Thank you so much, Dr. Palepu.

15             THE WITNESS:  Thank you.

16             THE COURT:  I normally do not allow, as I said,

17   but I'm going to allow it in this case.

18             Mr. Feldman, do you have a question?

19             MR. FELDMAN:  I do not.  I just want to do

20   exhibits.

21             THE COURT:  Okay.

22             MR. BERL:  I have exhibits, too.

23             THE COURT:  All right.  Doctor, thank you very

24   much.  You may step down.

25             THE WITNESS:  All right.

```
1                      (Witness excused.)

2                 THE COURT:  Mr. Berl.

3                 MR. BERL:  Yes.  Not many.  PTX-757, PTX-761,

4    PTX-729, PTX-591, PTX-588, and PTX-505.

5                 THE COURT:  Any objection from the defense?

6                 MR. FELDMAN:  No, Your Honor.

7                 THE COURT:  Those exhibits are admitted.

8                  (PTX-757, PTX-761, PTX-729, PTX-591, PTX-588 and

9    PTX-505 were admitted into evidence.)

10                THE COURT:  Mr. Feldman?

11                MR. FELDMAN:  I move to admit the following

12   exhibits:  DTX-1120, DTX-1119, DTX-577, DTX-46, DTX-1349,

13   DTX-8, DTX-6, and DTX-1112.

14                THE COURT:  Any objection?

15                MR. BERL:  No objection.

16                THE COURT:  All right.  They're admitted.

17                 (DTX-1120, DTX-1119, DTX-577, DTX-46, DTX-1349,

18   DTX-8, DTX-6, and DTX-1112 were admitted into evidence.)

19                THE COURT:  Can you all hear me?

20                MR. FELDMAN:  Yes.

21                MR. BERL:  Yes.

22                THE COURT:  They're admitted with the caveat I'm

23   not double-checking to determine whether those exhibits were

24   discussed with the witness.  You can each object to the

25   proffering of those exhibits in post-trial briefing and if
```

```
1    it's not discussed in post-trial briefing, the exhibits will

2    be struck.  All right?  All right.

3              Next, Mr. Berl?

4              MR. ZUBICK:  Good morning, Your Honor.  Mark

5    Zubick from Latham & Watkins.

6              For plaintiffs, our next witness we are going to

7    call is Dr. Juergen Siepmann.  He's going to address one of

8    the limited infringement elements that we have not been able

9    to stipulation.

10             THE COURT:  All right.

11             MR. ZUBICK:  May we approach with binders, Your

12   Honor?

13             THE COURT:  You may.  Your name again, sir?

14             MR. ZUBICK:  Mark Zubick.

15             THE COURT:  Zubick.  Thank you very much.

16             ... JUERGEN SIEPMANN, having been duly

17        sworn/affirmed as a witness, was examined and

18        testified as follows ...

19             MR. ZUBICK:  May I proceed?

20             THE COURT:  Yes, please.

21             MR. ZUBICK:  Thank you.

22                       DIRECT EXAMINATION

23   BY MR. ZUBICK:

24   Q.   Good morning, Dr. Siepmann.  Could you please

25   introduce yourself?
```

Siepmann - direct

1    A.    Good morning.  My name is Juergen Siepmann.  I'm a

2    professor of pharmaceutical technology at the University of

3    Lille in Northern France.

4    Q.    And, Dr. Siepmann, other than your professorship, do

5    you have any other responsibilities at the University of

6    Lille?

7    A.    I'm the director of a research group working on drug

8    formulation.

9    Q.    And, Doctor, as part of your responsibilities through

10   the University of Lille, do you have occasion to work with

11   companies in industry?

12   A.    Yes.  Roughly half of my projects are directly in

13   collaboration with industrial partners.

14   Q.    Doctor, are you able to provide for the Court some

15   examples of the industrial companies you collaborate with

16   through the university?

17   A.    For instance, Bayer, Astra-Zeneca, Merck, Ethypharm,

18   and others.

19   Q.    Thank you, sir.

20         Doctor, apart from your work at the University

21   of Lille, do you also serve as a consultant to the

22   pharmaceutical industry?

23   A.    Yes.

24   Q.    I know that much of your consulting work is

25   confidential, but could you generally describe the type of

Siepmann - direct

1    consulting projects you work on with industry?

2    A.    I'm contacted if in industry we have difficulties or

3    questions during the formulation of a drug product.

4    Q.    Dr. Siepmann, could you briefly just describe your

5    educational background for the Court, beginning with your

6    undergraduate training?

7    A.    I studied pharmacy at the Freie University of Berlin.

8    I grew up in Germany.  Then I did a Ph.D. in pharmaceutical

9    technology, working on drug formulation, and then I did a

10   post-doc at the University of Angers in France, working on

11   liquid parenteral formulations.

12   Q.    Doctor, what is a parenteral formulation?

13   A.    It's injected or implanted into the human body.

14   Q.    Doctor, I will switch topics.  Do you hold any

15   positions in scientific associations?

16   A.    Since 2010 I'm the president of the International

17   Society For Drug Delivery Sciences and Technology.

18   Q.    What are your responsibilities as president of that

19   organization, Dr. Siepmann?

20   A.    We are organizing different types of events, including

21   conferences, workshops, and the idea is to bring together

22   academic and industrial researchers in the field of drug

23   formulation.

24   Q.    Dr. Siepmann, did you publish any research in the area

25   of pharmaceutical technology?

Siepmann - direct

1    A.    Yes.

2    Q.    Could you give the Court an idea of the number of

3    publications you have in that field?

4    A.    Roughly 170 research articles in peer-reviewed

5    international journals.  Maybe 300 poster presentations.

6    About 100 oral presentations I think.  Seventeen book

7    chapters, three books, and probably I forgot some others.

8    Q.    I think that's enough, Doctor.

9          Could you give the Court an idea of some of the

10   topics that you published on in pharmaceutical formulation,

11   please?

12   A.    I published on drugs which are fragile.  I published

13   on drugs which are fully soluble in water.  I published on

14   drugs which have to be released slowly during certain time

15   periods.

16   Q.    We've heard a good deal already in this case about

17   drug degradation.  Is that what you mean by a fragile drug?

18   A.    Yes.

19   Q.    Doctor, do you hold any positions on academic

20   journals?

21   A.    Yes.  I'm editor-in-chief of the International Journal

22   of Pharmaceutics, and before that I was editor-in-chief of

23   The Journal of Drug Delivery Sciences and Technology.

24   Q.    And, Doctor, briefly, have you received any awards

25   in the course of your career that you're particularly proud

Siepmann - direct

1    of?

2    A.    I received the APV award for the most outstanding

3    Ph.D. thesis in 1998, 1999.   APV International Association

4    For Pharmaceutical Technology.

5              I received the 2006 International Journal of

6    Pharmaceutics Scientist Research Article Award.

7              In 2012, the APV award for Outstanding

8    Achievements in the Pharmaceutical Sciences.

9    Q.    Dr. Siepmann, could you please turn to exhibit PTX-884

10   in your binder.

11   A.    This binder?  I'm sorry.  I forgot the number.

12   Q.    That's okay.  PTX-884.

13             MR. ZUBICK:  And can we put that up, please?

14   BY MR. ZUBICK:

15   Q.    Dr. Siepmann, you can look at the screen as well?

16   A.    Probably better.

17   Q.    Dr. Siepmann, is this a true and correct copy of your

18   curriculum vitae?

19   A.    I think it's the beginning, yes.

20   Q.    So he has blown that portion up, but the document

21   itself, is that your C.V.?

22   A.    I would need to find it in the binder, but that's

23   right.

24   Q.    Okay.

25             MR. ZUBICK:  Plaintiffs proffer Dr. Siepmann as

1    an expert in pharmaceutical technology, including the

2    formulation of liquid injectable drugs.

3                MR. ALY:  No objection.

4                THE COURT:  All right.

5                MR. ZUBICK:  Thank you, Your Honor.

6    BY MR. ZUBICK:

7    Q.    Dr. Siepmann, did you prepare a demonstrative to aid

8    with your testimony this morning?

9    A.    Yes.

10   Q.    Okay.

11               MR. ZUBICK:  Can you please bring up PDX-1.

12   BY MR. ZUBICK:

13   Q.    Dr. Siepmann, we've put up demonstrative PDX-1

14   on the screen.  What will you be testifying about this

15   morning?

16   A.    The question is whether the proposed ANDA products of

17   Mylan, Fresenius Kabi and Apotex meet the claim limitations

18   comprising a stabilizing amount of antioxidant.

19   Q.    Okay.  And, Dr. Siepmann, in analyzing that question

20   that you just presented, whether these three ANDA products

21   meet the stabilizing amount of an antioxidant limitations,

22   what meaning did you give to the term?

23   A.    Its plain and ordinary meaning in light of the

24   specification of the patent.

25   Q.    Okay.  So let's bring up the patent, PTX-308, and

Siepmann - direct

1      let's look at Column 3, lines 51 to 54.

2                  Dr. Siepmann, we've brought up an excerpt of the

3      '831 patent.   What is the plain and ordinary meaning of

4      stabilizing amount of an antioxidant in light of the

5      specification?

6      A.      You can see here in the text highlighted in yellow,

7      the last two lines:   Those amounts which increase or enhance

8      the stability of the bendamustine in the compositions

9      described here in.

10     Q.    Dr. Siepmann, based on that definition from the patent

11     specification, did you conclude whether the Apotex,

12     Fresenius and Mylan ANDA products satisfy the claim

13     limitation stabilizing amounts of antioxidants?

14     A.      Yes.

15     Q.    Dr. Siepmann, does the patent specification provide

16     any additional information in addition to this definition?

17     A.      Yes.

18     Q.    What type of information does it provide?

19     A.      There are some examples for you.

20     Q.    Could you please bring up Table 3, which is in column

21     8 of the patent.

22                  Dr. Siepmann, we've put up Table 3 of the '831

23     patent on the screen.   What does this tell you about

24     stabilizing amount of antioxidant?

25     A.      This is an example for a formulation containing

Siepmann - direct

1    bendamustine.  If you have a look at the upper part of the

2    table, the formulation does not contain an antioxidant.  In

3    the lower part, it contains an antioxidant here, lipoic acid

4    at five milligrams per milliliter, and these two

5    formulations were put on stability.

6              The numbers I will talk about are highlighted in

7    yellow.  Forty degrees Celcius for 15 days and then you can

8    see without antioxidant, the drug contents came down to

9    56.3 percent and the total impurities on the right-hand side

10   came up to 41.9 percent whereas if you compare these results

11   with the formulations containing an antioxidant at the

12   bottom, there in this case with the antioxidant, the drug

13   content was 97.5 percent, and the total impurities are below

14   one percent, 0.53 percent.

15   Q.   Dr. Siepmann, if I understand you correctly, Table 3

16   shows an experiment, two formulations with and without an

17   antioxidant; is that correct?

18   A.   Yes.

19   Q.   I'd like to turn now, Dr. Siepmann, to whether or not

20   the three defendants' ANDA products satisfy the claim

21   limitation.  So let's start with Mylan.

22              Could you please bring up PTX-007.

23              Dr. Siepmann, could you explain for the Court

24   what exhibit PTX-007 is?

25   A.   So this is part of the ANDA of Mylan's ANDA product.

Siepmann - direct

1    Q.    Is this something that Mylan submits to the FDA?

2    A.    Yes, mm-hmm.

3    Q.    Okay.  What is the purpose of this type of document,

4    Dr. Siepmann?

5    A.    It describes how the drug formulation was developed,

6    what are the functions of the different excipients,

7    ingredients that I included.  Yes, and many other

8    informations:  How they found the product, how they control

9    the quality of the product.

10   Q.    Could we turn to page 2 of PTX-7.

11         Dr. Siepmann, we've put up an excerpt from the

12   second page of Mylan's submission to the FDA.  What is shown

13   in this chart, sir?

14   A.    As you can see, a table which gives the composition of

15   the proposed ANDA product, and on the right-hand side, the

16   last time before, the very last column, gives the function

17   of the different ingredients.  And what I've highlighted

18   here in yellow is monothioglycerol at a concentration of

19   five milligrams per millimeter and the function is

20   antioxidant.

21   Q.    Okay, Doctor.  Let's move onto Fresenius.  And can you

22   please bring up page 1 of exhibit PTX-486.

23         Dr. Siepmann, this is an excerpt from the

24   Fresenius ANDA.  What have you shown here?

25   A.    So this table gives the composition of the proposed

1   ANDA product of Fresenius Kabi, indicating the function of

2   the different ingredients, and highlighted in yellow is

3   monothioglycerol as an antioxidant as a concentration of

4   five milligrams per milliliter.

5   Q.    Thank you, Dr. Siepmann.  Let's finally turn to

6   Apotex.

7          Can you please bring up page 1 of PTX-474, which

8   is an excerpt from Apotex's ANDA.

9          And, Dr. Siepmann, what is shown here?

10  A.    This is a similar table showing the composition of the

11  proposed ANDA product of Apotex, and, again, highlighted in

12  yellow is monothioglycerol as an antioxidant at a

13  concentration of five milligrams per milliliter.

14  Q.    Dr. Siepmann, other than the three charts we've just

15  seen, was there any information from the development

16  defendants' ANDA products that played into your

17  determination of whether they satisfy the antioxidant's

18  claim limitation?

19  A.    Yes.

20  Q.    What was that information?

21  A.    They vary the concentration of the antioxidant and had

22  to look at the degradation of the drug and the total

23  impurity.

24  Q.    Can you please bring up page 55 of PTX-201, which is

25  from the Mylan pharmaceutical development report.

1          So, Dr. Siepmann, this is part of Mylan's

2     pharmaceutical development report.  What is described

3     here?

4     A.    So here, as you see in the title, they study the

5     effect of monothioglycerol content, content of the

6     antioxidant.  And what is highlighted in yellow, the text

7     below, says that the concentration can have impact on the

8     stability, and for this reasons, they varied the

9     concentration between 1.25 to 5 milligrams per milliliter.

10    Q.    And if we can please turn to page 57 of PTX-201.

11          Dr. Siepmann, what conclusion did Mylan reach

12    from this study on varying the amount of monothioglycerol in

13    its ANDA product?

14    A.    So, again, highlighted in yellow, any concentration

15    above 1.25 milligrams mL will be suitable to achieve the

16    desired product stability.

17    Q.    Dr. Siepmann, what does that conclusion tell you about

18    the role Mylan is telling the FDA, that the monothioglycerol

19    is playing in its ANDA product?

20    A.    It's the antioxidant which stabilizes the formulation.

21    Q.    Dr. Siepmann, given this testing, what is your opinion

22    with respect to whether Mylan's product contains a

23    stabilizing amount of antioxidant according to the

24    definition in the patent?

25    A.    It contains.

1    Q.    Dr. Siepmann, let's turn to Fresenius's testing.  Can

2    you please bring up page 35 of PTX-54.

3              And, Dr. Siepmann, what is shown here?

4    A.    So here, again, the concentration of the antioxidant

5    was varied.  That was for the Fresenius Kabi product.  And

6    they varied the concentration 50 percent and 75 refer to the

7    100 percent weight in which five milligrams are made.  They

8    study what happens if I have half of the concentration, half

9    of the amount, and what if I have three-quarters of the

10   amount.

11   Q.    When you say half or three-quarters of that amount,

12   where did Fresenius get those amounts from?

13   A.    They took five milligrams per mL and divided it by

14   two, 50 percent.

15   Q.    Could you please turn to page 39 of PTX-54.  And, Dr.

16   Siepmann, what did Fresenius conclude from its

17   monothioglycerol study?

18   A.    So what the key sentence that's highlighted in yellow,

19   when the antioxidant was added at the 75 percent level, the

20   formulation was stable.

21   Q.    So what does that tell you about the role Fresenius is

22   telling the FDA about whether the five milligrams per

23   milliliter, what role did it tell you Fresenius is telling

24   the FDA the five milligrams per millimeter of

25   monothioglycerol is playing in its product?

Siepmann - cross

1    A.    It's the antioxidant which stabilizes the formulation.

2    Q.    Dr. Siepmann, based on all of the information we've

3    reviewed today, do you have a conclusion about whether each

4    of defendants' ANDA products satisfies the antioxidant claim

5    limitation?

6    A.    Yes.

7    Q.    And what is that conclusion?

8    A.    They all meet that claim limitation.

9            MR. ZUBICK:  Thank you, Dr. Siepmann.  I have no

10   further questions.

11           THE COURT:  Mr. Aly?

12           MR. ALY:  May we hand up some binders?

13           THE COURT:  Yes.

14           (Mr. Aly handed binders to the Court.)

15           MR. ALY:  May I proceed?

16           THE COURT:  Please.

17                   CROSS-EXAMINATION

18   BY MR. ALY:

19   Q.    Dr. Siepmann, we're here today to talk only about this

20   one term, stabilizing amount.

21           Do you understand that?

22   A.    Yes.

23   Q.    And that is what was your testimony was about; is that

24   correct?

25   A.    Among others, yes.

Siepmann - cross

1    Q.      And one of the things that you explained was, your

2    definition of the term stabilizing amount pointed to the

3    patent specification; is that right?

4    A.      Yes.  We saw this a few minutes ago, yes.

5    Q.      That's what I'd like to talk about, DTX-308 at column

6    3, paragraph starting at line 49.

7            And, Dr. Siepmann, these lines you are referring

8    to are from the patent at line 52 and it's the stabilizing

9    amount shall be understood to include those amounts which

10   increase or enhance the stability of the bendamustine in the

11   compositions described herein.

12           Is that correct?

13   A.      Yes.  I think it's starting at 51 or 52.

14   Q.      And as far as that term is concerned, how much

15   stabilizing to do -- your opinion is any amount of

16   stabilizing would meet that definition; is that correct?

17           MR. ZUBICK:  Objection.  Give the Court some

18   context.  I said he may address infringement today and I'm

19   happy to have as many questions as Mr. Aly would like on why

20   he chose that definition and how the ANDA product met that

21   definition, but there's no surprises here.  He mentioned it

22   in opening.  We tried to meet and confer quite a bit on

23   this.

24           What he's going to do today throughout cross is

25   talk about indefiniteness.  That's a separate issue, part of

Siepmann - cross

1    the validity phase of the trial.  It is not yet in the case.

2    Until their expert Dr. Pinal, who didn't challenge

3    infringement, by the way, no opinion on infringement under

4    that definition.  Didn't challenge infringement.  What

5    he said was two paragraphs in an 800 paragraph report.

6    Two paragraphs.  It's indefinite.  You're going to hear

7    about that when Dr. Pinal comes up and Mr. Aly can

8    cross-examine Dr. Siepmann all day, but until that's in the

9    case, Dr. Siepmann hasn't testified about indefiniteness, he

10   hasn't heard the indefiniteness arguments.  It's not proper

11   to do that in this phase of the case.  He knew this was

12   coming.

13             THE COURT:  So you're recalling Dr. Siepmann?

14             MR. ZUBICK:  Reluctantly.  We tried to combine

15   them.  We said this is a narrow issue that your experts

16   would not contest.  Didn't contest it.

17             THE COURT:  Wait, wait.  Didn't contest?

18             MR. ZUBICK:  Infringement.  So we said it's

19   going to take 15 minutes.  It's going to bore the Court.

20             Can we stipulate just to infringement under our

21   construction?  No.  Fine.  We're happy to do it.  We will do

22   it efficiently.  I think I did that.  But can we do it in

23   the validity phase so you don't have to deal with this

24   objection.  He said no.  You have to get up and do it now.

25   It's a manufactured dispute.

Siepmann - cross

1          THE COURT:  All right.  Thank you.  Hold on.

2          So, wait.  Just to be clear, you are recalling

3    Dr. Siepmann in the validity part of the case.  Right?  I

4    just want to make sure we're absolutely clear on this.

5          MR. ZUBICK:  There's no question you will see a

6    lot of Dr. Siepmann next week.

7          THE COURT:  All right.  Aren't you lucky?

8    Hanging out in Wilmington as opposed to France.  All right.

9          It's Mr. Aly.  Right?

10         MR. ALY:  That's correct.  Perfect.

11         THE COURT:  All right.  So what's going on?

12         MR. ALY:  Sure.  Plaintiffs have to have the

13   same discussion we did have with counsel.  Dr. Siepmann and

14   counsel had to have a construction that they could justify,

15   and if that construction is just this, we're allowed to

16   figure out what the parameters are for the infringement

17   question.  That will involve claim construction issue as

18   well, and claim construction is a trial issue.

19         So to meet plaintiffs' burden on infringement,

20   they have to show through Dr. Siepmann what the claim means

21   and then how it applies.  And if the claim doesn't have a

22   meaning, in other words, it doesn't have the boundaries,

23   then he can just check off the box.

24         THE COURT:  If it doesn't have the boundaries.

25   It's a question of validity.

Siepmann - cross

1              MR. ALY:  It's a question of infringement.  Why

2     is that the case?  Because if the claim doesn't have a

3     boundary, we don't know if we're in it or out of it.

4              THE COURT:  I've got to tell you, you know my

5     reaction to this?  You have wasted my time.

6              MR. ALY:  --

7              THE COURT:  I mean, and this is what we go

8     through in Markman hearings all the time.  And if you've got

9     a case, let me read a case.

10             MR. ALY:  I do, Your Honor.

11             THE COURT:  Because my reaction is, now, I've

12    got some real questions as a layman as to how this is not

13    indefinite.  What does it teach?  I get that.  But I have to

14    say, I listened to the direct.  My reaction was, why are we

15    having this testimony?  And I've been in cases before.

16    Again, I have a fraction of the expertise you all do.  But I

17    have cases where folks reasonably just say, we'll stipulate

18    to infringement for this purpose because our argument is

19    it's indefinite.  That's what I think you are doing.  If

20    you've got a case that tells me somehow, I will read it

21    right now.

22             MR. ALY:  Sure.

23             THE COURT:  Hand it up.

24             MR. ALY:  And for the record, I'm handling up

25    Amgen v. Hirschberry, 13 F.3d, 1313.

1          THE COURT:  Tell me where to look.

2          MR. ALY:  Okay.  If you look at -- I believe

3     it's on page 1342.

4          THE COURT:  I've got it.

5          MR. ALY:  All right.  The discussion is on

6     infringement stipulation in view of indefiniteness, and it

7     concludes at the second-to-last sentence of Section A, one

8     cannot logically determine whether an accused product comes

9     within the bounds of a claim of unascertainable scope.

10     Accordingly we find that PEG does not infringe.  The '933

11     patent is valid.

12          THE COURT:  But I think the plaintiffs are just

13     saying they will stipulate.  They are not saying they get a

14     judgment of infringement.  They are saying, you stipulate

15     that if a Court comes along at a later time and says, no,

16     it's not indefinite, for whatever reason, and I will listen

17     to the argument.

18          MR. ALY:  Right.

19          THE COURT:  Then you've got infringement.

20          MR. ALY:  Well, that's the difficulty, and I

21     apologize.  I understand how that would be your reaction on

22     invalidity, but from our point of view, if we don't know

23     what we are infringing or how, then this is the same

24     question?  It's tied hand in hand for that reason.

25          THE COURT:  But you do know because you couldn't

Siepmann - cross

1    have gotten the drug approved.   The FDA bought into the fact

2    there was a sufficient amount of antioxidant to provide the

3    stability that was required.   Correct?

4                   MR. ALY:   Of course.

5                   THE COURT:   Doesn't that answer the question?

6                   MR. ALY:   No, because it doesn't tell you how

7    much they claim versus how much the FDA viewed as

8    sufficient.   They're two different questions and that's one

9    of the concerns here.

10                  THE COURT:   All right.   Here's what I'm going to

11   do.

12                  MR. ALY:   Yes.

13                  THE COURT:   We're going to save your

14   cross-examination for invalidity.   I'm going to charge the

15   amount of the direct that it took to the defense side and

16   then we'll have the next witness.

17                  And, Dr. Siepmann, we'll see you again.

18                  THE WITNESS:   Thank you.

19                  MR. ZUBICK:   Thank you.

20                  (Witness excused.)

21                  MR. ZUBICK:   I can move exhibits into evidence.

22                  THE COURT:   I'm sorry?

23                  MR. ZUBICK:   I can move exhibits into evidence.

24                  THE COURT:   Go ahead.

25                  MR. ZUBICK:   Plaintiffs request that PTX-884 --

```
 1                    THE COURT:  Just one second.

 2                    MR. ZUBICK:  Sure.

 3                    THE COURT:  Just one second.

 4                    MR. ZUBICK:  Plaintiffs request that PTX-884,

 5      PTX-308, PTX-7, PTX-486, PTX-474, PTX-201 and PTX-54 are

 6      moved into evidence.

 7                    MR. ALY:  No objection, but --

 8                    THE COURT:  All right.

 9                    MR. ALY:  I would like to say though that

10      there's one page.  These are large documents from FDA

11      submissions and the pages that were shown on the screen were

12      cited by counsel and those we believe should be the ones

13      that are the exhibit, not the whole giant document.  That

14      would be the exhibit number.

15                    MR. ZUBICK:  Based on my understanding from your

16      rules of yesterday, we have no objection.

17                    THE COURT:  That's what we'll do.  Just submit

18      the redacted versions consistent with that.

19                    MR. BERL:  Just for clarity, Dr. Siepmann is

20      not on cross-examination.  We can talk to him over the

21      weekend?

22                    THE COURT:  Absolutely.  All right.  Next

23      witness?

24                    MR. BERL:  I think we are resting our case.  I

25      think you signed all the infringement stipulations, so we're
```

```
 1    not going to be --
 2              THE COURT:  I asked for clarity on that
 3    yesterday.  I'm taking your word, Ms. Keller's word.  I
 4    think I signed three stipulations.  One of them was
 5    confidential and then I described the other two.  They
 6    related to two experts.
 7              MR. BERL:  So with that, we rest.
 8              THE COURT:  Okay.
 9              MR. BARABAS:  If I could clarify.  One of the
10    stipulations for my client Slayback.  We only have one claim
11    asserted against us of one patent.  The full discussions
12    didn't apply to us.  It couldn't involve the patent asserted
13    and we have stipulated to infringement of the one claim.
14              THE COURT:  Okay.  So I appreciate that for
15    clarity on the record and the time is allocated to the
16    defense, and I guess if Slayback wants the 15 minutes or
17    whatever it took?
18              MR. BARABAS:  No, we do not.
19              THE COURT:  Okay.  Sounds good?  All right.
20    We're good on the stipulation.  So now we're moving into
21    what, Mr. Feldman?
22              MR. FELDMAN:  Just as a procedural matter,
23    Apotex moves for judgment as a matter of law on
24    infringement.  Obviously, a lot of the arguments are going
25    to be reserved for claim construction, but I just want to
```

1     protect the record in case that becomes an issue.

2               THE COURT:  It is.  I mean, well, you're welcome

3     to do that.  Maybe Mr. Berl is going to surprise me, but my

4     understanding is that by stipulating, you are never

5     stipulating to a judgment of infringement against you

6     absent a finding by me that the patent is not invalid for

7     indefiniteness.

8               MR. FELDMAN:  Okay.

9               THE COURT:  If you've got some evidence --

10    anyway, that's where we are.

11              MR. FELDMAN:  Okay.  Then I also reserve the

12    issue on claim 9 I believe of the '797 patent which will be

13    addressed in the post-trial briefing.  Again, I just want to

14    protect the record.

15              THE COURT:  That's fine.  That's kind of why I

16    asked for clarity as to where we are on infringement, what's

17    left.  As long as you've done that.

18              MR. FELDMAN:  Okay.  Thank you, Your Honor.

19              MR. ALY:  Defendants call Dr. Rodolfo Pinal as

20    their first witness.

21              THE COURT:  Okay.

22                  DEFENDANTS' TESTIMONY

23              ... RODOLFO PINAL, having been duly

24              sworn/affirmed as a witness, was examined and

25              testified as follows...

Pinal - direct

```
1              MR. ALY:  May I approach with binders and
2     demonstratives?
3              THE COURT:  Please.
4              (Mr. Aly handed binders to the Court.)
5              MR. BERL:  I don't want to interrupt anything,
6     but we agreed that two of the combinations were withdrawn.
7     They remain in the demonstratives they sent up to.
8              MR. ALY:  They are right that the demonstratives
9     in there weren't reprinted, but we're not going to be
10    relying on anything.
11             THE COURT:  Let's tear the pages out.
12             MR. ALY:  Tear the pages out.
13             THE COURT:  So what are they?
14             (Pause.)
15             MR. ALY:  There are about 70 pages.  I think it
16    would be easier if we pulled them back, pulled out the pages
17    and handed them back up.  Is that all right?
18             THE COURT:  Do you want me to have -- I'm going
19    to give them back to you.  You are going to rip the pages
20    out and resubmit them?
21             MR. ALY:  That's right.
22             THE COURT:  All right.  That's fine.  And
23    incidentally, what we're going to do, I should have done it
24    yesterday.  I'm going to keep a Court version which we'll
25    mark for identification purposes only, not introduce into
```

Pinal - direct

1   evidence of the various PowerPoint presentations and

2   demonstratives that have been handed up to me.

3                  MR. ALY:  All right.

4                  THE COURT:  I mean, this is a little funny

5   thing, right, because I'm going to expect -- you all have an

6   expectation that when I'm reading your briefs and drafting

7   something, I'm going to be looking at the demonstratives.

8                  Do you have that expectation, Mr. Aly?

9                  MR. ALY:  I do.  The record reflects references

10  to the demonstratives often.

11                 THE COURT:  Do you have that expectation?

12                 MR. BERL:  I understand Your Honor's problem,

13  which is why I tried to do radio rather than TV and explain.

14  Rather than just looking at the demonstrative, I try to say

15  page 4 of Exhibit 431.  So if it would be easier not to go

16  back to the demonstrative, look at the exhibit.

17                 THE COURT:  Why are they not just proffered as

18  substantive evidence in that case?

19                 MR. BERL:  It's up to you.

20                 THE COURT:  Because it just makes it cleaner for

21  the record.  Then the Federal Circuit knows what I looked

22  at.

23                 MR. ALY:  Then we'll do it on a slide-by-slide

24  basis for that purpose.  I don't think that will be an

25  issue.  Some slides may not have been used, for example,

Pinal - direct

 1    that are in the deck that the parties have used, but I don't

 2    know.  We don't have an objection to that otherwise.  I

 3    think its use, there's no problem with that.

 4             THE COURT:  All right.  Think about it over

 5    lunch.  We'll decide.  But if you want a real accurate

 6    record as to what I consider, I think the PowerPoints would

 7    be part of the record.

 8             Go ahead.

 9             MR. ALY:  We have to retrieve the binders and

10    notebooks for the pulling of the slides.

11             THE COURT:  Oh, okay.  You're going to do it

12    now?

13             MR. ALY:  Well, we could do it at any time.

14             THE COURT:  Okay.  How long will you be with

15    this witness?

16             MR. ALY:  About two hours.

17             THE COURT:  Okay.  I will tell you what.  Why

18    don't we do this then.  Why don't we -- I will give you back

19    the demonstratives.  You pull your pages.  We'll take a

20    ten-minute break and then we'll go a straight two hours.

21             Does that sound good?  We'll break for lunch at

22    12:45?

23             MR. ALY:  Fine.

24             THE COURT:  Is that good with you, Mr. Berl?

25             MR. BERL:  Yes.

```
 1              THE COURT:  All right.  We'll do that.

 2              (Short recess taken.)

 3                       -  -  -

 4              (Proceedings resumed after the short recess.)

 5    THE COURT:  All right.  Please be seated.

 6              MR. ALY:  May I approach to stand up the

 7    demonstratives?

 8              THE COURT:  Yes.

 9              (Mr. Aly handed demonstratives to the Court.)

10              MR. ALY:  If I may proceed?

11              THE COURT:  Flees please.

12              MR. ALY:  And before I begin, I just wanted to

13    note for the record, we don't need to lay the foundation for

14    the prior art because that has been stipulated in the

15    pretrial order.  DI 307, Exhibit 1, Section 6.

16              THE COURT:  Great.

17                       DIRECT EXAMINATION

18    BY MR. ALY:

19    Q.    Could you please state your name?

20    A.    My name is Rodolfo Pinal.

21    Q.    What is your current occupation?

22    A.    If I may, Your Honor?  I know that I have a tendency

23    to begin to speak fast without realizing it.  I will make

24    every effort to avoid that, but I actually ask if you

25    notice, please let me know.
```

Pinal - direct

1          THE COURT:  All right.  Thank you very much.

2          THE WITNESS:  Would you please repeat the

3    question?

4    BY MR. ALY:

5    Q.     What is your current occupation, Dr. Pinal?

6    A.     I'm an Associate Professor of Industrial and Physical

7    Pharmacy at Purdue University.

8    Q.     Let's talk a little bit about your background.  Where

9    did you get your bachelor's degree?

10   A.     I got a bachelor's degree in pharmaceutical chemistry

11   from the National University of Mexico.

12   Q.     Did you earn a Ph.D.?

13   A.     I did.

14   Q.     Where did you earn your Ph.D.?

15   A.     At the University of Arizona.

16   Q.     What was your Ph.D. dissertation about?

17   A.     The title of my dissertation was estimation of aqueous

18   solubility of organic compounds.

19   Q.     What is aqueous solubility?

20   A.     It's the solubility in water.

21   Q.     When were you awarded your Ph.D.?

22   A.     In 1988.

23   Q.     What did you do after you earned your Ph.D.?

24   A.     I worked for two years as a post-doctoral research

25   fellow at the University of Florida.

1    Q.    What did you do after that?

2    A.    After that, I worked in the pharmaceutical industry.

3    Q.    At what company?

4    A.    The company was Hoffman- La Roche.

5    Q.    What kind of company is Hoffman- La Roche, generally?

6    A.    Hoffman- La Roche is one of the ten major

7    international pharmaceutical companies.

8    Q.    How long did you work at Hoffman- La Roche?

9    A.    From 1990 until 2003.

10   Q.    What was your job at Hoffman- La Roche?

11   A.    I had three jobs when I was at Hoffman- La Roche.  The

12   first one was in pre-formulation.  The second was in

13   formulation of injectable product.  And the third one was on

14   physical characterization of solids.

15   Q.    Dr. Pinal, what is pre-formulation?

16   A.    Pre-formulation involves the physical and chemical

17   characterization of new molecular entities.  These were

18   compounds that were part of the pipeline that were potential

19   new drugs and it involved studies of physical properties,

20   such as solubility and chemical properties such as

21   stability.

22   Q.    What was your role in the formulation department at

23   Hoffman- La Roche?

24   A.    As a formulator, I was responsible for designing and

25   coming up with formulations for injectable products as well

Pinal - direct

1   as with a method for manufacturing them.

2   Q.    What was your role in the solid state department at

3   the company?

4   A.    I was responsible for the physical characterization of

5   all active materials, excipients and intermediate blends

6   that were processed in the New Jersey facility.

7   Q.    What is your experience in liquid formulations?

8   A.    My experience goes back to my Ph.D.  My Ph.D. was on

9   solution and solution chemistry.  And then the applications

10  that I had when I was a post-doc, my post-doc was on solvent

11  systems and then subsequently as a formulator in developing

12  liquid systems for pharmaceutical products.

13  Q.    And do you have experience, sir, with injectable

14  products?

15  A.    I did, I do.  I worked for, between 1993 and 1997 as

16  an injectable, as a formulator for injectable products.

17  Q.    Over the course of your career, have you formulated

18  products that made it to a commercial product on the market?

19  A.    I worked on two projects that eventually became

20  marketed products.  The actual manufacturer of the batches

21  that were produced for sale was in a different group, but

22  the formulation part was done in my group.

23  Q.    And now that you are teaching, what kind of classes do

24  you teach?

25  A.    I teach undergraduate and graduate courses.  For the

Pinal - direct

1    undergraduate courses as well as the Pharm.D., which is a

2    doctoral pharmacy program.

3              I have been teaching parenterals in two

4    courses -- the introductory course for the first year

5    pharmaco students.  The title of the course is Dosage Forms

6    Two.  And for third year, for the third year pharmaco

7    students, I teach biotechnology and advanced.

8    Q.    Have you received any rewards or recognitions for your

9    work?

10   A.    Yes.  At the University I was inducted in The

11   Innovator's Hall of Fame a few years back.

12   Q.    What did it take to get into the Innovator's Hall of

13   Fame?

14   A.    I had this work that I had done on personalized

15   medicine and I was notified that I had been inducted.

16   Q.    Have you published in the field of formulation?

17   A.    Yes, I have.

18   Q.    What type of publications, generally?

19   A.    About -- different aspects, one common or frequent

20   theme in my publications has to do with drug dissolution and

21   solubility, including solvents as well as publications that

22   have to do with the processing that goes into making

23   formulations.

24   Q.    Are you listed as an inventor on any patents?

25   A.    I'm listed as an inventor on two patent applications.

Pinal - direct

1    Q.     Have you testified before as an expert?

2    A.     Yes, I have.

3    Q.     Have you testified as an expert for both patent owners

4    and people challenging patents?

5    A.     Yes, I have.

6           MR. ALY:  We tender Dr. Pinal as an expert in

7    formulations and pharmaceutical formulation development.

8           MR. BERL:  No objection.

9           THE COURT:  All right.

10   BY MR. ALY:

11   Q.     Now, to start off in any kind of invalidity analysis,

12   Dr. Pinal, did you form an opinion as to who the person of

13   ordinary skill in the art would be for the Family Two

14   patents?

15   A.     Yes, I did.

16   Q.     And we're showing on slide 3 a part from your report,

17   a very long definition, and this is for record purposes.

18          MR. ALY:  And, I would just ask that we

19   submit slide 3 as no objection or we could read it into

20   the record.

21          THE COURT:  This isn't stipulated?

22          MR. ALY:  It's not stipulated, but the

23   definitions are so close, that the testimony will

24   show --

25          THE COURT:  No, no.  Sorry.

Pinal - direct

1           MR. ALY:  Is the entry stipulated?

2           THE COURT:  Yes.

3           MR. ALY:  No.

4           THE COURT:  You didn't work it out, like whether

5    we just bring in all the PowerPoints?

6           MR. BERL:  We didn't discuss that during the

7    break.

8           THE COURT:  There's not a lot of time.

9           Then do you have any objection to this

10   PowerPoint or this slide?  Do you want to do the slide first

11   and confer about the PowerPoint?

12          MR. BERL:  That would be a good idea, I think.

13          THE COURT:  All right.  So this slide, slide 3,

14   and we'll have to come up with some system to mark all of

15   these for identification if they are not going to be

16   submitted, so let's just call it the PowerPoint that has

17   been proffered as the direct examination of row doll foe

18   Pinal.  Slide 3 is admitted into evidence.

19          (Slide 3 was admitted into evidence.)

20   BY MR. ALY:

21   Q.   Dr. Pinal, is the definition as shown on slide 3 the

22   definition of the POSA or ordinary person of skill in the

23   art that you used four your analysis?

24   A.   Yes, it is.

25   Q.   The next slide 4, have you provided a summary of the

1    plaintiffs' definition of the person of ordinary skill in

2    the art?

3    A.    Yes.

4    Q.    They use different words and terms, but does it change

5    your opinion if the Court selects one person of ordinary

6    skill in the art definition versus the other?

7    A.    No, that would not change my opinion.

8    Q.    Okay.  Let's look at claims of the Family Two patents.

9    DTX-006.  This is claim 1 of the '831 patent that's shown on

10   the screen.

11          Have you studied this claim, Dr. Pinal?

12   A.    Yes, I have.

13   Q.    I'd like to start with the term stabilizing amount of

14   an antioxidant.

15          Do you have an opinion as to whether that claim

16   is properly defined in the scope of the patent?

17   A.    Yes, and my opinion is that it's not properly defined.

18   Q.    Why not?

19   A.    Because the term stability, which refers to

20   stabilizing, is defined from three points of view.  One of

21   them is how much degradation takes place.  The other one is

22   in how much time, what length of time that degradation takes

23   place and the other one is under which temperature

24   condition.

25          So for the finding of stabilizing amount, it's

Pinal - direct

1    necessary to have what is the definition of what the targets

2    or the stability attribute is.

3    Q.    Let's look at column 3 of DTX-6 and lines 49 through

4    the rest of the paragraph.

5          Dr. Pinal on line 51 and 52, there's the term

6    stabilizing amount and a definition given in the patent.

7          Do you see that?

8    A.    I do.

9    Q.    Does that help you form an opinion as to what

10   stabilizing amount means?

11   A.    No.   The reason is that the stabilizing amount refers

12   to an amount that stabilizes, which is sort of like a

13   circular kind of definition, and it's not connected to what

14   criterion to use for stability, which is degradation time

15   and temperature.

16   Q.    Now, let's talk about them.   When you say degradation,

17   what would you expect to see in a standard definition?

18   A.    It would provide an extent of degradation that could

19   be in terms of percentage of degradants present or

20   percentage of amount of actual drug loss.

21   Q.    What about temperature effect?

22   A.    It would specify what temperature conditions the

23   formulation has been subjected to.

24   Q.    And what about the time?

25   A.    It's within a length of time specifically defined.

Pinal - direct

1   Q.      Why does it matter if the degradation time and

2   temperature are listed or not?

3   A.      Because temperature has a strong effect on how fast or

4   how slow a reaction can take place.

5                MR. BERL:  Objection.  This is beyond the scope

6   of his report.  He doesn't talk about the temperature issue

7   with respect to the definition.

8                MR. ALY:  Paragraph 897 and 98.

9                MR. BERL:  That's exactly what I'm looking at.

10               THE COURT:  Can I see it, please?

11               MR. ALY:  May I approach.

12               THE COURT:  Is this an exhibit?

13               MR. ALY:  I don't think we have the report.

14               THE COURT:  Okay.  Hand up the report.

15               And so just so I understand, the objection is

16   that the temperature, the duration or the degradation, or

17   all three --

18               MR. BERL:  I think the temperature is what he's

19   talking about now.

20               THE COURT:  Okay.

21               MR. BERL:  And I'm objecting to it.

22               THE COURT:  All right.  And, Mr. Aly, you say

23   it's paragraph what?

24               MR. ALY:  Paragraph 897 to 898.

25               THE COURT:  I mean, was he deposed after the

Pinal - direct

1    report?

2              MR. ALY:  Yes.

3              THE COURT:  So, Mr. Berl, I mean, I agree it's

4    very general, but I presume somebody could have asked the

5    witness in his deposition to explain what he meant by the

6    last statement and maybe to pin him into the universe of

7    components that went into his answer or, rather, that went

8    into his assertion that none of the patents inform the POSA

9    of what is considered a stabilizing amount.

10             MR. ALY:  And there is more, Your Honor.  This

11   is -- I just wanted to make it clear for the record.

12             For this term, at the point where the reports

13   were submitted, there are many other limitations, and that's

14   why it refers back.  As Your Honor will see to the

15   discussion of the term long term storage stable, at the end

16   of paragraph 898, so there is further discussion in

17   paragraph 874 through 878 that also provides aspects of the

18   same opinion.  At the time, there were just many different

19   limitations that related to the same subject matter.

20             THE COURT:  Yes.  I'm going to overrule the

21   objection.  I mean, this is essentially proving a negative

22   and so I'm going to allow the testimony.

23   BY MR. ALY:

24   Q.    Now, Dr. Pinal, when you reviewed the patent

25   specification for the Family Two patents, does it use in

1    different places different degradants, times and

2    temperatures to evaluate?

3    A.    Yes, it does.

4    Q.    Does that help you identify what the stabilizing

5    amount means?

6    A.    No, and the reason is the definitions of stability

7    used in the patent are different in different places of the

8    document.

9    Q.    Now, I want to shift for just a second on the term

10   stabilizing as what the FDA looks at when it's evaluating a

11   stable amount of antioxidant.  Does the FDA give conditions

12   for what to look for?

13   A.    The conditions for, that the FDA accepts or rejects

14   are based on that type of criteria involving amount of

15   degradation time and temperature condition.

16   Q.    Now, Dr. Pinal, do you have an understanding that if

17   the Court agrees that the claims using this term are

18   indefinite, to what claims would that apply?

19   A.    It would apply to -- well, claim 1 to start and then

20   claim 2, 3 and 5.

21   Q.    Of the '831 patent?

22   A.    Of the '831 patent.  Correct, yes.

23   Q.    And what about from the '797 patent?  Do you remember

24   the two claims?

25   A.    Yes.  That would apply to claim 9 and claim 11.

Pinal - direct

1    Q.    Are those all of the asserted claims from the Family

2    Two?

3    A.    Yes, they are.

4    Q.    Now, we can take that issue down and we'll now move on

5    to the rest of the opinion, Dr. Pinal.  And what we're going

6    to assume here is that an antioxidant could be in any

7    amount.  Okay, Dr. Pinal?  Can you make that assumption for

8    the rest of the day?

9    A.    Okay.

10   Q.    And in terms of any temperature, any degradant, and

11   any time.  That would be the assumption.  Can you use that

12   assumption for the question?

13   A.    I could, yes.

14   Q.    So in terms of when we get to the same term in an

15   obviousness analysis, will you be able to explain using the

16   plaintiffs' proposed definition and their understanding that

17   it can be any condition, any amount.

18         How does that impact your opinion for assessing

19   the term stabilizing amount?

20   A.    Well, it makes it so vague that, you know, it doesn't

21   have much meaning or any meaning, because if any amount

22   would do anything, then whether it's done would fall into

23   that category.

24   Q.    Now, as far as the obviousness of the Family Two

25   patents, what are the patents generally directed to, Dr.

Pinal - direct

1  Pinal?

2  A.    The patents of the Family Two patents are directed to

3  the formulation.

4  Q.    And DTX-006, we were looking at that a moment ago.

5  The first page, what is the priority date?

6  A.    It's January of 2010.

7  Q.    As of January 2010, was bendamustine a new compound?

8  A.    No, it was not.

9  Q.    How long was it available as a compound?

10 A.    It had been available for treating patients since the

11 early seventies.

12 Q.    Where in the world was bendamustine available?

13 A.    First in East Germany and after the re-unification of

14 Germany, in Germany.

15 Q.    Did bendamustine make its way to the United States as

16 an approved product?

17 A.    Yes, it did.

18 Q.    When was bendamustine first in an approved product in

19 the U.S.?

20 A.    In 2008.

21 Q.    What was the brand name for that product?

22 A.    The brand name was Treanda.

23 Q.    Have you looked at the label for the Treanda product?

24 A.    Yes, I have.

25 Q.    DTX-848.  And is this the label that you reviewed, Dr.

Pinal - direct

1   Pinal?

2   A.    Yes, it is.

3   Q.    On the bottom right on the first page, there will be

4   an approval date or revision date.  What is the date of this

5   Treanda label exhibit?

6   A.    The revision is from April of 2009.

7   Q.    Now, was Treanda a liquid product?

8   A.    No, it was not.

9   Q.    What was it?

10  A.    It was a lyophilized product, which is to say a

11  freeze-dried product.

12  Q.    We talked a lot about that, so let me move on to the

13  question.  What are the reasons that a formulator would

14  recognize that a lyophilized product had been used?

15  A.    A lyophilized product is used when the compound is

16  incompatible with water, and with water, the interaction

17  with water destroys the product, then it is necessary to,

18  often times to go to lyophilized product.

19  Q.    How does freeze-drying help with the problem with

20  water?

21  A.    It eliminates water from the product, so it does

22  eliminate the degradation reaction due to water.

23  Q.    What is the chemical name for the reaction that occurs

24  when water breaks apart the compound?

25  A.    The name of it, that type of reaction is hydrolysis,

1    which means break up by water.

2    Q.    Have you prepared a demonstrative just to show the

3    steps of administration for a lyophilized product?

4    A.    Yes, I have.

5    Q.    Let's go to the next slide, slide 8.

6          What are the steps for someone to administer a

7    lyophilized product, Dr. Pinal?

8    A.    Well, we see here on the demonstrative on the

9    left-hand side, there is a vial, which is headed lyo,

10   lyophilized product, that has a solid cake, so to speak,

11   inside.

12         That solid is the product of having

13   freeze-dried.  It was originally a solution from which the

14   water was removed and the solid was left in the vial.

15         Then the first step of manipulation is

16   reconstitution, which involves adding water to the, into the

17   vial in a similar way as instant coffee.  Instant coffee is

18   freeze-dried and then it's reconstituted with water.  So

19   this reconstituted solution is a concentrate in which the

20   drug is in liquid solution.

21         And the next step is further diluting that

22   concentrate with a diluent, which is aqueous diluent.  And

23   the technical term for that is admixing, so the admixture

24   that results for the dilution.  And here it's illustrated on

25   the right-hand side using one of those plastic IV bags and

Pinal - direct

1    IV stands for intravenous.  So these type of bags are used

2    in hospitals to administer patients with the drug.  And from

3    that mixture, there is a catheter on the bottom that goes to

4    the vein of a patient.

5    Q.    Why would a person of ordinary skill in the art try to

6    reformulate a drug that was already on the market?

7    A.    Because if the product is a lyophilized product, it

8    involves one additional step.  It would be if the product

9    was already a liquid form.

10   Q.    Why does that make a difference to have it skipping a

11   step from the freeze-dried versus reconstituted?

12   A.    For two reasons.  From the -- as in general terms, for

13   every parenteral product, the additional manipulation

14   involves -- every manipulation involves some risk of

15   microbial contamination.

16            An injectable product has to be free from any

17   microbial contamination, so the more steps of manipulation

18   that are needed before administration, the greater the risk

19   of potential contamination.  That is in general for all

20   parenteral products, and in the case of cytotoxic compounds,

21   there's an additional reason to do that.

22   Q.    What is the additional reason?

23   A.    The addition is that the manipulation steps that

24   involves reconstituting the lyo product into the concentrate

25   presents potential risk of exposure of the operator.  The

Pinal - direct

1    healthcare professional making the admixture could be

2    exposed to that, to that product, which is toxic by itself,

3    and it would be some risk presented to the operator.

4    Q.    Dr. Pinal, you used parenteral.  What does that mean?

5    A.    Parenteral.  Strictly speaking, the term parenteral

6    means other than by mouth.  In the pharmaceutical field, the

7    term parenteral refers for the most part to products that

8    are administered by injection.  It also includes products

9    that are administered surgically, but the term injectable

10   product or parenteral product are almost synonymous in the

11   field.

12   Q.    Now, would a person of ordinary skill in the art to

13   skip the step of reconstitution just put the drug in water

14   and sell it that way?

15   A.    No, and the reason is the hydrolysis reaction of

16   bendamustine is very sensitive, unstable in water.  So in

17   hours, the product would be destroyed, so it would not be a

18   product that would work because within the first day, it

19   would be degraded.

20   Q.    Why then a liquid version at all to try to

21   reconstitute?

22   A.    Well, as I mentioned, having a liquid product to start

23   eliminates one manipulation step that has advantages, two

24   advantages -- one general and one particular to cytotoxic

25   products.

Pinal - direct

1   Q.     So if it's not water, what choices does a person of

2   ordinary skill in the art have as 2010 to develop a liquid

3   version that was reconstituted of bendamustine?

4   A.     Well, the choices would be solvents, nonaqueous

5   solvents, so other than water that have an acceptable use in

6   injectable products.

7   Q.     But did the prior art teach a liquid system of

8   bendamustine without water, but specifically using

9   bendamustine?

10  A.     Yes.

11  Q.     Where should we start?  What prior art?

12  A.     We look at the reference by Olthoff.

13  Q.     Okay.  DTX-94.  Let's look at DTX-94, the top half.

14  And what is the Olthoff reference, Dr. Pinal?

15  A.     The Olthoff reference is a patent from the East

16  Germany country back in the early eighties.

17  Q.     And on page 2 does Olthoff describe the problem that

18  they were setting out to solve?

19  A.     Yes.

20  Q.     And what is the problem they are trying to solve?

21  A.     Well, actually, we can see.  Yes.  So one of the

22  things -- if we look at the excerpt on the top, it mentions,

23  it states that bendamustine is completely hydrolyzed in an

24  aqueous solution in a short period of time.  That's the type

25  of reaction that I just mentioned, that it's fast

Pinal - direct

1   degradation of bendamustine in water.

2   Q.    And given the hydrolysis problem, did Dr. Olthoff

3   describe how it was going to approach the solution on page

4   ten with the objective?

5   A.    Yes.  If we look at the excerpt -- if we look at the

6   excerpt --

7              THE COURT:  Hold up.

8              MR. BERL:  I'm sorry to interrupt.  There is no

9   page 10.  I'm really confused.

10             MR. ALY:  DTX-94 should at underscore ten.

11             MR. BERL:  Not the page of the document?

12             MR. ALY:  Of the exhibit.

13             MR. BERL:  Okay.

14             MR. ALY:  Okay?

15             THE COURT:  All right.

16             THE WITNESS:  The -- I'm sorry.

17   BY MR. ALY:

18   Q.    Dr. PInal, what was the objective of the Olthoff

19   invention?

20   A.    The objective of the invention, it can be seen here on

21   the excerpt on the bottom and is to produce stable ready to

22   use injection, which means a liquid formulation.  And it

23   refers not to bendamustine by its name, but by N-mustard

24   compounds, which is the chemical family to which

25   bendamustine belongs.

Pinal - direct

1    Q.    And it goes on to say, to avoid the technical solution

2    of a dry ampoule.  What does that mean?

3    A.    Well, it's referring to an ampoule instead of a vial.

4    A dry ampoule or a dry vial is when there's a lyophilized or

5    freeze-dried product.

6    Q.    Did Olthoff teach a way to create a formulation that

7    was liquid but not water?

8    A.    No.

9    Q.    Did it provide a stable formulation that had a liquid?

10   A.    Yes.

11   Q.    And what was the liquid that Olthoff used?

12   A.    Well, Olthoff teaches the use of, if we look at the --

13   this is page 12 of the exhibit.  The excerpt and the portion

14   that is highlighted towards the bottom, it shows what

15   specific liquid that was used, and this refers to alcohol

16   given the different types of names for different types of

17   alcohol.

18   Q.    I will ask about those in a second, but just

19   beforehand, to clarify on the record because maybe my

20   question was confusing.

21         Did Dr. Olthoff teach a way to make a liquid

22   formulation without using water that was stable?

23   A.    Yes.  Well, in this same, this same excerpt in the

24   highlighting, it teaches the -- two things.  One, that the

25   drug can be dissolved, and the other one, that it can be

1    made stable, and it refers to an extraordinarily high

2    chemical stability.

3              And then it identifies what type of solvent can

4    be used for that.

5    Q.    What solvents did Dr. Olthoff specify could be used?

6    A.    Well, if we go to the last portion of the highlighted

7    segment, it refers to monovalent alcohols, glycols and other

8    polyvalent alcohols.

9    Q.    You are going to have to explain that.  Let's start

10   with, what are monovalent alcohols?

11   A.    Let me start with what an alcohol is.  An alcohol is a

12   compound that contains what is termed an OH group or a

13   hydroxyl group, and a hydroxy group is an oxygen atom that

14   on one side has a hydrogen attached to it, and on the other

15   side, it has the rest of the molecule attached to it.  So an

16   alcohol is a compound that contains that type of group in

17   its molecular structure.

18   Q.    Within the class of alcohol, what is a monovalent

19   alcohol?

20   A.    A monovalent alcohol is one that contains only one OH

21   group.

22   Q.    Is there a common example of a monovalent alcohol?

23   A.    Ethyl alcohol or ethanol, which is the alcohol that is

24   present in alcoholic drinks, is a monomer of alcohol.

25   Q.    What is a glycol?

Pinal - direct

1    A.     A glycol is a compound that contains two OH groups in

2    its structure.

3    Q.     What is a polyvalent alcohol?

4    A.     A polyvalent alcohol is one that contains multiple OH

5    groups in its structure.

6    Q.     Does Olthoff teach specific examples using alcohols

7    with bendamustine?

8    A.     Yes, it does.

9    Q.     Let's look at the next portion.  This is going to be

10   from page 14 of the exhibit.

11          What does Olthoff teach to do as an example?

12   A.     We see on the highlighted segment of this excerpt, it

13   teaches specifically 1,2 propylene glycol, which is

14   abbreviated as PG in the field.

15   Q.     That same line that you are pointing to ethanol, it

16   uses the word polyols.  What are polyols?

17   A.     Polyols are, as I just mentioned, alcoholic compounds

18   that contain multiple OH groups.

19   Q.     Would a monovalent alcohol be included with that

20   definition?

21   A.     No.

22   Q.     Now, what would a POSA take away from Olthoff in

23   regards to formulating a bendamustine liquid product?

24   A.     Well, the POSA would learn from Olthoff that by

25   replacing the solvent in a solution of bendamustine,

Pinal - direct

1    replacing water with a polyol type of solvent, that would

2    protect the compound from the degradation that it undergoes

3    with water.

4    Q.    And in terms of the time frame 2010 or earlier,

5    what polyols would a POSA have used for injectable

6    formulation?

7    A.    The number of polyols available for using

8    pharmaceutical products was limited from, even from that

9    time, and it's just basically three of them.

10   Q.    What are the three?

11   A.    One of them is glycerol.  The other one is propylene

12   glycol or PG, and the other one is polyethylene glycol,

13   which is abbreviated as PEG, or PEG.

14   Q.    Did Olthoff describe in the reference other ways

15   that it increased the stability of the bendamustine

16   formulation?

17   A.    Yes.  One of the things that Olthoff mentioned is the

18   use of inert gas, like nitrogen in order to prevent, prevent

19   the degradation of a formulation.

20   Q.    And in terms of the polyols, the one that's used in

21   the example in Olthoff was PG?

22   A.    PG.  Correct.

23   Q.    Did Olthoff test PEG, polyethylene glycol?

24   A.    Not in the example presented.

25   Q.    So how, when you say that a POSA would know that there

Pinal - direct

1    were three polyols generally available, is there a place we

2    could go just to confirm that fact?

3    A.    Yes.  Like general reference on teaching parenteral

4    products or injectable products, like the basics or the

5    fundamentals of that, the POSA would find that type of

6    information.

7    Q.    What's an example of such a basic reference?

8    A.    The reference by Boylan, which is a chapter in a book.

9    Q.    Okay.  Let's go to DTX-63.  And we have the slide nine

10   that reflects the excerpt from DTX-63 from page 20.

11          What is the Boylan chapter that you've

12   identified, Dr. Pinal?

13   A.    Well, this is, the title of the chapter is parenteral

14   products, and as I mentioned, parenteral products are those

15   which are used to be administered by injection.

16          MR. BERL:  Objection, Your Honor.  This use of

17   Boylan is not in the report.

18          MR. ALY:  And it is a general reference for a

19   POSA's knowledge and, secondly, they had the slides and

20   didn't object.  They had them two days, no objection.

21          MR. BERL:  It's not a matter of slides.  It's a

22   matter of the testimony and it's not within the scope of the

23   report.  They are now using Boylan to satisfy claim

24   limitations like polyethylene glycol and propylene glycol.

25   They didn't assert that in the report.

Pinal - direct

1          MR. ALY:  Only to confirm the background POSA

2    knowledge.  And, again, if there was an objection, it could

3    have been made.

4          MR. BERL:  We reserved the right when we

5    conferred.  We obviously can still object to things that

6    weren't in the report.

7          THE COURT:  So, you know, it strikes me that

8    it's a recurring problem with patent cases.  When we try to

9    make them manageable when dozens of patents are asserted in

10   a case and there are hundreds, if not thousands, of prior

11   art that are potentially relevant, what do we do?

12          And, Mr. Berl, it strikes me as well, you

13   correct me if you think I'm misguided here, that when

14   considering what a POSA would do in making an obvious

15   determination, I'm not limited to specific reference.  I'm

16   allowed to consider background information that's in the

17   field.  Right?

18          MR. BERL:  I agree with that.  It's not a matter

19   of what Your Honor is allowed to look at.  It's a matter of

20   what they are allowed to put the testimony on up.

21          THE COURT:  But I just want to make sure at

22   least I'm getting to the point.

23          MR. BERL:  I agree with that.

24          THE COURT:  You agree with that, at least one of

25   the premises of my logic here.

Pinal - direct

1              MR. BERL:  Yes.

2              THE COURT:  Then what we've encountered is the

3    problem.  Something so basic, do you have to look at a

4    particular article, and yet they are doing it to make the

5    witness testify that it's a basic reference and

6    understanding what a polyol is.  Is that pronounced

7    correctly?

8              MR. ALY:  It is.

9              THE COURT:  I mean, at some point you need a

10   reference to do that.  You need a reference to know what

11   hydrolysis is.

12             You I guess could have objected because they

13   didn't have a basic reference chemistry book explaining what

14   hydrolysis is or an alcohol is.  I guess you need a basic

15   reference for that.  And where do you draw the line?  It's

16   really hard when, like me, I'm not a chemist or a

17   pharmacist.

18             MR. BERL:  Can I just make a couple things

19   clear?

20             One, I don't believe polyols is actually in that

21   reference.  I think that's written by the defendants.  The

22   reference doesn't say that.

23             MR. ALY:  That is the next question, I agree,

24   but that's what the testimony was, and that was also on the

25   slide produced to you.

Pinal - direct

1          MR. BERL:  But I think the more fundamental

2   point, Your Honor is right.  They cited what other

3   references were used in parenteral products and we explored

4   those references.  That was the basis for them saying there

5   are a limited number of alcohols that one could use.  They

6   didn't cite this one for that proposition.  That's the whole

7   purpose of the report, so I don't have to look at a thousand

8   references.  When I examine the witness at deposition, he

9   has already told me what steps he's relying on for alcohol

10  and I can examine him.  Now we have a new one for that

11  proposition.

12          MR. ALY:  We're not relying on this for anything

13  other than what are the polyols that were out there, and

14  that's the only testimony if we don't have to rely on this

15  alone for the combination because we're referring

16  specifically to examples of this in the next prior art

17  reference.  It's just to show that those were the polyols

18  that were there.

19          MR. BERL:  Just to be clear, that's a very

20  fiercely disputed proposition.  We don't think those are the

21  only polyols there.  That's a factual issue that Your Honor

22  will have to decide.

23          They said, here are references that show the

24  polyols.  We debated that and we examined their witness.

25  They'll examine our witness.  But now they have a new

Pinal - direct

1    reference that says, oh, there were only three.  The

2    reference they relied on during the entirety of the case for

3    this proposition has more than three polyols.  Now they want

4    to limit it to three, so they have a new reference for this

5    proposition never advanced before in more than 900

6    paragraphs of his report.

7              MR. ALY:  No.  I think that's a

8    misunderstanding, Judge.

9              THE COURT:  Can you stop for a second?

10             MR. ALY:  I can.

11             THE COURT:  So the defense position is there's,

12   I don't know, how many polyols?

13             MR. BERL:  I think it's plaintiffs' position.

14             THE COURT:  I'm sorry.  I meant plaintiffs'

15   position.

16             MR. BERL:  There are numerous polyols.

17             THE COURT:  Dozens?

18             MR. BERL:  There are dozens of polyols.

19             THE COURT:  And during the course of discovery,

20   defendants relied on at least one piece of prior art that

21   listed the available polyols.  Is that right?

22             MR. BERL:  They listed other polyols, correct.

23   Again, there's a dispute about what available means.  Their

24   position, as you've heard it, that it has to be FDA

25   approved.  We completely disagree with that.  But, yes,

1    there were other references that the parties debated about

2    that, like strictly.  They don't want to use that anymore

3    because now they want three.  If they wanted to say there

4    are only three polyols available, they would have cited

5    this and I would have examined him about that in his

6    deposition.

7              THE COURT:  All right.  But aren't you going to

8    cross him and say he didn't cite this earlier?  He cited

9    these other articles.  These other articles don't mention

10   polyethylene glycol?

11             MR. BERL:  That's the opposite.  The other

12   articles talk about more.

13             THE COURT:  But do they mention polyethylene

14   glycol?

15             MR. BERL:  Yes.

16             THE COURT:  All right.  But they talk about a

17   lot more, and your point would be such there's a much larger

18   universe, this is a lot less obvious than the defendants

19   would have me believe.

20             MR. BERL:  Correct.

21             THE COURT:  And they're picking this one

22   particular site.  So it's undisputed it's a polyol.

23             MR. BERL:  Yes, absolutely.  Those are three

24   polyols.  Those aren't the only three polyols, but those are

25   three polyols.

Pinal - direct

1           THE COURT:  Mr. Aly, did your expert identify

2   within the 40 pieces of prior art in his expert report a

3   prior art reference identifying available polyols?

4           MR. ALY:  I have to clarify unavailable.  I

5   would say no, because available means that were used in FDA

6   products or commercial approved.  That's part of the

7   correction to this document.  There may be other ones that

8   are out there in the world, but polyols are a general class

9   of compounds.  It doesn't mean all of them are used in FDA

10  products.

11          THE COURT:  So did your expert identify in its

12  piece of prior art at any time in his report FDA approved

13  polyols?

14          MR. ALY:  Yes.

15          THE COURT:  Okay.  And why aren't you going to

16  that reference and why are you bringing up this reference?

17          MR. ALY:  The FDA, AIG guide, along with the

18  list of ingredients in FDA approved products.  He would

19  testify, if allowed, this is that summary that's connected

20  to the FDA-approved most used excipients.

21          THE COURT:  Was it identified in his expert

22  report, this particular reference?

23          MR. ALY:  Oh, yes.

24          MR. BERL:  This particular reference?

25          THE COURT:  The one that's up on the PowerPoint?

Pinal - direct

1          MR. BERL:  Yes.  They relied on it for a

2     different proposition about antioxidants, never for this,

3     about polyols.

4          MR. ALY:  Look, Judge, this is what I was going

5     to say is a misunderstanding.  We're not using this as the

6     combination piece.  We have another reference for this.

7     This is literally background to say what was out there known

8     in the textbook.

9          THE COURT:  Then I guess you're not prejudiced

10    by let's strike it.

11         MR. ALY:  Then let's move on to the next

12    question, yes.

13         THE COURT:  And let's not engage in what I think

14    is an example of gamesmanship.

15         MR. ALY:  Of course.

16         THE COURT:  For the rest of the trial.

17         MR. ALY:  Of course.  Of course, Judge.

18         THE COURT:  I don't want to see more screens

19    like that then.

20         MR. ALY:  Of course, Judge.

21    BY MR. ALY:

22    Q.    Now, Dr. Pinal, had anyone already specifically taught

23    the use of polyols with examples of polyols with a nitrogen

24    mustard content?

25    A.    Yes.

Pinal - direct

1    Q.      Where in the prior art did they do that?

2    A.      The reference by Alam that teaches that.

3    Q.      Look at the Alam reference, DTX-56.  What was the drug

4    discussed in Alam?

5    A.      The name of the drug is cyclophosphamide.

6    Q.      And what is cyclophosphamide?

7    A.      Cyclophosphamide is a compound that's used as a drug

8    to treat cancer and it belongs to the same chemical family

9    as bendamustine.

10   Q.      Did you create a slide that compares cyclophosphamide

11   with bendamustine?

12   A.      Yes, I did.

13   Q.      How do they compare, the compound cyclophosphamide and

14   bendamustine?

15   A.      Well, I need to show chemical structures to explain

16   this concept.

17           MR. ALY:  And, Your Honor.  If you would prefer,

18   the witness can approach the screen to discuss this or can

19   point from there.

20           THE COURT:  Right now, that's fine.  Sure.

21   Pointing with a laser pen is fine.

22   BY MR. ALY:

23   Q.      Dr. Pinal, can you explain the comparison between

24   cyclophosphamide and bendamustine?

25   A.      Yes.  We see on the screen, and this is slide number

Pinal - direct

1    10, chemical structures.  One on the left, which is

2    cyclophosphamide.  Another on the right, which is

3    bendamustine.  I have circled in both of them what is called

4    the nitrogen mustard group, which is like a nitrogen with an

5    atom with two legs and the two legs end with a chlorine

6    atom, kind of like where the foot would be.

7         What we can see is that the nitrogen group in

8    the two molecules are exactly the same.  So that means that

9    the chemical reactions that would destroy the mustard group

10   in one compound will destroy it on the other, and by the

11   same token, the formulation approaches that would protect

12   the mustard group in one, the two compounds, will also

13   protect it in the other one.

14   Q.   For these mustard compounds, how do they relate to

15   mustard gas?

16   A.   Well, mustard gas is, if we take that small part like

17   the nitrogen mustard part, that's a mustard gas which is

18   pretty toxic.  If you want to turn it into the wet one that

19   they used in World War I, all you need to do is change these

20   nitrogens for a sulfur, and that would be the poison gas.

21   Q.   For bendamustine in particular, how could a person of

22   ordinary skill in the art use information about the

23   cyclophosphamide formulation?

24   A.   Well, as I said, these -- the portion of the molecule

25   that undergoes degradation is identical in two compounds, so

424

Pinal - direct

1    the teachings that protect these part of the molecule, the

2    nitrogen mustard group in one compound have application to

3    the, to the other compound.

4              So if it is learned from bendamustine, it can be

5    applied to cyclophosphamide and vice-versa.

6    Q.   And let's see what Alam did.  Go to the abstract, 56,

7    page 1.

8              What was the problem that Alam had set out to

9    solve?

10   A.   What Alam was said to prepare a liquid formulation

11   for the cyclophosphamide compound for parenteral

12   administration.

13   Q.   And did Alam identify why it was trying to use liquid

14   formulations as opposed to what was previously available?

15   A.   Yes.  It refers to the -- diseconomies, these

16   advantages of having a lyophilized or freeze-dried product.

17   Q.   Did you use the word diseconomies reading from that?

18   A.   Yes.  That is the same use.  It refers to the

19   disadvantages.

20   Q.   Did Alam teach a preferred solution to that problem?

21   A.   Yes.  And it is using a polyol as a co-solvent, which

22   means solvent in addition to another solvent.

23   Q.   And did Alam describe the type of solvent or

24   co-solvent to use?

25   A.   Yes.  And it's specified specifically, propylene

Pinal - direct

1   glycol or PG, polyethylene glycol or PEG, and glycerol.

2   Q.   Does it identify those three as the only polyols that

3   were considered in the Alam reference?

4   A.   Those are the three that were used in the example

5   presented by Alam.

6   Q.   Now, does Alam explain how much of PEG and PG to

7   use?

8   A.   Yes.

9   Q.   Go to page 3 of the patent.  We're looking from column

10  4, line 5.

11  A.   Yes.  And in this excerpt, it shows that, speaking at

12  a mixture of propylene glycol and polyethylene glycol, which

13  is from 10 to about 90 percent of PG and from the complement

14  of 90 to 10 percent of PEG.

15  Q.   And does that range provide guidance to a POSA of what

16  to do with PG and PEG?

17  A.   Yes.  It provides the ranges of mixtures of PG and

18  PEG, or PEG.  That would protect a nitrogen mustard group on

19  a compound that contains it.

20  Q.   And what would a formulator take away from the type of

21  ratios that could be used with the nitrogen mustard from the

22  Alam disclosure in column 4, lines 8 through 11?

23  A.   From this reference, the formulator would learn that

24  using PG and PEG in different combinations would still

25  protect the nitrogen mustard group.

Pinal - direct

1    Q.    Dr. Pinal, what about the fact that the range is

2    anywhere from 10 to 90 and 90 to 10?  Would a POSA consider

3    that to be too broad a range?

4    A.    No.  As a matter of fact, typically, in the

5    pharmaceutical industry, when these type of studies are

6    done, tested in ten percent increments like 10, 20, 30 and

7    so on.

8    Q.    And would the type of experiments that you are

9    describing be routine?

10   A.    Yes.  Those are part of the normal job of a

11   formulator.

12   Q.    What about stability?  Did Alam perform steps on the

13   stability of formulations using PEG and PG?

14   A.    Yes, it did.

15   Q.    Go to Table 1.  What is the title of Table 1, Dr.

16   Pinal?

17   A.    It's cyclophosphamide formulations.

18   Q.    And what is shown in the example column for the

19   formulation that was used in Alam?

20   A.    Well, it shows on the left-hand side, on the left

21   column, it shows the different ingredients that went into

22   the formulation, and on each of the columns, it shows that

23   the -- the amounts and proportions that were present of

24   each of the ingredients.  And the highlighted portions on

25   the right-hand side, which are formulations 9, 10 and 11,

Pinal - direct

1    those are the examples which are made of mixtures of

2    polyols.

3    Q.    Can you explain for the record, what is the

4    combination and formulation of number 9?

5    A.    No. Nine is 50 percent PG and 50 percent glycerol.

6    Q.    What about the formulation for 10?

7    A.    It's 80 percent PG and 20 percent PEG.

8    Q.    And formulation 11?

9    A.    It's the same, the same composition of solvents as

10    formulation 10, 80 percent PG, 20 percent PEG.

11    Q.    And why do you highlight those three compared to the

12    formulations 1 through 8?

13    A.    Because those, those three are the ones which are made

14    out of mixtures of polyols.

15    Q.    Did Alam report the stability results of these

16    formulations?

17    A.    Yes, it did.

18    Q.    Where?

19    A.    Table 2.

20    Q.    That is shown on the screen.  How do the stability of

21    formulations 9 through 11 without water compare to

22    formulations 1 through 8 with water?

23    A.    Yes.  So Table 2, the percent cyclophosphamide, which

24    shows how much cyclophosphamide is left after the different

25    time periods listed on the header of the column.

428

Pinal - direct

1              If we look at the two-week column, we can see

2       that for formulation 9, 10 and 11, which are the

3       formulations made with mixtures of polyols, the percentage

4       of intact cyclophosphamide is greater than for the other

5       formulation that contained water.

6       Q.    And based on the data, what polyols would a POSA

7       consider for using with bendamustine?

8       A.    Well, based on the nitrogen mustard stability, the

9       different compositions that are represented here, we see

10      that, if we look to the eleven-week period and we see that

11      for formulation 10, there was less degradation than the

12      others, so it would be a mixture of PEG and PG.

13      Q.    And how do the comparisons of the 11 week results for

14      the polyol formulations compare to the one with water and

15      polyols?

16      A.    Sorry.  Can you repeat the question?

17      Q.    Sure.  How do the eleven-week results for stability in

18      Table 2 for formulations 9, 10 and 11 compare to the other

19      formulations?

20      A.    Well, the formulations, what we -- formulations 9 and

21      10, which provide data, they give greater percentage of

22      intact bendamustine, so that means that those are the two

23      formulations that give the greater protection.

24      Q.    And this drug is cyclophosphamide?

25      A.    I'm sorry.  Yes.  The nitrogen mustard compound, which

Pinal - direct

1    is cyclophosphamide.

2    Q.    Let me ask you, why would a POSA look for the data for

3    cyclophosphamide and have any expectation as how it would

4    apply to bendamustine?

5    A.    As I mentioned, the chemical segment of the molecule

6    in cyclophosphamide that is being protected here is exactly

7    the same chemical segment that is present in bendamustine,

8    so the protection of that segment of the molecule would be

9    equally protected in both compounds.

10   Q.    Does bendamustine undergo -- would it be expected to

11   undergo any degradation that cyclophosphamide did not?

12   A.    Yes.   They are different molecules, so not all of the

13   activity is identical.

14   Q.    So why does it matter that the nitrogen mustard

15   overlap between cyclophosphamide and bendamustine would be

16   relevant to you?

17   A.    Because that is one portion of the molecule that is

18   very sensitive to degradation in bendamustine, so it is

19   necessary for the formulator to develop a formulation that

20   protects that portion of the molecule among other portions

21   that are present in the molecule.

22           THE COURT:   Now, Mr. Aly, when you say the

23   nitrogen mustard, what is the noun that follows mustard?

24   The nitrogen mustard?

25           MR. ALY:   Compound, maybe?   I'm not sure what I

Pinal - direct

1    said.

2                    THE COURT:  You didn't say anything.  That's

3    what I'm trying to figure out, just what you call it.  The

4    nitrogen mustard part of cyclophosphamide and bendamustine.

5    What's the part?  What do you call that part?

6                    MR. ALY:  I guess I would call that part the

7    nitrogen mustard part.

8                    THE COURT:  You used the word part too.

9                    MR. ALY:  I used the word part also.

10   BY MR. ALY:

11   Q.    Dr. Pinal may have a more specific word.  Let me ask

12   you:  Dr. PInal, what is the term you would use for the

13   nitrogen mustard part of the compound?

14   A.    The technical name is the nitrogen mustard group.

15                   THE COURT:  Group.  Okay.

16                   THE WITNESS:  And as a whole, cyclophosphamide

17   and bendamustine are nitrogen mustard compounds.

18   BY MR. ALY:

19   Q.    And if we can go back to the slide with the comparison

20   of the compounds.  For the bendamustine, what other

21   degradation pathways would a POSA focus on?

22   A.    Well, if we look at the structure of bendamustine, and

23   I'm going to use the pointer, there is another group on the

24   right-hand side.  The name of this group is the carboxylic

25   group.  That is present in bendamustine, but it is not

Pinal - direct

1   present in cyclophosphamide.

2   Q.    Why are you focusing on that group?  What would a POSA

3   expect to happen in a different formulation?

4   A.    The carboxylic group is susceptible to a type of

5   reaction that the name is esterification, esterification

6   reaction.

7   Q.    What is esterification?

8   A.    Esterification in simple terms is when another

9   compound, and specifically, one that contains an OH group,

10   connects itself to the carboxylic group shown there.  And

11   the result of that connected from the carboxylic and the OH

12   group containing compounds is connected is that it's used,

13   it's named an ester.

14   Q.    And what is the rate of reaction, if you know, for an

15   ester versus the nitrogen mustard compound in liquid?

16   A.    The nitrogen mustard hydrolysis reaction occurs very

17   fast, within hours.  The esterification reaction on the

18   right-hand side or on the carboxylic group of the

19   bendamustine molecule occurs very slowly, over many months.

20   Q.    But if Alam is teaching to use alcohol with OH group

21   and OH groups could cause esterification, why would a POSA

22   still continue to consider Alam?

23   A.    Because it gives a very good tradeoff.

24   Q.    What do you mean by that?

25   A.    Yes.  By using polyols, the formulator shuts down the

Pinal - direct

1    door on a degradation reaction that happened very quickly,

2    within hours, on the nitrogen mustard group.  In exchange,

3    it opened the door on another degradation reaction that

4    happened very slowly, over months, like little degradation

5    in a long time, and that is a very important consideration.

6    Q.    Why is that an important consideration?

7                MR. BERL:  Objection.  All of this analysis of

8    the different rates is not in the report either.  I mean,

9    I've given some latitude, but this is now going into detail

10   that is not the motivation theory in the report.

11               MR. ALY:  It is.  From the degradation pathway,

12   they're disclosed with pictures.  For the passage of time, I

13   would like to move on anyway.  I don't want to spend a lot

14   of time on this, but we do have the disclosure.  I'm happy

15   to talk about this.

16               THE COURT:  You're going to withdraw the

17   question?

18               MR. ALY:  I'm going to withdraw the question.

19               THE COURT:  All right.  The objection -- well,

20   it was sustained, so let's move on.

21   BY MR. ALY:

22   Q.    Now, could a person of ordinary skill in the art if

23   they wanted to choose a solvent with no OH group?

24   A.    Can you repeat the question?

25   Q.    I can.  Could a person of ordinary skill in the art if

Pinal - direct

1    they wanted to make a liquid formulation of bendamustine

2    choose a solvent that had no OH group?

3    A.    Yes, they could.

4    Q.    What are examples of that?

5    A.    Well, one example, the one example that has been used

6    for injectable products is a solvent named dimethyl

7    acetamide, DMA.

8    Q.    What is DMA?

9    A.    DMA is an organic solvent that doesn't contain any OH

10   groups in its structure.

11   Q.    When you said there were issues with DMA, what are

12   those?

13   A.    Well, it's a very strong -- it is a very strong

14   solvent.  It used in industrial.  So it's known that it

15   interacts with plastic used for preparing and administering

16   and administering injectables.

17   Q.    Nonetheless, in the prior art, did anyone test the

18   effect of solvents with no OH groups on bendamustine in

19   particular?

20   A.    Yes.

21   Q.    Who did that?

22   A.    There is a publication by Drager.

23   Q.    Go to the Drager reference, DTX-73, page 1.

24         What is the title of this patent, sir?

25   A.    Liquid formulations of bendamustine.

Pinal - direct

1    Q.    And what solvent systems are disclosed in Drager's

2    liquid bendamustine formulation?

3    A.    Drager teaches the use of solvent mixtures.

4    Q.    Hold on just a second?

5    A.    I'm sorry.

6    Q.    Looking at page ten, the Exhibit 73.

7              THE COURT:  So can I -- there's no objection I

8    guess right now.  It's probably a good reason, but help me

9    out.  So the patent is dated 2013?

10             MR. ALY:  Let's go back to the last slide.  Yes,

11   that's right.

12             THE COURT:  So why am I considering this?

13             MR. ALY:  Sure.  The reason it's stipulated as

14   prior art, Your Honor, is because the patent that's issued

15   later but was applied for before the priority date still

16   counts for the priority date, which is when it was invented,

17   and that's the earliest date here, is September 23rd, 2009,

18   that's shown in the highlighting for the application data.

19   That's why it was stipulated as prior art.

20             THE COURT:  Thank you.

21   BY MR. ALY:

22   Q.    Now, what does the Drager reference teach for the use

23   of liquid bendamustine formulations?

24   A.    It teaches the use of solvent mixtures and

25   specifically it refers to a mixture of being aprotic

Pinal - direct

1    solvent.

2    Q.    Can you spell that just to make sure we're talking

3    about the right word?

4    A.    A-p-r-o-t-i-c, aprotic solvent.

5    Q.    And what is an aprotic solvent?

6    A.    An aprotic solvent is one that does not contain OH

7    group in its structure.

8    Q.    And did Drager test the stability of bendamustine in a

9    formulation with no OH group in its structure?

10   A.    Yes, it did.

11   Q.    Let's go to the stability results.  This is from Table

12   2 of Drager.

13            What is the stability of bendamustine in a

14   hundred percent DMA with respect to the esters?

15   A.    Yes.

16   Q.    Well, I'm sorry.  I should ask first:  When you were

17   referring to the esterification reaction for bendamustine,

18   what are the esters that a POSA would look at?

19   A.    The esters between bendamustine specifically and its

20   carboxylic group portion with molecules of PG, and there are

21   two possible esters that can be produced because PG contains

22   two OH groups in its molecule.

23   Q.    And are those ester products given a shorthand name?

24   A.    Yes.  And they're listed on the two columns to the

25   right of the Table 2.  PG-1 and PG-2 refers to the two

Pinal - direct

1    possible esters that can be produced when PG connects itself

2    to a bendamustine molecule.

3    Q.    When DMA is used with bendamustine, what results did

4    Drager teach were found for PG-1 and PG-2 esters?

5    A.    Well, as we can see, it shows ND, which stands for

6    non-detected, meaning that when DMA, which does not contain

7    any OH groups is the only solvent, there's no possibility

8    of any ester being formed and therefore they are

9    non-detected.

10   Q.    So why would not a person just use the DMA by itself,

11   a hundred percent with bendamustine?

12   A.    Well, DMA is known to have some issues, and as I

13   mentioned briefly before, put very simply, it dissolves

14   plastic and it actually does that on plastics used for

15   preparing and delivering injectable products.

16   Q.    Even Drager, does it disclose and test formulations

17   that used DMA in combination with other excipients or

18   ingredients?

19   A.    Yes.  And we can see that here in Table 2.

20   Q.    What example used DMA in combination with something

21   else?

22   A.    The example right below DMA is a mixture that contains

23   66 percent DMA and 34 percent PG, meaning that solvent is

24   two-thirds DMA and 1-third roughly PG.

25   Q.    And what is the stability result for the combination

437

Pinal - direct

1   of DMA and PG in Table 2 of Drager?

2   A.    Well, here we can see that, this is -- this stability

3   study was done at five degrees Centigrade over a period of

4   12 months, which is listed on the top of the table, and

5   after that time, under that temperature condition, the

6   production of percent of PG-1 and PG-2 is 1.09 and

7   0.27 percent respectively.

8   Q.    And, Dr. Pinal, based on the data reported in Drager,

9   what would a POSA take away about which solvents to use with

10  bendamustine?

11  A.    One of the teachings of Drager here is that taking, by

12  taking two-thirds DMA and one-third PG, it's reducing by

13  two-thirds the number of OH groups or molecules that can

14  interact with bendamustine to produce esters, and the result

15  is a reduction of the amount.

16  Q.    And what happens if we go all the way to using a

17  solvent that has no OH?  What did Drager teach about the use

18  of that and its effect on stability?

19  A.    Well, if the -- the solvent used contains no OH, then

20  in terms of the esterification reaction, there is none of

21  that happening because it's just not possible.

22  Q.    And of the polyols that Alam has disclosed, which ones

23  have lower amounts of OH groups?

24  A.    The one that contains the, of the polyols that

25  contains the lowest amount of OH groups would be PG and

Pinal - direct

1    PEG.

2    Q.    How many OH groups do those two compounds have?

3    A.    The molecule of PG contains two OH groups.  The

4    molecule of PEG contains two OH groups, but the two

5    molecules have a very different size.

6    Q.    What about glycerol?

7    A.    Glycerol contains three OH groups.

8    Q.    So of the three polyols disclosed in Alam, which ones

9    would a POSA be motivated to use with bendamustine in view

10   of the Drager teaching?

11   A.    The ones with the lower number of OH groups, which are

12   PG and PEG.

13   Q.    And between PG and PEG, taking the learnings from

14   Drager, would the POSA have an understanding of which one

15   would be preferred for use with bendamustine?

16   A.    Yes, and that would refer to how many OH groups are

17   present in any given volume of the solvent.

18   Q.    But if PG and PEG both have two OH groups, how is it

19   making a difference between selecting between those two?

20   A.    The two molecules have very different sites, so they

21   also supply by themselves very different volume.

22   Q.    Have you created an illustration to show the

23   difference between PG and PEG?

24   A.    Yes.

25   Q.    Let's look at that demonstrative, slide 15.  What do

1    you have shown here, Dr. Pinal, starting with the left

2    side?

3    A.    I can explain this concept without using molecular

4    structure.   So molecules can be represented as plastic beads

5    connected.   In fact, many businesses that sell educational

6    materials sell kits of plastic beads to be connected for

7    students of chemistry.

8         So the representation that I have for here, on

9    the left-hand side is the propylene glycol or PG molecule.

10   It's made out of three green beads connected, and the red

11   beads represent the OH groups, which are the ones that will

12   connector hook up from the ester.   The PG molecule has one

13   OH group on the edge and one OH group on the center of that

14   three bead string.

15        On the right-hand side we have the PEG or PEG

16   molecule, which is actually a long string.   Here, it is

17   being represented as very neatly coiled and the reason for

18   that is that it makes it a simpler task to compare the

19   relative size of the two molecules, but the PEG molecule is

20   one long string that has on each end a red string or OH

21   group.

22   Q.    And have you prepared a demonstrative to show the

23   effect of the size of these compounds in a particular

24   volume?

25   A.    Yes.

Pinal - direct

1    Q.    Go to the next slide, 15.

2          What are you showing as a demonstrative on slide

3    15 starting with the left side?

4    A.    So here is a presentation of multiple molecules of the

5    two solvents such that the same volume of each one is

6    represented.  So if a molecule of bendamustine were to be

7    dissolved in each one, it will be the same concentration in

8    terms of the same number of milligrams per milliliter,

9    because the volumes represented are the same.

10         So if we look at a molecule present on the, on

11   the left-hand side, which is PG, there would be -- the

12   number is 56.  There are 28 pairs of OH groups.  So it would

13   be 56 chances for that molecule to collide and encounter a

14   solvent molecule and form the ester.

15         If the same molecule were dissolved on the

16   right-hand side, and, again, here you see illustrated it's

17   nicely coiled, but in reality, the PEG molecule is not

18   coiled randomly, also stretched.

19         The same molecule would have ten OH groups to

20   encounter to do that.  So the ratio just by pure number, the

21   number of potential reactions with OH groups on the

22   left-hand side is roughly more than five times greater than

23   for PG than for PEG.

24   Q.    And what would happen then if a person of ordinary

25   skill in the art put bendamustine in the PEG container?

Pinal - direct

1    A.    What would happen is that the, just because of the

2    sheer number for this esterification, number of red beads is

3    much greater, there will be a much faster production of the

4    ester.

5    Q.    I'm sorry.  In which one would there be a faster

6    reaction for the ester?

7    A.    On the left-hand side, which is the propylene glycol.

8    Q.    Let me ask the question:  As between polyglycol and

9    polyethylene glycol, which POSA would expect to have less

10   interaction with bendamustine?

11   A.    The one on the right-hand side, which is the PEG, and

12   the reason is that the number of OH groups per unit volume

13   is substantially lower than in pure PG.

14   Q.    Well, so a POSA could just do the hundred percent PEG

15   then; right?

16   A.    No.

17   Q.    Why not?

18   A.    Because PG, the POSA would know that PEG is a very

19   viscous liquid.  I mean, it's not as thick as honey, but

20   it's more like warm honey.  So the formulator would know

21   that a very viscous liquid would be very difficult to pull

22   with a needle and syringe out of the vial.  But the POSA

23   would also know that the scientific literature teaches that

24   putting some PG with PEG reduces the viscosity of that -- in

25   the resulting mixture.

1   Q.      Is that something that's general knowledge to you as a

2   formulator, Dr. Pinal?

3   A.      Yes.  That is part of the general knowledge that a

4   formulator that works in injectable products has.

5   Q.      So what would a formulator do given the information

6   that you've described about PEG and PG in view of the

7   teachings of Drager?

8   A.      The formulator would look for a formulation that has

9   as much PEG as possible, but not 100 percent.  And the

10  balance would be PG.

11  Q.      And what is the exercise that a person of ordinary

12  skill in the art would go through to determine how to

13  balance PEG and PG with bendamustine?

14  A.      Well, the -- the balance from the stability point of

15  view would be to make them and make that dissolve the drug

16  and place it in what is called the station at different

17  temperatures, and after different pre-established periods of

18  time, conduct an analysis to see how much of the degradants

19  were present.

20  Q.      Had that already been done in the prior art

21  specifically to optimize what the combination of PG and PEG

22  was for bendamustine in particular?

23  A.      For bendamustine?  For PEG?  Not specifically for

24  bendamustine.

25  Q.      And how would a person of ordinary skill in the

Pinal - direct

1    art go about doing the optimization of the ratio of PEG to

2    PG?

3    A.    Well, as I mentioned, it's making the mixtures of the

4    different ratios and preparing the solution and then follow

5    over time the amount of degradant present.

6    Q.    In the prior art, did the prior art teach what are the

7    ranges of PEG and PG to use with nitrogen mustard?

8    A.    Yes.

9    Q.    And we looked at that already.

10   A.    We did, yes.  Alam gives the ranges and the POSA would

11   take that information and conduct the testing using those

12   ranges.

13   Q.    And in terms of how much what amount of bendamustine

14   to put into a formulation, what would a formulator do next?

15   A.    The formulator would need to first decide what

16   concentration of bendamustine would go into the formulation.

17   Q.    And did you evaluate the dosage of bendamustine to be

18   administered?

19   A.    Yes, I did.

20   Q.    Let's look at DTX-848, the Treanda label.  This is a

21   label for a medical product, Treanda.  Are you a physician,

22   Doctor?

23   A.    No, I'm not.

24   Q.    Why would a formulator look at a label?

25   A.    Because the formulator has to make a product that the

444

Pinal - direct

1    physician is going to use, so it has to be a product that is

2    useful to the -- to the physician.

3    Q.    And during your time at Hoffman- La Roche, was it

4    common for you to look at labels to improve existing

5    products on the market?

6    A.    Yes.

7    Q.    How would a person of ordinary skill in the art

8    evaluate the volume of bendamustine to administer?

9    A.    Oh, the first is to look at what is the dose at which

10   bendamustine is given to patients, and the POSA would find

11   two indications.  One of them is 100 milligrams per a square

12   meter of surface area, and the other one is 120 milligrams

13   per square meter.

14   Q.    And what does that information tell a formulator about

15   how much drug should be in a prepackaged product?

16   A.    Well, this information tells the POSA how many

17   milligrams an average person would be receiving for each one

18   of the two indications.

19   Q.    And we will get to that calculation in just a moment.

20         What would be the size of the vial that a POSA

21   would target to fill?

22   A.    The most common size of container, and if it is

23   possible, it would be between five and ten milliliters.

24   Q.    Okay.  Why is five to ten milliliters an ideal volume

25   to use?

Pinal - direct

1    A.    Because the unit that is dispensed to the end user,

2    which is the health professional, could be the physician or

3    the pharmacist, has to be one that's handled easily in terms

4    of the size.  And it has to be a -- the person who prepares

5    the admixture, small hands or large hands.  Specifically, if

6    someone wore gloves 5, 6 or size 9, both of them should be

7    able to handle the vial, the size of the vial, and it's a

8    size that works very well for that range.

9    Q.    Did you bring a demonstrative just to show what that

10   vial size looks like, Dr. Pinal?

11   A.    I did.

12           MR. ALY:  And I have it.  May I approach, Your

13   Honor?

14           THE COURT:  Yes.

15           MR. ALY:  I've shown counsel as well.  I have

16   two.  I will bring them both to you, Dr. Pinal.

17             (Mr. Aly handed vials to the witness.)

18   BY MR. ALY:

19   Q.    What are these demonstrative vials that you have in

20   your hand?

21   A.    These are placebo.  This is just a normal saline

22   solution.  I use them in the laboratory to teach students

23   when I train them on how to do the add mixtures.  I use

24   them, and this is the typical size that is used.

25             It's possible for many products, because it very

Pinal - direct

1    easily is handled by someone with small hands or someone

2    with larger hands, and that is not it.  It also, the

3    contents can be withdrawn with a syringe.  And it has to be,

4    if it's a more than a ten-milliliter syringe, it can become

5    very hard for some people.  So ten milliliters or

6    five milliliters are the most convenient size.

7    Q.    And what size are you holding in your hand?

8    A.    This size is ten milliliters.

9    Q.    Now, have you done a calculation based on the dosage

10   that Treanda had delivered in the vial size to determine

11   what the target concentration would be?

12   A.    Yes, I have.

13   Q.    Look at the demonstrative, slide 17.  What are you

14   showing on your slide, Dr. Pinal, 17?

15   A.    Well, in order to get the dose, the number of

16   milligrams that an average patient would get, it would be

17   more convenient to use the larger dose, because then if the

18   larger dose is covered, then the smaller dose would also be

19   covered, but it may not be the case in every instance.

20          So here, the POSA would take the 120 milligrams

21   square meter of the size points to calculate the amount of

22   milligrams that an average patient would get.

23   Q.    And what do you do next to show the target

24   concentration?

25   A.    Well, multiply that dose by the surface area of the

Pinal - direct

1   average person, and the average value is about two square

2   meters, so by performing that multiplication, the number of

3   milligrams is 240 milligrams.  So here we go.

4   Q.   And --

5   A.   With this number, the POSA would know how many

6   milligrams are to be -- the average person would be

7   receiving.

8   Q.   And then what's the next step to find out what the

9   target concentration in the vial should be?

10  A.   Well, it will be to divide that amount by the volume

11  of the solution, which could be either five or ten -- five

12  or ten milliliters, which are the two most handled or user

13  friendly size type of vial.

14  Q.   And what does that show the result when you divide the

15  total dosage into those two vials?

16  A.   Well, if we divide it by ten milliliters, the result

17  would be 24 milligrams per milliliter, and if we do it in

18  five milliliters, it would be twice as much.  It would be

19  48 milligrams per milliliter.

20          In terms of concentration, it's more commonly

21  used in the field to use multiples of five, so it would be

22  more like about 25 and about 50 milligrams per milliliter.

23  Q.   And what concentration would be the easier of the two

24  to try to achieve?

25  A.   The lower concentration.

Pinal - direct

1    Q.     Which is what?

2    A.     25 -- 24 or about 25 milligrams per milliliter.   And

3    the reason is that every solvent has a solubility limit,

4    which is the maximum amount that can be dissolved in a given

5    volume, so there -- while there's an upper limit, there's no

6    lower limit.  So a lower concentration is always easier to

7    obtain than a high one.

8    Q.     And how does the work that you've done on the

9    demonstratives 16, 17 and 18 to calculate compare to your

10   work at Hoffman-LaRoche?

11   A.     This is the type of work that a formulator at

12   Hoffman-LaRoche as one with experience in the field would

13   follow.

14   Q.     Does the prior art confirm that 23.5 milligrams per

15   milliliter could be achieved?

16   A.     Yes.

17   Q.     Where is that?

18   A.     Also -- what page is that.

19   Q.     DTX-94, page 16 of the exhibit.

20          What are you referring to in terms of the

21   concentration that Olthoff teaches?

22   A.     As we see here on the second line of the highlighted

23   segment, Olthoff actually tested a range between 25 and

24   100 milligrams per milliliter and showed that it could be

25   dissolved at those concentrations.

Pinal - direct

1    Q.    And then for the ratios of PEG and PG to try to obtain

2    the 25 milligrams per milliliter, what would a POSA do?

3    A.    Well, the POSA would know that when mixing solvents,

4    the solubility might change.  So if the solvent added, if

5    the drug has equal or higher solubility in the added solent

6    than the original solvent, well, the solubility would either

7    stay the same or go greater, in which case it would be no

8    problem to get to a lower concentration.

9    Q.    And what parameters would a person of ordinary skill

10   in the art look to when developing a formulation with PEG,

11   PG and bendamustine?

12   A.    The solubility of the pure solvent.

13   Q.    Does Olthoff disclose the solubility in PG?

14   A.    Yes.

15   Q.    Let's look at that.  Page 14.  What is the solubility

16   that Olthoff reports for bendamustine in propylene glycol?

17   A.    125 milligrams per milliliter.

18   Q.    Now, does Olthoff disclose the solubility of PEG by

19   itself?

20   A.    No.

21   Q.    Would a POSA be able to obtain the solubility of --

22   A.    The POSA would be able to conduct a measurement to

23   value, but even before that, the POSA would know that it is,

24   that -- would know with certainty that it's possible to make

25   a solution of bendamustine in a mixture of propylene glycol

Pinal - direct

1    and polyethylene glycol.

2    Q.    Just from looking at the propylene glycol solubility?

3    How so?

4    A.    Because at 125 milligrams per milliliter, and the

5    objective is 25 milligrams per milliliter, there is an

6    80 percent legroom to drop.  So even if the addition of PEG

7    lowered --

8                  MR. BERL:  This isn't in his report either.

9                  MR. ALY:  It's in paragraph 201.

10                 THE COURT:  All right.  Mr. Berl?

11                 MR. BERL:  Yes.  This is really, really, really

12   an important issue, so if I could take a moment to explain.

13   What he's doing in 201, and you probably have the chart in

14   front of you, Your Honor.

15                 THE COURT:  I do.

16                 MR. BERL:  He is doing a --

17                 THE COURT:  Probability.

18                 MR. BERL:  Well, it's actually sort of a model

19   that he's doing where you have zero percent PG on the left

20   and a hundred percent PG on the right and then ratios in

21   between.

22                 And you'll see that the end point of that model

23   when you have a hundred percent PG all the way to the left

24   is 23.5.  And so he's using the 23.5 number, and we'll get

25   to where he got that in a moment, and the 125 on the right

Pinal - direct

1    from Olthoff and he has testified about the 125 from

2    Olthoff.  He's perfectly allowed to do that.

3            What he just tried to do is say, oh, you would

4    have an expectation of getting above 25 just based on

5    Olthoff without anything on the left.  Why?  Because they

6    know they're not allowed to use what's on the left, which is

7    23.5.

8            If you go to the previous page, Your Honor.

9    Page 64, that shows where they're getting this.  This says,

10   using 221 and 23.5 as the solubility values of bendamustine

11   in pure PEG and PG.

12           That 23.5 number is not in the prior art.  It

13   comes from Eagle's testing at paragraph 196 shows.  And

14   they're not allowed to do that because Eagle's testing is

15   not in the prior art.

16           That's paragraph 196 shows Eagle ran solubility

17   tests and they got 23.5 for PEG.  And so that's their real

18   theory in the expert report.  You take 23.5 from Eagle's

19   test.  You magically import it into the prior art somehow,

20   and then you do this model that you see on paragraph 201,

21   page 65, that says you would be between 23.5 and 1.5.

22   That's not what he's doing today.  He's trying to get around

23   using the 23.5 because he knows they're not allowed to use

24   that, and they have no theory in their expert report that

25   says you can get there without using the 23.5 from Eagle

Pinal - direct

1   that is not in the prior art.  That's what's going on.

2               THE COURT:  Okay.  Give me a few minutes.  I've

3   got to read this.  You can sit down if you want.

4               MR. BERL:  Sure.

5               (Pause.)

6               THE COURT:  All right.  Mr. Aly, first of all,

7   Mr. Berl has said I am not supposed to consider the

8   experimentation that was conducted by Eagle as part of the

9   prior art.  You agree with that.  Correct?

10              MR. ALY:  No, but we're not getting there yet.

11  There's a separate issue right now.  We don't agree because

12  the Eagle, any Eagle testing can be used to show an inherent

13  property.  If it is an inherent property, meaning a property

14  that just is, then anyone can test it using any information,

15  whether it's prior art or not.

16              THE COURT:  Okay.  So, but my question was

17  for -- my question was, and Mr. Berl has said I'm not

18  supposed to consider the experimentation that was conducted

19  by Eagle as part of the prior art.

20              MR. ALY:  That's right.

21              THE COURT:  So you do agree with that?

22              MR. ALY:  The experimentation for the prior art.

23              THE COURT:  That was my question.

24              MR. ALY:  The fact --

25              THE COURT:  Hold on.  Hold on.  So you agree

Pinal - direct

1    with that as a premise?

2              MR. ALY:  That's right.

3              THE COURT:  Okay.  All right.  Now, you are

4    right now questioning the witness with respect to

5    obviousness.

6              MR. ALY:  Yes.

7              THE COURT:  All right.  Which is a different

8    issue than inherency.

9              MR. ALY:  No.  It includes inherency.

10             THE COURT:  Okay.

11             MR. ALY:  If I can explain.  First of all, the

12   thing on the screen as public prior art is not Eagle data.

13   The Eagle data is Mr. Berl anticipating additional testimony

14   that may or may not come.  This is public published

15   information from the Olthoff reference.  But to answer Your

16   Honor's question about inherency, inherency can be used if

17   there's an obvious combination of elements, then there's a

18   property that goes with it, be it solubility or stability.

19   It doesn't get a patent for putting a number onto something

20   that's already out there.

21             THE COURT:  But it has to be whether the

22   inherency is known.  Isn't that the issue for obviousness?

23   I mean, there might be something inherent in a chemical

24   that's unknown at the time of the invention, and in that

25   regard, if that's the case, I'm not supposed to consider

Pinal - direct

1    inherency when I'm deciding obviousness.  Correct?

2              MR. ALY:  No.  I disagree.  A simple example

3    that we gave in the opening was the ice.  If the first

4    person to discover the property and it would be a discovery

5    that ice freezes at a particular temperature doesn't get a

6    patent for discovering that temperature.  Ice already

7    existed and now they've attached a property to it.  And the

8    same principle applies to an obviousness combination

9    development.  If there's a formulation that's obvious,

10   putting together pieces that are obvious, the limitations

11   that go with that, be it solubility or stability, are just

12   numbers.  So if there's a formulation that's obvious, the

13   numbers are inherent.  Again, we're not there yet.  Mr. Berl

14   is anticipating testimony.

15             The question that's pending is, if you know that

16   125 is the solubility, can you get 25 because it's a smaller

17   number.

18             THE COURT:  Hold on.  Hold on.  Stop.  You said

19   if there's a formulation that's obvious, the numbers aren't

20   current.  What do you mean by that?

21             MR. ALY:  Sure.  So if there's -- in this

22   particular case, the formulation --

23             THE COURT:  No.  Do me a favor.  I want to hear

24   from Mr. Berl.  I thought that you could have inherency.  Is

25   there something like an inherent property of a chemical?

Pinal - direct

1                    MR. ALY:  Yes.

2                    THE COURT:  But it may not be known at the time

3       it's relevant and therefore you shouldn't consider that

4       inherent property in deciding whether something is obvious

5       or not.  And you're telling me that's wrong.

6                    MR. ALY:  That's right.  I'm telling you that's

7       wrong.

8                    THE COURT:  Okay.

9                    MR. ALY:  That you can rely on an inherent

10      property.

11                   THE COURT:  But even that inherent property,

12      which was not known at the time of the invention?

13                   MR. ALY:  Correct.

14                   THE COURT:  Okay.  Do you agree with that, Mr.

15      Berl?

16                   MR. BERL:  I think he has expanded the doctrine

17      a lot, and respectfully, I don't think he has it completely

18      right.  This is addressed at paragraph 63 of our exhibit to

19      you.

20                   THE COURT:  Okay.  Hold up.

21                   So obviously, I must have drawn the wrong

22      conclusion, but the conclusion I was articulating came from

23      my reading of Honeywell last night or this morning and it

24      came from this quote:  That which may be inherent is not

25      necessarily known.  That which is unknown cannot be obvious.

1    I drew from that the conclusion that you could have an

2    inherent property that was unknown at the time of the

3    invention, and therefore based on that exact quote is what I

4    had in mind, I didn't think you could consider it for

5    obviousness.  I must be missing something with you.

6              MR. BERL:  No.  I'm with you.

7              THE COURT:  I thought you said you didn't agree

8    with me.

9              MR. BERL:  I didn't agree with Mr. Aly.  I agree

10   with you completely.

11             MR. ALY:  I'm not sure about the Honeywell case

12   in particular.  I'm confident there are going unexpected

13   benefits or results.

14             THE COURT:  I think this quote, and it's funny.

15   Isn't the point of it that you have to be very careful in

16   using inherency in the context of obviousness because,

17   quote, "that which may be inherent is not necessarily known,

18   and that which is not known cannot be obvious."  So if

19   you've got an inherent property in a chemical, which we

20   discover after the fact, after the fact of the invention, we

21   shouldn't consider it in an obviousness assessment because

22   nobody knew it and that's the whole point of obviousness.

23   What did a reasonable or a POSA know?

24             MR. ALY:  I disagree, Your Honor.

25             THE COURT:  All right.  So show me some case law

Pinal - direct

1   that tells me that because that's the way I understand it.

2          MR. ALY:   Okay.   I'm going to start with handing

3   up Titanium Metals Corporation, 278 F.2d, 775.

4          THE COURT:   All right.

5          MR. ALY:   Counsel is pointing out that I have

6   one copy.   I can give Your Honor my one copy or I can have a

7   bench brief submitted.   There is a bench brief we have on

8   inherent properties that can be used to show these kinds of

9   issues.   We also have other cases.

10          THE COURT:   Why don't you just submit a bench

11   memo if he can't get a copy of your case, and let's just

12   backtrack and make clear so why we're here.   We're here

13   because you're questioning a witness about experimentations

14   were conducted by Eagle.

15          MR. ALY:   No, I'm not.   Mr. Berl is anticipating

16   questions that are come up that I may, I actually will not

17   even ask if we can get through it this way.   Mr. Berl is

18   objecting to the way in which we're currently proceeding.

19          THE COURT:   All right.   Hold on.

20          All right.   This is Olthoff.   Correct?

21          MR. ALY:   Yes.

22          THE COURT:   And the question was put at line 21

23   of -- this is a rough transcript anyway.   The question was

24   put to the witness, it says Olthoff disclosed the solubility

25   in PEG.   The answer was yes.   Then the question was, well,

Pinal - direct

1     let's look at it.  Page 14.

2                     Page 14 is on the screen of the PowerPoint now?

3                     MR. ALY:  It is.

4                     THE COURT:  And the question was put to the

5     witness, what is the solubility that Olthoff reports for

6     bendamustine and propylene glycol?

7                     And the witness answered, 125 milligrams per

8     milliliter, which is highlighted on the screen.  Correct?

9                     MR. ALY:  Yes.

10                    THE COURT:  Now, the next question was put to

11    the witness.  Now, does Olthoff disclose the solubility of

12    PEG by itself?

13                    MR. ALY:  Yes.

14                    THE COURT:  And the answer was no.

15                    Then the question was:  Would a POSA be able to

16    obtain the solubility of, and you were interrupted, because

17    the witness anticipated your question, and the witness said,

18    the POSA would be able to conduct a measurement, the value,

19    but even before that, the POSA would know.  He would know

20    with certainty that it's possible to make a solution of

21    bendamustine in a mixture of propylene glycol and

22    polyethylene glycol.

23                    "Question:  Just from looking at the propylene

24    glycol solubility, how so?

25                    "Answer:  Because at 125 milligrams per

Pinal - direct

1    milliliter, an objective is, an objective is 25 milligrams

2    per milliliter.   There is an 80 percent legroom to drop.   So

3    even if the addition of PEG lowered -- and at that point

4    there was an objection.

5              And the objection was:  "This is not in his

6    report."

7              And the response was from you, Mr. Aly:  "It's

8    in paragraph 201."

9              MR. ALY:  Well, yes.

10             THE COURT:  All right.  So then we go look at

11   201.

12             MR. ALY:  Right.

13             THE COURT:  And 201 references the

14   125 milligrams per milliliter in Olthoff.

15             MR. ALY:  It does.

16             THE COURT:  And it is discussing as a premise

17   23.5 milligrams per milliliter on the left-hand column,

18   which comes from the experimentation conducted by Eagle.  Is

19   that correct?

20             MR. ALY:  That target does, but that's not what

21   the testimony will be about.

22             THE COURT:  But his testimony was the objective

23   is 25 milligrams per milliliter.  Isn't that the same thing

24   as the target?

25             MR. ALY:  No.  He explained that in his other

Pinal - direct

1    testimony as the walking through of the dose calculation,

2    which there's no objection.  Plaintiffs are talking about

3    something else.  Here, 201, the number 23.5, that is an

4    internal Eagle number for which there has been no testimony

5    sought or received that is the actual solubility of

6    bendamustine in PEG.  And there has been no testimony about

7    that.

8              The reason I pointed to 201 is there are several

9    pieces of information that are in that chart.  One is

10   basically 125 is bigger than 25.  That's in a nutshell the

11   point.  And because that means that if you can put 125 in

12   with one ingredient, you add another ingredient.

13             THE COURT:  Wait a second.

14             MR. ALY:  Yes.

15             THE COURT:  So 25 isn't even in that chart

16   except to the extent it falls along the continuum on the

17   column.

18             MR. ALY:  It's not in this chart.  The point

19   is --

20             THE COURT:  When you directed --

21             MR. ALY:  I did.

22             THE COURT:  The objection was the testimony

23   you're eliciting is not in the expert report, so you pointed

24   me to here.

25             MR. ALY:  I did.

Pinal - direct

1          THE COURT:  So where in paragraph 201 is there

2    any discussion -- let's start a couple things, break it

3    down.

4          MR. ALY:  Sure.

5          THE COURT:  That the objective is 25 milligrams

6    per milliliter?

7          MR. ALY:  The objective is not in paragraph 1.

8    That's another paragraph.

9          MR. NELSON:  200.

10         THE COURT:  He said 201.

11         MR. ALY:  The objective is not in that

12   paragraph.  It's in another paragraph.

13         THE COURT:  Okay.  So you're going to modify or

14   somebody just yelled out from the defense table, look at

15   paragraph 200, so that's what I'm doing.  Okay.

16         So now you're saying the 25-milligram objective

17   comes from paragraph 200.  All right.  And where is the

18   80 percent legroom to drop?

19         MR. ALY:  Simply the number difference between

20   125 and 25.  That's what's shown in the chart.  That line

21   that's going from 125 to 25, all that's showing is that the

22   difference there is there's that much room in between 125

23   and 25.  125, in other words, is bigger than 25.

24         THE COURT:  Mr. Berl?

25         MR. BERL:  The chart doesn't say that.  I mean,

Pinal - direct

1    the chart starts at 23.5.  There's no legroom theory

2    anywhere in this room, which is why I objected.  Frankly, I

3    was being too nice.  The prior answer should be stricken,

4    too.

5              This is a new theory.  They tried to get to 25,

6    the target, without using what Your Honor has properly

7    observed is the 23.5 that can't be used because it's not in

8    the prior art.  This is their back door and it's not in the

9    report.

10             MR. ALY:  He goes on --

11             THE COURT:  Mr. Aly, show me where the

12   80 percent drop is?  "Eighty percent legroom to drop."  Show

13   me where it is in your report.

14             MR. ALY:  The specific drop calculation I

15   inferred from the chart, but if it's not in the chart, I

16   would look at paragraphs that are more general --

17             THE COURT:  You cited 201.

18             MR. ALY:  I did.

19             THE COURT:  And somebody from your table yelled

20   out 200.

21             MR. ALY:  They did.

22             THE COURT:  Now you're trying to direct me to

23   some other paragraph.  What's the final answer?

24             MR. ALY:  It's 200 and 201, and that's the

25   answer.

Pinal - direct

1          THE COURT:  Do you want to show me any

2   particular language that points to an 80 percent legroom

3   drop?

4          MR. ALY:   The chart is what refers to that.   I

5   cannot point to any language.

6          THE COURT:  All right.   The answer is struck.

7          MR. ALY:  All right.

8   BY MR. ALY:

9   Q.    So now, then, Dr. Pinal --

10          THE COURT:   Wait.   That's just that answer.

11   Then we've got, and I guess we're going to come back to

12   inherency.

13          All right.   They've been renovating my chambers

14   and courtroom for the last month.   This is why things are

15   moved around and are still in a state of flux.   Just for the

16   record, where everybody yelled whoa, we had a flagpole drop

17   and nobody was injured.   All right.

18          So inherency.   You all weren't screaming because

19   I mentioned inherency.   It was about to fall on me.   So

20   let's go back to inherency.   We have to resolve that now.

21          MR. BERL:   And thanks to the technology, I have

22   the Titanium Metals case now, so if he wants to hand up a

23   copy, that's fine.   I have it on the iPhone.

24          THE COURT:  So just to be clear, we started the

25   testimony or the objections went back to this reference to

Pinal - direct

1    an objective of 25 milligrams and 80 percent loss, and that

2    has been struck because of the inability of defendants to

3    point to a place in the expert report where opinions were

4    made with respect to that.

5              Then during the course of the discussion with

6    counsel when I said you're questioning the witness about

7    obviousness, Mr. Aly corrected me and said, no, it's about

8    inherency.  And do we need to resolve that objection or do

9    we just at this point, we're just going to disregard

10   everything the witness has said since the question was put

11   to him about the 80 percent loss?

12             MR. ALY:  No, Your Honor.  That's going to be a

13   very important issue not only here to the extent that we're

14   relying on inherency here and have to do so, but also the

15   properties, the result in our formulation.  It's going to

16   come up again.  And that's why for us that is a post-trial

17   briefing issue.  It could be a jury trial briefing issue.

18   Either way, that is an important point about the scope of

19   inherency for obviousness for which we believe there are

20   several cases from the Federal Circuit to support.  It

21   happened just on trial at a district court trial last year

22   on that very issue.

23             THE COURT:  Do you want to pass up the case you

24   cited?

25             MR. ALY:  The case I cited was Titanium Metals,

Pinal - direct

1    778 F.2d, 775.

2              THE COURT:  Do you want to hand that up to me?

3    You've handed up to me also a bench brief.

4              MR. ALY:  Yes.

5              (Mr. Aly handed documents to the Court.)

6              THE COURT:  All right.  I'm going to guess the

7    plaintiffs don't disagree with anything in your bench brief,

8    but let me ask:  Do you?

9              MR. ALY:  Honestly, I got this five minutes ago.

10             THE COURT:  Sure.  Let's just go through it.

11             The solubility of the compound that solved the

12   inherent property.  I'm going to guess you don't disagree

13   with that.

14             MR. BERL:  Don't disagree.

15             THE COURT:  All right.  The next statement:

16   Data not in the prior art may be used to prove inherency.

17             Do you disagree with that?

18             MR. BERL:  In the obviousness context?

19             THE COURT:  No, no, no, no.  See, that's the

20   point.  We're not.  That is the whole point.

21             MR. BERL:  Okay.

22             THE COURT:  Just on inherency.  Do you disagree?

23   I don't think you would.  Data not in the prior art could be

24   used to prove inherency.

25             MR. BERL:  Yes.

Pinal - direct

```
 1                    THE COURT:  You don't disagree with that?

 2                    MR. BERL:  I don't disagree.

 3                    THE COURT:  Those are the only two statements in

 4      the bench brief, so that's good.

 5                    All right.  So now I think the issue is:  How

 6      does inherency come up?

 7                    MR. ALY:  Okay.

 8                    THE COURT:  All right.  Now, right now we're

 9      having testimony about obviousness.

10                    MR. ALY:  That's right.

11                    THE COURT:  And your position that it's

12      inherency is part of the obviousness inquiry.  Is that

13      correct?

14                    MR. ALY:  Yes.

15                    THE COURT:  All right.  And you've pointed --

16      there's nothing in your bench brief which addresses that,

17      but you've pointed up Titanium Metals and you've handed it

18      to me.

19                    MR. ALY:  Yes.

20                    THE COURT:  All right.  Where should I be

21      reading?

22                    MR. ALY:  You have my one copy, but it would be

23      on the bottom left of that page and there's a quotation from

24      the Twelfth Circuit, and we're applying it to say just

25      claiming a property does not give it any particular special
```

Pinal - direct

1    value.

2              THE COURT:  All right.  Is this the quote you're

3    referring to, which is, it's actually a quote, block quote

4    within the opinion, which says, "However, recitation in a

5    claim to a composition of a particular property said to be

6    possessed by the recited composition be that property newly

7    discovered or not does not necessarily change the scope."

8              Is that what you are referring to?

9              MR. ALY:  Yes, sir, and on the bottom of that

10   same page as well.

11             THE COURT:  Is In re Wilda a Federal Circuit

12   case?  In other words, the case that they are quoting from?

13             MR. ALY:  I don't have the citation in front of

14   me.  I'm told it may have a CCPA designation in the

15   parenthetical, which is the predecessor of the Federal

16   Circuit.

17             THE COURT:  Okay.

18             MR. ALY:  And was binding on the Federal

19   Circuit.

20             And I also wanted to point out, my co-counsel

21   has pointed out that in the bench brief, there is one of the

22   citations in the parentheticals for the connection of

23   inherency and obviousness in the parenthetical to the bench

24   brief, and that's from the citation to the Monsanto case.

25   That's on the second page of the bench brief.

Pinal - direct

```
 1                    And from 1345, note 13, which refers to the

 2     application, it says, applies equally to the PTAB's

 3     obviousness analysis.  So the anticipation analysis

 4     applies --

 5                    THE COURT:  Sorry.  You've got to slow down for

 6     me.

 7                    MR. ALY:  All right.

 8                    THE COURT:  Let's finish Titanium Metals.

 9                    MR. ALY:  All right.

10                    THE COURT:  Do you have Titanium Metals in front

11     of you?

12                    MR. ALY:  I don't have it in front of me.  I'm

13     sorry.

14                    MR. BERL:  He can use my computer copy.

15                    THE COURT:  That would be great.  Thank you, Mr.

16     Berl.

17                    MR. ALY:  Thank you.  Yes.

18                    THE COURT:  Show me language in Titanium Metals

19     that says inherency was something, how it's relevant to

20     obviousness.

21                    MR. ALY:  Titanium Metals is about the principle

22     of inherency.

23                    THE COURT:  Yes.

24                    MR. ALY:  It is not applying it in obviousness,

25     because inherency is something that can be used either for
```

Pinal - direct

1    anticipation --

2              THE COURT:  I think it's pretty clear.  I'm

3    sorry.  I have to be careful.  It's easy to get impatient.

4              MR. ALY:  I apologize, Judge.

5              THE COURT:  No, no.  I thought it was pretty

6    clear that the issue before us is the extent to which

7    inherency is relevant to obviousness.  Now, if I haven't

8    been clear, let me make that really clear.  I thought you

9    were handing up Titanium Metals to show that inherency is

10   relevant to obviousness.

11             MR. ALY:  No, Your Honor.

12             THE COURT:  You're not?

13             MR. ALY:  Titanium Metals, inherency is relevant

14   without having to look at that property.  I think in one of

15   Your Honor's statements, it was that if somebody discovered

16   a new property that they didn't know was a property before

17   from Honeywell, wouldn't that make it patentable?  And my

18   response to that was no, and I said no, and Titanium Metals

19   is an example of a case that shows that just claiming a

20   property, even if it was never before known, does not make

21   it patentable.  Now, applying that same principle to

22   obviousness, there are other cases that do so.

23             THE COURT:  Okay.  There's a total disconnect.

24   The record will show what it says, but if I said that, I

25   don't recollect that.  I'm sure Mr. Berl will defend me at

1      this later point.  I can tell.  I thought it was pretty

2      clear.

3              The whole point of Honeywell and at least what I

4      was trying to articulate is that something can be inherent,

5      but that's irrelevant to obviousness unless the inherent

6      property was known at the time or prior to the invention.

7              MR. ALY:  And I disagree.  And these cases in

8      the bench memo explain that.  Another one that I know --

9              THE COURT:  So show me now.

10             MR. ALY:  Centaurus was another case I know off

11     the top of my head as well.

12             THE COURT:  Where does it say I need to consider

13     inherency as part of the obviousness assessment?

14             MR. ALY:  Okay.  Reading from page 2 of the

15     bench memo in reference to the Monsanto case, 1345 at note

16     13.  The parenthetical reads, "Our finding that the PTAB

17     properly looked to the Kinney declaration in anticipation

18     analysis applies equally to the PTAB's obviousness

19     analysis."

20             And in the prior parenthetical, the reference to

21     the Kinney declaration is the example of the inherency

22     analysis, non-prior art data.

23             THE COURT:  All that says is that the Kinney

24     declaration is clear, looked to the prior art.

25             MR. ALY:  The whole point was, no, it looked to

Pinal - direct

1    non-prior art data and secret data.  That's on the bottom of

2    page 1.  Kinney declarations were non-prior art secret data,

3    but showed that a particular property went hand in hand,

4    necessarily present with the prior art teaching.

5                THE COURT:  Well, they say that the declarations

6    demonstrate what is inherent in the prior art reference.

7                MR. ALY:  Correct.

8                THE COURT:  Not inherent in the compound.

9                MR. ALY:  Well, but either way, the prior art --

10   honestly, Your Honor.  That's either way.  In that

11   particular case, if it was a compound, Judge, and somebody

12   said, this is a compound that has a melting point was a

13   common example, a particular number, that is also an

14   inherent property just like the solubility in the beginning.

15               THE COURT:  How could an inherent property

16   unknown at the time of the invention be relevant to

17   obviousness?

18               MR. ALY:  It's relevant because if the

19   formulation is obvious, it doesn't become nonobviousness

20   despite some number that goes with it if that number wasn't

21   anything about the natural result of the formulation itself.

22   And that's what, Par also is another case that's in the

23   bench memo, which is the last case on page 2, Par Pharma

24   versus TWI.

25               It's explaining the propriety of relying on data

1    collected in cases and affirms that opinion, that you can

2    rely on even data in the patent for obviousness.  And

3    there's a case that I know off the top of my head, Your

4    Honor, Centaurus, which in that case there was a method

5    that was in the prior art of administering a particular

6    drug, and the claim referred to drug plasma levels that went

7    with that administration, and the Federal Circuit said, you

8    cannot claim an obviousness method by adding the drug plasma

9    levels that go with it.  It doesn't make it any less obvious

10   even though that was a new discovery about what those levels

11   are.

12            THE COURT:  All right.  Mr. Berl, do you want to

13   add anything?

14            MR. BERL:  Yes.  Let me just observe this.  This

15   is not even the proper use of inherency even if they could

16   use inherency.

17            Inherency is generally applied to say, even

18   though the claim says 50 and 50 isn't in the prior art, 50

19   would be inherent.  It necessarily always is present, per

20   Titanium Metals, Continental --

21            THE COURT:  If he said I smelled at X degrees,

22   who cares?  If it's an inherent property, it's not

23   patentable.

24            MR. BERL:  Right.  25 milligrams per milliliter

25   is not in the claim.  What they are doing is trying to take

Pinal - direct

1    a data point from the prior art from Eagle's internal files,

2    put the it in the prior art, then do this model that you saw

3    in paragraph 201 of the report, then say that would have

4    given you a motivation and an expectation of success in

5    meeting the target.

6              This is inherency cubed basically.  I never

7    heard of something where you can use non-prior art data to

8    give you the motivation and expectation of success.  None of

9    these cases suggest that that is anywhere close to

10   permissible.

11             THE COURT:  All right.  Well, I mean, right now

12   I'm with Mr. Berl.

13             So let's do this.  I mean, part of it though is,

14   Mr. Aly threw this inherency thing out after the whole

15   objection about whether the objected to portions of

16   testimony were in the expert report.  It's not in the expert

17   report.

18             Is there an expert report on inherency?

19             MR. ALY:  Yes.  This is the same report.  It has

20   the idea that the stability limitations, and this 23.5 would

21   be values that would be the ones that go hand in hand.  So

22   as far as the stability limitations, there's a whole section

23   of inherency that says when you put the formulation with the

24   amount of PEG and the amount of PG, an antioxidant, you're

25   going to hit the number.  All you're doing is claiming the

Pinal - direct

1      number that goes with the temperature.

2                    THE COURT:  Where is that in the report?

3                    MR. ALY:  The report --

4                    THE COURT:  Let me ask you this:  Are you saying

5      that the portions of the testimony that followed the initial

6      statement about the objective being 25 milligrams, are you

7      saying all of that is in the expert report in the inherency

8      section?

9                    MR. ALY:  That is not in the inherency section.

10                   THE COURT:  Okay.

11                   MR. ALY:  That is in this section --

12                   THE COURT:  By this section, you mean 200 and

13     201?

14                   MR. ALY:  200 and 201, yes.

15                   THE COURT:  Well, I don't see it in that report.

16     I am just going to strike all of the testimony that the

17     witness has made, the witness gave, rather, after -- well,

18     from the time that it was objected to by Mr. Berl.  All

19     right.  That's how we'll do it.

20                   All right.  Continue.

21                   MR. BERL:  There was one prior question where he

22     sort of snuck this in before I objected.  I didn't realize

23     he was going to say that.  I think it should be stricken,

24     too.

25                   THE COURT:  Well, here's what I'm going to do

1    just to make it clean.  I'm going to strike it from the

2    point of the objection.  It doesn't make any sense what he

3    says right before.

4              MR. BERL:  Fine.

5              THE COURT:  All right.

6              MR. BERL:  That's right.

7    BY MR. ALY:

8    Q.    Dr. Pinal, when it refers to -- you're at the point

9    now when you've identified PEG and PG, and my question is:

10   What would a formulator do to determine the optimal range of

11   ratios of PEG and PG to test?

12   A.    Well, from aside from looking at the ratios used in

13   the prior art, conduct the testing using those particular

14   ratios.

15   Q.    And is that type of a test, what would the testing be

16   that one would do?

17   A.    It would be making the mixtures of PEG and PG, and

18   then in those mixtures, adding the drug, the desired amount

19   that wants to be dissolved, and then shake them overnight,

20   and the following day see if the drug made a solution.

21   Q.    How routine is the type of testing that you are

22   describing solubility testing, Dr. Pinal?

23   A.    That is a very commonplace routine test done by

24   formulators.

25   Q.    And after determining that a PEG/PG solvent system

Pinal - direct

1    could be used, what would an expectation be that a POSA

2    would have with a higher PEG content versus PG content on

3    stability?

4                MR. BERL:  Objection.

5                THE COURT:  All right.

6                MR. BERL:  I'm not sure I understand the

7    question.  I think it's exactly what Your Honor has

8    stricken.

9                MR. ALY:  I'm just reading from paragraph 189 of

10   the report, Your Honor.  This is a separate issue now.

11               THE COURT:  Hold up.

12               MR. BERL:  Okay.

13               THE COURT:  Yes?

14               MR. BERL:  If he's going to talk about

15   stability, that's perfectly fine.  I thought his question

16   was broader than that, and if he's going to now talk about

17   solubility in that context, I think it would be improper.

18               THE COURT:  The only thing is 189 reads as

19   follows.  "After determining that a PEG/PG solvent system

20   was established, a POSA would then determine the ratio of

21   PEG/PG to use in the formulations.  In so doing, the POSA

22   would have continued to optimize of stability and solubility

23   of the formulation."

24               MR. BERL:  That's fine.  That's what he's trying

25   to adduce.  I have no problem with that at all.

Pinal - direct

1          THE COURT:  Okay.  Then the objection is

2     overruled.

3          MR. ALY:  I forgot my question.  If the court

4     reporter could help me.

5          (The court reporter read back the question as

6     follows.)

7          "Question:  And after determining that a PEG/PG

8          solvent system could be used, what would an

9          expectation be that a POSA would have with a higher

10         PEG content versus PG content on stability?")

11         MR. BERL:  That one had expectation in it, which

12    is I think why I jumped up, and that's not what he said in

13    189.

14         THE COURT:  Okay.  So that was the question that

15    was objected to.

16         MR. ALY:  All right.

17         THE COURT:  Why don't you just scratch that and

18    start again.

19    BY MR. ALY:

20    Q.    Dr. Pinal, after determining if PEG/PG solvent should

21    be used, how could a POSA continue to optimize the stability

22    and solubility of the formulation?

23    A.    Well, once the ability to get the concentration, then

24    the stability question would be settled.  The next part

25    would be to look at how the formulation or what ratio to

Pinal - direct

1    improve, to further slow down the degradation, to improve

2    the stability.

3    Q.    And what would the prior art have taught about the

4    ratio of PEG and PG to use?

5    A.    The prior art would teach that having lower number of

6    OH groups in the formulation, which would happen if more PEG

7    than PG were used, that would reduce the degradation in the

8    formulation.

9    Q.    All right.  And how about the portion of PEG to PG

10   being specifically 90:10?  How would a POSA arrive at that?

11   A.    Well, that is a ratio that is taught by Alam in the

12   prior art, and also as I mentioned earlier, the POSA would

13   try to get, the goal would be to get as much PEG as possible

14   but not 100 percent.

15   Q.    And in terms of the part of the optimization of a

16   formulation, does a person of ordinary skill in the art test

17   the solubility of bendamustine?

18   A.    It's one test that is done.  Once the solubility limit

19   is known, any concentration below that is -- can be, can be

20   prepared.

21   Q.    In terms of the use of PEG and PG as a combination, is

22   it a part of routine formulator's work to test the

23   solubility and stability of combinations of those two?

24   A.    Yes, and as I mentioned, the type of experiments are

25   specifically done in ten percent increments and then

1    starting, looking at the solubility on the one hand and the

2    stability on the other.

3    Q.    And whether it's bendamustine or not, is it the same

4    approach that a formulator takes when evaluating stability

5    and solubility?

6    A.    Yes.  That is the type of approach that's general for

7    formulation development.

8    Q.    In terms of the solubility that Olthoff described,

9    what would the information on PG tell a person of ordinary

10   skill in the art about using PG with bendamustine?

11   A.    Sorry.  Again?

12   Q.    Sure.

13   A.    PG?  Which --

14   Q.    So looking at the teaching of Olthoff that is shown on

15   the screen, DTX-94 at page 14, it has propylene glycol.

16   A.    Okay.

17   Q.    What does that teach a person of ordinary skill in the

18   art about using propylene glycol with bendamustine for

19   solubility?

20   A.    Well, it shows that it would be possible to make a

21   formulation with any value of concentration lower than

22   125 milligrams per milliliter and the example of Olthoff, it

23   goes from 25 to a hundred.

24            MR. ALY:  Here, Your Honor.  Rather than beg the

25   objection, I would just proffer I would like to explore

1    paragraph 195, 196 of the expert report.

2            And my question is, Your Honor, is:  Before I

3    proceed, 196 is going to refer to Eagle testing and whether

4    there has been an allowance for that because of the inherent

5    property doctrine for solubility and get it into evidence

6    and brief it later or skip it altogether and come back?

7            THE COURT:  Mr. Berl?

8            MR. BERL:  Our position is that it's not in the

9    prior art.  How Your Honor wants -- he agreed it's not in

10   the prior art.  I don't think it's proper to be introduced

11   into evidence.  If Your Honor wants it proffered somehow, I

12   don't have much of an opinion about it other than it

13   shouldn't be properly admitted.

14           THE COURT:  All right.  Here's what we'll do

15   then.  To save time, he can ask the questions and then I

16   will look at the cases and make a decision later on.  So

17   with that understanding and essentially a conditional

18   objection.  Go ahead.

19   BY MR. ALY:

20   Q.    To make that easier, I will refer to Eagle

21   specifically when I refer to it.

22           Dr. Pinal, did you review Eagle testing of

23   solubility of bendamustine in PEG?

24   A.    I did.

25   Q.    What did you find as the solubility number that is the

Pinal - direct

1    result of bendamustine in PEG?

2    A.    The number is 23.5 or something of that value.    The

3    exact number, around there.

4    Q.    Using the Eagle testing data for PEG solubility with

5    the published data for PG solubility, what would a person of

6    ordinary skill in the art expect as far as achieving a

7    25-milligram per milliliter formulation?

8    A.    Well, the person of skill would understand that by

9    adding PEG to PG, the solubility would drop from 125 to a

10   lower value, and that at ten percent PG and 90 percent PEG,

11   it would be possible to make a solution with a concentration

12   of 25 milligrams per milliliter.

13   Q.    Now, if that formulation concentration was not

14   available to use on PEG and PG, would it be something a

15   formulator achieves by routine optimization?

16   A.    Solubility measurements are one of the most commonly

17   used tests in formulation development of liquid formulation,

18   and, in particular, injectable formulations.

19   Q.    Now, after having this PEG/PG formulation, this 90:10

20   ratio, what other steps would a POSA take to improve

21   stability?

22   A.    Well, the steps would be to further slow down

23   degradation reactions that take place on development of a

24   molecule.    The organic solvent protects, as I mentioned,

25   very effectively from hydrolysis on the nitrogen mustard

Pinal - direct

1    portion of the molecule.

2              The reaction that happens with the use of

3    polyols, which is a much slower reaction, but it's

4    nevertheless present, is the esterification reaction.

5    Q.    What would a person of ordinary skill in the art use

6    to help slow down the esterification reaction?

7              MR. BERL:  I don't have an objection.  I just

8    wanted the record to be clear about where the conditional

9    objection ended, so it wasn't just the first question.  I

10   think we're past this.

11             THE COURT:  We're onto a new topic.

12             MR. BERL:  We're onto a new topic.

13             THE COURT:  Before we get there, I'm just

14   confused by this question which was asked.  I mean, this is

15   essentially an opening question.  After the foundation was

16   laid, that Dr. Pinal reviewed testing.

17             "Question:  What did you find as the solubility

18   number that is the result of bendamustine in PEG?"

19             I don't know what that question means.

20             MR. ALY:  All right.

21             THE COURT:  Obviously, the witness did, but

22   solubility number that is the result of bendamustine in PEG.

23   I'm not sure what that means.

24             MR. ALY:  May I proceed?

25             THE COURT:  Yes.

Pinal - direct

1    BY MR. ALY:

2    Q.    Dr. Pinal, what is the solubility of a bendamustine in

3    PEG?

4              MR. BERL:  Just to be clear, we're now

5    talking --

6              THE COURT:  You've got a conditional objection.

7    BY MR. ALY:

8    Q.    And let me be clear with the question.

9              THE COURT:  It's based on Eagle testing.

10             MR. ALY:  Yes.

11             THE COURT:  What is the solubility of

12   bendamustine in PEG?  I just want to --

13             THE WITNESS:  The solubility value of

14   bendamustine in PEG based on the number from the Eagle

15   measurement is 23.5 milligrams per milliliter or something

16   very close to that.  I don't remember the exact number.

17   BY MR. ALY:

18   Q.    Now, how does a person of ordinary skill in the art

19   obtain the number of a solubility for a given drug in a

20   given volume?

21   A.    By taking the solvent, add a solid drug, then mixing

22   it overnight and the next day, measuring the concentration.

23   Q.    Now, to a formulator, is the solubility of a drug an

24   inherent property of a drug in a solvent?

25             MR. BERL:  I object.  Objection.  I'm not sure

Pinal - direct

1    what he means by inherent property.  If this is a legal

2    question, then Your Honor has the expertise to answer that.

3              MR. ALY:  I can rephrase.

4    BY MR. ALY:

5    Q.    Is the solubility of a particular drug in a particular

6    solvent something a POSA expects to change when the same

7    experiment is repeated?

8    A.    The solubility value of a compound in a solvent is a

9    property of that compound, so if the measurement is done

10   consistently by more than one laboratory, the value obtained

11   would be the same.

12             MR. ALY:  May I move on to the next section?

13             THE COURT:  Yes.

14   BY MR. ALY:

15   Q.    Now, moving on to additional ingredients for improving

16   stability, Dr. Pinal, what are other steps that a person of

17   ordinary skill in the art would take to improve the

18   stability of a formulation that uses PEG and PG?

19   A.    The next step would be to slow down as much as

20   possible the lowered reaction of esterification, which

21   occurs due to the presence of hydroxyl groups in the

22   formulation.

23   Q.    And how would you do that?

24   A.    Well, the POSA would know that that type of reaction,

25   esterification reaction, is accelerated and the technical

Pinal - direct

1  term is catalyzed by the presence of acidic compounds in the

2  formulation.

3  Q.    What are acidic compounds in the formulation?

4  A.    Acidic compounds in the formulation are the result

5  from the oxidation of PEG.

6  Q.    What is the oxidation of PEG?  What does that mean?

7  A.    PEG is known that to over long periods of time undergo

8  oxidation, which is it reacts with oxygen, and the, part of

9  the product of that oxidation reaction are acidic compounds.

10  And those acidic compounds accelerate the esterification

11  reaction.

12  Q.    What would a person of ordinary skill in the art do

13  for improving stability to address this oxidation issue?

14  A.    Oxidation reactions are blocked, so to speak, in the

15  chemical field by addition of antioxidants.

16  Q.    And what generally are antioxidants?

17  A.    Antioxidants are ingredients in a formulation that,

18  what they do, they preferentially consume oxygen, so they

19  get oxidized in preference to the drug and this way they

20  protect the drug from oxidation.

21  Q.    And did the prior art explain the problem in solution

22  of going hand in hand with PEG and an antioxidant?

23  A.    Yes.

24  Q.    Where did it do that?

25  A.    In the Handbook of Pharmaceutical Excipients.

1    Q.    What is the Handbook of Pharmaceutical Excipients?

2    A.    It's a reference that contains entries for the

3    majority of excipients.  An excipient in a pharmaceutical

4    formulation is any ingredient other than the active drug, so

5    it contains information regarding their properties, their

6    uses, and so on.

7    Q.    And for what purpose would a person of ordinary skill

8    in the art consult with the Handbook of Pharmaceutical

9    Excipients during the formulation development?

10   A.    When the formulator is going to work on developing a

11   formulation, the first pieces of information to collect

12   are the properties and uses of the different excipients,

13   and this is one of the references that are typically

14   consulted.

15   Q.    Rowe.  Look at DTX-160.  In particular, the provision

16   about polyethylene glycol.  And does it teach about the

17   oxidation you mentioned?

18   A.    Yes.  So if we look at the -- at the excerpt that is

19   shown.

20   Q.    This is from page 11 of the Rowe reference, DTX-160?

21         And, Dr. Pinal, what is shown there?

22   A.    The last, the last sentence in that excerpt teaches

23   that oxidation of polyethylene glycols may also be inhibited

24   by use of antioxidant.

25   Q.    And did you reference -- did you point to a reference

Pinal - direct

1   that lists suitable antioxidants?

2   A.    Yes, I did.

3   Q.    Which reference is that?

4   A.    That is the Boylan reference.

5          MR. ALY:  And, Your Honor, I know that we looked

6   at that reference for another purpose earlier.  I am putting

7   up on the screen for this purpose, this purpose is one that

8   Mr. Berl said was already disclosed in the report.  I'm

9   doing it with advance notice.

10         THE COURT:  All right.

11  BY MR. ALY:

12  Q.    Please look at DTX-63.  What does the Boylan reference

13  teach about suitable antioxidants to use in injectable

14  formulations?

15  A.    Well, this reference provides a list of some of the

16  most commonly used antioxidants in pharmaceutical injectable

17  formulations, which are listed in the center of the excerpt,

18  and on the right-hand side it provides the usual

19  concentrations at which they are used.

20  Q.    Are the six listed antioxidants viewed as equals if

21  we're using it in combination with PEG and bendamustine?

22  A.    No.

23  Q.    Why not?

24  A.    Because as I mentioned, one of the issues of PEG and

25  degradation is the production of acidic compounds.  Some of

Pinal - direct

1    these antioxidants are acidic.  What they would do is to

2    catalyze by their acidic nature or accelerate the

3    esterification reaction.

4    Q.    Of the list, what are the antioxidants that are

5    disclosed in Boylan that would not make the problem for

6    esterification worse?

7    A.    The additions which are not acidic on this list are

8    monothioglycerol and tocopherols.

9    Q.    What is monothioglycerol?

10   A.    Monothioglycerol is a compound that's very similar to

11   PG.  So if you take a PG molecule and you connect on the

12   sulfur and hydrogen group, that would be a monothioglycerol.

13   Q.    What are reasons that a POSA would select

14   monothioglycerol for use with PEG?

15   A.    Monothioglycerol is a very commonly used in injectable

16   products.

17   Q.    In terms of the antioxidants listed in the Boylan

18   reference, DTX-63, are they the only antioxidant references

19   that existed in the world?

20   A.    No.

21   Q.    Why are you looking at these, Dr. Pinal?

22   A.    These lists provide the most, the most common, or for

23   lack of a better term, the most popular antioxidants used in

24   injectable products.

25   Q.    Let's move on to the next subject matter.

                            Pinal - direct

 1                THE COURT:  All right.  How much more do you

 2      have left?

 3                MR. ALY:  Based on what we've done, I would say

 4      45 minutes still to go.

 5                THE COURT:  Okay.  Why don't we take a break

 6      then now and how long do you need for lunch?

 7                MR. ALY:  45 minutes.

 8                THE COURT:  All right.  Is that good for you?

 9                MR. BERL:  Yes, Your Honor.

10                THE COURT:  So we'll come back at 2:00 o'clock.

11                (Luncheon recess taken.)

12                       -  -  -

13                Afternoon session, 2:00 p.m.

14                THE COURT:  All right.  Please be seated.

15      Continue.

16      BY MR. ALY:

17      Q.    Dr. Pinal, we've talked about PEG and PG.  You talked

18      about an antioxidant.  To improve the formulation of

19      bendamustine with PEG and PG, what else, what other steps

20      would a POSA take to improve stability?

21      A.    Well, two aspects, and one of them I mentioned would

22      be to neutralize any acidic expression from the point of

23      view, and the other one would be during the process of

24      making a produced inert atmosphere, which is something that

25      has oxygen.

Pinal - direct

1    Q.     Let's take those two one at a time.  The first you

2    said was to reduce the acidity.  Why would a person of skill

3    in the art seek to reduce the acidity of a formulation of

4    PEG, PG and bendamustine?

5    A.     Because the POSA would know that the esterification

6    reaction is accelerated or catalyzed by the presence of

7    acidic compounds.  And the POSA would also know that the

8    oxidation of PEG, one of the byproducts are acidic products.

9    So the POSA would look for ways of neutralizing acidic

10   compounds that would be present to start or that could be

11   produced over in the long term.

12   Q.     And what would a person of ordinary skill in the art

13   do to address that issue with PEG?

14   A.     To put an antioxidant or a base, which is a technical

15   name.

16   Q.     Why would an antacid or a base address acidity?

17   A.     What it does, it neutralizes acid.  If there's a base,

18   it will neutralize it.

19   Q.     Is it common to use a base to neutralize an acid?

20   A.     Yes.  It's a very common feature in pharmaceutical

21   formulations.

22   Q.     What kind of ingredients are used to neutralize an

23   acid?

24   A.     Bases.  I would choose the technical name.

25   Q.     What is the common bases used in pharmaceutical

Pinal - direct

1   formulations?

2   A.    The best known and most commonly used base from a

3   chemical formulation is sodium hydroxide.

4   Q.    What about a person -- what about if a person buys PEG

5   from one company versus another company and they have

6   different acidities.  How would a POSA address that problem?

7   A.    If they have different acidities to start, it would be

8   to add, to neutralize that acidity until a common level of,

9   of the neutral, a neutralization for all the different

10  suppliers.

11  Q.    And to even further improve stability of a

12  bendamustine formulation, you identified, you said, inert

13  gas in manufacturing.  What does that mean?

14  A.    Yes.  There's a different chance one of them would do

15  like sparging, or sometimes the term is blanketing, which it

16  means to use instead of air, living air when making the

17  mixtures or when filling the containers, to replace it

18  with an inert gas such as nitrogen, because air comes in,

19  oxygen.  Oxygen oxidizes substances by replacing it or

20  purging it with nitrogen.  That reduces, further reduces any

21  potential --

22  Q.    Can you please spell the word sparging?

23  A.    S-p-a-r-g-i-n-g, sparging.

24  Q.    Is it routine to use nitrogen sparging with injectable

25  formulation?

Pinal - direct

1    A.     Yes.   As a matter of fact, the commercial equipment

2    that companies purchase for their factories comes already

3    pre-equipped with that type of equipment.

4    Q.     In terms of amount of antioxidant to use in a

5    formulation, where do you look for guidance on an amount to

6    use?

7    A.     Well, it's by looking at the, at the prior art would

8    show how material can be neutralized.

9    Q.     Let's look at DTX-63.   This goes to Table 2 of the

10   antioxidant section.

11            And what amount of antioxidant would a POSA use

12   with a formulation of PEG, PG and bendamustine?

13   A.     Just to clarify, we're talking right now an

14   antioxidants?

15   Q.     Antioxidants?

16   A.     Yes.   So as I mentioned, the -- the acidity.   The POSA

17   would focus on the ones that are not acidic.   And then on

18   the right-hand side there is a column showing the usual

19   concentration, so just as a guide, one percent corresponds

20   to ten milligrams per milliliter.   So if we look at the

21   numbers listed in there, multiply them times ten and that

22   would be the concentration.

23   Q.     Looking at monothioglycerol, which was the antioxidant

24   you had testified about, what would be the concentration a

25   POSA would use?

Pinal - direct

1   A.      As an initial, a starting point, the POSA would use

2   the concentrations listed here, which the range, the range

3   covers from one to ten milligrams per milliliter.

4   Q.      And to reach FDA set guidelines for the definition of

5   antioxidant effect, what amount would be used?

6   A.      Well, the POSA would conduct a test on that range,

7   like one to ten and the other values can be between such as

8   like a midpoint, which would be five milligrams per

9   milliliter.

10  Q.      Is testing with the amount of antioxidant to confirm

11  the effect?  Is that something that a formulator routinely

12  does?

13  A.      As far as routine work in formulation development.

14  Q.      Is that true for all formulations, not just the

15  bendamustine liquid, but all formulations in general?

16  A.      All formulations.

17  Q.      Putting the steps together, you testified about PEG,

18  PG, antioxidants, the antacid and a nitrogen sparging.  What

19  is the formulation that you believe would be obvious in view

20  of the prior art?

21  A.      Well, I have a summary of that formulation.

22  Q.      All right.  Slide 19.

23  A.      It would be a liquid formulation containing

24  25 milligrams per millimeter of bendamustine.  The solvent

25  would be made out of 90 percent PEG and ten percent PG.  It

1      will contain the antioxidant, that's five milligrams per

2      milliliter.  It will contain NaOH antacid to neutralize

3      acidity that could be present.  And for the manufacturing,

4      it would use an inert gas such as nitrogen to further

5      protect it.

6      Q.   Looking at the list of these five components that

7      you've identified and say that's a pretty intricate list,

8      Dr. Pinal.  And would a POSA really arrive at that

9      combination formulation in view of the prior art?

10     A.   It may look intricate, but if you consider that the,

11     they're rather limited as to how many solvents can be used

12     and then the prior art quickly narrowed that.  So it's a

13     result of a narrowing.

14     Q.   Based on your experience at Hoffman- La Roche, are all

15     of the components in this obvious formulation you identified

16     doing the job that a POSA would expect them to do?

17     A.   All of the components in this list of formulations

18     would be performed in the functions that are typically used

19     to perform in all the formulations, yes.

20     Q.   What would be the expectation, what would the

21     expectation be of a POSA as to the effect of taking

22     these steps on the stability of a bendamustine liquid

23     formulation?

24     A.   The expectation would be that with this measure taken

25     to protect the stability, the drug will remain with high

1    level of purity of low degradation over long periods of

2    time, many months.

3    Q.    To even further up the stability, what storage

4    conditions have been used with bendamustine prior?

5    A.    Bendamustine has been stored under conditions like

6    lower temperature, lower than room temperature.

7    Q.    Why is that?

8    A.    Degradation reactions or chemical reactions respond

9    very strongly to changes in temperature, so the lower the

10   temperature, the lower a chemical reaction will take place.

11   Q.    Did the prior art teach that bendamustine was more

12   stable when refrigerated?

13   A.    Yes, it does.

14   Q.    Go back to the Drager reference, DTX-73, page 5 of

15   this exhibit.

16           And, Dr. Pinal, what have you shown here from

17   Figure 3?

18   A.    This is Figure 3 from Drager.  It shows the stability

19   of the formulation.  On the vertical axis gives the percent

20   BM-1, which is how much percent remains.  On the horizontal

21   axis is the time period.  And the formulation used here is

22   very similar to that of Olthoff.  This is 99 percent PG

23   versus Olthoff, which was pure PG.

24           But what we can see here is two lines and they

25   show the effect of temperature on the seat of the reaction.

Pinal - direct

1    We see that at 25 degrees, within a few days, the --

2    basically, the entire drug is degraded.

3              In contrast, at five degrees Centigrade, we see

4    that for a period of about six months, there is very little

5    or no degradation to speak of until, and then after that, it

6    went to degradation, it starts becoming measurable.

7    Q.    And what would a POSA take away about the temperature

8    storage conditions used with bendamustine?

9    A.    That temperature has a very strong effect on the

10   stability as we can see here.  It makes a difference, very

11   substantial of six months.  In this particular example, we

12   can see it goes from a few days to six months by just

13   reducing the temperature.

14   Q.    Now, in Drager, is it not publish results with the

15   combination of PEG and PG for stability?

16   A.    Correct.

17   Q.    Now, this is where we're going to then shift to, if we

18   assume the obvious formulation is obvious, this is the one

19   that's shown on the slide.

20   A.    Okay.

21   Q.    If we can go back to the slide, slide 19.

22             Now, if we assume this is an obvious

23   formulation, is there data already published in the prior

24   art for what the stability results would be at certain time

25   points?

1    A.     Published in the scientific literature, no.

2    Q.     So what did you do to determine the results of the

3    formulation and whether it had an effect on stability as you

4    testified about?

5    A.     I reviewed the stability data from some of the lots of

6    Eagle, made by Eagle.

7    Q.     Well, let's look at the Eagle stability results.  What

8    is your understanding about what Eagle data tests that you

9    reviewed?

10              MR. BERL:  Objection, Your Honor.  I don't want

11   to relitigate everything from this morning.  I think this is

12   a different use of inherency.  It's still inherency.  I'm

13   not sure if Your Honor wants to handle it as a conditional

14   objection or otherwise.

15              THE COURT:  Is the only objection to inherency?

16   I'm going to let it in.  I read opinions about inherent

17   obviousness and inherent anticipation over the lunch break

18   and I can only say I'm certainly, if anything, more

19   confused.  So let's let it all in and you guys can educate

20   me and we can figure out how it's going to pan out.

21              MR. BERL:  I think this is different than what

22   we talked about this morning in terms of how it's being

23   used.  This is being used for the result rather than a

24   motivation, which was this morning.

25              THE COURT:  Okay.  Now, wait a second.

Pinal - direct

1   Unexpected result?

2                 MR. BERL:  No.  This shows that what he calls

3   the obviousness formulation would have had the stability as

4   opposed to this morning was, would you have thought you

5   would reach the solubility level, which is not in the claim,

6   and therefore had a motivation and expectation of success to

7   make this.

8                 THE COURT:  Okay.

9                 MR. BERL:  And I think that's an important

10  distinction.

11                THE COURT:  And the only objection I sustained

12  so far is, I precluded testimony on what was not in the

13  report.  Right?  That is not the basis of this objection

14  you're making right now?

15                MR. BERL:  Correct.

16                THE COURT:  The objection is noted.  We'll let

17  it in and we'll figure out how it should be considered at a

18  later date.

19                Go ahead.  Hold up.

20                MR. BARABAS:  Your Honor, I just want to make a

21  point on clarification.

22                So I represent Slayback.  We only have one claim

23  of one patent asserted against us, and I would just like to

24  clarify our obviousness argument doesn't rely on inherency,

25  it doesn't rely on any internal data.  In fact, Mr. Aly

Pinal - direct

1    hasn't gotten to it yet.  Rely on published references,

2    and we take no position on this inherency/obviousness

3    debate.

4              THE COURT:  Okay.  You'll have to remind me

5    about of that in post-trial briefing.

6    BY MR. ALY:

7    Q.    What Eagle batches did you review to assess the

8    stability data?

9    A.    I reviewed the stability data of the validation

10   batches.

11   Q.    What are validation batches?

12   A.    Validation batches are lots of the product that are

13   made in a way that's exactly the intended commercial

14   product, the same composition, the same conditions, the same

15   containers themselves, and the purpose is to obtain data to

16   demonstrate to the FDA what the quality and controls are all

17   in place before a product can be sold.

18   Q.    And had you reviewed what the formulation is that

19   Eagle had?

20   A.    I did.

21   Q.    And what is the Eagle formulation that resulted in the

22   test data submitted to the FDA?

23   A.    Well --

24   Q.    And it's shown on DTX-31 at page 31.

25   A.    Yes.  It is listed on this, the table shown right now

1    on the screen, and it contains bendamustine 25 milligrams

2    per milliliter.  Monothioglycerol, five milligrams per

3    milliliter.  Propylene glycol, or PG, 0.1 milliliters per

4    milliliter, which is an equivalent to ten percent.

5         The remainder, 90 percent, is PEG 400, which

6    shows footnote mark, and if we look at the bottom of the

7    table under the footnote, it indicates that sodium hydroxide

8    was used to modify, modification of PEG.

9    Q.    You're looking at the bottom footnote there?

10   A.    I am.

11   Q.    Okay.  What, when it says modify PEG, is that the same

12   as adding sodium hydroxide to a formulation with PEG?

13   A.    Yes.  The modification consists of adding PEG, adding

14   NaOH or sodium hydroxide to the PEG.

15   Q.    Now let's look at the Eagle data?

16        THE COURT:  Before you do, can I just ask a

17   question.  It probably has been addressed.  I don't know.

18   Is there a difference between PEG 400 and PEG?

19        I asked a question about solubility and PEG.  I

20   didn't understand it.  I thought you were dealing with PEG

21   400 specifically with Eagle, but is there something else?

22        THE WITNESS:  Yes.  PEG is a general term, so

23   PEG is a chain.  Like I say, a string.  Imagine a string of

24   different beads with two OH's on the end and the PEG can be,

25   you know, have different lengths.  It's the exact same type

Pinal - direct

1      of chemical compound, but 400 refers to the length of the

2      chain is such that the molecular weight is about 400 and

3      300, which is the same PEG, but the string is a little bit

4      shorter.  And there are PEGs also that have longer.

5               So they are the same effect, the chemical

6      structure.  The only difference is the length of the chain

7      and the number is to show how long.

8               THE COURT:  Does it make a difference in any

9      opinion you've given so far whether you're talking about PEG

10     400 or PEG 300?

11              THE WITNESS:  Very little difference, because

12     PEG 400 has a number of OH groups.  PEG 300 would have

13     slightly more and a longer PEG would have slightly less,

14     because it's just a number of green beads in between.  So if

15     you say 100, the total.  It could be three sets of 33 or 2

16     sets of 50, or 1 set of 100.

17              THE COURT:  All right.  Let me ask.  To the

18     lawyers, when I'm thinking about the PEG questions that have

19     been addressed about PEG only, is there any difference I

20     need to factor into any decision that I'll have to make, Mr.

21     Berl?

22              MR. BERL:  I don't believe so.  I have not heard

23     all the testimony.  But not yet.

24              THE COURT:  So far?

25              MR. BERL:  So far I think he has been using them

Pinal - direct

1    interchangeably unless I'm misunderstanding.

2              THE COURT:  That sounds good.  I don't have to

3    worry about the difference.  I can treat them as synonymous

4    to date.

5              MR. BERL:  I think so.

6              THE COURT:  All right.  Go ahead.

7    BY MR. ALY:

8    Q.    Let me add for the purposes of providing bendamustine

9    formulation, would a POSA choose PEG 400?

10   A.    Yes.  That's one of the choices that can be made.

11   Q.    And given the weight percentage of PEG 400 versus 300,

12   why would a POSA select PEG 400?

13   A.    PEG 400 contains slightly less OH groups than PEG 300.

14   Q.    And what are the most widely used PEGs in formulation

15   development?

16   A.    The two most commonly used are PEG 400 and PEG 300 for

17   injectable products.

18   Q.    Now, using the formulation that Eagle has shown on the

19   screen at slide 20, did you review stability data for that

20   at certain time points?

21   A.    I did.

22   Q.    Let's look at the first batch data result.  On slide

23   21, we have an excerpt from DTX-41 at page 9, and it's

24   referring -- and could you please explain, what are ZBR

25   batch 17, 18 and 19 shown there?

503

Pinal - direct

1   A.      Well, ZBR is the code number for the different, the

2   prefix, and then the number for the different lot numbers.

3   So there's three of them.  And what it -- so that's the

4   identifier for the lot.

5           And then the following, you look on the

6   left-hand side, gives the period of time when they were

7   tested, and the next two columns show PG-1 and PG-2, which

8   are the esterification, two types of esterification

9   products.  This is the shorthand for it.

10  Q.      And what is the difference in time between the table

11  on the left and the table on the right?

12  A.      The table on the left is four months time at five

13  degrees Centigrade, and the table on the right is 12 months

14  at the same temperature of five degrees Centigrade.

15  Q.      And generally, what are the effects on PG esters with

16  the formulation that Eagle has shown on slide 20?

17  A.      Well, as we can see going from the three months, the

18  way to look at the stability can be by adding the numbers on

19  the, for PG-1 and PG-2 for each Rowe, and if we see the

20  total amount of, of PG esters produced after four months is

21  lower than the total amount produced after 12 months.

22  Q.      In terms of doing a total PG ester calculation, just

23  for the record, can you just tell us what that involves for

24  a particular time point and batch?

25  A.      Yes.  So if we look, for example, at the, the first

504

Pinal - direct

1    Rowe on the left-hand side is the lot number ZBR 017.  After

2    3.95 months, about four months, they were .03 percent.  The

3    total amount of PG esters, 0.03 plus 0, which is 0.03.

4    Q.    What we're looking at on slide 21 for the ZBR data, is

5    that one example of data that you had generally reviewed

6    from the Eagle stability test?

7    A.    Yes.  This is one example of the data that I reviewed.

8    Q.    Rather than show all of the data, what we'll do is

9    we'll look at the ones as the claim terms come up that

10   relate to particular claim terms.  Is that all right?

11   A.    Yes.

12   Q.    Now, in terms of the next step, we've got the

13   formulation and the data that you've now testified generally

14   about.  We'd like to turn to the application of the prior

15   art to the asserted claims of the Family Two patent.

16             All right.  The next slide will show, what is

17   the first combination of prior art that you believe showed

18   the Family Two claims be invalid?

19   A.    The first, the first combination is Olthoff in view of

20   Alam and Boylan.

21   Q.    Let's talk about that combination.  What is the

22   motivation to combine Olthoff, Alam and Boylan?

23   A.    Well, Olthoff teaches that it can be stabilized by

24   dissolving it in a formulation made out of polyols, and Alam

25   teaches the use of mixtures of polyols, specifically PEG and

Pinal - direct

1   PG in specific ratios that can stabilize nitrogen, such as

2   cyclophosphamide, which is the same type of chemical

3   reaction that bendamustine has.  And Boylan teaches the use

4   of antioxidants and the amount that can be used in order to

5   prevent oxidation.

6   Q.    And why would a person of ordinary skill in the art

7   think that using the teachings of Alam with Boylan and

8   Olthoff would result in a stable liquid formulation?

9   A.    Because if they are put together, they -- the

10  different elements that would go to create that formulation.

11  Q.    All right.  And let's talk about your next

12  combination, the second combination.  What is the second

13  combination of claims that you believe renders the Family

14  Two claims obvious?

15  A.    The second combination is the reference by Drager in

16  view of Alam and Boylan.

17  Q.    And can you explain, what is the reason that a person

18  of ordinary skill in the art would combine the teachings of

19  Drager, Alam and Boylan?

20  A.    Both Drager and Alam teach the use of mixture of

21  solvents for formulation.  Drager specifically for

22  bendamustine and Alam for a nitrogen mustard, which has

23  similar chemistry as bendamustine.

24        Drager provides further teaching on how to slow

25  down the reaction on the other side, on the right-hand side

1    of the bendamustine molecule, which is the esterification

2    reaction by using solvent mixtures.

3            And Alam, as I mentioned before, provides the

4    specific combinations of PEG and PG.

5            And Boylan -- Drager also teaches the use of

6    antioxidants in the formulation, and Boylan teaches the

7    specific antioxidants and the specific amounts.

8    Q.    And why would a person of --

9            THE COURT:  Can you stop for a second?  Just

10   slow down.

11           Now, to me, this is déjà vu.  I want to make

12   sure I'm not missing something, and I'm not saying it's bad

13   to repeat.  In fact, it's good.  It's helpful in a way.

14   It's your time.  But haven't we covered this ground or am I

15   missing something, like I said?

16           MR. ALY:  We have covered the ground with the

17   pieces, but for an obviousness determination --

18           THE COURT:  You want to combine them?

19           MR. ALY:  It's just to combine the teachings and

20   now go claim by claim.

21           THE COURT:  But in a way, right, what you did

22   then prior, other than set me up to make it easier to

23   understand the application of the claims was unnecessary,

24   because it really is claim by claim?

25           MR. ALY:  I don't believe so, Your Honor,

1    because the background with the two combinations covers all

2    of the Family Two claims, and it's about saying what the art

3    shows.

4              The whole point of doing it this way and this is

5    why they do it in every case, it's to show what does the

6    prior art teach and then compare it to the claims.  If we

7    started with the claims and went backwards, we would have a

8    different problem.

9              THE COURT:  That's fair, but what I'm getting at

10   is -- fine.  I'm not saying it any different than you are.

11             MR. ALY:  All right.

12             THE COURT:  You're basically now just taking

13   what he has already opined about and showing how it applies

14   to specific claims?

15             MR. ALY:  Exactly.

16             THE COURT:  That's how it's applied to specific

17   claims?

18             MR. ALY:  Yes, Your Honor.

19             THE COURT:  Okay.  That's what I want to make

20   sure.  Go ahead.

21   BY MR. ALY:

22   Q.    Dr. Pinal, what would be the reason that a person of

23   ordinary skill in the art would expect the Drager, Alam and

24   Boylan combination to result in a stable formulation?

25   A.    As I mentioned, putting the different drugs together,

Pinal - direct

1   the POSA would come to the different attributes of

2   properties of the formulation.

3   Q.     Okay.  Now we are going to look at a claim chart that

4   takes the teachings you've already talked about, so you

5   don't have to repeat the teachings every time?

6   A.     Okay.

7   Q.     But explain why the claim chart you created have what

8   they have on there?

9   A.     Okay.

10          MR. ALY:  To do so, Your Honor, because of the

11   objection sustained about the Boylan reference, which was to

12   take the reference to PEG out, we have now recreated to

13   demonstratives to take this out.  This is going to be a new

14   copy, but it's a full set for anybody who wants them.  We

15   have those copies.  I'm going to hand up four full sets to

16   the Court, but it's to address that issue, that we have now

17   done another version with apologies.

18          THE COURT:  Okay.

19          MR. ALY:  May I approach?

20          THE COURT:  Yes.

21          (Mr. Aly handed charts to the Court.)

22          THE COURT:  What we'll do is, we're going to

23   hand back to you then what you're replacing so that there

24   will be no confusion as to what we look at here and then

25   tomorrow you can submit bound copies of this.  I appreciate

Pinal - direct

1    it.

2                    MR. ALY:  Yes, Your Honor.

3                    THE COURT:  Okay.

4                    MR. ALY:  We have now received back the original

5    demonstratives that will turn in and we'll replace versions

6    that are now stapled with bound versions tomorrow.

7                    THE COURT:  Great.  Thank you.

8    BY MR. ALY:

9    Q.    Now, we'll put up slide 30, Dr. Pinal.  And, Dr.

10   Pinal, a very busy slide, and this slide is going to take

11   the longest for us to get through because then it's pretty

12   much the same thing over and over again for the most part.

13   But let's just spend a few minutes on this one and then

14   we'll get through it.

15                    Now, we're first looking at claim 2 of the '831

16   patent, the asserted claim, and what have you shown on the

17   demonstrative on the left side?

18   A.    This demonstrative I have taken each one of the

19   elements of the claim and put it on a separate Rowe, so each

20   Rowe on this table, there's one element.  And then I compare

21   it on the right-hand side to the references from the

22   combination.

23   Q.    Now, you have a top section called formulation claim

24   elements and a bottom property claim elements.  What is the

25   difference between those?

Pinal - direct

1    A.      The top part refers to the composition, the elements

2    of the composition of the formulation, and the property

3    claim element refers specifically to the stability of the

4    formulation defined, as I mentioned before, in terms of

5    percent of degradation, the time and temperature.

6    Q.      And in terms of the formulation elements, why does the

7    combination of Olthoff, Alam and Boylan render claim 2 of

8    the '831 patent obvious?

9    A.      Because both Olthoff and Alam teach a known liquid

10   composition.

11   Q.      And as far as the other formulation components of

12   claim 2 of the '831 patent, can you please explain why the

13   combination of Olthoff, Alam and Boylan render the claims

14   obvious as to the formulation elements?

15   A.      Yes.   If we go to the background element, which refers

16   to the salt of bendamustine, that is specifically shown in

17   Olthoff and Alam teaches a nitrogen mustard, which has the

18   same demonstrating the nitrogen mustard group as

19   bendamustine.

20   Q.      And can you please continue?

21   A.      I will continue.   So for the third element, it refers

22   to an acceptable fluid giving composition for propylene

23   glycol, and Olthoff teaches propylene glycol and Alam

24   teaches the specific mixture of propylene glycol containing

25   the value of ten percent listed in the elements of the

Pinal - direct

1    claim.

2              The next one, which is polyethylene glycol, or

3    PEG, is generally taught in Olthoff because PEG belongs to

4    the family of polyols and Alam specifically teaches the use

5    of, the use of PEG.

6              For stabilizing amount of an antioxidant, which

7    is the next element, Boylan teaches specifically the use of

8    monothioglycerol and also teaches specific amounts typically

9    used.

10             And on the last element of the formulation claim

11   portion, there is the mixtures of, or ratios of PEG to PG in

12   the solvent, and also describes in general terms a polyol,

13   which the two PEG and PG belong to.  But Alam specifically

14   teaches the combinations or mixtures of PEG and PG in the

15   proportions listed on these elements of the claims.

16   Q.    Doctor, taking the formulation claim elements into

17   account, Dr. Pinal, do you have an opinion as to whether

18   they are obvious in view of Olthoff, Alam and Boylan?

19   A.    Yes.  For the reasons that I presented today.

20   Q.    And in view of the formulation claim elements, if

21   those are obvious, what is your opinion as to the property

22   claim elements in claim 2 of the '831 patent?

23   A.    My opinion is that the degradation properties, the way

24   the drug degrades in the formulation, is a result of the

25   underlying chemistry in this type of system, the chemistry

Pinal - direct

1    that the formulator would focus on.  And if this type of

2    system is produced, then the type of activity and reaction

3    that it would involve would be an integral part of that

4    system.

5    Q.    Now, this claim doesn't require sodium hydroxide.

6    Why did you still include it in the obviousness formulation?

7    A.    Because as I mentioned, sodium hydroxide is necessary

8    to neutralize the acidity that can't come from PEG, and that

9    is something that the POSA would know from the prior art.

10   Q.    So putting it altogether, if the formulation claim

11   elements are accepted to be obvious and the property claim

12   elements are accepted to be inherent, what is your opinion

13   as to claim 2 of the '831 patent?

14   A.    Well, my opinion is that claim 2 is obvious.

15   Q.    Go to the next slide, 31.  The next asserted claim is

16   claim 3 of the '831 patent.

17           And Dr. Pinal, why did you gray out sections

18   here and have one line that is not grayed out?

19   A.    Because claim 3 is repetitive of the elements of claim

20   2, so I have grayed out the ones.  The ones that look in

21   normal text is the one that's different.  And it refers to a

22   pharmaceutically acceptable fluid comprising about ten

23   percent of propylene glycol, and Olthoff teaches the use of

24   propylene glycol and Alam teaches specifically the ten

25   percent content of PG.

513

Pinal - direct

1    Q.    What is your opinion as to the formulation claim

2    element of claim 3 of the '831 patent?

3    A.    That would be obvious based on the, on the composition

4    of the formulations.

5    Q.    And I assume that the rest of the opinions of claim 2

6    would still apply to claim 3 as well?

7    A.    Correct.

8    Q.    Turn to the next slide, 32, claim 5 of the '831

9    patent.

10          What is the differences between claim 5 and the

11   other claims we've been discussing so far?

12   A.    Here, the difference is on the second element, which

13   refers to a concentration of about 25 to about 50 milligrams

14   per mL of bendamustine, and it also teaches a range of

15   bendamustine concentration that includes the range shown

16   here on the claim element.

17          And Alam also using a nitrogen mustard also

18   teaches a range of concentrations that cover the same range

19   used on the claim.

20   Q.    Now let's go to the next claim from the second Family

21   Two patent on slide 33, which are claim 2 of the '831

22   patent.  I'm sorry.  I'm wrong about that.

23          We're going back to claim 2 of the '831 patent,

24   but with your second combination, which is Drager plus Alam

25   plus Boylan.  And you've basically covered everything

Pinal - direct

1    already with Olthoff, but can you just summarize the

2    differences that Drager makes to your analysis?

3    A.    Yes.  So Drager uses a combination of solvents, and in

4    that mixture of solvents, controls the reaction of the

5    esterification portion of the molecule.

6          The second element is also the focus on the

7    bendamustine.

8          The third, the third element is the value of ten

9    percent, five to ten percent by volume of propylene glycol

10   is taught in Drager.  Drager also teaches the use of polyols

11   and specifically lists polyethylene glycol, and Drager also

12   teaches about the use of an antioxidant.  And for the last

13   one, the Drager reference refers to mixtures of solvents

14   specifically covering this last element.

15   Q.    And what is your opinion as to whether the combination

16   of Drager, Alam and Boylan renders obvious the formulation

17   claim element of claim 2 of the '831 patent?

18   A.    My opinion is that this combination renders this claim

19   2 obvious.

20   Q.    And if the formulation claim elements are obvious and

21   the property claim element is inherent, as you -- with your

22   earlier testimony and that's found to be the case, what is

23   your opinion as to the obviousness of claim 2 of the '831

24   patent as a whole?

25   A.    My opinion is that as a whole, the claim 2 of the '831

Pinal - direct

1    patent is obvious.

2    Q.    Let's look at the next slide, claim 3 of the '831

3    patent as shown on slide 34, with again the one difference

4    of the ten percent by volume propylene glycol.

5          Can you explain how the Drager instead of

6    Olthoff in combination with Olthoff and Drager applied?

7    A.    Yes.  In this case, the difference between the

8    previous combination which was Drager, Drager teaches the

9    use of mixtures of solvents and including the teaching for

10   ten percent propylene glycol.

11   Q.    And let's look at the next -- so I should ask you --

12   sorry about that.

13         On slide 34 for claim 3, what's your opinion on

14   the combination of the obviousness element in view of

15   Drager, Alam and Boylan?

16   A.    Can you repeat the question?

17   Q.    Of course.  What is your been as to the obviousness of

18   claim 3 formulation claim element in the '831 patent?

19   A.    That the combination of these claim elements is

20   obvious.

21   Q.    And if the formulation is found to be obvious and the

22   property claim element is found to be inherent, what is

23   your opinion as to claim 3 overall in view of those

24   references?

25   A.    That as a whole, claim 3 would be obvious.

516

Pinal - direct

1  Q.     The next slide, 35, is showing claim 5 again of the

2  '831 patent in combination with Drager, Alam and Boylan.

3               Can you explain how the use of Drager and Alam

4  and Boylan makes obvious the limitation that's shown, the 25

5  to about 50 milligrams per millimeter of bendamustine?

6  A.     Yes.   Once again here, the difference on the

7  combination is on Drager, and Drager teaches for

8  bendamustine a range of concentrations that includes the --

9  includes the recited range of 25 to 50 milligrams per

10  milliliter.

11  Q.    And claim 2, and if you look at the combination of

12  Drager, Alam and Boylan, what is your opinion as to the

13  obviousness of the formulation claim elements of claim 5 of

14  the '831 patent?

15  A.    My opinion is that the formulation claim elements of

16  this claim 5 are obvious.

17  Q.    And if the formulation is obvious and the property

18  claim elements are found to be inherent, what is your

19  opinion as to the obviousness of claim 5 of the '831 patent

20  overall in view of the three references, Drager, Alam and

21  Boylan?

22  A.    My opinion is that claim 5 as a whole is obvious.

23  Q.    Now, as far as the limitation as to the property claim

24  elements, it's grayed out here for this claim, but for

25  claims 2, 3 and 5, it's always less than or equal to

Pinal - direct

1    .11 percent PG esters at one month at five degrees Celcius.

2                Is that your understanding?

3    A.    It is.

4    Q.    Now, is there something special about .11 percent as

5    opposed to any other result?

6    A.    No.   It is just, it is a criterion that, as I

7    mentioned, stability is defined with three.   One is the

8    extent or percent of degradation.   The other one is the

9    time.   The other one is the temperature.   Those represent

10   one criterion for stability.

11   Q.    Did you looked at the Eagle test stability data for

12   that particular time point with that degradation to see if

13   it's found in all of the test data using the obviousness

14   formulation?

15   A.    Yes, I have.

16   Q.    And let's go to slide 26.   Now, the claim term was for

17   .11 percent or less at one month.   How does the ZBR data

18   that you reviewed compare to that claim term?

19   A.    It shows that after one month, the combined presence

20   of PG-1 and PG-2 is 0.11 percent.

21   Q.    But the time here is more like four months.   How

22   does that inform your opinion about the one month data

23   point?

24   A.    The reason is that degradation increases with time,

25   and if the value of the four months is less than

Pinal - direct

1    .11 percent, it had to be even less than that after one

2    month.

3    Q.    Did you consider data in addition to the ZBR batches

4    also from Eagle and Teva?

5    A.    Yes.

6    Q.    From the Eagle batches, let's go to slide 27.  Did you

7    consider batches with the BDM prefix, an excerpt shown on

8    the bottom of slide 27 from DTX-46?

9    A.    Yes, I did.

10   Q.    And for the record, ZBR batch data that we had

11   reviewed on the previous screen was referred to earlier in

12   the testimony today.

13   A.    Yes.  That is the table that I showed before and

14   explained how the numbers are added up.

15   Q.    Now we're looking at a new set of data on DTX-46,

16   slide 26.

17            So can you explain, please, what is shown on the

18   excerpt that you've called out on the bottom?

19   A.    Yes.  The result from the stability determination as

20   shown, if we look at the bottom Rowe, which is highlighted

21   on the red box, we can see that at five degrees Centigrade,

22   some time after the five months time point, the levels of

23   impurity or for the PG esters.  In this case, the two last

24   columns on the right-hand side have the header 1.1 and 1.13,

25   which corresponds to PG-1 and PG-2.

1    Q.    And what are the results shown for PG-1 and PG-2 at

2    the five-degree Celcius storage?

3    A.    The results are BDL, which stands for below detection

4    limit.

5    Q.    And what is the formulation that was used with batch

6    BDM 173 that's shown on the slide?

7    A.    This is the formulation of which I showed the summary

8    as the other formulation, which included sodium hydroxide in

9    it.

10   Q.    And what are the other components for the record?

11   A.    It's bendamustine at 25 milligrams per millimeter.

12   Thioglycerol, which is the same as monothioglycerol as five

13   milligrams per millimeter.  PEG 400 and PG and the ratio of

14   90 to 10 to make one milliliter, and with PEG being treated

15   with sodium hydroxide.

16   Q.    And let's go to the next slide, 28.  What are you

17   showing on slide 28, Dr. Pinal?

18   A.    Well, we see here for three other batches from Eagle

19   that at five degrees Centigrade storage, after the one month

20   period in, for the three batches shown here, which are BDM

21   201, BDM 202 and BDM 203, the PG ester one and PG ester two

22   are determined as BDL, which means below detection limit,

23   and so that means in all cases, the sum of the two less than

24   0.11 percent.

25   Q.    And because this is still from DTX-46, for the record?

Pinal - direct

1    A.    DTX-46, yes.

2    Q.    For the limitation of one month storage and having

3    less than or equal to .11 percent PG esters at five degrees

4    Celcius, and with the obvious formulation in five milligrams

5    per milliliter antioxidant, 90:10 of PEG to PG and using

6    sodium hydroxide, have you seen any data that does not meet

7    that limitation?

8    A.    I have not.

9    Q.    Let's go to the next claim, which is claim -- now

10   we're going to go to the next patent, which is the '797

11   patent and it has different limitations as to stability.

12   Let's look at slide 42, please.

13              And, Dr. Pinal, you've so far been talking about

14   the '831 patent, which is shown on the left in claim 1.

15              How does the formulation component of the '831

16   patent, claim 1, compare to claim 1 of the '797 patent?

17   A.    The two formulations have the same components.

18   Q.    All right.  As far as the formulation component,

19   rather than go through them one by one, let's not do that.

20   Are all of your opinions the same as to the formulation

21   components for the '797 patent claims as they are for the

22   '831 patent?

23   A.    Yes.

24   Q.    Now, the difference here with the '797 patent, let's

25   look at the impurity limitations.  Slide 45, please.

1           Now, what is the stability limitation of claim 9

2      of the '797 patent?

3      A.     Well, the stability limitation is shown here on slide

4      45 at the bottom, which is less than or equal to

5      0.43 percent of total PG esters at about three months at a

6      temperature of about 25 degrees Centigrade.

7      Q.     And 25 degrees Centigrade, based on what you had

8      reviewed and discussed about that temperature, what concerns

9      do you have about the stability at that room temperature?

10     A.     Well, as I showed with Figure 3 from the Drager

11     reference, it shows that 25, 25 degrees degradation of

12     bendamustine occurs much faster than five degrees

13     Centigrade.

14     Q.     And for this property claim term less than or equal to

15     .43 percent at about three months from the '797 patent, what

16     is your opinion?

17     A.     My opinion is that this, this set of stability

18     criteria is a reflection of the natural chemistry taking

19     place in that system, the chemistry that a formulator would

20     focus on.

21     Q.     And what is the argument made, well, it doesn't always

22     happen at 25 of degrees Celcius and something more needs to

23     be done?

24           What is your opinion as that argument is

25     presented to you?

Pinal - direct

1    A.    Well, if these results are, this stability, it's not a

2    result of the natural chemistry that the formulator would

3    focus on, then there's some piece of information that the

4    POSA would need to have in order for that to work.

5    Q.    And where would the POSA expect to look to see if that

6    information was provided?

7    A.    Look at the patent to see the teachings of the patent

8    itself.

9    Q.    And other than using the formulation claim elements,

10   does the patent teach any way to teach the total .43 percent

11   total PG esters at about three months at a temperature of

12   25 C?

13   A.    No.

14   Q.    Claim 9, if the formulation claim elements are found

15   to be obvious in view of Olthoff, Alam and Boylan, which

16   you've already addressed and the property elements found to

17   be inherent, what is your view as to the invalidity of claim

18   9 of the '797 patent?

19   A.    My opinion would be that claim 9 is obvious.

20   Q.    And if claim 9 of the '797 patent is found, property

21   claims in that claim to be not inherent, what is your

22   opinion as to the invalidity of claim 9 of the '797 patent?

23             THE COURT:  Hold up.

24             MR. BERL:  I mean, I think he's about to talk

25   about enablement.  He hasn't provided any basis for that at

Pinal - direct

1    all.  He hasn't -- I mean, an expert is not allowed to come

2    and say he's not enabled without analyzing whether it's

3    undue experimentation, and all he answered a moment ago was

4    there was no answer in the patent not to test for

5    enablement.  The question is undue experimentation.  He

6    provided no evidence of that at all.

7              MR. ALY:  What he has done so far is just say

8    that if a person can't reach it without following the steps

9    in the patent, then it's not enabled.  It's really that

10   simple.  But if you want to go to results, we are going to

11   go to results to show what the difference could be with

12   information that is in the patent or isn't, and we've got

13   those results.

14             THE COURT:  All right.  So I think I understand

15   better Mr. Aly's inherency argument now, which is you're

16   saying the test results show that there's an inherent

17   property claim, which is essentially a result, if you will,

18   of one of the claims of the patent, and therefore it's

19   invalid for inherency, that claim?

20             MR. ALY:  Yes.

21             THE COURT:  All right.  And you're saying it's

22   part of obviousness, because essentially you're treating

23   the formulation claims different than the property claims?

24             MR. ALY:  Yes.

25             THE COURT:  Okay.  I'm still not ruling on

1    anything definitive.  It makes more sense to me now.

2              MR. BERL:  Just to be clear, what he just

3    recited is his argument this afternoon.  That's not the same

4    thing what he was doing this morning.

5              THE COURT:  Well, it may not be, so we'll get to

6    that.  At least this makes more sense than what was before

7    lunch.

8              Are you relying, just so I'm clear, on the test

9    results?  Are all the test results performed by Eagle?

10             MR. ALY:  Yes.

11             THE COURT:  All right.  And could you have come

12   in and performed your own test results to prove inherency

13   for that?

14             MR. ALY:  Yes.

15             THE COURT:  You could have?

16             MR. ALY:  It would be the same thing.

17             THE COURT:  Yes.  I just wanted to make sure.

18   But you are relying on Eagle test results, but now you're

19   arguing in the alternative that if you couldn't achieve the

20   test results, that it's not enabled.

21             MR. ALY:  That's right.  And, Your Honor, that

22   would go -- I can just elicit that with some testimony or I

23   could explain the difference.  I think the next slide will

24   show exactly what we're talking about.

25             THE COURT:  All right.  Go ahead, Mr. Berl.

Pinal - direct

```
 1          MR. BERL:  Those aren't the only two options.  I
 2   mean, it's not the case that it's not -- that it's not
 3   inherent, it must be not enabled.
 4          THE COURT:  A hallmark I guess of our law that
 5   litigants get to argue in the alternative.  It does strike
 6   me in this sense as troubling of the it seems to me you
 7   ought to have to choose.
 8          Again, I will hear from the parties.  You ought
 9   to have to choose.  Either the test results are such that
10   the property claim isn't inherent and therefore the patent
11   is invalid because it's not inventive, it's invalid, or, no,
12   the test results don't show an inherent property, but nobody
13   can achieve it.  At least the patent doesn't tell you how to
14   achieve it.  Therefore, it's invalid because of lack of
15   enablement.
16          MR. BERL:  I agree with 95 percent of what you
17   said, except therefore it's invalid for lack of enablement,
18   because they would need to show more than showing that it's
19   not inherent.  They have to show undue experimentation.
20          THE COURT:  Right.  I get that.  That's a fair
21   point.  So that is a fair point, too.
22          But let me ask you, Mr. Berl:  Does he get to
23   argue in the alternative?
24          MR. BERL:  I don't think so.  I think it's
25   irreconcilable, as I said in my opening.
```

Pinal - direct

1          THE COURT:  See, here is the problem.  I can't

2    remember everything you said in your opening.  That was a

3    lot of information to digest.

4          MR. BERL:  Granted.  So I don't see how both can

5    be true even in the alternative.  I think it's a little late

6    to go here, and as I said, there's not two sides of the same

7    coin.  They're totally different inquiries.  They're

8    irreconcilable.

9          THE COURT:  Now, I kind of remember your slide.

10   All right.  So, all right.  Anyway, that is informative for

11   me at least going forward.

12          Now, as far as what we've got here is this slide

13   at this stage, Mr. Aly, talking about obviousness.

14          MR. ALY:  Yes.

15          THE COURT:  So why is enablement in your slide?

16          MR. ALY:  Because to transition to the next

17   slide, basically.  The point of it is, Your Honor, it's

18   either one or the other.  It is two sides of the same coin,

19   and the reason has to do with the sodium hydroxide.  There

20   has been some testimony about that.

21          Dr. Pinal says it's obvious and that's not in

22   the claim.  But if you add sodium hydroxide, which everybody

23   did but it's not in the patent, then it has to be inherent.

24   And the enablement is, I don't want plaintiffs to come back

25   and say, sodium hydroxide, nobody would have thought to do

Pinal - direct

1     that.

2                    THE COURT:  I did want to come back.  It's

3     funny.  It did actually make a mark and I did want to come

4     back.

5                    I didn't understand the question when you said

6     basically posit that sodium hydroxide is not in the claim of

7     the earlier patent but just assumed.  Is that the reason you

8     were asking that question?

9                    MR. ALY:  The obviousness formulation that Dr.

10    Pinal developed included sodium hydroxide in it.  The

11    alternative is relying on, as plaintiffs say, you wouldn't

12    have thought of sodium hydroxide.  That's something else.

13    Then the response would be, that's not in your patent.

14    Sodium hydroxide is not in the patent.

15                   MR. BERL:  The fact that it's not in the patent

16    doesn't mean it's not enabled.  Black letter law.  I mean,

17    if it's not undue experimentation, you use sodium hydroxide,

18    and he has testified four times already that it would have

19    been the most obvious thing he has ever seen to use sodium

20    hydroxide.

21                   It can't possibly not be enabled.  There's a

22    separate question on inherency.  This whole thing about them

23    adding sodium hydroxide even though it's not in the claim,

24    this is sort of the tangled web of the inherency claim.

25                   They now say, oh, we know it's not always going

Pinal - direct

1    to meet this stability, so now we're going to add something

2    else in order to sort of put our thumb on the scale so that

3    we can get closer to inherency.  I don't think they can get

4    there even with sodium hydroxide, but it doesn't work that

5    way.  You can't say, here is the particular thing within the

6    claim that I really, really like and ignore the rest of the

7    claim.

8              MR. ALY:  That's a misstatement of both the law

9    and the facts.  The issue here is -- honestly, the issue

10   here is what's the obvious formulation?  We don't get to

11   start with the claim language for that and then talk about

12   the property.  It's whatever the obvious formulation is.  It

13   may have way more things than the claim as we agree, sodium

14   hydroxide would be included and so would oxygen.  That's not

15   in the claim either.  That's the formulation a formulator

16   would have developed.  And when they do so, they would

17   always get this result.  That's what we're proving right

18   now.

19             And if plaintiffs want to say, we didn't really

20   claim that, we only claimed a subset of that, and there

21   might be other ways to do it and some work, some don't,

22   that's the definition of enablement and it's all their

23   choice.

24             Plaintiffs can say we agree with you, somebody

25   would do these things.  That's our primary position, it's

1    inherent.  If plaintiffs choose to argue with Dr. Pinal and

2    take the position, no, you have to take a few other things

3    that we didn't tell your in our patent, that's the

4    definition of enablement.  It's either or.

5              MR. BERL:  Just to be clear, that's not the

6    definition of enablement.  If we didn't tell you in our

7    patent, that means it's not enabled.  That's not the

8    definition.  It's undue experimentation and he has no

9    opinion in his report that there's, that there is undue

10   experimentation to get to sodium hydroxide, nowhere.  He

11   said the opposite today, but even in the alternative, he

12   can't do it because it's not in his report.

13             THE COURT:  All right.  So right now we've got

14   an objection to the slide and testimony?

15             MR. BERL:  It was really testimony.  I mean, the

16   slide isn't evidence as far as I understand, but he was

17   about to elicit an enablement opinion without having

18   established undue experimentation.  That was the objection.

19             MR. ALY:  You can prove lack of enablement by

20   just showing the results that it does not work without the

21   secret extra step that would be obvious and that's what

22   we're doing.  We also will elicit the testimony Mr. Berl is

23   talking about.  He's saying it's not anywhere in the report.

24   I would advise him to read 227 because I'm going to start

25   reading from paragraph 227 of the report in my next

1    question.

2              The only purpose of including the slide was to

3    say we'll cut into all the inherency stuff and shift to

4    enablement to show the either or with sodium hydroxide.

5    That's what we're going to see on the next slide.

6              THE COURT:  You know what, you're going to have

7    a lot of room for cross-examination.  I'm going to let it

8    go and you can raise these issues.  That's not to say I

9    don't appreciate your raising them for me.  I find it

10   informative.

11             All right.  Go ahead.

12   BY MR. ALY:

13   Q.    All right.  Dr. Pinal, let's look at slide 43.  Okay.

14   Slide 43, we have less than .43 percent PG esters at

15   25 degrees Celcius.

16             And what are you showing to the Court here, Dr.

17   Pinal?

18   A.    Here, these are results from two stability results

19   that I reviewed from two batches from Eagle.  The batches

20   are BDM 173 and the other one is BDM 172.

21   Q.    And what is the comparison between BDM 173 and 172?

22   A.    Yes.  If we look at the top of the slide 43, the

23   criteria for stability is less than 0.43 percent of PG

24   esters at 25 degrees.

25             If we go on the left-hand side for batch BDM

Pinal - direct

1   173, that batch was made with using NaOH for sodium

2   hydroxide.

3            And if we look at the data after three months,

4   which is the third, the third number on the column that has

5   the time, it has 0.21 percent for PG-1, which has the header

6   1.10 and BDL or below the section level for PG-2.

7   Q.    Let me stop you there.

8   A.    I'm sorry.

9   Q.    The 25-degree Celcius treated with sodium hydroxide,

10  does that meet the claim limitation?

11  A.    It does, because adding 0.21 plus something that is

12  below the section gives less than 0.43.

13  Q.    Now, on the right side when you described earlier

14  without sodium hydroxide, what is the result for the same

15  formulation, the same temperature, the same time?

16  A.    We can see that after either 15 days or one month, the

17  concentration of the PG esters is greater than 0.43 percent.

18  Q.    And when you're referring to the greater than

19  .43 percent, what data are you identifying from the BDM 172,

20  which does not have sodium hydroxide?

21  A.    Okay.  So if we look after 15-day period, for PG-1,

22  it's 0.51 and for PG-2, 0.16.  So by adding those two

23  numbers, the result is greater than 0.43, and the same

24  applies after, the same type of calculation after one month,

25  you see on the next one.

Pinal - direct

1  Q.    But the claim is for three months, so how does this

2  data help you if it stops at one month for the without

3  sodium hydroxide?

4  A.    As I mentioned before, degradation is something that

5  increases with time.  So if after 15 days, or after one

6  month the value is 0.4, greater than 0.43 percent, it will

7  be greater than 0.43 -- 0.42 percent anytime after that.

8  Q.    So if it is obvious, in other words, within the

9  wheelhouse of a POSA to use sodium hydroxide, what is your

10  opinion as to whether batches using sodium hydroxide will

11  have -- will meet the stability limitation?

12  A.    Well, the data showed that using sodium hydroxide

13  results in the formulation meeting the, meeting the levels,

14  the levels.

15  Q.    And what happens if you don't?

16  A.    The formulation doesn't meet those levels.

17  Q.    And because the claim doesn't require sodium

18  hydroxide, and assuming for this question that a POSA would

19  not be able to figure that out on their own, to use sodium

20  hydroxide, what is your opinion as to the invalidity of the

21  claim with the .43 percent PG esters at three months at

22  25 degrees Celcius?

23        MR. BERL:  Objection.  The same thing.  I just

24  want to preserve the record.  Not being able to figure it

25  out on their own is not undue experimentation.  It's not the

Pinal - direct

1    same thing.

2                   MR. ALY:  I can rephrase the question.

3    BY MR. ALY:

4    Q.    If a person of ordinary skill in the art could not

5    achieve through optimization the formulation with sodium

6    hydroxide, would they be able to achieve that result at room

7    temperature without undue experimentation?

8    A.    I'm going to --

9                   MR. BERL:  That's the same thing.  That's not in

10   his report either.

11                  MR. ALY:  I just read from paragraph 227 and

12   228, which I told you I would.

13                  MR. BERL:  No.

14                  THE COURT:  Hold up.  You've got an objection

15   and it's based on the witness being questioned about and

16   asked to provide an opinion that's not set forth in the

17   expert report.

18                  So, Mr. Aly, you claim it is set forth in the

19   expert report.  Can you tell me where it is?

20                  MR. ALY:  Paragraphs 227 and 228, Your Honor.

21                  THE COURT:  So some of the terms are new to me.

22   Refrigerability, what's the temperature for that?

23                  MR. ALY:  Five degrees.  And room temperature is

24   25.

25                  THE COURT:  All right.  So then the paragraph on

                          Pinal - direct

1    227 does, there's a general statement that for reasons in

2    Section 14.A.2.B, that the stability would have been

3    achieved at room temperature.  So that's what you are

4    relying on?

5              MR. ALY:  Yes, Your Honor.

6              THE COURT:  Section 14A.2.B.

7              MR. ALY:  Page 230.

8              THE COURT:  Page 230?

9              MR. ALY:  Page 230 through 232.

10             THE COURT:  Mr. Berl, I think it's not a lot of

11   detail, but I think the opinion seems to be in there.  It's

12   the subject matter.

13             What are you --

14             MR. BERL:  The question was:  Is there undue

15   experimentation?  I think, respectfully --

16             THE COURT:  I think the question was -- I think

17   the initial question was something about optimization.  Then

18   I think after your objection, the question was rephrased to

19   discuss routine optimization.  Let's go back and look at

20   that.

21             Yes.  So the last question that was objected to

22   was, a person of ordinary skill in the art could not achieve

23   optimization, the sodium with sodium hydroxide, would they

24   be able to achieve that at room temperature without undue

25   experimentation?

1          MR. ALY:  Yes.

2          THE COURT:  You said that's the same objection.

3    That's not in his report either.  I think that's in his

4    report.

5          MR. BERL:  Respectfully, I think Your Honor will

6    search in vein in the report for any opinion that says it is

7    undue experimentation to practice this claim.  There's

8    nothing that says that.

9          MR. ALY:  He just looked at paragraph 227 and

10   228.

11         228, I can read from that.  The asserted claims

12   of the '707 patent, which is the one that's the whole family

13   with all of these same limitations, would not be enabled

14   because this term would require undue experimentation and

15   then it's referring to all of the facts from the patent that

16   says if somebody else cannot figure it out on their own,

17   then the patent doesn't help.  It's an either or.  That's

18   exactly the undue experimentation question Mr. Berl is

19   posing.

20         We agree, that's our primary position.  It is

21   obvious.  That tells you it's not undue experimentation if

22   it is obvious, but if it isn't, that's exactly the flip side

23   of undue experimentation, and that's why Dr. Pinal had all

24   of these reports with all of the paragraphs explaining the

25   data.  If I had to assume that I can't figure out sodium

Pinal - direct

1    hydroxide, that's what 227 and 228 are about, then please

2    see all my data that shows you can't do it.

3              MR. BERL:  227 and 228 are about a patent that's

4    not in the case, the '707.  That's gone.

5              MR. ALY:  Come on, come on, come on.

6              THE COURT:  Wait, Mr. Aly, here's the thing.

7    Everybody needs to take a deep breath.

8              MR. ALY:  Right.

9              THE COURT:  All right.  So let's let Mr. Berl

10   finish and you'll have your chance to speak, and you please

11   address your remarks to me, not to Mr. Berl.  Okay?

12             MR. BERL:  Thank you, Your Honor.

13             THE COURT:  Go ahead.

14             MR. BERL:  227 and 228 are referring to the '707

15   patent.

16             THE COURT:  Yes.

17             MR. BERL:  The '707 patent is not asserted.

18   They refer to Section 14A2.  If you go to Section 14A2,

19   which is starting on, you know, I think probably about page

20   228, where they get to the enablement part is 896, paragraph

21   896 on 234.  Right.  And they get to the claims that matter

22   here that they're talking about here at the bottom of page 2

23   33, so that's where it says the PG ester stability

24   limitations are not enabled starting at paragraph 895 on

25   233.  The last bullet point is the limitation that Mr. Aly

Pinal - direct

1    is examining the witness about.

2              Paragraph 896 is the only substantive opinion

3    about that.  He says they're obvious in the first sentence.

4    The second sentence says, it's all routine experimentation.

5    And the third sentence says to the extent the routine

6    optimization is not obvious, they're not enabled because

7    they do not disclose any of these steps that a POSA would

8    have needed to take to obtain a storage stable formulation.

9    No opinion that that is undue experimentation, none.

10             THE COURT:  Okay.  So the record is clear, we

11   can all disagree on facts.  The defendants have relied on

12   paragraph 227 and 228 of the expert report.  Section, or

13   paragraph 227 makes a reference to Roman Numeral XIV.A.2.B.

14             Section 228 makes a reference to Section Roman

15   Numeral XIV.A.2.

16             Roman Number XIV, the report is entitled, The

17   asserted claims of the Family Two patent and claims 14 and

18   15 of the '887 patent are indefinite or not enabled.

19             Section A, XIV.A is titled, the term long-term

20   storage table is indefinite and not enabled.  And in the

21   first paragraph it says, which is paragraph 873, the report

22   states, every asserted claim of the '707 patent and claims

23   14 and 15 of the '887 patent claim a long-term storage

24   stable BDM product.

25             The next paragraph, paragraph 874, is a

Pinal - direct

1    discussion of the '707 patent.

2              Section XIV.A.2B, which is referenced in

3    paragraph 227, is entitled long-term storage stability is

4    not enabled at room temperature.

5              And in the first paragraph that follows that

6    title, paragraph 887, there's discussion about the long-term

7    storage stable requirement in the asserted claims of the

8    '707 patent as well as claims 14 and 15 of the '887 patent.

9              Now, the paragraph that Mr. Berl pointed to is

10   Roman Number XIV, Section B, which isn't referenced in

11   either 227 or 228 and it's titled PG ester stability

12   limitations are not enabled.

13             And then XIV.C of the report is titled the

14   Family Two patents are indefinite and not enabled for

15   stabilizing amount of an antioxidant.

16             All right.  Now, the question concerns what

17   claims of what patent?

18             MR. ALY:  The question that's pending is claim 9

19   of the '797 patent.

20             THE COURT:  So it's neither the '707 patent or

21   the '831 patent?

22             MR. ALY:  That's right.  But now, if I may, Your

23   Honor.  The reason this happened when there was a ton of

24   limitations that overlapped, and if you read on paragraph

25   895, it lists all of the limitations that have the PG esters

Pinal - direct

1    problem, including the claim 9 of the '797 patent, which is

2    on paragraph 895, under the heading, the PG ester stability

3    limitations are not enabled.

4              And in paragraph 896, it is not cut and paste

5    again from the earlier section, but it specifically says,

6    see paragraphs 216 to 229, which includes the 227 and 228,

7    where we started this conversation.

8              THE COURT:  All right.

9              MR. ALY:  And I understand this report had

10   references crossing over into each other, but that's because

11   there were 250 claims.  If we did this cut and paste every

12   single time, that would be filling up quite a few boxes of

13   documents.

14             THE COURT:  Right.

15             MR. BERL:  If I may, I don't think that's the

16   issue.  The long-term storage table is a different

17   limitation that may have different enablement issues because

18   rather than having to go out three months, you have to go

19   out significantly further.

20             So it's not just cutting and pasting.  They are

21   advancing one argument against terms that claim to have

22   long-term storage stable.  Those claims are all out of the

23   case.  They're not there.  We dropped them and we dropped

24   them for a reason, so we could narrow the case and get rid

25   of some of these defenses.  There remain 19.

Pinal - direct

1              And so he never said here in paragraph 896,

2      outside of the long-term storage stable claims that are

3      gone, that it's undue experimentation to reach the

4      claims that require three months like the claims of the

5      '797.

6              MR. ALY:  And, Judge, it's very simple.

7      Paragraph 895 lists the limitation and you'll see the bullet

8      points.  There are five of them.  None of them have the

9      long-term storage.  That's because the point here is, all of

10     the same arguments for long-term storage, which had the room

11     temperature versus refrigerated condition, apply here.

12     That's exactly where paragraph 896 was replaced to refer to

13     that same issue.

14              THE COURT:  All right.  You know, when you have

15     so many patents and so many claims, so many prior art

16     references, folks can make typographical errors, and folks

17     also, I think, are trying to do their best to not be

18     unnecessarily duplicative.

19              I think that although the reference in paragraph

20     227 -- well, I think that the reference to paragraph, or

21     section -- let's be really clear.  I will start over.

22     Sorry.

23              I think the reference in paragraph 227,

24     detection 14, whether it be A.2.B or A.2, would have

25     directed both attention to Section XIV.  And I think if

Pinal - direct

1    folks, and I think it would have been expected that given

2    the size of the case, the number of claims, that the

3    defendants could reasonably think that Section XIV.B read in

4    connection with the rest of Section 14 and paragraph 227 and

5    228 of the report was sufficient to allow for the expert to

6    opine on enablement with respect to the long-term storage,

7    and you can cross-examine him on undue experimentation, Mr.

8    Berl.

9              All right?  Go ahead.

10   BY MR. ALY:

11   Q.    Dr. Pinal, in addition to what's shown on slide 43,

12   did you consider additional batches of Eagle's formulations

13   of bendamustine that did not use sodium hydroxide and see

14   what happened at room temperature?

15   A.    Yes, I did.

16   Q.    Go to the next slide, 44.

17             What are you showing on slide 44, Dr. Pinal?

18   A.    Well, here on the right-hand side is batches, BDMs,

19   data that I reviewed.  The two at the bottom are from a

20   patent application.

21             And on the right-hand side it lists the amounts

22   of PG ester degradant, and what the results show for this do

23   not contain NaOH or sodium hydroxide is that the numbers for

24   PG esters vary very widely among the batches and the values

25   are greater than the 0.43 percent, that we have seen before.

Pinal - direct

1    Q.    Let's go back to slide 45 then, to circle back to

2    where we started on this major issue.

3              Claim 9 of the '797 patent, if it is obvious,

4    the formulation with sodium hydroxide, you've given

5    testimony on that.

6              Now, what if the sodium hydroxide is not

7    obvious?  What is your opinion as to claim 9 of the '797

8    patent, which requires .43 percent or less at three months

9    at 25 degrees Celcius of PG esters?

10   A.    Well, in the hypothetical, the formulator would know

11   to use sodium hydroxide.  Would need to learn it from

12   somewhere, so like the patent should instruct how to do it.

13   Q.    Does it teach anything other than the formulations

14   described here to do so?

15   A.    No, it does not.

16   Q.    Let's go to the combination then of Olthoff, Alam and

17   Boylan as applied to claim 9 of the '797 patent.  If the

18   formulation claim elements are obvious and the property

19   claim element is deemed to be inherent, what is your opinion

20   on the invalidity?

21   A.    In that situation, claim 9 would be obvious.

22   Q.    All right.  Let's go to the next slide, claim 11 of

23   the '797 patent compared against Olthoff, Alam and Boylan.

24              What is the limitation that's different from

25   claim 9 in claim 11?

Pinal - direct

1    A.     Well, in the regular text, the element claim, it's

2    stabilizing amount of thioglycerol, monothioglycerol.   And

3    Boylan teaches the use of monothioglycerol and also teaches

4    the amount of which it is usually placed in the formulation.

5    Q.     As far as the formulation elements of claim 11 of the

6    '797 patent, what's your view on the validity of those?

7    A.     My view is that they are obvious over the combinations

8    of Olthoff, Alam and Boylan.

9    Q.     And if the claim formulation elements are obvious and

10   the property claim element is inherent, what is your overall

11   opinion that claim 11 of the '797 patent?

12   A.     That claim 11 would be obvious.

13   Q.     Okay.  Let's go to the next slide, 47.

14          Now we have the combination of Drager, Alam and

15   Boylan, and you've already addressed the formulation

16   elements and you've already addressed the property claim

17   elements separately for the earlier combination of Alam,

18   Olthoff and Boylan.  Is my understanding correct?

19   A.     Yes.

20   Q.     What is your overall opinion if the formulation claim

21   elements are obvious and the property claim element is

22   inherent in view of Drager, Alam and Boylan?

23   A.     That claim 9 of the '797 is obvious.

24   Q.     And the next slide, 48.  For Drager, Alam and Boylan

25   as applied to claim 11 of the '797 patent, what is your

Pinal - direct

1    opinion as to the formulation claim element?

2    A.    That those elements are obvious.

3    Q.    And is there, based on the Drager teaching, if the

4    formulation claim element is obvious and the property claim

5    element is inherent, what's your opinion as to the overall

6    validity of claim 11 of the 797 patent?

7    A.    My opinion would be that claim 11 of the '797 patent

8    as a whole would be obvious.

9    Q.    Okay.  And now there's another limitation as to

10   stability data.  If we go back to slide 30, and here it's

11   reading from claim 2 of the '831 patent, which also applies

12   to the dependent claim, and you've already covered the

13   obviousness combinations for the formulation and the

14   .11 percent at one month.

15          What is the difference here in terms of yet

16   another stability data point?

17   A.    Yes.  If we look at the bottom elements, it's another

18   stability criteria, which is less than or equal to

19   0.18 percent at about 12 months at a temperature of about

20   five degrees Centigrade.

21   Q.    And as far as that limitation, because we're now at

22   five degrees Celcius, what does the data you reviewed show

23   you about meeting that property with an obvious formulation

24   in view of Olthoff, Alam and Boylan?

25   A.    It shows that it is a reflection of the natural

1    chemistry that the formulator would focus on.  So I think

2    it's inherent.

3    Q.    Did you see data to show what is the PG ester value at

4    12 months at five C using Eagle data?

5    A.    I did.

6    Q.    Go to slide 29.  You've mentioned already the ZBR

7    data.

8          For now, all we need to know is how are the

9    results you reviewed at 12 months compared to the claim

10   limitation at .18 percent at five months at five degrees C?

11   A.    We've already seen this data and we see by the

12   submission of PG-1 and PG-2 in each group, the summation is

13   less than or equal to 0.18 percent as in the claims.

14   Q.    And this is for the record.  Why 5C and why 25C?  What

15   are those representing?

16   A.    5C represents refrigeration, which is a typical source

17   temperature for pharmaceutical products and 25C represents

18   room temperature.

19   Q.    Now, we've gone through all the Family Two issues and

20   we have 15 minutes on Family Three as to the formulation

21   part because most of those are going to be method claims,

22   Your Honor, so I'm going to ask questions now about Family

23   Three.

24          So we've gone through now -- Dr. Pinal, thank

25   you for your time here.  We're going to go through Family

Pinal - direct

1    Three patents and we're going to show the table of contents

2    slide on that just to remember what those patent numbers

3    are.

4              Slide 53.  And what are the Family Three

5    patents?

6    A.    They are the '887, the '568, and the '399 patents.

7    Q.    And did you consider the POSA, who the POSA would be

8    for the Family Three patents?

9    A.    Yes, I did.

10   Q.    And is that the same as your Family Two POSA?

11   A.    Yes, it is.

12   Q.    Now, do you understand that the plaintiffs have

13   offered a different position for their Family Three POSA as

14   far as the combination of people could be?

15   A.    Yes.

16   Q.    Does your opinion change if the plaintiffs' version or

17   your version is accepted as to the validity of Family Three

18   patents?

19   A.    No, that will not change my opinion.

20   Q.    All right.  Let's go to the priority date.  What is

21   the priority date for the Family Three patent?

22   A.    It is March 2012.

23   Q.    '12?

24   A.    Yes.

25   Q.    And in terms of March 2012, by that time, was there

```
1   new prior art that was available in 2012 that was not
2   available in 2010?
3   A.    Yes.
4   Q.    What?
5   A.    There was application, a patent application by Palepu
6   that was published in 2011.
7   Q.    Let's look at DTX-984.
8         Now, Palepu, do you have an understanding as to
9   how this Palepu relates to the inventors of the Family Two
10  patent?
11  A.    Yes.  This application, which is shown here,
12  13/016,473, my understanding is because the same priority
13  date, the Family Two patent belongs to that group.
14  Q.    And so how do the disclosures in the text and the text
15  of the Family Two patent compare to the 2011 reference?
16  A.    The formulation is the same type of formulation in the
17  Family Two application.
18  Q.    Okay.  So now with the passage of time, let's just
19  look at the disclosure in Palepu 2011 that is now prior art
20  to Family Three and we're going to be looking at DTX-94, the
21  paragraphs 24 to 33.
22        Dr. Pinal, can you generally describe the
23  formulation described in Palepu 2011?
24  A.    Yes.  It starts in paragraph 25, which it's a
25  bendamustine or a pharmaceutically acceptable salt is the
```

1    active.

2              Item B has a pharmaceutically acceptable fluid.

3    Further down, that includes polyethylene glycol and

4    propylene glycol, which is say, PG.  Then it discloses a

5    stabilizing amount of thioglycerol.  And concentration for

6    bendamustine of 50 milligrams per milliliter.  And then

7    the rest reflects that it's a pharmaceutically acceptable

8    fluid.

9    Q.    And does it give a ratio of PG?

10   A.    Yes.  On paragraph 31, it gives a ratio of, effect of

11   PG of 90 to 10.

12   Q.    And does Palepu 2011 specify the amount of antioxidant

13   to you?

14   A.    Yes.  On paragraph 32, it is listed as 2.5 milligrams

15   per millimeter of thioglycerol.

16   Q.    How does it describe the stability of the formulation

17   it discloses?

18   A.    If we look at 33, it describes the stability, which

19   refers to the first part about it says method of testing.

20   That's the criterion is less than about five percent

21   impurities.  PAR stands for partial air, how to cap it.  And

22   as determined by HPLC, stands for high performance

23   chromatography.  And the number 223 NM is how it's

24   effective.

25              After that, and then the last portion is after

1    at least 15 months of storage at a temperature of from about

2    five degrees Celcius to about 25 degrees Celcius.

3    Q.    Okay.  Now, as to the formulation component and the

4    stability component, how does the disclosure in 2011 compare

5    to the one claim that's asserted against Slayback?

6    A.    It's the same type of formulation as I mentioned.

7    Q.    Can you just put that on the screen so we can see the

8    comparison of what's disclosed in Palepu 2011 versus what is

9    disclosed and claimed in the one claim asserted against

10   Slayback?  Dr. Pinal?

11   A.    Yes.  Sorry.  On the right-hand side we have, again,

12   the -- what we just learned from the Palepu application, and

13   on the left-hand side we have a claim, starting with claim

14   13, which depends from claim eight and depends from claim 1

15   of the, of the -- hold on.

16   Q.    Two?

17   A.    No.  The number of the patent.

18   Q.    2011?

19   A.    No.

20   Q.    Oh, the patent?

21   A.    The patent.

22   Q.    Okay.  '887 patent?

23   A.    '887.  Sorry.  Yes.  The '887 patent.

24   Q.    And does the '887 patent, how does the stability

25   limitation of the '887 patent in claim 1C compare to, I'm

Pinal - direct

1    sorry, claim 1A compare to the stability disclosure in the

2    prior art throughout 2011, paragraph 33?

3    A.    We see the last portion of 1A of '887, claim 1 of the

4    '887 patent, and we compare it to the test on paragraph 33

5    of the Palepu 2011 application.  We see the criterion for

6    stability is the same in both of them.

7    Q.    Is it the same word for word?

8    A.    Yes.

9    Q.    Okay.  Now, in terms of the formulation that is

10   disclosed and shown in Palepu 2011, how would that be

11   administered to a patient?

12   A.    It would be first diluted into an admixture and then

13   from that solution, then the formulation would be

14   administered into the patient.

15   Q.    And in terms of the prior art concentrations, the

16   Treanda concentration that was used, do you know what that

17   is?

18   A.    Yes.  The Treanda concentration, the concentration

19   asks for milliliter.  The dose would be like everything, 500

20   milliliter bag.

21   Q.    How does the concentration of Palepu 2011 compare to

22   the concentration of Treanda?

23   A.    It falls within the range of what the concentration of

24   the Treanda product would do.

25   Q.    Okay.  Now, the Treanda product was, like you said,

Pinal - direct

 1   five milligrams per milliliter after reconstitution, and the

 2   Palepu as we saw was 50 milligrams per milliliter in

 3   concentration for the reconstituted.  How do those two

 4   compare?

 5   A.    Well, they vary by a factor of ten.

 6   Q.    If you increase the concentration, what does it allow

 7   if a medical professional chose to do so, what does it allow

 8   them to do?

 9   A.    Well, if the concentration is ten times greater, the

10   same amount of the drug would be contained in a volume that

11   is ten times smaller.

12         So with that -- that would allow the medical

13   professional, if he or she chose to do that, to administer

14   the same amount of drug in the time which is proportionally

15   shorter given the smaller volume.

16   Q.    Did you prepare an illustration just to show the point

17   that volume and concentration are related?

18   A.    Yes.

19   Q.    Go to slide 55.

20         MR. BERL:  Yes.  Unless I missed it somewhere, I

21   don't believe this opinion is in the report either.

22         MR. ALY:  Sure.  Paragraph 466, and there's one

23   at 476.

24         MR. BERL:  So I do object, Your Honor.  466 is

25   not about Palepu, which is the subject of this.

Pinal - direct

1          476, to which Mr. Aly pointed, is really

2     their --

3          THE COURT:  Wait.  Sorry.  I thought he pointed

4     to 466.

5          MR. BERL:  Yes, he did.

6          MR. ALY:  I pointed to two paragraphs, 466 and

7     476.

8          THE COURT:  Oh, I'm sorry.

9          MR. ALY:  I did.

10          THE COURT:  Okay.  So, sorry.  So 476.

11          MR. BERL:  466 is not a discussion of Palepu and

12     whether Palepu would provide some reason to believe that you

13     could make the volume and concentration of family, what they

14     call Family Three.

15          476 is really their argument where they talk

16     about how you would achieve this concentration, and that's

17     why I stood up.  I'm concerned that we're going the same

18     place we were this morning.

19          Their argument, if you look at it, from 476 to

20     480, is basically the same argument as this morning.  It's

21     about doing experiments, and they take the results of the

22     experiments and then compare them to calculations they make

23     and say, oh, I would have an expectation of success based on

24     experiments that were not conducted in the prior art, and to

25     the extent that's what they are doing, they are, I object on

1    that basis that it's not prior art.  To the extent that

2    that's not what they're doing, I object on the basis it's

3    not in the report.

4              MR. ALY:  That's not what we're doing and it is

5    in the report with a concentration and volume is the slide

6    in the question that's currently pending.

7              A POSA would have immediately appreciated that

8    the higher concentration of bendamustine, it uses an example

9    in Olthoff's non-aqueous solvent system meant that a smaller

10   infusion volume could be used to administer the same total

11   dose.  The same point.

12             THE COURT:  All right.  I will overrule the

13   objection.  Let's go.

14   BY MR. ALY:

15   Q.    Dr. Pinal, what have you shown on slide 55?

16   A.    It's just an illustration showing that when the

17   concentration is lower, a given amount of drug would be

18   contained in a, in one size of volume, and in the volume,

19   the concentration gets higher, the same amount of drug can

20   be present in the smaller amount of the volume.

21   Q.    And if a medical professional chose to do so, how does

22   the volume affect time of administration?

23   A.    There is a direct relation between how much volume is

24   being injected and how long it takes to inject it, because

25   it's the rate of administration is set up on how many

1    milliliters per minute or milliliters per hour and so on.

2    Q.    What are common bag sizes that you have used?

3    A.    The small bag size is a 50-milliliter batch.  You

4    know, the common name refers to it as a minibag because it's

5    a small.  And there's batches 100, 250 and larger.

6    Q.    Why would a POSA -- is 50 milliliters considered a

7    common infusion?

8    A.    Yes.  It's a very common size volume for infusion,

9    yes.

10   Q.    Now, you are not a medical professional.  I think

11   we're clear on that?

12   A.    Correct.

13   Q.    Who do you understand will address the rest of the

14   limitations as to the methods of the Family Three claims?

15   A.    Yes.  My opinion is related to the formulation part up

16   to the dilution, because that's the responsibility of the

17   formulator or the pharmacy.

18   Q.    Then all we need to do then to finish up is to look at

19   the slides for the claims of the Family Three and just talk

20   about the formulation component.

21   A.    Okay.

22   Q.    With what you testified about.

23         Slide 56.  And, Dr. Pinal, you just compare the

24   opinions you've given with claim 13 of the '887 patent and

25   you're going to take Palepu 2011 and the Treanda label.

1    A.    Yes.   If we go, the ones we have marked are the ones

2    that I'm opining on.   The ones that are blank are not

3    opinions that I'm commenting.

4              So for the second element, which is the first

5    one that I have marked, refers to nonaqueous competition and

6    giving an amount of ten milligrams per milliliter to about

7    100 milligrams per milliliter is in the Palepu reference

8    that we just looked at.

9              The dilution of the aqueous liquid for the

10   admixture is specifically giving instructions for that on

11   the Treanda label, but it also talks in the Palepu

12   application.

13             The element that refers to the total volume of

14   about 50 milliliters, I just mentioned before, the smaller

15   volume in relation to the Treanda label is the direct result

16   of the higher concentration in the -- in the solution.

17             And, finally, there are some property claim

18   elements at the very bottom that describe what we just saw

19   the criterion for stability, which is in the '887 patent on

20   claim 13, which is the same as those disclosed in the Palepu

21   application from 2011.

22   Q.    All right.   And let's just group them all together at

23   the end here.

24             Claim 11 of the '568 patent, let's go to the

25   next slide.   The formulation claim element for claim 11 of

Pinal - direct

1    the '568 patent.  Can you please apply those to your

2    opinions as to Palepu 2011 and the Treanda label?

3    A.    Yes.  If you look at the two first boxes that have a

4    checkmark, my understanding is there's agreement between the

5    parties that the concentrations in the dilution from the

6    Palepu application correspond to the Treanda SciDus

7    concentration.

8    Q.    And in terms of the limitations that are grayed out,

9    you've already addressed those.

10            And can you address the liquid composition with

11   an antioxidant, says optionally here, may or may not be

12   required.

13            What's your opinion as to whether an antioxidant

14   could be use optionally?

15   A.    According to the Palepu reference, it teaches the use

16   of an antioxidant.

17   Q.    Okay.  And in terms of the calculation of dilution

18   ratio, as far as the stipulation, we can refer to the

19   statement that was filed and I think signed by His Honor

20   yesterday at paragraph 6, so I will get the exact specific

21   dates of that.

22            Stipulation 6 is a stipulation between the

23   parties filed under seal.  It explains that the calculations

24   can be done, and we don't have to do the math to show that

25   if he did the dilution, this would be the result that you

Pinal - direct

```
1    get.  Plaintiffs still object or dispute whether one would

2    do the dilution work.

3              Okay.  Let's go to the next slide, 58, and here

4    we have a different method with a different time and cycle.

5    That's medical as to the formulation components of claim 18

6    of the '568 patent.

7              Is there anything that changes for this claim?

8    A.    No.  I'm not providing an opinion on this, which is

9    the expertise of the medical specialist.

10   Q.    Okay.  Let's go to the next slide, 59.  It's referring

11   to method portions, but it has now parenterally

12   administering a hundred milliliters or less with the liquid

13   composition pricing 2.19 to about 5.59 milligrams per mL

14   bendamustine.

15             Can you explain about Palepu and Treanda with

16   respect to those limitations?

17   A.    Yes.  This is for the same type of analysis, smaller

18   volume than what the Treanda label instructs, corresponds to

19   a higher concentration, and that covers the, the element

20   that refers to the administering about 100 milliliters or

21   less.

22             And for the, for the liquid composition,

23   comprising about 2.19 to about 5.59 milligrams of

24   bendamustine.  It's the same type of reason that I presented

25   before.  That would correspond to the dilution from the
```

Pinal - direct

1   Palepu reference.

2   Q.     Okay.  And in terms of the next slide, slide 60, claim

3   13 of the 339 patent.  Variations on the same theme.  Can

4   you explain how Palepu and Treanda apply to the formulations

5   on that claim?

6   A.     Three checkmarks.  The first two, one -- the first

7   two, liquid composition comprising about 5.6 milligrams of

8   mL bendamustine.

9          And the next one refers to the solvent

10  component.  Those two, as I mentioned, my understanding is

11  the agreement between the parties that they correspond in

12  dilution to the Treanda label.

13         And the checkmark at the bottom of the three

14  shown on this slide, the polyethylene glycol is taught in

15  Palepu 2011.

16  Q.     Last slide, Dr. Pinal.  Look at 15 of the '399 patent.

17  The same basic information but with different details.

18         And can you please explain your opinion using

19  Palepu 2011 as to claim 15 of the '399 patent?

20  A.     Yes.  So here on the second element, a similar

21  analyses that lower volume corresponds to higher

22  concentration, so there's the connection between what the

23  Treanda label instructs, and the reduced volume of the

24  elements of the claim would result in a proportionally

25  higher concentration.

Pinal - direct

1          And a similar analysis, that's what I presented

2    before, after the dilution, the concentrations range recited

3    on the first element of claim 15 of the '399 patent, it

4    starts in Palepu 2011.

5    Q.     And as to the Family Three patents as a whole for just

6    the formulation part, and that's DTX-8 for the '887 patent,

7    DTX-5 for the '568 patent and DTX-13 for the '399 patent,

8    what is your opinion as to whether they are obvious?

9    A.     They are obvious in view of Palepu and the Treanda

10   label.

11   Q.     Last, just because I don't know what is going to

12   happen later, but as a general proposition, not going into

13   any detail, did you consider secondary considerations to

14   assess your invalidity opinion?

15   A.     I did.

16   Q.     And did they change your opinions as to whether or not

17   the patents are obvious?

18   A.     They do not.

19          MR. ALY:  No further questions, Your Honor, and

20   we're ready to turn in exhibits now, if you would like.

21          THE COURT:  You've got a bound version?

22          MR. ALY:  No, no.  To read in the exhibit

23   numbers.

24          THE COURT:  Yes.  Go ahead.  Sure.

25          MR. ALY:  All right.

Pinal - direct

```
 1              THE COURT:  You're moving now to the admission
 2    of the following exhibits.  Go ahead.
 3              MR. ALY:  DTX-6, DTX-848, DTX-94, DTX-56,
 4    DTX-73, DTX-160, DTX-63, DTX-31, DTX-41, DTX-eight, DTX-46,
 5    DTX-984, DTX-9, DTX-5, DTX-13.
 6              THE COURT:  Any objection?
 7              MR. BERL:  No objection.
 8              THE COURT:  All right.  They're admitted.
 9              (DTX-6, DTX-848, DTX-94, DTX-56, DTX-73,
10    DTX-160, DTX-63, DTX-31, DTX-41, DTX-eight, DTX-46, DTX-984,
11    DTX-9, DTX-5, DTX-13 were admitted into evidence.)
12              THE COURT:  So we've been going almost two
13    hours.  Do you want to take a break?  We're going to go
14    until 6:30, 6:45.
15              MR. BERL:  I'm happy to do whatever Your Honor
16    would prefer.
17              THE COURT:  I will defer to you.
18              MR. BERL:  Why don't we start now?
19              THE COURT:  And then sometime in the next 30 to
20    40 minutes, plan on taking a break.  Are you good with that?
21    You know what?
22              MR. BERL:  Actually, let's --
23              THE COURT:  We're going to take a break.
24              MR. BERL:  Good idea.
25              THE COURT:  Having thought a bit.
```

561

Pinal - cross

```
 1                    All right.  So we will -- you're welcome to step

 2      down.

 3                    THE WITNESS:  Thank you, Your Honor.

 4                    THE COURT:  Do you want about 15 minutes, Mr.

 5      Berl?

 6                    MR. BERL:  That sounds great.

 7                    THE COURT:  Okay.  We'll be back at 4:10.

 8                    (Short recess taken.)

 9                            -  -  -

10                    (Proceedings resumed after the short recess.)

11                    THE COURT:  Please be seated.

12                    MR. BERL:  May I approach, Your Honor?

13                    THE COURT:  Please.

14                    (Mr. Berl handed binders to the Court.)

15                          CROSS-EXAMINATION

16      BY MR. BERL:

17      Q.    Good afternoon, Dr.  Pinal.

18      A.    Good afternoon.

19      Q.    Dr. Pinal, your POSA has an advanced degree in

20      chemistry or a related field?

21      A.    Yes.

22      Q.    The POSA would know as part of his general knowledge

23      the chemical reaction that leads to esterification of

24      bendamustine?

25      A.    Yes.
```

Pinal - cross

1   Q.      The POSA involved in the development of pharmaceutical

2   formulations would have knowledge of chemistry?

3   A.      Yes.

4   Q.      In particular, the POSA would understand that many

5   chemical reactions involve a series of successive steps?

6   A.      Yes.

7   Q.      And what successive steps means is that in order for

8   any step to take place, it is necessary that the previous

9   step has been completed?

10  A.      Are you referring to the mechanism of action?

11  Q.      Yes?

12  A.      Or different reaction?

13  Q.      Yes?

14  A.      Yes.

15  Q.      Mechanism of action?

16  A.      Yes.

17  Q.      And the POSA would understand that the reaction could

18  not happen at a rate that is faster than the particular step

19  that is slowest?

20  A.      Correct.

21  Q.      That is the concept of the rate determining step?

22  A.      That is the concept, correct.

23  Q.      And the rate determining step in the breakdown of

24  bendamustine through the aziridinium ring is not a subject

25  that you have provided an opinion about?

Pinal - cross

1    A.    I have not opined on the rate limiting step, correct.

2    Q.    And as part of the study of chemical reaction and

3    kinetics of reaction, the activation energy concept is

4    something the POSA would have exposure to and knowledge of?

5    A.    The POSA would use that in its regular work for

6    development of the formulation.

7    Q.    And activation energy is one of the parameters that

8    are, that is included in the expression of the rate of a

9    chemical reaction?

10   A.    In the, according to the theory of the Arrhenius

11   theory, that is one of the parameters.

12   Q.    You said according to the Arrhenius theory?

13   A.    Correct.

14   Q.    And the value of the degradation rate constant is a

15   number related to the speed of the reaction?

16   A.    Yes.   It is a measure of the speed of the reaction.

17   Correct.

18   Q.    And you do not have an opinion regarding the

19   activation energy of the reaction by which bendamustine can

20   degrade?

21   A.    That is correct.

22   Q.    And you have no opinion about what modification would

23   increase or decrease the activation energy of the reaction

24   by which bendamustine would degrade?

25   A.    I do not present opinions on that topic.

Pinal - cross

1    Q.    And you have no opinion about whether the use of

2    different solvents would increase or decrease the activation

3    energy of the reaction by which bendamustine degrades?

4    A.    My analysis is not based on activation, correct.

5    Q.    So you have no opinion?  Doctor, in your slides, you

6    didn't present this one.  You showed the mechanism by which

7    bendamustine degrades at the nitrogen mustard site; is that

8    correct?

9    A.    Incorrect.

10   Q.    Well, your slides show -- well, let me ask it this

11   way:  The POSA would know that the nitrogen mustard group of

12   bendamustine degrades via the aziridinium ring?

13   A.    The POSA would know that's one of the steps going to

14   the degradation of the aziridinium ring for hydrolysis.

15   Q.    So the POSA would know that for hydrolysis at the

16   nitrogen mustard site of bendamustine, the reaction goes

17   through the aziridinium ring; is that correct?

18   A.    For the reaction in water, correct.

19   Q.    Okay.  And you don't dispute that other bendamustine

20   degradants reported in the prior art also go through the

21   aziridinium intermediate, do you?

22   A.    I do not dispute that.

23   Q.    Okay.  So let's take a look at some of those

24   structures from the prior art.

25              If we could pull for you 73-8-27.  These are

Pinal - cross

 1    structures shown in the Drager patent, DTX-73, that we'll

 2    show on the screen.

              Doctor, you see there's a structure in Drager

 3

 4    called the BM-1 dimer?

 5              Do you see that?

 6    A.    I see it.

 7    Q.    Okay.  And that's a degradation product reported by

 8    Drager; correct?

 9    A.    Correct.

10    Q.    You don't dispute that the BM-1 dimer is formed

11    through the aziridinium ring?

12    A.    I do not dispute that.

13    Q.    And you don't dispute that it's an ether product, do

14    you?

15    A.    Well, it is actually an ester product because it has

16    the carbonyl on the left-hand side.

17    Q.    Okay.  Let's take a look at DCE.

18              Do you see that in the upper right?

19    A.    I see it.

20    Q.    And that's another degradant reported in the Drager

21    prior art; is that correct?

22    A.    Correct.

23    Q.    And you don't dispute that DCE is formed through an

24    aziridinium ring?

25    A.    I do not dispute that.

Pinal - cross

1    Q.     You don't dispute that Drager teaches the POSA that

2    degradants form via the nitrogen mustard group in solvents

3    other than water?

4    A.     Can you repeat the question?

5    Q.     You don't dispute that Drager reports that degradants

6    of bendamustine form via the nitrogen mustard group in

7    solvents other than water?

8    A.     I do not dispute that.

9    Q.     And you don't dispute that those degradants form

10   through the aziridinium ring?

11   A.     The ones that involve the nitrogen mustard, I do not

12   dispute that they could involve the aziridinium ring.

13   Q.     The POSA working on a formulation wants to maintain

14   the integrity of the active; is that correct?

15   A.     Correct.

16   Q.     The POSA would be motivated to reduce the extent of

17   degradation of the active by all of the different possible

18   chemical reactions, including among them the ones disclosed

19   by Drager?

20   A.     Of a general statement, yes, I agree.

21   Q.     And the POSA would not have wanted to use a solvent

22   system that the POSA expected to enhance substantially

23   degradation by one or more of those chemical reactions?

24   A.     I agree with that.

25   Q.     Let's take a look at Olthoff.  We'll take a look at

Pinal - cross

1    page four of Olthoff and we'll put some of it on the screen.

2    94-12-1.   This is DTX-94, the Olthoff reference.

3                  Now, you highlighted, Doctor, various statements

4    from Olthoff about the stability of the formulations he

5    discloses; is that correct?

6    A.    Correct.

7    Q.    That it discloses that it has an extraordinarily high

8    chemical stability; correct?

9    A.    Correct.

10   Q.    And the basis for the statements in Olthoff about the

11   stability of his formulation is the stability data that you

12   report; is that correct?

13   A.    Correct.

14   Q.    And you didn't even show the Court Olthoff's data

15   today, did you?

16   A.    I did not.

17   Q.    Doctor, the POSA would understand that bendamustine

18   undergoes esterification in protic solvents; is that

19   correct?

20   A.    Yes.

21   Q.    And the two solvents tested by Olthoff, ethanol and

22   propylene glycol, are both protic solvents; is that correct?

23   A.    Correct.

24   Q.    Olthoff detects no ester of propylene glycol in his

25   testing; is that correct?

Pinal - cross

1   A.      The testing that Olthoff reports refers to degradation

2   products.  It doesn't identify what specific approach they

3   are.

4   Q.      At 25 degrees, at room temperature, it reports no

5   degradation; is that correct?

6   A.      Correct.

7   Q.      And yet the prior art reported that there is

8   degradation of bendamustine in propylene glycol to the

9   propylene glycol esters; is that correct?

10  A.      Correct, yes.

11  Q.      And likewise at 25 degrees in the ethanol solution,

12  Olthoff reports no impurities; correct?

13  A.      Correct.

14  Q.      But the POSA would know --

15          THE COURT:  Mr. Berl, sorry, but go back to your

16  question about the prior art.  The prior art, just so I

17  know, prior art for what?

18          MR. BERL:  Prior art for the --

19          THE COURT:  For this case?

20          MR. BERL:  Yes.

21          THE COURT:  For this case, not for that patent?

22          MR. BERL:  No, this patent, the prior art is old

23  as dirt.

24          THE COURT:  I want to make sure I understood it.

25  We're talking about prior art that's relevant to this case?

Pinal - cross

1                    MR. BERL:  Yes.

2       BY MR. BERL:

3       Q.    Have you understood my questions that way, sir?

4       A.    Yes, I think I understand for the patent.  Correct?

5       Q.    Yes.  When I'm talking about the prior art, I mean the

6       prior art to the asserted patents?

7       A.    To the asserted patents.

8                    THE COURT:  Okay.  Sorry.  I just want to make

9       sure.

10                   MR. BERL:  Thank you.

11      BY MR. BERL:

12      Q.    Doctor, Olthoff reports no degradation in ethanol at

13      25 degrees; is that correct?

14      A.    Correct.

15      Q.    But the POSA would know that ethanol would form ethyl

16      esters of bendamustine; correct?

17      A.    Correct.  If I mentioned, it's the slow reaction that

18      takes place, yes.

19      Q.    And in fact, the prior art disclosed ethyl esters of

20      bendamustine after Olthoff; is that correct?

21      A.    Subsequent to Olthoff, yes.

22      Q.    And Olthoff didn't find nitrogen mustard degradants

23      that are dimers in his testing either, did he?

24      A.    Doesn't report on dimers.

25      Q.    Even though Drager finds that dimers are indeed formed

1    in non-water solvents; is that correct?

2    A.    Correct.

3    Q.    And the POSA would agree that dimers are formed in

4    non-water solvent?

5    A.    Based on the teachings of Drager, yes.

6    Q.    And likewise, Olthoff reports nothing about a DCE

7    impurity; correct?

8    A.    That is correct.

9    Q.    Even though the prior art to this patent showed that

10   DCE impurities are formed in non-water solvents; correct?

11   A.    Correct.

12   Q.    So you would agree that despite the fact that Olthoff

13   shows no degradation in either of his solutions at

14   25 degrees, the POSA would indeed know that many impurities

15   are formed in these non-water solvents; is that correct?

16   A.    Yes.

17   Q.    And, sir, you would agree with me that if the POSA

18   concluded that Olthoff data were wrong or unreliable, the

19   POSA would conclude that the statements Olthoff makes on the

20   basis of the data were wrong and unreliable?

21   A.    Okay.  Let me see if I understand.  If the POSA

22   concluded that Olthoff was wrong, then what is the second

23   part?

24   Q.    Then the statements that Olthoff makes on the basis of

25   his data likewise would be wrong?

1    A.    Well, I think that's -- it would be reasonable if the

2    POSA considered all the -- like wrong, then the logical

3    thing would be to consider that it was wrong.

4    Q.    Okay.

5    A.    On the hypothetical, yes.

6    Q.    So you agree that if the POSA believed that if the

7    data in Olthoff were wrong or unreliable, then the

8    statements made on the basis of the data were wrong and

9    unreliable?

10   A.    Under that hypothetical, I agree.

11   Q.    Okay.  And we can agree, sir, that Olthoff chose only

12   testing for propylene glycol and ethanol; correct?

13   A.    Yes.

14   Q.    There is no testing of any polyol other than propylene

15   glycol?

16   A.    Correct.

17   Q.    Olthoff doesn't say anything about PEG.  It's not

18   mentioned in Olthoff; is that correct?

19   A.    Correct.

20   Q.    And it's not tested in Olthoff?

21   A.    Correct.

22   Q.    We can agree that you can't say what a reference

23   teaches as a whole without the whole reference; is that

24   correct?

25   A.    Sorry.  What?

Pinal - cross

1   Q.    You can't say what a reference teaches as a whole

2   without the whole reference; correct?

3   A.    Yes.  I mean, if you look at the whole reference, then

4   that tells you what it teaches, yes.

5   Q.    And you relied on the data from Olthoff in reaching

6   conclusions; correct?

7   A.    Incorrect.

8   Q.    You didn't even rely on the data in Olthoff in

9   reaching conclusions about whether it disclosed stable

10  formulations?

11  A.    I looked at the whole reference by Olthoff and I made

12  reference to the date.

13  Q.    You agree with me that the statements in Olthoff based

14  on the stability of the formulations are based on his

15  stability data?

16  A.    Can you repeat that?

17  Q.    You agree with me that the statements in Olthoff about

18  the stability of his formulation are based on his data;

19  correct?

20  A.    Oh, correct, yes.

21  Q.    So you certainly considered and looked and analyzed

22  his data; is that correct?

23  A.    Yes.

24  Q.    Okay.  And, sir, you don't speak German, do you?

25  A.    No.

Pinal - cross

1   Q.    So you relied on the translation of Olthoff; is that

2   right?

3   A.    I did, yes.

4   Q.    You didn't even read the whole translation, did you?

5   A.    I read the whole translation.

6   Q.    Let's blow up the middle section of this on page 5.

7   Sorry.  What was there before, page 5 of the translation.

8   Okay.

9           Sir, this is the entirety of the section

10  describing the method of the experiment in Olthoff; is that

11  correct?

12  A.    Sorry.  Can you repeat the question, please?

13  Q.    Sure.  What we're blowing up here is the entirety of

14  the description of how Olthoff performs his experiment; is

15  that correct?

16  A.    Yes.  This contains information about the analysis.

17  Q.    About how he conducted the experiment; is that

18  correct?

19  A.    Correct.

20  Q.    In the middle of that discussion, it says missing

21  sentence.

22          Do you see that?

23  A.    I see it.

24  Q.    And you didn't even find out what was in that

25  sentence, did you?

Pinal - cross

1   A.    I went and looked at it and tried to look at it to

2   tried to see what it was.   It didn't make sense because I

3   don't speak German.

4   Q.    Let me see if I understand.   You went through the

5   German?

6   A.    Yes, because when you see something that says missing

7   sentence, let's see what it says.   Of course.   I don't speak

8   German but I looked at it.

9   Q.    You looked at it in German?

10  A.    Yes.   I don't speak German.

11  Q.    You don't speak German.   So that was a course of

12  useless exercise for you.   Right?

13  A.    I can't help it much it's a missing statement.   I have

14  to look to see what it was.

15  Q.    Did you ask the lawyers for a complete version of

16  Olthoff given that it was your lead reference?

17  A.    Yes.

18  Q.    They didn't give one to you?

19  A.    This is what I got.

20  Q.    So you asked for a complete version of Olthoff and

21  they didn't give it to you.   Is that what I understand?

22  A.    It wasn't like that.   I just said, what is the missing

23  sentence?   It is what it is.   Does anybody know what it

24  means?   And I couldn't tell, so I had to work with it.

25  Q.    Sir, if we go to page 6, to the next page, you agree

Pinal - cross

1    that Olthoff tests ethanol.  We just looked at that; is that

2    correct?

3    A.    Olthoff what?

4    Q.    Tests bendamustine in ethanol?

5    A.    Yes.

6    Q.    Okay.  And it reports no impurities at 25 degrees, as

7    we just saw; is that correct?

8    A.    Correct.

9    Q.    The purity data are no better for PG than they are for

10   ethanol in Olthoff; is that correct?

11   A.    Well, based on the known, yes.

12   Q.    Okay.  And ethanol is a monovalent alcohol, not a

13   polyol; is that correct?

14   A.    Correct.

15   Q.    And Olthoff explains its preference for polyvalent

16   alcohol over monovalent alcohols like ethanol?

17   A.    Yes.

18   Q.    And that's done at the top of page 6.  We'll blow that

19   up.

20          And he says, monovalent alcohols are of limited

21   use for the production of injection solution.

22          Do you see that?

23   A.    I do.

24   Q.    That's the basis for why Olthoff said to use polyols

25   rather than monovalent alcohols like ethanol; is that

1    correct?

2    A.    Correct.

3    Q.    And this statement is not true as of the priority date

4    in this case, 2010; is that correct?

5    A.    Sorry.  What?

6    Q.    As of 2010 --

7    A.    Yes.

8    Q.    -- it was not true that monovalent alcohols like

9    ethanol are of limited use in the production of injection

10   solution?

11   A.    Let me see if I understand your question.  There are

12   limited -- well, what it says is pharmacological reasons and

13   one other thing.  It says when you inject alcohol like any

14   injection, so that held then and it still holds today.

15   Q.    Sir, ethanol is used in marketed formulations as often

16   as propylene glycol; is that correct?

17   A.    Just about.

18   Q.    Okay much and it's used much more often than PEG; is

19   that correct?

20   A.    I would agree with that.

21   Q.    So the statement here about propylene glycol being

22   used more frequently and there by rejecting ethanol and

23   monovalent alcohol, whether it was true or not in 1983 in

24   East Germany, it wasn't true in 2010 to the POSA; is that

25   correct?

1    A.    Can you rephrase your question, please?

2    Q.    Sure.  By 2010, the POSA would not have agreed with

3    the statement that propylene glycol is used more frequently

4    than ethanol; is that correct?

5    A.    The POSA would not -- sorry.  Again?

6    Q.    The POSA would not have agreed with the statement in

7    Olthoff that propylene glycol is used more frequently than

8    ethanol; is that correct?

9    A.    I would agree with that.

10   Q.    Okay.  Doctor, let's take a look at Drager.  I think

11   that's DTX-73.  And let's first take a look at column 2,

12   starting at line 19.

13         THE COURT:  All right.  So, Mr. Berl, you're

14   referring to a POSA.  Do I have to worry about a dispute to

15   what the parties mean by POSA?

16         MR. BERL:  Here is the issue, as I understand

17   it, Your Honor.  I don't think that the words of the

18   parties' definition of the POSA actually differ very much.

19   I do think there's a dispute and I think you'll hear it most

20   crisply when you hear our witnesses testify about what the

21   POSA would consider, whether the POSA would consider

22   concepts of chemistry.

23         Their POSA has an advanced degree in chemistry

24   and Dr. Pinal just agreed would consider a whole host of

25   issues like kinetics and activation energies, all of those

1    things.  So there may not be a dispute any more about

2    whether the POSA would consider those things.  But to the

3    extent there's a dispute, I think that's what it is.

4              THE COURT:  All right.

5    BY MR. BERL:

6    Q.    Doctor, if we look at column 2 of Drager, that's

7    DTX-73, starting at line 19.  Now, column 2, line 19.  Okay.

8              Yes.  Sir --

9    A.    Where are we?

10   Q.    Sorry.  Column 2, line 13?

11   A.    13.

12   Q.    I apologize.

13   A.    13.

14   Q.    This was written after the Olthoff patent; is that

15   correct?

16   A.    Yes.

17   Q.    Okay.  This is filed in 2008; is that correct?

18   A.    Let me see.  Yes.

19   Q.    And it says in column 2 of Drager that formulations of

20   bendamustine that do not require lyophilization and/or

21   reconstitution are needed.  The POSA would agree with that;

22   is that correct?  In other words, Olthoff had not created a

23   formulation of bendamustine that could be used that did not

24   require lyophilization and reconstitution?

25   A.    Well, Olthoff created a formulation that did not

1   require lyophilization.  So can you repeat your question?

2   Q.    But not that one that was used.  There was still a

3   need for formulations of bendamustine that did not require

4   lyophilization in 2008; is that correct?

5   A.    Okay.  So in 2008, there was no commercial,

6   commercially available formulation.  In that sense, I would

7   agree.  There was not one commercially available.

8   Q.    Okay.  And in the 25 years between when Olthoff became

9   a patent and this was written, 1983 to 2008, no one was

10  restrained by regulatory exclusivity for making a

11  bendamustine liquid formulation; is that correct?

12          MR. ALY:  Beyond the scope of direct.

13          MR. BERL:  Their whole theory as I understood it

14  in opening was, it didn't matter that there was this long

15  passage of time because there was regulatory exclusivity, so

16  no one had an incentive to do anything.  Now this is their

17  own obviousness witness.  Whom am I suppose to probe about

18  that?

19          THE COURT:  I wish I knew more about patent law

20  when I maybe looked at the schedule you all put forward.  I

21  think the point is it's long-felt need and we have not

22  gotten to secondary considerations yet.  Maybe I'm missing

23  something.

24          MR. ALY:  That is, Your Honor.  The whole point

25  of the invention story from the opening until today is,

580

Pinal - cross

1    there's no reason that it didn't happen earlier because of

2    exclusivity, which is the nexus to their secondary

3    considerations and that's exactly what we've all been --

4                THE COURT:  I mean, in other words, my

5    understanding, Mr. Berl, is, this witness is going to be

6    recalled to address long-felt need and then you'll have an

7    opportunity at that point to cross-examine him.

8                MR. BERL:  Fine.  This has nothing to do with

9    long-felt need.  That's not what I'm trying to establish.

10   The law is clear that the long passage of time between the

11   prior art relied on and the invention is probative of prima

12   facie obviousness, because it suggests there's a lot of time

13   that everyone had Olthoff and no one did what they are

14   saying is obvious.

15               And so the Federal Circuit has recognized,

16   that's very different than a case where there's the prior

17   art, and then all of a sudden there's the invention.  And

18   their response as I understood it was, no one can do it.

19               THE COURT:  You know, your question seems to me

20   certainly starting to get into long-felt need issues.

21               MR. BERL:  I will move on.

22               THE COURT:  Just go ahead.  All right.

23               MR. BERL:  Well, so --

24               THE COURT:  I mean, I guess the point -- I guess

25   I will sustain the objection.

```
 1                  MR. BERL:  Okay.

 2                  THE COURT:  I mean, it's already into evidence

 3      that there's a long gap.  I expect we'll come back to this

 4      passage.

 5                  MR. BERL:  Okay.

 6      BY MR. BERL:

 7      Q.    Doctor, let's go down to column 4, 33 through 38.

 8                  Sir, Drager reports that bendamustine converts

 9      to non-bendamustine products degrade upon exposure to

10      certain nucleophiles, for example, water and alkaline

11      glycols such as propylene glycol.

12                  Do you see that?

13      A.    I see it.

14      Q.    And a POSA would have agreed with that; is that

15      correct?

16      A.    Yes.

17      Q.    And PEG is also an alkaline glycol; is that correct?

18      A.    PEG is also.  Correct, yes.

19      Q.    And let's go to -- let's stay in Olthoff.  Sorry, stay

20      in Drager.  73, 833.

21                  Sir, Drager discloses that polar aprotic,

22      solvents are sufficiently nucleophilic for bendamustine

23      such that polar aprotic solvent bendamustine adducts do not

24      form over the course of typical commercial storage

25      conditions.
```

Pinal - cross

1                    Do you see that?

2    A.    Can you point me where in Drager?

3    Q.    I believe we're in column 3.

4    A.    Column 3?  Which line?

5    Q.    Well, 321.

6    A.    321.  Give me one second.

7    Q.    The question was, a POSA would agree with this

8    statement; is that correct?

9    A.    Yes, the POSA would agree.

10   Q.    And Drager teaches to use aprotic solvents; is that

11   correct?

12   A.    As part of the mixture of solvents, yes.

13   Q.    So Drager teaches to use either aprotic solvents alone

14   or aprotic solvents with protic solvents?

15   A.    That is one of the teachings of Drager.

16   Q.    I just gave two.  Those are two of the teachings of

17   Drager; correct?

18   A.    Well, that is -- okay.  Protic solvents alone or

19   mixtures of protic solvents with aprotic solvents.

20   Q.    I'm not sure if you misspoke.  Aprotic solvents alone

21   or mixtures of protic solvents and aprotic solvents; is that

22   correct?

23   A.    Let me see.  Drager uses, to use a protic solvents

24   mixed with protic solvents or mixtures of aprotic solvents

25   with mixtures of protic solvents.

Pinal - cross

1    Q.    Okay.  Drager does not disclose using mixtures of

2    protic solvents, correct, without aprotic solvents?

3    A.    In their teaching, the example, no, it doesn't.

4    Q.    In the disclosure, I'm not limited to the example, the

5    disclosure of Olthoff does not include using mixtures of

6    protic solvents without any aprotic solvents?

7    A.    Yes.  It actually covers the mixture of aprotic with

8    protic.  That's correct.

9    Q.    So you agree with me?

10   A.    With that -- yes.

11   Q.    I'm sure we don't agree about everything, but at least

12   we can agree about that.  And your formulation that you

13   testified today that you believe is obvious contained only

14   protic solvents; is that correct?

15   A.    Correct, and it is based on the teachings from Drager

16   and this is important.  Do you want me to explain?

17   Q.    No, I don't.

18   A.    Okay.

19   Q.    You did not opine today that any formulation is

20   obvious that contained protic solvents plus aprotic

21   solvents; is that correct?

22   A.    I'm sorry.  What?

23   Q.    You did not give an opinion to the Court today that

24   there was an obvious formulation that had both protic

25   solvents and aprotic solvents?

584
Pinal - cross

1    A.    I did not think about it.

2    Q.    Okay.  Drager never cites to Alam; is that correct?

3    A.    I believe so, yes.

4    Q.    You believe --

5    A.    I need to check the references.  Do you want me to?

6    Q.    As far as you're aware, Drager never cites to or

7    references Alam; is that correct?

8    A.    Yes, correct.

9    Q.    Okay.  And as I understood your testimony, the problem

10   that the POSA would have thought he had after reading Drager

11   is that there were too many esters; is that right?

12   A.    No.

13   Q.    So you don't think a POSA would be motivated after

14   reading Drager to reduce the PG esters?

15   A.    That part, yes.

16   Q.    Oh?

17   A.    But the previous question, no.

18   Q.    So the POSA would be motivated to reduce PG esters

19   after reading Drager; is that correct?

20   A.    Correct.

21   Q.    And you combined Drager with Alam; is that correct?

22   A.    Correct.

23   Q.    Let's take a look at about what you say about Alam.

24   That's slide 10.

25         First of all, Alam doesn't say anything about

1    bendamustine; is that correct?

2    A.    That is correct.

3    Q.    Only cyclophosphamide; is that correct?

4    A.    Correct.

5    Q.    And cyclophosphamide has nothing to do with esters; is

6    that correct?

7    A.    Not with esters.  It's on the nitrogen oxide group.

8    Q.    Just to be clear, cyclophosphamide does not form

9    esters; is that correct?

10   A.    Well, I have not looked in detail as to the type of

11   reactions that happen on the right-hand side of the

12   cyclophosphamide, so I cannot answer at this point exactly

13   whether it would form esters.  What I can tell you is that

14   if it forms esters, it would not be the same type of ester

15   as --

16   Q.    You did not provide any opinion today that

17   cyclophosphamide would form esters; is that correct?

18   A.    Correct.  I provided no opinion on that.

19   Q.    Rather, you provided the opinion that the nitrogen

20   mustard part of the molecule were, quote, identical.

21              Do you remember that?

22   A.    I do.

23   Q.    Now, first of all, you didn't even get the structure

24   of cyclophosphamide right.  Did you, sir?

25   A.    I'm not sure I understand.  What do you mean?

Pinal - cross

1    Q.    There's an oxygen here, isn't there?

2    A.    Oh, yes.  It is actually caught because of the piece

3    on top of it.

4    Q.    Okay.  And so this is called a phosphoramide group in

5    the ring of cyclophosphamide; correct?

6    A.    Correct.

7    Q.    And that's what's known as an electron withdrawing

8    group; is that correct?

9    A.    Well, not the whole group it's basically which part.

10   There are some atoms in there that are electron withdrawing,

11   not all of them.

12   Q.    Electrons are withdrawn from this nitrogen in the

13   nitrogen mustard in cyclophosphamide;  is that correct?

14   A.    Well, that is the difference between the --

15   Q.    Let me ask an easy question, sir.  You don't have the

16   opinion that cyclophosphamide breaks down at the nitrogen

17   mustard through the aziridinium ring?

18   A.    Nitrogen mustard, the activity happened through the

19   aziridinium ring.

20   Q.    Including in cyclophosphamide?

21   A.    Well, the chemistry of the nitrogen mustard, which is

22   the same, it would be similar between the two compounds.

23   Q.    Sir, the phosphorus nitrogen bond has to break in

24   cyclophosphamide before the hydrolysis occurs.

25   A.    No.  What has happened, you see there's like a crutch

Pinal - cross

1    with two rings.  The aziridinium ring is like a crutch with

2    two legs, making a triangle.  That triangle is separate from

3    the other part.  The aziridinium ring happens between the

4    crutch and the leg, which is the same between the

5    structures.

6    Q.    We'll take a look at that with Dr. Anslyn, but let me

7    ask you this, sir.  You put this statement on the screen and

8    said that they're identical, this statement from Alam; is

9    that correct?

10   A.    The statement is from Alam, so the sentence is the

11   circled portion of the structures are identical.  That's my

12   take.

13   Q.    Okay.  And it says cyclophosphamide is a drug

14   chemically related to the nitrogen mustards; is that

15   correct?

16   A.    Correct.

17   Q.    Okay.  And you would agree that there are nitrogen

18   mustard compounds that are more similar in structure and

19   degradation to bendamustine, like chlorambucil; is that

20   correct?

21   A.    I would need to look at the structure, but if, for

22   example, next to the nitrogen mustard, there will be a group

23   with a ring, that would make it more similar.  It's still

24   the group would be the same group.

25   Q.    You didn't provide any opinions relating to prior art

Pinal - cross

1    relating to chlorambucil?

2    A.    That's correct.

3    Q.    Or melphalan, another nitrogen mustard that had both

4    esters and the nitrogen mustard?

5    A.    That's correct.

6    Q.    Instead, you plucked out a reference that relates to

7    cyclophosphamide, a compound that doesn't even form esters;

8    is that correct?

9    A.    Cyclophosphamide is the same as hydrolysis by using

10   polyol, which is the opinion that I was forming.

11   Q.    Doctor, let's take a look at Alam, column 4, line 5.

12   You have showed part of this, but not all.

13            You showed the part about 10 to 90 percent of

14   the propylene glycol and 90 to 10 percent of the

15   polyethylene glycol.

16            Do you recall that testimony?

17   A.    I do.

18   Q.    Okay.  And you didn't continue to testify to the Court

19   about what Alam says his preferred ranges are.  His

20   preferred ranges are 70 to 90 of PG and 10 to 30 of PEG; is

21   that correct?

22   A.    Correct.

23   Q.    So his preference is to use more propylene glycol and

24   less PEG, not the other way around; is that correct?

25   A.    What Alam uses for its -- yes.

589

Pinal - cross

1    Q.    The only examples that have mixtures of propylene

2    glycol and polyethylene glycol have 80 percent propylene

3    glycol, 20 percent polyethylene glycol; is that correct?

4    A.    That is correct.

5    Q.    Doctor, the POSA would understand that not all OH

6    groups are equally reactive; is that correct?

7    A.    Yes, a POSA would know that.

8    Q.    Some of them will react faster than others; is that

9    correct?

10   A.    Correct.

11   Q.    The POSA would know that one of the OH groups in the

12   propylene glycol molecule will react faster than the others;

13   right?

14   A.    From the teachings of the prior art, yes.

15   Q.    Okay.  And speaking of the teachings of the prior art,

16   let's take a look at the Table 2 of Drager, DTX-73.

17              Can we go to Table 2?  That's fine.

18              Sir, you see that this is testing both PG-1 and

19   PG-2; is that correct?

20   A.    Correct.

21   Q.    And PG-1 is formed by the primary alcohol of propylene

22   glycol; correct?

23   A.    Yes, the one on the edge of the, you know, the

24   paragraph that I showed, yes.

25   Q.    And PG-2 is formed by the secondary alcohol of

Pinal - cross

1   propylene glycol; is that correct?

2   A.    Yes.   The one in the middle of the diagram that I

3   showed.

4   Q.    And based on the data in Drager, we can see that the

5   appearance of the ester from the primary hydroxyl group

6   appears roughly four times faster overall for a period of

7   about 12 months; is that correct?

8   A.    Correct.

9   Q.    So you don't dispute that 80 percent of the PG esters

10  that will be produced will be produced by the primary

11  alcohol in the form of PG 1, and 20 percent will be produced

12  by the secondary consideration as PG-2?

13  A.    The numbers are by themselves, so if you look at the

14  numbers, that will be the breakdown between the two.

15  Q.    And you do not provide an opinion about the kinetics

16  of esterification reaction for bendamustine; is that

17  correct?

18  A.    I did not rely on an opinion of the kinetics of the

19  reaction.

20  Q.    And in the diagram that you showed the Court with all

21  of the red balls and green balls, do you recall that

22  diagram?

23  A.    I do.

24  Q.    First of all, that wasn't drawn to scale, was it?

25  A.    It was approximately to scale.   That was the point of

Pinal - cross

1    that diagram.  The number of balls were the same.  The

2    position was not to scale, but the same volumes.  So the

3    numbers are not perfect, but the volumes of one side and the

4    volume of the other side are very close.  That's all the

5    point I was trying to make.

6    Q.    All of the OH balls on your diagram were the same; is

7    that correct?

8    A.    All of the OH balls are the same if you look at them.

9    Q.    Yes.

10   A.    They are the same.  And I don't mean only the OH ball.

11   The OH groups.  When they look, they look the same as the

12   molecule.

13   Q.    You would agree one reacts faster than the --

14   A.    Yes.  The one on the edge goes faster because it is on

15   the edge.

16   Q.    Doctor, we can agree that precipitation of a liquid

17   formulation is a big problem; is that correct?

18   A.    Okay.  So --

19   Q.    If a liquid formulation precipitates, that can be a

20   big problem; is that correct?

21   A.    Okay.  If a liquid formulation undergoes

22   precipitation, specifically if there's going to be an

23   injection, yes, that would be a problem.

24   Q.    And the POSA would want to maintain a liquid system

25   under the conditions of storage; is that correct?

Pinal - cross

1   A.      That is correct.

2   Q.      So when it's stored in whatever conditions it's stored

3   in, the POSA would want to make sure it maintains a liquid;

4   is that correct?

5   A.      Yes.

6   Q.      And it does not precipitate; is that correct?

7   A.      Correct.   Yes.

8   Q.      And we'll put aside the whole dispute about whether

9   you were permitted or not to rely on Eagle's data, but even

10  with reliance on Eagle's data, sir, you did not provide an

11  opinion about the predicted solubility of a PEG PG solvent

12  system in 90 to 10 at refrigerated conditions; is that

13  correct?

14  A.      Let me see.   Using the Eagle data, if I provided an

15  estimate for solubility of five degrees specifically?   No, I

16  did not.

17  Q.      Yes.   The only opinion you provided about solubility

18  of a 90 to 10 PEG PG ratio, even using the Eagle data, was

19  at room temperature; is that correct?

20  A.      The estimates that I did were for room temperature,

21  correct.

22  Q.      And the information that you that used about propylene

23  glycol solubility, that was at room temperature, too?

24  A.      Yes.

25  Q.      And it is not uncommon for solubility to change as a

1    function of temperature?

2    A.    Yes.  It can happen.  It can change as a function of

3    temperature.

4    Q.    In fact, the prior art for bendamustine in the

5    Britaine application disclosed that the solubility of

6    bendamustine hydrochloride decreases linearly with

7    temperatures are from 25 of degrees to zero degrees;

8    correct?

9    A.    The number of solvents and mixtures, so can you point

10   me out --

11   Q.    Do you dispute that's the teaching of the prior art,

12   sir?  That the solubility of bendamustine was known to

13   decrease from 25 degrees down to zero degrees approximately

14   linearly?

15   A.    Yes, depending on the solvent being tested, yes.

16   Q.    In all of the -- okay.  That's fine.

17              Now let's talk about the stability of the

18   admixture.  Do you recall your testimony about that?

19   A.    Yes.

20   Q.    And to be clear, the admixture is the diluted solution

21   that is then administered to the patient; is that correct?

22   A.    Correct.

23   Q.    Okay.  And you would agree that a particular concern

24   of the POSA would have been to have a sufficiently high

25   solubility in the solvent system to prevent bendamustine

Pinal - cross

```
 1    from coming out of solution, precipitating when the solvent

 2    system would be diluted into a 50-milliliter bag of saline;

 3    is that correct?

 4    A.    I agree with that.

 5    Q.    And the factors that would determine the solubility of

 6    bendamustine in the diluted mixture would include the

 7    solubility of bendamustine in each of the three components

 8    of the mixture:  PEG, PG and saline; is that correct?

 9    A.    Correct.

10    Q.    And it would depend on the proportion of that mixture

11    between PEG, PG and saline; is that correct?

12    A.    Yes.

13    Q.    And the solubility of the bendamustine in the solvent

14    plus diluent system varies nonlinearly with additional

15    dilution with aqueous diluents; is that correct?

16    A.    The -- okay.  Let me be clear in my own words.

17    Q.    Yes.

18    A.    If the proportion of water increases, and with that,

19    the proportion of the organic solvent will be reduced, the

20    drop in solubility would be more than linear.

21    Q.    Okay.  So, in other words, just to try to take this

22    out of the realm of science verbiage, if you have an organic

23    solvent mixture, let's say with PEG and PG -- are you with

24    me?

25    A.    Yes.
```

Pinal - cross

1    Q.    And then you dilute that into a diluent for admixture

2    to administer into a patient.  Are you with me?

3    A.    Yes.

4    Q.    And that admixture diluent, let's say it's saline,

5    sodium chloride in water.  Are you with me?

6    A.    Yes, yes.

7    Q.    Then the solubility of bendamustine in that solution

8    will go down more than linearly as a function of your

9    dilution into the normal saline; is that correct?

10   A.    Correct.

11   Q.    And the solubility of bendamustine in saline had not

12   been reported as of 2013; is that correct?

13   A.    Correct.

14   Q.    But you would agree that the POSA would have expected

15   the solubility of bendamustine hydrochloride to be lower in

16   saline than in water?

17   A.    That would have been a reasonable expectation.

18   Q.    And it was your view in this case that the value of

19   the solubility of bendamustine in a PEG PG 90:10 ratio

20   diluted into 50 milliliters of sodium chloride would be

21   obtained by experimentation; is that correct?

22   A.    That is how it is done routinely, yes.

23   Q.    That's how it would be done.  In other words, the way

24   that the POSA would have known what solubility could be

25   achieved of the PEG PG solvent system diluted into 50

Pinal - cross

1    milliliters of saline is to conduct experimentation; is that

2    correct?

3    A.    The POSA doesn't need to know solubility to answer

4    that question.

5    Q.    That may or may not be, but the way the POSA would

6    have known what the solubility would be would be to conduct

7    experimentation; is that correct?

8    A.    To know the solubility, that is basically

9    conducting --

10   Q.    And to know whether the solubility would be above or

11   below 5.6 milligrams per milliliter of bendamustine, the

12   POSA would have conducted experimentation; is that correct?

13   A.    I don't think I understand.  The first part -- the

14   first question, the previous question, knowing the

15   solubility, you know if you can or cannot get

16   5.6 milliliters.

17   Q.    Okay.

18   A.    The first question answers the second one.

19   Q.    Okay.  I just want to make sure the record is very

20   clear here.

21   A.    Okay.

22   Q.    The way you can determine solubility as of 2013 in a

23   mixture of PEG-PG 90/10 diluted into 50 milliliters of

24   saline is to perform experiments?

25   A.    Yes.  You conduct a test and get the number.

Pinal - cross

1    Q.      And only by conducting experts would the POSA be able

2    to know whether he can achieve a solubility of

3    5.6 milligrams per milliliter of bendamustine; is that

4    correct?

5    A.      In order to know the precise value, the experiment

6    needs to be done.

7    Q.      In order to know that the POSA, in order to know

8    whether the value is above or below 5.6, the POSA would need

9    to do experiments?

10   A.      Yes.

11   Q.      Okay.

12   A.      Correct.

13   Q.      And to be clear, those experiments were not done in

14   the prior art for what you called Family Three, what we're

15   calling Family Two, the dilution patent?

16   A.      No, they were not.

17   Q.      They were not in the prior art?

18   A.      No.

19   Q.      Sorry.  Double negative.  Yes, you agree with me they

20   are not in the prior art?

21   A.      Okay.  I agree that they were not in the prior art.

22   Q.      Okay?

23   A.      Okay.

24   Q.      Thank you.  That was my fault.

25           Dr. Pinal, excipients are added during the

Pinal - cross

1   manufacturing process to fulfill some specific purpose; is

2   that correct?

3   A.    Yes.  Specifically, a function.  That's the

4   terminology used.  Yes.

5   Q.    Okay.  And it's your view that the POSA would have

6   added an antioxidant to the formulation in the prior art

7   because PEG 400 otherwise could degrade and catalyze

8   esterification; is that correct?

9   A.    That was the knowledge about PEG, happened to PEG,

10  yes.

11  Q.    And it was your view that that happens to propylene

12  glycol, too; is that correct?

13  A.    Much more slowly, but, yes, it can happen to propylene

14  glycol as well.

15  Q.    Propylene glycol was known to autooxidize and create

16  acidic conditions just like PEG; is that correct?

17  A.    Two of them.  One of them much faster.  Even though it

18  was low, but PEG is low and PG is very low.

19  Q.    Okay.  But you provided in your expert report in this

20  case the opinion that the POSA would have used an

21  antioxidant to slow down the auto oxidation of both PEG and

22  propylene glycol; is that correct?

23  A.    Yes.  They're non-discriminating.  They protect from

24  oxidation by consuming the antioxidant.  So what they do is

25  that.  They don't go and select one or the other.  They

Pinal - cross

1    would protect whatever is there from oxidation.  That's how

2    they work.

3    Q.    And so it's your view that the POSA would have wanted

4    to use an antioxidant to protect propylene glycol; is that

5    correct?

6    A.    Propylene glycol as well as PEG.  The thing is that

7    PEG is more susceptible to oxidation, so it would protect

8    them both.

9    Q.    Drager discloses a formulation with 66 percent

10   propylene glycol; is that correct?

11   A.    Correct.

12   Q.    And he does not use an antioxidant in the formulation?

13   A.    Not in that formulation.

14   Q.    And Olthoff discloses a formulation with propylene

15   glycol; is that correct?

16   A.    Correct.

17   Q.    The liquid formulation that we saw tested in his table

18   a few moments ago; is that correct?

19   A.    Correct.

20   Q.    And he likewise does not use an antioxidant; is that

21   correct?

22   A.    Protects from oxidation, what do you mean?

23   Q.    He does not use an antioxidant.  And you did not

24   identify a single marketed formulation that uses PEG with a

25   molecule prone to esterification; is that correct?

Pinal - cross

1    A.    You referred to -- just to be clear, marketed.

2    Q.    Yes.

3    A.    No, I did not.

4    Q.    Okay.  And likewise, you did not identify a single

5    marketed product that uses PEG with an antioxidant?

6    A.    Marketed product?  No.

7    Q.    Okay.  Let's take a look at Drager about antioxidants,

8    column 7, 1 through 17.  Drager discloses some antioxidants,

9    is that correct, even though he doesn't use them in his

10   formulation?

11   A.    Correct.

12   Q.    Okay.  And let's take a look at the antioxidants he

13   discloses for use with bendamustine, column 7, line 1.

14              We've blown up the list that has various

15   antioxidants, sir, that stars at about line 7.

16   A.    Okay.

17   Q.    Do you see that?

18   A.    I see it.

19   Q.    Monothioglycerol is not found there; is that correct?

20   A.    Correct.

21   Q.    And if we go to column 3 of the patent, Drager lists

22   quite a few aprotic solvents that he discloses should be

23   used with bendamustine; is that correct?

24   A.    Correct.

25   Q.    And the POSA would have understood that he's

1  disclosing this full list of aprotic solvents that can be

2  used with bendamustine; is that correct?

3  A.    Yes.

4  Q.    And many of those aprotic solvents are not used in FDA

5  approved formulations; is that correct?

6  A.    Actually, the vast majority of them are not, so the

7  only one that, the only aprotic solvent that he's using in

8  an FDA approved product is DMA.

9  Q.    And he is also using that DMA approved product?

10  A.    Yes, but not by injection; by physical process.

11  Q.    Okay.  Let's take a look at further down in Drager,

12  column 3.  Drager lists various protic solvents as well; is

13  that correct?

14  A.    Sorry.  Can you repeat the question?

15  Q.    Drager lists various protic solvents in column 3 as

16  well?

17  A.    Correct.

18  Q.    Quite a few of them; right?

19  A.    Yes, a number of them.  Yes.

20  Q.    Not all of them used in marketed products; is that

21  correct?

22  A.    Let's see.  Yes, not all of them used in commercial

23  products.

24  Q.    And you would agree, sir, that Drager is the most

25  thorough discussion and provision of data about liquid

1    bendamustine formulations as of the priority date; is that

2    correct?

3    A.    I would say, I would qualify that.  I would say it

4    provides very good information regarding the esterification

5    reaction, and if you put it in those terms, I would agree,

6    referring to the esterification reaction.

7    Q.    It provides more data.  Well, it doesn't just provide

8    data about the esterification reaction.  It provides

9    information about other degradants through the nitrogen

10   mustard site; correct?

11   A.    This POSA would take and be able to use it in

12   different ways than the esterification.

13   Q.    Doctor, that's the way you used it, but you agree that

14   Drager discloses multiple degradants that break down through

15   the nitrogen mustard site?

16   A.    Well, that part I agree.

17   Q.    Okay.  And, sir, let's talk about the purity

18   limitations of the claim.

19            You, in your expert report, identify what you

20   called an exemplary POSA formulation or the exemplary POSA

21   formulation.

22            Do you recall that?

23   A.    I do.

24   Q.    And those were the formulations that you asserted be

25   obvious in this case; is that correct?

1    A.    Correct.

2    Q.    Okay.  And those had certain ingredients; correct?

3    A.    Correct.

4    Q.    And that's still your opinion today, that those are

5    the obvious formulations, what you called the exemplary POSA

6    formulations in your claim?

7    A.    My opinion has not changed.

8    Q.    Sorry.  I misspoke.  Your opinion today is that the

9    formulations that are obvious are those you called the

10   exemplary formulations in your expert report; is that

11   correct?

12   A.    Yes.  I referred that way to them.

13   Q.    Okay.  And you recall that you discussed with Mr. Aly

14   the claim limitation requiring .43 percent PG ester or less

15   after three months at 25 degrees; correct?

16   A.    Sorry.  If I recall discussing that with Mr. Aly?

17   Yes, I do.

18   Q.    All right.  And you would agree, sir, that some of the

19   formulations within the scope of your exemplary formulation

20   could have more than .43 percent total PG ester after three

21   months at 25 degrees; is that correct?

22   A.    Okay.  I need you to clarify the question.

23   Q.    Sure.

24   A.    So --

25   Q.    I'm talking about the exemplary formulations that you

Pinal - cross

```
 1    said in your report and then said again today are the

 2    obvious ones.  Are you with me?

 3                MR. ALY:  I'm going to object here as to

 4    vagueness, frankly, because as formulations, plural, is

 5    used, referring to something in the report and formulation,

 6    singular, referring to the testimony today and that's an

 7    unclear question.

 8    BY MR. BERL:

 9    Q.    You provided --

10                THE COURT:  Hold up.  Let me see counsel at

11    sidebar.

12                (Sidebar conference held as follows.)

13                THE COURT:  Can somebody bring a copy of the

14    chart that you used that referenced this?

15                MR. ALY:  Can the witness be excused for a

16    moment?

17                THE COURT:  Actually, that would be best.  Why

18    don't we do this.  I can't figure out how to work this

19    machine.

20                Do you want to step out of the courtroom?  That

21    would be great.

22                Now that I've brought you all up to the corner,

23    if the witness is leaving, you can all head back.

24                (End of sidebar conference.)

25                All right.  Is the witness out of the room?  Is
```

1    the witness out of the room?

2              MR. ALY:  He is.

3              THE COURT:  All right.  So I heard the

4    objection.  It has something to do with the difference

5    between formulations, plural, and formulation.  What does

6    the PowerPoint chart refer to?

7              MR. ALY:  Slide 19.

8              THE COURT:  Slide 19.  That wasn't the slide I

9    was thinking of, but okay.

10             So that says the obvious -- actually, that is in

11   part, it's the obvious formulation.

12             MR. ALY:  Right.

13             THE COURT:  Okay.  I was thinking this would

14   also be relevant to the property claim elements.

15             MR. BERL:  That's where we're going.

16             THE COURT:  What gets me about this and I sort

17   of kind of feel like am I missing something.  I usually am.

18   I mean, the way I understood the questioning was on direct

19   would allow for this question you put to the witness,

20   because he basically posited in the abstract, he would come

21   up.

22             He, the expert, says the POSA would come up with

23   a formulation, but it's an abstract formulation, and now

24   you're saying there's a difference between a formulation

25   singular and formulations.  For instance, in your obvious

Pinal - cross

1    formulation, it doesn't have a specific amount of sodium

2    chloride, so I figured, okay.  That just means there has to

3    be some sodium chloride in there.  And now I think you're

4    suggesting oh, no.  There's something else going on.  So

5    maybe explain it, because I'm inclined to let the question

6    in.

7            MR. ALY:  The question -- the objection is not

8    about scope.  It's really about clarity.

9            THE COURT:  No.  Well --

10           MR. ALY:  It's not that.  I agree, Your Honor.

11   There are a number of formulations that were disclosed as

12   obvious versions in the report and that's why Mr. Berl was

13   referring to the report.  And the testimony does not have

14   all of the different iterations.  It has the one iteration

15   that was presented as evidence.

16           So when Mr. Berl is comparing between the screen

17   formulation versus other formulations, it just is not clear

18   which ones he's talking about.  I have no problem with it if

19   he's throwing them all up on the screen or saying, here's

20   what you said in your report even, but just to ask the

21   general question is my concern for record purposes to say,

22   obvious formulations and your formulation today.  It could

23   be two different things.  We just don't know what the first

24   is.

25           MR. BERL:  I will just add I don't know what the

1    witness is going to say, but here's my concern.  What he

2    said at his deposition is that the formulations that are

3    obvious, it's not just one.  It's a group of formulations,

4    basically for some of the same reasons Your Honor just

5    identified 30 seconds ago.

6              I don't know if he now thinks there's only one

7    formulation, but even if he does think there's only one, in

8    his report he thought there were a bunch of obviousness

9    formulations.  If some of those formulations that he thought

10   were obvious and he said ten minutes ago he hadn't changed

11   his opinion from his report -- if some of those don't always

12   hit the .43 percent after three months, if it doesn't always

13   necessarily happen, it's over.  They can't meet the

14   inherency even with all the data in the prior art that you

15   give them.  So, you know, we can all go home early from this

16   part of the case if he agrees that doesn't always happen.

17             And so I don't think it's right for them to be

18   able to say, oh, those were the ones that he said were

19   obvious in his expert report.  Now he has a different view.

20   He's just limiting himself to one little one that he's now

21   going to stay is always, you know, hits the .43 percent, so

22   all of his admissions at his deposition about it depending

23   on knowing whether it would hit the .43, we can throw that

24   out the window, I don't think it works that way.

25             THE COURT:  I'm going to overrule the objection.

1    I'm going to say, Mr. Aly, you are not to do a speaking

2    objection on this topic in front of this witness because I

3    think it's important that this be explored without the

4    witness being influenced.

5              I'm not saying the objection was improper, but

6    on this particular topic going forward, if you've got an

7    objection, stand up.  We'll entertain it at sidebar.

8              MR. BERL:  I fear it's too late.

9              THE COURT:  You may proceed.  You may get the

10   witness back in.

11             Sir, you may return to the stand.

12             THE WITNESS:  Thank you.

13             THE COURT:  All right.  Then the objection is

14   overruled.  Go ahead, Mr. Berl.

15   BY MR. BERL:

16   Q.    Doctor, in your expert report, you identified a group

17   of exemplary formulations that you asserted to be obvious;

18   is that correct?

19   A.    A group of formulations, correct.

20   Q.    So it wasn't just one formulation.  It was a group of

21   formulations; is that correct?

22   A.    Yes.

23   Q.    And you still believe those to be obvious

24   formulations; is that correct?

25   A.    Yes.  Some of them are obvious, yes.

609

Pinal - cross

1   Q.    So I want you to answer my question about the group of
2   formulations you believe to be obvious.  Okay?  And my
3   question is:  Some of these groups of formulations within
4   the scope of the exemplary formulations you assert to be
5   obvious could have more than .43 percent PG esters after
6   three months at 25 degrees; is that correct?
7   A.    I need to know if you refer to the formulation --
8   okay.  When you say stability, after how long, what
9   temperature and how much percent?
10  Q.    Three months.
11  A.    Okay.
12  Q.    Okay.  25 degrees.
13  A.    25.
14  Q.    And I'm asking you about PG esters, total PG esters.
15  A.    Okay.
16  Q.    Do you follow me so far?
17  A.    I do.
18  Q.    Okay.  And do you have in mind the group of exemplary
19  formulations that you asserted in your report to be obvious
20  and you still believe are obvious.  Okay?
21  A.    Okay.
22  Q.    So my question is:  Some of these groups of
23  formulation that you assert to be obvious could have more
24  than .43 percent total PG esters after three months at
25  25 degrees; is that correct?

Pinal - cross

1    A.    What I can say is that if you take the formulation

2    that provides the maximum protection, that would be below

3    that.   Depending on the variations that would come, that

4    would come from that, it's hard for me to tell you exactly

5    how much percentage would be in terms of degradation after

6    that time.

7    Q.    I'm not asking about the maximum protection.   I'm

8    asking about the group of formulations you assert to be

9    obvious.   And my question is:   Some of the formulations

10   within that group of formulations you assert to be obvious

11   could have more than .43 percent total PG esters after three

12   months at 25 degrees.   Isn't that true, sir?

13   A.    So the formulation of 25 degrees after -- well, I will

14   give you the best answer that I can.   It's depending on what

15   conditions and specific ingredients.   It could be, but it's

16   not something I can tell you with, like with precise

17   numbers.

18   Q.    And when you say depending on the kind of ingredients,

19   depending on what PEG supplier you used, for example?

20   A.    Not what PEG supplier, but whether or not you put an

21   antacid or not.   That's important.   Like who supplied the

22   PEG is not something that really matters.

23   Q.    Sir, the formulations you asserted to be obvious in

24   your report all had sodium hydroxide; is that correct?

25   A.    Correct.

Pinal - cross

1    Q.    Okay.  So it doesn't depend on whether you have sodium

2    hydroxide.  All of them have PEG, PG, sodium hydroxide,

3    monothioglycerol?

4    A.    Yes.

5    Q.    You would agree, sir, that some of those formulations

6    could have more than .43 percent PG esters after three

7    months at 25 degrees; is that correct?

8    A.    If the formulation contained five milligrams per mL

9    antioxidant, with the -- it would contain also the antacid

10   or sodium hydroxide and it was manufactured in an inert

11   atmosphere, it would be less than that.

12   Q.    Well, Doctor, let's take a look at your deposition.

13   Let's see what you said in response to this question there.

14   Page 68, line 16.

15           MR. ALY:  Is the witness going to be afforded a

16   copy?

17           THE COURT:  It's on the screen.

18           MR. ALY:  Okay.

19           THE WITNESS:  Which --

20   BY MR. BERL:

21   Q.    Page 68?

22   A.    Sorry.  Which --

23   Q.    Sorry.  It's in the back of your binder, but it's also

24   on the screen?

25   A.    Okay.

Pinal - cross

```
 1   Q.      Pages 68 and 69?

 2                   THE COURT:  You can look in the binder or the

 3   screen, whatever you prefer.

 4                   THE WITNESS:  Okay.  Sir, which tab number?

 5   BY MR. BERL:

 6   Q.      I think it's at the very back.  It's the last tab in

 7   your binder, sir.

 8   A.      Okay.

 9   Q.      Are you there?

10   A.      Yes.  So page, sorry.  68?

11   Q.      Page 68, line 18.

12   A.      Okay.  Give me a minute.

13   Q.      Do you recall that I asked you questions at the

14   deposition a few months ago, sir?

15   A.      I do.  I recall you asked me a lot of questions.

16   Q.      Okay.  I did.  And you were under oath when I was

17   asking you those questions; is that correct?

18   A.      Yes.

19   Q.      And you told the truth; is that correct?

20   A.      I did.

21   Q.      And you had an opportunity to submit an errata sheet

22   to change mistakes that were made; is that correct?

23   A.      Correct.

24   Q.      And you, in fact, submitted an errata sheet that

25   changed certain things?
```

Pinal - cross

1    A.    Yes.

2    Q.    Okay.  And the question I asked you starts at the

3    bottom of page 68.  I said:  Some of those groups of

4    formulations within the scope of your exemplary POSA

5    formulation in paragraph 13 could have more than .43 percent

6    total PG esters after three months at 25 degrees; right?

7               And you answered:  If the POSA -- if for

8    formulations that are within the group of exemplary POSA

9    formulations, the levels of impurities that would be

10   observed, the POSA would expect them to be of similar range.

11   It may not be exactly the same value.  But the POSA would

12   expect them to be of similar value.

13              Now, how far up or how far -- far down from

14   that, that is a question that requires, you know, to get

15   into speculative thought.

16              And I said, okay.

17              And you said, but what we can say is that the

18   POSA would expect them to be similar but not necessarily

19   exactly the same.

20              Was that your testimony, sir?

21   A.    Absolutely, yes.

22   Q.    Okay.  And, sir, you also agreed that whether the

23   exemplary formulations that you assert to be obvious have

24   .43 percent PG esters half or less after three months

25   at  25 degrees depends on a variety of things; is that

1  correct?

2  A.     Yes.  So if the exemplary formulation, which there are

3  several of them, if it meets all the, what I put as the

4  obvious formulation, you would expect to have that required,

5  meet the requirement.

6  Q.     You would expect your obvious formulations to have

7  that requirement?

8  A.     Yes.

9  Q.     Based on the Eagle data; is that correct?

10  A.     No.

11  Q.     You --

12  A.     The Eagle data shows what definition of stability is

13  met.

14  Q.     Okay.

15  A.     Yes.

16  Q.     But you can't testify that all of the formulations of

17  your exemplary formulation necessarily always will have less

18  than .43 percent PG esters at 25 degrees after three months;

19  is that correct, sir?

20  A.     As I mentioned before, I would expect them to have

21  similar value as to what precise number I cannot give you.

22  Q.     They would be similar to .43.  They could go up, they

23  could go down, but they would be similar; is that correct?

24  A.     No.  It would be similar in the range because the

25  range is below.  It's not at .43.  It's below that.  So it

1    would be similar to that.  So the precise value, I cannot

2    tell you.

3    Q.    But, sir, let me ask you this, sir:  Can one have an

4    exemplary formulation that you assert to be obvious within

5    the scope of what you described as the obvious formulation

6    and have more than .43 percent total PG esters at three

7    months, 25 degrees?  That's possible, isn't it, sir?

8    A.    If the -- okay.  Let me just put it to clarify.  If

9    the formulation matches the exemplary or obvious formulation

10   that I present, that value of less than .43 is part of the

11   formulation.  It's one of these properties, so it would have

12   to have that.  Whether that number, what exact number that

13   would be, I cannot tell you, but I can tell you that they

14   would be similar fitting that type of criterion.

15   Q.    Let's put up --

16              THE COURT:  Because it's a bench trial --

17              THE WITNESS:  Okay.

18              THE COURT:  I'm going to ask the question be

19   repeated and if the witness can directly answer the

20   question.

21              THE WITNESS:  Okay.

22              MR. BERL:  Well, okay.

23   BY MR. BERL:

24   Q.    Sir, my question, hopefully, is simple:  Can one have

25   an exemplary formulation, one of the formulations you assert

Pinal - cross

 1   to be obvious and have more than .43 percent total PG esters

 2   at three months, 25 degrees?

 3            Do you agree that could happen; is that correct?

 4   A.    I would -- no, I don't.

 5   Q.    Okay.  Let's take a look at your deposition, sir.

 6   Page 61, line 18 go over to page 62.

 7            And I said:  My question is very simple.  Can

 8   one have an exemplary formulation within the scope of what

 9   you describe in paragraph 13 of your expert report and have

10   more than .43 percent total PG esters at three months,

11   25 degrees?

12            And you said, that is something that the POSA

13   would understand would depend on what is the specific -- you

14   know, other parameters of the chemistry.  So with that

15   particular value, the -- the number that would be sort of

16   like a reference point and then it may fluctuate by changing

17   the amounts.

18            Was that your testimony, sir?

19   A.    Yes, it is.

20   Q.    Okay.  And, sir, you cannot testify before the Court

21   today under oath that it is impossible to have an exemplary

22   POSA formulation that adds more than .43 percent esters

23   after three months at 25 degrees, can you?

24   A.    If it is a formulation that I said is the obvious

25   formulation, it would be less than .43.  The actual number,

Pinal - cross

1    I cannot tell you.

2    Q.    You just said the obvious formulation?

3    A.    Formulation, yes.

4    Q.    Okay.  I'm not asking about that.  I'm asking about

5    the group of formulations you asserted to be obvious in your

6    expert report that you still assert to be obvious today.

7            Are you with me?

8    A.    Yes.

9    Q.    Okay.  You cannot testify before the Court today under

10   oath that it is impossible to have an exemplary POSA

11   formulation that has more than .43 percent PG esters after

12   three months at 25 degrees, can you, sir?

13   A.    What I would say is there's some remote possibility, I

14   would give you that.  I cannot do more than that.

15   Q.    It would depend; right?

16   A.    It would depend.  And as I stated in my deposition, so

17   if the question is more specific, I could give a more

18   specific answer.  I can't give you a specific answer.

19   Q.    Your answer is:  Not necessarily, it would depend;

20   right?

21   A.    Okay.  I will put it that way.

22            MR. BERL:  Okay.  That's all the questions I

23   have.  Thank you.

24            THE COURT:  All right.  Thank you.

25            Any redirect?

1          MR. ALY:  Yes, Your Honor.

2                    REDIRECT EXAMINATION

3     BY MR. ALY:

4     Q.    All right, Dr. Pinal.  As far as the -- can we please

5     look at that slide 19 from the defense presentation.

6               Now, Dr. Pinal, you may have looked at several

7     formulations and one question I wanted to know is:  Is this

8     formulation, slide 19, as obvious if you took the sodium

9     hydroxide out?  Is that still an obvious formulation?

10    A.    It will still be obvious.

11    Q.    And what about if you put the sodium hydroxide in or

12    out, what effect does that have on the PG ester limitation

13    at 25 degrees Celcius?

14    A.    The presence or absence of NaOH has an impact on the

15    production of PG esters.

16              MR. BERL:  This is also outside the scope of the

17    report.  In the report he said that -- I'm happy to do this

18    at sidebar if you don't want the witness to hear.

19              THE COURT:  That's probably a good idea.

20              MR. BERL:  Okay.

21              (Sidebar conference held as follows.)

22              MR. BERL:  He did not provide an opinion in his

23    report the formulations were obvious without the NaOH.  His

24    report says these are the formulations I assert to be

25    obvious.

Pinal - redirect

```
 1              THE COURT:  Do you agree?  Are there any
 2   formulations upon which he opined in his expert report that
 3   did not include NaOH?
 4              MR. ALY:  No.  And I guess the point is, if it's
 5   obvious with NaOH, then it's obvious without NaOH.  It's one
 6   less thing to have to worry about.  They're more and more
 7   obvious as you have less agreed.  Starting with PG, for
 8   example.
 9              THE COURT:  That's not the way it was presented
10   to me.  In fact, I will be honest with you.  One of the
11   questions I'm going to have for you at some the point is I'm
12   not how he gets 897, why it's not 820, why it's not 70, 30.
13   But that's what you guys presented.
14              MR. ALY:  Right.
15              THE COURT:  I'm going to sustain the objection.
16   It's beyond the scope.
17              MR. ALY:  All right.
18   BY MR. ALY:
19   Q.    When Mr. Berl was talking about formulations, what
20   opinions were you able to reach as to whether or not the
21   .43 percent PG ester limitation is reached when using your
22   obvious formulation on slide 19?
23   A.    My opinion --
24              MR. BERL:  Objection.
25              THE COURT:  All right much hold up.  I'm going
```

1    to allow the question.  Overruled.

2              THE WITNESS:  That formulation, the one, that

3    would meet the specification.  Now, there can be changes to

4    that formulation and it still would be obvious, and that

5    could change the stability of that formulation.

6    BY MR. ALY:

7    Q.    Now, counsel had asked you about the Olthoff reference

8    and portions of the missing lines.  Do you know where that

9    document came from?

10             THE COURT:  Just for clarity, which document?

11   I'm not sure?  The English translation document?

12             MR. ALY:  The English translation document.

13             THE COURT:  Okay.

14   BY MR. ALY:

15   Q.    DTX-94?

16   A.    I don't recall -- it's the document that had the

17   English and German version.

18   Q.    Do you recall if this came from the patent application

19   file that Eagle submitted to the Patent Office with the

20   translation that you reviewed?

21             MR. BERL:  Objection.  It seems pretty leading.

22             THE COURT:  That's definitely leading.  I

23   thought the authentication wasn't in dispute about this.  I

24   let the cross go because it was kind of cute.  I also

25   thought how much am I really going to put weight on this,

 1   because you all stipulated to the authentication.  Right?

 2              MR. BERL:  Just to be clear, we're not fighting

 3   about authentication.  That wasn't the point of the cross.

 4   I will take cute as a compliment.

 5              THE COURT:  The point is that to me, you're

 6   going to stipulate to authenticity, then if it's a missing

 7   line, it can't -- nobody can be faulted for it.  Okay?

 8   That's where I am.  So I'm not putting any weight on it.

 9   BY MR. ALY:

10   Q.    Now, Mr. Berl asked you about the Drager reference,

11   DTX-73.

12   A.    Yes.

13   Q.    And Drager discusses Olthoff and does some experiments

14   trying to be like Olthoff; right?

15   A.    Yes.

16   Q.    Now, did you look into the conditions that Drager

17   used to do the experiments it did versus the ones Olthoff

18   used?

19              MR. BERL:  Objection, Your Honor.  This was

20   beyond the scope of the direct and beyond the scope of the

21   cross.

22              He specifically didn't get into the comparison

23   of the Drager and Olthoff data, so the big issue in the

24   case, and he completely avoided it during his testimony

25   today.

622

Pinal - redirect

```
 1              THE COURT:  All right.  Hold up.  I thought
 2   there was cross-examination about Olthoff underlying data.
 3              MR. ALY:  Yes.
 4              THE COURT:  All right.  Now, so you're saying
 5   there wasn't any cross-examination about Drager underlying
 6   data?
 7              MR. BERL:  There's a part of Drager that talks
 8   about Drager's effort to repeat Olthoff.
 9              THE COURT:  Okay.
10              MR. BERL:  And --
11              THE COURT:  That didn't come up.
12              MR. BERL:  Big dispute between the parties.
13   Incredibly today, it didn't come up.
14              THE COURT:  Right.
15              MR. BERL:  So I didn't cross about that, of
16   course.
17              THE COURT:  But was there any questioning on
18   cross about the underlying data of --
19              MR. BERL:  Drager's repetition of Olthoff
20   experiment?
21              THE COURT:  Not repetition.  I don't care about
22   that.  Was there any questioning about Drager's data?  I
23   thought there was.
24              MR. BERL:  Drager's data.
25              THE COURT:  Well, the data upon -- any data set
```

1    forth in Drager?

2              MR. BERL:  Data set forth in Drager, yes.

3    Drager testing of Olthoff, no.

4              THE COURT:  Okay.  But there was questioning

5    about both data that was relied upon respectively by Olthoff

6    and Drager.  Objection overruled.  Let's go.

7    BY MR. ALY:

8    Q.    Did you have a chance to look at the conditions of

9    testing between those used in the Drager reference versus

10   Olthoff?

11   A.    Yes.  We actually looked at the data from Figure 3

12   from Drager.

13   Q.    What did you see?

14   A.    Well, we saw we also earlier today the data for the

15   stability.  That is a formulation, and I do recall having

16   mentioned today that that is 99 percent propylene glycol,

17   which is very similar to Olthoff.  The difference is that

18   Olthoff used 100 percent propylene glycol, not 99 percent.

19              Another difference that I did not mention today

20   but exists between the results presented here in Drager and

21   Olthoff is that Olthoff used inert atmosphere when preparing

22   the formulation, and as I mentioned earlier today what

23   Olthoff, method of use inert gas, in their atmosphere,

24   protects from oxidation.  Drager doesn't indicate that

25   nitrogen atmosphere was used when reproducing the results

624

Pinal - redirect

1    from Olthoff.

2    Q.    Now, speaking of Drager, Mr. Berl asked you if there

3    were the requirement of aprotic solvents in Drager.  You

4    agreed and said that there's something that you would like

5    to explain, but weren't given the opportunity on cross.

6                Can you explain what you were going to say about

7    the teachings of Drager and aprotic solvents?

8    A.    Yes.  The teaching of Drager, when reading Drager, and

9    Drager actually uses technical language, but it actually

10   teaches to reduce the concentration of OH groups, and I can

11   point you where in Drager that is.

12   Q.    All right.

13   A.    If you look at column 4 on Drager.

14   Q.    On four.  We're looking at DTX-73, column 4.

15   A.    Yes.  You see the first full paragraph.  It actually

16   goes -- I would try to explain what it is alternatively,

17   formulations of the present invention will comprise, here is

18   the key part, ten moles per liter.

19                Now, moles is a way of measuring the amount of

20   substance in grams, but it actually refers by just a simple

21   multiplication as to the number of molecules.  And the

22   multiplication involved -- I'm explaining.

23                THE COURT:  Yes, but.  Okay?

24                MR. BERL:  This is nowhere in his report.  I

25   certainly didn't adduce this.  I simply asked:  Doesn't it

Pinal - redirect

 1   say that it discloses aprotic solvents with protic solvents?

 2   I didn't ask about this and it's not in his report.

 3               MR. ALY:  Honestly, I didn't expect to elicit

 4   this portion.  I'm obviously fine with whatever Dr. Pinal

 5   has, but it wasn't my intention to see any additional

 6   information.  That's what the witness talked about.  I

 7   didn't intend to though.

 8               MR. BERL:  I take Mr. Aly at his word, but I

 9   think --

10               THE COURT:  Well, first of all, I have a general

11   rule.  You get to explain your answer.  You either do it on

12   the cross or you get to do it in redirect.

13               I'm going to let the witness explain it.  I

14   think you're going to reference the entire paragraph is my

15   guess and what comes after this sentence?

16               THE WITNESS:  Yes.

17               THE COURT:  Answer the question.  Go ahead.

18               THE WITNESS:  Okay.  So this is, very briefly,

19   to a person that is reading this paragraph, ten moles per

20   liter, there's just a simple multiplication from a concept

21   of nature, and the -- I'm going to get technical and I

22   apologize for that, Your Honor.  By multiplying the number

23   of moles by that number, one gets exactly the number of

24   molecules, and if one knows the number of molecules, which

25   are very large numbers, that's why moles are used, one gets

1    the number of OH groups, because a molecule has 1, 2 or 3,

2    whatever number.

3              So the point that I'm trying to make is that

4    when somebody refers to this paragraph, it tells that it's

5    looking at the number of molecules.  It's not spelled out in

6    words, but that's exactly what it says.  That is exactly

7    what somebody reading would get out of it.

8    BY MR. ALY:

9    Q.    And, Dr. Pinal, as far as what you understand Drager

10   to be teaching, how would that inform a POSA what to do

11   about what Drager was teaching?

12   A.    What Drager was doing, mixing with something that has

13   OH and mixing that has some OH and it's a lower number,

14   reducing the amount.  Here in this paragraph, it's saying

15   exactly what is happening at the molecular level.  It's

16   actually controlling the number of ways.  It's not spelling

17   it like that, but that's exactly what it's saying.

18   Q.    What --

19              MR. BERL:  I don't know how long you have gone

20   on on?

21              MR. ALY:  I'm going to go on.

22              MR. BERL:  I think we may have a few motivation

23   theories.  To the very least, I think we should be able is

24   to respond to this theory.

25              THE COURT:  If you want to.  I mean, to me, I

Pinal - redirect

1    thought the question was about aprotic versus protic, and

2    so I mean you can spend your time the way you want, Mr.

3    Berl?

4              MR. BERL:  If you don't need it --

5              THE COURT:  If the lawyer is ready to move on, I

6    would move on, but I'm not stopping anybody.  Your clock.

7    BY MR. ALY:

8    Q.    Let's go down to the Olthoff reference, DTX-94, and on

9    page 14 on the top.  Page 6 of the exhibit.  Top paragraph,

10   please.

11             I just wanted you to have the opportunity to

12   explain, Dr. Pinal, there was a portion that was highlighted

13   about limited use today versus when Olthoff was written, but

14   there was a part in the front that was not highlighted and

15   you were starting to explain.

16             What is your understanding of for

17   pharmacological reasons and for reasons concerning the

18   production, as far as why monovalent alcohols are not used

19   as frequently?

20   A.    Well, pharmacological has two parts.  One of them I

21   did mention.  Injecting into the blood is basically

22   integration, because that's exactly what happened.  Another

23   part that is the POSA, the formulator would know about

24   ethanol is that it is more irritant than the other solvents.

25   So expressed even at the same concentration, at the local

Pinal - recross

1    level of the injection, it would be more irritant.

2              And concerning the production, it evaporates

3    easily.  PEG and PG especially do not evaporate.  So some

4    safety precautions have to be placed.  So those are the

5    three considerations.

6              MR. ALY:  Nothing further, Your Honor.

7              THE COURT:  All right.  Wait.

8              MR. BERL:  May I have two minutes?

9              THE COURT:  As long as you want.

10                  RECROSS EXAMINATION

11   BY MR. BERL:

12   Q.   Sir, for the first time today on redirect you

13   testified about the fact that Drager used 99 percent PG and

14   Olthoff used 100 percent PG.

15              Do you recall that a moment ago?

16   A.   Yes, I do recall.

17   Q.   Let's take a look at Olthoff table.  He doesn't say

18   100 percent propylene glycol.  He just says propylene

19   glycol; is that right?

20   A.   Correct.

21   Q.   And when one orders propylene glycol, it's not

22   100 percent pure propylene glycol; is that correct?

23   A.   When somebody buys a chemical, it would come with an

24   assay of how much it is in there.

25   Q.   And even today, 30 years after Olthoff, around the

Pinal - recross

1    late 2000s, if you buy propylene glycol even in the United

2    States, it's somewhere around 99 percent pure; is that

3    correct?

4    A.    Well, that would be -- the level would say what the

5    purity is.

6    Q.    And the purity level, if you buy it from somebody like

7    Aldridge, which is the main catalogue from which a lot of

8    people buy their lab materials; is that correct?

9    A.    Correct.

10   Q.    You wouldn't be surprised to see that the level in

11   Aldridge is 99 or 99-and-a-half percent?

12   A.    It would have different grades.

13   Q.    Including around 99 percent?

14   A.    Including 99 percent.

15   Q.    Okay.  And you don't have an opinion that somehow the

16   purity of propylene glycol was better in East Germany in the

17   early 1980s than it would be in the United States at the

18   priority date, do you?

19   A.    I don't have an opinion on that.

20   Q.    It's not like the East Germans excelled in this

21   particular area of science like doping athletes; right?

22   Thank you very much.

23            THE COURT:  Thank you, Doctor.  You may step

24   down.

25            THE WITNESS:  Thank you.

```
 1                    (Witness excused.)

 2                    THE COURT:  All right.  Next?

 3                    MR. NELSON:  Good afternoon, Your Honor.  Kevin

 4      Nelson.  May I proceed?

 5                    THE COURT:  Yes, please.

 6                    MR. NELSON:  Defendants call doctor Michael J.

 7      Thirman to the stand.

 8                    May I come up with some binders?

 9                    THE COURT:  Yes, please.

10                    (Mr. Nelson handed binders to the Court and to

11      the witness.)

12                        ... MICHAEL J. THIRMAN, having been

13           duly sworn/affirmed as a witness, was examined and

14           testified as follows...

15                    THE COURT:  Mr. Nelson?

16                    MR. NELSON:  Thank you, Your Honor.

17                         DIRECT EXAMINATION

18      BY MR. NELSON:

19      Q.    Good afternoon, Dr. Thirman.  Have you been retained

20      as an expert by defendants in this litigation?

21      A.    Yes, I have.

22      Q.    And have you prepared slides today to assist the Court

23      in understanding your testimony?

24      A.    Yes.

25      Q.    And is this the slide deck that's up on the screen and
```

Thirman - direct

1    in front of the Court?

2    A.    Yes.

3    Q.    Can you please summarize the opinions that you'll be

4    providing today?

5    A.    Well, my opinions are that the claims are invalid due

6    to obviousness.   The claims involve the same drug,

7    bendamustine, with the same dose and schedule and the same

8    indications.   The administrative details were disclosed in

9    the prior art or would have been obvious.

10   Q.    And what prior art references will you be discussing

11   with the Court today?

12   A.    I will be discussing the Treanda label and the

13   previous references regarding bendamustine.

14   Q.    And if we can look at the next slide, please.   And

15   generally, are these the limitations from the family of

16   claim limitations that you will be discussing today?

17   A.    Yes.

18   Q.    I'd like to talk a little bit about your background.

19   What's your current occupation?

20   A.    I am a physician.   I am an associate professor at the

21   University of Chicago section of hematology/oncology.

22   Q.    Can we pull up DTX-1022, please.   And it's in your

23   binder if you want to refer to it, but what is this

24   document, sir?

25   A.    This is my C.V.

Thirman - direct

1    Q.     And does this C.V. accurately summarize your

2    educational and professional experience throughout the

3    years?

4    A.     Yes, it does.

5    Q.     And I want to talk a little bit about your educational

6    background.  If we can go to slide 5, please.

7              Please summarize for the Court your educational

8    background.

9    A.     Well, I obtained my bachelor's degree at the

10   University of Michigan in biological sciences and also my

11   medical degree at the University of Michigan in 1986.  I was

12   a resident at the University of Minnesota Hospital in

13   internal medicine from 1986 to '89, then a fellow in

14   clinical pharmacology for one year, 1989 to 1990.

15             Subsequently, I went to the university of

16   Chicago for a clinical fellowship at the University of

17   Chicago, the section of hematology/oncology, and also

18   performed research there, subsequently becoming a research

19   associate in 1994 through 1996.

20   Q.     And have you had any teaching experience in your

21   career?

22   A.     Yes, I have.

23   Q.     And what has that teaching experience been?

24   A.     I've been involved in the teaching of graduate

25   students, medical students, internal medicine residents and

1    hematology/oncology fellows.

2    Q.    And have you held any other professional or positions

3    in connection with your academic work?

4    A.    Well, my research and clinical work all focus on the

5    treatment of patients with blood cancers.

6    Q.    And is there a specific area that you specialize in?

7    A.    I specialize in the treatment of leukemia and

8    lymphoma.

9    Q.    Have you heard of a term, and I see it there in your

10   research associate title, hematology and oncology.   What is

11   hematology?

12   A.    Hematology is the study of blood disorders and

13   oncology is the study of cancers.

14   Q.    And do you actually treat cancer patients?

15   A.    Yes, I do.

16   Q.    And when did you first begin treating cancer patients?

17   A.    I started treating cancers patients as a resident in

18   internal medicine and then focused on the treatment of

19   cancer patients when I started my fellowship in

20   hematology/oncology in 1990.

21   Q.    And when focusing on just your patient care, is there

22   a particular area that you focus on for patient care?

23   A.    Again, my patient care is involving patients with

24   leukemia and lymphoma.

25   Q.    Approximately how many patients with leukemia and

Thirman - direct

1    lymphoma have you treated in your career?

2    A.    Approximately 2 or 3,000.

3    Q.    And approximately how many of those have you been

4    treating with bendamustine?

5    A.    Approximately 50 to a hundred.

6    Q.    When treating patients with bendamustine, are you

7    aware of the formulation of bendamustine that you are

8    using?

9    A.    In general, as a treating physician, we do not pay

10   attention to the specific formulation.

11   Q.    And if we can go to slide six, please.

12         Have you received any recognitions or awards in

13   connection with your experience treating cancer patients?

14   A.    Yes, I have.

15   Q.    Is this a summary of the awards and recognition you

16   received throughout your career?

17   A.    Yes.

18   Q.    And I'd like to focus on two of them, if you don't

19   mind.

20         First, the 2007 Stohlman Scholar Award.  Can you

21   please describe that for the Court?

22   A.    Yes.  I was awarded a leukemia and lymphoma society

23   grant.  That's a five-year grant for research, and then they

24   select the group who had the most outstanding science within

25   their scholars to receive that award.

1   Q.    And the 2017 Chicago Magazine Top Cancer Doctor, can

2   you please describe that award to the Court, please?

3   A.    Well, Chicago magazine polls physicians in the Chicago

4   area to identify the top cancer doctors in various

5   specialties.

6   Q.    And that's awarded every two years; is that right?

7   A.    Every two to three years.

8   Q.    We'll keep our fingers crossed.

9   A.    Okay.

10  Q.    Can you go to slide 5, please.  I'm sorry.  Slide 7,

11  please.

12          And does this slide summarize your additional

13  experience in oncology and hematology?

14  A.    Yes, it does.

15  Q.    And can you briefly summarize that additional

16  experience for the Court?

17  A.    Yes.  I published a number of peer-reviewed research

18  articles, book chapters.  I have been invited to speak

19  around the country.  I'm on editorial boards for three

20  journals.

21          I'm a member of a number of committees,

22  including leadership positions at the University of Chicago.

23  I currently have two grants for research, one from the

24  National Cancer Institute.

25          I have trained approximately nine graduate

1    students and fellows in laboratory and again I've been

2    involved in the teaching of medical students, residents and

3    fellows.

4    Q.    Have you heard of the term institutional review board?

5    A.    Yes.

6    Q.    What is an institutional review board?

7    A.    An institutional review board reviews clinical trials

8    for their suitability.

9    Q.    And have you ever served on an institutional review

10   board?

11   A.    I'm currently a member of the University of Chicago

12   Institutional Review Board.

13   Q.    Have you ever testified as an expert in a case before?

14   A.    Yes, I have.

15   Q.    Approximately how many times?

16   A.    Approximately four times.

17   Q.    Were any of those patent cases?

18   A.    No.  This is the first patent case for me.

19   Q.    Well, welcome.  Were you accepted as an expert by the

20   Court each time you testified?

21   A.    Yes.

22              MR. NELSON:  I offer Dr. Thirman as an expert in

23   hematology, oncology.

24              MR. BERL:  No objection.

25              THE COURT:  All right.

1  BY MR. NELSON:

2  Q.    Dr. Thirman, I'd like to explore your invalidity

3  positions now.

4        Can you please summarize for the Court what your

5  opinion is regarding invalidity of the asserted claims?

6  A.    Well, my opinion is that the asserted claims are

7  invalid due to obviousness.

8  Q.    What legal standard did you consider regarding the

9  question of whether the asserted claims are obvious?

10 A.    Well, I have a slide on that, so the standard that I

11 use was to evaluate the scope and content of the prior art,

12 the differences between the prior art and claim limitations

13 and the level of ordinary skill in the art.

14       I will not be discussing secondary

15 considerations today.

16 Q.    Are there any portions of the claims that we're going

17 to look at today for which you are not providing an opinion?

18 A.    I will not be providing opinions on formulation

19 issues.

20 Q.    Now, we've heard a lot in court the last few days

21 about a person of ordinary skill in the art or a POSA.  Have

22 you provided a definition that you are going to use for a

23 person of ordinary skill in the art?

24 A.    Yes, I have.

25 Q.    And what is that definition?

638
Thirman - direct

1   A.    I believe I have a slide on that.  So there are three

2   closely related definitions that I've provided here.  The

3   first is a skilled formulator with a Ph.D. and experience

4   working with a team, including a medical professional or

5   oncologist.

6               The second is a team of scientists, including a

7   skilled formulator, a medical professional or oncologist,

8   and a clinical research scientist.

9               And the third is a medical professional or

10  oncologist assisted by a team including a skilled

11  formulator.

12  Q.    Has your personal experience given you the perspective

13  of a POSA as of the respective priority dates we are going

14  to look at?

15  A.    I have extensive training and clinical experience in

16  treating patients with leukemia and lymphoma.  I conduct

17  clinical trials on patients with leukemia and lymphoma.

18              I work with colleagues around the country and

19  around the world on these clinical trials for patients with

20  leukemia and lymphoma and also on clinical issues related to

21  their treatment.

22              I've also trained fellows over the years who

23  have gone on to take care of patients with leukemia and

24  lymphoma.

25  Q.    And I'm going to ask the next slide be put up.

1          This is a summary of plaintiffs' proposed POSA

2     definition.  Do you understand your definition to be

3     materially different than the one that plaintiffs have

4     provided?

5     A.    My understanding is that the plaintiffs' proposed POSA

6     definitions are not material, materially different from

7     mine.

8     Q.    And would it change your opinion if the Court adopts

9     the wording in plaintiffs' definition of POSA instead of

10    yours?

11    A.    No, it would not.

12    Q.    Have you considered certain priority dates for the

13    asserted patents we're going to look at?

14    A.    Yes, I have.

15    Q.    And what dates have you considered?

16    A.    Well, for the Family Two '797 patent, the priority

17    date is January 28th, 2010.

18          And the Family Three A, '568, '399 and '887

19    patent, the priority date is March 20th, 2012.

20    Q.    And how do these priority dates impact your decision

21    as to what was and was not prior art?

22    A.    I only considered the references that were published

23    before the priority date as prior art.

24    Q.    Now, before we talk about the past specifically, I

25    want to talk a little bit about what would be important when

1    a medical POSA is treating a patient.

2              When deciding how to treat a patient, what is

3    the overall goal for a medical POSA?

4    A.    Well, the overall goal for a medical POSA is to select

5    a chemotherapy drug or chemotherapy regimen that has

6    efficacy and safety for treating their cancer.

7    Q.    Efficacy.  What is efficacy?

8    A.    Efficacy refers to the anti-tumor properties of a

9    chemotherapy drug or a chemotherapy regimen.

10   Q.    And can you explain to the Court the process that a

11   medical POSA would employ in determining the outcome of a

12   drug?

13   A.    A POSA would review the previously published

14   references related to that type of cancer as well as the

15   FDA approved labels for the drugs to be used in the

16   treatment.

17   Q.    And you also mentioned safety.  What does safety mean?

18   A.    Safety refers to the side effects of the chemotherapy

19   drug.  So side effects are very common, unfortunately, with

20   chemotherapy drugs.

21   Q.    And why would a medical POSA be concerned about safety

22   when treating a patient?

23   A.    Safety is a key consideration both for the patient and

24   also because the tolerability OR the regimen is very

25   important for the patient's ability to remain on therapy.

Thirman - direct

1    Q.    And what would a medical POSA understand a most

2    important impact on safety and efficacy when treating a

3    patient?

4    A.    Well, the critical determinant of safety and efficacy

5    is the total dose of the chemotherapy drug that the patient

6    receives.

7    Q.    Now let's talk about bendamustine, which is sort of

8    the reason why we're today.  How is bendamustine

9    administered to patients?

10   A.    Bendamustine is administered intravenously.

11   Q.    And what does an intravenous administration mean?

12   A.    Well, it's delivered in a liquid form through an

13   intravenous catheter, which can either be a central venous

14   catheter or a peripheral IV catheter.

15   Q.    And what are the potential categories of side effects

16   that are related to intravenous administration of a drug in

17   general?

18   A.    Well, there are acute side effects related to

19   infusion, so that can include fevers, chills, nausea,

20   vomiting, and there are also infusion effects related to the

21   vein that the chemotherapy drug is being administered into,

22   so those are infusion side effects.

23        There are also late side effects related to

24   chemotherapy.  There can be hematologic toxicity, which

25   refers to a decrease in blood counts.  That occurs typically

Thirman - direct

1    one to three weeks after chemotherapy, and then

2    non-hematologic toxicities, referring to side effects

3    involving various organ systems.

4    Q.    I want to explore a little bit more.  Individually,

5    you talked about infusion-related reaction, including nausea

6    and vomiting.  Are there known ways to manage those infusion

7    related side effects like nausea and vomiting?

8    A.    Yes.  So for a drug like bendamustine, which induces

9    fairly extensive nausea and vomiting, we always give

10   antiemetics, which are antinausea drugs.  We typically give

11   one to four antinausea drugs before and after the treatment.

12   Q.    Now, you also mentioned non-hematological toxicities.

13   What are some examples of those?

14   A.    Well, non-hematologic toxicities in the acute setting

15   can refer to nausea, vomiting, and infusion side effects,

16   and later on can also refer to organ toxicities, such as

17   cardiac toxicity or neurotoxicity.

18   Q.    We saw during the opening statement in some of the

19   documents early on terms like phlebitis, thrombophlebitis.

20   What's phlebitis?

21   A.    Phlebitis is an irritation of a superficial vein,

22   which can happen after infusion of a chemotherapy drug.

23   It's typically associated with drugs that are in the class

24   referred to as vesicants.

25   Q.    Is bendamustine -- was bendamustine known by medical

Thirman - direct

1    POSAs to be an irritant or a vesicant?

2    A.    Bendamustine is typically classified as an irritant,

3    which means it can irritate a vein.  And if there's

4    infiltration of bendamustine into the subcutaneous tissues,

5    it can cause irritation.

6    Q.    Where do patients typically receive intravenous

7    administration?

8    A.    The patients typically receive the intravenous

9    administration in an outpatient infusion suite or in a

10   hospital.

11   Q.    Well, walk us through that process for a patient

12   getting to the clinic and receiving intravenous

13   administration of a drug like bendamustine.

14   A.    Well, typically, the patient checks in at the clinic,

15   waits to register.  They often go for blood tests to make

16   sure that it's safe to administer the chemotherapy.  There's

17   often a wait of an hour, hour-and-a-half to obtain the

18   results of the laboratory tests.  The patient is then seen

19   by a nurse who obtains the vital signs on the patient,

20   checks on them.

21           If they have a central venous catheter, it's

22   accessed.  If they do not, a peripheral IV is inserted.

23   Assuming the laboratories are acceptable, the chemotherapy

24   drugs would be brought to the infusion chair where the

25   patient is placed and then antiemetics are administered, and

1    then the chemotherapy drugs or regimen are given along with

2    intravenous fluids, more antiemetics.

3              And when all the treatments are complete, IV

4    lines are removed and the patient is checked for safety and

5    then discharged home.

6    Q.    And I want to pull a couple things out of there and

7    dig in a little bit.  You talked about a central line.

8    What's that?

9    A.    Well, a central line is a, typically, a larger IV

10   that's inserted under the skin into a large vein in the neck

11   or chest.

12   Q.    And how does it relate to a peripheral IV?

13   A.    Peripheral IVs are small catheters with a much smaller

14   gauge, much shorter, and they're typically inserted into the

15   hands or arms.

16   Q.    You talked about administration of fluids to a patient

17   that was getting treatment.  Why administer fluid?

18   A.    Well, bendamustine is associated with nausea and

19   vomiting, so in that setting, the patient can become

20   dehydrated.  Bendamustine can also induce fever and, again,

21   patients who have a fever become dehydrated and require IV

22   fluids.  And furthermore, with the first one or two cycles

23   of bendamustine, the patients are at risk for a condition

24   called tumor lysis syndrome, and this requires vigorous

25   hydration with IV fluids, and it's listed in the precautions

Thirman - direct

1   section.

2   Q.    And you also mentioned some other drugs that are

3   administered with chemotherapy on occasion, such as we

4   talked about bendamustine.  What are some of the other drugs

5   that are typically administered with bendamustine?

6   A.    Well, typically, bendamustine is administered with

7   anti-CD 20 monoclonal antibodies, such as rituximab.

8   Q.    And are those administrations sequentially or

9   simultaneously for bendamustine?

10  A.    With the first administration of the anti-CD 20

11  antibody, it's typically sequential, and then with

12  subsequent dosing, it's often given simultaneously.

13  Q.    And when you are caring for a patient, what do you

14  tell them typically their time is going to be at that

15  infusion clinic?

16  A.    Well, it varies by a number of factors.  So when

17  patients are on the first one or two cycles, the tumor lysis

18  syndrome, they're typically there all day receiving IV

19  fluids and we repeat the laboratories later in the day to

20  make sure that they have acceptable electrolytes before

21  going home.

22          On the days where patients are receiving the

23  monoclonal antibodies, since those happen very slowly due to

24  various reactions that patients experience, it usually takes

25  four to eight hours.

Thirman - direct

1              If the patient is coming in just for

2    bendamustine, typically, we would expect about two to

3    four hours of time of the patient there to get the

4    antiemetics and the additional IV fluids that are often

5    given.

6              MR. NELSON:  Your Honor we're going to talk to

7    the Family Two patent that Dr. Thirman will be discussing.

8    BY MR. NELSON:

9    Q.   I'd like to talk about the legal scope and content

10   that's related to Family Two, and to do so, give me a little

11   bit of history that you understand a POSA would know about

12   bendamustine.

13   A.   Well, bendamustine is a chemotherapy drug that is a

14   derivative of nitrogen mustard.  It was developed in East

15   Germany in the 1960s and is shown to have anti-tumor

16   properties in the 1970s and eighties.

17   Q.   Was bendamustine available in the United States before

18   2010?

19   A.   Yes.  It became available in 2008.

20   Q.   And what is the name of that product that was

21   available before 2010?

22   A.   The product name for bendamustine at that time was

23   Treanda.

24   Q.   Can you please turn to DTX-993, please.  And, Dr.

25   Thirman, what is DTX-993?

Thirman - direct

1   A.   DTX-993 is the FDA label for Treanda.

2   Q.   And is this document prior art to the patents we'll be

3   discussing today?

4   A.   Yes, it is.

5   Q.   What's the publication date for this document?

6   A.   It is April 2009.

7   Q.   And where is that indicated on there?

8   A.   It's on the middle right side of the first page.

9   Q.   And in general, what information does the product

10   label provide to a medical provider?

11   A.   Well, the product label contains a great deal of

12   information.  It has the indications for the drug, the

13   dosing schedule to administer, the precautions and the first

14   reaction, and then the administration details.

15   Q.   We'll go through each of those specifically, but let's

16   start at the top.

17        What is the active ingredient in the Treanda

18   product?

19   A.   Bendamustine.

20   Q.   And how is Treanda or how was Treanda known to be

21   administered?

22   A.   It is administered intravenously.

23   Q.   What are the indications that the prior art Treanda

24   label stated it is indicated for?

25   A.   It has two indications, chronic lymphocytic leukemia,

Thirman - direct

1    or CLL.  And also indolent B cell Non-Hodgkin's lymphoma

2    abbreviated NHL.

3    Q.    And what would a medical POSA understand to be the

4    administration dose and schedule for the prior art Treanda

5    product?

6    A.    Well, for CLL, the dose is 100 milligrams per meter

7    squared per day for days 1 and 2 of a 28-day cycle, and for

8    NHL, it's 120 milligrams per meter squared on days 1 and 2

9    of a 21-day cycle.

10   Q.    And how would a medical POSA use this information?

11   A.    Well, it's important to use the correct dose and

12   schedule for the specific cancer that a patient has been

13   treated for.

14   Q.    How is safety and efficacy impacted by the dosage

15   administration?

16   A.    Well, again, the safety and efficacy are determined by

17   the dose that a patient receives.

18   Q.    If a particular dose is known to be safe and effective

19   for a drug, what would a medical POSA expect about the

20   safety and efficacy of a slightly higher or slightly lower

21   dose?

22   A.    Well, with a slightly higher dose, a medical POSA

23   would expect a slightly greater anti-tumor efficacy and also

24   a slightly --

25              THE COURT:  Sorry.  One second, please.

 1              MR. HARBER:  Objection.  I don't believe this is

 2    in the report.

 3              MR. NELSON:  This is background.  He's just

 4    educating the Court as to dosage and side effects, and

 5    that's clearly in his expert report, and he just testified

 6    very clearly that dosage is what controls safety and

 7    efficacy.  That's all throughout his report.  But this is

 8    just background, Your Honor.

 9              MR. HARBER:  Respectfully, it's not background.

10    It's the issue in the case.  It's how changes to the

11    schedule affect safety.

12              MR. NELSON:  The question wasn't changes in

13    schedule.  A slightly higher dose.  Not to do with how many

14    times it's administered, it's the amount of drug, so

15    counsel completely had it wrong.

16              MR. HARBER:  That's a substantive opinion that's

17    not offered in the report.

18              THE COURT:  Let me see counsel at sidebar.

19              (Sidebar conference held as follows.)

20              THE COURT:  All right.  It's being asked about

21    dosage.  The objection is that this is an important opinion

22    that goes beyond background.

23              MR. HARBER:  Yes.

24              THE COURT:  Just flesh that out for me.  It's

25    late in the day.

Thirman - direct

1          Again, I was giving a little bit of leeway

2    because it was in the background section, but the witness

3    offered, you know, a few minutes ago and just now the

4    opinion that safety and efficacy is driven by dose, so the

5    whole issue in the case on this family is if you change the

6    duration or the concentration or the volume, does that

7    affect safety, and what the doctor is saying now is his

8    opinion is essentially those things are driven by dose, and

9    I still have not heard Mr. Nelson identify where that

10   opinion is.

11          MR. NELSON:  Because, Your Honor, when we get

12   the actual opinions that relate to it, we talked about

13   concentration, volume and schedule.  None of the things that

14   he talked about.  Counsel can't dispute he's clearly, and I

15   will point to paragraphs, but he has clearly talked about

16   the relationship between total dose and safety and efficacy.

17   We're not talking about the schedule.  I agree those are

18   issues in contention.  I will address those.

19          THE COURT:  Okay.  Do you dispute that total

20   dosage is discussed in his report?

21          MR. HARBER:  Yes, but what I'm objecting to.

22          THE COURT:  You do dispute.  You disagree?

23          MR. HARBER:  No.  Sorry.  I believe that dose is

24   referred to in the report.  The opinion that I'm objecting

25   to, unless I'm misunderstanding what the doctor said, was

1    that the dose is the driver of safety and efficacy.  That

2    opinion I do not understand to have been disclosed in the

3    report.

4              MR. NELSON:  That is what he said.  That is

5    clearly there.  And he already testified about two or three

6    questions ago.

7              MS. STAFFORD:  He was deposed about that for

8    hours.

9              MR. NELSON:  He was deposed about that lots.

10             MS. STAFFORD:  That question was asked.

11             MR. NELSON:  We'll get to a specific question.

12   This again is just general background.  This has never, as

13   far as I've known, been an issue.  I agree we had issues

14   about schedule and volume, but not total volume.  It has

15   never been an issue in the case.

16             THE COURT:  You know what, I'm going to let it

17   go.  Frankly, I'm not sure how it fits into the whole case.

18   That's part of my problem.  I'm inclined to just let it go.

19             If you think -- if something arises more

20   particular and you say, look, this is really getting, and

21   can prejudice me because of this reason, object.  Let me

22   know.  Then we can deal with that.

23             (End of sidebar conference.)

24   BY MR. NELSON:

25   Q.   I want to talk about the total dose of the drug that's

Thirman - direct

1   administered to the patient.  If that particular dose is

2   known to be safe and efficacious by a medical POSA, what

3   would that person expect the safety and efficacy of a

4   slightly higher or slightly lower dose?

5   A.    So a medical POSA would expect a slightly higher dose,

6   would have greater tumor efficacy and higher side effects,

7   and conversely a slightly lower dose would have slightly

8   decreased anti-tumor effects and slightly lower side

9   effects.

10  Q.    Turning back directly to the Treanda prior art label,

11  what is the administration time discussed for this product?

12  A.    Thirty to 60 minutes.

13  Q.    And if we look at page 2 of the prior art label, what

14  is the -- well, what's the administration volume that is

15  disclosed here?

16  A.    500 mL's.

17  Q.    And in general for a chemotherapy drug, how is safety

18  and efficacy impacted by administrative volume?

19  A.    Administrative volume usually does not have any impact

20  on safety or efficacy.

21  Q.    And is there a disclosure in this reference about the

22  administration concentration of the Treanda product?

23  A.    Yes.  It's 0.2 to 0.6 milligrams per millimeter.

24  Q.    Does the Treanda label discuss the adverse side

25  effects that are associated with Treanda therapy?

Thirman - direct

1    A.    Yes, it does.

2    Q.    Where is that discussion?

3    A.    So that's on the first page, the right side.  There

4    are the warnings and precautions about specific issues to

5    watch out for, and then there are the adverse reactions just

6    beneath that.

7    Q.    And how would a medical POSA understand the reporting

8    of these adverse side effects and these warnings and

9    precautions?

10   A.    Well, the adverse reactions explain the most common

11   hematologic and non-hematologic side effects, so the most

12   common non-hematologic side effects for both CLL and NHL are

13   pyrexia, which is fever, and also nausea and vomiting.

14         And then the most common hematologic side

15   effects for both CLL and NHL are a decrease in blood count,

16   so that's lymphopenia, anemia, leukopenia and neutropenia.

17   Q.    And how do these side effects compare to other

18   chemotherapy drugs?

19   A.    Well, some are in common.  So, for instance, the

20   hematologic abnormalities are observed typically with most

21   cytotoxic chemotherapy.  So after patients receive cytotoxic

22   chemotherapy, their blood counts decrease two to three weeks

23   later and then recover.  In addition, most chemotherapy

24   drugs induce some level of nausea and vomiting.  It varies

25   by the specific drug.

Thirman - direct

```
 1              Pyrexia or fever is specific or more specific

 2   for bendamustine.  We tend not to see that with other

 3   chemotherapy drugs.  So there are some that overlap and some

 4   that are distinct.

 5   Q.    Let's pull up DTX-995, please.  And what is this

 6   document?

 7   A.    This is the Bendeka label.

 8   Q.    And what are the active ingredients, what is the

 9   active ingredient in the Bendeka product compared to the

10   active ingredient in Treanda?

11   A.    It's the same.  Bendamustine.

12   Q.    If you turn to slide, turn to slide 12, please.  Thank

13   you.

14              Can you compare the indication and usage for the

15   Treanda products and the Bendeka product?

16   A.    The indications and usage in Treanda and Bendeka are

17   identical, CLL and NHL.

18   Q.    And what is the comparison of the dosage and dosing

19   schedule?

20   A.    The dosing schedule for both CLL and NHL are identical

21   for Treanda and Bendeka.

22   Q.    The next slide.  Can you please compare the adverse

23   reactions that are reported for the prior art Treanda

24   product and the Bendeka product?

25   A.    The adverse reactions are identical between Treanda
```

Thirman - direct

1       and Bendeka.

2                   MR. BERL:  Objection.  Again.

3                   MR. HARBER:  Objection.  I just want to make

4       sure this isn't opening some door on the comparison of

5       results.

6                   MR. NELSON:  These are not results.  He's

7       comparing the two labels.

8                   THE COURT:  All right.

9                   MR. NELSON:  There's no --

10                  THE COURT:  Okay.

11      BY MR. NELSON:

12      Q.     Do you know of any changes between the administration

13      of the prior art Treanda product and the Bendeka product?

14      A.     Yes.  The administration time and volume are different

15      with Bendeka.

16      Q.     And are you aware of any differences -- let's look

17      specifically at the Family Two patent that you are going to

18      be discussing.  We have a slide on that.

19                  Are these the claims of the Family Two '797

20      patent that you'll be discussing?

21      A.     Yes, they are.

22      Q.     And this is from DTX-8 at page 10.

23                  Did you -- do you understand that Dr. Pinal

24      testified earlier that a POSA would have been motivated to

25      develop a liquid form of bendamustine having the limitations

Thirman - direct

1    that are discussed in this claim?

2    A.    Yes.

3    Q.    Why would a medical POSA have been interested in a

4    liquid bendamustine formulation?

5    A.    A liquid bendamustine formulation would provide an

6    administration option.

7    Q.    And what would a medical POSA have expected with

8    respect to the safety and efficacy of administering a

9    ready-to-use liquid bendamustine formulation?

10   A.    Well, the lyophilized powder is constituted in a

11   liquid and a medical POSA would expect that a liquid

12   formulation of bendamustine would be safe and effective.

13   Q.    And why is that?

14   A.    Well, it's the same drug, and when it's administered

15   to patients, it's always administered as a liquid.

16   Q.    Now, turning our attention back to claims 9 and 11 of

17   the '797 patent, what limitation would have been relevant to

18   the medical POSA?

19   A.    Well, the limitation would be treating leukemia and

20   other blood cancers with a liquid bendamustine containing

21   composition.

22   Q.    And what would a medical POSA have known or expected

23   about using liquid bendamustine to treat leukemia?

24   A.    Well, since Treanda is reconstituted into a liquid, a

25   medical POSA would know that it is safe and feasible and

Thirman - direct

1    effective to administer a liquid formulation.

2    Q.    Where does the Treanda label disclose a method of

3    treating leukemia as described in claim 9 and 11?

4    A.    In the indications section of the label.

5    Q.    Would the formulations limitation affect a medical

6    POSA's expectation as to whether bendamustine can be

7    effectively used to effectively treat leukemia?

8    A.    No.

9    Q.    Why not?

10   A.    Formulation indications would be expected to be safe

11   and feasible by a medical POSA.

12   Q.    What's your opinion with respect to the validity of

13   claims 9 and 11 of the '797 patent?

14   A.    My opinion is that claims 9 and 11 of the '797 patent

15   are invalid due to obviousness.

16   Q.    Now, let's turn to the Family Three claims that are at

17   issue and, again, I want to start with the scope and content

18   of the prior art.

19            As of the priority date, where would a medical

20   POSA have looked to find safe and effective ways to

21   administer bendamustine?

22   A.    As of the priority date, a medical POSA would have

23   referred to previously published references in the field and

24   the Treanda label.

25   Q.    And what references would the medical POSA have relied

Thirman - direct

1   on in addition to the Treanda label?

2   A.   Well, there are a number.   Preiss 1985, Preiss 1998, 2

3   papers from Schoffski in the year 2000 and Barth.

4   Q.   And what would the label in those publications that

5   you discussed teach about the safe and effective ways of

6   administering bendamustine?

7   A.   Well, all of those references teach about how to

8   administer bendamustine safely and effectively.

9   Q.   Would a POSA have had any expectation that these

10  different administrations would be safe and effective?

11  A.   Yes.

12  Q.   And what publications indicated that bendamustine

13  could be administered over a short time and a faster

14  duration?

15  A.   Well, Preiss 1985 and Preiss 1998 disclose treatment

16  by an IV infusion over 3 to 10 minutes.   This is confirmed

17  in the Schoffski papers in 2000 and also in Barth.

18          Barth teaches the administration of a low volume

19  form of bendamustine and that also would be relevant to the

20  Preiss 85 and 98 papers.

21  Q.   Please pull up DTX-1194.   What is this document, sir?

22  A.   This is Preiss 1985.

23  Q.   And is this prior art to all the asserted claims?

24  A.   Yes, it is.

25  Q.   What was the goal of the Preiss 1985 article?

Thirman - direct

1   A.    The goal of Preiss 1985 was to perform a

2   pharmacokinetic analysis of bendamustine.

3   Q.    What's a pharmacokinetic analysis?

4   A.    That entails determining the Cmax and the AUC, which

5   is the area under the curve.

6   Q.    And what would that tell a medical POSA?

7   A.    First of all, it's important for treating patients

8   with the drug and also it's important for designing clinical

9   trials.

10  Q.    How was bendamustine administered to a patient --

11          THE COURT:  Before you get to that, I don't

12  think the witness has testified what Cmax means.  Just for

13  the record, can you tell everybody what Cmax means?

14          THE WITNESS:  Yes.  The Cmax is the peak

15  concentration of the drug in the bloodstream.

16          THE COURT:  All right.  It may have been, but I

17  don't recall it being formally entered.

18          MR. NELSON:  Sorry.  We were going to get into

19  that a little bit later.  I appreciate Your Honor addressing

20  it.

21          THE COURT:  All right.

22  BY MR. NELSON:

23  Q.    How was bendamustine administered to patients in the

24  Preiss 1985 article?

25  A.    So there were two methods of administration.  One was

1    oral, and the other was by an intravenous infusion over

2    three minutes.

3    Q.    And what dosage was administered to the patients based

4    on their weight?

5    A.    It was 4.2 to 5.5 milligrams per kilogram.

6    Q.    Now, the article assumed an average weight of the

7    patient of 68 kilograms.  So approximately, what was the

8    average total dose that was administered to a patient?

9    A.    The average total dose was approximately 280 to

10   375 milligrams.

11   Q.    And is that higher or lower than the dosage that was

12   administered as disclosed in Treanda?

13   A.    That is a higher dose.

14   Q.    How does the administration differ here from the

15   administration in the prior art Treanda document?

16   A.    Well, the administration here is by a three-minute

17   infusion and in the Treanda label, it's a 30 to 60-minute

18   intravenous infusion.

19   Q.    Is there any disclosure of the volume that's

20   administered in Preiss 1985?

21   A.    There's no specific disclosure of a volume, but based

22   on the fact that it's delivered over three minutes, this

23   would require that a fairly low volume of administration was

24   used.

25   Q.    In your experience, what's a reasonable amount of

1      fluid that can be administered in three minutes?

2      A.     A reasonable amount of fluid that can be delivered in

3      three minutes is approximately 50 to a hundred mL's.

4                  MR. BERL:  Objection, Your Honor.  That opinion

5      is not in the expert report.

6                  MR. NELSON:  He provided it in the expert report

7      and testimony.  I can cite to the paragraph.

8                  THE COURT:  All right.  So do we have the

9      report?

10                 MR. NELSON:  It is, because what he testified --

11                 THE COURT:  Can you hand up the report, please?

12                 MR. NELSON:  Oh, I'm sorry.

13                 (Mr. Nelson handed a binder to the Court.)

14                 THE COURT:  Can you identify the paragraphs in

15     the report?

16                 MR. NELSON:  Yes.  As usual, this will require

17     some explanation, but let me tell you much of his opening

18     report is paragraph 122 to 125, and paragraph --

19                 THE COURT:  Whoa, whoa.  Try and be slower.  I

20     can't keep up with you, Mr. Nelson.  So say it again,

21     please.

22                 MR. NELSON:  122 to 125.  This is the general

23     testimony.

24                 THE COURT:  Okay.

25                 MR. NELSON:  And what he is testifying here

Thirman - direct

1   about --

2              THE COURT:  Just give me a second, sir, please.

3              MR. NELSON:  Sure.

4              (Pause.)

5              THE COURT:  Okay.  So 122 to 127.  What else?

6              MR. NELSON:  125.  131, that's the background.

7   131 --

8              THE COURT:  All right.  Let me just read it.

9   All right.  Any other paragraphs in the report?

10             MR. NELSON:  That's it on that.  I want to

11  explain it so there's context.  What he's saying here is

12  consistent.

13             THE COURT:  It absolutely is consistent.

14             MR. NELSON:  Right.

15             THE COURT:  What he opines in paragraph 131 is

16  that by implication, you know that the volume is going to be

17  less than 500 milliliters.

18             MR. NELSON:  Right.

19             THE COURT:  That is pretty broad.

20             MR. NELSON:  It gets more specific.  Not only on

21  are there other portions, but Mr. Harber asked him about

22  specific sizes, gauge sizes.  He testified about all of

23  that.

24             He had the opportunity to ask him this specific

25  question and he didn't.  He asked him other questions about

1    how much can be administered in different times and

2    different volumes.  He testified about other times and other

3    volumes.  I'm just asking the followup question that wasn't

4    asked.  Never asked.

5                   THE COURT:  Go ahead.

6                   MR. HARBER:  There's a big difference between

7    saying it's less than 500, which is obviously disclosed,

8    and saying it's 50 to a hundred, which is the claim

9    limitation.

10                   THE COURT:  I agree.  If this is all you've got,

11    it's not coming in.  The objection is sustained.  I mean,

12    that is a very broad opinion.  I don't know what games are

13    being played.  Step this up so that at trial we come in with

14    a very specific amount, but that was not disclosed, so

15    objection sustained.

16                   MR. NELSON:  We're not trying to play games,

17    Your Honor.

18                   THE COURT:  Just go ahead.  Just ask the

19    question.

20    BY MR. NELSON:

21    Q.    What pharmacokinetic result did Preiss 1985 report?

22    A.    Preiss 1985 reported on the AUC and Cmax.

23    Q.    We talked about Cmax.  What's AUC?

24    A.    AUC is area under the curve, which is the total dose

25    that the patient is exposed to.

Thirman - direct

1   Q.     And what would a medical POSA understand from these

2   results?

3   A.     A medical POSA would understand both the Cmax and AUC

4   and would use these values to help calculate the doses for

5   future chemotherapy trials.

6   Q.     And where in Preiss 1985 is efficacy discussed?

7   A.     It's discussed on page 6.

8   Q.     And what is the discussion of efficacy on page 6?

9   A.     Preiss notes that leukocyte depression was found in

10  40 percent of the tests, so patients with chronic

11  lymphocytic leukemia have an elevated leukocyte count and it

12  was in decreased in 40 percent of the cases here.

13  Q.     Can anybody disclose any conclusions?

14  A.     Yes.  It concludes that rather mild side effects

15  occurred.

16  Q.     And overall, how would a person of ordinary skill in

17  the art understand that disclosure from Preiss 1985?

18  A.     Well, a person of ordinary skill in the art would

19  understand that with the doses used here, that only mild

20  side effects were noted.

21  Q.     How many patients were studied in the Preiss 1985

22  reference?

23  A.     Seven patients.

24  Q.     And how does that number of patients impact a medical

25  POSA's understanding of the results of Preiss 1985?

Thirman - direct

1    A.     Well, Phase 1 testing of drugs currently in place,

2    three patients per dose level.  So this is consistent with

3    what we would do today.

4    Q.    I want to turn to DTX-991, please.  And what is

5    DTX-991?

6    A.    DTX-991 is Preiss 1998.

7    Q.    And what's the goal of the -- yes?

8             THE COURT:  Mr. Nelson, how many more minutes do

9    you have on this prior art, rather prior art reference

10   you're about to do?

11            MR. NELSON:  On this particular reference, 10,

12   15 minutes, maybe.

13            THE COURT:  So maybe we should break now then.

14            MR. NELSON:  Okay.

15            THE COURT:  It's 6:35.  Doctor, you are free to

16   step down.

17            THE WITNESS:  Okay.

18            THE COURT:  And he remains on direct, so you're

19   free to speak with counsel.

20            THE WITNESS:  Okay.

21            THE COURT:  This evening.  All right.  Now,

22   tomorrow, scheduling.  As I told you, we need to start at

23   10:30 tomorrow and we can go late again.  I will give you

24   this option.  I mean, I have a 9:00 o'clock commitment, so

25   it's possible I can be back at 10:00.  I'm going to get here

Thirman - direct

1    as soon as I can.

2              Do you want to be ready to go at 10:00 and then

3    I may be late?  I'm really confident I should be back at

4    10:30.

5              What do you want to do?

6              MR. NELSON:  We can't start without you, Your

7    Honor.

8              MR. HARBER:  10:30 is fine.

9              THE COURT:  We'll just do 10:30.  We'll go to

10   6:30.

11             The following day, Thursday, I know what you all

12   said about security, but I really would like to begin at

13   8:30 because I would like to get in 8:30 to 10:00.  I have

14   another proceeding at 10:00.  You can leave all your stuff

15   here.  It's a criminal proceeding.  Not nearly as many

16   lawyers.  I think it's going to be an hour to two-hour

17   proceeding.

18             And so what we could do is, you can think about

19   how you want to do that, whether you want to come back at

20   11:00 and see if it's over and we begin right away.  Just

21   give some thought to that, because my goal is, let's get as

22   much as we can in as fast as we can.

23             Anyway, when that proceeding is done, the same

24   thing.  A short lunch.  We can go late in the day.  We are

25   off Friday.  Oh, wait.  So then Thursday we have the entire

1    day.  I'm sorry.  I mixed up my days.  Sorry.  Yes.  So

2    tomorrow is Wednesday.  Right.  We're going to begin at

3    10:30 and we've got the whole day.

4              On Thursday we're going to try to begin at 8:30.

5    Everybody, please get here early, and then we'll go from

6    8:30 to 10:00, and we've got the remainder of the day after

7    my criminal proceeding.

8              Friday we're off.  Monday we're off.  Tuesday we

9    resume at 9:00.

10             Okay.  Is there anything else we need to resolve

11   tonight?

12             MR. NELSON:  No, Your Honor.

13             MR. HARBER:  No, Your Honor.

14             THE COURT:  Okay.  Everybody have a good

15   evening.  Thank you.

16             MR. NELSON:  You, too.

17             (Court recessed at 6:36 p.m.)

18                  -   -   -

19

20

21

22

23

24

25