1                       - VOLUME 3 -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                          - - -

5
     TEVA PHARMACEUTICALS          :   CIVIL ACTION
6    INTERNATIONAL GMBH,           :
     CEPHALON, INC., and EAGLE     :
7    PHARMACEUTICALS, INC.,        :
                                   :
8                    Plaintiffs,   :
                                   :
9          vs.                     :
                                   :
10   SLAYBACK PHARMA LIMITED       :
     LIABILITY COMPANY, et al.,    :
11                                 :
                     Defendants.   :   NO. 17-1154-CFC
12

13                          - - -

14                          Wilmington, Delaware
                            Wednesday, September 11, 2019
15                          10:33 o'clock, a.m.

16                          - - -

17   BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

18                          - - -

19   APPEARANCES:

20
             SHAW KELLER LLP
21           BY:  KAREN E. KELLER, ESQ. and
                  NATHAN R. HOESCHEN, ESQ.
22

23                    -and-

24

25                          Valerie J. Gunning
                            Official Court Reporter

1    APPEARANCES (Continued):

2

3                    WILLIAMS & CONNOLLY LLP
                     BY:  DAVID I. BERL, ESQ.,
                          ADAM HARBER, ESQ.,
4                         ELISE BAUMGARTEN, ESQ.,
                          SHAUN P. MAHAFFY, ESQ.,
5                         BEN PICOZZI, ESQ. and
                          MATTHEW LACHMAN, ESQ.
6                         (Washington, D.C.)

7
                          Counsel for Plaintiffs
8                         Teva Pharmaceuticals International GmbH
                          & Cephalon, Inc.
9

10
                     LATHAM & WATKINS LLP
11                   BY:  DANIEL G. BROWN, ESQ.,
                          MICHELLE L. ERNST, ESQ.,
12                        KENNETH SCHULER, ESQ. and
                          MARC ZUBICK, ESQ.
13                        (New York, New York)

14
                          Counsel for Defendant
15                        Eagle Pharmaceuticals, Inc.

16

17                   FARNAN LLP
                     BY:  BRIAN E. FARNAN, ESQ.
18

19                            -and-

20
                     SCHIFF HARDIN LLP
21                   BY:  IMRON ALY, ESQ. and
                          ARUN J. MOHAN, ESQ.
22

23                        Counsel for Defendant and Counterclaim
                          Plaintiff Fresenius Kabi USA LLC
24

25

1    APPEARANCES (Continued):

2
                  SMITH KATZENSTEIN & JENKINS LLP
3                 BY:  EVE ORMEROD, ESQ.

4
                          -and-
5

6                 WINDELS MARX LANE & MITTENDORF LLP
                  BY:  JAMES P. BARABAS, ESQ.
7

8                      Counsel for Defendants
                       Slayback Pharma Limited Liability Company,
9                      et al.

10

11                SMITH KATZENSTEIN & JENKINS LLP
                  BY:  JEREMY S. COLE, ESQ.
12

13                        -and-

14
                  FLASTER GREENBERG P.C.
15                BY:  JEFFREY A. COHEN, ESQ.
                       (Chicago, Illinois)
16

17                        -and-

18
                  HAHN LOESER & PARKS LLP
19                BY:  STEVEN FELDMAN, ESQ.,
                       SHERRY L. ROLLO, ESQ.
20                     DANIEL CHERRY, ESQ. and
                       JOHN CRAVERO, ESQ.
21

22                     Counsel for Defendants
                       Apotex Inc. and Apotex Corp.
23

24

25

1    APPEARANCES (Continued):

2

3              THE DEVLIN LAW FIRM LLC
               BY:  JAMES M. LENNON, ESQ.

4
                        -and-
5

6              WILSON SONSINI GOODRICH & ROSATI
               BY:  NICOLE STAFFORD, ESQ.,
7                   DENNIS GREGORY, ESQ.,
                    DAVID STEUER, ESQ.,
8                   ADEN M. ALLEN, ESQ. and
                    SHYAM PALAIYANUR, ESQ.

9

10                  Counsel for Defendant
                    Mylan Pharmaceuticals

11

12                      -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2

3              (Proceedings commenced in the courtroom,

4    beginning at 10:33 a.m.)

5

6              THE COURT:  All right.  Good morning.  Please be

7    seated.

8              I understand there's a housekeeping matter, Ms.

9    Keller?

10              MS. KELLER:  Yes.  Two brief housekeeping

11    matters.  Yesterday Your Honor had asked if the parties

12    could make a chart of what claims are actually at issue here

13    and the parties have agreed on this.

14              If I can approach?

15              THE COURT:  Please.

16              (Ms. Keller handed documents to the Court.)

17              MS. KELLER:  Hopefully, that's helpful for Your

18    Honor.

19              THE COURT:  It will be.  Thank you.

20              MS. KELLER:  Second, as we were putting the

21    chart together, it came to our attention, there was an

22    additional stipulation related to the '270 patents between

23    the plaintiffs and Apotex.  That was filed in July of 2018,

24    right during the transition between Judge Sleet and Judge

25    Stark, and it was never executed by the Court.

```
 1                    THE COURT:  Okay.

 2                    MS. KELLER:  It's docket number 93.  So it has

 3      been on file and the parties are treating it as if it has

 4      been entered, but it just was never entered by the Court.

 5                    THE COURT:  All right.  You don't have a copy,

 6      do you?

 7                    MS. KELLER:  Yes, I do.

 8                    THE COURT:  I will sign it now.  I'd better read

 9      it before I sign it to be really safe.

10                    MS. KELLER:  And that's the housekeeping items

11      for this morning, Your Honor.

12                    THE COURT:  All right.  Thank you.

13                    MS. KELLER:  Thank you.

14                    MR. PALAIYANUR:  Just one more housekeeping

15      thing.

16                    THE COURT:  Just one second.

17                    MR. PALAIYANUR:  Sure.

18                    THE COURT:  Okay.  I will sign the stipulation.

19      Okay.  Yes, sir?

20                    MR. PALAIYANUR:  On behalf of the defendants, we

21      have revised slides for Dr. Pinal's direct that are bound.

22                    THE COURT:  Thank you.

23                    MR. PALAIYANUR:  This takes out the Boylan

24      reference and the two that the defendants have dropped.

25                    THE COURT:  Thanks.  All right.
```

674
Thirman - direct

1              MR. NELSON:  May I proceed, Your Honor?

2              THE COURT:  Please.

3              MR. NELSON:  Kevin Nelson, and the defendants

4      recall Dr. Thirman.

5              THE COURT:  All right.

6                  ... DR. MICHAEL J. THIRMAN, having been

7              previously duly sworn as a witness, was examined

8              and testified further as follows ...

9              MR. NELSON:  May I approach the witness and give

10     him a bottle of water?

11             THE COURT:  Sure.

12                      DIRECT EXAMINATION, Continued.

13     BY MR. NELSON:

14     Q.    Good morning, Dr. Thirman.

15     A.    Good morning.

16     Q.    We left off with DTX-991.  I will pull that up on the

17     screen.  And what is DTX-991?

18     A.    It is the Preiss 1998 reference.

19     Q.    And what was the goal of the Preiss 1998 reference?

20     A.    The goal of Preiss 1998 was to determine the dose

21     limiting toxicities and maximally tolerated dose of

22     bendamustine.

23     Q.    Let's take them one at a time.  What is the dose

24     limiting toxicity of a drug?

25     A.    It is the dose of the drug at which severe or

1    life-threatening side effects occur.

2    Q.    And the maximum tolerated dose, what is that?

3    A.    That is the dose level beneath the dose where the dose

4    limiting toxicities are occurring, so that is a tolerable

5    dose without severe or life-threatening toxicities.

6    Q.    And what would be the purpose of a medical POSA

7    evaluating and considering those values?

8    A.    Well, it's very important to, first of all, understand

9    what toxicities occur at the level associated with dose

10   limiting toxicities and it's important to know the maximally

11   tolerated dose to proceed with further clinical trials.

12   Q.    How was bendamustine administered in the Preiss 1998

13   article?

14   A.    It was administered intravenously over three to

15   ten minutes.

16   Q.    Was there particularly, a particular dosage that

17   Preiss 1998 identified to be a maximally tolerated dose?

18   A.    There were two different schedules used.  The first

19   was a single dose over one day and then a divided dose over

20   four days, so for the single dose, the maximally tolerated

21   dose was 215 milligrams per meter squared, and with divided

22   dosing over four days, it was 340 milligrams per meter

23   squared.

24   Q.    Is that a higher or lower dose than what was known to

25   be in the Treanda product we looked at yesterday?

Thirman - direct

1    A.     Higher.

2    Q.     Does Preiss 1998 identify any side effects that were

3    experienced in this article?

4    A.     Yes.

5    Q.     And where is that?

6    A.     In Figure 2.

7    Q.     And what were the side effects that were observed?

8    A.     Well, the types of side effects differed between the

9    single dose of bendamustine and the divided doses over four

10   days.

11   Q.     Are the adverse events that are described in

12   connection with this article consistent with the Treanda

13   label adverse events we talked about yesterday?

14   A.     Yes.

15   Q.     And was the bendamustine administration in this

16   article considered to be well tolerated whether it was one

17   day or more?

18   A.     It was considered to be well tolerated.

19   Q.     Let's look at the conclusion of the Preiss 1998

20   article.

21          And what does Preiss 1998 conclude about the

22   side effects associated with bendamustine that was

23   administered in three to ten minutes?

24   A.     It concludes that only mild toxicity occurred even at

25   high doses.

1   Q.     Based on the Preiss 1998 article, would a POSA have

2   expected additional side effects from a shorter infusion

3   time than what was disclosed in Treanda?

4   A.     No.  They studied bendamustine with a three to

5   ten-minute infusion, so one would not expect increased

6   toxicities.

7   Q.     What would a POSA have expected with respect to the

8   safety of the drug when administering bendamustine using the

9   three to ten-minute infusion from Preiss 1998 and the lower

10  Treanda dose as described in the Treanda label?

11  A.     Well, a POSA would expect that it would be either the

12  same or lower given the fact that lower doses are used with

13  Treanda.

14  Q.     So what would the POSA take away from the Preiss 1998

15  article?

16  A.     That at the doses and schedule used in Preiss 1998,

17  that it is safe and feasible to infuse bendamustine over

18  three to ten minutes.

19  Q.     Was Preiss 1998 ever relied upon or confirmed in any

20  later study?

21  A.     Yes, it was.

22  Q.     What studies were those?

23  A.     There were two papers from Schoffski in the year 2000.

24  Q.     Let's look at DTX-987, please.  And what is this

25  document, Dr. Thirman?

1   A.    This is the document labeled Schoffski 2000a.

2   Q.    Is the Schoffski 2000a prior to all of these patents?

3   A.    Yes, it is.

4   Q.    Generally, what does Schoffski 2000a disclose?

5   A.    It's a Phase 1 study in bendamustine in patients with

6   advanced solid tumors.

7   Q.    How was bendamustine administered in the Schoffski

8   2000a article?

9   A.    It's administered intravenously over 30 minutes.

10  Q.    And what does Schoffski 2000a report regarding this

11  administration of bendamustine?

12  A.    Schoffski reports that the side effects were

13  comparable to what was observed with the three to ten-minute

14  infusion described by Preiss.

15  Q.    Can we go to page 5 of the article, please.

16          And can we look at the paragraph that goes from

17  the bottom of 5 to the top of page 6.  Thank you.

18          How does this relate to the opinion you just

19  provided?

20  A.    Schoffski noted their results were in accordance with

21  three-minute IV infusion of bendamustine, so the side

22  effects with the 30-minute infusion schedule were comparable

23  to the three-minute infusion schedule.

24  Q.    How would a medical POSA understand Schoffski's

25  administration to affect the safety and efficacy with

Thirman - direct

1   respect to a three to ten-minute bendamustine administration

2   that we saw from Preiss, the two Preiss references?

3   A.    Well, Schoffski confirms that the same side effects

4   occurred with the 30-minute infusion that occurred with the

5   three-minute infusion.

6   Q.    And we saw a reference earlier to a 215 milligram per

7   meter squared administration.  What was that in reference to

8   in the Schoffski paper?

9   A.    That was in reference to the maximally tolerated dose

10  with the single administration of bendamustine.

11  Q.    And where have we seen that before?

12  A.    That was in Preiss 1998.

13  Q.    And let's go to DTX-988, please.  And what is this

14  document?

15  A.    This is another Phase 1 study in advanced solid tumor

16  patients published by Schoffski.

17  Q.    And what is the infusion time in this, can we call it

18  the Schoffski 2000b?

19  A.    Sure.

20  Q.    What is the infusion time that's disclosed in

21  Schoffski 2000b?

22  A.    Schoffski discloses an infusion time of 30 minutes.

23  Q.    And we see there again in the background, if we look

24  at the second sentence in the background, there's a

25  clinically tolerated dose.  Do you see that?

1    How would a medical POSA have understood that

2    statement?

3    A.    A medical POSA would understand that Schoffski is

4    confirming that the maximally tolerated dose for a single

5    treatment with bendamustine is 215 milligrams per meter

6    squared.

7    Q.    And what conclusions does Schoffski 2000b come to with

8    respect to a three to ten-minute infusion in view of their

9    30-minute infusion?

10   A.    Again, Schoffski concludes that the side effects

11   observed with the 30-minute intravenous infusion were

12   comparable to those observed by Preiss with the three to

13   ten-minute infusion.

14   Q.    And if we can look at page 5 of this article, and if

15   we could go down to the bottom.

16         And if you look at the bottom left column up at

17   the top right.  Is this statement that's here in Schoffski

18   2000b consistent with what we saw in Schoffski 2000a?

19   A.    Yes, it is.

20   Q.    We talked a little bit with the Court yesterday about

21   the concept of Cmax or maximum plasma concentration.  How is

22   Cmax related to adverse events in general?

23   A.    In general, as Cmax increases, the potential for side

24   effects increases.

25   Q.    Now, assuming that dose is fixed but administration

1    time is shorter so that infusion occurs faster, generally,

2    what would a POSA have expected would happen to Cmax and

3    side effects?

4    A.    Well, generally, a POSA would expect that the Cmax

5    would increase and the possibility for side effects would

6    also increase.

7    Q.    Now, from Preiss and Schoffski, what would a medical

8    POSA have expected regarding the tolerability of

9    bendamustine using a three to ten-minute infusion?

10   A.    Well, at the doses described, a POSA would expect

11   that the side effects were found to be comparable with

12   either a 30-minute infusion or a three to ten-minute

13   infusion.

14   Q.    Now, we've been talking about infusion time.  I would

15   like to talk about infusion volume.

16         Based on the data and pharmacokinetics in the

17   Preiss and Schoffski references that we looked at, what

18   would a medical POSA reasonably expect to be a safe and

19   effective volume of administration?

20   A.    50 to 100 mL's.

21   Q.    Now, are you aware of any other references that

22   discuss volume of administration of bendamustine that are

23   relevant to this case?

24   A.    Yes.  A reference from Barth.

25   Q.    And let's look at DTX-1004.  And what is this, what is

1    this exhibit?

2    A.    This is the Barth reference.

3    Q.    All right.  And generally, what does Barth teach a

4    medical POSA?

5    A.    Well, Barth discusses the bendamustine plus Rituximab

6    regimen and its use in indolent cell lymphoma, and it

7    also discusses administration issues relating to

8    bendamustine.

9    Q.    And where is that discussion in Barth that's relevant

10   to the medical POSA with respect to volume of

11   administration?

12   A.    If you turn the page there.

13   Q.    And we're at page 5?

14   A.    Page 5.

15   Q.    Okay.  And can you share with the Court what is

16   discussed here in Barth?

17   A.    Well, Barth makes the observation that it's unclear

18   why in the United States the label specifies a 500 mL volume

19   with a final concentration of 0.2 to 0.6, and notes that

20   it's difficult to implement a short infusion with a volume

21   of 500 mL's.

22             And it also notes that it's possible to

23   reconstitute bendamustine in a volume of up to five

24   milligrams per mL in both the American and German

25   literature, and therefore recommends administration of

1   bendamustine in a lower volume to implement the short

2   infusion.

3   Q.     And what is the volume of bendamustine that Barth

4   expressly discloses that's already known?

5   A.     A hundred to 250 mL.

6   Q.     In your clinical experience, are 100 and 250 mill

7   fluid common or uncommon?

8   A.     Common.

9   Q.     What are the circumstances where administering a lower

10  volume of bendamustine would have expected to be

11  advantageous?

12  A.     Well, it's potentially as in cases for administration,

13  convenience, and there also may be certain clinical

14  circumstances where a low volume could be beneficial to a

15  patient.

16  Q.     So we've looked at the Treanda label, the Barth

17  reference, the Preiss references and the Schoffski

18  references.  Why would a medical POSA have considered all of

19  these references together?

20  A.     Well, all of these references inform a medical POSA on

21  the administration issues related to bendamustine.

22             MR. NELSON:  By the parties' agreement, I'm

23  going to discuss a reference that was not in Dr. Thirman's

24  initial report.  It was in his prior report he was asked

25  about in deposition, so the parties have testified he can

1    testify about it here.  I'm going to ask him, it wasn't in

2    his expert report.

3                    Well, so I would like to look at DTX-1021.  And

4    for the record, this is also -- this was PTX-260 that was in

5    plaintiffs' opening slide.

6    BY MR. NELSON:

7    Q.    Now, Dr. Thirman, what is this reference, DTX-1021?

8    A.    This is the Ruffert reference.

9    Q.    And as I mentioned, this reference was not in your

10   expert report.

11                   Why would a medical POSA have not considered

12   this reference in, with respect to the claims that are at

13   issue here?

14   A.    Well, this reference describes a three-drug

15   combination regimen, including bendamustine using the trade

16   name Cytostasan combined with Vincristine and Prednisolone.

17   This is not a regimen I've used before or my colleagues at

18   the University of Chicago have used before.

19   Q.    Why wouldn't you use combinations --

20                   THE COURT:  Is this anticipatorily taking the

21   sting out of cross?

22                   MR. NELSON:  So, Your Honor, this relates to a

23   disagreement and some material that was struck out from the

24   expert report, which was a broader, part of a broader

25   attachment that was struck out of the expert report.  They

Thirman - direct

1  criticized Dr. Thirman for not caring about it, not

2  considering it.

3              THE COURT:  Anticipating cross, you're taking

4  this thing out ahead of time?

5              MR. NELSON:  Well, he's addressing what their

6  experts say affirmatively about this document.  Cross is

7  whatever it is, but their experts have said stuff about this

8  article.

9              THE COURT:  So it's anticipating, it's

10  impeaching what their experts will eventually say?

11              MR. NELSON:  I can agree to that qualification.

12              THE COURT:  I just want to understand.

13              MR. NELSON:  I want to make sure.  I don't know

14  what the cross is going to be.  Yes, their experts have said

15  some things.

16              THE COURT:  Are you recalling Dr. Thirman?

17              MR. NELSON:  At this time -- we're recalling him

18  on secondary considerations.  Our review was that this was a

19  secondary considerations issue.

20              They said, no, it wasn't, it was prima facie.

21  We said, well, you never disclosed this reference to us in

22  the first place.  It wouldn't have been considered by a

23  POSA, which is what I just elicited and why.

24              THE COURT:  Okay.  All right.

25  BY MR. NELSON:

Thirman - direct

1    Q.      Why, in your opinion, would a medical POSA have not

2    considered the combination of Cytostasan in these other

3    drugs?

4    A.      As discussed in Barth, the bendamustine Rituxan

5    combination is a superior regimen for treating indolent

6    Non-Hodgkin's lymphoma and also CLL.  This regimen is

7    not in use in the United States due to a lack of efficacy

8    compared to other combinations, specifically bendamustine

9    Rituxan.

10   Q.      And is bendamustine and Rituxan combinations widely

11   used or rarely used?

12   A.      It's very widely used.

13   Q.      So let's turn back to this.  If we look at Table 2 on

14   page 3 of this reference, what is being described here in

15   Table 2?

16   A.      This is the listing of the three drugs that are used,

17   along with the dose and schedule.

18   Q.      And it calls it a Cytostasan combination.  You use the

19   abbreviation Cy VP.  How would a medical POSA understand

20   that?

21   A.      Well, the CY here is clearly Cytostasan, which is

22   bendamustine, and the "V stands for Vincristine and the P

23   for prednisolone.

24   Q.      If we could keep that up there but also pull up table

25   4, please.

Thirman - direct

```
 1              And Table 4 has a similar title, but calls
 2   it the Cy VP protocol.  How would a medical POSA
 3   understand that designation with respect to what's being
 4   administered?
 5   A.     Well, combination or protocol would be interchangable.
 6   Q.     If we take away Table 4.  So the Cytostasan, how is
 7   that being administered in Ruffert?
 8   A.     It's being administered in a volume of 500 milliliters
 9   in one hour.
10   Q.     And how does that compare to how Treanda was
11   administered?
12   A.     Well, Treanda was administered also in 500 milliliters
13   in either 30 or 60 minutes.
14   Q.     Now, the amount of Cytostasan where bendamustine is
15   administered, what is that?
16   A.     That's 60 milligrams per meter squared.
17   Q.     How does that compare to the amount of bendamustine
18   that's administered with Treanda?
19   A.     It's lower.
20   Q.     And if you look at the Vincristine and the
21   prednisolone, how are those administered?
22   A.     They're both administered intravenously.
23   Q.     Let's look at what plaintiffs focused on in their
24   opening and that's Table 7, please.
25              And what is described here at Table 7?
```

```
 1                    THE COURT:  I'm sorry.  I've got to go back.  I

 2      apologize.  I probably missed something you said.  The

 3      infusion, what does that mean?

 4                    THE WITNESS:  That's the intravenous infusion of

 5      the drug.

 6                    THE COURT:  So his IV?

 7                    THE WITNESS:  It's IV.

 8                    THE COURT:  Why is it written in infusion for

 9      Cytostasan versus the other two that use IV?  Is there

10      something different about it?

11                    THE WITNESS:  Well, it's a little bit unclear.

12      They do specify for the bendamustine that it's a short-term

13      infusion over one hour.  Vincristine is usually given

14      rapidly by IV push or IV bolus, so it may be that they're

15      saying that it's not an infusion, that it's given

16      intravenously by bolus or push.  But we have the information

17      in the table.

18                    THE COURT:  It sounds like you don't know what

19      it means.

20                    THE WITNESS:  Well --

21                    THE COURT:  I mean, not you, just because the

22      table is ambiguous.  It says short-term sodium infusion.  Is

23      that an IV?

24                    THE WITNESS:  Yes.

25                    THE COURT:  Underneath it says for Vincristine
```

 1    and the other "P" compound, whatever it is, IV.  Are they

 2    different types administration?

 3               THE WITNESS:  They're the same types of

 4    administration.  Vincristine is typically given rapidly, so

 5    30 seconds to one minute.  That's commonly known.

 6    Vincristine is a very strong vesicant, and the way it's

 7    taught to be administered is to give it as quickly as

 8    possible so that you can ensure that it's not going into the

 9    subcutaneous tissue.  So you literally attach a syringe to

10    the IV and you draw some blood out, make sure you got blood

11    return.  Push, make sure you don't have any resistance,

12    which if you do have resistance, you stop, because that

13    means you're in the subcutaneous tissues or against the

14    vessel wall and you push them in, pull some blood out, push

15    them in and then you're done.  That's the safest way to give

16    Vincristine because it's the strongest vesicant chemotherapy

17    drug that is used.

18               MR. NELSON:  I might be able to help here.  If

19    we can keep that up and pull up Table 7.  Use the bottom of

20    Table 7, please.  There we go.

21    BY MR. NELSON:

22    Q.    Now, Dr. Thirman, at the bottom of Table 7 it talks

23    about thrombophlebitis that in one minute.  It talks about

24    happening after the IV bolus.  How does that relate to the

25    discussion you had with the Judge with the admission of

1    Vincristine and Prednisolone?

2    A.    Well, exactly as the Judge pointed out, Cytostasan,

3    which is bendamustine, is given by a one hour intravenous

4    infusion and the Vincristine and Prednisolone are given IV.

5    They describe IV bolus.  We known that Vincristine can't be

6    given by a long IV infusion.  It's unsafe.  It has to be

7    given quickly in the method that I just described.

8              So the implication is that the IV bolus is

9    related to the Vincristine.

10   Q.    And would a medical POSA consider a 500 mL infusion

11   over a one hour period to be a bolus administration

12   generally?

13   A.    No.  So a bolus typically refers to giving, you know,

14   an infusion over a short period of time.

15   Q.    Now, plaintiffs in their opening statement focused

16   on the phlebitis result and the thrombophlebitis result.

17             First of all, I think we discussed phlebitis

18   yesterday.  Can you just remind the Court briefly what

19   phlebitis is?

20   A.    Phlebitis is an irritation in a superficial vein, so

21   this can occur after administration of chemotherapy at the

22   site where the IV catheter is inserted.

23   Q.    And what is thrombophlebitis?

24   A.    Sometimes a blood clot occurs in that superficial vein

25   if it has been damaged by the chemotherapy, so that's

1    referred to as thrombophlebitis.

2    Q.    All right.  And how would a medical POSA from the

3    disclosure here in Table 7, what would a medical POSA expect

4    to be causing the phlebitis and thrombophlebitis at the

5    approximately 35 percent level?

6    A.    Well, this is a known common complication of

7    Vincristine.  So Vincristine is, as I told you, a very

8    strong vesicant associated with damage to the vein where

9    it's inserted.  There's a black box warning in the FDA label

10   for Vincristine related to this.  And we know that

11   bendamustine is an irritant, which is different than an

12   vesicant.

13           So looking at the side effects here, a POSA

14   would expect that the phlebitis would be attributed to the

15   Vincristine.

16   Q.    And you mentioned irritant versus vesicant.  I know we

17   talked about bendamustine being an irritant.  Is Vincristine

18   an irritant or vesicant?

19   A.    Vincristine is a very strong vesicant.

20   Q.    And what is an vesicant?

21   A.    A vesicant is a chemotherapy drug that damages veins

22   and the subcutaneous tissue if it's infiltrated.

23   Q.    The title of Table 7, what is being described with

24   respect to the title of Table 7?

25   A.    Well, so they are using the WHO criteria, so that's

1    the World Health Organization, and side effects are graded 1

2    through 4.  So Grade 1 is mild, Grade 2 is moderate, Grade 3

3    is severe and Grade 4 is life-threatening.

4    Q.    Now, the Treanda label, which is bendamustine, does

5    that report at all phlebitis or thrombophlebitis at anywhere

6    near the level disclosed here?

7    A.    No, it does not.

8    Q.    Would a medical POSA expect that if bendamustine

9    administration caused phlebitis or thrombophlebitis at this

10   level, would that be disclosed, effectively disclosed in the

11   Treanda label?

12   A.    Yes, it would be expected.

13   Q.    But you've not seen it there; is that correct?

14   A.    Not in the Treanda label.

15   Q.    Are there any adverse events that you see on here that

16   are more usually associated with bendamustine therapy?

17   A.    Yes.  So, for instance, nausea and vomiting are very

18   frequent side effects with bendamustine, and nausea and

19   vomiting typically do not occur with either Vincristine or

20   prednisolone.  So looking at that, a POSA would expect that

21   the nausea and vomiting could be attributed to the

22   bendamustine.

23         In addition, fever is a fairly specific side

24   effect for bendamustine in some patients.  We don't see

25   fever at administration of Vincristine and Prednisolone.

Thirman - direct

1    Again, it's likely that that was due to the bendamustine.

2    Again, it's a three-drug regimen, but a POSA would

3    understand which side effects are associated with which

4    drug.

5    Q.    I want to turn back now to our discussion of the

6    Preiss and Schoffski and Barth references along with the

7    Treanda label and I want to focus now on the Family 3

8    patents that we're here to discuss.

9            Generally, what is your opinion today regarding

10   the validity of the formulation 3 patents?

11   A.    My opinion is that they're invalid due to obviousness.

12   Q.    Pull up slide 16, please.  Are these the claim

13   limitations that you evaluated and we'll discuss with the

14   Court with respect to the Family 3 patents?

15   A.    Yes.

16   Q.    And I want to look at these in some more detail right

17   now.  Let's look at the next slide, which is claim 13 and 15

18   of the '399 patent.  What are the claim limitations that

19   would have been relevant to claim 13 and 15 of the '399

20   patent?

21   A.    Well, to summarize, it's treatment of cancer with

22   bendamustine via intravenous administration and about ten

23   minutes or less, and in claim 13, in a volume of 100 mL's or

24   less, and claim 15, in about 50 mL's to about 65 mL's.

25   Q.    For the record, this is DTX-13.

1          Next slide, please, is a discussion of the

2    limitation of claim 13 of the '887.  What limitations would

3    have been relevant to the medical POSA for claim 13 of the

4    '887?

5    A.    It's treatment of CLL or indolent B-cell NHL at a

6    dosage of about 25 to 120 milligrams per meter squared.

7          Parenteral administration, which is either

8    intravenous or subcutaneous administration of a drug to a

9    human in about 15 minutes or less in a volume of about 50

10   mL's.

11   Q.    And the next slide discusses claim 11.  I'm sorry,

12   for the record, that was DTX-9, which is the '887 patent.

13         The next side is claim 11, 18 and 22 of the '568

14   patent, which is DTX-5.  What medical limitations would be

15   relevant to a medical POSA from these claim?

16   A.    Claim 11 is CLL.  Claim 18 and 22.  The schedule for

17   CLL is listed.  Intravenous administration in about ten

18   minutes or 15 minutes or less, and the volume about 50 mL's

19   or about a hundred mL's or less.

20   Q.    I want to look at all of these limitations claims

21   across, or all of these limitations across the claims to

22   assist the Court.

23         Let's look at the next slide, please.  And these

24   are the limitations you provided across all the claims you

25   just discussed.  And let's start with the disease state.

Thirman - direct

1    Thank you.

2                 How did they claim disease state?

3    A.    Their CLL and NHL and they're in the Treanda label.

4    Q.    The reference to the Treanda label, is that what is up

5    on the screen right now?

6    A.    Yes.

7    Q.    And generally, could you describe where in the Treanda

8    label a medical POSA would have found this information?

9    A.    In the indications section.

10   Q.    Proceeding to the next limitation, the dosage and

11   scheduling limitations that are across all the claims.

12   Where would a medical POSA have found this information in

13   the prior art?

14   A.    Well, this would be in the dose and schedule section

15   of the Treanda label.

16   Q.    And the next limitation is the administration

17   limitation, the intravenous administration and the human

18   parenteral limitation.  Where would a medical POSA have

19   found this limitation in the prior art?

20   A.    Again, this would be in the dose and schedule section.

21   Q.    And just for clarification, the human and parenteral

22   administration, where would those be found in the prior art?

23   A.    Well, the Treanda label is for treating human patients

24   and parenteral refers to either intravenous or subcutaneous,

25   so the intravenous administration will be included.

Thirman - direct

1    Q.    And next let's look at the time limitations that are

2    relevant to the claim.  And how do the claimed

3    administration times compare to the prior art?

4    A.    The claimed administration times are disclosed in

5    Preiss 1985 and Preiss 1998 and confirmed in the two papers

6    from Schoffski in the year 2000.

7    Q.    And what reason would a medical POSA have to

8    administer bendamustine using the Treanda label dose and

9    the schedule in the ten minutes or less that are discussed

10   here?

11   A.    Well, so the administration time would be a matter of

12   convenience.

13   Q.    How do the claimed volumes, if we look at volume next,

14   how do the claim volume and volume limitations compare to

15   the prior art?

16   A.    The claimed volume, volumes would be consistent with

17   the prior art.  The hundred mL's or less is covered in Barth

18   and about 50 to 65 mL and about 50 mL's would be comparable

19   and there would be a reasonable expectation based on Barth.

20   Q.    And what potential advantages would a medical POSA

21   have known about a lower volume after administration of

22   bendamustine?

23   A.    Well, again, it's an option for administration that

24   might provide convenience, and low volume administration

25   could be valuable in certain clinical situations.

1   Q.    Now, let's look at each of the claims specifically as

2   we're required to do so.  Pull up the next slide.  And I

3   want to focus specifically on claim 13 of the '399 patent.

4            From the perspective of a medical POSA, how does

5   claim 13 of the '399 patent compare to the prior art?

6   A.    Claim 13 of the '399 patent is obvious because it is

7   disclosed in the prior art, so the Treanda label discusses

8   the treatment of cancer and intravenous administration,

9   which is also covered in the Preiss, Schoffski and Barth

10  references.  Preiss and Schoffski disclose treatment in

11  about ten minutes or less and the low volume in Preiss and

12  Schoffski and also Barth.

13  Q.    And now if we look at claim 15, how does, from the

14  perspective of a medical POSA, how do the elements of claim

15  15 compare to the prior art?

16  A.    Claim 15 is very similar to claim 13.  The only

17  difference is the volume of 50 mL's to about 65 mL's, and a

18  POSA would have a reasonable expectation based on the Preiss

19  and Schoffski references and Barth.

20  Q.    Now let's look at the '568 family or patent claims

21  that are asserted, starting with claim 11.  From the

22  perspective of a medical POSA, how would the elements of

23  claim 11 compare to the prior art?

24  A.    Well, claim 11 of the '568 patent is obvious because

25  it's disclosed in the prior art, so treatment of CLL on day

1 and 2 of a 28-day cycle are disclosed in the Treanda

label.  Intravenous administration in the label as well as

the Preiss and Schoffski and Barth references.  The

administration time in about ten minutes and the Preiss and

Schoffski references.  Reasonable expectation for the volume

of about 50 mL's based on the Preiss, Schoffski and Barth

references.

Q.   And if we can look at claim 18.  How does claim 18

compare to the prior art from the perspective of a medical

POSA?

A.   Well, claim 18 of the '568 patent is obvious because

it's disclosed in the prior art.  It's similar to the

previous claim with the only change being treatment of

indolent B cell NHL on days 1 and 2 of the 21-day cycle.

Q.   To wrap up the '568 patent, claim 22, how does claim

22 compare to the prior art from the perspective of a

medical POSA?  Pull up claim 22.  Thank you.

A.   So claim 22 of the '568 patent is obvious because it's

disclosed in the prior art.  The only difference between

this claim and the previous claim is the administration time

in about 15 minutes or less, which is covered in the Preiss

and Schoffski references, and the volume of about 100 mL's

in the Preiss, Schoffski and Barth references.

Q.   I want to go back to claim 18 very quickly just to

make sure I heard you correctly.  Where is the limitation,

1   the treatment limitation?  Where is that?

2   A.    Oh, sorry.  So the treatment of NHL is in the Treanda

3   label as well as the schedule.

4   Q.    Okay.  And where, generally, would one find that in

5   the Treanda label?

6   A.    That is in the indications and dosing schedule

7   section.

8   Q.    Let's go to the last, I'm sorry, the slide for the

9   '887 patent, claim 13.

10  A.    So --

11  Q.    Go ahead.

12  A.    I'm sorry.

13  Q.    I was going to say, so claim 13 of the '887 patent,

14  from the perspective of a medical POSA, how does claim 13

15  relate to the prior art?

16  A.    Claim 13 of the '887 patent is obvious because it's

17  disclosed in the prior art, so treatment of CLL or NHL at a

18  dosage of about 25 to 120 milligrams per meter squared is

19  covered in the Treanda label.

20         Parenteral administration to a human is covered

21  in the Treanda label.

22         The Preiss and Schoffski references and the

23  Barth reference, administration time in about 15 minutes or

24  less in the Preiss and Schoffski references.  And the volume

25  of about 50 mL's, there would be a reasonable expectation

Thirman - direct

```
 1    based on the Preiss, Schoffski and Barth references.
 2    Q.    So in conclusion, what are your opinions regarding the
 3    validity of the Family 3 patents?
 4    A.    My opinion is that the Family 3 patents are invalid
 5    due to obviousness.
 6              MR. NELSON:   Thank you.
 7              MR. HARBER:   Your Honor, permission to approach
 8    with binders?
 9              THE COURT:   Yes.
10              (Mr. Harber handed binders to the witness and
11    the Court.)
12              MR. HARBER:   May I proceed, Your Honor?
13              THE COURT:   Yes.
14                        CROSS-EXAMINATION
15    BY MR. HARBER:
16    Q.    Good morning, Dr. Thirman.
17    A.    Good morning.
18    Q.    Now, I believe that you testified on direct that
19    bendamustine had been known and used since the 1960s or
20    1970s in Germany; is that correct?
21    A.    That's correct.  It was discovered in the early 1960s
22    and then its antitumor efficacy was studied in the seventies
23    and eighties in east germ me.
24    Q.    By the priority date, it was about 40 or 50 years that
25    it had been in use?
```

1    A.     It depends which date you pick, but that's fine.

2    Q.     And, in fact, at the priority date, what we've --

3    we've heard something about Treanda in this case, but at the

4    priority date in 2012, there were, Treanda was not the only

5    bendamustine product that was on the market around the

6    world; isn't that right?

7    A.     Well, I know that Treanda was available in the United

8    States and I know that there were other products available

9    in other countries.

10   Q.     And you didn't look into those for purposes of your

11   opinion; is that right?

12   A.     I did look at some of them.  I mean, the studies that

13   we discussed described the use of bendamustine in Germany

14   and other countries, so the Ruffert reference refers to the

15   name Cytostasan as a trade name.  There's also another trade

16   name mentioned in some of the references, RibosePharm.  So

17   there are other trade names.  I don't know all the trade

18   names around the world for bendamustine.

19   Q.     But other than Treanda and Cytostasan and ribomustin,

20   which is the same product, you're not aware of what the

21   approvals were for bendamustine around the world.  Is that

22   fair?

23   A.     I would know the approvals in the United States.  I

24   don't know all the approvals around the world.

25   Q.     But you are not aware, correct, sir, of any approved

1    product anywhere in the world for bendamustine at the

2    priority date that was indicated to be infused in under

3    30 minutes; is that correct?

4    A.    Well, again, I don't know the specific indication

5    time.   I would be happy to look at that with you.

6    Q.    So is that you agree with me, that you're not aware of

7    that then?

8    A.    No.   I know that bendamustine is approved in the

9    United States by the Treanda label which describes treatment

10   in about 30 to 60 minutes.

11   Q.    My question, sir, was:   You are not aware of any

12   approved bendamustine product anywhere in the world at the

13   priority date that was indicated to be infused in under

14   30 minutes; is that correct?

15   A.    Well, I'm not aware of the labels from the other

16   countries in terms of their approvals.

17   Q.    So you are not aware; is that correct, sir?

18   A.    I'm not aware specifically, no.

19   Q.    And you are not aware of any bendamustine product

20   anywhere in the world at the priority date that was

21   indicated to be infused in a volume of less than

22   500 milliliters; is that correct?

23   A.    Well, I don't know how the labeling and indication

24   process works in other countries, so I know that in Preiss

25   and Schoffski, that they had administered it over three to

1    ten minutes.  Once that is published, I think that's what

2    physicians in those countries would do.  I don't know how

3    that would match up, but my assumption is that is what they

4    were doing since that is what was published.

5    Q.    That was an assumption.  You didn't look into what the

6    indicated label for Ribose pharm, for example, in Germany

7    was; is that correct?

8    A.    I looked at the publications that we discussed.

9    Q.    So is that a no?

10   A.    No with the caveats that I just stated.

11   Q.    I'm not sure I understand.  Did you or did you not

12   consider the indicated instructions for volume and duration

13   in the ribomustin label?

14   A.    No, I did not consider that specifically, but as I

15   told you, a POSA would understand based on all the

16   references that that is how it was being used.

17              MR. HARBER:  I gave a little leeway, but I would

18   appreciate an instruction if the witness answered the

19   question.

20              THE COURT:  I think he did answer it.  He said

21   no.  Then he's trying to explain why no.  You got an answer.

22              MR. HARBER:  All right.

23              THE COURT:  I think you got the answer you

24   wanted.

25              MR. HARBER:  Yes.

1   BY MR. HARBER:

2   Q.    As part of your work in this case, you attempted to

3   identify any publication from anywhere world where

4   bendamustine was used in under 30 to 60 minutes.

5   A.    I did search on the references related to

6   bendamustine.  There are now thousands of them.  Looked at

7   the ones that described it initially.

8   Q.    My question, sir, was:  You attempted to find any

9   publication describing the infusion of bendamustine before

10  the priority date in under 30 to 60 minutes; is that right?

11  A.    That's correct.

12  Q.    And other than the two Preiss studies that you

13  discussed on direct, you weren't able to find it?

14  A.    Well, no.  The Schoffski references describe the

15  Preiss references, so the Preiss 85 and 98 references that

16  you just talked about and they are confirmed in the two

17  papers from Schoffski in 2000.  In general, we don't look

18  for, you know, multiple levels beyond that once it's shown

19  and confirmed.

20  Q.    But in the Schoffski papers, the only duration of

21  infusion that was used for bendamustine was 30 minutes; is

22  that correct?

23  A.    That's correct, but they also refer to the Preiss and

24  85 and 98 and say that the side effects were comparable, so

25  they are directly referring to that.

1    Q.    So I will return to my question.  Other than the two

2    Preiss studies you mentioned, you were unable to find

3    another publication before the priority date from anywhere

4    in the world where in that study, bendamustine had been

5    infused in under 30 to 60 minutes?

6    A.    That's correct.

7    Q.    And in terms of clinical practice, sir, as of the

8    priority date, other than in those two Preiss studies you

9    mentioned, you are not aware anywhere in the world of anyone

10   infusing bendamustine in under 30 minutes in a patient?

11   A.    Well, in order to understand it, once something is

12   published, we, and the oncology community don't discuss, you

13   know, administration times of chemotherapy like that, so

14   once it's established that something is safe, I am talking

15   to my colleagues about efficacy and safety of drugs.  We're

16   not talking about infusion times, so it would be something

17   that just doesn't come up as an issue.

18   Q.    My question was:  Were you aware, sir?

19   A.    Not specifically aware, but as I mentioned to you, it

20   would not be something that would come up in discussions

21   with colleagues.

22   Q.    Now, I think you mentioned before that you have never

23   been involved in the design of a pharmaceutical company

24   label; is that correct?

25   A.    That's correct.

Thirman - cross

1   Q.     And you don't know what factors go into the labeling?

2   A.     I have a general understanding of the factors, but,

3   you know, I don't work for the FDA.  I've never worked for

4   the FDA.  I've never, you know, been tasked to create a

5   label myself.

6   Q.     And the Treanda label at the priority date that was in

7   existence, it indicated that bendamustine should be

8   delivered in either 30 or 60 minutes; is that correct?

9   A.     Correct.

10  Q.     In 500 milliliters of fluid?

11  A.     Correct.

12  Q.     And in a concentration of .2 to .6 milligrams per

13  milliliter of bendamustine in the fluid; is that correct?

14  A.     I have to double-check the label about the

15  concentration, but I believe that's correct.

16  Q.     But you don't know that?

17  A.     That's not what I said.  I said if you want me to look

18  at a specific concentration, I believe that's correct, but,

19  you know, it's my practice to double-check things.  As an

20  oncologist, a dose of drugs and concentration, these are

21  very important issues that we don't just state off the top

22  of our head.  But I believe that you're correct, this is 0.2

23  to 0.6.

24  Q.     And you're not aware of how the FDA came up with those

25  parameters for the labeling?

Thirman - cross

1    A.    I have not seen any documents from the FDA related to

2    that specific issue.

3    Q.    Now, I believe you said this before, but you agreed,

4    bendamustine is what is called a cytotoxic drug; is that

5    correct?

6    A.    That's correct.

7    Q.    That means it doesn't just kill cancer cells.  It also

8    kills healthy cells?

9    A.    Unfortunately, that's correct.

10   Q.    And bendamustine is a nitrogen mustard derivative; is

11   that right?

12   A.    That is correct.

13   Q.    In other words, it's a poison.

14   A.    Well, a poison is a loaded term, so I don't like to

15   think of the fact that I'm giving poison to people every day

16   in my practice.  They're chemotherapy drugs that are

17   designed to kill cancer.  We hope that there's a selective

18   benefit in killing cancer cells relative to normal cells.

19   But I don't commonly want to talk to my patients, tell them

20   I'm going to give them poison.

21   Q.    Nitrogen mustards were used as chemical warfare agents

22   in World War I?

23              MR. NELSON:  They're selling the product, too,

24   Your Honor.  I don't know why he's trying to make --

25              THE COURT:  So what's your objection?

1          MR. NELSON:  I guess it's irrelevant.

2          THE COURT:  I'm not sure how probative it is.

3     But if you are going to state an objection, state it under

4     the rules of Federal Rules of Evidence.

5          MR. NELSON:  I said it was irrelevant.

6          THE COURT:  Overruled.

7     BY MR. HARBER:

8     Q.    Nitrogen mustards were used as chemical warfare agents

9     in World War I; is that correct?

10    A.    No, that's not correct, so the chemical warfare agent

11    was sulfur mustard, and sulfur mustard is not really in a

12    gas form.  It's a -- it's a chemical that is in a powder

13    that is dispersed and was used unfortunately for chemical

14    warfare agents.

15          Subsequently, it was found that people who are

16    exposed to sulfur mustard develop low blood counts, and

17    oncologists being creative people, recognized this as a

18    potential advantage for treating lymphoma, and so nitrogen

19    mustard was developed as an intravenous formulation of

20    sulfur mustard.

21    Q.    It was known at the priority date that bendamustine

22    caused undesirable side effects; is that correct?

23    A.    That's correct.

24    Q.    It was known to cause local side effects; is that

25    correct?

Thirman - cross

1   A.      Correct.

2   Q.      Those are side effects at the site of the infusion?

3   A.      Yes.

4   Q.      Bendamustine was a known irritant?

5   A.      That is correct.

6   Q.      It was known to cause phlebitis; is that right?

7   A.      Well, irritants generally have an irritating effect on

8   veins.   Phlebitis is usually more sever, so that's something

9   we typically see with an vesicant drug rather than an

10  irritant.

11  Q.      You agree that phlebitis is a possible side effect of

12  bendamustine administration.   Is that correct, sir?

13  A.      Well, mild phlebitis, so, again, I was feeling the WHO

14  criteria.   There are also the new ones from common toxicity

15  criteria.   So it's graded 1 through 4, so it's possible that

16  mild phlebitis could be caused by bendamustine.

17  Q.      Can we go to Paragraph 86 of Dr. Thirman's opening

18  expert report.   This is all in the binder I gave you.   You

19  can look at the screen.

20          This is your expert report.   Is that correct,

21  Doctor?

22  A.      Well, do you have a page that I can turn to?

23  Q.      It's in your binder.

24  A.      Okay.   One second, please.   Do you know which tab I

25  look under?

Thirman - cross

1              MS. BAUMGARTEN:  The second tab that says

2      opening report.

3              THE WITNESS:  One moment, please.

4      BY MR. HARBER:

5      Q.    You agree, sir, that phlebitis is a possible side

6      effect of bendamustine administration?

7      A.    Yes.  That's what I just stated.

8      Q.    Bendamustine would also have been expected to

9      damage -- you can take that down -- tissues outside the

10     vein?

11     A.    No.  That's not an expectation.  That's an

12     unanticipated side effect, so if the vein is damaged and

13     bendamustine leaks out, then that is called an

14     extravasation.  Again, because bendamustine is an irritant,

15     it can irritate the local tissues.

16     Q.    Can we go to paragraph 49 in your expert report, sir.

17     It's right in front of you.

18              Do you see in your expert report:  As explained

19     before, as of 2010, bendamustine was a known irritant and

20     would have been expected to damage, expected to damage to

21     tissues when used outside the vein.

22              Do you see that?

23     A.    Yes.

24     Q.    That's your sworn expert report in this case?

25     A.    That's correct.

1   Q.    And the name for causing damage to tissues outside

2   of the vein, I think you've said that's extravasation;

3   right?

4   A.    That's correct.

5   Q.    And bendamustine -- take that down -- would also have

6   been known to cause systemic side effects?

7   A.    That's correct.

8   Q.    Those are side effects caused by the circulation of

9   the drug throughout the body?

10  A.    Yes.

11  Q.    And you testified on direct about a term called Cmax;

12  is that right?

13  A.    That's correct.

14  Q.    And Cmax is the maximum concentration of drug in the

15  body?

16  A.    It's the peak concentration of the drug.

17  Q.    The peak concentration of the drug.

18        And you agree that the Cmax point often relates

19  to the most significant short-term side effect that are drug

20  side effects?

21  A.    I would agree with that.

22  Q.    You would agree when analyzing the tolerability of

23  increasing the concentration and decreasing the duration of

24  an IV drug infusion, a person of ordinary skill in the art

25  would evaluate the Cmax of the drug in the blood; is that

Thirman - cross

1  correct?

2  A.    Are you reading from my report?

3  Q.    I'm asking you a question.

4  A.    Oh, okay.  I wasn't sure if you were asking me to

5  confirm something.  Can you repeat that, please?

6  Q.    My question is:  You agree that when analyzing the

7  tolerability of increasing the concentration and decreasing

8  the duration of an IV drug infusion, a person of ordinary

9  skill in the art would evaluate the Cmax of the drug in the

10 blood?

11           Do you agree with that?

12 A.    Yes.

13 Q.    And do you agree that infusing a drug in ten minutes

14 instead of 30 minutes would have been expected to produce a

15 higher Cmax?

16 A.    With the same total dose of the drug?

17 Q.    Yes?

18 A.    Yes.

19 Q.    And that would have been known as of the priority

20 date?

21 A.    That's correct.

22 Q.    And you talked before about a drug that you give in

23 your practice that's called Rituxan; is that correct?

24 A.    That's correct.

25 Q.    And Rituxan is a chemotherapy agent?

1  A.     No, not exactly.  It's a monoclonal antibody.  That's

2  not a cytotoxic chemotherapy drug.  It's a completely

3  different class of drug.  It's an antioxidant product, so it

4  has no cytotoxic effects.

5  Q.     Fair enough.

6          In your -- Rituxan is indicated to be infused

7  over a period of six hours; is that correct?

8  A.     Well, typically with the first dose, we start out very

9  slowly and work the dose up as tolerated, so the side

10 effects with Rituxan and other monoclonal antioxidants are

11 due to the fact that it's derived from another species.  So

12 patients have an immune system that reacts to a foreign

13 product and this causes fevers and chills.

14 Q.     My question, sir, was:  You agree that Rituxan is

15 indicated to be infused in a six-hour infusion; is that

16 correct?

17 A.     Well, it's indicated to be given as tolerated, so,

18 yes.  That's essentially correct.  Sometimes it's six

19 hours.  Sometimes it's four hours.  Sometimes it's eight

20 hours.  So I want to make sure I answer your question

21 correctly.  It's not limited to six hours.  It's four to

22 eight, typically.

23 Q.     Right.  And you, for your patients, you extend that

24 time to eight hours in the first cycle of treatment; is that

25 correct?

Thirman - cross

1    A.    Typically.

2    Q.    Because of your concern of side effects if it's given

3    faster than that?

4    A.    That's correct.

5    Q.    And you split the dose over two days instead of

6    delivering it on one day; is that correct?

7    A.    With the first dose, we often do that.

8    Q.    Again, because you're concerned with the side effects?

9    A.    That's correct.  So the side effects with Rituxan,

10   because it's a biologic product, are totally different than

11   a cytotoxic chemotherapy like bendamustine.  So these are

12   reactions of the immune system:  Fevers, chills, drop in

13   blood pressure.  So it has to just do with how the body

14   reacts to a foreign product as opposed to how the body

15   reacts to a chemotherapy drug.

16   Q.    For bendamustine, sir, you agree that the person of

17   ordinary skill in the art would want to deliver the drug in

18   a manner that was as safe as possible while still achieving

19   efficacy; is that correct?

20   A.    I would agree with that.

21   Q.    And you would agree that as between two methods of

22   administration that achieve equal efficacy, a person of

23   ordinary skill in the art would prefer the safer method?

24   A.    Can you say that again, please?

25   Q.    You would agree that as between two methods of

1    administration of bendamustine that achieve equal efficacy,

2    a person of ordinary skill in the art would prefer the safer

3    method?

4    A.    Well, you know, that's a complicated statement that

5    you just raise, so, we are always striving for efficacy and

6    safety when we're administering chemotherapy drugs,

7    monoclonal antioxidants, whatever treatments that we give

8    the patient.  So there is a juggling that takes place.

9    Sometimes there's conflicting issues.  So that's a very

10   broad statement and I don't want to be misinterpreted, but

11   in general, we seek safety and efficacy.

12   Q.    Sir, can you turn to the tab in your binder that has

13   your deposition transcript in it?  And if you can go to page

14   70, first tab.

15   A.    Page 70 is -- where there's two sets of --

16   Q.    I'm sorry.  And are you with me yet?

17   A.    One second, please.  I have to put my glasses on.

18   Okay.

19   Q.    And my only question to you here, sir, will be:

20   Were you asked this question and was this your answer under

21   oath?

22              The question is:  And so my question is in light

23   of that fact, there was not a question of efficacy, would

24   the person of ordinary skill in the art from an oncologist's

25   perspective prefer the method of administration that is

Thirman - cross

1    safer to the one that might be less safe?

2              And your answer is:  Well, again, if you put

3    together a question like that and say would a person of

4    ordinary skill in the art prefer the safer or the less safe

5    method, I think a person of ordinary skill in the art would

6    prefer the safer method.  It depends on a lot of issues, as

7    I mentioned, related to the method of administration.

8              That's your testimony; is that correct?

9    A.    That's correct.

10   Q.    And, sir, you are an oncologist at the University of

11   Chicago; is that correct?

12   A.    That's correct.

13   Q.    And you've also served on a number of advisory boards

14   for pharmaceutical companies in your career?

15   A.    Yes.

16   Q.    You served on boards for Genentech?

17   A.    Yes.

18   Q.    Astra-Zeneca?

19   A.    Yes.

20   Q.    Janssen?

21   A.    Yes.

22   Q.    AbbVie?

23   A.    Yes.

24   Q.    And you're compensated for your work in all of those

25   settings?

1    A.    Yes.

2    Q.    And you agree that your work on those advisory boards

3    doesn't affect your prescribing habits for those companies'

4    drugs?

5    A.    I would agree with that.

6    Q.    Now, the University of Chicago is what is known as an

7    academic medical center; is that right?

8    A.    That's correct.

9    Q.    And your practice I think you said before is focused

10   on hematological cancers?

11   A.    That's correct.

12   Q.    And part of your practice is treating inpatient

13   leukemia patients; right?

14   A.    That's correct.

15   Q.    And those are patients who are admitted to the

16   hospital?

17   A.    That's correct.

18   Q.    The drug at issue in this case, I think you said

19   before, was indicated for treating CLL and NHL; is that

20   right?

21   A.    Yes.

22   Q.    And CLL and NHL patients can be treated at academic

23   medical centers.  That's one of the places they can be

24   treated; is that correct?

25   A.    Yes.

1    Q.    They can also be treated in what are known as

2    community health clinics; right?

3    A.    Yes.

4    Q.    And you would agree that community oncologists tend to

5    see more straightforward cases of CLL and NHL?

6          MR. NELSON:  I want to object.  I think this is

7    going to secondary considerations, something that's later in

8    the case.  That's where these questions seemed to come from

9    in the deposition and his expert report.  I'm just concerned

10   we're going into an area that's reserved for later in the

11   case.

12         THE COURT:  Relevance?

13         MR. HARBER:  I can proffer the relevance.  I

14   would prefer not to do it in front of the witness.

15         THE COURT:  Let's have a sidebar.

16         (Sidebar conference held as follows.)

17         THE COURT:  All right.

18         MR. HARBER:  Your Honor, the point is this.

19   Dr. Thirman offers a perspective on how the person of

20   ordinary skill in the art would be concerned about various

21   side effects and I'm adducing testimony that he has a

22   certain perspective and that's from his practice and that's

23   why he has certain beliefs about what side effects would

24   matter or not matter.  So we think it goes to how, the prima

25   facie case of how you would read the reference.

1           THE COURT:  The side effects of persons at a

2  community center are different than patients at a hospital?

3           MR. HARBER:  The concern you would have with

4  side effects given the types of patients he's treating is

5  different than the concern that people in another setting

6  may have for the side effects, which actually, the evidence

7  will later show, is a vast majority of the way these

8  patients are treated is in a community center.

9           THE COURT:  By community center, is that

10  impoverished patients?

11           MR. HARBER:  No.  It's just like a doctor's

12  office in the suburbs you would drive to.

13           THE COURT:  To me I can see where it gets

14  somewhat into secondary.  On the other hand, I don't know

15  how you will be prejudiced any way, Mr. Nelson.  Overlap.

16           MR. NELSON:  My earlier context was solely that.

17  If he wants to talk about POSA, that's fine.  I'm not going

18  to object to that.  I just need a clarification.  We have an

19  agreement on what the POSA is.  It's sort of new to me.

20           THE COURT:  Actually, you don't.  I wish you

21  both did.

22           This is part of the problem.  You both say you

23  have two different POSAs and the record is replete with

24  statements from both side saying there's no material

25  difference, yet you've insisted on them.

1        MR. NELSON:  I have not seen this issue as being

2   a POSA issue before.  If that's what he's talking about,

3   it's fine.  I just didn't know where he was going.

4        THE COURT:  So you can go.

5        (End of sidebar conference.)

6   BY MR. HARBER:

7   Q.    I will re-ask my question, Doctor.  You agree that

8   community oncologists tend to see more straightforward cases

9   of CLL than NHL?

10  A.    Well, that's a generalization.  They can sometimes see

11  complicated patients as well.  I think what you're referring

12  to is is that that sometimes more complicated cases are

13  referred to a university, but, you know, I have many

14  colleagues in the community who do treat complicated cases

15  as well.

16  Q.    You would agree that community oncologists generally

17  tend to see earlier presentations of the disease?

18  A.    Well, again, that's a generalization, so we have many

19  new cases that arrive at the University of Chicago.  I

20  diagnosed someone with CLL last week.  So it happens all the

21  time, but they also see new cases out in the community.

22  Q.    My question was:  You would agree that in general,

23  community oncologists are more likely to see early

24  presentations of CLL and NHL than you see in an academic

25  medical center?

1    A.      That's generalization.  As I said, we're diagnosing

2    CLL and NHL at all times in patients.  I don't know what the

3    frequency is.  There are more community oncologists than

4    there are academic oncologists, so it's just a matter of

5    numbers.  I don't know, I have not looked at surveys on this

6    in terms of exact percentages.  I understand what you are

7    trying to say and that's a reasonable generalization.

8    Q.      You agree that academic medical centers have access to

9    clinical trials that may not be available to community

10   oncologists?

11   A.      I would agree.

12   Q.      And academic medical centers have access to new drugs

13   and new drug combinations that aren't available to community

14   oncologists?

15   A.      I would agree.

16   Q.      And so, again, if patients aren't responsive to

17   standard treatments, they are generally referred to academic

18   medical centers like yours; is that correct?

19   A.      I'm sorry.  Did you say responsive or not responsive?

20   Q.      Not response to standard treatments, they are likely

21   to be referred to an academic medical center like yours?

22   A.      Yes.  So patients who are not responsive are often

23   referred to us.

24   Q.      Now, you testified on direct about several references.

25   I want to ask you a few questions about those.

1            The first one was a reference of Preiss 1985,

2    which is DTX-320.

3            Now, Preiss 1985 was a pharmacokinetic study; is

4    that correct?

5    A.    That's correct.  You said it was DTX-320.  Should I go

6    to that?

7    Q.    You can if you would like.  And can we put it up?  I

8    don't know if I got an answer to this.  I apologize.  You

9    agree Preiss 1985 is a pharmacokinetic study?

10   A.    Yes.

11   Q.    The stated goal of Preiss, the top highlight here, was

12   to obtain an initial data -- after its intermittent IV to

13   humans; is that correct?

14   A.    That's correct.

15   Q.    And Cytostasan is bendamustine?

16   A.    Yes.

17   Q.    It's a different formulation than the formulation in

18   the asserted claims here; correct?

19   A.    It's a different trade name.

20   Q.    Do you know what the formulation is of Cytostasan?

21   Does it compare to the asserted claims?

22   A.    I was not asked to review formulations.

23   Q.    And you see here that in the study, it's administered

24   intermittently IV and oral administration; correct?

25   A.    And that's correct.

1   Q.     In terms of adverse events, there can be differences

2   between IV and oral administration of a drug; right?

3   A.     Well, it depends on how well a drug gets absorbed

4   orally, so it's possible to achieve the same doses of the

5   drug with oral and intravenous administration, and so that

6   was one of their goals, was to look at pharmacokinetics.

7   Q.     You agree generally IV drugs are absorbed into the

8   blood more quickly than orally administered drugs?

9   A.     IV drugs are absorbed more quickly than oral drugs.

10  Q.     And you agree that one category of side effects for an

11  IV infusion is infusion site reactions; is that correct?

12  A.     That's correct.

13  Q.     You don't have those with oral administration drugs;

14  is that right?

15  A.     That's correct.

16  Q.     Now, in this study, this study involved seven

17  patients; is that correct?

18  A.     That's correct.

19  Q.     And those patients, there were two patients who had

20  stage four non-Hodgkin's lymphoma; is that correct?

21  A.     Correct.

22  Q.     Two patients who had metastatic breast cancer?

23  A.     Correct.

24  Q.     And then it says an immunoblastic lymphoma, fibrous

25  sarcoma and adenocarcinoma were diagnosed in one case each?

1  A.    That's what it says.

2  Q.    A patient with different diseases?

3  A.    Yes.

4  Q.    And the goal of Preiss 1998 was not to compare

5  different infusion durations; is that correct?

6  A.    That's Preiss 1985.

7  Q.    I'm sorry.  The goal of Preiss 1985 was not to compare

8  different infusion durations; is that right?

9  A.    That's correct.

10  Q.    And the study was not designed to study the safety of

11  different infusion durations; is that correct?

12  A.    That's correct.

13  Q.    Now, there's no -- take that down.

14         There's no information anywhere in Preiss 1985

15  about how side effect information was collected; is that

16  correct?

17  A.    They report on side effects.  I don't believe they

18  discuss the method of collection of that information.

19  Q.    The paper does not say whether side effect

20  observations were self-reported or monitored by medical

21  professionals; is that correct?

22  A.    Well, if a medical professional is performing a study

23  like this, the side effects are typically monitored by the

24  medical professional.

25  Q.    My question was:  The paper doesn't report how it was

1    done in the study; is that correct?

2    A.    I am not aware of how the side effects were reported,

3    whether it was patient reported orifice reported.  My

4    assumption is that it's physician assessed.

5    Q.    But the paper does not say one way or another; is that

6    correct?

7    A.    Well, it's correct, but typically, for all of these,

8    there are thousands of studies like this, so they report on

9    side effects.  Typically, they're assessed by the physicians

10   who are conducting the clinical trial.

11   Q.    The paper does not say how long after the

12   administration of bendamustine the side effect information

13   was collected; is that correct?

14   A.    Well, it talks about side effects that occur.  Can

15   you give me just a minute, please?  I have to switch my

16   glasses.

17           So they talk about, for instance, on page 6 of

18   Preiss 1985, leucocyte depression, which is a decrease in

19   the white blood cell counts occurring in 40 percent of the

20   tests whereby the values did not drop below a lower limit of

21   1800 cells per cubic millimeter of blood.

22           So it takes about two weeks for the decrease in

23   blood counts to manifest, so since they're reporting on

24   blood counts, I would think that they monitored at least two

25   weeks.  You would probably need to go out to about three

1    weeks to monitor that side effect.  So at a minimum, I would

2    say two to three.

3    Q.    It doesn't say whether it was monitored before that?

4    A.    You know, they're reporting on the lowest level, so a

5    POSA would understand when you're referring to a decrease in

6    blood counts, that it takes, let's say, one to three weeks.

7    So if you're going to report on it, then you need to

8    consider that period of time.  You wouldn't report on

9    leucocyte suppression two days after chemotherapy with

10   bendamustine because it would not have happened yet, and by

11   four weeks, typically, it's recovered.

12             So based on this, a medical POSA would

13   understand that they monitored for approximately two to

14   three weeks.

15   Q.    But it doesn't say how many observations were taken in

16   those two to three weeks?

17   A.    It does not say how many observations.

18   Q.    It doesn't say when those observations were taken?

19   A.    Just a minute.  I don't see where they say when the

20   observations were taken.  As I was telling you, I think

21   they're looking at a decrease in the white blood cell count.

22   One would assume that they used the relevant time period

23   that everyone would know in the field.

24   Q.    My question is not whether they took an observation in

25   the two to three-week period that you're discussing.  My

1    question, sir, is:  The paper does not say at what time

2    points, inside or outside of that period, they may have

3    taken side effect observations; is that correct?

4    A.    I don't believe that they state that specifically.

5    Q.    And the paper does not say what side effects these

6    authors were looking for?

7    A.    Well, so the primary purpose of this paper was a

8    pharmacokinetic analysis and they also report on side

9    effects here, so they say, despite the high dosage, only

10   rather mild side effects occurred in addition to nausea,

11   vomiting, dryness of the mouth.  Mild changes in taste were

12   observed, and then I mentioned the leucocyte depression.  So

13   they're reporting on those specific side effects.

14   Q.    But it doesn't say what other ones they may have been

15   looking for; is that correct?

16   A.    I do not believe so.

17   Q.    And the authors of Preiss 1985 also don't say how they

18   grade the severity of the observed side effects; is that

19   correct?

20   A.    So I was telling you about the grading system.  So

21   Grade 1 is mild.  Grade 2 is moderate.  Grade 3 is severe

22   and Grade 4 is life-threatening.  So when they say only

23   rather mild side effects, they're using the term mild.  Mild

24   is associated with Grade 1.  So I believe that they're, in

25   terms of the grading system, that would be Grade 1 side

1   effects.

2   Q.    But the paper itself doesn't say what grading system

3   these authors are using for side effects; is that correct?

4   A.    I don't believe they specified a grading system.    I

5   believe the WHO system was used in some of the papers and

6   then the common toxicity criteria developed by the NIH was

7   developed later.

8   Q.    And the paper doesn't identify which patients had the

9   observed side effects; is that correct?

10  A.    What do you mean by which patients?

11  Q.    So we looked at before the seven patients had

12  different cancers; right?

13  A.    That's correct.

14  Q.    And the paper doesn't say which patients had which

15  side effects that were observed in the study?

16  A.    That's correct.

17  Q.    And the paper doesn't distinguish between the side

18  effects for IV administration and for oral administration;

19  is that right?

20  A.    That's correct.

21  Q.    Now, another paper you talked about was Preiss 1998.

22  If we can look at DTX-991.

23        This is a paper that appears in a conference

24  proceeding for the Seventeenth International Cancer Congress

25  in Brazil; is that correct?

Thirman - cross

1   A.    That's correct.

2   Q.    And you can't speak to whether or not this particular

3   paper was peer-reviewed; is that correct?

4   A.    Well, in general, when a paper is submitted to a

5   meeting like this, in general, they are peer-reviewed.

6   Q.    But you can't speak to whether this paper was

7   peer-reviewed; is that correct?

8   A.    Well, there isn't a specific stamp that they put on a

9   peer-reviewed paper, so when papers are published like this

10  at an international cancer Congress, the expectation is that

11  they're peer-reviewed, but they're all presented there.  So

12  I don't have specific evidence.  I was not at this cancer

13  Congress.

14  Q.    If we can take a look at the title, sir.  Do you see

15  it says pharmacological and clinical date of bendamustine;

16  is that correct?

17  A.    Yes, I do.

18  Q.    That word should be data; right?

19  A.    I believe it's a translation and I would believe that

20  you're probably correct there.

21  Q.    But this is an actual reproduction of what was in the

22  Seventeenth International Cancer Congress proceedings; is

23  that right?

24  A.    Yes.  It's possible that it's a typographical error,

25  and I would agree that it makes sense that it's clinical

Thirman - cross

1    data.

2    Q.    And that is something that if this particular

3    presentation had been subject to a serious peer review, that

4    should have been caught.  Do you agree?

5    A.    Well, you know, that's an interesting question about

6    peer review.  So I was looking at the top cancer journal and

7    it misspelled a key term for a type of lymphoma, and that

8    was -- that was last year.

9              So there are typographical errors in even the

10   top journals at the current time, and you would think that

11   they would be caught, but I've seen numerous typographical

12   errors in many, many papers.  The key thing is that the

13   scientific data are correct.

14   Q.    If we can look at the second page of this right under

15   the materials and methods heading.  If we can blow that up.

16             Can you highlight the first sentence under

17   materials and methods?

18             Do you agree that a part of the purpose of the

19   Preiss 1998 paper was to investigate the kinetic profile of

20   bendamustine; is that correct?

21   A.    That's correct.

22   Q.    And the purpose of Preiss 1998 was not to study the

23   safety of different rates of infusion of bendamustine; is

24   that correct?

25   A.    That's correct.  It was not to study specific rates of

Thirman - cross

1    infusion.

2    Q.    And there's no direct comparison related to different

3    rates of infusion for bendamustine in Preiss 1998; is that

4    correct?

5    A.    So Preiss 1998 used a three to ten-minute intravenous

6    infusion and I believe that they refer to Preiss 1985 as

7    well.  Yes, they do.  Lower on, you can see it right there.

8    Q.    But there is no direct comparison of different rates

9    of infusion, different durations of infusion of bendamustine

10   in Preiss 1998; is that correct?

11   A.    Correct.  They don't compare three minutes to a

12   ten-minute infusion, for instance.  They specify that the

13   bendamustine was administered intravenously over three to

14   ten minutes and they don't separate out the different

15   durations for that infusion within the limits here of three

16   to ten minutes.

17   Q.    Nor do they compare it to any other infusion duration;

18   is that correct?

19   A.    Well, so that was not the purpose of the study.

20   They're stating right in the materials and methods what they

21   are doing.

22   Q.    Now, there is no information in Preiss 1998 about how

23   side effect information was collected in this study either;

24   is that right?

25   A.    Again, they go into great detail about the side

1    effects, so I don't know in terms of the side effect

2    collection what you're referring to.

3    Q.    The paper doesn't say whether side effect information

4    was monitored by medical staff or self-reported; is that

5    correct?

6    A.    Well, so in the materials and methods, if you look at

7    the last sentence there, where they refer to WHO Grade 3

8    toxicity, so that tells me that they're using the WHO

9    criteria.   That's World Health Organization.   It's Grade 1

10   through 4 as I told you about.

11             Typically, this would be determined by a

12   physician conducting the study, so patients don't grade

13   their toxicities and the specific types of toxicities here

14   are very technical.   So, for instance, they mention cardiac

15   arrhythmias.   That's not something that you would ask a

16   patient about and ask them to report back to you.   You are

17   monitoring them.

18   Q.    But the paper itself doesn't say; right?

19   A.    Yes, but as I told you, a POSA would understand this

20   based on the WHO grading, what was taking place.

21   Q.    And the paper doesn't say at what time point after

22   bendamustine administration the side effects were observed?

23   A.    Well, they talk about acute side effects and then

24   delayed side effects.   So they talk about the mylo

25   suppression, so that that refers to the suppression of the

Thirman - cross

1   bone marrow and the decrease in blood count.

2            So they talk about leukopenia, which is a low

3   blood cell count, monistat leukemia, which is a low platelet

4   count.  So as we were discussing already, these occurred two

5   to three weeks after treatment with bendamustine, and then

6   gradually recover by about four weeks.

7            So since they're monitoring for those side

8   effects -- as I told you before, it wouldn't make sense to

9   monitor three days after administration of bendamustine for

10  these side effects.  You have to wait for them to occur.

11  You don't know what the peak is, so even if you cut it off

12  at two weeks, sometimes it occurs at three weeks.  So you

13  have to wait enough time to see these side effects manifest

14  before you would grade them.

15  Q.    So your testimony is that in this paper, the person of

16  ordinary skill in the art would understand that the side

17  effects were monitored several weeks after administration?

18  A.    Well, I would understand that the side effects would

19  be monitored for up to three to four weeks after the

20  administration of bendamustine.

21  Q.    The paper doesn't say that; right?

22  A.    Well, that's correct, but a POSA would understand if

23  you are putting in leukopenia, thrombocytopenia, that you

24  have to have waited for those side effects to manifest.

25  Q.    And the paper doesn't say how many times or at what

1     points in that four-week period the side effect observations

2     were taken; is that correct?

3     A.     No, it doesn't say how many times, but I think you can

4     understand from what I was just explaining to you.  If in

5     some patients it's at two weeks, in other patients it's at

6     three weeks, and your goal is to grade these side effects,

7     it wouldn't make sense to only look at two weeks or only

8     look at three weeks.  It would require multiple time points

9     to assess these side effects and grade them appropriately

10    with the World Health Organization criteria.

11    Q.     But the paper doesn't say one way or another; is that

12    correct?

13    A.     Well, yes, but a POSA would understand what this

14    entails.  If you are doing this type of work, you have to

15    monitor for the side effects, so you have to wait the

16    appropriate period of time for the side effects to manifest.

17    Q.     Would the POSA understand that the side effects were

18    monitored directly after the infusion based on this?

19    A.     Well, a POSA would understand that they were because

20    they're reporting acute side effects, like cardiac

21    arrhythmias, disorientation, dry mouth.  Those occur with a

22    short period of time after the bendamustine infusion, so

23    those are acute side effects.  So they would have to be

24    monitored for that.

25    Q.     But it doesn't say at what point that monitoring was

Thirman - cross

1    done?

2    A.    Again, so if you're, if you're looking for cardiac

3    arrhythmias, which are serious, you cannot just say come

4    back in a week.  You're going to be checking them that day

5    and the following day and, you know, they also have the

6    four-day regimen.

7              So, again, it doesn't specify the specific dates

8    that they monitored, but the implication from the Figure 2

9    data is that they did monitor these side effects, and you

10   couldn't reasonably expect to report on these types of side

11   effects if you didn't check for them.

12   Q.    The paper talks about the fact, and this is about

13   seven lines up from the bottom of what's on the screen,

14   patients with different types of cancer.

15             This paper refers to the fact that this study

16   was performed on patients with different types of cancer; is

17   that correct?

18   A.    That's correct.

19   Q.    It doesn't say which types?

20   A.    I believe they say different types.  I believe it does

21   not specify or give a breakdown of the different types of

22   cancers that the patients have.

23   Q.    And in this study, the bendamustine treatment is being

24   delivered only in a single cycle; is that correct?

25   A.    A single cycle, yes.

1    Q.     And you agree that bendamustine therapy side effects

2    result for both the amount of drug given per cycle and the

3    number of cycles given; is that correct?

4    A.     Well, as you said, this was only a single cycle.   In

5    general, the side effects are related to the dose of

6    bendamustine that was administered.   With subsequent cycles

7    we can see a decrease in blood counts due to bone marrow

8    suppression, so in some cases we reduce the dose of

9    bendamustine with subsequent cycles due to decrease in blood

10   counts.

11   Q.     My question, sir, was:  You agree that bendamustine

12   therapy side effects result from both the amount of drug

13   given per cycle and the number of cycles given; is that

14   correct?

15   A.     Well, the principle determinant is the dose.   The

16   number of cycles as I just explained can affect the bone

17   marrow and suppress the bone marrow, so there can be

18   additional cumulative effects on the bone marrow with

19   multiple cycles that require later reductions in label

20   cycles.

21   Q.     So is the answer to my question yes or no?

22   A.     Well, ask it again.   I'm trying to explain it to you

23   as best I can, so I'm not trying to be confusing.   I'm

24   trying to explain it.

25   Q.     My question, sir, is:  You agree that bendamustine

1    therapy side effects result from both the amount of drug

2    given per cycle and the number of cycles given?

3    A.    With the caveat that I just said, the number of cycles

4    refers to late side effects that occur with blood counts.

5    I would agree that the dose is a critical determinant and

6    that with subsequent cycles, we see a decrease in blood

7    counts.

8    Q.    Sir, can you turn to paragraph 73 of your opening

9    expert report in your binder?

10         My question will simply be:  Is this your sworn

11   expert report that was submitted in this case?

12         You say, bendamustine therapy side effects

13   result from both the amount of drug given per cycle and the

14   number of cycles given.  Therefore, these side effects are

15   typically more severe in subsequent cycles because there are

16   cumulative effects on bone marrow.

17         Was that your sworn statement in your expert

18   report, sir?

19   A.    Yes.  I believe it's consistent with what I just told

20   you.

21   Q.    And you agree that the maximally tolerated dose could

22   be different with additional cycles of bendamustine therapy;

23   is that correct?

24   A.    Could you say that again, please?

25   Q.    You agree that it's possible that the maximally

1    tolerated dose could be different with additional cycles of

2    bendamustine therapy?

3    A.    No.   I think the way you're describing it is

4    incorrect, and a POSA would understand the maximally

5    tolerated dose refers to the side effects that occur with

6    the acute administration.

7              So we don't say in the example that was in my

8    report and what we were just talking about, we don't say

9    that the maximally tolerated dose changes with cycle five.

10   What we say is that there are dose reductions due to low

11   blood counts.

12             So no one would ever say the MTD, which is the

13   maximally tolerated dose, is different in cycle five so that

14   the pharmacokinetic analysis is performed with the first

15   cycle and that's how we get the Cmax, the AUC, and all of

16   the side effects that are associated with that.

17             The later cycles of chemotherapy, not just

18   bendamustine, but all cytotoxic chemotherapy, there are

19   cumulative effects on the bone marrow and we often need to

20   dose reduce.   But that would not refer to the MTD of a dose.

21   The MTD is determined with the initial cycle and dose

22   reductions are determined based on blood counts with later

23   cycles.

24   Q.   Sir, can you turn to page 82 of the deposition

25   transcript in your binder.   Put that up.

 1           My question to you, sir, is simply going to be:

 2    Were you asked this question and did you provide this answer

 3    under oath?

 4           "Question:  And so the maximum tolerated dose

 5    for -- that's determined for a single cycle will not

 6    necessarily be the maximum tolerated dose if bendamustine is

 7    delivered over, say, six or eight cycles; correct?

 8           "Answer:  It's possible that the maximally

 9    tolerated dose could be different with additional cycles of

10    bendamustine or any other chemotherapy drug."

11           That was your testimony there, sir?

12    A.    That's correct.

13    Q.    And at the priority date you testified about the

14    Treanda label earlier.  And you agree that the person of

15    ordinary skill in the art at the priority date concerned

16    with treating CLL or NHL would follow the indicated dose and

17    cycle regimen in the Treanda label?

18    A.    Generally, I would follow the dosing schedule in the

19    label.  In some circumstances, adjustments are made.

20    Q.    Now, if we can look at Figure 2 of the Preiss 1998

21    reference.

22    A.    Again, which DTX?

23    Q.    Oh, I'm sorry.  It's DTX-991.

24    A.    991.

25    Q.    Now, sir, there were two, I think you mentioned there

Thirman - cross

1   were two administration schedules that were studied in

2   Preiss 1998?

3   A.    That's correct.

4   Q.    There's administration of bendamustine in a single

5   day; right?

6   A.    Correct.

7   Q.    And bendamustine delivered over four days; is that

8   correct?

9   A.    Correct.

10  Q.    And these, as we said before, it was only a single

11  cycle of treatment?

12  A.    That's correct.

13  Q.    In other words, the drug in the single experiment was

14  given one time and that's it?

15  A.    That's correct.

16  Q.    And there was not, there was not any -- and there was

17  a maximum tolerated dose that's measured for both of these

18  administration schedules; is that correct?

19  A.    That's correct.

20  Q.    And the maximum tolerated dose is different; is that

21  right?

22  A.    That's correct.

23  Q.    For administration over four days, it's 85 milligrams

24  per meter squared; is that correct?

25  A.    Well, you're not quite correct there.  So it's

Thirman - cross

1    85 milligrams per meter squared per day.

2    Q.    Per day.  Correct?

3    A.    The total, and that's in the abstract, is four times

4    that amount, so it's 340 milligrams per meter squared.  So

5    when they report on the maximally tolerated dose for

6    bendamustine for the four-day schedule, they state that it's

7    340 milligrams per meter squared and for the single dose,

8    they report that it's 215 milligrams per meter squared.

9    Q.    But the four-day maximum tolerated dose is not

10   215 milligrams per meter squared times four; is that

11   correct?

12   A.    That's correct.

13   Q.    It's much lower than that?

14   A.    As stated there, it's 85 milligrams per meter squared

15   per day, which is 340 milligrams total.

16   Q.    And you agree that Preiss 1998 does not provide any

17   information about what the maximum tolerated dose would

18   be for a two-day administration schedule; is that correct?

19   A.    Well, the Preiss 1998 provides data on the one day and

20   four-day schedule, which brackets the two-day schedule, so

21   it's directly relevant to a two-day schedule.

22   Q.    But it does not provide information about what the

23   maximum tolerated dose would be for a two-day schedule; is

24   that correct?

25   A.    Well, again, the two days is between one and four, so

1    the one-day dosing is to determine the maximum amount that

2    you can give at a single day and the four-day schedule is

3    the cumulative dose.  That's the total that you can give

4    over multiple days.  So two days is between one and four.

5    The four-day schedule is important for determining later

6    side effects, like the decrease in blood count.

7              So if you were to look at this table in detail,

8    you would see that with the one-day dosing, there's very

9    little leukopenia and thrombocytopenia, and with the

10   four-day dose, there is.  It said there's cumulative effect

11   on the bone marrow.  That effect also correlates with the

12   antitumor effects.  So the goal is to safely deliver a dose

13   that has the best antitumor effect.  You could just use the

14   data to determine how to do a two-day schedule.

15   Q.    Sir, can you turn to page 296 in your deposition

16   transcript?  Look at lines 10 through 14.  You can look

17   on the screen.  If it's easier, you can find it in your

18   book.

19             And my only question to you will be:  Were you

20   asked this question and did you provide this answer under

21   oath?

22             "Question:  And the paper does not provide any

23   information about -- in a two-day application of

24   bendamustine, for example, what the maximum tolerated dose

25   would be."

743

Thirman - cross

1                The answer:  That's correct.

2                That was your testimony under oath?

3    A.    Yes.

4    Q.    And the paper, Preiss 1998, does not provide any

5    information about what the maximum tolerated dose would be

6    with repeated cycles of the drug; is that correct?

7    A.    That's correct.  So the assumption with that paper is

8    that the side effects would all have resolved by the end of

9    the cycle, and then the way we administer all chemotherapy

10   regimens is we continue with the same doses for the second

11   and subsequent cycles with the caveat that sometimes we need

12   to dose reduce the chemotherapy drugs due to low blood

13   counts.

14   Q.    Now, you're not testing, testifying as an expert in

15   pharmacokinetics in this case; is that correct?

16   A.    Well, that is correct, but as part of my job, I rely

17   on the pharmacokinetic analysis to perform clinical trials.

18   Q.    You don't hold yourself out as an expert in

19   pharmacokinetics?

20   A.    No, I do not hold myself out as an expert in

21   pharmacokinetics.  However, I rely on pharmacokinetics and

22   design clinical trials.

23   Q.    Now, one of the other references you talked about was

24   the Schoffski 2000a reference.  That's DTX-987.

25                And do you agree in this study, I think we

1   discussed it before, only a 30-minute infusion of

2   bendamustine was given?

3   A.    That's correct.

4   Q.    And there is a section in Schoffski 2000a titled,

5   assessment of toxicity; is that correct?

6   A.    That's correct.

7   Q.    And it provides details about how toxicity was

8   assessed in the study; is that right?

9   A.    That's correct.

10  Q.    It describes exactly when the toxicity information was

11  assessed; right?

12  A.    That's correct.

13  Q.    It indicates that there were assessments taken before

14  each cycle of treatment?

15  A.    That's correct.

16  Q.    And it says that there were repeated physical

17  examinations on a weekly basis afterwards; correct?

18  A.    That's correct.

19  Q.    And it says that electrocardiograms were taken to

20  assess cardiac toxicities on days 1 and 8 of each treatment

21  cycle.

22          Do you see that?

23  A.    Yes.

24  Q.    And, again, we discussed before, this is not

25  information that was in the Preiss paper we just looked at;

1    is that right?

2    A.    This level of detail was not in the Preiss paper, but

3    Schoffski compares their side effects to what was reported

4    in the Preiss paper.

5    Q.    I want to actually look at the section that you

6    testified about on that point.

7              So if we can look at that page of the document.

8    At the bottom of the page, so just rolling into the next

9    page, can you highlight the first paragraph first.

10             Your counsel put up this paragraph on direct and

11   asked you about the sentence in accordance with; is that

12   correct?

13   A.    That's correct.

14   Q.    And your testimony is that what Schoffski is saying

15   here is that the side effects that they observed in the

16   Schoffski study were comparable with the side effects in the

17   Preiss 1998 study.  That was your testimony?

18   A.    That's correct.

19   Q.    And you did not talk about and your counsel did not

20   show you the next paragraph of this.  If we can put that

21   up.

22             Now, this paragraph said, differences in the

23   observed toxicity profile of bendamustine with other

24   published data from disease oriented trials can, in part, be

25   explained by the fact that we used the very detailed NCI CTC

1    criteria which the toxicity in reference trials has been

2    reported -- whereas, which the toxicity in reference trials

3    has been reported without any further specification.

4              The NCI criteria have been designed for a more

5    sensitive assessment of non-hematological toxicity.  The

6    toxicity of the short infusion schedule was strictly

7    monitored on a weekly basis in contrast to most other

8    published data.

9              Do you see that paragraph, sir?

10   A.    Yes.

11   Q.    The short infusion that's being referred to here as

12   it's referred to in Schoffski is the 30-minute infusion of

13   bendamustine; is that correct?

14   A.    Where are you seeing the short infusion?

15   Q.    We can look at the abstract if you don't remember.

16   A.    Oh, it's not on this paragraph here?

17   Q.    The last sentence says, the toxicity of the short

18   infusion schedule...

19   A.    Thank you.  I wasn't sure what you were referring to.

20   Q.    That's where I'm referring to the 30-minute infusion

21   given in Schoffski; is that correct?

22   A.    Yes.

23   Q.    Now, the next reference from Schoffski --

24   A.    If you could allow me to finish my answer, please.

25              So what a POSA would do is read the paragraph

747

Thirman - cross

1  before and this paragraph.  The paragraph before was talking

2  about similarities in toxicity and specifically referencing

3  Preiss.  This one is talking about differences in toxicity

4  in this area.  And so they are saying in contrast to most

5  other published data.

6           So they are not making that contrast to Preiss.

7  They are talking about other published data, because they

8  talked about Preiss in the paragraph before.

9  Q.    Do you know what other published data they're

10  referring to for side effects in the study?

11  A.    Other previously published papers on bendamustine.

12  Q.    You're not aware of which ones?

13  A.    Well, they're not stating which ones, so I can't state

14  which ones, but obviously they're making a contrast between

15  Preiss, which they discuss in the previous paragraph, and

16  the similarities in the side effects, and this one on

17  differences and side effects.  And they say, in contrast to

18  most other published data.

19           So if they had a difference with Preiss, it

20  would be in the previous paragraph rather than leaving it

21  unnamed.  You wouldn't talk about Preiss and say, our side

22  effects were very similar and not say how they differ.

23  Q.    Now, another reference you looked at was Schoffski

24  2000b.  Can we look at that?

25  A.    What DTX?

Thirman - cross

1    Q.    I'm sorry.  DTX-988.

2          Now, again, this paper has a section titled

3    assessment of toxicity and response.

4          Do you see that?

5    A.    Yes.

6    Q.    It describes the same information or similar

7    information to what was in the Schoffski 2000a reference; is

8    that correct?

9    A.    I believe so.

10   Q.    And if you go to -- I want to go to again the sentence

11   you talked about here, which was in accordance with.

12         Just go to the page, page 5 of the reference.

13   It goes to the bottom of the first column.  The bottom of

14   the first column, top of the second column.  And, again,

15   your counsel -- go down one more line, please.

16         When your counsel asked you about this, sir, he

17   didn't put the whole paragraph on the screen.  You testified

18   about the first sentence, and you said, again, this is

19   comparing the Preiss 1998 data to the Schoffski data.  That

20   was your testimony?

21   A.    Here it's comparing to the previous Phase one data, so

22   that would be the Preiss and the Schoffski data.

23   Q.    And the end of this paragraph, which, again, your

24   counsel did not show you and you did not testify about to

25   this Court, let's look at the last sentence here.  We did

```
 1   not observe confusion or other signs of neurotoxicity when

 2   giving the drug as a repeated 30-minute IV infusion.

 3                That's what the paper says; is that correct,

 4   sir?

 5   A.     That's what it says right there.

 6   Q.     Now, you testified on direct about a reference called

 7   Ruffert; is that right?

 8   A.     That's correct.

 9   Q.     And you, when you formed your opinion that the patents

10   in this case were invalid, you had never seen Ruffert;

11   right?

12   A.     I'm trying to recall if that came up.  I don't believe

13   I did for the opening report.

14   Q.     So the first time you saw that document is after you

15   had already concluded that the patents were invalid; is that

16   correct?

17   A.     I don't recall the exact date.  I looked at many, many

18   references.  I just don't remember exactly when I saw that.

19   As I testified before, it's not a regimen that is in use,

20   so, and also, it's a combination of three drugs, so it's

21   really difficult to interpret bendamustine.

22   Q.     Sir --

23   A.     So bendamustine specifically.  Can I finish or should

24   I stop?

25                MR. HARBER:  I would ask the Court, we're on a
```

1    tight clock.  I've been a little lenient.  But if you would

2    please instruct the witness to answer the question.

3                    THE COURT:  I think the answer is you don't

4    remember?

5                    THE WITNESS:  That's correct.

6                    THE COURT:  All right.  Move on.

7    BY MR. HARBER:

8    Q.    If it would help, it's on page 337 of your deposition

9    transcript, lines 4 to 7.

10                   "And the first time you saw this paper was after

11   you had already determined that the asserted patent claims

12   were obvious, correct?

13                   "Answer:  I believe that's correct."

14   A.    Can you go -- I don't know this to be certain of what

15   you're saying here.

16   Q.    Go to the prior page.

17   A.    Where does it say Ruffert so I know that you're not

18   talking about something else?

19   Q.    And on lines 8 through 10.

20   A.    Okay.  All right.  I agree that's what I said.

21   Q.    Now, if we can look at Table 2 in Ruffert.

22   A.    Can you please tell me what exhibit number that is?

23   Q.    I'm sorry.  It's PTX-336.

24                   Now, in this study, bendamustine was delivered

25   on days 1 through 5 in 60 milligrams per meter squared; is

Thirman - cross

1    that correct?

2    A.    So it's 336 in my binder?

3    Q.    1021.  I'm sorry.  DTX-1021.

4    A.    Okay.  Yes.  I found it.

5    Q.    Okay.  In this study, Vincristine was delivered in a

6    dose of 1.4 milligrams per meter squared just on day one of

7    the regimen.

8    A.    That's correct, with a maximum of two milligrams.

9    Q.    And the Cytostasan, which is bendamustine, is

10   delivered on days 1 through 5 of the regimen; is that

11   correct?

12   A.    Correct.

13   Q.    And the amount is 60 milligrams per meter squared; is

14   that correct?

15   A.    Correct.

16   Q.    So it's at least 43 times as much bendamustine as

17   Vincristine, depending on the size of the patient?

18   A.    I'm not really sure what you're referring to.  We

19   don't, we don't compare doses between drugs, so that's,

20   that's totally irrelevant.

21             No one would ever --

22   Q.    I'm just asking --

23   A.    -- compare a dose of one drug to another because it's

24   specific to the drug.

25   Q.    The question, sir, was:  Is it correct that the amount

1    of Vincristine, the amount of bendamustine delivered in the

2    study is at least 43 times as much as the amount of

3    Vincristine?

4    A.    Well, it's -- if you're doing a calculation like that,

5    it's correct.  As I told you, a POSA, any medical

6    professional could tell you that you would never make this

7    type of comparison.  Some drugs we give grams of.  Other

8    drugs we give micrograms.  So there can be a millionfold

9    difference and it's just absurd is all I would say.  I guess

10   I will just stop with that.

11   Q.    All right.  Again, you testified about this study.

12   I want to go to pages 4 and 5.  If we could put those both

13   up.

14              You testified about this study and you testified

15   about this table and a side effect table.  But I want to ask

16   you about something that your counsel didn't put up on the

17   screen and that you didn't testify about.

18              And if you look at the line right above

19   discussion, first of all, and let me get that.  That first

20   sentence, and then there's -- the relatively high

21   percentage.  No, I want two things up.  This is the first.

22   And then on the second page, the last sentence in the second

23   to last paragraph in the last column.

24              Now, there are two conclusions in Ruffert that

25   you didn't testify about.  One, if you look in the first

1    sentence, the first sentence up here:  The relatively high

2    percentage (35.4 percent) of cases of phlebitis after

3    intravenous bolus injection is problematic and which are

4    much less frequently observed whether using short-term

5    infusion.  And the short-term infusion in the study is

6    bendamustine.  Is that correct?

7    A.    Well, they're not stating the specific drugs in this

8    sentence, so they're referring to an intravenous bolus

9    injection that is likely to be the Vincristine, and they use

10   the term in Table 2 for Cytostasan and it's a short-term

11   infusion.

12   Q.    That's my question.  Bendamustine is a short-term

13   infusion, correct, in the study?

14   A.    Well, again, all I know is what is in this Table 2 and

15   what is here in front of us.  So they don't have the

16   specific drug names here, but --

17   Q.    In the study, bendamustine is described as being

18   delivered in part as a short-term infusion; is that correct?

19   A.    That is correct.

20   Q.    And I think you testified before that Vincristine

21   should not be given in a short-term infusion.  It has to be

22   given quickly?

23   A.    Well, so, you know, some of these terms are relative,

24   so short-term can mean different things to different people.

25   So we, to be safe, give it quickly.  Some people say quickly

Thirman - cross

1    is short-term, but I believe that the short-term infusion as

2    you are stating is referring to bendamustine here.

3    Q.    And you cannot give a 30-minute infusion of, or

4    shouldn't give a 30-minute infusion of Vincristine; is that

5    correct?

6    A.    Typically, with a peripheral IV, you should not do

7    that.  With a central venous catheter, you could.

8    Q.    Where it says the thrombophlebitis -- let me ask you.

9    The paper doesn't describe Vincristine as being delivered as

10   a short-term?

11   A.    So we had that Table 2 up.  It just says IV.

12   Q.    And if you look at the last sentence over here on the

13   right, the thrombophlebitis that occurs after intravenous

14   bolus can largely be avoided with the use of short-term

15   infusions; is that correct?

16   A.    I see that sentence.

17   Q.    So it is saying for a drug, the side effects

18   associated with one method of administration can be

19   alleviated by using a different method of administration; is

20   that correct?

21   A.    In general, I think that statement is true.

22   Q.    And you're aware that the data and findings of Ruffert

23   are reported in the bendamustine label in Germany; is that

24   correct?

25   A.    Well, which label are you referring to?

Thirman - cross

1  Q.   The ribomustin label?

2  A.   I don't recall off the top of my head whether it was

3  in there.  So this is a three-drug regimen.  I don't know

4  what their labeling requirements are, but I would be happy

5  to look at that with you.

6  Q.   But it's not -- as part of your opinions in this case,

7  you didn't consider whether or not these data were

8  reproduced and discussed in the bendamustine label?

9  A.   I focused on this paper.  I didn't focus on the

10 reference in a ribomustin paper in Germany.

11 Q.   If we can pull up DTX-1015, and that should be in your

12 binder.

13       You I believe had speculated or testified on

14 direct that the phlebitis would be coming from the

15 Vincristine in that study, was your view?

16 A.   That's correct.  Where is -- 1015?  Okay.  I'm sorry.

17 Q.   And this is a document that you cite in your expert

18 report discussing Vincristine; is that correct, sir?

19 A.   Yes.

20 Q.   And if you look at the second bullet point under how

21 Vincristine is given, it says, Vincristine is a vesicant.  A

22 vesicant is a chemical that causes extensive tissue damage

23 and blistering if it escapes from the vein.  The nurse or

24 doctor who gives Vincristine must be carefully trained.  If

25 you notice pain, redness or swelling at the IV site while

Thirman - cross

1   you are receiving Vincristine sulfate, alert your healthcare

2   professional immediately.

3                Do you see that?

4   A.    Yes.

5   Q.    And the name for some of the damage that is done when

6   a chemical escapes from the vein, that's extravasation;

7   correct?

8   A.    That's correct.

9   Q.    And if you look at the next page of this document, it

10   lists -- it has side effect information for Vincristine, and

11   it says, the following side effects about a third of the way

12   down the page.  The following side effects are common

13   occurring in greater than 30 percent of patients taking

14   Vincristine.  And the only one listed there is hair loss; is

15   that correct?

16   A.    Correct.

17   Q.    And if you go a little further down the page, it lists

18   less common side effects, right here, all the way down.

19                It says, the following side effects occurring in

20   ten percent to 29 percent for patients receiving

21   Vincristine, which is less common, and phlebitis is not one

22   of these; is that correct?

23   A.    That's correct.  So if you look at the top of the

24   page, if you could go back there, the first sentence is that

25   most people do not experience all of the side effects

1    listed.  They don't list phlebitis, and I believe it's

2    because of what you showed me on page 1 about how careful

3    you need to administer Vincristine.

4    Q.    But this document, this was included in your expert

5    report.  The word phlebitis doesn't appear anywhere in here.

6    A.    Well, if you go to page 1, which I think you just had

7    up.

8          So on the first page, it emphasizes that

9    Vincristine is a vesicant and that a doctor or nurse who

10   gives Vincristine must be carefully trained, and so this

11   is telling you that this is a major concern with

12   Vincristine.

13         So the fact that we follow this does not mean

14   that it's not a very concerning issue with Vincristine.

15   That means that people aren't following the directive, and

16   if you look at the FDA label for Vincristine, there's a

17   black box warning about this.

18   Q.    Well --

19   A.    So you would want to be careful.

20         Now, I am not sure what your -- the fact that

21   you are not seeing phlebitis means it's not significant?

22   I'm trying to understand what you are asking.

23   Q.    My question, sir:  This is the document that you cited

24   in your expert report discussing Vincristine; is that

25   correct?

Thirman - cross

1    A.    That is correct.

2    Q.    And this document does not contain the word phlebitis

3    or thrombophlebitis; is that correct?

4    A.    That's correct.  These chemo care are what we give

5    patients.  They're hand-outs when we explain the drugs that

6    they're getting.  So they are often not using technical

7    language so that lay people can understand that.

8              So phlebitis, thrombophlebitis, these are terms

9    that patients might not understand.  That's why they say

10   things.  When they say, if you notice, they're talking about

11   a patient, not a doctor, and they say, pain, redness or

12   swelling at the IV site.  They're not saying if you notice

13   thrombophlebitis, call your doctor.

14   Q.    If you could look at DTX-1004.  That's the Barth

15   reference you mentioned.  And look at page 5 of the

16   reference, which is where you were testifying about before.

17             Again, I want to ask you:  There was part of

18   this that was a put up on the screen that you testified

19   about.  I want to ask you about the rest of the document.

20             You testified that Barth was suggesting that

21   notwithstanding what was in the American prescribing

22   information, that it believed that bendamustine could be --

23   get into a smaller bag; right?

24   A.    Right.  So they, Barth states that 30-minute short

25   infusion factors in Germany can be readily achieved with

Thirman - cross

1    infusion in volumes of 100 to 250, 0.9 percent sodium

2    chloride.

3    Q.    And it's referring in that second-to-last paragraph

4    there.  This is not something that was put on the screen on

5    your direct.  It refers to a 30-minute infusion that was

6    given in Barth; is that correct?

7    A.    Yes.  I believe that is on the screen here and was

8    shown before, so I'm not sure what -- is there something

9    else that I --

10   Q.    That actually wasn't on the screen.  But my question

11   is:  It does say that the duration of the infusion in Barth

12   was 30 minutes that he's discussing?

13   A.    That's correct.

14   Q.    And even in suggesting that the volume could be

15   reduced in Barth's view for bendamustine, you don't believe

16   that Barth is suggesting giving bendamustine more rapidly or

17   more slowly; is that correct?

18   A.    Well, you know, Barth is teaching to use this short

19   infusion practice in Germany, so the Preiss 1985, Preiss

20   1998, those were in Germany.

21          So they are advising to use the short infusion

22   that is practiced in Germany.  It looks like they're using

23   30 minutes in this case.

24   Q.    My question, sir, was:  Even in suggesting that the

25   volume of the infusion could be reduced, you don't believe

1    that Barth is suggesting giving bendamustine more rapidly or

2    more slowly; is that correct?

3    A.    Well, Barth is talking about the volume of infusion

4    that is practical when administering a short infusion.  They

5    are not directly addressing the time of infusion.

6                   MR. HARBER:   Thank you.

7                        REDIRECT EXAMINATION

8    BY MR. NELSON:

9    Q.    A couple quick things, Doctor.  Thank you for your

10   time.

11               Can we pull up DTX-993, please.

12   A.    Should I switch binders?

13   Q.    Yes.  Yes.  That would be a good idea.  DTX-993.  And

14   this is a Treanda label you look at earlier.

15               Do you recall?

16   A.    Yes.

17   Q.    And let's look at the adverse reactions section right

18   there on that first page?

19   A.    Yes.

20   Q.    Does this adverse reactions section discuss

21   thrombophlebitis or thrombophlebitis?

22   A.    No, it does not.

23   Q.    How does this adverse reaction information get in the

24   label?  How is it compiled?

25   A.    Well, they look at the clinical trials that are

1    performed and they look for the frequency of adverse

2    reactions or post-marketing trials that are often performed

3    as well as surveys of large numbers of patients who were

4    treated with a drug who added additional information that

5    comes out.

6    Q.    And would a medical POSA expect that if phlebitis or

7    thrombophlebitis was a frequent occurrence with bendamustine

8    therapy, that it would be here in the adverse reaction

9    section of the bendamustine label in the prior art?

10   A.    Yes.

11   Q.    Let's stick with the Treanda label, and I want to go

12   this time to the dosage and administration section.

13             If you recall, counsel talked to you extensively

14   about issues like number of cycles and cumulative effects of

15   dosing, those kind of things.

16             What does the Treanda label tell a person of

17   ordinary skill in the art about dose modifications of the

18   drug?

19   A.    Well, it tells you how to reduce the dose for either

20   toxicity or hematologic toxicity.

21   Q.    How does that relate to the number of cycles and the

22   cumulative effect on the drug?

23   A.    Well, so what it relates to is if a patient has a

24   Grade 3 or greater hematologic toxicity, that the doses

25   should be reduced and similarly, for Grade 3 or greater

1    non-hematologic toxicity, the doses can be reduced, and then

2    dose explanations, re-escalation may be considered.  So once

3    the acute side effects resolve and the late side effects

4    resolve, it's possible to go back up.

5    Q.    And would all of this have been known and understood

6    by a medical POSA in light of this prior art Treanda label?

7    A.    Yes.

8    Q.    I want to talk just briefly about a point that counsel

9    was talking with you about, extravasation.  Extravasation,

10   is that common with bendamustine therapy?

11   A.    No, it is not common.

12   Q.    If it were to occur with bendamustine therapy, what

13   would be the cause of extravasation?

14   A.    Well, causes of extravasation in general relate to a

15   vein breaking or a needle poking through a vein and

16   chemotherapy drugs passing through into the subcutaneous

17   tissue.

18   Q.    I want to switch gears to one other thing, and that's

19   the concept of Cmax and side effects that we talked about

20   and you talked about with counsel.

21             What's more important to a medical POSA, the

22   Cmax or reported data regarding the adverse side effects

23   that were impact the daily life of a patient?

24   A.    Well, the actual data reported with the drug

25   administration is critical because the Cmax is just a number

Thirman - redirect

1    that's calculated.  You need to do the studies to see what

2    happened to the patients and then use that toxicity data to

3    assess how well tolerated the drug is and what side effects

4    might occur.

5              MR. NELSON:  And that's all we have, Your Honor.

6    I would just enter some exhibits into evidence unless

7    there's anything further.

8              THE COURT:  I have a few questions.

9              MR. NELSON:  Yes.  I thought you would.

10             THE COURT:  Doctor, you said, I think, you

11   treated 2 to 3,000 patients for cancer?

12             THE WITNESS:  Approximately.

13             THE COURT:  About how many have had CLL?

14             THE WITNESS:  CLL is relatively uncommon.  I

15   would say I've treated about a hundred, approximately

16   200 cases.

17             THE COURT:  And about how many with NHL?

18             THE WITNESS:  Again, it's probably about 2 or

19   300.

20             THE COURT:  All right.  So about 400 or

21   something.  Right?

22             THE WITNESS:  4 to 500, sure.

23             THE COURT:  And I understood you treated about

24   50 to a hundred patients with bendamustine?

25             THE WITNESS:  Between CLL and NHL.  These are

1    approximations.  I have not totaled --

2                  THE COURT:  No, no.  Is it fair, when you said

3    50 to a hundred, that's limited to CLL and NHL patients?

4                  THE WITNESS:  Yes.  I'm just trying to think if

5    there might be -- the numbers are a little bit complicated

6    because we shared the care of many of our patients in our

7    group, so there's seven of us, and so if I'm helping out

8    covering or treating one of my colleagues's patients with

9    bendamustine or Rituxan or anything else, I try to keep that

10   in my head as someone, I've been involved in their

11   treatment.  These are approximations.

12                 THE COURT:  I guess, would it be fair to say

13   less than a quarter of the CLL and NHL patients you treated,

14   you've administered bendamustine?

15                 THE WITNESS:  Yes.

16                 THE COURT:  What were you administering in

17   general terms to those 75 of the patients?

18                 THE WITNESS:  Well, so CLL and NHL are treated

19   differently, so bendamustine and Rituxan used to be the

20   common, most common chemotherapy regimen for CLL, but in the

21   last seven years or so, a whole series of new drugs have

22   been developed -- ibrutinib.  These are oral drugs and

23   they've just recently been shown to be superior to

24   bendamustine and rituximab.

25                 I participated in some of those clinical trials,

Thirman - redirect

 1    and I directed our site for some of the national trials on

 2    CLL.

 3              Interestingly, in non-Hodgkin's lymphoma,

 4    bendamustine and Rituxan remain the best regimen for many

 5    patients who have indolent lymphoma.

 6              So the incidence or the frequency that we used

 7    bendamustine and Rituxan in non-Hodgkin's lymphoma stayed

 8    about the same whereas our use in CLL is decreasing.

 9              THE COURT:  The Preiss study, there were only

10    two CLL patients in the study.  Right?  This is the 85.

11              THE WITNESS:  I would have to double-check.

12    That sounds right.  I believe so.

13              THE COURT:  And my recollection is there were

14    only seven total patients; is that right?

15              THE WITNESS:  That's correct.

16              THE COURT:  As a non-doctor, non-scientist, it

17    seems remarkable to me in ways that scientists and doctors

18    would rely on such a small population to make any kind of

19    scientific opinion.

20              THE WITNESS:  So let me explain when we're doing

21    new drug testing, we call the early phase testing Phase 1,

22    and the goal is to determine, typically, the

23    pharmacokinetics of the drug.  You don't need very many

24    patients because that doesn't vary that much.  And then the

25    accused toxicities, which again are pretty comparable among

1   patients assuming their kidney function and liver function

2   are adequate.

3           And often with Phase 1 studies, we don't know

4   the dose.  So some patients end up getting doses that are

5   too low and don't really have an antitumor effect, and as

6   you keep escalating the dose and you get to the dose with

7   toxicity, unfortunately some patients get too high of a dose

8   and severe and life-threatening side effects.

9           So in Phase 1 clinical trials, we're only

10  putting patients on per dose levels.  If there's a side

11  effect that's significant, then we expand that to six

12  patients.  So it's called a three design.  And the reason

13  is, is we're not hoping or we're hoping not to give too many

14  patients either a dose that is ineffective, which wouldn't

15  benefit them, or so severe that it causes life-threatening

16  side effects.

17          If we were to expand more than that, then

18  patients, more patients would be exposed to either doses

19  that are too low or too high.  So even as of now, we're

20  doing this three plus three design.

21          THE COURT:  And so you don't have any hesitation

22  by making judgments about the invalidity of a patent or

23  obviousness of a treatment method based on two instances of

24  the administration of a drug?

25          THE WITNESS:  Well, so I believe, is asking, you

1    know, would it be better to have more data?  It's always

2    better to have more data.

3              So there's more than one study here.  There's

4    Preiss 85.  Then there's Preiss 1998, where they treated

5    a much larger group of patients and did a more detailed

6    study.  I think that one was about 50 patients.

7              THE COURT:  That's what it said on the screen.

8              THE WITNESS:  Yes.

9              THE COURT:  That was also various different

10   types of cancer.

11             THE WITNESS:  That's right.  So the patients

12   with various types of cancers will tend to have the same

13   acute side effects.  For instance, cardiac arrhythmia.  It

14   doesn't matter if the patient has non-Hodgkin's lymphoma or

15   breast cancer.  So if a certain dose is going to cause an

16   abnormal heart rhythm, it will occur in any tumor type.  But

17   they had multiple tumor types.

18             The difference between CLL and the other tumor

19   types is that chronic lymphocytic leukemia tends to involve

20   the bone marrow extensively, and as a result, the blood

21   counts can drop lower.

22             So if you notice in the FDA label that the

23   indication and use and the drug dose for CLL is a slightly

24   lower dose, and instead of the 21-day cycles for NHL, it's

25   the 28-day cycle.

1              So there are differences in side effects as you

2      note very a appropriately.  So the hematologic side effects

3      could be different with different tumor types and that's why

4      the CLL dosing is lower.  But the acute toxicities really

5      are pretty consistent across the tumor types.

6              THE COURT:  And in my last kind of question, if

7      you will, or area of inquiry, and I want to speak in general

8      terms, not with reference to the particular prior art

9      references.  But if I read a prior art reference and I was a

10     doctor and it set forth data about the results of

11     administering a particular drug at a particular amount of

12     volume, and let's just say for argument's sake

13     500 milligrams.

14              THE WITNESS:  Volume or dose?

15              THE COURT:  Dose.  Sorry.  Dose.

16              In forming an opinion about whether or not I

17     could infer from that smaller dosage amount or larger dosage

18     amount, when I only have the one number in the study, what

19     factors do I consider?

20              THE WITNESS:  Well, that's a complicated

21     question.  So, again, it depends, do the patients have

22     normal liver and kidney function, because that can affect

23     the metabolism.  In general, higher doses have more

24     antitumor effects and more side effects, and lower doses,

25     the opposite.

Thirman - redirect

1            In addition, we typically have more than one

2    study that we can look at where you can sort of see a ring.

3    It's difficult for one study to do everything.  So there are

4    so many patients and so many physicians out there.

5            So I think --

6            THE COURT:  So in practice, you've got live

7    patients.  How many studies do you need to read before you

8    pick an amount to actually inject in a patient live?

9            THE WITNESS:  Well, the answer to that is one.

10   So if there's one study and it's definitive, and there are

11   many, many examples of it.

12           We see one study.  You know, I can think of some

13   great examples.  A new drug comes along and it's dramatic

14   what the effects are, then one study is all you need.

15           If the results of a study are relatively modest,

16   you worry about, you know, perhaps there's some variability

17   and you would like to see more data before you adopt that.

18           So these early phase trials that are being

19   described here are to discover the dosing schedule and then

20   to do randomized studies, comparing one treatment to

21   another.

22           So, for instance, in Barth, they are talking

23   about a randomized study for indolent and lymphoma patients,

24   where they compared bendamustine to Rituxan to that chop,

25   which is a four-drug chemotherapy session.  And

1    bendamustine/Rituxan was superior to that chop regimen.

2    That was somewhat unexpected because chop was the standard

3    at that time.

4         So a randomized study was done marginally led by

5    the Germans in this skill study group and it shows that it's

6    superior.  So assuming that everything was done

7    appropriately, which we generally rely that the study was

8    done appropriately after we see all the details, then that's

9    convincing.

10        And I can tell you that everyone in the U.S. and

11   around the world has adopted that measurement for indolent

12   lymphoma based on that study.

13        THE COURT:  And then, last, related to this, a

14   bit more specific then.  Explain to me how you concluded

15   it's obvious that the volume as set forth in claim 13 of the

16   '399 patent of 100 milliliters or less, that that is

17   obvious, and yet you also say it's obvious with respect to

18   claim 15, that the line would be about 50 milliliters per

19   65 milliliters.  Both of those conclusions are based

20   according to the chart that was presented by the counsel

21   that questioned you on the exact same references.

22   A.    Well, so there are a couple reasons.  First of all,

23   the differences between, say, 50 and a hundred mL's is very

24   modest, so it's trivial.

25        There's no, even in patients who require low

Thirman - redirect

1  volume, 50 mL's or a hundred mL's, it's a really tiny

2  amount.

3              I can show you, like, a can of soda --

4  Q.    Is it trivial between 100 to 500?

5  A.    No, it's not.  That 500 with have a little bit more

6  effect in people who require low volume.  The other thing is

7  that when you have these intravenous catheters, that's a

8  rate of infusion depending on the bore of the catheter.  So

9  depending on the size.  So, for instance, I think like a

10  24-gauge catheter, you can only infuse I think like 20 mL's

11  a minute and a 22-gauge catheter I think is 36 mL's per

12  minute.

13             So if you look back and say the Preiss reference

14  and you know that they administered in three minutes, you

15  know that that volume has to have been pretty small because

16  there's just a physical limitation of putting volume through

17  a small tube.

18             So we don't have --

19             THE COURT:  Basically, though, is it fair to say

20  that really what you've done is, you've concluded that it's

21  safe to administer less than a hundred, and therefore you're

22  willing to say anywhere within that 0 to 100 range, it would

23  follow as a matter of logic.  It's just not a trivial

24  difference.  It's because it's only a trivial difference.

25  Is that the logic of your opinion?

Thirman - redirect

1          THE WITNESS:  Well, you have to have the volume

2    that it's reconstituted in.  So that varies whether it's

3    Treanda or Bendeka, I believe.  So you have to reconstitute

4    in the right volume.  So if that's, let's say, 36 mL's,

5    you typically put that in a bag.  If it's a different

6    amount.

7              So the other thing that Barth talks about

8    is bag size and they give an example of reconstituting

9    bendamustine in 36 mL's.

10             So every bag of fluid, whether it's a 50 mL bag

11   or 100 mL, they're not totally full, so you have to be able

12   to add a volume to that bag.

13             And so in the concentrations that they talk

14   about in Barth, they give an example.  If you put it in 36

15   mL's, you can't add that to a 50 mL bag.  There isn't enough

16   space.  But there is enough space and, you know, I don't

17   know the exact language.  You probably had about 20 percent,

18   25 percent of whatever the bag size is.  So you can add it

19   to a hundred mL's, and they're saying if you want to give

20   the more rapid infusion, use a hundred mL bag.

21             So if you have a more concentrated version of

22   bendamustine, you could put it in a 50 mL bag.  It just

23   depends on the volume of reconstitution.

24             THE COURT:  All right.  Have my questions

25   prompted either counsel questions?

1             MR. NELSON:  No your Honor, Your Honor.

2             Just to admit into evidence the following DTX's.

3    These are all DTX-numbers.  987, 988, 991, 993, 995, 1004,

4    1021, 1022, 1194.  Thank you.

5             MR. HARBER:  No objection.  I would add one that

6    we used with the doctor on cross, which is DTX-1015.

7             MR. NELSON:  No objection.

8             THE COURT:  All right.  All of those exhibits

9    are admitted.

10             (DTX-987, 988, 991, 993, 995, 1004, 1021, 1022,

11    1194 and DTX-1015 were admitted into evidence.)

12             (Witness excused.)

13             THE COURT:  All right.  Shall we break for

14    lunch?  How much time?

15             MR. HARBER:  Whatever the Court prefers.

16             THE COURT:  Do you want to do 45 minutes?

17             MR. NELSON:  Yes.

18             MR. HARBER:  Sure.

19             THE COURT:  Thank you.  You're excused.

20             THE WITNESS:  Thank you, Your Honor.

21             (Witness excused.)

22             (Luncheon recess taken.)

23                      -   -   -

24             Afternoon Session, 1:51 p.m.

25             THE COURT:  All right.  What's next?

Buxton - deposition designations

1            MR. PALAIYANUR:  Shyam Palaiyanur on behalf of

2    Mylan Laboratories Limited.  With permission to approach?

3            THE COURT:  Sure.  Thank you.

4            MR. PALAIYANUR:  Your Honor, defendants call by

5    deposition Christopher Buxton.

6            THE COURT:  All right.

7            (The videotaped deposition of Christopher Buxton

8    was played as follows.)

9            "Question:  How is it that -- well, let me step

10   back.  At some point during your work at SciDose you began

11   to work on a liquid bendamustine formulation, right?

12            "Answer:  That is correct.

13            "Question:  How did that come about?

14            "Answer:  Well, strictly, it was a communication

15   from Nagesh, which is Dr. Palepu, that he had acquired this

16   projected and was thinking of means of progressing it, and

17   we spoke initially over the phone about it, and then

18   subsequently we had more detailed discussions.

19            "Question:  Approximately when was this?

20            "Answer:  That was around 2008 to 9 sometime.  I

21   cannot remember the exact date.

22            "Question:  And, generally speaking, what was

23   the nature of your work on the development of the liquid

24   bendamustine formulations?

25            "Answer:  Well, I was advised that the main

1    objective was to produce liquid concentrate of the

2    formulation, and the work that I would be involved with was

3    figuring out a way to get the -- this concentrate in a

4    stable form.

5              "Question:  Sure.  Well, you indicated

6    previously that while there was the obvious requirement that

7    it be soluble and stable sufficient to use, so what I am now

8    trying to understand is what you meant by that, and we could

9    talk about two parts of that.  The first part was

10   solubility, and the second part was stability.  Right now my

11   question is:  What did you mean by soluble sufficient to be

12   ready to use?

13             "Answer:  The -- how can I best describe this?

14   Qualitatively we need to get something similar to the first

15   stage of reconstitution of the lyophile.

16             "And at that stage you would have the lyophile

17   dissolved in, presumably, some aqueous medium which would be

18   unstable.

19             "Now we needed to generate something similar

20   which did not chemically degrade in the some way that the

21   existing lyophile would.

22             "Question:  And I think this may be part of your

23   prior answer, but what did you mean by, stable sufficient to

24   be ready to use?

25             "Answer:  What I mean by that is that it is

Buxton - deposition designations

1    chemically stable.  It is not degraded to give degradation

2    products.

3              "Question:  -- and the water was undesirable in

4    the formulation because bendamustine itself is unstable in

5    aqueous solution generally?

6              "Answer:  Bendamustine hydrolyzes very rapidly

7    in water.  It forms this hydrolysis product which you

8    sometimes see recorded as HP1.  That is the basis of the

9    problem.

10             "The use of solvents which did not contain water

11   was an attempt to look at whether removing the water

12   entirely from the system would be a good thing to do.

13             "Question:  And ultimately, Doctor, what I am

14   trying to understand is that there were a number of

15   inorganic solvents that exist and potentially could be used,

16   and what I am trying to understand is why out of the

17   universe of potential inorganic solvents you started with

18   these three particular solvents?

19             "Answer:  You mean inorganic solvents?

20             "Question:  Inorganic solvents.  Excuse me.

21             "Answer:  Not particularly.  As a chemist rather

22   than a pharmacist then solubility, you could take a range of

23   solvents, a pharmacy, someone with a strict pharmacy

24   background would identify ones that were more usable than

25   others.

Buxton - deposition designations

1        "So you are right, you could take a range of

2    these things.  Now, that particular list I have described

3    was trimmed, not trimmed down, was assessed by Dr. Palepu

4    who has a closer affinity with the commercial requirements

5    than I do.  So that is why those initial ones were chosen at

6    Dr. Palepu's request.

7            "Question:  Other than lactic acid, propylene

8    glycol and ethanol, what other solvents were tried?

9            "Answer:  Well, I can give you an overview of

10   what we did.  Again, there may have been things done in

11   Hyderabad that I was unaware of.  Sometimes things would be

12   tested.  Maybe they did not work and nobody would hear about

13   it at all.  But we did look at dimethyl sulfoxide, which was

14   a favorite of the technical director at the time.

15           "Ultimately we did look at polyethylene glycol,

16   which was the two other ones.

17           "Question:  Why was DMSO looked at?

18           "Answer:  DMSO is a solvent which has good

19   solubilizing properties for a lot of organic materials.

20           "Question:  Why was PEG looked at?

21           "Answer:  PEG was looked at because we had it in

22   the lab, I believe.  And it is a solvent which is used in

23   pharmaceutical formulations.

24           "Question:  And a particular grade of PEG that

25   you looked at was PEG 400?

1      "Answer:   PEG 400.   Yeah.   I am just trying to

2    recollection whether any other PEG was used.   I do not

3    recollect any.

4           "Question:   Do you know why that particular

5    grade of PEG was used as opposed to other grades?

6           "Answer:   Well, there are many grades of PEG,

7    most of which are solids, for parenteral use.   Clearly, it

8    has got to be a liquid.   So you are restricted to PEG 400 or

9    300 effectively.   PEG 400 appears to be the one which is

10   mostly used.

11          "Question:   Mostly used in the pharmaceutical --

12          "Answer:   In the pharmaceutical industry, that

13   is correct.   And why that is, I do not know.

14          "Question:   -- so ultimately a formulation

15   containing 90 to -- 90 to 10 ratio of PEG 400 to propylene

16   glycol was chosen for further experimentation; right?

17          "Answer:   That is correct, but it did not appear

18   out of the blue.

19          "Question:   Okay.   Very good.   If it is -- if it

20   is the same sentence, it begins:

21          It would appear that stability would be improved

22   if we could minimize the presence of alcohol groups --

23   answer:   That is correct.

24          "Question:   Within a nonaqueous environment.

25          "So you have that?   Why did you reach that

1    conclusion?

2              "Answer:  That was an explanation as to why PEG

3    400 would show good stability that we had observed at five

4    degrees.

5              "Question:  And why was that an explanation of

6    the stability at five degrees?

7              "Answer:  There is data maybe in this report

8    that indicates the actual levels obtained from PEG 400,

9    which is on page 17, I believe.

10             "Question:  Let us go back.

11             "In the report, were you comparing the data for

12   PEG 400 with one of the other alcoholic solvents in order to

13   reach the conclusion that stability would be improved if we

14   could minimize the presence of alcohol groups within a

15   nonaqueous environment?

16             "Answer:  That is generally true.  I am just

17   looking to see whether there is anything in the report which

18   would make it easy for you.

19             "What he is saying is true, the observation was

20   that we were" getting esters formed with these various

21   alcoholic solvents.  And in order to do that, you need an

22   alcohol and a bendamustine acid.

23             "So the simplistic argument was that if there

24   was material with fewer hydroxy groups in it per unit weight

25   or molecule, you would be likely to less esterification.

Buxton - deposition designations

1      That was the reason for taking a closer look at PEG 400.

2                  "Question:  In other words, had you made any

3      predictions as to how bendamustine would degrade in the

4      presence of PEG 400?

5                  "Answer:  No is the answer to that.  The

6      valuation was made after the event.  The explanation as to

7      why the results that had been displayed was rationalized in

8      that way.

9                  "Question:  And so as a result of the

10     observation that PEG 400 -- or excuse me, that there was an

11     oxidative process going on here that led to the inclusion of

12     an antioxidant in the formulation; is that correct?

13                 "Answer:  There were discussions that since this

14     was a material which appeared to be due to oxidation, we may

15     be able to reduce that on using an antioxidant.

16                 "Question:  I apologize if we covered this

17     before.  How was the ratio of PEG 400 to propylene glycol

18     chosen in the formulation?

19                 "Answer:  The solubility of bendamustine in PEG

20     400 is only around 20 milligrams per mL.  At that stage we

21     were looking to achieve concentrations of around 50 mg's per

22     mL, so we needed something else into the system to try and

23     improve that solubility.  That was why propylene glycol was

24     chosen.

25                 "Question:  And why was propylene glycol, as

1    opposed to some other solvent, chosen as the co-solvent for

2    use with PEG 400?

3                "Answer:  I was advised by Dr. Palepu that

4    propylene glycol would be more acceptable from a regulatory

5    perspective than other solvents.

6                "Question:  The next question relates to the

7    antioxidant itself, and the selection of the amounts of the

8    antioxidant.  How was the monothioglycerol chosen as the

9    antioxidant for use in the formulation?

10                "Let us step back a little bit and talk about

11    the process by which various antioxidants were considered.

12                "Do you recall which antioxidants were

13    considered for use in the formulation?

14                "Answer:  There is data somewhere in the

15    documents.  We did consider others.  One we were

16    particularly interested in was the lipoic acid.  But there

17    were others we tested that were not as -- did not prove to

18    be as good.

19                "Question:  Do you know why monothioglycerol was

20    ultimately chosen, understanding that it was a decision by

21    Eagle?

22                "Answer:  My understanding is that Eagle was not

23    prepared to risk the FDA deciding that lipoic acid was a

24    novel excipient, and would hence require safety studies.

25    They preferred something more conventional.

Buxton - deposition designations

1          "Question:  Was that because lipoic acid was not

2     in the inactive ingredients guide?

3          "Answer:  That is my understanding.

4          "Question:  And were you able to, quote unquote,

5     "repair the PEG"?

6          "Answer:  We were.

7          "Question:  And how did you do that?

8          "Answer:  We did it by neutralizing the PEG with

9     initially sodium hydroxide solution so that we ended up with

10    an HP comparable to the Merck material.  And when that was

11    incorporated into a batch and tested, the levels of

12    degradation were reduced compared to the critical low pH

13    stuff.

14          "MR. GREGORY:  The first exhibit to be marked,

15    this is document bearing Bates numbers EGL-Bendeka_00194541

16    through 632.

17          "Question:  Let me rephrase that.  Did you have

18    any role in the preparation of the document that has been

19    marked as Exhibit Buxton 1?

20          "Answer:  Yes.  The slides themselves were

21    prepared by Dr. Palepu following discussions with myself,

22    and a lot of the data he has actually abstracted from

23    various documents that I have given to him.

24          "Question:  Yes, sir.  The next exhibit will be

25    Buxton 2.  It is a single page document bearing Bates

1     numbers EGL-Bendeka 00192415.

2               "(Exhibit 2 marked for identification.)

3               "Question:  At any rate, Doctor, do you

4     recognize this document?

5               "Answer:  Yes.  It is a couple of e-mails, one

6     from him to me, Dr. Palepu, and my response.

7               "Question:  All right.  And, well, what was Dr.

8     Palepu asking?

9               "Answer:  I do not remember the precursor to

10    this, but he is asking why don't we consider the terminal

11    hydroxy groups in PEG 400 alcohol.

12              "Question:  What did you respond to Dr. Palepu?

13              "Answer:  I responded to him that we do consider

14    the terminal hydroxy groups in PEG 400 alcohol.

15              "MR. GREGORY:  The next Exhibit Number 3, or

16    Buxton three, is a document bearing Bates numbers

17    EGL-Bendeka_00192293 through 295.

18              "(Exhibit 3 marked for identification.)

19              "Question:  So do you recognize this as a series

20    of e-mails between you and Dr. Palepu dated around

21    March 22nd and 23 of 2011?

22              "Answer:  That is correct.

23              "Question:  All right.  So do you recall the

24    occasion of this series of e-mails?

25              "Answer:  I recognize what the discussion is

784

Buxton - deposition designations

1    about, but I do not remember the origins of why we were

2    discussing it, other than in the context of hydroxy groups

3    in solvents.

4               "Question:  Why were you discussing whether you

5    could reduce the number of alcoholic groups to 0?

6               "Answer:  This is in connection with reducing

7    the esterification.

8               "Question:  Reducing the esterification in what

9    particular context?

10              "Answer:  Well, in the general context that we

11   had observed enters from a variety of alcohols in contact

12   with bendamustine.

13              "Question:  Okay.  So if we could turn to

14   Exhibit 4.  This appears to be a cover e-mail attaching

15   the -- what is Exhibit 5; right?

16              "Answer:  So this is the attachment to that

17   e-mail.

18              "Question:  This being Exhibit 5; right?

19              "Answer:  Okay.

20              "Question:  Well, Doctor, I will represent that

21   the metadata we received indicates that -- this document,

22   Exhibit 5, is the attachment to Exhibit 4, and you can see

23   that the Bates numbers are sequential, so it goes from Bates

24   ending 190 to 191.

25              "Do you see that?

Buxton - deposition designations

1           "Answer:  Yes.

2           "Question:  Okay.  Very good.  If we look at

3    Exhibit 5, this is a -- the title is Treanda (bendamustine

4    hydrochloride for injection) reconstitution stability

5    studies; right?

6           "Answer:  That is correct.

7           "Question:  Do you know why this study was

8    conducted?

9           "Answer:  No.

10          "Question:  You would have -- but if we turn

11   back to Exhibit 4, your -- you are listed as a recipient of

12   this document, right?

13          "Answer:  That is correct.

14          "Question:  And so you would have received this

15   document as part of the ordinary course of your work at --

16   excuse me, your work with SciDose, right?

17          "Answer:  Yes, if this was an attachment to that

18   e-mail and my name is on the e-mail, I would have received

19   it, I guess.

20          "Question:  Two additional exhibits.  Exhibit

21   Buxton six is a document bearing Bates numbers.

22   EGL_BENDEKA_00191231.

23          (Exhibit 6 marked for identification.)

24          "Question:  Exhibit Buxton 7 is a document

25   bearing Bates numbers EGL-Bendeka 00191232 through 237.

1              "(Exhibit 7 marked for identification.)

2              "Question:  Okay.  Thank you, Doctor.

3              "So Exhibit No. 6, or excuse me, Exhibit Buxton

4     6, that is an e-mail from you to Dr. Palepu and is it Dr.

5     Witchey dated on March 18th, 2012; right?

6              "Answer:  That is correct.

7              "Question:  And you are attaching to that an

8     edited version of a report which is Exhibit 7?  Right?

9              "Answer:  So let me get this straight.  This is

10    my edit of -- that I referred to in the e-mail, is that

11    correct?

12             "Question:  I believe so, Doctor, and the reason

13    I'm actually asking you --

14             "Answer:  Or is it the final document?

15             "Question:  -- well, let us clarify that,

16    Doctor.  But I -- my understanding is that Exhibit 7 is the

17    version -- is the version edited by you have a report that

18    was provided by Dr. Palepu, so it is your edits to that

19    document?

20             "Answer:  Okay.  The only reason I ask is that

21    there is a phrase, sentence here:  Leonore can be the

22    wordsmith.  She often used to turn it into Americana before

23    it was disseminated for -- sometimes my English is a bit

24    esoteric.

25             "Question:  All right.  I have another document

1     for you.   This was previously marked as exhibit Palepu 31.

2               "(Exhibit Palepu 31 previously marked.)

3               "Question:   Do you recognize the document that

4     has been previously marked as exhibit Palepu 31?

5               "Answer:   Yes.   It is the notes from the -- the

6     slides from the meeting in Hiberabad in 2012.

7               "Question:   And what was the summit Hiberebad

8     2012?

9               "Answer:   Just one of these periodic meetings

10    that SciDose used to organize to update on various

11    projects.

12              "Question:   Okay.   If you turn to the next

13    page ending 759, I actually would like to direct your

14    attention to the bullet point number four which says:

15    'The low pH of various PEG batches is characteristic of a

16    poor oxidative state which is the cause of the inferior

17    stability.'

18              "Do you see that?

19              "Answer:   Yes.

20              "Question:   What was meant by that?

21              "Answer:   It is generally true, or it is true,

22    that when PEG oxidizes on storage, it does give rise to

23    acids which cause it to have a lower pH.   So if you have a

24    batch of PEG which displays a low pH, then you can assume it

25    has been oxidized in some form.

1          "Question:  So the low pH -- is it fair to say

2     that the low pH is an effect of the poor oxidative state and

3     not the direct cause of the -- of poor oxidative state?

4          "Answer:  When PEG degrades, it forms a series

5     of acids, mainly formic acid, and it is that presence of

6     formic acid which gives rise to the low pH.

7          "Question:  If you could turn back to what has

8     been marked as exhibit Palepu 16.

9          "(Exhibit 16 previously marked.)

10         "Question:  And if you look at the page with

11    Bates ending 345, from 346, there is a description there

12    of -- with a heading degradation mechanism.

13         "Answer:  That is correct.

14         "Question:  All right.  Did you prepare those

15    degradation mechanism schemes?

16         "Answer:  Yes, I supplied the formula -- the

17    formulae that are drawn on here.

18         "Question:  How did you do that?

19         "Answer:  You are asking me for the -- the

20    package I am using --

21         "Question:  Let me clarify the question.  Let me

22    make it a little clearer.

23         "Was this -- the mechanism itself, was this

24    something that you wrote out based on your own knowledge

25    of the -- of the basic chemical principles, or is it

Buxton - deposition designations

1    something that you found in the literature, or was it

2    something else?

3              "Answer:  This was the prevailing knowledge that

4    TherDose had at the time.  I believe this was obtained from

5    the API suppliers's documentation.

6              "Question:  Doctor, I have two more documents

7    that were previously marked at Dr. Palepu's deposition.  It

8    will be 33 through 36.  That is 33.

9              "(Palepu Exhibit 33 previously marked.)

10             "Question:  Doctor, are you ready?

11             "All right, sir.  Have you seen these documents

12   before?

13             "Answer:  Yes, I have seen the e-mails -- these

14   e-mails.

15             "Question:  And these are -- if we start

16   with Exhibit 33, these are -- so 33 through 35, these are

17   e-mails that are either to or from you around March 4, 2012;

18   right?

19             "Answer:  Correct.

20             "Question:  Doctor, the next exhibit was

21   previously marked as exhibit Palepu 37.

22             "(Exhibit Palepu 37 previously marked.)

23             "Question:  All right.  So, generally speaking,

24   what were the -- what was the purpose of these e-mails?

25             "Answer:  I am not sure it had a specific

1    purpose.   The e-mails describe the situation between Eagle

2    and SciDose at the time of the observation of this problem,

3    or observation of this effect that had the variability of

4    the PEGs was giving.

5              "Question:  Okay.  Good.  Thank you.  You can

6    put that aside, Doctor.

7              "So the next exhibit is -- was previously marked

8    as Exhibit Palepu 42.

9              "(Exhibit Palepu 42 previously marked.)

10             "Question:  Are you ready, Doctor?

11             "Answer:  Yes.

12             "Question:  Thank you.

13             So do you recognize this as a series of e-mails

14   involving you from about March of 2012?

15             "Answer:  That is partly true.  There is one

16   e-mail between Leonore Witchey and Dr. Palepu.

17             "Question:  Okay.  But you were --

18             "Answer:  I was copied in it, yes.  There was

19   not -- principally to me.

20             "Question:  -- so if we can start at the -- or

21   the -- it is the beginning of the e-mail chain, but the last

22   page of the document, so Bates ending 246, so what prompted

23   this e-mail from Leonore Witchey?

24             "Answer:  I am looking at the e-mail.  It would

25   appear that Leonore is reporting Eagle's views, presumably

1   following a meeting she had with Eagle representatives, Sri

2   Sundaram I would think.

3           "Question:  Right.  If you can turn back to

4   question -- sorry.  It bridges from Bates ending 245 to 246,

5   which was Dr. Palepu's e-mail to Leonore Witchey, and in

6   the -- it is going to be the sentence bridging the first

7   line second line at the top there.

8           "It says:  All I can say is that what I have

9   told the Eagle nincompoops, 'You cannot project stability at

10  5C based on 40 and 25 (degrees) C.'

11          "Do you see that?

12          "Answer:  Yes.

13          "Question:  What was your understanding of what

14  Dr. Palepu was saying at that point?

15          "Answer:  My assumption was this had come out of

16  discussions between him and Sri Sundaram.  I was not party

17  to those particular discussions except that it is clear that

18  Eagle thought they could do accelerated testing at 40 and 25

19  for a short period of time and come up with a conclusion

20  about whether things were satisfactory or not in the long

21  term.

22          "Now, we knew that was not a reliable way to

23  look at the formulations.

24          "Question:  The next document I would like to

25  look at has already been entered, so it should be in your

1    stack as Palepu Exhibit 17.  Let me know when you have that

2    in front of you.

3               "MS. JI:  The Bates number is Eagle-

4    Bendeka_00192627 through 00192638, and it is the e-mail

5    containing the Olthoff reference.

6               "Answer:  Okay.

7               "Question:  This is an e-mail that you sent;

8    correct?

9               "Answer:  That is correct.

10              "Question:  And when did you send this e-mail?

11              "Answer:  I sent it on August the 9th, it says

12   here, so I presume that is exactly when it went.

13              "Question:  And what was the purpose of this

14   e-mail?

15              "Answer:  Well, I was obviously responding to

16   some data sent by Aranu Seshu and making suggestions of what

17   we could do beyond this.

18              "Question:  Was your suggestion at the time of

19   this e-mail to look at the PEG 400 as a solvent for liquid

20   bendamustine formulation?

21              "Answer:  I was asking her to check the

22   solubility of bendamustine in PEG 400.

23              "Question:  Why?

24              "Answer:  PEG 400 was a solvent that TherDose

25   had in the laboratory and was a possible candidate for this

1   formulation.

2                "MS. JI:  I am going to direct you to the third

3   to last sentence of the e-mail.

4                "The next sentence you write states:

5   Alternatively, we can probably use anything over ten mg per

6   mL.

7                "Do you see that?

8                "Answer:  Yes, that is correct.  Yes.

9                "Question:  What do you mean by:  'We can

10  probably use anything over ten mg per mL'?

11               "Answer:  Well, ultimately, we would be looking

12  to test it.  It would be great if we could test it at 50

13  mg's per mL, but if that is not possible and it was

14  solubility at ten mg's per mL, we could also check the

15  stability in that.

16               "Question:  Let us take a look at the last

17  sentence of the e-mail:  'It may also be the case that the

18  ester formation is not so significant at the lower

19  temperatures, which is why I suggest completing the existing

20  experiments.'

21               "What was the basis of your BELIEF that it may

22  be the case that the ester formation is not so significant

23  at the lower temperatures?

24               "Answer:  That belief is based on the simple

25  observation that chemical reactions proceed slower at lower

1    temperatures.

2             "Question:  So you would generally expect less

3    ester formation at lower temperatures?

4             Answer:  All chemical transformations tend to

5    proceed at lower rates, at lower temperatures.

6             "MS. JI:  Welcome back, Dr. Buxton.  I would

7    like for you to look at a document that has already been

8    entered as Buxton Exhibit 2.

9             "(Exhibit 2 previously marked.)

10            "Question:  Bearing Bates numbers

11   EGL_Bendeka_00192415.

12            "I want to start with Dr. Palepu's e-mail at the

13   bottom of the page referring to alcohols.

14            "By alcohol, do you understand Dr. Palepu to be

15   referring to a molecule that is likely to donate protons?

16            "Answer:  I take it you are referring to Dr.

17   Palepu's mention of PEG as alcohols?  Is that what you are

18   driving at?

19            "Question:  Yes, that is right.

20            "Answer:  Okay.  We are describing PEG as

21   alcohols merely because it has alcoholic groups on either

22   end of the chain.

23            "Question:  Why is it important that PEG has

24   alcohol groups the purpose of developing a formulation of

25   bendamustine?

Buxton - deposition designations

1          "Answer:  Well, it is not important really

2    because PEG 400 is being used as a solvent.  It just happens

3    to have hydroxy groups on the end of the chain.  If it did

4    not have hydroxy groups on the end of a chain and PEG 400

5    was still soluble, that would be fine.

6          "Question:  Is it -- all right.  Now, I want to

7    take a look at your e-mail at the top of the page, and I am

8    particularly looking at the first sentence.

9          "Is it a benefit that the molecular weight of

10   PEG 400 is much higher than the other species in total of --

11         "MS. JI:  Sorry.  I am just going to finish.

12         "Question:  -- is it a benefit that the

13   molecular weight of PEG 400 is much higher than the other

14   species, the total number of OH groups associated is

15   relatively small on a weight-per-weight basis?

16         "Answer:  Well, my perception was it was a

17   benefit, because the number of hydroxy groups per unit

18   weight would be less in a high molecular weight material

19   like PEG 400 compared with the lower molecular weight

20   alcohols we had already looked at.

21         "Question:  Why would you consider a benefit in

22   this situation to have a lower number of OH groups?

23         "Answer:  Because we were seeing ester formation

24   for degradation products.  Ester formation requires two

25   components.  One is the bendamustine itself, and the other

1    is the alcohol.  If there are fewer alcohols around, then

2    you would expect to get less esterification.

3            "Question:  Let us take a look at the third

4    sentence in that paragraph.  Can you -- starting with

5    additionally, can you read that sentence to me?

6            "Answer:  Additionally, the OH groups in PEG 400

7    are probably less mobile, more protected sterically and

8    hence less reactive.

9            Is that what you mean?

10           "Question:  Yes.

11           "Answer:  Okay.  Yes.  Why -- what is the basis

12   of your statement that the OH groups in PEG 400 are probably

13   less mobile?

14           "Answer:  That is a -- that is an observation

15   based on the fact that polymer materials do not exist as a

16   linear chain of atoms.  They tent to adopt confirmations

17   which can be quite complex.  PEG 400 would be no different

18   to any other polymer in that respect.

19           "Question:  Were you aware of this observation

20   before you began work on the liquid bendamustine product?

21           "Answer:  That was not an observation.  That

22   was a hypothesis as to why PEG 400 might be worth looking

23   at.

24           "Question:  Is it a benefit that the OH groups

25   in PEG 400 are probably less mobile?

Buxton - deposition designations

1          "Answer:  I do not know whether they are less

2     mobile, but if they were, that would be an advantage.

3          "Question:  Why would that be an advantage?

4          "Answer:  The chemical reactions involve the

5     mobility of ions or molecules, and if the molecules are

6     moving slower, the chemical reactions tend to be slower.

7          "Question:  What is the basis of your

8     statement that the OH groups in PEG 400 are more protected

9     sterically?

10          "Answer:  I did not say they were more protected

11     sterically.  Specifically, they were probably less mobile

12     and more protected sterically and hence less reactive.  That

13     is merely a recognition that polymers, as I said before, do

14     not exist as linear molecules.  The chains are complex.

15     They wind around themselves.  They form all sorts of shapes.

16     And some of the OH groups may well be embedded within the

17     mass of the molecule structure.

18          "Question:  Was it your understanding at the

19     time of this e-mail that the OH groups in PEG 400 were

20     probably less reactive due to the fact that they were

21     probably less mobile and more protected sterically?

22          "Answer:  Yes, it was not an observation, it was

23     just a potential explanation.

24          "Question:  All right.  We can set Buxton

25     Exhibit 2 aside.

1          "I will ask the court reporter to hand you what

2     has been marked as Buxton Exhibit 10.

3          And most of this document is redacted, so I

4     would like to focus on the one e-mail on the first page, but

5     you are welcome to look through the rest of the document, of

6     course.

7          Is Buxton Exhibit 10 an e-mail that you wrote?

8          "Answer:  Yes.  Clearly, I have written this to

9     Teja.

10          "Question:  Welcome back, Dr. Buxton.  This is

11     going to be the last document for me, but I would like for

12     you to put Palepu Exhibit 37 in front of you.  It is an

13     e-mail chain starting with Bates number

14     EGL-Bendeka_00191695.  Let me know when you have it.

15          And this e-mail addresses the variability and

16     its effect on stability of the bendamustine formulation; is

17     that right?

18          "Answer:  Yes, this is the e-mail we saw before

19     which refers to the differences in opinion as to the problem

20     with the polyethylene glycols.

21          "Question:  Did you apply your chemical

22     knowledge with respect to determining other possible

23     degradation mechanisms during your work of the bendamustine

24     project?

25          "Answer:  As the data came in, specifically the

1    LCMS data, yes, I was providing a chemical insight, if you

2    like, as to what the structures might be.

3              "Question:  In this report, if you flip through,

4    and this report is dated October 2009; is that right?

5              "Answer:  That is correct.

6              "Question:  And I take it then that it reflects

7    research that had been conducted in or before October 2009?

8              "Answer:  Yes, that is right.

9              "Question:  And by this point, and you can

10   answer this, I think, by flipping through the document, had

11   SciDose tested PEG as a solvent for a formulation of

12   bendamustine hydrochloride?

13             "Answer:  If they had, it would be mentioned

14   here.

15             "Question:  And if you look to page 17, for

16   example, in the interests of time, had -- up to 2009, when

17   this report was authored, had SciDose tested PEG as a

18   solvent for bendamustine hydrochloride?

19             "Answer:  Yes.  BDM 047, the reaction -- a

20   formulation they had examined in which PEG had been used.

21             "Question:  And had the stability been tested?

22             "Answer:  Yes.  This is -- this table is a

23   description of the stability data obtained.

24             "Question:  And this table is a table on Bates

25   ending 466 in exhibit Palepu 19; is that right?

1          "Answer:  That is correct, 190466.

2          "Question:  Okay.  Now, I would like to move to

3     another document that was marked as Buxton Exhibit 2.  What

4     is the date of this e-mail at the top that you sent in

5     Buxton 2?

6          "Answer:  March 19th, 2010.

7          "Question:  So just for clarity, is that before

8     or after SciDose had tested PEG as a solvent in bendamustine

9     hydrochloride formulations?

10         "Answer:  Well, it is clearly after we first

11    tested it.

12         "Question:  And you remember you were asked

13    various questions about some of the statements that you made

14    in the e-mail of March 19th, 2010, a few minutes ago.

15         "Do you recall that?

16         "Answer:  Yes.

17         "Question:  To be -- and one of the things you

18    talk about here is the total number of hydroxyl groups on a

19    weight per weight basis.

20         Do you see that?

21         "Answer:  Yes.

22         "Question:  Just to be clear, did that analysis,

23    or any of the analysis that is reflected in this e-mail,

24    play any role in SciDose's decision to try PEG 400 as a

25    solvent for bendamustine hydrochloride formulations?

Buxton - deposition designations

1              "Answer:  No.

2              "Question:  And was the analysis of the number

3    of hydroxyl groups or any of the other analysis included in

4    this e-mail considered before PEG was tried in 2009, or only

5    after?

6              "Answer:  No, it was -- no, it was considered

7    afterwards as an explanation as to why PEG 400 might be

8    better than some of the other alcohols.

9              "Question:  Why were you considering this as an

10   explanation after you had the data?  What is the purpose of

11   that?

12             "Answer:  Because we were surprised there was

13   such poor stability at 40 degrees, and yet at the lower

14   temperatures, it was improving considerably.

15             "Question:  The explanation that is provided

16   here, including the discussion of the total number of OH

17   groups that are associated on a weight per weight basis, did

18   that explanation, made after you obtained data, explain all

19   of the data that had been generated by SciDose with respect

20   to the stability of bendamustine formulations?

21             "Answer:  Again, it was an explanation of the

22   results that had been obtained with polyethylene glycol.  We

23   had other data, of course, with other batches.  It clearly

24   was not the complete answer.

25             "Question:  Was that explanation even consistent

1    with all of the data obtained by SciDose?

2              "Answer:  No.  There were some cases where there

3    clearly was a difference.  There was some cases where you

4    thought it might actually be better than PEG, but it turned

5    out not to be.

6              "Question:  What is it?

7              "Answer:  Well, it turned out that the -- that a

8    formulation which you might have expected to be better than

9    PEG was not.

10             "Question:  And when you say might have

11   expected --

12             "Answer:  From this analysis that we are talking

13   about here.  From the number of hydroxy groups.

14             I mean, I can point you to glycofurol, because

15   it is close to PEG in structure.  It only has one hydroxy

16   group.  And from memory, the stability was actually quite

17   poor.

18             "Question:  And when you say would have been

19   expected, are you speaking about the expectation before you

20   received data or the analysis post factum?

21             "Answer:  The analysis afterwards.

22             "Question:  In providing those summaries, did

23   you intend to provide a description of every experiment that

24   SciDose conducted, or every solution that you had and Dr.

25   Palepu considered?

1           "Answer:  No, I would not do that because I

2    was not aware of all the tests that had been done at

3    TherDose.

4           I think as I have said before, that Dr. Palepu

5    controlled the way the research went, and he did, on a

6    number of occasions, instruct that certain research be

7    carried out without my knowledge or input.

8           "Question:  And with respect to that part of the

9    project on which you were involved in answering

10   Mr. Gregory's questions, were you intending to provide every

11   thought and every test that was conducted in that part of

12   the project?

13          "Answer:  No."

14          (End of videotaped deposition.)

15          MR. PALAIYANUR:  Shyam Palaiyanur on behalf of

16   Mylan Laboratories, Limited.

17          Defendants move to admit DTX-283 into evidence.

18   DTX-284, DTX-579, DTX-280, DTX-277, DTX-285, DTX-278,

19   DTX-279, DTX-1123, DTX-1087, DTX-1113, DTX-48, DTX-49,

20   DTX-1121, DTX-1118, DTX-1112, and DTX-1120.

21          MS. BAUMGARTEN:  No objection, Your Honor.

22          THE COURT:  All right.  They're admitted.

23          (DTX-283 into evidence.  DTX-284, DTX-579,

24   DTX-280, DTX-277, DTX-285, DTX-278, DTX-279, DTX-1123,

25   DTX-00087, DTX-1113, DTX-48, DTX-49, DTX-1121, DTX-1118,

1   DTX-1112 and DTX-1120 were admitted into evidence.)

2              THE COURT:  So what I'd like to do, I won't

3   charge you time for this.  Two minutes for the defense.

4              What should I take away from that deposition?

5   And then I'm going to give two minutes to the plaintiff.

6              MR. FELDMAN:  Good afternoon, Your Honor.

7   Steven Feldon on behalf of Apotex and the defendants.

8              In our view, the takeaway there is that Dr.

9   Buxton's testimony is highly corroborative of what Dr.

10  Pinal was saying his testimony about the obviousness, an

11  impact of using polyols in connection with bendamustine

12  molecule.

13             As you heard Dr. Buxton say, he was aware of,

14  you know, the structures and the relative structures of PEG

15  and PG and the relative effects that those two could have in

16  relation to a bendamustine solvent system.  And his

17  expectations I think are reflected there.  He was using

18  just, you know, logic and it wasn't highly complicated

19  chemical analyses.  When he talked, for example, about

20  antioxidants, you know, he's choosing a particular

21  antioxidant.  Why?  Because it's FDA approved.

22             So initially, they started with lipoic acid.

23  Then they switched to monothioglycerol, and the suggestion

24  for that came from Eagle.  And the reason they did that was

25  simply because it was an FDA approved solvent and it just

1    worked.

2              And the same thing when they're talking about

3    propylene glycol and polyethylene glycol.  Again, we are not

4    talking about exotic solvent systems.  These are common

5    things.  As we heard earlier about Olthoff, those were

6    exactly what got suggested.  Olthoff said polyols, Eagle

7    used polyols.  I think the timeline is important as well.

8              As we talked yesterday with Dr. Palepu, they saw

9    Olthoff in July.  By October, they had their system.  And so

10   I think that's the main takeaway, Your Honor.

11             THE COURT:  All right.

12             MR. FELDMAN:  Thank you.

13             THE COURT:  Thanks.  Plaintiff?

14             MR. BERL:  There was a lot there, but I will go

15   through all of it.

16             He said Dr. Buxton was corroborative of their

17   theory that fewer hydroxyl groups would be a reason to.

18   What Dr. Buxton said and Dr. Palepu said the same thing.

19   This is a post factum explanation for data they already had.

20   This is not a reason that they tried PEG.  So it's one thing

21   to explain data already, after you already have it.  That's

22   easy.  It's not a prediction.

23             The POSA, of course, did not have their data.

24   They didn't have their data, so there's no evidence anywhere

25   in this record that they tried any solvent system or did any

1    experiment on the basis of this hydroxyl group theory.

2              And to be honest, even if they had, all it would

3    show is the reason the inventor did something.  Of course,

4    not the reason the POSA would have done something on the

5    basis of the prior art.

6              Now, what he said about this not being a highly

7    complicated chemical analysis, I think this actually proves

8    the opposite.  These documents show, for example, that Dr.

9    Buxton saw this deschlorethyl degradant, DCE, and that's

10   something that was in the prior art.  Other people like

11   Drager had seen it.  No one else said, you know what?  That

12   I think is an oxidation reaction and so I may want to try an

13   antioxidant.  He used his four decades of experience as an

14   organic chemist to try to figure out that reaction that no

15   one else had figured out that that might be oxidation.

16   Nowhere in the prior art.  Dr. Pinal, no one else said that

17   that would have been thought to be oxidation.

18             So the notion that, oh, this is all real easy

19   and no chemical analysis is going on is completely disproven

20   by this document and the testimony.

21             As to, oh, there are only a few things to use

22   and they got Olthoff and then they tried PEG.  The testimony

23   was from Dr. Palepu, and Dr. Buxton doesn't say anything

24   different, that they got Olthoff and they couldn't read

25   Olthoff.  It was in German.  They didn't have a translation.

1              There is no evidence that they took polyols from

2       Olthoff.   There's no evidence that they said anything about

3       PEG based on Olthoff.   Olthoff doesn't even say PEG.   I

4       mean, even if they could read it, they couldn't have drawn

5       that conclusion, and it's just not true.

6              They explained why they used PEG.   They had it

7       around.   Nothing else was working, so they said, this is all

8       sort of going unpredictably and not very well.   Let's try

9       this, too.

10             The idea that this was because Olthoff is

11      completely from the imagination of the defendant and not

12      based on the record.

13             Finally, as to monothioglycerol, the testimony

14      was that Eagle asked them to use it rather than alpha lipoic

15      acid because it had been FDA approved, but not that Eagle

16      told them to use and try monothioglycerol.   So they tried

17      monothioglycerol and Alpo sick acid.   Both worked and Eagle

18      said, You know what, since both worked, use

19      monothioglycerol.   That was an apple to poke at.   But that's

20      not Eagle telling them which antioxidants would be suitable.

21      So they're misinterpreting the testimony.

22             THE COURT:   At any point am I going to hear how

23      much Buxton or --

24             MR. BERL:   Palepu?

25             THE COURT:   Dr. Palepu got paid?

1                  MR. BERL:  I don't think you're going to hear

2       that.  I think it was in their deposition, in this

3       deposition I believe, and I don't think either side

4       designated that testimony.  I suppose we could give you that

5       information.

6                  If you're asking me, I don't recall.  I think

7       Dr. Buxton said he got some sum of money.  I don't remember

8       exactly what it was.  I think it was in pounds.  Do you want

9       me to tell you my best recollection?  I think it was about a

10      million pounds he got.  I might be wrong on that.  That's my

11      best recollection.  And he was sort of a consultant for

12      SciDose.

13                 Dr. Palepu, of course, was a co-owner of SciDose

14      and a founder of the company, so I think he got paid

15      differently based on a percentage of scales.  My

16      understanding is he made an arrangement with someone who

17      sort of bought his future royalty stream, so he got some

18      lump sum of money and he's not being paid any more.

19      Neither of them are being paid on the basis of Bendeka

20      sales.

21                 THE COURT:  All right.  Anything from the

22      defense?

23                 MR. FELDMAN:  I believe that Dr. Palepu got paid

24      around $15 million.

25                 THE COURT:  15 million?

1           MR. FELDMAN:  Yes.  We can verify that.

2           THE COURT:  How about in terms of when he was

3    engaged?  In other words, how were these folks retained at

4    the outset?  And the reason why I'm asking is, I think for

5    me, it would be a little bit probative of perhaps, I won't

6    say inventive, but what kind of minds are being brought to

7    bear on this problem that Eagle encountered.

8           MR. BERL:  Like what was the arrangement in

9    terms of how the money would flow between Eagle and SciDose?

10   Is that what you are asking about or why --

11          THE COURT:  Well, for instance, there are

12   e-mails from Dr. Palepu, who was a professor at Iowa.

13          MR. BERL:  With a his professor at Iowa.

14          THE COURT:  Running ideas by him.  And then

15   those e-mail chains?  Is that guy compensated, he said.  I

16   didn't think he necessarily was.

17          And then he got e-mails ruminating about various

18   concepts with Buxton, and I'm just -- to a certain extent,

19   that might tell me something then.  Their compensation and

20   the terms of their original engagement of how challenging

21   the problem is as opposed, you know.

22          MR. BERL:  I don't remember the exact terms

23   of the compensation, but my best understanding was that

24   there was an arrangement between Eagle and SciDose rather

25   than an arrangement in particular with Dr. Palepu or Dr.

1    Buxton.  SciDose was the company that Dr. Palepu founded, he

2    said.

3              And I think the arrangement was that SciDose

4    would get some royalty, some percentage of sales if the

5    project succeeded and a product ultimately was sold.  So

6    obviously Dr. Palepu benefited from that as a founder.

7              Dr. Buxton I think had a separate arrangement.

8    He was a consultant with SciDose.  I don't remember the

9    exact arrangement between SciDose and Dr. Buxton, but I do

10   know that I think both of them sort of got paid for their

11   future royalty stream by some other company that said, we'll

12   give you a lump sum when you win the lottery or something.

13             THE COURT:  Okay.  All right.  Next?

14             So whenever we started at 2:45, that seven

15   minutes won't be attributed.

16             MS. ROLLO:  Good afternoon, Your Honor.  Sherry

17   Rollo on behalf of Apotex.

18             Our next witness will be on behalf of Apotex and

19   Slayback.  We discussed with opposing counsel and they've

20   agreed, if it's okay with the Court, Mr. Berl obviously

21   would like to ask a couple of questions about the claim

22   that is asserted against Slayback at the end of the

23   examination.

24             THE COURT:  Sure.

25             MS. ROLLO:  Then the defendants Apotex and

1    Slayback call Dr. John Yates to the stand.

2                  ... DR. JOHN YATES, having been duly

3              sworn as a witness, was examined and testified

4              as follows...

5              MS. ROLLO:  Permission to approach with binders?

6              THE COURT:  Please.

7              (Ms. Rollo handed binders to the Court.)

8              MS. ROLLO:  I have one for the witness as well.

9              THE COURT:  All right.

10             (Ms. Rollo handed a binder to the witness.)

11             THE WITNESS:  Thank you.

12             MS. ROLLO:  May I proceed?

13             THE COURT:  Please.

14                         DIRECT EXAMINATION

15   BY MS. ROLLO:

16   Q.    Dr. Yates, please state your name for the record.

17   A.    John Yates.

18   Q.    And have you been retained as an expert in this case?

19   A.    Yes.  I've been retained on behalf of Apotex and

20   Slayback.

21   Q.    Have you prepared slides to assist the Court in your

22   testimony today?

23   A.    Yes.

24   Q.    And is this the slide deck you prepared?

25   A.    It is.

Yates - direct

1    Q.     Dr. Yates, did you prepare a slide that represents

2    your education and professional experience?

3    A.     Yes.

4    Q.     Dr. Yates, can you please briefly explain your

5    educational background?

6    A.     Sure.  I obtained a bachelor's degree in clinical

7    physiology and pharmacology, and -- at chef field university

8    medical school.  I then went on to get my medical degree,

9    which confusingly in the U.K. is called an MB ChB.  That's

10   the degree that allows you to see patients and get called

11   doctor.

12             And then I obtained an M.D. degree, which is

13   something that i s more akin to a Ph.D. and is obtained

14   after at least three years of independent research.

15   Q.     And, Dr. Yates, you said you hold a degree in

16   pharmacology and physiology.

17             Can you please explain the course work that is

18   involved in the pharmacology component?

19   A.     Sure.  So I studied the handling of drugs and the

20   absorption, distribution, metabolism and elimination of

21   drugs, and that is an area of pharmacology called

22   pharmacokinetics.

23   Q.     You stated that you have a medical degree.  Have you

24   practiced medicine?

25   A.     Yes.  I practiced medicine for ten years from the

1    time I graduated to the time I joined industry as a

2    physician.

3    Q.    And as a practicing physician, did you administer

4    infusions?

5    A.    Yes.  Many of them.  A lot of drugs that I

6    administered were IV drugs.

7    Q.    Did you ever experience complications in administering

8    infusions?

9    A.    Yes.  Many of the patients I was dealing with during

10   that time were elderly and many elderly patients have rather

11   fragile veins, so one of the problems I had was in some

12   patients, the tip of the catheter would actually go through

13   the veins and as we've discussed, you can get extravasation,

14   meaning the fluid that you are infusing goes in the tissues

15   around the vein rather than into the circulation.

16   Q.    Any other types of complications?

17   A.    Yes.  In addition, occasionally, I would see

18   phlebitis, which is inflammation of one of the superficial

19   veins in the arm and you would get some -- in both cases you

20   could get some redness and sometimes pain at the site of the

21   infusion.

22   Q.    You mentioned you work in the pharmaceutical industry.

23            How long did you work in the pharmaceutical

24   industry?

25   A.    Altogether, about 20 years.

1    Q.    And what pharmaceutical companies did you work for?

2    A.    So as on the slide there, I worked at Merck and

3    company for about 13 years, and then went on to be president

4    of global research and development at Takeda, a Japanese

5    company.  Since then I've been chief medical officer at two

6    companies.  One was Array BioPharma and the other was Radius

7    Health.

8    Q.    And what titles did you hold over your career in the

9    pharmaceutical industry?

10   A.    The titles are there.  President of global R&D and

11   chief medical officer are my most recent titles

12   Q.    And what was your role during your career in the

13   pharmaceutical industry?

14   A.    So I was a clinical development scientist.

15   Q.    And what does a clinical development scientist do?

16   A.    So I was responsible in that role for taking drugs

17   even before they got first into human studies, and

18   understand those and then move them through the clinic in

19   the different phases of research, Phase 1, 2, and 3.  Worked

20   to get them approved by the FDA and then continue to learn

21   about those drugs even after they get approved.

22   Q.    So what type of role would you have prior to the drugs

23   being used in man?

24   A.    So I think there are three aspects even before a drug

25   goes into humans.  One is to understand the drug, what its

1    potential benefits are, the disease that you are going to

2    treat, and, you know, work on the science of the drug.

3              The second is to understand the safety risks,

4    the toxicology and working with toxicologists on

5    understanding what the risks are and how to mitigate those

6    risks.

7              And then the third area is working with

8    formulators to decide on what is the best kind of

9    formulation for a new drug.  In this case, we're talking

10   about an already existing chemical entity, but a new form of

11   a chemical entity.

12   Q.    And did you do any work with respect to dosing

13   regimens?

14   A.    Yes.  I've done much work on dosing regimens in my

15   time.

16   Q.    And what is a dosing regimen?

17   A.    So it's how a drug is given.  So bendamustine is a

18   good example.  It's given intravenously, so that's a route

19   of administration.  It's given in certain volume of fluid.

20   And it's given at a certain dose, a hundred or

21   120 milligrams per meter squared over days 1 and 2 of the

22   cycle, which can be 21 days, or 28 days.  So that would be a

23   regimen.  It would be a description of all of the aspects of

24   how a drug is given.

25   Q.    In your experience, once a dosing regimen is decided

Yates - direct

1   on, what would typically happen next in the drug industry?

2   A.   So as a clinical research scientist, I would design

3   the clinical program, Phase 1, Phase 2, Phase 3, so the

4   studies would get progressively larger.

5           As we learned more about the drug, we would

6   tailor the next studies based on what we knew from the

7   previous studies, and work with the regulators, and

8   obviously, we would work with outside experts as well.

9           In the case of an oncology drug, we'd work with

10  an oncologist like Dr. Thirman to be able to understand the

11  drug and also work with him to be able to help us design the

12  clinical trials and to work with his colleagues who actually

13  performed the studies.

14  Q.   And have you personally designed any clinical trials?

15  A.   Yes.   In my career I've designed well over a hundred

16  clinical trials.

17  Q.   And as your -- in your role as a clinical research

18  scientist, what interactions have you had with the

19  formulator throughout your career?

20  A.   So over at least half of my career in drug

21  development, I have worked very closely with formulators and

22  led teams that have included formulators in considering new

23  formulations of drugs, ways to improve on existing drugs.

24  So many, many times, I've actually worked and I've even had

25  two patents on formulations of combination drugs and I've

```
 1   also originated new treatment regimens, particularly a

 2   process, that involves once weekly treatment.

 3   Q.    And how many U.S. patents are you the inventor on?

 4   A.    A total of ten.

 5   Q.    During your career, have you been responsible for

 6   developing any oncology drugs?

 7   A.    Yes.  During my time at Array, I worked on several

 8   oncology drugs.

 9   Q.    Were any of those oncology drugs infusion drugs?

10   A.    Yes.

11   Q.    While working on oncology drugs at Array, did you have

12   a reason to interact with an oncologist?

13   A.    Yes.  We would have panels of oncologists who were on

14   our research council and also I would go and visit

15   oncologists in different institutions to basically review

16   our proposals, get them involved as investigators, as lead

17   authors.  So many times I would work with oncologists.

18   Q.    Were you -- were any of the cancer drugs you helped to

19   develop cytotoxic drugs?

20   A.    Yes.  The drugs that we're talking about by infusion,

21   it was Kinesia spindle protein inhibitor and that drug was

22   given by infusion and it was a cytotoxic drug.  Of course,

23   the same kind of suppression of bone marrow that we see with

24   bendamustine.

25   Q.    Did you -- did any of the infusion drugs you worked on
```

 1    have solubility issues?

 2    A.    Yes.   When I was at Takeda, we had a drug that was so

 3    insoluble in water, that it had to be given in a lipid

 4    emulsion, which was a very challenging formulation.

 5    Q.    During your time in the pharmaceutical industry, have

 6    you been responsible for determining the infusion time for

 7    intravenous drugs?

 8    A.    Yes.

 9    Q.    Have you been responsible for determining the volume

10    of diluents in intravenous drugs?

11    A.    Yes.

12    Q.    During your time in the pharmaceutical industry, were

13    you involved in interactions with FDA?

14    A.    Yes.   Many.

15    Q.    Can you please describe your interactions with FDA?

16    A.    Yes.   So my term at Merck, I attended every meeting

17    related to the osteoporosis drug I was developing.   I

18    developed many of the documents.

19          There were FDA advisory committee meetings that

20    I presented at and I led the team that developed the label

21    for that particular osteoporosis drug.   Then when I moved

22    to Takeda, the head of regulatory affairs reported directly

23    to me.   We were working on approximately 20 drugs at any

24    given time, so between us, we would develop the strategy for

25    drug development and working with the FDA on each of those

1    drugs.

2    Q.    You mentioned a responsibility for the label as one of

3    your roles.

4            Have you had responsibility for other regulatory

5    documents with respect to the pharmaceutical industry?

6    A.    Yes.    I mean, I've written many documents that are

7    regulatory documents, including integrated summaries of

8    safety and efficacy.   I've written documents such as

9    investigative brochures and many study reports.

10   Q.    And what is investigator's brochure?

11   A.    Before a drug is approved, when you have a drug label,

12   then you don't really have something that you can give to

13   the investigator to tell them about what the drug is and

14   what it does and what the safety risks are, so you develop

15   an investigator brochure as a substitute for that.

16           In that investigator brochure, you tell the

17   investigators everything you know about the safety and

18   efficacy of the drug, and if you find out any new

19   information that affects either one, either safety or if you

20   get a new study result or you see a new adverse experience,

21   then you put that into a new investigator brochure and get

22   that very quickly to the investigators so that they are

23   always updated on the most recent information about the

24   product.

25   Q.    Can I have you turn in your binder to DTX-1402.

Yates - direct

1   A.   Yes.

2   Q.   And what is DTX-1402?

3   A.   This is my curriculum vitae.

4   Q.   And does your curriculum vitae accurately represent

5   your professional and educational experience?

6   A.   It does.

7        MS. ROLLO:  Defendants Apotex and Slayback offer

8   Dr. Yates as an expert in drug development.

9        THE COURT:  All right.

10        MR. HARBER:  I'm not sure if this is the right

11   time to make whatever objections we have.  It obviously

12   depends on the opinion the doctor provides, so maybe it's

13   better for us to cross and then we can deal with our issues

14   later?

15        THE COURT:  Right.  So you'll need to make an

16   objection on any topic if and when it arises to make sure

17   that you preserve it if you want to take that objection to a

18   higher Court.

19        MR. HARBER:  Okay.  Thank you.

20   BY MS. ROLLO:

21   Q.   Dr. Yates, do you have a general understanding of

22   the legal framework for determining whether a patent is

23   obvious?

24   A.   Yes.

25   Q.   And what would that understanding be?

Yates - direct

1    A.    That a person of ordinary skill in the art working at

2    around the time of the invention would consider the

3    invention obvious in the light of the prior art.

4    Q.    Do you have a slide demonstrating your understanding

5    of what a person ever ordinary skill is with respect to the

6    asserted patents?

7    A.    I do.  So I'm not going to go through the full

8    definitions here.  There were exactly three definitions.

9    The one I will focus on is the middle one and essentially,

10   there's a formulator of drugs with an advanced degree and

11   appropriate experience in chemistry or related fields.

12            There's a clinical development scientist and

13   that's the sort of role I'm filling here in terms of my

14   expertise with a medical degree and many years experience in

15   developing drugs.

16            And then there's also a team that would include

17   oncologists, pharmacologists, toxicologists, and others that

18   would work together to decide on the appropriate development

19   of a drug and how to get it through the clinic and through

20   approval and onto the market.

21   Q.    Is this the definition that you applied in forming

22   your opinions?

23   A.    It is.

24   Q.    And are you aware that plaintiffs have proposed two

25   different definitions with respect to the patents in this

Yates - direct

1    case?

2    A.    Yes.

3    Q.    And have you considered those definitions in forming

4    your opinions?

5    A.    Yes.  I think actually, they're very similar to the

6    definitions that are up here on the slide.  So in

7    considering those definitions and these definitions, none of

8    them would change my opinions.

9    Q.    Dr. Yates, do you have a slide that shows how you

10   personally would fit into this POSA team that's in the

11   definition of a person of ordinary skill in the art?

12   A.    I do.

13   Q.    Please describe --

14   A.    Yes.  Sorry.  This is a very simple slide.  Clearly,

15   we talked about the formulator.  A clinical development

16   scientist usually is a person who works, interacts directly

17   with the formulator to discuss problem solve issues, decide

18   on what's necessary from a clinical point of view and then

19   the formulator develops a formulation which can be tested in

20   the clinic.  The clinical development scientist is also the

21   one that would work with people like Dr. Thirman,

22   oncologists in this case for developing an oncology drug.

23   So this would be the core of a team and clearly, these are

24   not the only individuals that would be involved.  I

25   mentioned people like a toxicologist and marketing experts

1    and so forth would be involved as well.  But this, as a POSA

2    team, I think would be, represent the most important

3    individual.

4    Q.    And do you have a slide that summarizes the opinions

5    that you're offering in this case?

6    A.    Yes, I do.

7    Q.    And what would be your opinions with respect to the

8    '568 patent?

9    A.    Right.  So I would say that each of the claims in the

10   '568 patents, and we'll see this with some other patents as

11   well, fall into two categories.

12        The first category is things that have already

13   been told, taught in the Treanda label, things like

14   indications, CLL, NHL are indications, and we know about

15   them because the Treanda label tells us.

16        And then there are things like the cycle.  Days

17   1 and 2 of a 28-day cycle or days 1 and 2 of a 21-day cycle.

18   Again, those are elements of the claims that are lifted

19   directly from the Treanda label.

20        The other category is things that are not in the

21   Treanda label, and that is a specific volume, in this case,

22   say 50 milliliters, or a specific duration of the infusion.

23   In this case, ten minutes.  And there's some variation.  You

24   see claim 22 has about a hundred milliliters or less,

25   50 milliliters.

1          But you'll see a theme as we go through these

2     patents, that they either basically are elements lifted from

3     the Treanda label or the other elements of the claim are

4     volume and duration of infusion that are different from the

5     Treanda label.

6     Q.    And just so the record is clear, Dr. Yates, the

7     asserted claims, do they also have formulation components to

8     them?

9     A.    Yes.  There is a formulation.  Basically, the Palepu

10    2011 formulation, and so for the most part, I'm talking

11    about patents in which Palepu 2011 is prior art.

12    Q.    And you are not personally providing any opinions with

13    respect to the formulation components?

14    A.    That's correct.

15    Q.    And can you please give us a summary of your opinions

16    with respect to the '399 patent?

17    A.    Yes.  So you'll get a theme here.  Cancer or malignant

18    disease is an indication.  Clearly, CHL and NHL fall into

19    that category.  The third bullet is intravenously

20    administered.  That comes directly from the Treanda label.

21    The other two claims in claim 13 of the '399 are volume

22    claim, 100 mL or less and a duration claim, about ten

23    minutes or less.

24          The same is true of claim 15.  Cancer or

25    malignant disease and intravenous administration.  But,

1      again, volume claim 50, the 65 milliliters and a duration

2      claim of infusion of ten minutes or less.

3      Q.     And can you please describe your opinions with respect

4      to the '797 patent?

5      A.     Right.  So the '797 patent is in the first family and

6      so it's different and, in fact, it teaches using, this is a

7      method of use claim, so using the formulation in leukemia

8      Hodgkin's disease, which actually is different than

9      non-Hodgkin's lymphoma, Your Honor.  And then multiple

10     myeloma, which is an indication in Europe for Bendeka and

11     it's in a mammal.  So it's a very different claim.

12     Q.     And can you describe your opinions that you will give

13     with respect to the '887 patent?

14     A.     Right.  This is again a claim that can largely be

15     lifted from the Treanda label.  It's treating CLL or NHL in

16     a human with a dose from about 25 milligrams per meter

17     squared to 120 milligrams per meter squared.  All of that

18     information is in the Treanda label.  The only two bullets

19     that are remaining are the duration, in this case, about

20     15 minutes for the infusion, and then the volume again about

21     50 milliliters.

22     Q.     And, Dr. Yates, you were in the courtroom yesterday

23     when Dr. Pinal testified?

24     A.     I was.

25     Q.     And you heard Dr. Pinal testify with respect to the

 1   obviousness of the formulations that are claimed in the

 2   patent?

 3   A.     I did.

 4   Q.     And with respect to the '568, '399 and '887 patents,

 5   is there prior art that's disclosed based on Dr. Pinal's

 6   testimony?  Is there prior art that discloses the

 7   formulation?

 8   A.     Yes.  Palepu 2011.

 9   Q.     And can we refer to those formulations in those three

10   patents as the Palepu 2011 formulations?

11   A.     Yes.

12   Q.     Now, Dr. Yates, based on your experience in the

13   pharmaceutical industry and as a physician, a clinical

14   development scientist and a leader of development team, if a

15   formulator were to come to you with the formulations from

16   Palepu 2011, what would you do next?

17   A.     Right.  This is a situation where the active chemical

18   ingredient, the chemical entity is already on the market and

19   at the time is, you know, as a lyophilized product Treanda.

20   So I would first look at the Treanda label.

21   Q.     Can I take you to exhibit DTX-1202.

22   A.     1202?  Yes.

23   Q.     And what is DTX-1202?

24   A.     This is the 2010 Treanda label.

25   Q.     And, Dr. Yates, you were in the courtroom when Dr.

1   Thirman testified earlier today?

2   A.   I was.

3   Q.   And did you hear his testimony with respected to the

4   2009 Treanda label?

5   A.   I did.

6   Q.   And is the 2009 Treanda label and the 2010 label the

7   same with respect to doses and administration?

8   A.   Yes.

9   Q.   Did you also hear Dr. Thirman discuss the adverse

10  reactions listed on the Treanda label?

11  A.   I did.

12  Q.   Is there other safety information provided in this

13  Treanda label?

14  A.   Yes, there is.

15  Q.   What would that safety information -- excuse me.  What

16  would that safety information have taught a POSA about

17  safety of a treatment regimen?

18  A.   Yes.  So there is safety information in the clinical

19  studies section in Tables 1 and 3, and a POSA would look at

20  that in addition to the listing of adverse events.

21          If I could ask for Table 1 and Table 3 to be

22  shown here.  This is Table 1.  This is adverse events in the

23  patients with CLL and if you blow that up a little bit.

24  Okay.

25          So here is a listing of all of the adverse

1    events.  There are actually two groups in that study.  One

2    was Treanda and then there was a comparison group of

3    chlorambucil, which I'm going to ignore for the moment.  So

4    we're just going to look in the Treanda column.

5              And each of these events is listed here and

6    particularly I want to draw your attention to the two

7    categories for each event.  All grades, so Grade 1, 2, 3 and

8    4, and then there's the most serious grade, grade 3 and 4

9    alone.

10             And I will just take you through one row, which

11   is the number of patients with at least one adverse

12   reaction.  It doesn't matter what it is.

13             So for patient who has a headache, they fall in

14   this category.  A patient that is a little tired one day,

15   they fall in this category.  And as a result, 79 percent of

16   patients treated with Treanda had at least one adverse event

17   that was of some description, and then 34 percent had a

18   serious adverse event, i.e., a Grade 3 and 4.

19             Maybe we can look at the same data for the NHL,

20   which is Table 3.  Okay.

21   Q.    And what would Table 3 tell you?

22   A.    So Table 3 is, as you see here, the non-hematologic

23   adverse events occurring in at least five percent of

24   patients, and so it's basically the same information that's

25   in Table 1, but for the NHL patients, and I remind you that

1  the NHL patients had a slightly higher dose, 120.  They had

2  a more frequent dosing every three weeks instead of every

3  four weeks.  And they could have up to eight cycles instead

4  of up to six cycles.

5           So they had that going against them, but they

6  also had an infusion over 60 minutes as opposed to

7  30 minutes for the CLL.  And so that's important because if

8  the more rapid infusion was a problem even between 60 and

9  30 minutes, then you'd expect things to be worse over here

10 than over here.

11          I will take you to that same category here.

12 There were 176 patients in total, and all 176 of them had an

13 adverse event of some description, so that compared to the

14 79 percent of patients in the CLL category.

15          And then moving across to the more severe grade

16 3 and 4, 53 percent of them had a Grade 3 or 4 adverse event

17 compared to, going back over here, 34 percent in CLL.

18          And this is the other two adverse events I want

19 to draw your attention to, which is nausea and vomiting.

20 And looking, first of all, in the CLL patients, 20 percent

21 have some degree of nausea and 16 percent had vomiting in

22 the CLL patients of any grade, 1, 2, 3, or 4.

23          But if you confine it two group 3 and 4, it was

24 one patient in each group, which is less on percent of

25 patients who had severe or furious nausea or vomiting.

Yates - direct

1          When we look over on this side for non-Hodgkin's

2    lymphoma, the figures are higher.   75 percent versus

3    20 percent had some degree of nausea and 40 percent instead

4    of 16 percent had some vomiting in the population, and here

5    you see that four percent and three percent respectively had

6    serious nausea or vomiting here.

7          So there are a lot of caveats, Your Honor, about

8    these data because this is not a head-to-head study and one

9    would not take these data and say there is necessarily worse

10   safety in this population, but certainly, I think one would

11   say it doesn't look like this population is any worse.   If

12   anything, the reports of adverse events seem to be less in

13   the CLL population.

14         So all I'm saying about this is that there

15   wasn't a big concern coming out of the Phase 3 data

16   suggesting that going from 60 to 30 minutes at least was a

17   problem in terms of adverse events.

18   Q.    Now, Dr. Yates, after reviewing the labels of the

19   commercial bendamustine drug product, what would you do next

20   as a clinical research scientist?

21   A.    Okay.  So I would also want to look at the -- let me

22   see.  The safety data.

23   Q.    After you've looked at the Treanda label and looked

24   at the safety data for the commercial product, what would

25   you do next in developing the formulation into a drug

Yates - direct

1  product?

2  A.    Right.  Okay.  So the next step would be to design the

3  clinical trials.  Right.

4  Q.    And what would you do to design the clinical trials?

5  What decisions would you have to make?

6  A.    Okay.  So the decision to be made in this case is we

7  have a drug.  We know the dose.  We know the regimen.  We

8  wanted to know, are going to give it in the 500 milliliters

9  of saline or half normal saline, dextrose saline, or are we

10 going to give it in a smaller volume?  Are we going to give

11 it over 30 minutes and one hour or are we going to give it

12 in a shorter period of time?

13         So those are the questions I would raise, and

14 here we have an opportunity, because instead of a

15 lyophilized formulation that has to be first reconstituted

16 as a five-milligram per mL in water for injection and then

17 taken into the 500 mL's of diluent, we're starting with a

18 much smaller amount of fluid, and the potential is to give

19 that in a much smaller volume of diluent.  One can do that

20 without causing precipitation.  One can therefore have the

21 potential for a smaller volume that can be given in a

22 shorter period of time.

23         MR. HARBER:  Objection, Your Honor.  I believe

24 part of that last answer about giving it in a smaller volume

25 without precipitation was not within his report.

 1              MS. ROLLO:  If you want to strike that last

 2      statement, that's fine.  I think we're going to get the same

 3      point and it will be within the report in a different way.

 4              THE COURT:  Well --

 5              MS. ROLLO:  I'm not going to find the exact

 6      wording for it.

 7              THE COURT:  Yes.  But just so we're clear, the

 8      point is either in or the point is not in.

 9              MS. ROLLO:  All right.  Then I would point you

10      to --

11              THE COURT:  I don't have the report.

12              MS. ROLLO:  I have another copy.

13              (Ms. Rollo handed documents to the Court.)

14              MS. ROLLO:  Start at paragraph 38 to 46.

15              THE COURT:  I'm sorry.  Was it 38 or 36?

16              MS. ROLLO:  38 through 46, that whole section.

17              THE COURT:  Oh, through 46.  All right.  So this

18      is probably a really stupid question on my part.  When

19      people say liquid form of Treanda, that just means

20      reconstitute.  Is that all that means?

21              MS. ROLLO:  No, Your Honor, much it's truly a

22      liquid form that has not had to be reconstituted.

23              THE COURT:  Has that been mentioned in this case

24      yet?

25              MR. HARBER:  That would be what the first family

Yates - direct

1    is directed to.  Oh, Treanda.  Sorry.

2              THE COURT:  Has a liquid form of Treanda been

3    mentioned in the case until --

4              THE WITNESS:  Well, the patent --

5              THE COURT:  Wait, sir.  You're a witness.

6              THE WITNESS:  Yes.  Okay.

7              MR. HARBER:  I don't believe it has.

8              THE COURT:  I mean, I have to say, and I'm going

9    to be embarrassed if I'm proven wrong by the record, and I

10   got the bad feeling it's probably likely, but I don't

11   remember having any knowledge of a liquid form of Treanda.

12   I thought it was presented that it's a freeze-dried

13   lyophil that you reconstitute, and then the liquid is

14   what Bendeka is all about.  Don't be totally lacking

15   confidence in my ability if I've missed something, but

16   I've missed that.

17             MR. HARBER:  I think that's right.  The liquid

18   Treanda, we're talking about the first family.

19             THE COURT:  I'm not talking about anything.  I'm

20   talking about since trial started.  I don't remember any

21   record evidence of a liquid form of Treanda.  Has there

22   been?

23             MR. HARBER:  No.

24             THE COURT:  So I don't know what it is, so maybe

25   I'm not that stupid.  I don't know what it is.

834

Yates - direct

1          MS. STAFFORD:  I believe it was referenced in

2     the a least the opening and it's also the formulation that

3     came out of Drager much it's in our slides.

4          THE COURT:  Okay.  So maybe it's in a slide.  We

5     can look at it.  That's not record evidence.  There has been

6     no record evidence.

7          Do you think maybe counsel referred in an

8     opening to it?

9          MS. STAFFORD:  Counsel referred to it in opening

10    somewhere.

11         MR. BERL:  With permission, in ten seconds, I

12    can say what was said in opening.

13         THE COURT:  On your part?

14         MR. BERL:  Yes.  On my part at least.  I didn't

15    want, to be confused.

16         THE COURT:  I am now.

17         MR. BERL:  I failed.  The Drager '006 patent,

18    which has been discussed a lot, that's prior art.

19         THE COURT:  Right.

20         MR. BERL:  There was later a product that came

21    out of that research that was not prior art.  The product

22    itself that came out of that research, not in the prior art.

23    So I didn't want in case the whole idea of Drager product

24    came out, I didn't --

25         THE COURT:  But how do you have a product that's

1    not in the prior art?

2              MR. BERL:  Because it came out too late to be in

3    the prior art.

4              THE COURT:  Now, you know what?  Now, okay.

5              MS. STAFFORD:  It's the one with the DMA and the

6    propylene glycol.

7              THE COURT:  Okay.  Sorry.

8              MS. STAFFORD:  That's why the discussion of DMA

9    and propylene glycol, because the Drager patent itself prior

10   art, but the liquid product itself was too late.

11             THE COURT:  I do recall that now.  All right.

12   All right.  So where is it?  I mean, I can see the volume,

13   but I don't see the precipitation.  I don't know how that's

14   really going to pan out as a practical matter.

15             MS. ROLLO:  Sure.  So the section is how you

16   would figure out whether this drug would be soluble in a

17   certain volume of liquid.  If it's not, it's when it

18   precipitates out.

19             In the section I referred you to, he is

20   determining what volume, what the smallest volume you can

21   get to and not have it precipitate out is.

22             THE COURT:  Although that word is not used.

23             MS. ROLLO:  Correct.

24             THE COURT:  Yes?

25             MR. HARBER:  I think there are two issues now

1     that we have been pointed to the portion of the report.  I

2     would say part of our Daubert does relate to one of the

3     steps in the opinion here.  I'm not sure how Your Honor

4     wants to handle that as it plays out.

5                    THE COURT:  Well, first of all, object if you

6     think of anything he's not under Rule 702 permitted to

7     testify to.

8                    MR. HARBER:  Right.

9                    THE COURT:  Go ahead.

10                   MR. HARBER:  But I would just say that, you

11    know, one of the issues in the case is would there have been

12    an expectation that you would be able to take this

13    formulation, the Palepu 2011 formulation, and without

14    knowing Eagle's data, expect that you could get it into

15    a smaller volume without having to worry about

16    precipitation, and that's, I would say that's not clearly

17    disclosed here.

18                   THE COURT:  All right.  I'm going to overrule

19    the objection.  You made it to protect the record and I'm

20    going to overrule it.

21                   MR. HARBER:  Thank you.

22    BY MS. ROLLO:

23    Q.    Dr. Yates, how would a clinical research POSA in 2012

24    determine the appropriate volume for infusion?

25    A.    Okay.  So one would look at the prior art literature,

Yates - direct

1   particularly the prior art of Olthoff, and look at what

2   Olthoff did in his nonaqueous formulations of bendamustine.

3   Q.    Can I direct you to DTX-94 in your witness binder.

4   A.    Yes.

5   Q.    And, Dr. Yates, what is DTX-94?

6   A.    This is the Olthoff Patent No. 159289, and this is

7   from Olthoff 1983, the original patent being in German with

8   an English translation in DTX-94_009.

9   Q.    And, Dr. Yates, what would Olthoff teach a clinical

10  development POSA about the volumes of diluent required for

11  giving a bendamustine formulation?

12              MR. HARBER:  Objection, Your Honor.  This would

13  be the 702.

14              THE COURT:  And I will overrule it.

15              THE WITNESS:  Okay.  So one would look at

16  example one on page 7 of the English translation.  And here

17  you see that there's a concentration of the bendamustine of

18  2.5 grams per hundred milliliters, and, of course, if one

19  divide 2.5 grams by a hundred, then the concentration here

20  is 25 milligrams per milliliter.

21              And what Olthoff proposed is that one milliliter

22  is placed in ten milliliter ampules, the ampules initially

23  being filled with inert gas as a way of preventing oxidation

24  or any, any degradation and sealed.

25              And then immediately before the injection -- I

1    draw your attention to the word injection, Your Honor,

2    because that implies giving it over seconds or maybe a

3    minute or so.  Then nine milliliters of the chosen diluent

4    is to be added into the open ampule.  And so it's this

5    dilution radio that I was referring to.

6              And then if we go to claim 1 of Olthoff, which

7    is on the next page, we see that Olthoff actually provides

8    some alternative ratios of anywhere between one of the

9    nonaqueous bendamustine solutions of five of the diluent up

10   to one of the bendamustine to 20 of the diluent, which could

11   be saline or another suitable diluent.

12             So this is the range, Your Honor.  And the other

13   critical piece of information to get to a volume is what is

14   the dose that you want to give, and we have some slides on

15   that, I think.

16   Q.   First, can I ask you just so everybody is clear, you

17   referred to the dilution ratios and you have the two numbers

18   1 to 5.  Can you explain what each of those numbers are used

19   for?

20   A.   Right.  Well, I will use a trivial example, and some

21   of us are old enough to remember the sort of Minute Maid

22   orange juice which came in a concentrate, and you have to

23   put into it your pitcher and then dilute it with maybe five

24   can fulls of water and then mix it up.  So that would be a

25   dilution ratio of 1 to 5 to reconstitute your orange juice.

Yates - direct

 1    In this case, you're reconstituting the bendamustine

 2    solution so that you've diluted sufficiently that you have

 3    something that can be given intravenously without any

 4    concerns about the toxicity or the impact of too high a

 5    concentration of the excipients.

 6              And so this is a ratio that Olthoff gave that

 7    he considered suitable for dilution of a nonaqueous

 8    solution.

 9    Q.    Now, Dr. Yates, if you want to bring up your slide.

10    Can you explain how you would calculate the dose that you

11    mentioned for bendamustine?

12    A.    Right.  So a typical adult has a body surface area,

13    which is worked out from just a calculated, put in your

14    height and weight, and then it tells you what your total

15    surface area of skin is in your body.  And the typical range

16    for most people is between 1.5 and 2 meters squared.  And

17    I'm going to use those two examples to get to the dose.

18              So we know from the Treanda label that the

19    starting doses are either a hundred CLL or 120 milligrams

20    per meter squared for non-Hodgkin's.  Taking the smaller

21    body surface area of patients of 1.5, 100 milligrams per

22    meter squared times 1.5 meter squared gives you a dose of

23    150 milligrams.  120 times 1.5 would give you a dose of 180.

24              For somebody who has a body surface area of two,

25    you clearly just double these, so 100 milligrams per meter

1   squared becomes 200.  120 becomes 240.

2            And what I'm going to use just as an example is

3   a total dose of 200 to show you how the calculations work to

4   come up with a volume.

5   Q.    And how would you come up with that volume using that

6   200 milligrams dosage?

7   A.    Right.  If I can have the next slide.  So using the

8   200 dosage, and using the 25 milligram per mL given by

9   Olthoff in his example one, dilute between 1 to 5 and 1 to

10  20.

11           So the amount of drug, 25, 200 divided by 25 is

12  eight milliliters.  Eight milliliters contains

13  200 milligrams in this concentration.  And eight milliliters

14  is for 1 to 5 dilution.  Five times eight is 40.  So you

15  want 40 milliliters of diluent.  If you did the dilution 1

16  to 20, 8 times 20 is 160.

17           So that gives us a range of diluent

18  concentrations that we can potentially use to combine with

19  our eight milliliters of a 25-milligram per milliliter

20  solution of bendamustine.

21  Q.    And what conclusion would a POSA draw from this range

22  of volumes?

23  A.    A POSA would draw the conclusion that we can use an

24  amount of diluent anywhere from as low as 40 milliliters to

25  as high as 160 milliliters with an eight-milliliter volume

1   of the nonaqueous 25-milligram per mL solution of

2   bendamustine.

3   Q.      And can I take you to DTX-79 in your binder, Dr.

4   Yates.

5   A.      Yes.

6   Q.      And can you tell me what DTX-79 is?

7   A.      Yes.  This is a paper from a group in -- with the

8   first author being Glimelius, and it's to do with the rate

9   of infusion of a drug, a cancer drug, called 5-flurouracil.

10  Q.      And what did Glimelius teach a POSA with respect to

11  infusion volumes?

12  A.      If we go to the next page, I think somewhere above

13  patients and methods.

14          This is talking about the, the time of infusion

15  and 5-flurouracil could be given as an injection over two to

16  four minutes or as an infusion over 10 to 20 minutes and

17  those times were selected because they adhere to general

18  clinical routines of giving 5-flurouracil, and essentially,

19  what is being discussed here is the routine use, as

20  discussed by Dr. Thirman this morning, of minibags that

21  either have a volume of 50 or a hundred milliliters.

22          So these are the standard sizes.  There are 250

23  milligram bags of saline and so forth and 500 mL's, but

24  going lower than that, 50 and a hundred milliliters are

25  routine sizes, and essentially a 50-milliliter bag can

1    easily be infused over a period of ten minutes.

2    Q.    Dr. Yates, if you were to use the 200-milligram dose

3    from your prior example, what would be the total amount of

4    fluid that would be infused into a patient?

5    A.    So in this case, if one uses a 50-milliliter bag, one

6    is adding eight milliliters of the 25-milligram per mL

7    solution of bendamustine, so what gets infused in the

8    patient is actually 58 milliliters, but these bags are

9    designed to accommodate additional drugs and so there is not

10   a problem of adding that sort of volume to a 50-milliliter

11   bag.

12   Q.    And, Dr. Yates, you previously discussed the volume of

13   Treanda being 500 milliliters?

14   A.    Yes.

15   Q.    Prior to Treanda.  Would a POSA in 2012 have had a

16   reason to change that volume for infusion?

17   A.    Yes.

18   Q.    And what would that reason be?

19   A.    So the 500 milliliters is a relatively large volume

20   and one would want to reduce that volume in order to be able

21   to infuse the bendamustine more quickly, so that would have

22   some potential convenience advantage.

23   Q.    And if I take you to DTX-1004 in your binder.

24   A.    Yes.

25   Q.    And what is DTX-1004?

Yates - direct

1   A.      This is a review article by Juergen Barth from

2   Germany, and it is a review of a particular study of

3   bendamustine plus Rituximab.  This is another regimen with

4   Rituximab and there's a discussion of that particular study,

5   but there's also a discussion of how bendamustine has been

6   given in Germany as well as in the United States.

7   Q.      And what did Barth teach a POSA with respect to

8   infusion volumes of bendamustine?

9   A.      Well, he says on the page 7, I think it is, of this

10  review.  That's right.  At the bottom.  The bottom left-hand

11  paragraph, left-hand column, the bottom paragraph.  And --

12  that's right.

13          Okay.  What Barth says is it's unclear why the

14  American prescribing information specifies 500 milliliters

15  of 0.9 percent sodium chloride or normal saline and a final

16  concentration of 0.2 to 0.6.

17          A short infusion with such a volume is difficult

18  to implement.  Not quite clear, Your Honor, what he's

19  talking about with a short infusion here.

20          Then he talks in the middle part of this

21  paragraph of, in Germany they make up the initial dilution

22  in water as 2.5 milligrams per mL where in the U.S. it's

23  five milligrams of mL.  But the important part of this is

24  down here.  He's saying, thus the volume for injection into

25  a hundred or 250-milligram bags can be reduced.

1        For a patient with a two-meter squared body

2   surface area and a basal dosage of 90 milligrams, which is

3   just slightly less than the U.S. dose of CLL, the volume

4   would be 36 milliliters in contrast with a concentration,

5   which is the lower concentration.

6        So what he's saying is that we can give the drug

7   perhaps more quickly if we could reduce the volume and we

8   can reduce the volume by using bags which are only either a

9   hundred or 250 milliliters.

10  Q.    Dr. Yates, you seem to imply a correlation between the

11  infusion volume and the time of infusion.  Can you describe

12  what that would be?

13  A.    Yes.  So as Dr. Thirman says, there is a rate of

14  infusion in terms of milliliters per minute, and I think

15  there's a slide that we can use to discuss that.

16       The Treanda label had two rates of infusion.

17  One is to give 500 milliliters, actually a little bit

18  moreover 30 minutes with CLL, and the other is over

19  60 minutes for NHL.  The calculation, if you divide 500 by

20  30, you get a rate of infusion of nearly 17 mL's per minute,

21  and if you look at the slower rate of infusion with NHL,

22  it's 8.3 mL's per minute.

23       So thinking of the size of these minibags that

24  are commonly available, if one wants to use 50 milliliters

25  as the vehicle, as the diluent, one can infuse

1   50 milliliters in about three minutes using the higher rate

2   of infusion, or about six minutes using the lower rate of

3   infusion, but there is -- there are always devices

4   associated with infusion systems that allow one to slow the

5   rate of infusion.

6            So one could slow the rate of infusion to

7   whatever you like, ten minutes or 15 minutes, and so

8   50 milliliters is a convenient volume, and by the teachings

9   of Olthoff is a sufficient volume to be able to give a dose

10  of, for example, 200 milligrams of bendamustine.

11  Q.    And, Dr. Yates, in 2012, would a POSA know of any

12  instances where bendamustine was administered in less than

13  30 minutes?

14  A.    Yes.  Dr. Thirman already discussed the teachings of

15  Preiss from 1985 and 1998, and so there, the drug was given

16  over -- between three and ten minutes.

17  Q.    And can I take you to DTX-991?

18  A.    Yes.

19  Q.    And what is DTX-991?

20  A.    This article we saw from Dr. Thirman.  It is the

21  article from 1998.  The first author is Preiss and it is an

22  article that discusses the pharmacology of bendamustine as

23  well as the safety and determination of the maximum

24  tolerated dose.

25  Q.    And what would Preiss 1998 tell a POSA about the

1    infusion times for bendamustine?

2    A.    So the infusion time that Preiss used was between

3    three and ten minutes.

4    Q.    And what did Preiss report, Preiss 1998 report with

5    respect to the kinetic profile of bendamustine?

6    A.    If we can go to the third page of the report, and we

7    can focus in around here where it talks about total body

8    clearance of bendamustine does not change.  So highlight

9    those four lines for me, please.

10            Then I will read this section.  Total body

11   clearance of bendamustine does not change in dependence on

12   the broad, nearly tenfold dose variation between 0.5 and 5

13   milligram per kilogram.  Therefore, bendamustine is subject

14   to a linear, dose-independent kinetics in the

15   therapeutically relevant dose range from 1 to 5 milligrams

16   per kilogram.

17   Q.    So what does that mean that it has a linear dose

18   independent kinetics?

19   A.    That means that if a patient doubles the dose or

20   quadruples the dose, then the amount of drug that the

21   patient sees, whether measured in terms of AUC, area under

22   the curve, or in terms of Cmax, is going to in turn be

23   doubled or quadrupled.  So there's a proportionality, direct

24   proportionality between the dose and the exposure.

25   Q.    So if you kept the dose the same but gave it a more

Yates - direct

1    rapid versus a slow infusion, what would happen?

2    A.    So that would increase the Cmax, because it's being

3    given more quickly and there's no time for it to be

4    eliminated or metabolized in that time, but it would not

5    change the area under the curve.  So total exposure in terms

6    of area under the drug concentration curve would remain the

7    same.

8    Q.    And what do you mean by area under the curve, so that

9    we are all clear?

10   A.    Okay.  So a drug -- before a drug is given, there is

11   no concentration at all of that drug, and then once the drug

12   is given say by infusion over ten minutes, there is a rapid

13   increase in the concentration of that drug until it reaches

14   the maximum, the Cmax, at the end of that exposure, and then

15   there is a decay, like an exponential decay for part of it,

16   and eventually, and it was bendamustine that decayed quite

17   quick.  The half-life is only 30, 40 minutes.

18             So within about five half-lifes, or within about

19   two or three hours, most of the drug is gone from the

20   system, and certainly by the next day, there's no drug

21   left.  So one takes the, the time and then the concentration

22   overtime, measures that in terms of the area under the

23   curve and that is used as a parameter of total exposure to

24   drug.

25   Q.    And how did the doses of bendamustine administered in

Yates - direct

1    Preiss 1998 compare to the labeled doses of the prior art

2    Treanda?

3    A.    So actually, this range of, you see here, .5 to

4    5 milligrams per kilogram is actually a very large range.

5    Five milligrams per kilogram and somebody weighing a hundred

6    kilos would be 500 milligrams, which is clearly very, very

7    high.

8         But we can see actually as we go down this page,

9    the doses that used are shown in this chart, which we've

10   seen earlier on today, that shows you the doses that they

11   actually used.

12        So if I can show you, first of all, there are

13   two ways, as we've learned, in which Preiss gave this drug.

14   He either gave it daily for four days or as a single dose on

15   one day.  And the doses he used in the repeated dosing over

16   four days were 45, 52, 65 and 85-milligram per meter

17   squared.

18        So this is not the total dose, and it varied

19   according to the body surface area of the individual, but

20   these are relatively low doses compared to the Treanda

21   labeled doses of 100 and 120.

22        On the right, and this is much more difficult to

23   see, but this is 155, 175, 195, and 215.  You can see it

24   more clearly now, milligrams per meter squared.  These are

25   very high doses.  Every one of these doses greatly exceeds

849
Yates - direct

1    the maximum dose given in a single day by the Treanda label

2    of 120 milligrams.

3    Q.    So, Dr. Yates, sticking with Figure 2 then, what is

4    Figure 2 reporting with respect to the doses given in Preiss

5    1998?

6    A.    Right.  So the doses on the bottom axis, on this axis

7    we see what they are referring to as the toxicity grade,

8    which is -- corresponds to either the World Health

9    Organization or the CDC definition of toxicity.

10           Given the time that this was done, and I was

11   done in Europe I think it would be more the World Health

12   Organization, but they roughly correspond.

13           So a toxicity grade of one corresponds to a mild

14   adverse event, something that would be not concerning to the

15   individual or something that would go away quickly.

16           An adverse event two would be a moderate adverse

17   event.  And then higher adverse events would be severe, and

18   if they got above four, they would be life-threatening.

19           And so maybe we can just start on this chart to

20   start with.  This is the single dose of bendamustine given,

21   and you can see that the adverse events here, dry mouth,

22   cardiac arrhythmia, disorientation, and this one, leukemia

23   company/thrombocytopenia is essentially bone marrow

24   suppression.

25           What you can see is that for the most part, the

1    lower doses 155, 75 and 95, were associated with only mild

2    AE's or less.  So this was very well tolerated.

3            The maximum tolerated dose, which seemed to be

4    215 milligrams per meter squared, and dry mouth and cardiac

5    arrhythmia were the most important.  There isn't a bar with

6    the vertical stripes such as orientation, but that's really

7    only seen significantly spent with the maximum tolerated

8    dose, 215.  You've sign very, very little with the two

9    middle doses and not at all with the lowest dose.

10           So overall, one could say, and I remind you,

11   Your Honor, that this is a three to ten-minute infusion, so

12   the Cmax would be expected to be much higher than with a 30

13   or 60-minute infusion.  This is showing good tolerability of

14   an infusion over 3 to 10.

15   Q.    Doctor, just real quick.

16   A.    Yes.

17   Q.    So this would be a single dose on an incorporate

18   single day?

19   A.    Yes.

20   Q.    And the other slide, what -- the other slide of the

21   chart, what does that show?

22   A.    Yes.  That's what I wanted to go to next.

23           Here we have the bendamustine given daily for

24   four days, and we see the same trend, that with increasing

25   dose, there is increasing incidence of adverse events and

1    the maximum tolerated dose is 85 milligrams per meter

2    squared.   And there is -- maybe we can go to the

3    demonstrative slide next.

4              Okay.   And maybe the next slide.

5              This is interesting, I think, because this gets

6    to the question of nausea and vomiting.   And what we see

7    here is that when the drug was given every day for four

8    days, even at the lowest dose of 45 milligrams, but

9    particularly at the 52, 65 and 85 milligrams, it was quite a

10   significant amount of nausea and vomiting whereas if you

11   look over to the single doses, there is no report of nausea

12   or vomiting in the patients who got the single doses.   And

13   because of the rapid metabolism of bendamustine, that means

14   to say every day they get the drug, they start with a clean

15   slate.   They've got no drug remaining in their system.

16             One would expect the area under the curve and

17   Cmax to be much higher with a dose such as 215-milligram per

18   meter squared than with these lower doses such as 52,

19   65-milligram per meter squared.

20             So this is just -- it's actually the repeated

21   dosing that causes nausea and vomiting rather than Cmax.

22   Q.    And, Dr. Yates, what would be the total dose of the

23   four days of bendamustine?

24   A.    So bendamustine at 85 milligrams, that is a total dose

25   of 340 milligrams cumulatively over four days.   These

1    patients were given a very high dose of bendamustine.

2    Mostly, it was well tolerated, but it is a high dose and

3    this really tests the idea that one can give high doses of

4    bendamustine over a short period such as ten minutes or

5    less.

6    Q.    And did Preiss 1998 report on any localized skin

7    reactions after the injection?

8    A.    No.  That was an interesting aspect of this.  We

9    talked about phlebitis and thrombophlebitis.  There's not a

10   mention either in these charts or in the text of Preiss to

11   indicate that any patient developed either phlebitis or

12   thrombophlebitis.

13   Q.    And did any prior art report on the localized

14   reactions of the site of injection?

15   A.    So there was a study done for Treanda in rabbits

16   looking at localized reactions, and that was in my first

17   report.  It did show that there is a very limited amount of

18   inflammation when rabbits were deliberately injected into

19   the ear around the vein.

20   Q.    And can I take you to DTX-1130?

21   A.    Yes.

22   Q.    And what is DTX-1130, Dr. Yates?

23   A.    This is from the Centers For Drug Evaluation Research,

24   which is part of the Food and Drug Administration.  And it's

25   the pharmacology's review for Treanda.

1  Q.    And can I take you to page 124?  Can we bring that

2  up?

3  A.    Right.

4  Q.    And, Dr. Yates, what is this study?

5  A.    So the title of this study is the Perivenous and

6  intra-arterial tolerance study in the rabbit.

7  Q.    And what was done in the study?

8  A.    So if we go below the table on page 124 to the text

9  just below the table.  That's all right.

10         So these, these were New Zealand white rabbits.

11  There were three of each sex per dose group given, and you

12  see here, groups 1 to 4 were given perivenous injection.

13  That mean the needle was deliberately placed by the side of

14  the vein rather than into the vein.

15         So this is extravasation as would be seen if the

16  tip of the, the infusion cap had broke through a vein.  And

17  in each case, they got 200 microliters or .2 of a

18  milliliter, and they, in the right here, got a dose of

19  bendamustine in the left ear -- I'm sorry, in the right ear,

20  and left ear was used as a control.

21         And so we followed it up in two ways.  One was

22  clinically, and we'll look at that first, and then

23  histopathology.

24  Q.    And what were the clinical findings?

25  A.    Okay.  If we can go to the next page, and this area

854

Yates - direct

1   here that says results just above this table.

2              So there was no mortality.  There were no

3   clinical signs whatsoever, so there were no impacts on these

4   rabbits.  There was, in terms of the local reaction, there

5   was slight or moderate bruising at both the test and control

6   sites, and it was more notable in the animals given the

7   injection in the artery.

8              We know the pressure in an artery is much

9   greater than the pressure within the veins, so it's not

10  surprising that there was more bleeding when the injection

11  was into the artery than around the veins.  But essentially,

12  because it was the same in the test and control sites,

13  saline, which was the control, gave as much bruising as did

14  the bendamustine.  So there were no differences whatsoever

15  in terms of the clinical findings.

16  Q.    Did the study also refer to microscopic findings?

17  A.    Right.  If we go down the same page to histopathology,

18  we can see that there are finding.  There are four groups

19  here, each of which received vehicles and no bendamustine.

20  And there are four groups that received bendamustine and the

21  highest dose was one milligram per mL.  The second highest

22  dose was 0.6-microgram per mL.  I want you to focus on that.

23             I would also like you to focus on the category

24  of perivascular inflammation.  These two slides here were

25  slight and moderate, perivascular inflammation.

1          What we've seen, Your Honor, out of the six

2     rabbits in each group, there were four rabbits that had some

3     degree of perivascular inflammation in the highest dose

4     group, four rabbits in the second dose group, three in the

5     third dose group and two in the lowest dose group.

6          But you see here, even in this group, Vehicle 1,

7     there were four rabbits that had some inflammation.  So the

8     suggestion that inflammation might be worse or with three of

9     them that had moderate inflammation, this is only one in the

10    placebo group here.

11         But this is very mild in terms of overall

12    effects, and the same is true in each of these other

13    categories.  There is no category listed as severe.  There's

14    minimal or moderate, but no animal had severe inflammation,

15    whichever of these measured information are used.

16         So the bottom line findings from this is that

17    bendamustine is an irritant, particularly when given outside

18    of the vein, but it is not a major irritant.  It doesn't

19    cause severe inflammation, and basically, this is the kind

20    of inflammation that would go away within a matter of days

21    or weeks.

22    Q.    Now, Dr. Yates, did you prepare a slide summarizing a

23    POSA's knowledge with respect to the prior art for

24    bendamustine formulations?

25    A.    Yes, I did.

Yates - direct

1   Q.    After 2012?

2           And, Dr. Yates, can you please describe this

3   slide?

4   A.    Right.   Treating the disease is very easy.   This is

5   the Treanda label.   It was given intravenously in CLL, NHL.

6   Days 1 and 2 were known of a 28-date cycle.   The doses were

7   known.

8           The formulation that's being used was known for

9   this family of patents and it's the Palepu 2011 formulation.

10          So, Your Honor, that really just leads to

11  questions that you raised about volume and duration of and

12  infusion.   And in terms of volume, I think that Olthoff is

13  the strongest reference because that with using the Treanda

14  label gives you a range of doses based upon the dilution

15  factors of Olthoff, but certainly gives you a lower volume,

16  a hundred milliliters.   It doesn't quite take you down to

17  50 milliliters, but Olthoff does.

18          And then Preiss, gave the drug by injection both

19  in 85 and 98 over 3 to 10.   It's impossible he used a very

20  large volume because of the constraints of injection.   So

21  therefore, we don't know its volume.   Like, he didn't say,

22  but it's likely to be small.

23          And then duration and confusion, I think Preiss

24  tells us precisely he gave the injection over 3 to 10 and we

25  know Glimelius used these 50-milliliter bags or

Yates - direct

| 1 | 100-milliliter bags and fused them over ten to 20 minutes. |

So basically, what I'm saying is that the volume is predictable, and the duration of infusion is predictable, and ten minutes and the volume of 50 milliliters would have been one of the obvious choices for a person of ordinary skill.

Q.    And, Dr. Yates, I'd like to take you to DTX-984 in your binder, please.

A.    Yes.

Q.    And what is DTX-984?

A.    Okay.  We're back on the Olthoff patent.  No?  Am I on the wrong page?  I have Olthoff.

Q.    Under 984?

A.    Oh, 984.  Sorry.  I misheard you.  Okay.  Okay.  Here we have Palepu.

Q.    And is Palepu 2011?

A.    Yes.

MS. ROLLO:  Can I take it to Paragraph 19, please.

BY MS. ROLLO:

Q.    And, Dr. Yates, looking at Paragraph 19, what are the concentrations of bendamustine disclosed in Palepu 2011?

A.    Right.  He starts with a larger range, going from ten milligrams per mL to a hundred, preferably 20, to about 60,

Yates - direct

1    and then preferably he reduces the range from 25-milligram

2    per mL to 50-milligram per mL, and then gives about

3    30 milligrams and some other choices.  Certainly,

4    25 milligrams per mL is one of the choices on that list.

5    Q.      Thank you.

6            Dr. Yates, would a POSA in 2012 have had any

7    concerns regarding the efficacy of the Palepu 2011

8    formulations in the volume of 50 milliliters or less in ten

9    minutes?

10   A.      No.

11   Q.      Why would a POSA not have a concern?

12   A.      Because this was a known active drug that was known to

13   be efficacious in treating these diseases.  It was given at

14   the same doses in the same regimen, albeit more quickly, but

15   because it as linear pharmacokinetics, the amount of drug

16   the body sees was anticipated to be the same as if the drug

17   was given over longer periods of infusion.

18   Q.      Would a POSA in 2012 have had any concerns of the

19   Palepu formulation in 20 milliliters or less?

20   A.      No.

21   Q.      Why not?

22   A.      Once again, it's the same drug that is being used for

23   years and was known to be relatively safe for an oncology

24   drug.  There was no indication from Preiss that the safety

25   would be any worse than for a 30 or 60-minute infusion, so a

Yates - direct

1    POSA would not have been concerned.

2    Q.    Dr. Yates, did you review any documents provided by

3    Eagle to the FDA?

4    A.    Yes.

5    Q.    And did Eagle provide any statements to the FDA

6    regarding the safety of bendamustine infusion in

7    50-millimeter volume in ten minutes or less?

8    A.    Yes.

9    Q.    And those statements, did Eagle express any concerns

10   to the FDA about administering a bendamustine product in

11   50 milliliters or less?

12                MR. HARBER:   Objection, Your Honor.   Relevance.

13                MS. ROLLO:   The Federal Circuit has found that

14   statements made by an applicant to the FDA are relevant to

15   provide motivation to a person of ordinary skill in the art

16   when they report on the prior art, and that's what we'll

17   show, that Eagle's statements are reporting on the prior

18   art.

19                THE COURT:   Can you explain why regardless, why

20   the Federal Circuit said it's relevant?

21                MS. ROLLO:   Sure.   So it's going to be Eagle.

22   It's an admission of a party opponent on how they viewed the

23   prior art and it's going to be corroborating of the expert

24   testimony on what the prior art says.

25                THE COURT:   All right.   I think it's relevant.

Yates - direct

1          MR. HARBER:  May I be heard on the point

2     briefly?

3          THE COURT:  Sure.

4          MR. HARBER:  Just to be clear, this is a

5     statement by the inventor after the priority date that is

6     not public.

7          THE COURT:  Right.  But it's an admission.  I

8     think as I said earlier about the admissibility -- frankly,

9     once you articulated that, it seemed definitely relevant.

10    What gave you pause was having this witness be the one whom

11    the statement is introduced into evidence.  For instance,

12    foundation.  How does he know what was said?  That wasn't

13    the objection.  The objection was a 402 objection.  You

14    probably ought to lay a foundation.  I assume it's a

15    document or something.

16         MR. HARBER:  Right.  That would be to that

17    particular question, there was a relevance objection, but

18    depending on what she asked the witness.  If she's asking

19    the witness to interpreted a statement, where he doesn't

20    know the context --

21         THE COURT:  That's fair.  If he's going to

22    report about some oral statement made by Eagle and he's

23    speculating as to the particulars, we'll get to that.  Let's

24    see what the statement is going to be.  I think it's

25    relevant.  I think we crossed this bridge before.  I think

Yates - direct

1    I even asked you all, you all for the record being

2    plaintiff, what would you do if this came up and I think

3    your response was you acknowledge the admission by a party

4    opponent.

5              MR. HARBER:  Right.  I didn't object that it was

6    hearsay.  You know, the objection is to the expert's ability

7    to provide -- again, I'm not sure what the witness is going

8    to say.

9              THE COURT:  That's fair.  Let's see what it is.

10   I know now what I need to look for with particularity and I

11   will do that.

12             So go ahead.

13   BY MS. ROLLO:

14   Q.    Dr. Yates, can I take you to DTX-1041 in your binder.

15   A.    Yes.

16   Q.    And can you tell the Court what DTX-1041 is?

17   A.    Yes.  DTX-1041 is an e-mail from Foma Raskovsky that

18   includes attachments for an FDA meeting scheduled for

19   January 15, 2013, and it was planning for a rehearsal a few

20   days later on January 3rd, and there is a background

21   document for a Type B or pre-IND meeting with the FDA that

22   is included in this in which Eagle is making statements to

23   the FDA prior to their January 15th meeting of questions

24   that they have, but also background materials that they

25   wanted to convey to FDA concerning the rationale for the

Yates - direct

1    proposed studies.

2    Q.    And so if we can go to page 2 of the document.

3              Dr. Yates, is this the background materials

4    you're referring to?

5    A.    Yes.

6    Q.    And, Dr. Yates, what is a pre-IND meeting?

7    A.    So prior to initiating any studies in humans with any

8    new products, whether it's a new variance on an existing

9    chemical entity or brand-new product, there needs to be a

10   pre-IND meeting in which the sponsor company gains agreement

11   with the FDA on how to proceed going forward with the

12   initial use in man.

13   Q.    And, Dr. Yates, have you in your career been a part of

14   such meetings with FDA?

15   A.    Yes.

16   Q.    If we can go to page -- so it will be the one ending

17   in Bates number 140310.

18              And what is this document, Dr. Yates?  It might

19   be easier if you want to look at the screen.

20   A.    Okay.

21   Q.    It's up to you.

22   A.    This is a review of the published literature on

23   bendamustine, the chloride exposure levels in human.

24              MR. HARBER:  Objection, Your Honor.  Foundation.

25              THE COURT:  So by foundation, as I thought it

1    might be a document, I didn't know it was going to be a

2    document or was it going to be, he's going to say Joe Smith

3    from Eagle talked to so and so at the FDA.

4              So it's a document.  I thought you already

5    stipulated to the authenticity of documents.

6              MR. HARBER:  Right.

7              THE COURT:  So that's the authentication I think

8    is relevant because we now know what the source of statement

9    is.

10             MR. HARBER:  We know what the source of the

11   statement is, Your Honor, but she's basically asking a

12   witness who has zero firsthand knowledge of this.

13             THE COURT:  She's asking him to read the

14   document.  Let's be clear.  Right?  That's why I said to you

15   I was kind of thrown for a loop, why through this witness?

16   This to me is a factual thing.  It's basically, here's

17   what -- now, he's an expert so he gets to opine on the

18   significance of this or what it means.  Right?  But in terms

19   of getting it into evidence, unless you're telling me you

20   didn't stipulate to the authenticity of it, it comes into

21   evidence.

22             MR. HARBER:  My objection, that wasn't my

23   objection.

24             THE COURT:  Okay.

25             MR. HARBER:  My objection was, the question I

 1    believe was, what was this document?  There was no

 2    foundation that this witness had any idea what this

 3    particular document is here other than the ability to read

 4    the title of it.

 5              THE COURT:  Well --

 6              MR. HARBER:  There has been no foundation laid

 7    for what this is.

 8              THE COURT:  She said, has he ever done any INDs.

 9              In other words, we don't know -- hold on a

10    second.  Isn't it self-authenticating?  Director of

11    regulatory affairs on page one.  She's attaching to a group

12    of people for whom she's contacting that are listed on the

13    Internet this document, which provides background material

14    so that all of these folks can prepare for a meeting with

15    FDA.

16              So this seems to me to be an admission by a

17    party opponent, i.e., Foma Raskovsky, right, that represents

18    background material in the eyes of Eagle that's relevant to

19    the FDA meeting.  Why isn't it an admission by a party

20    opponent?

21              MR. HARBER:  Again, the question -- so if the

22    witness wants to say, here's a page in this packet, here's

23    what the words say.

24              THE COURT:  I think that's all that's going to

25    be done.

1          MR. HARBER:  But the question, again, Your

2     Honor, I was objecting to is what is this document?  There's

3     no foundation that this particular part of the document,

4     that this witness has any idea what it is or what it was

5     intended to do.

6          THE COURT:  I thought the witness was just

7     questioned and read from the cover e-mail that said attached

8     to our background.  Am I missing something?  It's in the

9     record.  I thought that you all highlighted that on the

10    cover e-mail.

11         MR. HARBER:  Again --

12         THE COURT:  I will tell you what --

13         MR. HARBER:  There's a particular document in

14    here that the witness is going to be asked about.

15         MS. ROLLO:  These are material that Eagle

16    themselves, their counsel has represented were provided to

17    the FDA as background materials for what took place on

18    January 15th.

19         THE COURT:  This is during trial?

20         MS. ROLLO:  Actually, prior to the trial, during

21    discovery.

22         THE COURT:  Well, then that doesn't counsel.  I

23    mean, but hold on a second.

24         Okay.  When this line of questioning began, it

25    sounded like there was, the witness was being asked to

Yates - direct

1    testify about statements that were made to the FDA by Eagle

2    and you objected.  That was a fair objection.  And we said

3    we didn't know what he was going to say.  He was going to

4    say he overheard what the FDA said was at a meeting.  It was

5    a document.  We let the questions go.  We said he had to lay

6    a foundation.  It turned out it was a document.  This

7    document.  Fair enough, we don't know what was said to the

8    FDA yet from this witness.

9                 MR. HARBER:  Right.  To be clear, that's not my

10   objection.  I agree --

11                THE COURT:  I'm just thinking about what took so

12   long to get here.  I'm going through my thought process.

13   But what it seems indisputably is this is a document adopted

14   by Foma Raskovsky, who is an Eagle representative, whose

15   forwarding the document and purport, and is saying in an

16   e-mail that the document contains meeting background

17   material for folks to use to prepare to go on behalf of

18   Eagle to the FDA.  This seems to me to be whatever follows

19   on the e-mail in the past is an admission by Eagle.  Are you

20   with me so far?

21                MR. HARBER:  Yes.  I'm not disputing that.

22                THE COURT:  All right.  So now all that the

23   defendants want to do is read from this admission.

24                MR. HARBER:  If that's all they want to do with

25   the witness, that's fine.  What I took the question to be

Yates - direct

1    asking is, what is this document?  What's the context of

2    this?

3                I don't know that the foundation has been

4    established that this witness knows that.

5                THE COURT:  Okay.  And I thought, and, boy, I

6    might just -- these are long days.  I thought though on the

7    screen was put the cover e-mail and there were some

8    highlighted portions.  Am I missing something?  Am I wrong

9    on that?  Did I just imagine that?  If I did, did I imagine

10   it?  If I did, tell me truthfully.  I don't care.  Then you

11   can just lay the foundation anyway.

12               MS. ROLLO:  Just the title.  That's all he read.

13               THE COURT:  He read the title.  You didn't show

14   the cover e-mail?

15               MS. ROLLO:  Yes, Your Honor.

16               THE COURT:  Yes.  There's the highlighted

17   portion.

18               THE WITNESS:  Right.

19               THE COURT:  So they have established what it is.

20   It's a document attached to the e-mail by Foma Raskovsy.

21   And they then went on the cover page of the attachment and

22   described it as being pre-IND meeting background material.

23               Go ahead.

24               MR. HARBER:  Right.  Again, if the, if -- again,

25   I don't know what the testimony that's going to follow this

1    is.  If it's literally, here's the document that's attached,

2    it says this, I'm not objecting to this.

3              THE COURT:  Okay.  I think that's all that's

4    going to happen.  Then what's going to happen, I'm going to

5    guess, they're going to say, now, tell me, how does that

6    factor into any opinions you want to offer.  Let's wait and

7    see.  Let's first get the document in.

8              MS. ROLLO:  Hardly stand the suspense.

9              If you can clear that, Bill.  I have to go back

10   to the introduction.  Sorry.

11   BY MS. ROLLO:

12   Q.   And, Dr. Yates, what was this document provided to do

13   judging from what's written in the document?

14   A.   I mean, I can read it or I can tell you what I think

15   it is.

16             THE COURT:  So that's where the objection is

17   fair.  All right.  So just read the document.

18             THE WITNESS:  This document is intended to

19   provide an overview of the published literature on

20   bendamustine hydrochloride exposure levels in clinical

21   studies to support the conclusion that the predicted

22   increase in Cmax for Eagle's faster infusion and or IV push

23   product is within the range of clinical experience.

24   BY MS. ROLLO:

25   Q.   Does Eagle in this document make statements regarding

Yates - direct

```
 1    the safety of this proposed faster infusion in our IV push
 2    product?
 3    A.    Yes.
 4    Q.    And if we could go to that section, Bill, the IV push
 5    administration section.  Thank you.  Yes.  Perfect.
 6              Dr. Yates, what does Eagle say about the safety?
 7              THE COURT:  Why don't you identify the page so
 8    we all have it.
 9              MS. ROLLO:  Oh, sure.
10              THE WITNESS:  All right.  DTX-10410 --
11              MS. ROLLO:  Let's use the Bates number, Dr.
12    Yates.  It's EGL-Bendeka_00140310.
13    BY MS. ROLLO:
14    Q.    Do you need the question again?
15    A.    Yes.
16    Q.    Dr. Yates, what does Eagle tell the FDA with were
17    respect to the safety of its faster infusion in our IV push
18    product?
19              THE COURT:  Objection.  Sustained.  There's no
20    evidence that this was sent to the FDA.
21              THE WITNESS:  It was.
22              THE COURT:  So, Dr. Yates, we have real strict
23    rules here.
24              THE WITNESS:  I'm sorry.  I apologize.
25              THE COURT:  You're only permitted, since you are
```

Yates - direct

1        under oath, to respond to questions to counsel or the Court

2        when a question is posed.

3                    THE WITNESS:  I apologize.

4                    MS. ROLLO:  May I rephrase the question.

5                    THE COURT:  Yes.

6        BY MS. ROLLO:

7        Q.    Dr. Yates, what does this document say about the

8        safety of Eagle faster IV or faster infusion and/or IV push

9        product?

10       A.    Okay.  I will read the last sentence, and I will read

11       it.  "Thus, short duration infusion of bendamustine appears

12       to be well tolerated in this study and a dose of

13       215 milligrams has been reported in the literature as the

14       clinically tolerated dose for bolus administration of the

15       bendamustine, referencing Schoffski 2000a and b."

16       Q.    Dr. Yates, what does this document say with respect to

17       the dosages compared to Eagle's faster IV push, faster

18       infusion and IV push product?

19       A.    Okay.  In the middle it's saying, the reported Cmax

20       values from 20.03 to 49.38 milligrams per mL which compares

21       reasonably well with the predicted Cmax for a three-minute

22       slow IV push administration of Eagle's product at

23       120-milligram per mL and it gives a range of 11 to

24       17.6-milligram per mL.  And it says, after adjusting for the

25       higher dose, on average 1.6 higher, used in the Preiss

1    study.

2            And it goes on to say, the study also reported

3    that only mild side effects occurred despite the high doses

4    with nausea, vomiting, mouth dryness and taste disorders

5    being observed in less than half the subjects.

6    Q.    All right.  Dr. Yates, I'd like to take you to

7    DTX-1059, please.

8    A.    Yes.

9    Q.    And can you tell us what is DTX-1059?

10   A.    Yes.  This is a letter from the FDA containing the

11   memo of meeting minutes for the meeting that was held on

12   January 15th, 2013, the pre-IND-type E meeting that we were

13   just discussing.

14   Q.    Dr. Yates, in your experience, have you received

15   meeting minutes such as these from the FDA?

16   A.    Yes.

17   Q.    And turning your direction to question seven on page

18   7.

19   A.    Yes.

20   Q.    Can you tell us what is being discussed here?

21   A.    Yes.  Question seven is, does the agency agree that

22   the proposed pharmacokinetic bioequivalency study based on

23   area under the concentration time curve (AUC) and safety

24   study is the appropriate bridging study for this proposed

25   505(b)(2)?

Yates - direct

1  Q.    And, Dr. Yates, can you tell the Court what a bridging

2  study is?

3  A.    So bridging study is a study that is used to connect

4  the proposed products to an already approved product by

5  agreement with the FDA that would allow the new product

6  to have access to the data that the FDA already has access

7  to.

8         In this case, to the Treanda label so that the

9  sponsor does not need to repeat the full Phase 2, Phase 3

10 program.

11 Q.    And, Dr. Yates, did the FDA respond to that question?

12 A.    Yes.

13 Q.    And how did the FDA respond?

14 A.    So they actually agreed to the ten-minute infusion

15 study as proposed by Eagle with only one change, which was

16 they wanted Eagle to study the higher dose of 120 milligrams

17 per meter squared rather than 100 milligrams per meter

18 squared, but they did not agree to the IV push study, and,

19 in fact, the two protocols were being proposed.  And they

20 did not agree to the IV push study because they were

21 concerned about needing to see additional safety data rather

22 than the data that would be available from a very small

23 study.

24 Q.    And taking you now to DTX-1061.

25 A.    Yes.

Yates - direct

1    Q.     And, Dr. Yates, what is DTX-1061?

2    A.     This is an investigator's brochure from Eagle

3    Pharmaceuticals concerning the bendamustine hydrochloride

4    injection concentrate.

5    Q.     You testified already that you are familiar with

6    investigator's brochures?

7    A.     Yes.

8    Q.     And you have authored investigator's brochures?

9    A.     Yes.

10   Q.     You have signed off on investigator's brochures?

11   A.     Yes.

12   Q.     Can you remind us, what is the significance of an

13   investigator's brochure?

14   A.     Yes.  As I mentioned, prior to approval of the

15   drug, there is no actual label for that drug, and the

16   investigator brochure takes the place of that by providing

17   information on non-clinical studies, effects in humans,

18   clinical experience, and summary of the data.  Essentially,

19   anything that is known about the product, particularly with

20   respect to safety and/or efficacy is put as information to

21   the investigators who also share it with the IRB, and it is

22   the way to inform investigators of potential benefits and

23   risks.

24   Q.     And if I can take you to page 14 of the investigator's

25   brochure.

1          MS. ROLLO:  And if you can highlight that

2    section under literature review.

3    BY MS. ROLLO:

4    Q.    And, Dr. Yates, what is being reported under this

5    section of the investigator's brochure?

6    A.    So this again is a literature review.  It repeats many

7    of the statements that were presented to the FDA concerning

8    the literature review.

9    Q.    And, Dr. Yates, what is the section reporting with

10   respect to the tolerated dose of the product in the

11   investigator's brochure?

12   A.    It's saying clinically tolerated dose of bendamustine

13   hydrochloride whether administered as a three-minute bolus,

14   has been reported to be 215 milligrams per meter squared,

15   well above the 120 milligrams per meter squared proposed for

16   Eagle's product.  It goes on.

17   Q.    If I can take you to page 11 of the brochure?

18   A.    Which page?

19   Q.    Eleven?

20   A.    Yes.

21          MS. ROLLO:  And if we could highlight the second

22   paragraph that starts with, It is intended.

23          THE COURT:  What page did you say it was?

24          MS. ROLLO:  It's 11, Your Honor.

25   BY MS. ROLLO:

Yates - direct

1   Q.    And, Dr. Yates, how is Eagle's product being described

2   in the investigator's brochure?

3   A.    Treating the same indication at the same dose, but at

4   a different administration concentration and duration.

5   Q.    And what was the administration duration of Eagle's

6   proposed product?

7   A.    Ten minutes IV with a dilution into 50 mL's of normal

8   saline on days 1 and 2 of a 28-day cycle.

9   Q.    Dr. Yates, if I can have you turn to DTX-5.

10  A.    Yes.

11  Q.    And, Dr. Yates, what is DTX-5?

12  A.    This is the Patent Number '568.

13  Q.    And do you have a slide that describes what the claims

14  you are opining about?

15  A.    Yes.

16  Q.    And can you please explain what claim 11 of the '568

17  patent is about?

18  A.    Yes.  So claim 11 of the '568 patent, and I will work

19  from the bottom, is an infusion over about ten minutes for

20  chronic lymphocytic leukemia with a regimen which is from

21  the Treanda label on days 1 and 2 of a 28-day cycle.

22          And then moving upwards, it is the method of

23  treating CLL comprising, giving a volume of about

24  100-milliliter or less and certain levels of bendamustine,

25  certain levels of polyethylene glycol and propylene glycol,

1    and parenterally acceptable diluents, and optionally, an

2    antioxidant.  So it is similar to the claims that we

3    discussed early on.

4    Q.    Dr. Yates, are there any elements of that this claim

5    that are not taught by the prior art we discussed?

6    A.    No.

7    Q.    And did you prepare a slide summarizing that opinion?

8    A.    Yes.  So a method of treating chronic lymphocytic

9    leukemia.  Clearly, that's directly from the Treanda label.

10   A volume of about 50 milliliters of a liquid composition I

11   derived from Olthoff, 40 mL and 60 mL.

12            The formulation is derived directly from Palepu,

13   but then these concentrations in the diluted solution of

14   bendamustine also can be derived from Palepu just by simple

15   mathematics.

16            And then the parenterally acceptable diluent is

17   derived again from the Treanda label and an antioxidant

18   derived from Palepu, ten minutes.  In addition to Olthoff,

19   you have Preiss, Glimelius, that teach infusions over about

20   ten minutes, and the cycle they want, days 1 and 2 of a

21   28-day cycle is derived again from the Treanda label.

22   Q.    Did Yates, did you prepare a slide providing your

23   opinion for claim 18 of the '568 patent?

24   A.    Yes.

25   Q.    And can you describe this slide?

Yates - direct

1    A.     Yes.   So, again, the infusion duration is ten minutes.

2    The infusion volume is 50 milliliters, and it's again given

3    on what the cycle of days 1 and 2 of a 21-day cycle much

4    this is relating to non-Hodgkin's.   It again has the

5    similar range concentrations of bendamustine, PG and PEG,

6    and an acceptable diluent and optionally, enough

7    antioxidant.   So it is very similar to the claim that we

8    just looked at.

9    Q.     And are there any elements of this claim that are not

10   taught by the prior art?

11   A.     No.

12   Q.     And do you have a slide describing claim 22 of the

13   '568 patent?

14             THE COURT:   So let's do this.   So riveting,

15   Mr. Buxton's film deposition, I didn't realize we had been

16   at it for four hours, so we ought to take a break, and I

17   think we'll do that.

18             MS. ROLLO:   Sure.

19             THE COURT:   Time to do it.   All right?   Can we

20   all go to around 6:30 again, try to get through?   All right?

21   So we'll break for ten minutes.

22             (Short recess taken.)

23                       -   -   -

24             (Proceedings resumed after the short recess.)

25             THE COURT:   All right.   Dr. Yates, please come

1    back up on the stand.

2                    THE WITNESS:  Thank you.

3                    THE COURT:  Incidentally, just housekeeping.  I

4    said 8:30 tomorrow.  I didn't realize I have a scheduling

5    telephone conference at 8:30.  It should be five minutes.  I

6    really do want to hit the ground running at 8:45, so all

7    right?  Is that still good with everybody?

8                    MR. BERL:  It is.  Maybe at the very end of

9    today, we can talk about the schedule for tomorrow and then

10   what's going to happen.

11                   THE COURT:  Sure.  Okay.  We'll do that at the

12   end.  That sounds good.

13                   All right.  And how much longer, ballpark, do

14   you think you'll be?

15                   MS. ROLLO:  I think both between myself and

16   Slayback, probably ten minutes.

17                   THE COURT:  And then we'll have cross.  All

18   right.

19   BY MS. ROLLO:

20   Q.    Welcome back, Dr. Yates.

21   A.    Thank you.

22   Q.    Before we left, we were discussing claim 22 of the

23   '568 patent.  Can you please explain claim 22 in your

24   opinion?

25   A.    Right.  So this is the claim treating non-Hodgkin's

Yates - direct

1    lymphoma with a liquid composition in a certain range, but

2    it has a range of bendamustine, again, a range of

3    concentrations of PG and PEG and a parenterally acceptable

4    diluent, and it's given over a period of equal to, less than

5    or equal to about 15 minutes.

6    Q.    Dr. Yates, are there any elements of climb 22 of the

7    '568 patent that are not in the prior art?

8    A.    No.

9    Q.    And, Dr. Yates, did you provide a slide with respect

10   to claim 13 of the '399 patent?

11   A.    Yes.

12   Q.    And, Dr. Yates, what is claim 13 of the '399 patent

13   about?

14   A.    Right.  So this claim of the '399 patent is very

15   similar.  Again, method for treating cancer or malignant

16   disease includes CLL and NHL.  It has a range of

17   bendamustine concentrations, PG and PEG concentrations, an

18   acceptable diluent, optionally, an antioxidant.  And the

19   duration of the infusion is about ten minutes or less.

20   Q.    Is there any element of claim 13 of the '399 patent

21   that are not in the prior art?

22   A.    No.

23   Q.    And do you have a slide explaining claim 15 of the

24   '399 patent?

25   A.    Yes.

1    Q.    Can you please explain claim 15?

2    A.    Right.  So this claim is similar and it has a volume

3    of 50 to 65 milliliters, but, again, the drug is

4    administered intravenously over ten minutes or less.

5    Q.    And are there any other elements of the claim --

6    of claim 15 of the '399 patent that are not in the prior

7    art?

8    A.    No.

9    Q.    Dr. Yates, did you prepare a slide with respect to

10   claims 9 and 11 of the '797 patents?

11   A.    Yes.

12   Q.    And can you please explain what these claims are

13   about?

14   A.    Right.  Treatment of leukemia, Hodgkins or multiple

15   myeloma, so non-Hodgkin's or multiple myeloma is an

16   indication in Europe but not in the United States.  But,

17   again, there's bendamustine.  A pharmaceutically acceptable

18   fluid in a certain range.  Polyethylene glycol.  It gives a

19   stabilizing amount of an antioxidant selected from a long

20   list, but claim 11 limits that list to thioglycerol or

21   monothioglycerol, which we heard from Dr. Pinal is

22   essentially the same thing much and there's a certain

23   limitation on the amount of PG esters at about three

24   months of storage at a temperature of about 25 degrees

25   Celcius.

1    Q.    And, Dr. Yates, with respect to the formulation

2    portion of the '797 patent, you're relying on Dr. Pinal's

3    testimony?

4    A.    Yes, I am.

5    Q.    And so, Dr. Yates, excluding the formulation portion

6    of the '797 patent, are there any other elements of claim 9

7    that were not taught in the prior art?

8    A.    No.

9    Q.    And excluding the formulation portion, are there any

10   elements of claim 11 in the '797 patent that are not taught

11   in the prior art?

12   A.    No.

13   Q.    Dr. Yates, would a POSA in 2010 have had any concerns

14   concerning the safety of the formulation in claim 9 of the

15   '797 patent?

16   A.    No.

17   Q.    Why not?

18   A.    Well, this is a drug that has been used for years, and

19   this is a different formulation of that drug, so all of the

20   excipients are generally regarded as safe and on the FDA

21   inactive ingredients list, so there was no reason to be

22   concerned.

23   Q.    What were the inactive ingredients in the formulation?

24   A.    PG, PEG, and then an antioxidant, monothioglycerol,

25   and some level of sodium hydroxide.

1    Q.      Why would a POSA in 2010 reasonably expect those

2    ingredients to be safe in an IV administration?

3    A.      They were all on the FDA inactive ingredients list and

4    had been used in many approved products.

5    Q.      And can I direct you to DTX-107, please.  And what is

6    DTX-107, once you're there?

7    A.      Okay.  This is an article by Strickley, and it's

8    called solubilizing excipients in oral and injectable

9    formulations.

10   Q.      And what does Strickley tell a POSA about the safety

11   of the solvents explained in the '797 patent?

12           MR. HARBER:  Objection, Your Honor.  This would

13   be subject to our Daubert motion.  I'm not again sure

14   exactly what is being asked here.

15           THE COURT:  Yes.

16           MS. ROLLO:  I'm simply asking about the

17   expectation for the safety.  He has designed hundreds of

18   clinical trials and been involved in those.

19           THE COURT:  All right.  If it's limited to that?

20           MR. HARBER:  That's fine.

21           THE COURT:  Okay.  Then you can proceed.

22           THE WITNESS:  So Strickley indicates that PG and

23   PEG are safety and commonly used.

24   BY MS. ROLLO:

25   Q.      If we can go to the section under organic injectable

Yates - direct

1   formulation.

2   A.   The page number, please?

3   Q.   22.   And what does this tell a POSA about the safety

4   of the solvents claimed in the '797 patent?

5   A.   It tells us that, this is talking about organic

6   injectable formulations and that examples of drugs that are

7   non-ionizable, lipophilic, and nonpolar are challenging to

8   formulate, and it gives several examples of drugs such as

9   paclitaxel, docetaxel.   These are oncology agents and others

10  that are all solubilized in nonaqueous solutions composed

11  entirely --

12            THE COURT:   Can you stop for a second?   I mean,

13  this does not seem to be directed to the safety of

14  excipients.

15            MS. ROLLO:   Thank you.   I will strike it.

16            THE COURT:   I don't know why you are even -- you

17  don't do yourself any good in this court if you say one

18  thing and then you follow up with another thing.   So that

19  was not what I expected.

20            MS. ROLLO:   I understand, Your Honor.

21  BY MS. ROLLO:

22  Q.   Dr. Yates, did you consider any secondary

23  considerations in forming your opinion today?

24  A.   Yes.

25  Q.   And would think of those secondary considerations

1    change your opinion?

2    A.    No.

3                    CROSS-EXAMINATION

4    BY MR. BARABAS:

5    Q.    Dr. Yates, I'm just going to question you about a

6    claim in the patent asserted against only by client,

7    Slayback Pharma.

8              Dr. Yates, do you recognize 0009?

9    A.    Yes.

10   Q.    What is this document?

11   A.    This is the '887 patent.

12   Q.    Have you reviewed this patent?

13   A.    I have.

14   Q.    Have you formed an opinion about this patent?

15   A.    Yes.

16   Q.    And what is that opinion?

17   A.    The asserted claims in this patent are obvious because

18   they're taught in the prior art.

19   Q.    And if we could look at the first Slayback slide.

20              And, Dr. Yates, if I could ask you to explain,

21   what is claim 13 of the '887 patent about?

22   A.    It's about a particular composition formulation that

23   is -- has certain characteristics in terms of the total

24   impurities at a certain temperature over a certain time, and

25   it's diluted in a diluent and then given parenterally to a

Yates - cross

1   subject and there is a range of doses given of bendamustine

2   ranging from 25 to 120 milligrams per meter squared.  And

3   claim 13 clarifies that the volume administered is about

4   50 milliliters.  Claim 8 says the subject is a human.

5   Q.    Okay.  And, Dr. Yates, are there any elements of this

6   claim that are not taught by the prior art?

7   A.    No.

8   Q.    And did you prepare a slide summarizing that opinion?

9   A.    Yes.

10  Q.    Would you explain generally what is shown on that

11  slide before we break it down element by element?

12  A.    Right.  So on the left-hand side, the claim 13 is

13  written in independent form, and on the right hand side,

14  each element is linked to the relevant prior art.

15  Q.    All right.  Dr. Yates, what is shown with respect to

16  the preamble of the '887 patent in view of the prior art?

17  A.    The preamble involves treating CLL or NHL, and that is

18  revealed in the Treanda label, both treatment of CLL and

19  NHL.

20  Q.    Okay.  Dr. Yates, what is shown with respect to an

21  Element A?

22  A.    All right.  So there is a nonaqueous liquid

23  composition revealed, a range of doses of ten to a hundred

24  milligram per mL, and a level of total impurities of less

25  than about five percent determined by a particular HPLC

1    method once the composition is being stored for 15 months at

2    a temperature of from about five degrees Celcius to about

3    25 degrees Celcius.

4              And then the relevant prior art is Palepu,

5    which, 2011, which reveals the composition, containing

6    50 milligrams per mL of bendamustine, and Palepu also

7    reveals the exact impurity limitation recited in this

8    element of the claim.  And I would point out also Olthoff

9    gives a range of doses of bendamustine in nonaqueous

10   solution from 25, 50 to 125 milligrams per mL, so    the

11   range here overlaps substantially with the range of Olthoff.

12   Q.    Dr. Yates, going specifically to that impurity

13   limitation, have you prepared a slide with respect to that

14   limitation?

15   A.    Yes.

16   Q.    Can we look at that slide?

17   A.    Reading from the claim, the wording here as determined

18   by high performance liquid chromatography, wavelength of

19   223, after at least about 15 months of storage at a

20   temperature of from about five degrees Celcius to about 25

21   Celcius.  That's word for word what we see in the claim.

22   Q.    And I actually want to pull up DTX-984, which is the

23   Palepu 2011 reference.

24   A.    Yes.

25   Q.    If we could specifically go to paragraph 24 through 33

1    of that reference first.

2    A.    Yes.

3    Q.    And if we could blow that up.

4          Okay.  And I first direct your attention to

5    paragraph 24.  And what is being disclosed there?

6          THE COURT:  Just for the record, is it paragraph

7    24 or column 2, line 24?  Paragraph?  What is this?

8          MR. BARABAS:  Sorry, Your Honor.

9          THE COURT:  No.  You don't have to be sorry.

10         MR. BARABAS:  It's a patent application.

11         THE COURT:  Oh, the application.

12         MR. BARABAS:  They have paragraph numbers.

13         THE COURT:  Okay.

14         MR. BARABAS:  I'm referring to the specific

15   paragraph number.

16         THE COURT:  They don't reboot with the new

17   columns or new pages.  They continue throughout?

18         MR. BARABAS:  So when it becomes a patent, then

19   you have column and line numbers.

20         THE COURT:  Okay.  Thank you.

21         MR. BARABAS:  No problem.

22   BY MR. BARABAS:

23   Q.    So if we could go to specifically paragraph 24 first,

24   Dr. Yates.

25   A.    Yes.

Yates - cross

1    Q.    And what's that discussing?

2    A.    Yes.  This is talking about a preferred long-term

3    storage stable bendamustine containing compositions in

4    accordance with the invention, and it goes on to talk about

5    bendamustine or a pharmaceutically acceptable salt

6    thereafter, a pharmaceutically acceptable fluid, including

7    PEG and PG.  Stabilizing amount of thioglycerol or about

8    50 milligrams of bendamustine.

9    Q.    I just want to stop you right there.

10   A.    Right.

11   Q.    That 50 milligrams a millimeter, how does that compare

12   to the claim language?

13   A.    So the claim is, I believe, for 50 milligrams per mL.

14   Q.    So if we could go back to the claim language of the

15   claim, the previous slide.

16           And then looking again, Dr. Yates, claim Element

17   A, that's from about ten --

18   A.    Right.

19   Q.    Mg to about 100 mg?

20   A.    It includes the 50.

21   Q.    It includes the 50.

22           Now, if we can go back to the Palepu 2011

23   reference.

24   A.    Yes.

25   Q.    I want to take you to paragraph 23, Dr. Yates.  How

1   does that compare to the claim language?

2   A.     So each of these compositions have the same stability

3   profiles already described, i.e., having less than about

4   five percent total impurities PAR as determined by HPLC at a

5   wavelength of 223 nanometers, after at least about 15 months

6   of storage at a temperature of from about five degrees

7   Celcius to about 25 degrees Celcius.

8   Q.     Okay.  So this is the formulation from Dr. Palepu, who

9   was in court the other day; is that correct?

10  A.     Yes.

11  Q.     Okay.  Now, if I could take you specifically, Dr.

12  Yates, to Paragraph 7 of this application.  If we could blow

13  that up.

14         And I would like to direct your attention, Dr.

15  Yates, to the second-to-last sentence.  If I could just ask

16  you to read that.

17  A.     Yes.  "The inventive formulations are advantageously

18  ready to use or ready for further dilution."

19  Q.     All right, Dr. Yates.  With that background, if we

20  could go back now to the slide showing the claims in view of

21  the prior art.

22  A.     All right.

23  Q.     And, Dr. Yates, before I get into Element B, the POSA,

24  the clinical scientist POSA wouldn't have had to do any

25  further work to get that formulation.  He would have taken

Yates - cross

1   it directly from Dr. Palepu's 2011 publication, which is

2   undisputed prior art; right?

3   A.    Yes.

4   Q.    Okay.  Now, with that background, if we could go back

5   to Element B, what does -- what is shown with respect to

6   Element B in view of the prior art?

7   A.    Element B in the prior art is for a diluting with

8   parenterally acceptable aqueous diluent and the Treanda

9   label provides, well, two such diluents.  Namely, sodium

10  chloride and half normal sodium chloride.

11  Q.    And let's now turn to Element C of the claim, which

12  talks about administering a composition.

13            What is shown with respect to Element C in view

14  of the prior art?

15  A.    The two bits, if you like, of Element C.  One is

16  bendamustine at a dosage range from 25 to 120, and that

17  range is given in the Treanda label.  25 is the lowest dose

18  for CLL.  120 is the starting dose for NHL.  So that's from

19  the Treanda label.

20            And then the second part of Element C is the

21  administration and volume of about 50 milliliters of the

22  diluted composition over a period of less than or equal to

23  15 minutes, and we've discussed already several of these

24  references.

25            Olthoff in particular gives the volume in

Yates - cross

 1    connection with the Treanda label, giving it a dose of about

 2    200 milligrams.  Barth gives a volume of a hundred mL's.

 3    Preiss gave as infusion duration of 10, 3 to 10, which is

 4    less than 15 minutes.  And Glimelius tells us we can infuse

 5    50 to a hundred mL's of a range in 10 to 20 minutes.

 6    Q.     Okay.  Dr. Yates, why would a POSA have a reason to

 7    combine these references?

 8    A.     Well, first of all --

 9                 MR. HARBER:  Objection.

10                 THE WITNESS:  From here to here, there's only

11    two references.

12                 THE COURT:  Stop.

13                 THE WITNESS:  Sorry.

14                 MR. HARBER:  The motivation to combine these

15    references is not in his report.

16                 MR. BARABAS:  Actually, if I can have his

17    report.

18                 THE COURT:  Counsel, can you just repeat into

19    the microphone what you said?

20                 MR. BARABAS:  If we can go to Appendix B-3, and

21    it's pages 40 to 51 are discussing the claim 13, which

22    depends from claim 8, which depends from claim 1, and

23    there's a high level section right on page, Appendix D three

24    on page 40.

25                 And I guess I'd also --

1                    THE COURT:  Wait.  Before you go any further,

2    I'm sorry.  I've got a report of John Yates.  Somebody

3    handed it to me.  You're going off to something else.  So

4    what is it?

5                    MR. BARABAS:  I can hand you my copy.

6                    THE COURT:  Is it of the Yates report?

7                    MR. BARABAS:  Opening expert report of John

8    Yates, M.D.

9                    THE COURT: All right.  I've got report of John

10   Yates, M.D., responsive to secondary considerations.

11                   MR. BARABAS:  I'm told your report is missing

12   the appendices.

13                   THE COURT:  All right.

14                   MR. BARABAS:  I would be happy to hand that up.

15   If I may approach?

16                   THE COURT:  Sure of does your adversary --

17                   MR. BARABAS:  Do you have a copy of that?

18                   MR. HARBER:  Yes.

19                   THE COURT:  All right.  Then Appendix B, what

20   else?

21                   MR. BARABAS:  I'm sorry.  Appendix B-3.

22                   THE COURT:  B-3.

23                   MR. BARABAS:  Specifically at page 40 with

24   respect to the '887 patent.  Also, we can go on if you go

25   back into the body of the report as well.

1                THE COURT:  Mr. Harber, what do you think?

2                MR. HARBER:  The issue is that this is what we

3     submitted.  We weren't on notice that that question was

4     going to be asked here.

5                When we submitted our letter the other day, it

6     was essentially the same issue with Dr. Pinal.  We had

7     raised after we got these reports that they did not clearly

8     disclose if there was some particular set of references in a

9     particular motivation to combine that defendants' experts

10    would be running, we were not on notice of.

11               We appeared before Your Honor in May.  I think

12    Your Honor gave them an opportunity.  We decided what were

13    the set of combinations.  Your Honor gave them an

14    opportunity to correct that record.  They didn't do it.

15               I asked Dr. Yates in particular at his

16    deposition, which occurred after that date.  I listed all of

17    the references he had in his report and I said, are you

18    relying on any subset of those references to render the

19    claims obvious?  He said, I have not identified those in my

20    report.

21               And here we are at trial and the witness is

22    offering a specific set of references that was never

23    specifically set out before and is going to offer a

24    motivation to combine them that is not disclosed here.

25               MR. BARABAS:  May I respond to that?

Yates - cross

1      THE COURT:  Yes.

2      MR. BARABAS:  Okay.  At the time that this

3   report was submitted, my co-defendants, who have ultimately

4   230 clients pending against my client.  There are about 50

5   claims pending from I thing two patents, one of which was

6   dropped.

7      We had obviously in the text, had we known claim

8   13 would be one claim out of the 50-odd claims initially

9   asserted at trial against our client, there would have been

10   more detail than in these particular paragraphs about this

11   particular patent.  But I think it does generally describe

12   what he's going to do here.

13      And specifically with respect to --

14      THE COURT:  Wait, wait.  Let's slow down.

15      MR. BARABAS:  All right.

16      THE COURT:  The timeline.  So I vaguely recall

17   we had to have a hearing in May and we had to set in

18   concrete the combination.

19      Were you at that hearing?

20      MR. BARABAS:  I do not believe I was at that

21   hearing, Your Honor.  I'm aware of it.  What I was going to

22   say, the combinations here are no surprise to Mr. Harber,

23   because if you look on pages 40 through 51, every one

24   of the references that I have right there is right next

25   to the particular claim elements.  You've got the

1    combinations.

2              THE COURT:  I just want to make sure.  You know,

3    this was a very hard case to manage.  It has been through

4    two other judges.  Right?  And I recall this was a really

5    big issue putting in place limitations to make it fair to

6    both sides so nobody was sandbagged at trial.

7              MR. BARABAS:  Right.

8              THE COURT:  So Mr. Harber, I'm going to ask:

9    Can you walk me through the chronology?  We'll go slowly and

10   then we'll hear.  Go ahead.

11             The first thing is the May hearing?

12             MR. HARBER:  The first thing is we got the

13   reports.

14             THE COURT:  Right.

15             MR. HARBER:  And were we got the reports, we had

16   correspondence back and forth.  We submitted it the other

17   day, the other evening to, with our letter.  We had

18   correspondence.

19             THE COURT:  You submitted what?

20             MR. HARBER:  We cited, I believe, our letter

21   briefing from that hearing, which set out the

22   correspondence.

23             THE COURT:  Right.  Okay.  I remember this.  In

24   fact, it seemed to be all resolved.

25             MR. HARBER:  That was for Dr. Pinal.  We had

 1    resolved that with the combinations he was running.  This is

 2    a different issue.

 3                THE COURT:  I see.

 4                MR. HARBER:  And so we wrote that and said, your

 5    reports, the way they were written, was, frankly, baffling.

 6    For example, to take what Mr. Barabas said, it's true if

 7    you look in the chart for certain elements, it says

 8    they're relying on certain disclosures.  That's not our

 9    objection.

10                Our objection is that if this expert wants, or

11    the defendants want to say that I would take this particular

12    disclosure from this limitation, this disclosure from this

13    limitation, and this disclosure from this limitation, and

14    this would be a motivation to combine those and those would

15    invalidate your claims, we have to be on notice of that.

16    And I don't see that disclosure in here.  And, again, I

17    specifically asked this witness at his deposition.

18                So I don't know how I'm supposed to examine him

19    about his opinions on this combination if it was never

20    disclosed to me.

21                THE COURT:  All right.  I think it's a fair

22    recitation of the circumstances.

23                MR. BARABAS:  --

24                THE COURT:  Yes.  But before I do that, you've

25    identified B-3 beginning at page 40.

1              MR. BARABAS:  Right.

2              THE COURT:  And there's no question as I read

3      through it, there are disclosures of prior art.

4              MR. BARABAS:  Right.

5              THE COURT:  But as I read through it very

6      quickly, I'm not seeing anything about motivation to combine

7      references.

8              MR. BARABAS:  Yes.

9              THE COURT:  Before you answer, and I will let

10     you speak, can you point to me anything in the text of B-3

11     from which I could see discussion of motivation to combine?

12             MR. BARABAS:  So I would first say, those words

13     are not used, but what it's describing is the process under

14     obviousness that a POSA would go through.

15             THE COURT:  Where is it?

16             MR. BARABAS:  So if you look at the second

17     paragraph, the third line.

18             THE COURT:  On what page?

19             MR. BARABAS:  I'm sorry.  I'm on page 40 of

20     appendix B-3.

21             And it begins at the end of the third line,

22     second paragraph, it begins:  For that purpose, in view of

23     the prior art particularly, and then it recites prior art, I

24     understand that the formulator without any extraordinary

25     level of skill or experience would have developed a liquid

Yates - cross

1   formulation and it goes on.

2           And I think Mr. Harber is correct, the level of

3   detail, you know, when you are doing this work, 25, I think

4   it's actually more than that at the time.

5           And in view of the number of references, it is

6   not, you know -- it is not as detailed as it might have been

7   had we know the particular claim was asserted against us

8   ultimately at trial.  But we have every reference right

9   there right with the particular claim language if we wanted

10  to track right through, you know, the claims.

11          THE COURT:  Does anybody have a transcript?

12          I have to say, my recollection is consistent

13  with Mr. Harber's and I'm at a loss for that reason why I'm

14  having to address this now.  And you're saying that, well,

15  you're prejudiced because they've kept claim 13 in the case,

16  but under the case management rules that were set, they

17  didn't violate that order by having claim 13 still in the

18  case.

19          MR. BARABAS:  Right.  I guess my question

20  is I didn't understand what the violation is on our side

21  though.

22          THE COURT:  I thought you were limited to

23  identifying the combinations, but that's my recollection.

24  And you've got some colleagues standing up very quickly, so

25  I'm going to hear everybody.

1           MR. FELDMAN:  Again, those claims are no longer

2   asserted against our clients.  I don't really want to wade

3   into this.  My recollection, you can look at the transcript

4   obviously.  It was limited to a number of prior art

5   references, but you did not order the combination.

6           MS. STAFFORD:  To add a little more flavor, when

7   we filed our expert reports, they were asserting 240 claims

8   against us collectively, their initial opening reports due

9   the same day.  They only maintained 90 claims.  Talk about

10  sandbagging, gamesmanship.  They could have told us weeks

11  before.

12          THE COURT:  I hear you.  It's a challenge in

13  this case with respect to that kind of stuff.  I hear you.

14  It's very hard to figure out what's right.

15          Do you want to show me the transcript?

16          MR. HARBER:  I have a binder of what I believe

17  we submitted the other night.  If I could approach?

18          THE COURT:  Okay.  I will take a look at it.

19          (Mr. Harber handed a binder to the Court.)

20          THE COURT:  Do you want to point me to specifics

21  real quick?  You've got it highlighted.

22          You do have highlighted language.  You have not

23  highlighted how I ended the hearing.

24          MR. HARBER:  That's right, Your Honor.  My

25  position was not that you had precluded this.  My position

 1    was we had asked them for these combinations and they

 2    refused to identify them when we set out a separate set of

 3    combinations.

 4                 You said, I'm going to deny it, but defendants

 5    are raising a point and I'm going to hold defendants to what

 6    they said in the report.

 7                 THE COURT:  I remember that very, very clearly.

 8                 MR. HARBER:  My objection, just to be clear,

 9    is --

10                 THE COURT:  It's not in the report.

11                 MR. HARBER:  It's not in the report.

12                 THE COURT:  All right.

13                 MR. HARBER:  The timeline, there are allegations

14    of sandbagging here.  I mean, I asked the witness at his

15    deposition about what combinations he was relying on and

16    they weren't -- this wasn't identified.

17                 MR. BARABAS:  I don't have the transcript in

18    front of me.  I would ask if these particular claims were

19    asked at the deposition.

20                 THE COURT:  All right.  Someone is lucky that

21    the Marshal is not in the room.  Turn those phones off.  So

22    just to be clear, for those in the audience who weren't

23    lawyers involved in the case, if there's anybody -- you

24    know, I'm looking at an appendix which is a claim chart

25    that's 135 pages long, which has a two-paragraph

1      introduction, which is most generously described as a

2      conclusory overarching statement that the 135-page claim

3      chart with its various disclosures, and there are numerous

4      disclosures of prior art led Dr. Yates to form an opinion

5      about obviousness.

6              It would be completely unhelpful to a party who

7      was served with this report to figure out what opinions Dr.

8      Yates had about the motivation to combine specific

9      references.

10             Mr. Harber, I'm going to be honest with you.

11     The Federal Circuit may look at this and say, you know what,

12     we're going to give him his day.  And I'm going to give you

13     the choice, because you might be able to cross-examine this

14     witness very effectively.  And do you really want to

15     ultimately just preclude him from even offering an opinion,

16     which were you to prevail, might create reversible error and

17     you're back here again?

18             MR. HARBER:  I think, I mean --

19             THE COURT:  Because I think -- what I'm trying

20     to say is, I hear you and I actually think it's a legitimate

21     objection, and I'm tempted to just preclude the testimony

22     from coming in.  But I know the reality of litigation and

23     appeals in the Federal Circuit.

24             MR. HARBER:  I understand it.  I will just say

25     that in the letter we submitted to, we cited two cases from

Yates - cross

1    the Federal Circuit that refute, that affirm lower Court

2    decisions that preclude a witness, an expert from testifying

3    on just this basis when there wasn't a specific combination

4    of references and a specific --

5                    THE COURT:  Here's the problem.  It's going to

6    be up to some panel of judges that's going to say, is it

7    enough to say that that one sentence that your adversary

8    read into the record is enough in combination with, they do

9    have specific references that are disclosed relative to

10   these limitations?

11                   That's the bet, and you know what?  It's a

12   gamble you can take.  I'm going to let you make the call.

13   You get to decide.  What do you want to do?

14                   MR. HARBER:  We are maintaining our objection,

15   Your Honor.

16                   THE COURT:  I'm going to then not allow the

17   testimony in.  I think it would be frankly a stretch to say

18   that there's any disclosure about specific prior art in the

19   combinations that are in that report and actually tied to

20   the motivation, so I don't think it's disclosed in the

21   expert report, so I will sustain the objection.

22   BY MR. BARABAS:

23   Q.    And my final question then is:  You've already

24   discussed briefly your views with Ms. Rollo on the secondary

25   considerations and none of the asserted secondary

1    considerations apply here.

2              What opinion do you specifically have with

3    respect to whether any secondary considerations support the

4    validity of claim 13 of the '887 patent?

5    A.    Yes.  I have the same opinion.  The '887 patent, that

6    none of the secondary considerations alter my opinion and

7    that the claim 13 of the '887 patent remain invalid for

8    obviousness because of the prior art.

9              MR. BARABAS:  Okay.  Thank you, Dr. Yates.

10             MR. HARBER:  May I approach?

11             THE COURT:  Please.

12             (Mr. Harber handed binders to the Court.)

13             THE COURT:  Incidentally, is the report part of

14   the record, because it does need to be made part of the

15   record so that any appellate court, in the event that my

16   ruling were to be appealed, it's important that the Federal

17   Circuit read that entirety of appendix B-3 and know what I

18   was looking at.

19             MR. HARBER:  We can take care of that

20   administratively.

21             THE COURT:  At some point, please do.

22             MR. BARABAS:  We would ask to move that into the

23   record as well.

24             THE COURT:  All right.  You need to confer with

25   each other and then decide how it's marked and whatnot.

Yates - cross

1    BY MR. HARBER:

2    Q.    Good afternoon, Dr. Yates.

3    A.    Good afternoon.

4    Q.    I want to start where, with one of the materials in

5    the binder that you had from your own counsel.  It was

6    DTX-1041.

7              Can we put that up?

8              You recall testifying about exhibit DTX-1041.

9    That contained a lit review from Eagle to the FDA; is that

10   correct?

11   A.    Yes.

12   Q.    That was the document, the few pages of this.  It's a

13   200-page document that you testified about on direct; is

14   that correct?

15   A.    Yes.

16   Q.    And if you look, there's a listing of attachments

17   here.  And there's a number of them.  That literature

18   review wasn't the only thing that was attached for the FDA;

19   right?

20   A.    Correct.

21   Q.    For example, attachment five is a summary of non-GLP

22   rabbit studies?

23   A.    Yes.

24   Q.    Do you see that?

25   A.    Yes.

Yates - cross

1    Q.      That's something Eagle gave the FDA?

2              MS. ROLLO:  Objection, Your Honor.  These are

3    the rabbit studies they said weren't coming in for

4    unexpected results.

5              MR. HARBER:  That's not what I'm offering it

6    for.

7              THE COURT:  Are you offering that rabbit study?

8              MR. HARBER:  No, Your Honor.  They were the ones

9    that moved the document into evidence.  I'm just noting it's

10   attached here.

11             THE COURT:  Okay.  Incidentally, I'm trying to

12   find realtime, but I've lost my connection.

13             I think though a premise of your first question

14   was, this did go to the FDA.

15             MR. HARBER:  Well, let me --

16             THE COURT:  Did we fight that battle for

17   nothing?

18             MR. HARBER:  My objection wasn't whether these

19   went or didn't --

20             THE COURT:  We'll go over that.  Is it in

21   dispute, did this go to the FDA?

22             MR. HARBER:  I believe the disputed materials

23   went to the FDA.  The objection was a foundation about what

24   Eagle was trying to convey.

25             THE COURT:  Fair enough.  All right.

1   BY MR. HARBER:

2   Q.   Dr. Yates, attachment 5 is a summary of non-GLP rabbit

3   studies; is that correct?

4   A.   Could you point me to attachment five?

5   Q.   I'm just asking you from the first page, it lists the

6   attachments.

7   A.   Are we talking about the memo from Foma Raskovsy?

8   Q.   Yes.  I'm talking about the document that you

9   testified about on direct.

10  A.   Okay.

11  Q.   One of the attachments is described as summary of

12  non-GLP rabbit studies; is that correct?

13  A.   I'm sorry.  Point me to exactly where it says

14  that.

15  Q.   In the attachment to the e-mail, the very first page,

16  sir.  It's also on the screen if you would like to look.

17  A.   Yes.  Attachment five, summary of non-GLP rabbit

18  studies.

19  Q.   You did mention that on direct; is that correct?

20  A.   I don't recall the question about it.

21  Q.   And the next item listed there is attachment 6A,

22  hemolysis study draft protocol.

23        Do you see that?

24  A.   Yes.

25  Q.   And that's not something that you testified about on

1    direct; is that correct?

2    A.    You mean during my deposition?

3    Q.    No.  On your direct testimony today.

4    A.    No, I did not mention that.  That was a draft study

5    and not a completed study.

6    Q.    And attachment 6-B, GLP rabbit local tolerance draft

7    protocol.

8              Do you see that?

9    A.    Yes.

10   Q.    You didn't testify about that; is that correct?

11   A.    No.

12   Q.    And attachment 7-A is called Monte Carlo simulations

13   of bendamustine pharmacokinetics.

14             Do you see that?

15   A.    Yes.

16   Q.    That's a study that Eagle commissioned.  Do you know?

17   A.    It's an analysis, not a study.  They analyzed the data

18   from previous studies.

19   Q.    And you -- that was an analysis that Eagle

20   commissioned and paid and a university in Australia to

21   conduct.  Are you aware of that?

22   A.    That's what you told me at my deposition.

23   Q.    Are you aware one way or another?

24   A.    I believe you.

25   Q.    But you don't know?

1    A.    You told me that and I have no reason to disbelieve

2    you.

3    Q.    And, again, on your direct testimony you did not

4    mention this as a document in this packet; is that correct?

5    A.    Yes.

6    Q.    The Eagle -- and this document was not asking for

7    permission to market its shorter infusion product without a

8    bioequivalence safety study; is that correct?

9    A.    I would call it a bioequivalence study.  It obviously

10   included some patients and so there was some minimal safety

11   information, but it was not titled a safety study.

12   Q.    They were asking for permission to do a study; is that

13   correct?

14   A.    Right.  A presumed study that included bioequivalence.

15   Q.    And it included endpoints on safety?

16   A.    Yes.  All studies do.

17   Q.    Now, you are testifying on behalf of Apotex and

18   Slayback in this case?

19   A.    Yes.

20   Q.    Those are the only defendants who retained you in this

21   matter?

22   A.    That is correct.

23   Q.    But before you were retained by anyone, you had a

24   phone call that included lawyers from Fresenius Kabi and

25   Mylan; isn't that right?

Yates - cross

1  A.    That's my recollection and that's what I told you.

2  Q.    And the purpose of that call was to talk about your

3  background?

4  A.    Well, I think that was part of it.  I thought it was

5  to see if they wanted to retain me or not.

6  Q.    After that call, Fresenius Kabi and Mylan did not

7  retain you; is that correct?

8  A.    That's correct.

9  Q.    Now, one of the parties who did retain you here is

10  Apotex; is that right?

11  A.    Yes.

12  Q.    And this is not the first time you have done work for

13  Apotex?

14  A.    That's correct.

15  Q.    And, in fact, you've testified for Apotex three or

16  four times in the last five years; is that right?

17  A.    I can't tell you exactly the number of times in the

18  last five years, but it may well have been.

19  Q.    And am I correct so that except for a six-month period

20  in 2004 where you worked for a company called Radius, all of

21  your work in the last ten years has been as an expert

22  witness in litigation matters?

23  A.    No.  I've also been a fact witness in some product

24  liability lawsuits on behalf of both Takeda and Merck.

25  Q.    All of your earned income in the last ten years except

1    for the period when you were at Radius came from being an

2    expert witness in litigation matters?

3    A.    Except for the -- I did get paid as a witness, fact

4    witness in those other cases.

5    Q.    So all of your earned income in the last ten years,

6    except for that six-month period, was being paid to testify;

7    is that correct?

8    A.    That's -- well, with a short stint teaching chemistry

9    at the local college, that is true.

10   Q.    That was for about a five-month period a few years

11   ago?

12   A.    Yes.

13   Q.    Now, aside from this case, you have testified in other

14   patent cases before; is that correct?

15   A.    Yes.

16   Q.    You've done it six times?

17   A.    Five times before this one.

18   Q.    Okay.  And in every one of the cases that you have

19   been retained as an expert that are patent matters, you have

20   determined that the patent is asserted is obvious; is that

21   correct?

22   A.    Yes.

23   Q.    Now, you, yourself, are the inventor on several

24   patents; right?

25   A.    Yes.

Yates - cross

1    Q.    And you testified at trials concerning those patents,

2    have you not?

3    A.    Yes.

4    Q.    Including trials in other countries?

5    A.    Yes.

6    Q.    And one of those was in Australia; is that correct?

7    A.    Yes.

8    Q.    And that case involved your former employer, Merck,

9    did it not?

10    A.    Yes.

11    Q.    And that was a challenge to one of the patents on

12    which you were an inventor; right?

13    A.    Yes.

14    Q.    And in that case, the Court held that your testimony

15    stretches credulity.  Are you aware of that?

16    A.    Yes.

17    Q.    And the Court rejected the evidence that you provided

18    in that matter.  Are you aware of that?

19    A.    Yes.

20    Q.    Now, you do not currently practice medicine; is that

21    right?

22    A.    That's true.  I regard myself as a physician and I

23    still use my physician skills, but I don't see patients.

24    Q.    You have not seen a patient since 1990 when you gave

25    up your license?

1    A.    That's right.

2    Q.    And before that time, you were not an oncologist;

3    right?

4    A.    Correct.

5    Q.    You were an endocrinologist?

6    A.    Yes.

7    Q.    And you've never treated cancer; is that correct?

8    A.    Not -- I've treated cancer patients, but not to treat

9    the cancer itself.

10   Q.    And you've never treated CLL or NHL; is that correct?

11   A.    No, not to treat the disease.

12   Q.    So I am correct?

13   A.    You are correct.

14   Q.    And you have never prescribed bendamustine; is that

15   correct?

16   A.    That's true.

17   Q.    And you have never prescribed any nitrogen mustard?

18   A.    That is true.

19   Q.    And you've never prescribed any chemotherapy agent?

20   A.    That is true.

21   Q.    And you've never spoken to a patient who is being

22   treated by bendamustine; is that correct?

23   A.    Correct.

24   Q.    And you've never spoken to a patient who was being

25   treated by any nitrogen mustard; is that correct?

1    A.     I don't know that that is true.  I don't think that's

2    true.

3    Q.     You've never treated thrombophlebitis; is that

4    correct?

5    A.     I've seen phlebitis.  I've not seen thrombophlebitis.

6    Q.     And before you were retained in this case, you had

7    never heard of bendamustine before; is that correct?

8    A.     That's right.

9    Q.     Am I correct since you started work on this case at

10   some point last year, all of your income has been from your

11   work on this matter?

12   A.     Yes.

13   Q.     Now, you indicated earlier that you are testifying in

14   this case from the perspective of a clinical development

15   scientist; right?

16   A.     Yes.

17   Q.     And a clinical development scientist, as I believe you

18   have explained it to me, corresponds to a role at a

19   pharmaceutical company?

20   A.     Yes.

21   Q.     Is that right?

22   A.     That's right.

23   Q.     And the -- you agree that it rarely exists outside of

24   a pharmaceutical company?

25   A.     Yes.  It occasionally can, but rarely.  I agree.

1    Q.    And in your view, the overall objective of a clinical

2    development scientist would be to produce a product that

3    would be both medically useful and commercially viable?

4    A.    Yes.

5    Q.    And the POSA team in your view would be looking for

6    opportunities in the oncology area where there could be a

7    way to produce a product that might be medically useful and

8    commercially viable; is that right?

9    A.    Yes.

10   Q.    So the POSA in your view would be looking for

11   commercial medical opportunities?

12   A.    Yes.

13   Q.    Now, you agree that the frequency of dosing in the

14   case of bendamustine is an important factor in the level of

15   toxicity; is that correct?

16   A.    Frequency of dosing is an important factor, so in

17   regard to if you give it every day versus giving it as a

18   single dose, I'm not sure the question.  So you have to

19   elucidate it for me.

20   Q.    How often you give a patient bendamustine is an

21   important factor in the level of toxicity you observe; is

22   that correct?

23   A.    For the same dose or for different doses?

24   Q.    For the same dose or different doses.  My question is:

25   Do you agree that the frequency of dosing is a factor that

Yates - cross

1   affects toxicity for bendamustine?

2   A.    So if a dose is divided, so you take a dose of say

3   200 milligrams taken over two days instead of one day, then

4   I'm not sure I agree with your, your proposition that just

5   by dividing the dose, I don't think it becomes less safe

6   because it's the same total.

7   Q.    My question, sir, is:  You agree that one of the

8   factors that affects toxicity for bendamustine is the

9   frequency with which it is given to a patient?

10  A.    Well, you have to define the other factors, and if

11  it's the same total dose, I disagree.

12  Q.    You agree then the Preiss 1998 study you looked at,

13  that the maximum tolerated dose, if the patient only got

14  bendamustine on one day was 215 milligrams per meter

15  squared; is that correct?

16  A.    Yes.

17  Q.    And if that bendamustine was spread out over four

18  days, the maximum tolerated dose for any one given day

19  was only 85 milligrams per meter squared; is that correct?

20  A.    Right.  But the maximum cumulative dose was 340 in

21  that particular case.

22  Q.    Right.  But you couldn't give 215 milligrams per meter

23  squared each day for four days in a row and have it still be

24  tolerated; is that correct?

25  A.    Well, the 85 given every day for four days was the

Yates - cross

1    maximum tolerated dose and one would not want to exceed that

2    unit dose every day for four days because that would be

3    beyond the maximum tolerated dose.

4    Q.    So is the answer to my question yes?

5    A.    Please repeat the question.  It's very important.

6    Q.    The question was:  You could not take the maximum

7    tolerated dose from a one day administration and say that it

8    would be safe to give a patient every day for four days in a

9    row; is that correct?

10   A.    That is correct.

11   Q.    And you are not aware of any reference before the

12   priority date where the maximum tolerated dose was

13   determined for a daily bendamustine infusion two days in a

14   row in ten minutes or less; is that correct?

15   A.    When you add the caveat in ten minutes or less, that

16   is correct.

17   Q.    Now, you testified on direct about a reference called

18   Glimelius, DTX-79.

19   A.    Yes.

20   Q.    Do you recall that?

21   A.    Yes.

22   Q.    And that was not a reference that involved

23   bendamustine; right?

24   A.    Agreed.

25   Q.    Bendamustine is not mentioned anywhere in that study?

1    A.    Agreed.

2    Q.    It does not talk about the safety of a bendamustine

3    infusion anywhere; is that correct?

4    A.    Correct.

5    Q.    And there's no literature you're aware of that says

6    that this reference would be relevant for bendamustine; is

7    that correct?

8    A.    Well, its relevance is not, it's not irrelevant

9    because it's talking about routine practice in using 50 and

10   a hundred milliliter bags and the duration of infusion of

11   those bags using a chemotherapy agent.  So I needed the

12   reference to say if you have this volume, then this duration

13   would be a typical duration for infusion.

14   Q.    But you agree, sir, there is no literature you're

15   aware of that says that the findings in this study are at

16   all relevant to bendamustine.  That's correct?

17   A.    It is relevant to bendamustine because it's telling

18   you a routine duration of an infusion of 50 or a hundred

19   milliliters and now we're talking about adding bendamustine,

20   two bags that have 50 or a hundred milliliters.

21   Q.    I understand that's your opinion.  My question is

22   different.  My question was:  You are not aware of any

23   literature that says that anything recorded in this paper,

24   DTX-79, is relevant to bendamustine?

25   A.    No other literature.  That's right.

Yates - cross

1    Q.     Now, you mentioned solubility, so I want to ask you

2    about this.  You gave a number of, you provided some

3    testimony about what you believe to be the expected

4    solubility of the formulation that was based on your reading

5    of the Olthoff reference, DX 94; is that correct?

6    A.     Yes.

7    Q.     And am I correct that the entirety of that testimony

8    is premised on the ratio that's reported in a claim in that

9    1983 East German study; right?

10   A.     Yes.

11   Q.     And now, sir, you are not a formulator?

12   A.     That's correct.

13   Q.     And you agree that you would bow to Dr. Pinal's

14   experience as a formulator for overall considerations as a

15   formulator?

16   A.     That's true.  I have agreed that Dr. Pinal is the

17   expert here in formulation.

18   Q.     Now, let's look at Olthoff, which is DTX-94.

19          Can we put up Example 1 and claim 1, please, of

20   the last two pages.

21          Now, the formulation in this case, you were

22   talking about the ability to get the claimed formulation or

23   the expectations with respect to getting the claimed

24   formulation in a patent into admixture; is that correct?

25   A.     Sorry.  Repeat the question.

Yates - cross

1    Q.    You are offering opinions about the expected

2    solubility of a formulation that has PEG, PG and

3    bendamustine in admixture that has been delivered to

4    patients.  Is that fair?

5    A.    It is my opinion that these dilution ratios are

6    reasonable dilution ratios and that there's no expectation

7    that there would be any solubility problems when these

8    dilution ratios are used.

9    Q.    Now, you agree that Olthoff does not have any example

10   with PEG anywhere in the patent; correct?

11   A.    I agree.

12   Q.    And you agree that bendamustine probably would not

13   have the same solubility in an aqueous injection either; is

14   that correct?

15   A.    Yes.  And that's clear from Olthoff, that there are

16   differences in solubility.

17   Q.    And there's likely to be differences, for example,

18   between the solubility of bendamustine saline versus water;

19   right?

20   A.    Yes.

21   Q.    But you don't know the specifics of why that is; is

22   that correct?

23   A.    Well, there is a reference by Barth that discusses

24   that phenomenon.

25   Q.    You recall when I asked you that question at your

1    deposition, you did not know why that was; is that correct?

2    A.    No.   I have looked at that reference and found that

3    rationale, at least a qualitative reason why saline and

4    water would differ since then.

5    Q.    My question was not for you to add new opinions, sir.

6    My question was simply when I asked you that question at

7    your deposition, do you know why the solubility of

8    bendamustine would be different in saline versus water, you

9    did not know the answer to that; is that correct?

10   A.    At that time, I couldn't remember, but I had read Mast

11   previously, so I want back to it and found the reference.

12   Q.    And, in fact, I went on to ask you:   That's not

13   something that you looked into for the purposes of providing

14   your opinions in this case.

15         Do you recall that?

16   A.    Yes.   I mean, clearly, I looked into a lot of things,

17   including references like Mast, but I didn't retain all of

18   that information.

19   Q.    Well, let's put up page 199 of the transcript, lines 8

20   through 13.   Actually, why don't we go to page 198 and 199,

21   line 15 of 198.   Start at line 15 of 198 to line 13 of 199.

22         And your testimony, sir, was -- my question was:

23         "So you don't know why the solubility of

24   bendamustine would differ in pure water versus a sodium

25   chloride solution?

1          "Answer:  I can't tell you the specifics.  I

2   think that, though, there is likely to be differences

3   between the solubility within a saline solution and pure

4   water.

5          My question was, but you don't know why?

6          Your answer was" I don't know specifically why,

7   no.

8          My question:  Did you look into the specifics

9   when forming your opinions in this case?

10         Your answer as to why there may be differences

11  in solubility in saline versus water:  I did not look.

12         That was your testimony, sir?

13  A.     Yes.

14  Q.     And you were here when Dr. Pinal testified yesterday;

15  right?

16  A.     Yes, I was.

17  Q.     And you don't disagree with Dr. Pinal, that the

18  solubility of bendamustine in the admixture we're talking

19  about, saline, would be a function of three things.  One is

20  the solubility of bendamustine in PEG; right?

21  A.     Yes.

22  Q.     One is the solubility of bendamustine in PG; is that

23  correct?

24  A.     Yes.

25  Q.     And the other is the solubility of bendamustine in

Yates - cross

1   saline; right?

2   A.    Well, the fourth factor, which is the temperature.

3   Q.    But the other factors are also part of the equation

4   with temperature?

5   A.    I believe so.

6   Q.    And Olthoff doesn't report any solubility data for

7   PEG; is that correct?

8   A.    That's correct.

9   Q.    And there's no data anywhere in Olthoff that would

10  tell the person of ordinary skill what the solubility of

11  bendamustine would be in saline; is that correct?

12  A.    Apart from Mast reporting it qualitatively, I have not

13  seen any quantitative data.

14  Q.    I'm asking you about Olthoff, which you were relying

15  on your opinion?

16  A.    In Olthoff, it doesn't talk about the reliability in

17  saline.

18  Q.    In we can go back to DTX-94.  Put the example in the

19  claim up again.

20          You agree that claim 1 does not refer to PEG at

21  all or a mixture of PEG and PG; is that correct?

22  A.    That's correct.

23  Q.    And Example 1 doesn't refer to PEG at all or a mixture

24  of PEG and PG; is that correct?

25  A.    That's correct.

1   Q.      And the only solubility data in this patent is for PG

2   and bendamustine, which is very high; is that right?

3   A.      Well, the solubility for ethanol and for glycerol in

4   addition.

5   Q.      But for the three things that are relevant here.  The

6   only one that has been reported in this reference as

7   solubility is bendamustine and PG; right?

8   A.      In this reference, yes.

9   Q.      And that solubility is very high; right?

10  A.      Yes.

11  Q.      And it's higher than the solubility would be in PEG or

12  a mixture of PEG and PG; is that right?

13  A.      Yes.

14  Q.      Now, there's no indication in Olthoff that Olthoff

15  tested any of these dilution ratios that are described here;

16  is that correct?

17  A.      That's right.  These don't say one way or another

18  whether he tested these dilution ratios and what he tested

19  them for.

20  Q.      There's no indication in Olthoff that anyone was ever

21  treated with a composition that's described in his patent;

22  is that correct?

23  A.      There's no indication that anyone was treated from

24  this patent.

25  Q.      Now, one of the things that you discussed on your

1    direct was that you took from the Treanda label a comparison

2    of the adverse event data for CLL and NHL patients.

3              Do you recall that?

4    A.    In my report I put the data side by side.  In my

5    presentation today, I just discussed the tables separately.

6    Q.    Yes.  If we can look at those two tables that you

7    discussed.  This is DTX-1202, Table 1 and Table 3.

8              Now, you would agree there are inherent

9    limitations of comparing adverse experiences across

10   different patient populations receiving different doses of

11   bendamustine in different studies; is that correct?

12   A.    Yes.  I indicated that a certain, many caveats of how

13   to look at these data, but nonetheless, I believe that a

14   POSA would have looked at these data to see if there was

15   some strong signal one way or the other of that.

16   Q.    You were here when Dr. Thirman testified earlier

17   today; is that correct?

18   A.    Yes.

19   Q.    Dr. Thirman is an oncologist, sir?

20   A.    Yes.

21   Q.    Dr. Thirman didn't compare these data; right?

22   A.    Correct.

23   Q.    Now, the two populations as I think you just said

24   received different doses of bendamustine; right?

25   A.    Yes.  100 versus 120 milligrams per meter squared.

1    Q.      They received bendamustine in a different number of

2    cycles; is that correct?

3    A.      Yes.

4    Q.      They -- the cycles were of different length; is that

5    correct?

6    A.      Yes.

7    Q.      And this is not a cross-over study; is that correct?

8    A.      Correct.

9    Q.      So no patient in any of these studies received both a

10   30-minute and a 60-minute infusion of bendamustine?

11   A.      That's right.

12   Q.      And the NHL -- the premise of your comparison was to

13   you the fact that the NHL patient adverse event reports are,

14   I don't remember if you said comparable or not significantly

15   better than the CLL 30-minute data would suggest you could,

16   that there wouldn't be a difference between 30 and 60-minute

17   infusion.  Is that fair?

18   A.      No.  I actually stated it in the negative in that

19   there wasn't a clear trend to suggest that CLL, which has a

20   30-minute infusion, had any higher incidence.

21           I'm not trying to say that there was a

22   significant difference or a meaningful difference between

23   the two.  I'm just suggesting that if the data had come

24   out the other way around, that might have been evidence

25   suggestive that the shorter term infusion could be a

Yates - cross

1  cause of more adverse events.  As it happens, it wasn't

2  that way.

3  Q.    You're aware, sir, that the 60-minute data here in

4  NHL, these are relapse patients; is that correct?

5  A.    Yes.

6  Q.    And the CLL data, the 30-minute infusion, those are

7  first line patients; is that correct?

8  A.    Can be.

9  Q.    They have not had prior chemotherapy?

10  A.    The relapse failures are Rituximab relapse failures

11  and as we heard, that's not a chemotherapy.

12  Q.    But you would agree that the 60-minute, the data that

13  you are looking at for the patients who got bendamustine at

14  60 minutes, those are patients who had had prior cancer

15  therapy before their participation in the study?

16  A.    For antioxidant cancer therapy, which is not a

17  cytotoxic, yes.

18  Q.    And the minute patients did not?

19  A.    The 30-minute patients I believe some of who were

20  pre-treated, but I don't recall the specifics.

21  Q.    And you agree that the shortest duration that anyone

22  received bendamustine in these studies was in 30 minutes; is

23  that correct?

24  A.    Yes.

25  Q.    Now, you would agree that the maximum tolerated dose

1   is not necessarily the recommended dose for clinical use?

2   A.    That's true.

3   Q.    And the dose for a cytotoxic agent is often refined

4   over a series of studies?

5   A.    Yes.

6   Q.    You would agree if a lower dose is used in later

7   studies than what was determined to be the maximum tolerated

8   dose for a cytotoxic agent in a Phase 1 study, a POSA

9   would understand that would be because the team had decided

10  that the side effects observed, even at the so-called

11  maximum tolerated dose, were severe enough that it was not

12  merited.

13          Do you agree with that?

14  A.    Yes.

15          MR. HARBER:  I have no further questions.

16          THE COURT:  Any redirect?

17          MS. ROLLO:  No questions, Your Honor.

18          THE COURT:  All right.  You're excused.  Thank

19  you.

20          THE WITNESS:  Thank you.

21          MS. ROLLO:  Can I enter exhibits?

22          THE COURT:  Sure.  No, no.  You know what, let's

23  just do it in the morning when the deputy clerk is here.  It

24  makes it easier.

25          MS. ROLLO:  All right.

```
 1                    THE COURT:  Thank you.  Can both sides please
 2      remember to do that?
 3                    MR. HARBER:  Sure.
 4                    (Witness excused.)
 5                    THE COURT:  All right.  What's next?
 6                    MR. FELDMAN:  I believe there are more
 7      designations, Your Honor.
 8                    THE COURT:  You're going to play a video again?
 9                    MR. FELDMAN:  Yes.
10                    THE COURT:  How long is the video?
11                    MR. PALAIYANUR:  Twenty minutes, Your Honor.
12                    THE COURT:  All right.  You know, you all asked
13      about do I prefer playing or reading video, and the reason,
14      one of the reasons I asked about for both sides to summarize
15      the significance of Mr. Buxton's testimony or deposition was
16      I did think a lot of it was repetitive of prior live
17      testimony and I'm listening to it thinking, why am I
18      listening to it again?  It is hard to listen to it.
19                    So maybe you should be mindful of that as you're
20      figuring out your deposition clips.  If it's merely just
21      to repeat what other witnesses said, you may be think you
22      want -- well, you may want to do it and you may not want to
23      do it.  I will leave it at that.
24                    MR. FELDMAN:  On another reason is there were
25      some documents that we needed to get into the record.  There
```

1   wasn't another easy reason to get it.  Perhaps we could

2   confer and cut down on the depositions.

3              THE COURT:  If anybody is being forced to play a

4   deposition to get a record in, I would ask that the other

5   side, and I don't know who is who and whatever, but just --

6              MS. BAUMGARTEN:  Elise Baumgarten on behalf of

7   plaintiffs.

8              They did approach us about one deposition that

9   they were going to play to get in documents and we agreed we

10  would enter all documents without the deposition, so we are

11  doing our part.

12             MR. FELDMAN:  To be clear, I wasn't saying they

13  haven't.

14             THE COURT:  Well, going forward, I mean, it's a

15  waste of time in a bench trial to play a deposition to

16  documents whose authenticity is really not questioned.  I

17  mean, that's a waste of time.

18             All right.  We'll end the day I guess with

19  20 minutes of depositions.

20             MR. PALAIYANUR:  Permission to approach, Your

21  Honor.

22             THE COURT:  Please.

23             (Binders handed to the Court.)

24             THE COURT:  And then, Mr. Berl, you said you had

25  some kind of housekeeping issue.  Do you want to do it at

1    6:30?

2                    MR. BERL:  That's fine.

3                    THE COURT:  Let's not forget.

4                    MR. PALAIYANUR:  The defendants call by

5    deposition Anthony Drager.

6                    (The videotaped deposition was played as

7    follows.)

8                    Question:  Was bendamustine a known compound in

9    2014 -- I'm sorry, in 2004.  Let's me start over.  Was

10   bendamustine a known compound in 2004?

11                   (Video paused.)

12                   "THE VIDEOGRAPHER:  The court reporter will now

13   swear in the witness.

14                   "ANTHONY DRAGER, Ph.D., sworn.

15                   "Question:  Was bendamustine a known compound in

16   2014 -- I'm sorry, in 2004.  Let me start over.  Was

17   bendamustine a known compound in 2004?

18                   "Answer:  Yes, it was known.

19                   "Question:  What are the benefits of a ready to

20   use formulation over a lyophilized formulation?

21                   "Answer:  Benefits to, you mean just to the

22   clinic?  Or to --

23                   "Question:  To anybody.

24                   Answer:  Well, I would say that the elimination

25   of a step in the prep is always a beneficial, you know,

Drager - deposition designations

1    beneficial to the lyophilized formulation.

2                 Lyophilization is also the most expensive type

3    of formulation to produce.  You're very limited in size.

4    So, we try to avoid that if we can.

5                 "Question:  I'm going to enter Drager Exhibit 1,

6    bearing Bates stamped TEVABEND 00144925 through TEVABEND

7    00144928.  Feel free to look at any portion of this

8    document.

9                 "I'm going to direct you to the last page,

10   whenever you are ready.

11                "Answer:  Okay.

12                "Question:  Have you seen this document before?

13                "Answer:  I have not.

14                "Question:  It looks like an e-mail chain from

15   2005.  Is that right?

16                "Answer:  According to the date stamps, yeah, it

17   looks to be correct.

18                "Question:  Would a line exception be desirable

19   from a marketing manufacturing pointed of view?

20                "Answer:  Primarily as I said before,

21   lyophilized products are the most difficult ones to

22   manufacture.  And you're very limited in capacity.  So that

23   from a manufacturing and marketing perspective, well, from a

24   manufacturing perspective is problematic.  So if you can get

25   away from a lyophilized product, it's always desirable.

Drager - deposition designations

1              "And from a marketing and ease of use

2      perspective, a ready-to-use is always preferable over one

3      that requires multiple steps of preparation.

4              "Question:  I'm going to enter as Exhibit 3 a

5      document bearing Bates numbers TEVABEND 00149102 through

6      149121.

7              "This report identifies a number of benefits

8      of a nonaqueous liquid formulation of bendamustine;

9      correct?

10             "Answer:  Yes.

11             "Question:  And these were the same benefits

12     that you had identified earlier today; correct?

13             "Answer:  Correct.  They are pretty standard.

14     If you can get rid of a lyophilized process, it's always

15     good.

16             "Question:  Can you turn to the page ending in

17     113, page 12 of the Salmedix development report?

18             "Answer:  Okay.

19             "Question:  I want to take a look at the

20     conclusions here.

21             "Answer:  Okay.

22             "Question:  Does Salmedix conclude that

23     bendamustine HCL shows adequate shelf life stability when

24     prepared as a nonaqueous liquid formulation?

25             "Answer:  That's their statement, their first

Case 1:17-cv-01154-CFC   Document 350   Filed 10/25/19   Page 266 of 281 PageID #: 10519
933
Drager - deposition designations

1    statement in the conclusion.

2              "MS. JI:  I'm going to enter as Exhibit 4 an

3    e-mail bearing Bates numbers TEVABEND" --

4              THE COURT:  Can you pause it?

5              (Videotape paused.)

6              THE COURT:  I don't know who is proffering this.

7    The Salmedix, that's not one of the prior art?  I'm

8    confused.  In other words, it's not on the list.  Can

9    somebody explain to me why he was even shown documents and

10   then they didn't offer them and then they just move on.

11   What is going on?

12             MR. FELDMAN:  My understanding is Salmedix was

13   the predecessor to Cephalon with respect to the bendamustine

14   products and Mr. Drager I believe is one of the inventors on

15   the Drager patent, which you heard about.

16             THE COURT:  I heard that.

17             MR. FELDMAN:  Yes.

18             THE COURT:  So Salmedix?

19             MR. FELDMAN:  They were acquired I belive by

20   Cephalon.  Teva can explain that probably better than I can.

21             My understanding is Cephalon acquired Salmedix,

22   acquired the Treanda products.  That was the predecessor.

23             THE COURT:  And renamed it?

24             MR. FELDMAN:  Yes.

25             MS. STAFFORD:  And they're also claiming several

 1    others, a formulation based on Salmedix, and Drager was with

 2    Salmedix.  There will be evidence related to their view as

 3    to their liquid formulation being relative.

 4                THE COURT:  All right.  I'm sure there is going

 5    to be a rebuttal.  Go ahead.

 6                MS. BAUMGARTEN:  Yes, Your Honor.  We don't need

 7    to argue the substance right now.  I just want to correct a

 8    few of the facts that were elicited.

 9                Anthony Drager did not work for Salmedix.  He

10    was an employee at Cephalon.  So what happened was Salmedix

11    worked on developing a liquid formation.  They were going to

12    go for it.

13                Cephalon acquired Salmedix and they decided to

14    go for it because they were interested in bendamustine at

15    that time, which at that time was a lyophilized form, and

16    they ended up marketing the lyophilized form.  That's what

17    we know today as Treanda.

18                They again wanted to develop a liquid.  They

19    went back to see the work that Salmedix had done and see

20    whether that was successful.  That's why he's looking back

21    at it.  I want to clarify he was not, in fact, a Salmedix

22    employee.

23                THE COURT:  Okay.

24                MR. FELDMAN:  That's correct.  I misspoke.  I

25    apologize.

Drager - deposition designations

1          THE COURT:  Was this ever mentioned before?

2          MS. BAUMGARTEN:  I don't believe so.

3          THE COURT:  Definitely, bench trials are

4   different than jury trials.  I encourage you to use

5   transition statements.  I mean, because I mean a lot of the

6   stuff is -- well, I don't know what they're talking about,

7   so anyway.

8          So I encourage counsel, if you want to do that,

9   feel free to use a transition statement.  It's your time.

10  You have to figure out how to use it.  Frankly, transition

11  statements can be a very effective use of time.  I have an

12  understanding of what's coming in.  Go ahead.

13          "Question:  I'm going to enter -- bearing Bates

14  numbers TEVABEND 00143649 through 143650.

15          "Have you seen this e-mail chain before?

16          "Answer:  Yes.  I'm part of the e-mail chain.

17          "Question:  It's a conversation between you and

18  Piyush Patel?

19          "Answer:  Yes, towards the end.  There were a

20  couple of other people at the beginning.

21          "Question:  Okay.  So by February 2016, you knew

22  that your team would want to develop two formulations of

23  bendamustine liquid to test?

24          "Answer:  Well, essentially at this point we

25  anticipate that we may have some work around that.  But

Case 1:17-cv-01154-CFC   Document 350   Filed 10/25/19   Page 269 of 281 PageID #: 10522
936
Drager - deposition designations

1    again, based on this timing, we hadn't even touched or

2    started working on the compound in our group.

3              "Question:  I'm going to enter as Exhibit 5 a

4    lab notebook bearing Bates numbers TEVABEND 00109332 through

5    TEVABEND 00109639.

6              What is Exhibit 5?

7              "Answer:  Exhibit 5 appears to be the laboratory

8    notebook for Dr. Rachel LaBell.

9              "Question:  And the lab notebook number is 2356?

10             "Answer:  That's correct.

11             Question:  If you look towards the bottom of the

12   page, it says propylene glycol -- Salmedix reported

13   solubility of bendamustine to be 125 milligrams per

14   milliliter at 25 degrees Celcius.

15             "Answer:  Correct.

16             "Question:  And it describes the procedure that

17   Dr. LaBell had performed to test the solubility of

18   bendamustine in propylene glycol; correct?

19             "Answer:  That's correct.

20             "Question:  Do you know whether this test was

21   performed in a chemical hood?

22             "Answer:  Specifically, I don't know how she did

23   it.  The procedure at the time was that all open handling of

24   the compound would have been done in a ventilated cabinet,

25   yes.

1          "Question:  Would this procedure have been done

2     under inert gas conditions?

3          "Answer:  I doubt it at this point.  I don't

4     know for sure.  But we weren't handling it under inert

5     conditions, not for screening.

6          "Question:  And the next line says,

7     glycerin-Salmedix reported solubility of bendamustine

8     to be 17 milligrams per milliliter at 25 degrees Celcius;

9     correct?

10          "Answer:  Correct.  That's what it says.

11          "Question:  And then after that it describes the

12     procedure that Dr. LaBell performed in order to test the

13     solubility of bendamustine in glycerin?

14          "Answer:  Correct.

15          "Question:  If Salmedix is not report on the

16     bendamustine solubility in DMA, how did Dr. LaBell select

17     DMA to be tested?

18          "Answer:  DMA was a solvent that was recently,

19     you know, was recently in an approved product for -- that

20     was approved by the FDA.  So, it's a fairly good solvent.

21          "So, you know, the plan was to evaluate the

22     solubility.

23          "Question:  Was DMA selected because it was

24     likely to be approved by the FDA?

25          "Answer:  At this point, at this point it was a

Drager - deposition designations

1    matter of it had been approved by the FDA.

2            "So, you know, at this point it's just

3    screening.  So, again, we're trying to figure out what it's

4    actually soluble in.

5            "So I think it was more just figuring out what

6    the solubility in DMA would be.

7            "Question:  Do you know why Dr. LaBell decided

8    to check the solubility and purity of bendamustine in

9    samples containing propylene glycol combined with a second

10   solvent?

11           "Answer:  I am.

12           "Question:  Why?

13           "Answer:  Because our experience with the

14   propylene glycol was that while it gave us the solubility,

15   we saw instabililty with propylene glycol straight.  So we

16   were trying to dilute out the propylene glycol by adding a

17   suited able co-solvent to get stability.

18           "Question:  You knew you wanted the benefit of

19   the solubility of the propylene glycol but something else to

20   add stability?

21           "Answer:  Basically, what I'm saying is, we knew

22   that propylene glycol gave us some solubility for the

23   compound, but it created stability issues for us.

24           "Question:  You would understand all of these

25   procedures to be conducted under a lab hood?

1          "Answer:  Yes, they would be done in a lab hood.

2          "Question:  With no other special conditions?

3          "Answer:  Yeah.  Can you define, I mean, what

4     kind of special --

5          "Question:  Previously we talked about inert gas

6     as an example.

7          "Answer:  It would not, I mean if there were

8     anything like that, it should be noted in here.

9          "Question:  Do you know at what point the purity

10    would be considered too bad to continue evaluating?

11         "Answer:  As a formulator, we usually follow the

12    ICH guidelines.  So, usually anything greater than

13    90 percent would be a problem.

14         "Question:  I'm going to enter as Exhibit 8 a

15    pharmaceutical development report bearing Bates numbers

16    TEVABEND 00246683 through TEVABEND 00246732.

17         "Do you recognize this report, Dr. Drager?

18         "Answer:  Yes.  I've seen this report.

19         "Question:  It's a formulation selection report

20    dated August 5th, 2013 for a bendamustine liquid drug

21    product.

22         "Answer:  That's the title, yes.

23         "Question:  Let me mark as Exhibit 9 a document.

24    It's a cover e-mail bearing Bates numbers TEVABEND 00146312

25    through TEVABEND 00146313 -- I'm sorry.  It's just the first

1   Bates number.

2          "And attached to it is the attachment that was

3   produced along with that cover e-mail.

4          "Answer:  Okay.

5          "Question:  Bearing Bates numbers TEVABEND

6   000146313 through 146328.

7          Is Exhibit 9 an e-mail from Rachel LaBell to

8   Michael Capppola and cc'ing you?

9          "Answer:  Yes, according to the sent to and CC

10  lines, yes.

11         "Question:  I'm going to enter Exhibit 10, which

12  is a document titled bendamustine update November 14, 2006,

13  bearing Bates numbers TEVABEND 00110748 through 110753.

14         "Have you seen this document before, Dr. Drager?

15         "Answer:  I have.

16         "Question:  Who prepared this document?

17         "Answer:  It appears that this is a document

18  prepared by Rachel LaBell.

19         "Question:  Dr. LaBell says, the '289 patent

20  claims the composition of bendamustine formulations that

21  contain propylene glycol (PG), and any other monohydric or

22  polyhydric alcohols.

23         "Do you see that?

24         "Answer:  I do see that.

25         "Question:  And she says, given that HP data CD

1    was a polyhydric alcohol, it might be difficult to get a

2    composition claim in a new patent on a formulation with

3    cyclodextrins.

4              "Do you see that?

5              "Answer:  I do see that.

6              "Question:  Did you ever consider patentability

7    of a formulation when deciding whether to move forward with

8    development of that formulation?

9              "Answer:  Usually not.  I mean typically, you

10   find something that works and because you're working with

11   novel compounds, you can get a patent because they are novel

12   compounds.

13             "Question:  Did Dr. LaBell consider

14   patentability of the liquid bendamustine formulation when

15   deciding whether to move forward with development of that

16   formulation?

17             "Answer:  You're referencing the other

18   formulation, not the cyclodextrin formulation?

19             "Question:  Correct.

20             "Answer:  So, by other formulation, you mean the

21   33 percent DMA PG formulation?

22             "Question:  Yes.

23             Answer:  That, I can't say.  I mean, I know that

24   the science directed her to that.  I don't know if

25   patentability was a driver for her or not.  For me, it

Drager - deposition designations

1    worked.

2              "Question:  Is that a question I would have to

3    ask Dr. LaBell herself?

4              "Answer:  You can.  I mean, I know that in the

5    environment that I worked in that that was not the primary

6    driver for us.  I mean, that's the luxury of working in

7    branded molecules.  Our molecules are usually novel and so

8    we can get the -- we can put it in whatever formulation we

9    want and then patent it.  It's really not an issue.

10             "Question:  But bendamustine wasn't a novel

11   molecule?

12             "Answer:  I know.  I'm just saying in general,

13   because of that, because of the environment we were in, we

14   didn't at the time think that was the driver.

15             "Question:  I'm going to enter Exhibit

16   Number 11, an e-mail chain bearing Bates numbers TEVABEND

17   00146168.

18             Dr. Drager, this is a chain of two e-mails, both

19   from Piyush Patel; correct?

20             "Answer:  Yes.

21             "Question:  And they are both dated

22   October 29th, 2008.  Is that correct?

23             "Answer:  Yes, according to the time stamp.

24             "Question:  I hope you're very familiar with

25   this document.  This is the Drager '006 patent bearing Bates

1    numbers TEVABEND 001419 '08 through 141919.

2                    Are you aware of any attempts or experiments

3    performed at Cephalon other than the experiment described on

4    page 59 and related pages of Exhibit 5 that attempt to

5    reproduce the German patent?

6                    "Answer:  I can't say.  I don't, to my

7    knowledge, I don't recall actually setting out to reproduce

8    the German patent.

9                    "Question:  Would Dr. LaBell know?

10                   "Answer:  She might, but I mean essentially, we

11   have -- we're testing the stability of propylene glycol,

12   which is I think what you're referencing in the German

13   patent.  And based on the data incidentally later we find

14   that it's not stable in propylene glycol by itself.  So I

15   think that's where that statement comes from.

16                   "MS. JI:  I'm going to enter as Exhibit 14 an

17   e-mail chain bearing Bates numbers TEVABEND 00143105 through

18   143313.

19                   "You can put this away.  I'm going to enter as

20   Exhibit 15 a cover e-mail bearing Bates number TEVABEND

21   00280604 and the attachment that was produced along with

22   it bearing Bates numbers TEVABEND 0028062005 through

23   280616."

24                   (End of videotaped deposition.)

25                   THE COURT:  Okay.  You have exhibits to move?

Drager - deposition designations

1    Why don't you wait until tomorrow morning.  That will be

2    good.

3              All right.  So housekeeping?

4              MR. BERL:  I just wanted to discuss how tomorrow

5    will go.

6              Frankly, Your Honor, there are some people who

7    aren't going to be involved tomorrow.  They can go home

8    maybe and see their families, et cetera.

9              THE COURT:  Yes.

10             MR. BERL:  So I don't know how much depositions

11   they have left for tomorrow.  I know we have -- I assume --

12             MR.  NELSON:  We'll probably confer.

13             MR. BERL:  They'll confer.  They have some

14   depositions remaining.  They'll rest.  We'll make a motion.

15   We think it's meritorious, but it is up to Your Honor to

16   decide if you want to entertain that, but if Your Honor

17   doesn't entertain a motion at that point, I will put on our

18   case.

19             THE COURT:  I'm not going to enter it.

20             MR. BERL:  Okay.

21             THE COURT:  You are going to make a motion to

22   say they have not established enough to go forward on an

23   obviousness case?

24             MR. BERL:  Correct.  And some of their 112

25   defenses.

Drager - deposition designations

```
 1                    THE COURT:  Oh.

 2                    MR. BERL:  But --

 3                    THE COURT:  Okay.

 4                    MR. BERL:  If --

 5                    THE COURT:  It's a bench trial.

 6                    MR. BERL:  Then we'll have three witnesses that

 7      we're then planning to call tomorrow.  I think that given

 8      the schedule put forth, I think that's going to take all the

 9      time.

10                    Our estimate is that those witnesses will

11      probably be at least three-and-a-half ours on direct.

12                    THE COURT:  Okay.

13                    MR. BERL:  At least.

14                    THE COURT:  That's not going to fill the day.

15                    MR. BERL:  They'll have cross too, though.

16      That's just the direct.

17                    THE COURT:  Okay.

18                    MS. STAFFORD:  I forget.  What is the schedule

19      for tomorrow?  8:45.

20                    THE COURT:  Start at 8:45.  We're going to go to

21      10:00.  I have a criminal proceeding.  So we'll come back at

22      one and we'll go to 6:30.

23                    MR. BERL:  Right.

24                    MS. STAFFORD:  I don't know if we have enough

25      cross to fill that in.  We're under time constraints.
```

1           So they've got a large number of witnesses and

2   we also have our rebuttal case, and we're not sure if

3   they're going to drop any more secondary considerations

4   other than the ones they've already dropped.  If they would

5   let us know that, it would help us know how much cross we

6   would have so we can plan better.

7           MR. BERL:  We can talk about this tonight.  We

8   have less time less than we thought we would.  Things are

9   going slower I think for both sides than we thought.

10          THE COURT:  You have less time?

11          MR. BERL:  We have less time remaining on our

12  number of hours allotted by the Court than we thought we

13  would at this point in terms of -- the witnesses are going

14  slower than we thought --

15          THE COURT:  One was a particularly challenging,

16  let's be honest, witness.

17          MR. BERL:  I think --

18          THE COURT:  Under the circumstances -- we talked

19  about this on the record.  He had hearing issues that made

20  it very, very difficult for both sides.

21          MR. BERL:  Understood.  I think it's going

22  slower for them.

23          MS. STAFFORD:  I know your first three witnesses

24  relate -- well, two of your first two relate to secondary

25  considerations.  If you are going to drop Darendorff and

Drager - deposition designations

1    Leoni.

2             So if you are going to drop certain secondary

3    considerations, it's going to shorten the cross.  You

4    probably will have time to put on another witness or two,

5    particularly if we've got seven hours.  We don't have that

6    much deposition testimony left, particularly if we meet and

7    confer.

8             THE COURT:  You've got to use the time.

9             MS. STAFFORD:  Exactly.

10            THE COURT:  As far as I'm concerned, I only have

11   so much time.  I've dedicated it to you.  I'm going late.

12            Let's move.  Let's not waste time.  Judge

13   Robinson had a procedure, which I have been following.  If

14   you don't finish, you know -- if you finish at 4:30, there's

15   two hours left, you lose the time.

16            MR. BERL:  Absolutely.  We're never going to do

17   that.  I can assure you.

18            THE COURT:  And if you needed more time, I

19   need to be flexible, because there's a criminal proceeding.

20   I don't think it will go all two hours, but maybe it is

21   best given what you've said with the uncertainty just   to

22   say 8:30 to 10:00 and then you're off between 10:00 and

23   1:00.

24            MR. BERL:  8:45 to 10:00.

25            THE COURT:  I'm sorry.  8:45 to 10:00.

Drager - deposition designations

1                MR. BERL:  Okay.

2                THE COURT:  Actually, having said that, what we

3    may do is start earlier.  I think maybe we start at 12:30.

4    12:30 to 6:30.

5                MR. BERL:  We'll confer.

6                THE COURT:  We'll work it out in the morning.

7                MR. BERL:  Yes.

8                THE COURT:  All right.  Have a good day.

9                (Court recessed at 6:37 p.m.)

10                        -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25