1                    - VOLUME 4 -

2            IN THE UNITED STATES DISTRICT COURT

3            IN AND FOR THE DISTRICT OF DELAWARE

4                        - - -

5
     TEVA PHARMACEUTICALS           :   CIVIL ACTION
6    INTERNATIONAL GMBH,            :
     CEPHALON, INC., and EAGLE      :
7    PHARMACEUTICALS, INC.,         :
                                    :
8                    Plaintiffs,    :
                                    :
9         vs.                       :
                                    :
10   SLAYBACK PHARMA LIMITED        :
     LIABILITY COMPANY, et al.,     :
11                                  :
                     Defendants.    :   NO. 17-1154-CFC
12

13                         - - -

14                       Wilmington, Delaware
                         Thursday, September 12, 2019
15                       8:45 o'clock, a.m.

16                         - - -

17   BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

18                         - - -

19   APPEARANCES:

20
                 SHAW KELLER LLP
21               BY:  KAREN E. KELLER, ESQ. and
                      NATHAN R. HOESCHEN, ESQ.
22

23                       -and-

24

25                               Valerie J. Gunning
                                 Official Court Reporter

1   APPEARANCES (Continued):

2

3               WILLIAMS & CONNOLLY LLP
                BY:  DAVID I. BERL, ESQ.,
                     ADAM HARBER, ESQ.,
4                    ELISE BAUMGARTEN, ESQ.,
                     SHAUN P. MAHAFFY, ESQ.,
5                    BEN PICOZZI, ESQ. and
                     MATTHEW LACHMAN, ESQ.
6                    (Washington, D.C.)

7

8                    Counsel for Plaintiffs
                     Teva Pharmaceuticals International GmbH
                     & Cephalon, Inc.
9

10

11              LATHAM & WATKINS LLP
                BY:  DANIEL G. BROWN, ESQ.,
                     MICHELLE L. ERNST, ESQ.,
12                   KENNETH SCHULER, ESQ. and
                     MARC ZUBICK, ESQ.
13                   (New York, New York)

14

15                   Counsel for Defendant
                     Eagle Pharmaceuticals, Inc.

16

17              FARNAN LLP
                BY:  BRIAN E. FARNAN, ESQ.

18

19                       -and-

20

21              SCHIFF HARDIN LLP
                BY:  IMRON ALY, ESQ. and
                     ARUN J. MOHAN, ESQ.

22

23                   Counsel for Defendant and Counterclaim
                     Plaintiff Fresenius Kabi USA LLC

24

25

1    APPEARANCES (Continued):

2

3            SMITH KATZENSTEIN & JENKINS LLP
             BY:  EVE ORMEROD, ESQ.

4
                        -and-
5

6            WINDELS MARX LANE & MITTENDORF LLP
             BY:  JAMES P. BARABAS, ESQ.
7

8                Counsel for Defendants
                 Slayback Pharma Limited Liability Company,
9                et al.

10

11           FLASTER GREENBERG P.C.
             BY:  JEREMY S. COLE, ESQ.
12

13                      -and-

14
             FLASTER GREENBERG P.C.
15           BY:  JEFFREY A. COHEN, ESQ.
                  (Chicago, Illinois)
16

17                      -and-

18
             HAHN LOESER & PARKS LLP
19           BY:  STEVEN FELDMAN, ESQ.,
                  SHERRY L. ROLLO, ESQ.
20                DANIEL CHERRY, ESQ. and
                  JOHN CRAVERO, ESQ.
21

22               Counsel for Defendants
                 Apotex Inc. and Apotex Corp.
23

24

25

1    APPEARANCES (Continued):

2
              THE DEVLIN LAW FIRM LLC
3             BY:  JAMES M. LENNON, ESQ.

4
                    -and-
5

6             WILSON SONSINI GOODRICH & ROSATI
              BY:  NICOLE STAFFORD, ESQ.,
7                  DENNIS GREGORY, ESQ.,
                   DAVID STEVER, ESQ.,
8                  ADEN M. ALLEN, ESQ. and
                   SHYAM PALAIYANUR, ESQ.
9

10                 Counsel for Defendant
                   Mylan Pharmaceuticals
11

12                   -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         **P R O C E E D I N G S**

2

3                         (Proceedings commenced in the courtroom,

4       beginning at 8:45 a.m.)

5

6                         THE COURT:  All right.  Good morning.  Please be

7       seated.

8                         All right.  What's next?

9                         MS. ROLLO:  Your Honor, we would like to enter

10      exhibits from yesterday.

11                        THE COURT:  Okay.

12                        MS. ROLLO:  Defendants would like to offer

13      DTX-1402, DTX-1202, DTX-79, DTX-1130, DTX-1041, DTX-1059 and

14      DTX-1061.

15                        THE COURT:  Okay.

16                        MS. BAUMGARTEN:  No objection, Your Honor.

17                        THE COURT:  All right.  They're admitted.

18                        (DTX-1402, DTX-1202, DTX-79, DTX-1130, DTX-1041,

19      DTX-1059 and DTX-1061 were admitted into evidence.)

20                        MS. BAUMGARTEN:  Plaintiffs would like to offer

21      one exhibit into evidence.  This was an exhibit we used on

22      cross with Dr. Thirman.  It was a duplicate document that

23      was stamped two different ways.  So the record is clear, we

24      would just like to enter both so there's no confusion.

25                        THE COURT:  All right.

1              MS. BAUMGARTEN:  So plaintiffs would like to

2      move to enter DTX-320 into the record.

3              THE COURT:  All right.

4              MR. FELDMAN:  No objection.

5              THE COURT:  All right.  It's entered.

6              (DTX-320 was admitted into evidence.)

7              MR. PALAIYANUR:  Your Honor, defendants would

8      like to enter the exhibits from the Drager deposition

9      yesterday, and also we've reached agreement on two other

10     depositions with plaintiff.  Those would be just admitted

11     into the record rather than having the deposition

12     transcripts being read.

13             THE COURT:  Okay.  All right.  So why don't

14     you list.  You can identify the Drager exhibits first,

15     please.

16             MR. PALAIYANUR:  Yes.  So the Drager exhibits

17     are DTX-222, DTX-652, DTX-653, DTX-654, DTX-1222, DTX-1223,

18     DTX-1225, DTX-1226, DTX-1227, DTX-1228, DTX-1229, and

19     DTX-1231.

20             THE COURT:  All right.

21             MS. BAUMGARTEN:  No objection.

22             THE COURT:  They're admitted.

23             (DTX-222, DTX-652, DTX-653, DTX-654, DTX-1222,

24     DTX-1223, DTX-1225, DTX-1226, DTX-1227, DTX-1228, DTX-1229,

25     and DTX-1231 were admitted into evidence.)

1          MR. PALAIYANUR:  And then defendants would also

2     like to offer the exhibits from the deposition of Adrian

3     Heppner.  If I may approach, Your Honor?

4          THE COURT:  Just so I understand, are these

5     exhibits going to be discussed by any witness during trial

6     then?

7          MR. PALAIYANUR:  I believe some of them will be

8     used for cross-examination and have already been discussed

9     by some witnesses, Your Honor.

10          THE COURT:  Okay.  Just because I want to remind

11     you all of the rule, right, if it's not discussed, it's not

12     part of the evidence.

13          MR. PALAIYANUR:  Right.

14          THE COURT:  Even if it's admitted.

15          MR. PALAIYANUR:  Sure.

16          THE COURT:  All right.  Go ahead and offer them.

17          MR. PALAIYANUR:  Some of them, it's a little

18     hard to know based on the witnesses that will be offered in

19     the future and the cross-examination testimony.

20          THE COURT:  Right.  So you can admit them at

21     this point, and if they're not discussed in the post-trial

22     briefs, they're going to be struck anyway.  Go ahead if you

23     want to identify them at your convenience.

24          MR. PALAIYANUR:  May I approach with the

25     deposition binders?

```
 1                    THE COURT:  Sure.

 2                    MR. PALAIYANUR:  Thank you, Your Honor.

 3                    THE COURT:  All right.

 4                    MS. BAUMGARTEN:  May I clarify what's being

 5      passed up?

 6                    MR. PALAIYANUR:  This is including the

 7      transcripts.

 8                    MS. BAUMGARTEN:  I think we prefer the

 9      transcript.  It's simply the exhibits that we stipulated

10      to.

11                    THE COURT:  I was actually going to ask this.

12      So for clarification, you're introducing documents.  You are

13      not introducing deposition transcripts?

14                    MR. PALAIYANUR:  Correct, Your Honor.

15                    THE COURT:  Go ahead.

16                    MR. PALAIYANUR:  Can we have a little bit of

17      time to remove the transcript?  I will read the exhibit

18      numbers into the record right now?

19                    THE COURT:  That would be fine.

20                    MR. PALAIYANUR:  Great.  Thank you, Your Honor.

21                    Defendants admit DTX-319, DTX-1050, DTX-1058,

22      DTX-1082, DTX-1083, DTX-1084, DTX-1085, DTX-1090, DTX-1091,

23      DTX-1095, DTX-1096, and those are from the deposition of

24      Adrian Heppner, Your Honor.

25                    THE COURT:  And who is that?
```

1          MR. PALAIYANUR:  That is Teva's 30(b)(6) witness

2     on certain patents-in-suit, Your Honor, on the development

3     of the formulation of the proposed patent.

4          THE COURT:  All right.

5          MS. BAUMGARTEN:  No objection as to the

6     admission of these exhibits.  He's not a Teva employee.  He

7     is an Eagle employee.  He's a chief medical officer of Eagle

8     he and was a 30(b)(6) witness on some of the aspects that

9     was submitted to the FDA.  It's a separate issue.

10          THE COURT:  She's correct?

11          MR. PALAIYANUR:  Correct, Your Honor.

12          THE COURT:  She's is correct.  All right.  Then

13     the exhibits are admitted.

14          MR. PALAIYANUR:  Sure.  And defendants also

15     offer into the record DTX-0947, DTX-0952, DTX-0972,

16     DTX-1078, DTX-1092, DTX-1099, DTX-1101, DTX-1102, DTX-1103,

17     and DTX-1106 from the deposition of Sri Sundaram, and Sri

18     Sundaram was one of the inventors of the patents-in-suit,

19     Your Honor, and specifically the Family 3 patents that we've

20     been discussing, the '887 patent, '568 patent, and the '399

21     patents.

22          THE COURT:  All right.

23          MS. BAUMGARTEN:  No objection, and I agree with

24     that characterization.

25          THE COURT:  All right.  And they're admitted,

1  but you don't agree with the characterization of the family,

2  or do you?

3                  (DTX-0947, DTX-0952, DTX-0972, DTX-1078,

4  DTX-1092, DTX-1099, DTX-1101, DTX-1102, DTX-1103, and

5  DTX-1106 were admitted into evidence.)

6                  MS. BAUMGARTEN:  I think -- I don't think

7  there's a substantive disagreement.

8                  THE COURT:  You want to call it 2 and 3 -- you

9  want to call it 1 and 2.  They want to call it 2 and 3?

10                  MS. BAUMGARTEN:  Yes.  We thought it was clear,

11  because there were only two patents-in-suit, to call it 1

12  and 2.  But all agree how they're grouped.

13                  THE COURT:  Why don't you go with the 1 and 2?

14                  MR. PALAIYANUR:  Your Honor, it's a historical

15  anomaly, so there were originally three patent families in

16  suit.  The lot of the documents in the record are going to

17  refer to family Family One, Family Two, Family Three.

18                  THE COURT:  Okay.

19                  MR. FELDMAN:  If I may make a point?

20                  THE COURT:  Yes.

21                  MR. FELDMAN:  I just want to be clear on the

22  ground rules with respect to these exhibits.

23                  So is the rule that if they're talking about

24  them in post-trial briefs, that they're in, or do we need to

25  have a witness now talking about them, because we had had

1    discussions with the other side and it wasn't clear to us

2    with respect to these types of things, you know, saving the

3    Court's time with respect to deposition designations, not

4    have to play them.  But if the rule is going to be we can't

5    use these documents, then I think we do have to play the

6    deposition designations here.

7                THE COURT:  Well, so the rule was you had to

8    discuss the exhibit during the course of trial in order for

9    it to be deemed admitted.  And by discuss, the rule -- and I

10   will just tell you, historically, this evolved because

11   that's what Judge Robinson started.  And then what happened

12   was, and the reason why she did that was because what

13   parties were doing in these types of cases is knowing there

14   was de novo review, they would sandbag the Court, the

15   District Court, and they were basically trying their case to

16   the Federal Circuit, not to the District Court, and they

17   were putting things in the record that they never brought to

18   the attention of the District Court Judge, and then they

19   would go up to the Federal Circuit and they would say, de

20   novo review.  Let me make a completely different argument

21   and let me just identify completely different argument that

22   I never discussed in front of the poor District Court Judge

23   who spent days and hours sweating out, you know, how to

24   decide the case and only to find out that there was a

25   completely different theory that was being discussed on

1    appeal and then having cases sent back in time.

2              So, frankly, out of I think frustration and

3    trying to make the whole process in both courts more

4    efficient, Judge Robinson smartly said, you've got to

5    discuss it at trial.

6              So then what parties started doing, as I

7    understand it, is, they would have a witness mention the

8    exhibit at trial, and they would do the same thing.

9              So that's what gave rise to Judge Robinson's

10   rule of, and if you don't discuss it in a post-trial

11   briefing, it's deemed struck.  And I saw this as a lawyer.

12   I thought it was a very smart thing to do as a judge, and so

13   I've done it as a judge.

14             So now what I'm afraid of is the whole rationale

15   of that rule is kind of getting jettisoned because of maybe

16   something I said yesterday, which is why are we playing a

17   deposition only to authenticate an exhibit?

18             And so to be clear, in my mind, merely having

19   somebody authenticate something doesn't satisfy the rule

20   that it has been discussed at trial.  Mere mention of an

21   exhibit number by a witness doesn't satisfy the rule.  I can

22   make exceptions to that if both parties want to bring to my

23   attention something like, I will give you an example, an FDA

24   document or the INDA that we discussed at the end of the

25   day.

1               Is that what you called it, an INDA?

2               MR. FELDMAN:  Yes.

3               THE COURT:  Where it's an admission by a party

4    opponent that is the basis to introduce it, and it is clear

5    from the document what it is.

6               I guess in certain circumstances, I could just

7    save it for post-trial briefing, but I think you ought to

8    err on the side of it needs to be discussed, because

9    otherwise, I mean, if it's important, it ought to be

10   discussed during the trial.

11              MR. FELDMAN:  Sure.

12              THE COURT:  So I don't know if that really

13   answers your question, Mr. Feldman.  I mean, so I don't want

14   to have a situation where just you're getting an exhibit

15   into evidence and a witness is just identifying it by number

16   only and then I hear about it and learn about it really for

17   the first time in post-trial briefing.

18              MR. FELDMAN:  May I confer with my co-counsel?

19              THE COURT:  Yes.

20              MS. STAFFORD:  While they're conferring, there

21   is one other issue.  There are two other -- may I approach?

22   Sorry.

23              THE COURT:  Please.

24              MS. STAFFORD:  There are two other witnesses

25   that we would actually like to play their deposition video

1    clips.  These are corporate witnesses that were designated

2    under 30(b)(6).  They're admissions against the parties.

3    They are Mr. Rainey.  He is and plaintiff Cephalon and

4    Teva's 30(b)(6) witness on the decision to develop liquid

5    Treada, I am sure Your Honor had questions about yesterday,

6    in addition to discontinue liquid Treanda and the decision

7    to license Bendeka.

8              Now, Mr. Rainey is Teva's senior vice president

9    of specialty sales, and the testimony we think would be

10   helpful to establish that instead of, as you heard from

11   Mr. Tarriff, the decision being related to this Study 1301

12   and the desire to have chair time.  Instead, this is just

13   part of a life cycle management strategy to remove the

14   lyophilized Treanda from the market, replace the liquid

15   Treanda, and then to do the same thing again -- to remove

16   the liquid Treanda and to discontinue it and then to do a

17   forced switch to the Bendeka, and we think it's important

18   for you to have the entire context as well as important for

19   us to be able to rebut what Mr. Tarriff put in.

20             This is another example of them wanting to have

21   their cake and eat it, too.  They present fact testimony and

22   they want to foreclose our ability and your ability to know

23   the rest of the story.

24             THE COURT:  Have they even objected to this?

25             MS. STAFFORD:  Yes.  That's why it's an issue.

1          THE COURT:  Okay.  Fine.

2          MS. STAFFORD:  The next witness is Ms. Brooks.

3     She was all the plaintiffs' 30(b)(6) regarding sales and

4     marketing of Bendeka.  She is a senior director ever

5     oncology and the brand director for both Bendeka and Treanda

6     for Teva.

7          She will testify on a different perspective as

8     to Teva's transition of the market for liquid Treanda to

9     Bendeka and she'll also testify to the sales and marketing

10    of Bendeka.

11         We think we're entitled to put it in responsive

12    to Mr. Tarriff in this phase of the case, admission of a

13    party opponent, party witness.  Clearly admissible.

14         THE COURT:  Ms. Baumgarten?

15         MS. BAUMGARTEN:  Yes, Your Honor.  I didn't

16    expect that I would be making my objection in response to a

17    pre-admission.  I will do my best to respond.

18         THE COURT:  Wait.  In response to what?

19         MS. STAFFORD:  In response to what Ms. Stafford

20    said.  I will do my best to respond as I also explain my

21    objection.

22         We think this is not the appropriate phase of

23    the case to put this in.  Let me start where Ms. Stafford

24    ended, which is with Mr. Tarriff's testimony.  We agree

25    Mr. Tarriff testified on somewhat we call objective indicia

1    on nonobviousness in his direct.

2            Paragraph 55 of the pretrial order states that

3    fact witnesses testify only once.  So the issue was everyone

4    agreed that Mr. Tarriff was a fact witness who needed to

5    testify in the first phase of the case as to background of

6    the patents-in-suit.  The issue was he also had evidence of

7    objective indicia, which we are due to present in Phase 3

8    and they are due to rebut in Phase 4.

9            Because we called him once, and that was a

10   provision for the convenience of the witnesses, we put that

11   on then.  Now, if we decide not to put on commercial

12   success, which, as Mr. Berl said, we are behind on time,

13   and depending on how the case comes in, we may not put it

14   on.

15           Our plan is to have a pow-wow this weekend and

16   discuss what objective indicia we will present.  We will not

17   rely on Mr. Tarriff's testimony on that front.  That is

18   something we needed to do because we need to preserve our

19   rights.  This is simply preempting our argument, potential

20   argument on commercial success because there's no relevance

21   to the prima facie case as to what Teva's marketing strategy

22   is to this, and the Federal Circuit law is clear that lack

23   of commercial success is not relevant to a case.

24           We've been referring generally --

25           THE COURT:  Wait, wait.  Sorry.  Lack of

1     commercial success isn't relevant to?

2             MS. BAUMGARTEN:  To obviousness.  Let me

3     clarify.  We've been talking generally in this case about

4     objective indicia, and I actually think that makes it less

5     clear.

6             That's shorthand.  There are two types of

7     objective indicia in the case.  Not in this case, but

8     generally.  There are objective indicia of nonobviousness,

9     and that's what we've been discussing putting on.  So those

10    are things like commercial success or unexpected results,

11    like we've been talking about.  And what those are is that

12    the patentee can decide after putting on a prima facie

13    case, I have some objective considerations that we think

14    are corroborative of prima facie nonobviousness and we want

15    to put those in.  And that's, and it's our burden, and

16    that's why we presented first in the case and they get to

17    rebut it.  It's different from prima facie obviousness,

18    where it's their burden by clear and convincing evidence to

19    disprove.

20            There actually is such a thing of objective

21    indicia of obviousness.  There's only one I know of.  It's

22    called simultaneous invention, but there has been no

23    argument about it in this case, which is why you've never

24    heard about objective indicia of obviousness.  It's just the

25    only issue in this case is objective indicia of

1    nonobviousness.  And because that's all that's at issue

2    here, those only go into the mix if they are raised by

3    plaintiffs.  In this case, the patentees.

4           If you're curious as to the proposition, because

5    I thought you would be interested, why is their commercial

6    success not relevant is commercial success is relevant?  I

7    do have some cases if you would like to hear that.

8           THE COURT:  Give me a second to think about what

9    you said.

10           So you're taking the position that evidence of

11    commercial success can be relevant where, and lack of

12    commercial success at the same time is not relevant?

13           MS. BAUMGARTEN:  Yes.  And that's not a

14    position.  I can quote from -- here's the first case.

15    Custom Accessories.  This is a Federal Circuit case.

16    It's 807 F. 2d 955, and I have copies if the Court would

17    like it.

18           THE COURT:  What's the date of the case?

19           MS. BAUMGARTEN:  1986.  I have other cases.

20           THE COURT:  What is the date of Graham vs.

21    Deere?

22           MS. BAUMGARTEN:  It is post Graham.  I know

23    because the highlighted portion I have to read to you says

24    under Graham.  That's how it starts.  I don't know the date

25    of Graham offhand.  Mr. Berl does.

1          THE COURT:  You've answered my question.

2          MS. BAUMGARTEN:  Yes.

3          THE COURT:  It comes after Graham.

4          MS. BAUMGARTEN:  Yes.

5          THE COURT:  What does it say?

6          MS. BAUMGARTEN:  The quote I've highlighted is,

7   "Under Graham, objective evidence of nonobviousness includes

8   commercial success, long felt but unresolved need, failure

9   of others and copying.  When present, such objective

10  evidence must be considered.  It can't be the most probative

11  evidence of nonobviousness in the record.  On the other

12  hand, the absence of objective evidence does not preclude a

13  holding of nonobviousness because such evidence is not a

14  requirement for patentability.  As stated in Medtronic, Inc.

15  v. Intermedics, Inc., the absence of objective evidence is a

16  neutral factor."

17         THE COURT:  That doesn't seem to me to say that

18  lack of commercial success is not relevant when commercial

19  success is relevant.  I mean, my problem with the argument

20  you're making is, if commercial success is relevant, then

21  the other side gets to test whether it's truly commercial

22  success or not commercial success.  I mean, if commercial

23  success is an issue, I should get to hear about whether it's

24  commercially successful or not.

25         MS. BAUMGARTEN:  I respectfully agree.  The

1   law is clear objective indicia of nonobviousness are

2   factors --

3           THE COURT:  I'm not saying you can't raise it.

4   It's just once it's in evidence, I get to hear it.

5           MS. BAUMGARTEN:  Yes.  And once -- but we have

6   not yet put it in evidence is the point.

7           THE COURT:  See, this is the other problem I

8   have.  I know you guys stipulated and I just -- you

9   stipulated to the phasing, if you will, of this trial, but

10  the case I read I cited to you all yesterday.

11          MS. BAUMGARTEN:  In re Cyclobenzaprine?

12          THE COURT:  I think so.  You know, I think the

13  Federal Circuit is saying, call it what you want.  I, the

14  District Court, am supposed to look to nonobviousness as one

15  big pot and I am not supposed to engage in this phasing the

16  way you all agreed to.  In fact, I'm supposed to step back

17  and look at all the factors.

18          And as far as secondary consideration and you

19  say burden, the only burden I recall in the case law is,

20  there's a burden of production that comes from the plaintiff

21  that they have to identify these considerations, but I

22  didn't think there's this hard and fast procedure or

23  mechanism that is required by the Federal Circuit for me to

24  consider either in terms of how this evidence is presented

25  at trial or even at the end of the day, just to consider it

1   substantively.

2           The only area so far in which it matters as to

3   how I characterize a particular issue as a secondary

4   consideration or not seems to me is with respect to the

5   scheduling order issue.  In other words, and I tried to

6   articulate this.  I will try one more time is, I read the --

7   now, what's the name of the case again?  The In re --

8           MS. BAUMGARTEN:  I think it's In re

9   Cyclobenzaprine.  Am I saying it wrong?

10          THE COURT:  Let me make sure.  I've got a number

11  of cases sitting in front of me and I found that case

12  particularly helpful.  And you pronounced it phonetically,

13  In re Cyclobenzaprine.

14          MS. BAUMGARTEN:  I do not know if I --

15          THE COURT:  Let's do it for the benefit of the

16  Federal Circuit.  676 F.3d 1063.  I pointed this case out to

17  you all.  I read it.  I think it provides the most cogent

18  explanation of what a District Court is supposed to do under

19  these circumstances.  And so in relying in that case, it

20  seems to me I am required to give consideration to secondary

21  considerations.

22          I don't think the line between the prima facie

23  case and the secondary considerations is a black and white

24  line the way the phasing that you all stipulated to

25  suggests, but it was important for me to draw a line as to

1    whether unexpected results and teaching away were properly

2    characterized or not characterized as secondary

3    considerations solely for me to decide whether the parties

4    had complied with the scheduling order put in place by

5    Judge Sleet, and, in particular, the provision in the

6    scheduling order which did not allow for a reply brief

7    except for purposes of secondary consideration.

8                "So now we return to the issue right before me.

9    And you are saying, hey, they want to play the 30(b)(6)

10   depositions to address, it sounds like, well, you call it

11   commercial success.  I'm not sure they even characterized it

12   that way.  But to the extent you're right, it just seems to

13   me under In re Cyclobenzaprine that I should entertain the

14   evidence and, you know, the only issue is really when during

15   the trial I should entertain it.

16               MS. BAUMGARTEN:  So respectfully, I disagree

17   with that.

18               THE COURT:  Okay.

19               MS. BAUMGARTEN:  I think the issue that's

20   addressed by In re Cyclobenzaprine is that objective

21   indicia, if it is introduced in the trial, must be weighed

22   by you.  It's all going into the pot of what you consider

23   for obviousness.  But the issue is, objective indicia must

24   only be addressed by you if it's relied on by the patentees.

25               Now, because objective indicia is a factor that

1    patentees can choose to raise or choose not to raise in the

2    case and we've chose not to raise many objective indicia and

3    we may drop more objective indicia over the weekend and we

4    think it's premature for them to pre-rebut these issues.

5         There has been also evidence by Myles Laboratory

6    by the Federal Circuit.  This is 997 F.2d 870, and it's

7    addressing a decision that is upholding a finding of

8    nonobviousness, saying it did not show objective indicia of

9    nonobviousness, but evidence in part weighs in favor of

10   nonobviousness, although a lack of such evidence does not

11   way in favor of nonobviousness.

12        So, again, the issue is there are distinct

13   categories of objective indicia.  There is objective indicia

14   of nonobviousness and there is objective indicia of

15   obviousness.  The fact that they have not argued objective

16   indicia of obviousness, the example I gave of simultaneous

17   inventions does not weigh in favor of nonobviousness.  We

18   have not made that argument.  The issue is here, they are

19   trying to argue that if we do not put forward evidence of an

20   objective indicia of nonobviousness that weights in favor of

21   nonobviousness, which is clear by the Federal Circuit law,

22   that is not true.

23        MS. STAFFORD:  Can I clarify one thing, Your

24   Honor?  They've already raised --

25        THE COURT:  You don't have to.  Here's where I

am.  I'm of the view that under in re Cyclobenzaprine, I am

supposed to consider all evidence of obviousness and

nonobviousness before reaching a determination.  I mean,

this is what the Court said in that case.  "Even panels that

have used the prima facie and rebuttal language generally

have made clear that a fact-finder must consider all, that

is emphasized, evidence of obviousness and nonobviousness

before reaching a determination."

That is what I'm going to use as the most

important guiding principle that I'm to follow.

And let me just ask you the hypothetical.  So,

and I'm not saying this is the facts of this case, but let's

just assume a hypothetical.

So let's say there are internal documents where

Teva said something along the lines of in private e-mails

between high level executives, hey, our patents are about to

expire and we don't really think there's a legitimate path

to patenting a liquid form of this drug, but know what?

Let's engage in a strategy, of filing, frivolous patent

applications so that we can stave off competition and ensure

that our brand drug will be the exclusive drug on the market

for 20 years.

Now, I'm not saying at all that that is what

documents reflect in this case, but let's just for

argument's sake posit that.  You would say that I couldn't

1    consider that evidence?

2              MS. BAUMGARTEN:   That is, first of all, let me

3    be clear.   That's not what the documents say.

4              Second of all, that is going to prima facie

5    obviousness.   It's an admission by a party opponent going to

6    prima facie obviousness about the validity of the patents.

7    What they want to introduce is evidence of marketing.   So

8    the issue is, we want to promote a drug or what do sales of

9    the drug reflect.   That goes to commercial success.   Those

10   are two different inquiries.

11             The prima facie obviousness case, you have

12   allowed them to introduce evidence of submissions to the

13   FDA.   That all goes in.   It's fine.   The issue here, what do

14   you do with evidence related to marketing, promotion of the

15   drug product, which is relevant to commercial success?

16             THE COURT:   Okay.

17             MR. BERL:   If I just may make one comment and

18   then Ms. Stafford wants to speak too, but in respect to In

19   re Cyclobenzaprine, that was addressing a situation where

20   that's the patent advanced objective indicia of

21   nonobviousness.   And the Federal Circuit would say, you

22   can't ignore that.   If they raise it, you've got to consider

23   it, District Court.   You can't just ignore it.   That case

24   does not address the situation of what happens when a

25   patentee does not choose to rely on objective indicia of

1    nonobviousness.

2           It never said that in that situation, a

3    defendant gets to raise one of those issues and the Court

4    must consider it.  That case doesn't say that, and I submit

5    no case says that.

6           MS. STAFFORD:  Your Honor, just really quickly,

7    it makes it a lot simpler.  They've already raised objective

8    indicia of nonobviousness by admitting the testimony of

9    Mr. Tarriff, where he said that they have commercial

10   success.  He said that they have the objective indicia of

11   licensing.  He talked about the timing of the license with

12   Teva, implying it was because of the results of Bendeka.  He

13   tied chair time and other stuff to the motivation as to the

14   prima facie case of obviousness.

15          So this is all in rebuttal to Mr. Tarriff's

16   testimony that is in the record.  You have to consider it

17   and we should be entitled to respond to it.

18          THE COURT:  All right.  So here's what I'm going

19   to do.  I'm going to admit the evidence.  As of right now it

20   seems it's admissible at the very least to impeach the

21   witness, because it goes to his credibility.  It's extrinsic

22   evidence, so it's limited in its use for impeachment only.

23   On the other hand, I think the manner in which the witness

24   raised it and the lengths to which he went to describe his

25   altruistic motives, it's deserving of me to have a complete

1    picture to hear some of the proffered evidence.  For right

2    now it's admissible though for that basis only and we can

3    decide post-trial, when you all have a chance to brief this

4    more completely, whether I will consider it substantively to

5    make a determination as to nonobviousness.

6              MR. BERL:  Can I ask one clarifying question,

7    because as Ms. Baumgarten said, we're going to have to be

8    making decisions over the weekend about what to do with some

9    of the objective indicia in an effort to try to close this

10   case by the time we have to, and so I just want to be clear

11   that if we decide not to raise, let's say, an objective

12   indicia, let's say we're not going to rely on commercial

13   success, I want to understand what that means.

14             Does that mean they get to call an expert who

15   says it's not a commercial success or rebut a commercial

16   success case we're deciding to drop, because if so, that's a

17   very different consideration and we're going to have some

18   trial about an issue that we bear the burden of production

19   on that we're telling the Court we're not raising.  So I

20   just want to be clear when we make our decision.

21             THE COURT:  I know, what to do?  You know, you

22   all have hit me with like 30 seconds to make these

23   decisions.  You all stipulated to a phasing of the trial.

24   You didn't ask me to have any input on that.

25             I'm the third judge to get the case and now

1    you're asking me to make that decision on the fly so you can

2    dictate the rest of your trial schedule.  I mean, it's very

3    unfair.

4         I think this should have been thought out

5    beforehand and, you know, I gave you an amount of time to

6    try the case and, you know, how many years has it been in

7    litigation?  I mean, how many conferences have we held so

8    you could narrow the case throughout the litigation, even

9    during my tenure, and you're hitting me with this now in the

10   middle of trial?

11        I'm just going to say, you know what, I'm not

12   going to rule on that.  You are going to have to take your

13   chances and figure it out.  And I want to make very clear to

14   the Federal Circuit, to the extent either party is

15   suggesting they were prejudiced by the time limitations

16   placed on the parties, that the Court strenuously objects to

17   that.  I'm not saying you're making that argument, Mr. Berl.

18   I'm saying if you do later on.

19        So I think we did the best we could to manage

20   the case and we'll have to move forward with me not

21   answering that question, because I'm not able to answer it

22   in an informative way right now.

23             MR. BERL:  I was not suggesting that the Court

24   was prejudicing us by the time at all.

25             MS. STAFFORD:  Yes, Your Honor.

```
 1                    MS. BAUMGARTEN:  Yes, Your Honor.

 2                    THE COURT:  So basically, the proffered

 3      depositions -- are you going to play them?

 4                    MS. STAFFORD:  Yes.  They're short.

 5                    THE COURT:  You're going to play them.  They're

 6      admitted.

 7                    MS. STAFFORD:  For what purpose?

 8                    THE COURT:  And I'm saying for impeachment and

 9      background information, both.  Impeachment and background

10      information only, whether I consider it in the substantive

11      determination as to obviousness will be made post-trial.

12                    MR. PALAIYANUR:  May I approach, Your Honor?

13                    THE COURT:  Yes.  And I did add for background

14      purposes as well as impeachment very intentionally.

15                    MR. PALAIYANUR:  Your Honor, defendants call by

16      deposition Thomas Rainey.  He's the 30(b)(6) witness for

17      plaintiffs Teva and Cephalon.  He's going to testify on the

18      topics of Teva's decision to develop liquid Treanda, which

19      you will remember was the product that came after the Drager

20      prior art reference.  He has also been designated on Teva's

21      decision to discontinue liquid Treanda and the licensing for

22      Bendeka.

23                    THE COURT:  All right.

24                    (The videotaped deposition of Thomas Rainey was

25      played as follows.)
```

Rainey - deposition designations

1              (THOMAS EDWIN RAINEY, sworn.)

2              "Question:  Mr. Rainey, could you please state

3     your full name for the record, please?

4              "Answer:  Sure.  It's Thomas Edwin Rainey.

5              "Question:  And who is your present employer?

6              "Answer:  Teva Pharmaceuticals.

7              "Question:  And what is your current title

8     there?

9              "Answer:  I'm the senior vice president of

10    specialty sales.

11             "MR. PALAIYANUM:  So I will ask the court

12    reporter to mark this exhibit, as we are at Exhibit 6

13    now.

14             "Question:  Are you familiar with this document?

15             "Answer:  It appears it's an e-mail from me to

16    Fred Vitale, who is my boss.  And the subject reads, Treanda

17    lifecycle.

18             "Question:  And the e-mail has an attachment,

19    correct?  And what is that attachment?

20             "Answer:  The attachment reads, Treanda Generic

21    Strategy.PPTX.

22             "Question:  And if you could turn to Bates

23    number 272998.

24             "Answer:  Mm-hmm.

25             "Question:  What's shown on this slide ?

1            "Answer:  This is showing a -- the Treanda, it's

2       labeled Treanda Lifecycle Timeline.  And it looks like a

3       conversion from Treanda lyo to CFI, which is the concentrate

4       for infusion.

5            "Question:  So the e-mail with the presentation

6       was sent in August 2012.  And it looks like Teva is planning

7       a conversion in 2014, based on what's shown on this slide.

8            "Is that fair?

9            "Answer:  Yes.

10           "Question:  And so what does it mean for Teva to

11      convert from the lyophilized to the liquid formulation?

12           "Answer:  So the plan was to, since customers

13      were asking for an easier product to prepare, if you

14      remember on the last slide, 98 percent said that they

15      preferred a liquid, those that prepared the product.  And so

16      the idea here was that we would convert the Treanda

17      lyophilized to the liquid.

18           "Question:  So you don't know whether price

19      incentives were used to --

20           "Answer:  I believe that the strategy that was

21      used here was to limit the lyo on the wholesaler, since it's

22      a buy and bill product, and that that they could then use

23      the liquid product.

24           "Question:  What does that mean, to limit the

25      lyo on the wholesaler?

Rainey - deposition designations

1              "Answer:  That means that you not distribute the

2       lyophilized as much to the wholesaler, and then they can

3       then order the liquid product.

4              "Question:  And how does Teva do that?  Do they

5       prevent the wholesalers from ordering the lyophilized

6       product?

7              "Answer:  We have a discussion with the

8       wholesalers and say we're going to ship you this product.

9       And that allows then the wholesalers to sell just that

10      product.

11             "Question:  So was part of the decision to

12      market liquid Treanda was this -- in order to convert

13      consumers from the lyophilized to the liquid formulation?

14             "Answer:  Yeah, I will go back to that market

15      research slide that you presented earlier on the ease of

16      preparing and all the steps they need to take, our customers

17      were saying they wanted a liquid.  It was a more efficient

18      way to manufacture the product and bring it to market.

19             "So the decision was made here to transition

20      from the lyo to liquid, because that's what our customers

21      were saying that they wanted.

22             "Question:  Was part of the strategy to convert

23      the market to liquid Treanda before the entrance of generic

24      lyophilized Treanda?

25             "Answer:  I mean, it says right here that the

Rainey - deposition designations

1    strategy was to convert existing Treanda before the generic

2    lyos were to come to market.  But this was going to

3    hopefully give us a competitive advantage as the generic

4    lyos came out, because, as it says right here, advantages,

5    the accuracy of the concentration and less worries about

6    loss of medication during reconstitution.  Safety by

7    removing the potential for aerosolization risk in case of

8    accidental breakage or when not under the hood.  Convenience

9    of one step in delivery process, introducing less potential

10   errors, which we kind of saw all the process that you have

11   to go through to prepare the lyo versus the liquid, and the

12   stability, at this time, we were looking to increase the

13   stability.

14              "So these are all the things that we were

15   looking at as an advantage that would help us compete with

16   the generics.

17              "Question:  Was it a consideration, then, to get

18   liquid Treanda on the market before generic competitors for

19   lyophilized Treanda came on the market?

20              "Answer:  Look, you know, I think this says in

21   the slide right here, the intention was conversion from

22   existing Treanda to the CFI in advance of entering generic

23   lyo.  But, again, I will go back to my -- what I've stated,

24   we wanted to compete with the generics.

25              "Question:  When did liquid Treanda launch?

1      "Answer:  Liquid Treanda launched in November of

2      '14.

3          "Question:  And when did Teva start considering

4      whether to discontinue liquid Treanda?

5          "Answer:  Shortly after, I think it was around

6      March of 15.

7          "Question:  And why did Teva consider whether to

8      discontinue liquid Treanda at that time?

9          "Answer:  Around that time, we were getting

10     reports of interactions with closed system transfer devices.

11         "Question:  And what were those reports?

12         "Answer:  The reports were that the closed

13     system transfer devices were being -- I don't know a better

14     word, they were melting.  I don't know a better word, or the

15     technical word.  But the plastic peg that was going through

16     the stopper was being impacted.

17         "Question:  So the decision to discontinue

18     liquid Treanda was made around February 2016; is that

19     correct?

20         "Answer:  Yes.

21         "Question:  So what actions did Teva take after

22     receiving the complaints on December 9th, 2014?

23         "Answer:  So what Teva did at that point, I

24     believe it was around March 15th time period, that we

25     brought Treanda lyo back to the market and made it fully

1    available for those customers that wanted to use a closed

2    system transfer device.  But for those customers that didn't

3    want to use a closed system transfer device, the liquid

4    remained available where they could use the naked needle and

5    have the advantages of the liquid.

6              "Question:  So even though there were complaints

7    related to closed system transfer devices, there were still

8    safe methods for preparing liquid Treanda?

9              "Answer:  Yes.

10             Mr. PALAIYANUR:  So I will mark this document as

11   Exhibit 11.

12             "Question:  Sir, are you familiar with this

13   document?

14             "Answer:  If you could give me a second to go

15   over this real quick, please.

16             "Okay.

17             "Question:  So what is this document?

18             "Answer:  This appears to be a document that was

19   a follow-up to the Dear Healthcare Provider letter.  I don't

20   know why it's -- I don't know why it's dated March 10th, but

21   it seems to be a follow-up to that letter that went out on

22   the Dear Healthcare provider.  And it appears that it is a

23   list of compatible devices for use with Treanda injection,

24   which Treanda injection is Treanda liquid, based on testing

25   conducted by Teva from February of 2015 through June of

1    2015.

2               "Question:  So this was another Dear Healthcare

3    Provider letter that would have been sent to healthcare

4    providers such as doctors, nurses and other preparers of

5    liquid Treanda?

6               "Answer:  Yes.

7               "Question:  And the letter informs those

8    healthcare providers that there are safe methods of

9    administering liquid Treanda; is that correct?

10              "Answer:  Yes.  But I'd like to add there's

11   always a safe method of preparing Treanda and using the

12   naked needle and not using a closed system transfer device.

13   It's important to point out a closed system transfer device

14   is usually used to reconstitute.  So they're using the

15   closed system transfer device already on a concentrate.  So

16   there's always been a method to that.

17              "MR. PALAIYANUR:  I will ask to mark the next

18   document Exhibit 12.

19              "Question:  Welcome back, Mr. Rainey.

20              I think before the break we had marked

21   Exhibit 12.  So are you familiar with this document?

22              "Answer:  If you can give me a second here to

23   look at it.

24              "Okay.

25              "Question:  So what is this document?

Rainey - deposition designations

1              "Answer:  This is a letter that appears to be

2       going to our wholesalers, I believe, because it's from Chris

3       Doerr, trade operations, announcing Bendeka.

4              "Question:  And the document is dated when?

5              "Answer:  January 27, 2016.

6              "Question:  So what does the document announce

7       about Bendeka?

8              "Answer:  It says here, I'm pleased to announce

9       Bendeka injection is now available for shipment.  And it's

10      saying to replace Treanda injection.

11             "Question:  So when Teva discontinued liquid

12      Treanda, did it completely take liquid Treanda off the

13      market?

14             "Answer:  So when we launched -- and this letter

15      spells it out here -- when we launched Bendeka, we left --

16      Teva left Treanda liquid on the market until March 31st,

17      2016.  And -- yeah, left it on till March 2016 and then

18      that, Treanda liquid, was discontinued.

19             "Question:  So -- so the decision to discontinue

20      liquid Treanda that was made prior to this date,

21      January 27th, 2016?

22             "Answer:  It would have to have been to announce

23      it in this --

24             "Question:  Well, is that consistent with your

25      understanding?

1              "Answer:  Yes.

2              "Question:  And was the safety or efficacy of

3      liquid Treanda a consideration in deciding whether to

4      withdraw liquid Treanda from the market?

5              "Answer:  The main decision, as I remember, to

6      withdraw is that we had now Bendeka, which was a liquid

7      product which we've already talked about the advantages of

8      having a liquid product.  But now this one offered a number

9      of other advantages, ten-minute infusion instead of in an

10     hour, 30 minutes to an hour for a patient.  Bendeka was a

11     multiuse vial, as you can see here in this document,

12     TEVABEND00272217, is that Bendeka was a multiuse vial

13     compared to Treanda single dose vial.

14             "And what that means is there's less waste and

15     that you can use the leftover product for another patient or

16     that same patient when they come in for their next dose.

17     And there are some stability differences in admixture

18     stability, meaning with Bendeka, you could actually leave it

19     in the mixture longer than you could with the Treanda

20     liquid.

21             "So when we compared all these advantages of

22     Bendeka, that's when we decided to not promote Treanda

23     liquid anymore or educate on Treanda liquid anymore and go

24     fully to Bendeka.

25             "Question:  So around the time that Teva

1    replaced Bendeka with -- or, I'm sorry, I got that backward.

2                   "So around the time that Teva replaced Bendeka

3    with liquid Treanda, Teva stopped marketing liquid Treanda,

4    is that correct?

5                   "Answer:  Yeah.  So Teva stopped educating

6    physicians around Treanda liquid and educated around the

7    benefits of Bendeka around this time.

8                   "Question:  Did Teva consider the competition

9    for Bendeka when it decided to license Bendeka?

10                  "Answer:  At that -- at that time, there was no

11   other competition.  At that time, Teva had the, the

12   lyophilized and the Treanda liquid, which we determined not

13   to go forward with after Bendeka, that was the only

14   competition at that time.

15                  "Question:  So just so I understand correctly,

16   the only competition for Bendeka was lyophilized and liquid

17   Treanda?

18                  "Answer:  At that time, Teva only had all the

19   bendamustine at that time.

20                  "Question:  So did Teva consider whether liquid

21   Treanda would compete with Bendeka when it decided to

22   license Bendeka?

23                  "Answer:  The way I understand that we looked at

24   it is that when we licensed Bendeka, it was a better

25   product.  And we wanted to bring a better product to the

Rainey - deposition designations

1    market.   We just had all those issues with the closed system

2    transfer devices with Treanda liquid, and so once we had

3    Bendeka with the ten-minute infusion, I won't go through

4    them, but all the other things that -- advantages, the

5    decision was made not to go forward with Treanda liquid.

6                 "Question:  When the decision was made to

7    discontinue the liquid Treanda product, was a decision made

8    to no longer promote the liquid Treanda product?

9                 "Answer:  Yes.  The decision was made not to

10   promote it, because all of our promotional efforts at that

11   time went to Bendeka, because we thought it was a better

12   product at that time."

13                (End of videotaped deposition.)

14                MR. PALAIYANUR:  Your Honor, defendants would

15   also call Anne Brooks by deposition, but I understand the

16   testimony, the deposition designations will run past

17   10:00 a.m. this morning, so if it's okay with Your Honor,

18   we'd like to just run until 10:00 and then finish out.

19                THE COURT:  Sure.  How long are they?  Do you

20   know?

21                MR. PALAIYANUR:  Ms. Brooks' deposition is

22   31 minutes, I believe.

23                THE COURT:  Okay.

24                MR. PALAIYANUR:  I will approach the bench with

25   a binder.

1          (Mr. Palaiyanur handed binders to the Court.)

2          MR. PALAIYANUR:  Your Honor, defendants call by

3     deposition Ms. Anne Brooks.

4          Ms. Anne Brooks is Teva's 30(b)(6) witness on

5     the sales and marketing for Bendeka, and she will testify on

6     the transition of the market from liquid Treanda and the

7     sales of Bendeka.

8          MS. BAUMGARTEN:  I will object for the record.

9     I think that's an incorrect characterization on the topics

10    for which she was designated as a 30(b)(6) witness.  If we

11    need to play that clip, we can do so later today.  I believe

12    she was only designated on marketing and sales information

13    about Bendeka.

14          THE COURT:  All right.

15          (The videotaped deposition of Anne Michaud

16    Brooks was played as follows.)

17          "MR. PALAIYANUR:  And at this time, the court

18    reporter will swear in the witness.

19          (Anne Michaud Brooks, sworn.)

20          "Question:  All right.  Who is your present

21    employer?

22          "Answer:  Teva Pharmaceuticals.

23          "Question:  And what is your current title at

24    Teva Pharmaceuticals?

25          "Answer:  Senior director, oncology marketing.

1          "Question:  And what is your current job

2    responsibilities?

3          "Answer:  I am the brand director for three

4    oncology brands, Bendeka, Treanda and Synribo.  And I manage

5    a marketing budget and develop brand plans.

6          "Question:  What does Teva do to advertise

7    Bendeka?

8          "Answer:  Teva advertises Bendeka through

9    journal ads, digital advertising to healthcare providers.

10          "Question:  Anything else?

11          "Answer:  And we utilize our sales force to

12    deliver marketing messages.

13          "Question:  How big is your sales force to --

14    how -- let me strike that.

15          "How big is your sales force that you use to

16    deliver marketing messages for Bendeka?

17          "Answer:  It is roughly the size of a typical

18    oncology sales force in the U.S.

19          "Question:  And what would be the typical size

20    of an oncology sales force in the U.S.?

21          "Answer:  Roughly 70 to 120 sales reps in the

22    country.

23          "Question:  Did Teva prioritize the marketing of

24    Bendeka over Treanda when Bendeka was launched?

25          "Answer:  Yes.

1           "Question:  And how did it prioritize that

2   marketing of Bendeka?

3           "Answer:  We focused all promotional dollars on

4   Bendeka rather than Treanda.

5           "Question:  And when you say promotional

6   dollars, how much money are you talking about in the -- you

7   can ballpark that.

8           "Answer:  Several million dollars.

9           "Question:  Exhibit 5.  And if you could go to

10  the last page, February of 2018 to March of 2018, the total

11  sales for bendamustine went from 55,711,454 to 83,479, 521.

12          "Do you know what caused this jump?

13          "Answer:  There's a significant increase in the

14  Treanda line because there was a shortage of Bendeka.

15          "Question:  When was the shortage of Bendeka?

16          "Answer:  We received report of a shortage of

17  Bendeka in mid-February of 2018.

18          "Question:  And has that shortage been resolved

19  today?

20          "Answer:  Yes.

21          "Question:  And when was the shortage of Bendeka

22  resolved?

23          "Answer:  The stock-out shortage of Bendeka

24  resolved by the end of March.

25          "Question:  What options did the end customers

 1    have when there was a shortage of Bendeka to use for their

 2    patients?

 3                 "Answer:  If a customer had enough Bendeka

 4    inventory in their own ware -- you know, systems, they could

 5    use Bendeka.  They could also purchase Treanda.  Or they

 6    could use a whole different type of treatment that's not

 7    bendamustine for their patients.

 8                 "Question:  This data shows that they bought a

 9    substantial amount of lyophilized Treanda when there was a

10    shortage of Bendeka; correct?

11                 "Answer:  This report states that they purchased

12    25 million in March of 2018.

13                 "Question:  And that was a substantial increase

14    from the previous month of sales of lyophilized Treanda;

15    correct?

16                 "Answer:  That was an increase of 16 million.

17                 "Question:  And in January of 2018, the sales of

18    lyophilized Treanda was 2,883,555; is that correct?

19                 "Answer:  That's correct.

20                 "Question:  So from January of 2018 to March of

21    2018, the sales of lyophilized Treanda increased about 23

22    million; is that correct ?

23                 "Answer:  That's is correct.

24                 "MR. ALLEN:  Please mark this as Exhibit 7.

25                 "Question:  So I've just handed you Exhibit 7,

1    which is TEVABEND00106894.  And are you familiar with this

2    document?

3                    "Answer:  Yes.

4                    "Question:  And how does the yearly amount of

5    sales and marketing for Bendeka compare with the sales and

6    marketing per year for lyophilized Treanda?

7                    "Answer:  It is higher.

8                    "Question:  So there are no sales and marketing

9    expenses for lyophilized Treanda for 2016, 2017 and 2018; is

10   that right?

11                   "Answer:  Correct.

12                   "Question:  And what is a market research

13   expense?

14                   "Answer:  Market research expense is money spent

15   toward any market research study conducted to gain customer

16   insight on the brand.

17                   "Question:  Would you please mark this as

18   Exhibit 9.

19                   "And what is this Exhibit 9?

20                   "Answer:  This exhibit is a U.S. brand plan for

21   the bendamustine franchise for fiscal year 2016.

22                   "Question:  If you could go page

23   TEVABEND00106872.  And under positioning statement, it says,

24   Treanda has been on the market since March 20th, 2008.  The

25   brand is well established and positioned within the

1    marketplace.  It is the current leader in the treatment of

2    both CLL and iNHL-two plus.

3                   "Do you see that?

4                   "Answer:  Yes.

5                   "Question:  When this document was written in

6    March 2015, was Treanda the market leader in CLL and

7    iNHL-2-plus?

8                   "Answer:  The document states that it is

9    the current leader in the treatment of both CLL and

10   iNHL-2-plus.

11                  "Question:  And to clarify, the Treanda here

12   that's mentioned is lyophilized Treanda?

13                  "Answer:  It's not clear.

14                  "Question:  So it's not clear whether or not

15   it's lyophilized Treanda or liquid Treanda?

16                  "Answer:  No, because when we look at patient

17   shares within disease areas, we look at the total molecule.

18   So that would be bendamustine bendamustine's share is the

19   market leader.

20                  "Question:  By saying that, are you saying it's

21   both of them together?

22                  "Answer:  Yes.

23                  "Question:  Now, if you would turn the page to

24   TEVABEND00106873, the first sentence there, underneath the

25   figures, it says, the focus going forward for the

Brooks - deposition designations

1    bendamustine franchise will be to expand upon the heritage

2    that Treanda has built when developing a strategic position

3    for rapid bendamustine in the marketplace.

4              "Do you see that?

5              "Answer:  Yes.

6              "Question:  Did Teva rely upon the success of

7    Treanda when marketing Bendeka?

8              "Answer:  When we launched Bendeka, we did

9    reference that Bendeka is another form of bendamustine,

10   which is a product that customers had been using for many

11   years.

12             "Question:  Please take some time and page

13   through this and let me know when you're done.

14             "Have you seen this document before?

15             "Answer:  Yes.

16             Mr. Allen:  Please mark this as Exhibit 11.

17             "Question:  You've just been handed what has

18   been marked as Exhibit 11, which begins at TEVABEND

19   00106821.

20             "Question:  And what is Exhibit 11?

21             "Answer:  This is the bendamustine franchise

22   U.S. region brand plan for fiscal year 2017.

23             "Question:  And what is the bendamustine

24   franchise in Exhibit 11?

25             "Answer:  It represents Bendeka, Treanda liquid

Case 1:17-cv-01154-CFC   Document 351   Filed 10/25/19   Page 48 of 266 PageID #: 10582
996
Brooks - deposition designations

1    formulation and Treanda lyophilized powder.

2              "Question:  Are there any other bendamustine

3    products that are not Bendeka, liquid Treanda and

4    lyophilized Treanda?

5              "Answer:  These represent the Teva bendamustine

6    products.

7              "Question:  So if you'll turn to the page at

8    TEVABEND 00106824.  And the second sentence I believe is

9    referring to Treanda, it says, it faces potential generic

10   entry in 2016 due to the expiry of regulatory exclusivity on

11   May 1st, 2016.  A significant lifecycle management strategy

12   to protect the bendamustine franchise for Teva was the in-

13   licensing and launch of Bendeka, which was FDA approved in

14   December 2015.

15             "Do you see that?

16             "Answer:  Yes.

17             "Question:  So is it correct to say that within

18   five months of Bendeka's launch, Teva wanted to almost

19   completely transition from Treanda to Bendeka?

20             "Answer:  The goal, yes, was to transition

21   90 percent of Treanda business to Bendeka; that customers

22   would be choosing Bendeka 90 percent of the time, Treanda

23   ten percent of the time.

24             "Question:  And why wasn't it able to do so?

25             "Answer:  Some practices and physicians were

1    slow to switch.

2              "Question:  Does Teva know why they were slow to

3    switch?

4              "Answer:  There were a few reasons that we would

5    hear from some customers.  One was that there was simply the

6    challenge of the fact that Bendeka did not have a unique J

7    code at the time.  And a unique J code gives a much more

8    likely -- it's much more likely that a practitioner would be

9    reimbursed in a timely fashion if their claim is admitted --

10   is submitted to CMS or to another payer with a specific J

11   code.  It just ensures more timely reimbursement.

12             "Other accounts, you know, switching a

13   bendamustine formulation was not as high of a priority as

14   other products that would require formulary review, which

15   can take several months to accomplish in a big hospital

16   system.  And some customers felt that switching was -- you

17   know, required a lot of review and a lot of people to look

18   at it, and it just took longer than -- till May 1st.

19             "Question:  Eventually, Teva was able to acquire

20   a unique J code for Bendeka; correct?

21             "Answer:  Yes, brick was awarded a unique code

22   by CMS.

23             "Question:  There's a section titled

24   Communication to Stakeholders.

25             "O you see that?

Brooks - deposition designations

1              "Answer:  Yes.

2              "Question:  And in that first paragraph, it

3    states, per the Eagle agreement, 80 percent of bendamustine

4    details must be for Bendeka.

5              "O you see that?

6              "Answer:  Yes.

7              "Question:  Is that an accurate statement?

8              "Answer:  No.

9              "Question:  How -- how not?

10             "Answer:  My understanding of the Eagle

11   agreement is that 80 percent of -- oh, bendamustine details

12   delivered by the Teva sales force must equal 80 percent of

13   the prior year's Bendeka details.  So, for example, if the

14   Teva sales force delivered 1,000 details in 2016, they would

15   have to deliver 800 details in 2017, or 80 percent.

16             "Question:  Turning to TEVABEND 0106850.  And

17   Figure 13 is titled Programming and Strategic Spend

18   Guidance.

19             "Do you see that?

20             "Answer:  Yes.

21             "Question:  And the first line is the headers

22   for the columns and they're CSFF, programs, spending

23   guidance, HMI, and then responsible group, and then S in

24   parentheses.

25             CSFC, does that stand for critical success

Brooks - deposition designations

1   factors?

2              "Answer:  Yes.

3              "Question:  And then spending guidance, the H

4   mL, is that high, medium, low?

5              "Answer:  Yes.

6              "Question:  So for the first row, underneath the

7   headers, it says, convert greater than or equal 90 percent

8   of Treanda to Bendeka by May 1st, 2016, under the CSF

9   column; correct?

10             "Answer:  Yes.

11             "Question:  And then the program -- under the

12  program column, it states, personal promotion, 170,000

13  details 2016?

14             "Answer:  Yes.

15             "Question:  Did Teva reach its 170,000 details

16  goal in 2016?

17             "Answer:  Yes.

18             "Question:  Did it exceed the 170,000 details

19  goal in 2016?

20             "Answer:  Yes.

21             "Question:  Please mark this as Exhibit 12.

22             THE COURT:  Why don't we break here.

23             Details, is that like marketing details?  What's

24  details?

25             MR. PALAIYANUR:  I believe it's contact.

```
 1              THE COURT:  Contact?  Do you agree with that?

 2              MS. BAUMGARTEN:  Yes.  It's the sales force

 3     going out.  They call it detailing.

 4              THE COURT:  All right.  Why don't we break here.

 5     We'll begin at 12:30.  Would that work for the parties?

 6              MS. STAFFORD:  Yes, Your Honor.

 7              THE COURT:  All right.  All right.  Thank you

 8     very much.

 9              I was going to say, we've got another

10     proceeding.  If you can all at least just clear out as fast

11     as you can the tables and then take your time as far as the

12     other materials.  That is fine.  Thank you very much.

13              MR. BERL:  Should we have eaten lunch by 12:30?

14              THE COURT:  Do you mind?

15              MR. BERL:  No.  I just want to make sure

16     everyone knows when to eat.

17              THE COURT:  Yes, yes.  But you know what, you're

18     also worried about time.  That's one of the reasons I was

19     trying to push it up.

20              MR. BERL:  We have how many hours we have for

21     the overall trial, so it's perfectly up to Your Honor.  I

22     just want to make sure I tell people eat before you come

23     back.

24              THE COURT:  Yes.  That's fair.  Well, you know,

25     you're right, Mr. Berl.  We have what we have timewise and I
```

Brooks - deposition designations

 1    built it into the schedule including the Thursday morning

 2    for a little bit of extra time if I want to add for closing

 3    arguments, so I will tell you what.  Given that, why don't

 4    we come back at 1:00 o'clock.  Thanks for bringing it to my

 5    attention.

 6              For the next case, the Government and

 7    Mr. Dougherty, we're going to start at 10:05 so that we can

 8    take a break.

 9              (Recess taken.)

10                   -  -  -

11              Afternoon Session, 1:02 p.m.

12              THE COURT:  All right.  Please be seated.

13              All right.  Go ahead.

14              MR. PALAIYANUR:  Defendants will resume the

15    deposition testimony of Ms. Anne Brooks as a 30(b)(6)

16    witness for Bendeka.

17              THE COURT:  Thank you.

18              "Answer:  Yes.

19              "Mr. Allen:  Please mark this as Exhibit 12.

20              "Question:  You've been handed Exhibit 12 with

21    first Bates number of TEVANBEND  00106878.

22              Have you seen this document before?

23              "Answer:  Yes.

24              "Question:  And what is it, Exhibit 12?

25              "Answer.  This is a weekly dashboard report on

Brooks - deposition designations

1    the performance of the Bendeka launch.

2              "Question:  And if you would turn to page

3    TEVANBEND   00106880, what is this slide showing?

4              "Answer:  This slide shows the percent of sales

5    of Bendeka versus Treanda at a specific time point, here

6    it's noted at February 21st, versus the predicted transition

7    or split of the business in the dotted green line.  So

8    it's showing performance of the transition goal versus the

9    plan.

10              "Question:  And the prediction of that dotted

11   green line that says planned, that just looks like a

12   straight line from 0 to 90 percent by May 1st, is that

13   correct?

14              "Answer:  Roughly, yes.  I don't know if this

15   is an exactly perfect straight line, but it's close, yes.

16              "Question:  I mean, other than the goal of

17   reaching 90 percent by May 1st, was there anything else that

18   Teva used to drive and create this planned line?

19              "Answer:  This planned line was created by our

20   forecasting department based on their experience and

21   knowledge of how conversion launches take place.

22              "Question:  So as of February 21st, Bendeka was

23   not selling as planned; correct?

24              "Answer:  Correct.

25              "Question:  Do you know if this difference

1    between actual and planned continued for the dates after

2    February 21st?

3                 "Answer:  I know that we did not achieve

4    90 percent transition by May 1st.

5                 "MR. ALLEN:  Please mark this as Exhibit 13.

6                 "Question:  You've been handed Exhibit 13, which

7    is Bates number TEVANBEND  00272011.

8                 "And have you seen this document before?

9                 "Answer:  Yes.

10                "Question:  What is Exhibit 13?

11                "Answer:  This is a commercial plan update

12   PowerPoint presentation for Bendeka.

13                "Question:  Okay.  If you turn the page to

14   TEVANBEND  00272013, what is this slide showing?

15                "Answer:  So this is a weekly tracker of the

16   sales of Treanda compared to the sales of break compared to

17   the plan at the time point, looks like March 13th.

18                "The bottom graph is showing the amount of

19   inventory of each product at wholesale at the time of this

20   data point, which is March 13th.

21                "Question:  And then above that, there's a

22   Bendeka average weekly details are double that of the

23   Treanda detailing same time in 2014?

24                "Answer:  Yes.  This is saying that the Bendeka

25   weekly details are double that of Treanda details at the

Brooks - deposition designations

1  same time.   In 2014 was at the same time of its life cycle.

2              "Question:  And when you say time of its

3  lifecycle being its launch?

4              "Answer:  Yes.

5              "Question:  Please mark this as Exhibit 14.

6              You've been handed Exhibit 14, with Bates number

7  TEVANBEND   00106759.

8              "Now, what is this document?

9              "Answer:  This is a high level summary of the

10  2018 strategic bland plan for the U.S. bendamustine

11  franchise.

12             "Question:  When Bendeka was launched in 2016,

13  was the price 14 to 16 percent lower than Treanda across

14  hospitals?

15             "Answer:  I don't recall the WAC price of

16  Treanda lyo versus Bendeka, but at the launch of Bendeka, it

17  was priced at parity to Treanda liquid.

18             "Question:  How much lower than Treanda is

19  Bendeka currently priced?

20             "Answer:  Bendeka's WAC price is roughly 17 to

21  18 percent below Treanda's WAC.

22             "Question:  And then the second sub-bullet

23  states, promote patient centric value of time off active

24  treatment in addition to safety/efficacy/heritage.

25             "Why is time off active treatment valuable to

Brooks - deposition designations

1    the patient?

2              "Answer:  We learned from market research with

3    patients that they liked the ability to not have to take

4    treatment every day for the rest of their life and that time

5    off active treatment was a benefit to a bendamustine- based

6    regimen.

7              "Question:  And the time off active treatment,

8    is that with respect to days, months, years?

9              "Answer:  That corresponds to months or number

10   of cycles.  It refers to days or, you know, number of days

11   within a month that you would be treated.  It also applies

12   to amount of time you're actively receiving treatment, so

13   ten minutes versus 30 to 60 minutes in a chair.  So it spans

14   all three of those parameters.

15             "Question:  And how many days do they have off

16   of the treatment once they're done with those cycles?

17             "Answer:  So after six cycles of therapy, they

18   no longer receive active treatment until the product --

19   until their disease relapses.

20             "Question:  How many days would that normally

21   be?

22             "Answer:  Most data sets would suggest that

23   patients remain -- you know, there's no treatment

24   progression for roughly two years.

25             "Question:  So the third bullet point is,

Brooks - deposition designations

1   brand's strategic imperatives for 2018 to '22, it says,

2   drive LCM initiatives.

3           "What does LCM mean?

4           "Answer:  Lifecycle management.

5           "Mr. Allen:  Please mark this as Exhibit 16.

6           "Question:  And you've been handed Exhibit 16,

7   which is TEVANBEND  00106764.  Are you familiar with this

8   document?

9           "Answer:  Yes.

10          "Question:  And what is this document?

11          "Answer:  This is the 2018 bendamustine

12  franchise brand plan for the U.S.

13          "Question:  If you could please turn to

14  TEVANBEND  00106766.  And in the second bullet, what is the

15  product and its global value proposition?

16          "And in the second sub-bullet, Treanda launched

17  in the U.S. in 2008 hitting peak sales in 2013.  Sales have

18  declined slowly, squiggly line, five percent each year since

19  2013 due to increasing competition.

20          "Do you see that?

21          "Answer:  Yes.

22          "Question:  Is this referring to lyophilized

23  Treanda or liquid Treanda?

24          "Answer:  It would have applied to both liquid

25  and lyophilized collectively.

Brooks - deposition designations

1       "Question:  And the next bullet says, Bendeka

2   launched in 2016 as an approved formulation of bendamustine.

3           And I think we've established that Bendeka with

4   a was launched in January 2016; is that correct?

5           "Answer:  Correct.

6           "Question:  And so even before Bendeka launched,

7   the sales of Treanda were declining at five percent per

8   year; is that correct?

9           "Answer:  Correct.

10          "Question:  Do you know why sales of

11  lyophilized -- or Treanda and liquid Treanda were declining

12  prior to Bendeka's launch in 2016?

13          "Answer:  Competitive agents, such as Imbruvica,

14  Gazya, Fluorabine containing regimens.

15          "Question:  So if you could turn to TEVANBEND

16  00106769.  And this slide is titled market definition.

17          "Do you see that?

18          "Answer:  Yes.

19          "Question:  All right.  And then it says,

20  share has declined greater than ten percent over past

21  12 months.

22          What factors contributed to the ten percent

23  decline?

24          "Answer:  Primarily Imbruvica.

25          "Question:  If you could please turn to

1    Exhibit 16, TEVANBEND  00106772.  And the title of this

2    slide is bendamustine market insight summary - CLL; correct?

3                   "Answer:  Yes.

4                   "Question:  And at the time of creation of this,

5    these slides, the bendamustine formulations that were being

6    marketed were lyophilized Treanda and Bendeka; correct?

7                   "Answer:  Correct.

8                   "Question:  If you could turn to 106781 -- I

9    will repeat that.

10                   Can you please turn to the page at TEVANBEND

11   1 -- 00106781.  And under implication for Teva, on the

12   second slide down, it says, promotion of bendamustine by

13   competitors, Roche, AbbVie, increase SOV.

14                   What does that statement mean?

15                   "Answer:  So what that means is that if you look

16   in the prior column, second bullet, Obinutuzumab, that is

17   Gayva, and Ibrutinib, that's Imbruvica, they are now

18   approved in combination with bendamustine in relapsed

19   refractory follicular lymphoma and CLL respectively.

20                   "So what has been happening is that the sales

21   reps. from Roche and AbbVie, who promote Obinutuzumab and

22   Ibrutinib, are talking about that combination data, which

23   includes bendamustine.  So they're essentially talking about

24   bendamustine in their details.

25                   "Question:  And SOV, what does that stand for?

Brooks - deposition designations

1    "Answer:  Share of voice.

2    "Question:  And then in the same second column,

3    that third bullet in that same cell that you just referred

4    to, it says, Eagle likely to launch RTD bendamustine in 2019

5    when generics enter the market.

6    "What is Teva's basis for this statement?

7    "Answer:  Teva's foundation for this statement

8    was that, at the time, Bendeka had achieved 93 percent share

9    of the bendamustine market.  And we felt that it was much

10   less likely that Eagle would want to enter as a competitor

11   into a market where they already had 93 percent share.

12   "Question:  And I guess your answer to the

13   previous question was because once the generics enter the

14   market, the market share of Bendeka would be lowered and,

15   therefore, have more of a chance to compete?

16   "Answer:  So we felt that Eagle would launch in

17   2019 at the same time as the generics, because they would

18   be, yes, capturing share and volume at a point where Bendeka

19   had less -- was less competitive.

20   "Question:  Are these expenses that are here for

21   Bendeka similar to what Teva spends on the same functions

22   for Treanda?

23   "Answer:  This represents, again, forecasted

24   spend for 2018 through 2020 for Bendeka.  I'm not aware of a

25   document that has this information for Treanda.

Brooks - deposition designations

1        "Question:  Is that because Teva does not plan

2   to spend for these similar functions for Treanda?

3        "Answer:  That planning has not taken place for

4   Treanda.

5        "Question:  Do you know if these spends are

6   similar to what Teva's competitors spend to market their

7   drugs that compete with Bendeka?

8        "Answer:  This is lower than what other

9   competitors are spending.

10       "Question:  And what makes you say or believe

11  that these are lower than what other competitors are

12  spending for their agents that compete with Bendeka?

13       "Answer:  I have seen some audit reports that

14  project marketing spend for other brands.  And there are

15  other sales forces that are larger that Teva's, so labor

16  costs would be higher.

17       "Question:  When you say audit reports, who

18  created those audit reports?

19       "Answer:  They would be reports generated by a

20  third party vendor.

21       "Question:  And who is that third party vendor?

22       "Answer:  I don't recall."

23       (End of videotaped deposition.)

24       MR. PALAIYANUR:  A couple housekeeping matters.

25       First, defendants move to admit the exhibits

Brooks - deposition designations

1    used in connection with the deposition testimony of Mr.

2    Rainey and Ms. Brooks.  If I may read those exhibits into

3    the record.

4              First, the deposition, the exhibits to the

5    deposition testimony of Mr. Rainey, DTX-0499, DTX-500, and

6    DTX-501.

7              Next, Your Honor.  The exhibits to the

8    deposition testimony of Ms. Brooks, DTX-0267, DTX-0269,

9    DTX-0367, DTX-0467, DTX-0496, DTX-0820, DTX-0821, DTX-0822,

10   DTX-0823.

11             And then, Your Honor, we also wanted to update,

12   regarding --

13             THE COURT:  Hold up.  Any objection?

14             MS. BAUMGARTEN:  No objection.

15             THE COURT:  All right.  Those are admitted.

16             (DTX-0499, DTX-500, and DTX-501, DTX-0267,

17   DTX-0269, DTX-0367, DTX-0467, DTX-0496, DTX-0820, DTX-0821,

18   DTX-0822 and DTX-0823 were admitted into evidence.)

19             MR. PALAIYANUR:  We wanted to update, regarding

20   the deposition testimony that defendants are not playing.

21   Specifically, Sri Sundaram and Huffner.

22             Plaintiffs have agreed to waive the sponsorship

23   requirement to the extent that it's permitted by Your Honor,

24   so we'll work on a joint stipulation to admit, you know,

25   these specific documents that, had mentioned that may not be

Brooks - deposition designations

1    used in connection with the witness.

2                THE COURT:  I'm sorry.  The sponsorship?  What

3    does that mean?

4                MR. PALAIYANUR:  I think as you were explaining

5    this morning, it's not going to come into the record, or

6    Your Honor won't consider it unless it's used and actually

7    testified about, but there might be some categories

8    documents, like documents submitted to the FDA.

9                THE COURT:  I see.  That you might want to

10   jointly work out?

11               MR. PALAIYANUR:  Right.  Thank you, Your Honor.

12               THE COURT:  Thank you.

13               So I just want to make one other comment for the

14   record.  I also thought about just a little bit, about the

15   admissibility of the two depositions that were played, and

16   I've already admitted them.  I did describe the limitations

17   and I belive I said background and impeachment were the

18   ultimate basis, but there is also the issue of, generally

19   hadn't thought of it.  Even plaintiffs in its opening

20   statement promised it was going to show at trial the

21   smashing success of this drug, and I don't think you get to

22   say something in opening like that and not allow the other

23   side to rebut it even if you decide, the plaintiff decides

24   not to go for the with the evidence.

25               Now, whether the evidence is used for any

Brooks - deposition designations

1    purpose in the obviousness analysis is a different story,

2    but if you make a promise, I don't think the other side can

3    be faulted for we need to rebut that assertion.  Otherwise,

4    it's not fair, because counsel for both sides are respected

5    and I'm going to kind of take them at their word.  And I

6    want to be careful in a bench trial I don't confuse

7    counsel's representations with evidence.  So, all right?

8              Anyway, I'm sure you all will do a good job in

9    your post-trial briefs explaining what I should consider and

10   what I should not in making the determination of

11   obviousness.

12             All right.  Next?

13             MS. STAFFORD:  At this stage defendants conclude

14   their presentation of Phase 2 or this part of the case.

15             THE COURT:  All right.  What's next?

16             MS. STAFFORD:  Wait, wait.  We have to hand

17   something up to you.

18             MR. PALAIYANUR:  We have to hand up the

19   deposition binders.

20             THE COURT:  To put them into the record?

21             MS. STAFFORD:  I think they've already been

22   admitted.  We can give them to you at a break.

23             THE COURT:  All right.  Necessary?

24             MR. PICOZZI:  Your Honor, we understand it's

25   this Court's practice generally not to consider motions for

1  judgment as a matter of law in bench trials.  However, we

2  think that there are a very limited number of issues that

3  the Court ought to consider.

4            THE COURT:  Okay.

5            MR. PICOZZI:  Defendants have raised numerous

6  112 defenses in their pretrial papers, but in particular,

7  there are a couple of those 112 defenses on which they have

8  not presented any evidence or argument in Phase 2.

9  Specifically, if you turn to page 39 of Exhibit 2D.  This is

10 defendants' statement of the issue, disputed issues of fact

11 that remain to be litigated.

12            THE COURT:  All right.  Hold on.  Is this in the

13 PTO?

14            MR. PICOZZI:  Yes.

15            THE COURT:  I think maybe the way also, this is

16 my first ANDA trial, so you should make any motion you feel

17 like you have to make.

18            MR. PICOZZI:  Understood.

19            THE COURT:  And part of the reason is because if

20 the defense tries to bring in evidence after you make your

21 motion, it's too late, so the record is frozen at this

22 point, and I do want to make that clear.

23            So, you know, and I have not figured out what

24 I'm going to do in terms of all of the post-trial briefing.

25 Let's say we had simultaneous briefs.  Maybe that's what was

Brooks - deposition designations

1    anticipated.  I don't know.  And then it turns out the

2    defense in explaining the evidentiary basis of their case

3    relies on evidence that occurred after the making of this

4    motion, I'm going to permit the plaintiff to respond and

5    say, too late.  They didn't make their case, it's over.  All

6    right?

7            MR. PICOZZI:  Understood.

8            THE COURT:  And by the same token, you know,

9    defense gets to do the same.  Right?  Although I don't

10   remember defense motion, but although this is where we get

11   into, you know, this whole obviousness, what do I consider

12   when.

13           Any way, okay.  So go ahead.  Point me again

14   then to the section of the pretrial order.

15           MR. PICOZZI:  Sure.  Just to make clear, this is

16   a, given the Court's instructions, this is a motion for

17   judgment as a matter of law on all outstanding validity

18   issues.

19           THE COURT:  Right.

20           MR. PICOZZI:  But in particular, there are

21   certain issues I think that may be worth assessing here.

22           THE COURT:  Yes.

23           MR. PICOZZI:  So if you turn to page 39 of

24   defendants' statement of issues of fact, you'll see that in

25   their pretrial papers, defendants present several written

Brooks - deposition designations

1    description defenses.

2             THE COURT:  Yes.

3             MR. PICOZZI:  Those defenses are separate from

4    and adjudicated under a different standard than the other

5    112 defenses that they've raised concerning indefiniteness

6    and enablement.

7             Defendants have not presented any evidence or

8    testimony at trial concerning those issues, and so we ask

9    that the Court rule for plaintiffs as a matter of law on

10   defendants' written description issue both as presented in

11   their statement of facts as well as the paragraphs in their

12   statement of law.  I can direct the Court to those

13   paragraphs as well, if that would be helpful.

14            THE COURT:  Okay.  Let me hear the defense on

15   this.

16            MR. ALY:  A lot of people want to be heard.  I

17   will just go over here.

18            THE COURT:  We missed you yesterday, Mr. Aly.

19            MR. ALY:  Thank you, Your Honor.  I came very

20   late.

21            THE COURT:  I saw you come in the back.

22            MR. ALY:  For Fresenius Kabi, and I believe I'm

23   speaking for Mylan, too, we agree for the written

24   description issue shouldn't be going forward, that part of

25   it.  I understand, however, that Apotex would like to still

Brooks - deposition designations

1    present on those and that's fine, but I just want to make

2    that part clear.

3             And Slayback will speak for itself.  The claims

4    that we were writing about here, those aren't even the

5    claims that apply to the Slayback only claims, so Slayback's

6    counsel may have his own view, well, because it doesn't go

7    to the evidence, any opinion on this issue.

8             THE COURT:  Okay.  So that gets rid of -- so, in

9    other words, Fresenius and Mylan.  You said -- you kind of

10   hedged on you think you speak for Mylan?

11            MS. STAFFORD:  We did not present written

12   description.

13            THE COURT:  All right.  Fresenius and Mylan,

14   motion granted, it having been stipulated to.  All right.

15   Perfect.

16            All right.  Next?  Slayback or Apotex?  Okay.

17   Slayback.

18            MR. BARABAS:  For Slayback, you signed a

19   stipulation, I believe, on Monday morning to the effect that

20   Slayback and the plaintiffs agree that Slayback is not

21   presenting any 112 defenses at this trial and our defense is

22   obviousness to claim 13.

23            THE COURT:  That's right.  You reminded me of

24   that at the beginning of trial.  I apologize if I didn't

25   remember that.  That takes care of your client.

Brooks - deposition designations

1          MR. BARABAS:  Thank you.

2          THE COURT:  Apotex?

3          MR. FELDMAN:  We believe that the defense is

4   preserved.  Written description defense is whether the

5   inventors had possession of what ends up being claimed in

6   the patent at the time.

7          Okay.  As we heard Dr. Palepu testify, they did

8   not actually have possession of adding NoAH to get the

9   specific impurity levels.  I'm talking in particular about

10  Claim 9 of the '797 patent, which was the 25 degrees

11  .43 percent PG esters.  Okay.  And you say data.  We

12  presented data that showed in their own test results that

13  they could not get consistent impurity levels at that

14  temperature at the claimed levels and therefore we believe

15  they did not possess the invention at the time.

16          You also saw they had filed a second patent

17  application later, okay, where they did figure out how to do

18  this consistently which had NoAH in it.

19          On that basis, because it's clear they did not

20  possess the invention at the time of that, that at least

21  with respect to that claim, there's lack of written

22  description.  We'd like to preserve that for the record,

23  Your Honor.

24          THE COURT:  Okay.  And so basically you're

25  conceding that for all claims other than claim 9 of which

1    patent?

2              MR. FELDMAN:  '797 patent.

3              THE COURT:  Of the '797 patent, that written

4    description is off the table?

5              MR. FELDMAN:  And claim 2 of '831, Your Honor.

6              THE COURT:  Okay.  So, all right.  That narrows

7    the dispute.  That's helpful.

8              Let's hear from plaintiffs' counsel.  Do you

9    want to address the issue?

10             MR. PICOZZI:  I will briefly address that

11   argument.

12             THE COURT:  What's your name, sir?

13             MR. PICOZZI:  Ben Picozzi.

14             THE COURT:  Thank you.

15             MR. PICOZZI:  I think there are two important

16   issues.  The first is that the test results that they are

17   alluding to are outside the scope of the patent and cannot

18   be considered in connection with the descriptions that are

19   given as well as the claims.

20             The second, and I think perhaps the more

21   important issue is that defendants have failed to present

22   any expert testimony on the actual question of written

23   description, and both the Federal Circuit as well as other

24   courts in this district in considering some of the written

25   description defenses have held that without an expert who is

 1    able to explain why the description in the patent is

 2    insufficient, that mere lay testimony is inadequate.

 3                   And on that point, I can point you to paragraph

 4    129 --

 5                   THE COURT:  All right.  Hold on one second.

 6                   MR. PICOZZI:  -- of our statement of issues.

 7                   Can somebody tell me where in the PTO claim

 8    9 of the '797 patent is so I can take a look at it or an

 9    exhibit?

10                   MR. FELDMAN:  We can put it up on the screen,

11    Your Honor.

12                   MS. BAUMGARTEN:  They're pulling it up on the

13    screen, Your Honor.

14                   THE COURT:  All right.  So as I understand

15    Mr. Feldman's argument, there's no requirement that sodium

16    chloride be in this.  Is that right?

17                   MR. PICOZZI:  Sodium hydroxide.

18                   THE COURT:  Right.  And your point, Mr. Feldman,

19    is that the test results of the plaintiff show that you need

20    to have sodium hydroxide in order to achieve the composition

21    described in claim 9?

22                   MR. FELDMAN:  The impurity level.  That's

23    correct.

24                   THE COURT:  Right.  All right.  And the

25    evidence, the only evidence you point to is the plaintiffs'

1    test results?

2              MR. FELDMAN:  And the inventor's testimony that

3    they hadn't invented that part of it at the time that they

4    filed the specification.

5              THE COURT:  Wait.  You mean the inventor

6    testified that he was not able to achieve this until he

7    filed the subsequent patent application?

8              MR. FELDMAN:  He testified that they had not

9    thought to do the sodium hydroxide, which is --

10             THE COURT:  But did you present any expert

11   testimony that the only way to achieve claim 9 impurity

12   level is through the use of sodium hydroxide?

13             MR. FELDMAN:  I believe Dr. Pinal testified

14   about the same test results and he did, in fact, through

15   those same charts demonstrate that you could not

16   consistently get that impurity level without sodium

17   hydroxide, which is why it was in his formulation proposed,

18   but you couldn't consistently get that.

19             THE COURT:  But that is the only evidence you

20   are relying on.  Is that correct?

21             MR. FELDMAN:  We also rely on the inventor's

22   evidence, because unlike most cases, you don't have the

23   inventor coming up and say, I didn't have this at the time.

24             THE COURT:  Right.  It's the coupling of those

25   two?

1    MR. FELDMAN:  Right.

2         THE COURT:  And that's it?

3         MR. FELDMAN:  That's it.

4         THE COURT:  I'm going to deny the motion for

5    right now, but it sounds like this is going to be resolved

6    on a legal issue as to whether or not expert testimony is

7    going to establish that.  It will be very, very shortly

8    briefed and he can decide that.

9         MR. BERL:  Yes.  It is disputed factually, too.

10   We don't agree with anything Mr. Feldman just said.

11        THE COURT:  Except what I'm getting at is you

12   might even be able to stipulate to what he said.  You're

13   going to say as a legal matter, that's not good enough, as I

14   understood the argument.

15        MR. BERL:  Yes.

16        THE COURT:  Okay.  So I'm going to conditionally

17   deny it.  You know, I'm going to say something which I wish

18   patent lawyers took to heart more, which is low hanging

19   fruit is something that, you know, I think any fact-finder,

20   any judge thinks about, and if you make ten arguments and

21   four of them are really, really bad, it's low hanging fruit

22   for your opponent and affects the credibility of all of your

23   other arguments.  That's just the way it is.  So hopefully,

24   folks will be judicious in the arguments that they are going

25   to move forward with.

Brooks - deposition designations

1        All right.  What's the next motion?

2            MR. STEUER:  Can I be heard for a moment?  My

3    first words on record here.  David Steuer for Mylan.

4            If I could cycle back for a moment to the

5    comments about the freezing of the record at this point.  As

6    I understand the procedure, our prima facie case on

7    invalidity is frozen, and unless we were to have a granted

8    motion for reopening, the evidence is frozen for that.

9    However, it's my understanding that the Court's ultimate

10   decision on our case can include material that we elicit

11   during the plaintiffs' rebuttal case.  For example, if

12   because of defendants' cross-examination, an expert admits

13   to obviousness, that should go -- even though it's not part

14   of our case, that would go into the mix of the Court's

15   evidence in getting a ruling.

16           THE COURT:  It can, that's true, but if the

17   defendant in the post-trial brief said, defendant -- if the

18   plaintiff, rather, in their post-trial brief said, as an

19   initial matter, the only evidence presented by the defense

20   to establish invalidity in its case-in-chief, in their

21   case-in-chief was A, B and C and as a matter of law, A, B

22   and C is insufficient to carry the day, they win and then

23   I'm not going any further.

24           MR. STEUER:  Right, because that would indicate

25   that a prima facie case hasn't been established.  And what I

Brooks - deposition designations

1    understand --

2                    THE COURT:  Again, I went back and I read again

3    over lunch, and I think the Federal Circuit is telling me,

4    don't adopt this prima facie rebuttal case.  They're telling

5    me I make it in the first instance.  Now, I mean, if you

6    want to call it prima facie, fine.  You would have to

7    establish as a matter of law, and we'll get to the burden of

8    proof what that is later on, that the invention was obvious

9    or the claimed invention was obvious.  And I guess that's

10   the equivalent of a prima facie case.  I mean, it's not

11   going to include consideration of secondary considerations

12   that have not been raised by the defense yet.  That's for

13   sure.

14                    MR. STEUER:  Yes.  I agree with that.

15                    THE COURT:  Okay.

16                    MR. STEUER:  It's just my narrow point, evidence

17   elicited in cross-examination can be used to satisfy the

18   ultimate burden in the case.

19                    All right.  Let me put it in the negative.  For

20   example, if there's an admission by one of the witnesses

21   from the plaintiff that indicates obviousness, we're

22   entitled to rely on that in arguing for -- that judgment

23   should be given to the defendants here.

24                    THE COURT:  You are entitled to rely on it, but

25   if the plaintiffs show in their brief that in your

Brooks - deposition designations

1    case-in-chief you only presented 1, 2, 3, and if 1, 2 -- I'm

2    going to first consider, are 1, 2 and 3 sufficient to

3    establish obviousness, and if they are not, I think the case

4    is over.

5              MR. STEUER:  Even if 1, 2 and 3 is established

6    in the evidence as a totality, it's the Court's view that

7    because of the shifting of the case presentation at this

8    point, that the defendants --

9              THE COURT:  You all agreed to this, not me.  You

10   all agreed to present it this way.

11             MR. STEUER:  I guess my point, Your Honor.  I

12   don't think it's a function of the order of presentation.  I

13   think it's a function of the record that the Court uses to

14   decide the case.

15             So if we don't have A, B and C now, then the

16   plaintiffs are entitled to judgment, because we have not met

17   our burden of establishing a prima facie case.  But if we go

18   forward and the Court takes in the evidence, I think the

19   position is all the evidence should be fair game to argue to

20   the Court that these are invalid patents.

21             THE COURT:  I think that if -- I'm just going

22   with what you all have established, which is you said you're

23   going to do a presentation first where the invalidity has to

24   be established.  You've all called it a prima facie case,

25   but you've got to establish that.  And what it really means,

1  it seems to me, is a determination as to obviousness without

2  consideration of second objective indicia of secondary

3  consideration.

4        So under the procedure that you have all set up,

5  it seems to me there ought to be a time for sides to present

6  motions for judgment as a matter of law and you're supposed

7  to do what I do in a normal case, which is you've got a

8  burden of proof and then you get to bring a motion for

9  judgment as a matter of law, and then you proceed to a

10  rebuttal case.

11        As I say, I do think it's complicated because as

12  I read In re Cyclobenzaprine, I have questions whether this

13  case ever should have been conducted in the phases that you

14  all stipulated to, and it seems to me everything should have

15  been dumped in the pot and then I should make a judgment.

16  But that's not the way the case was stipulated to be

17  presented.

18        MR. STEUER:  Okay.  And I think that's the only

19  place I would differ with, is, I don't think the order of

20  presentation affects the overall rule of what evidence is

21  before the Court for determination of the cause.

22        MS. STAFFORD:  And, Your Honor, we pointed

23  out the other day and numerous times, including when Your

24  Honor revised the motion in limine ruling.  We have

25  stipulated once, so, yes, if we didn't establish a prima

Brooks - deposition designations

1   facie case, then you are entitled to consider judgment as a

2   matter of law, but if we did and they go on to put their

3   rebuttal part of the case, then we're entitled to put on a

4   rebuttal to that.  And then you look at the totality of the

5   evidence.

6            And Your Honor said that, for example, experts

7   dealt with things that we thought were on notice that we

8   thought there were secondary considerations and they change

9   in this gray area and say, no, we're only replying on this

10  prima facie case, Your Honor said we could go into that

11  evidence in Phase 4 to respond to them.  For example, we

12  were allowed to talk about the expectations.  We weren't

13  allowed to do the comparative testing.

14           And so I think what my colleague, Mr. Steuer, is

15  trying to impress, we never agreed not to put on a rebuttal

16  case, or, you know, they were allowed to put on whatever

17  they want to in Phase 3 and you shouldn't consider our

18  response to that.

19           THE COURT:  All right.  Hold up.

20           MS. STAFFORD:  I think perhaps, Your Honor, it's

21  an issue that could be raised in post-trial briefing as

22  well.

23           THE COURT:  Yes.  I can imagine the size of

24  these post-trial briefs.  All right.

25           MR. BERL:  If I may, ten seconds.  I just want

Brooks - deposition designations

1    to make clear, I disagree with virtually everything that was

2    said.  It's our view that if they fail to establish a prima

3    facie case, the case is over, and that's it.

4            With that, we have a limited amount of time for

5    our case and I would like to get started.

6            THE COURT:  Do you have a case that says that

7    though?

8            MR. BERL:  Sure.  We can -- so on the Otsuka

9    versus Sandoz at 678 F.3d 1280, and the pin cite is 1296.  I

10   will read the quote from the Federal Circuit.

11   Because we agree with the District Court that the defendants

12   failed to prove that claim 12 of the 528 patent would have

13   been prima facie obvious over the asserted prior art

14   compound, we need not address the Court's findings regarding

15   objective indicia -- objective evidence of nonobviousness.

16           And if you want a District Court case?

17           THE COURT:  No.  That's enough.  That makes it

18   more complicated for me because that actually supports your

19   position.  So we're going have to figure this out

20   post-trial.

21           MR. STEUER:  I don't disagree with that

22   decision.  I think it's right.  I don't think it addresses

23   what I'm saying, which is if we have not shown prima facie

24   obviousness over the appropriate standard which is only

25   inferences favorable to the proponent, then they are

Brooks - deposition designations

1  entitled to.

2          THE COURT:  Right.

3          MR. STEUER:  And then obviousness wouldn't

4  matter because we have not shown it's prima facie obvious.

5  But if we get past that hurdle, all I'm saying, the Court

6  will have a big record in front of it with lots of testimony

7  and evidence and the parties are entitled to bring to the

8  Court's attention the evidence however presented that they

9  believe supports their position.

10          THE COURT:  Here's where I am.  I'm changing my

11  mind because I think it's the safest course and I make

12  mistakes.  So notwithstanding what I said to plaintiffs, I'm

13  changing my mind, and I'm not going to entertain judgment as

14  a matter of law motions right now, and I'm going to let

15  everything come in and then I'm just going to deal with this

16  at the very end, you know, and not have to deal with the

17  issue.

18          I apologize.  The law is complicated and,

19  frankly, the case law is hard to reconcile, some of the

20  rulings, and I have a limited capacity to do so even if it

21  were crystal clear.

22          The motion is denied and don't, you cannot rely

23  on anything I said in connection with those motions.

24          MR. PICOZZI:  Understood.

25          THE COURT:  Sorry.  Let's move on.

Brooks - deposition designations

1        MR. MAHAFFY:  Your Honor, Shaun Mahaffy from

2   Williams & Connolly on behalf of plaintiff.

3        We'd like to call Dr. Eric Anslyn.  And while

4   we're getting set up, Your Honor, if I may just give some

5   context for witnesses that we're going to be presenting.

6        THE COURT:  Yes.  That would be great.

7        MR. MAHAFFY:  The first witness is going to be

8   Dr.  Eric Anslyn.  He's going to be testifying with respect

9   to certain chemistry aspects of the formulation family.

10       Depending on time today, we may present several

11  additional experts about the administration family.  The

12  reason for that difference in the patent families that we'll

13  be presenting is Dr. Anslyn's schedule.  He has a

14  longstanding obligation next week, so he needs to be -- he

15  needs to testify today.

16       THE COURT:  Okay.

17       MR. MAHAFFY:  I just wanted to let the Court

18  know about that ahead of time.

19       THE COURT:  Great.  Thank you.

20            . . ERIC VAN ANSLYN, having been

21            duly sworn/affirmed as a witness, was examined

22            and testified as follows. .

23                DIRECT EXAMINATION

24  BY MR. MAHAFFY:

25  Q.   Good afternoon.

Anslyn - direct

1    A.    Good afternoon.

2    Q.    Could you state your name for the record?

3    A.    Eric Van Anslyn.

4    Q.    And could you describe your educational background?

5    A.    I have a Bachelor of Science in chemistry from the

6    California State University, Northridge.  I have a Ph.D. in

7    chemistry from the California Institute of Technology.  And

8    I was a National Science Foundation Fellow at Columbia

9    University.

10   Q.    And what is your current profession?

11   A.    I am currently a professor of chemistry at the

12   University of Texas at Austin.

13   Q.    And how long have you been a chemistry professor at

14   the University of Texas?

15   A.    This year is my 30-year anniversary at UT.

16   Q.    And what is your area of research?

17   A.    Physical organic chemistry.

18   Q.    What is physical organic chemistry?

19   A.    Physical organic chemistry is a subdiscipline of

20   chemistry that deals with understanding the reactivity and

21   the reaction mechanisms of organic molecules.

22   Q.    And this case is about stabilizing the bendamustine

23   molecule.  Is any of your work related to stabilizing

24   molecules?

25   A.    Yes, it has.

1   Q.    Could you give the Court an example?

2   A.    For example, at the moment we're involved in a

3   research project about sequencing single peptides one at a

4   time, and we have to stabilize some fluorophores in that

5   procedure that are used in some pretty harsh reaction

6   conditions.

7   Q.    And what classes do you teach?

8   A.    So at the undergraduate level, I teach introductory

9   organic chemistry to the pre-medical sciences, and at the

10  graduate level, I teach physical organic chemistry.

11  Q.    And what textbook do you use to teach your graduate

12  level physical organic chemistry class?

13  A.    Well, I have the benefit of using a textbook that I

14  co-authored.

15  Q.    And is that textbook only used at Texas, do you know?

16  A.    No, it is not.  It is used widely throughout the

17  country.  It has been translated into Chinese.  You might

18  say it's the bestseller in the area of physical organic

19  chemistry.

20  Q.    Approximately how many scientific articles have you

21  published?

22  A.    Over 300.

23  Q.    And how many of those articles were related to

24  physical organic chemistry?

25  A.    I would say nearly all of them are in some manner

1    related to physical organic chemistry.

2    Q.    And has any of your work involved analytical

3    chemistry?

4    A.    Yes.  Much of what we do in the area of physical

5    organic chemistry is actually oriented towards analytical

6    applications.

7    Q.    Okay.  And over the course of your career, how many

8    students had you supervised in your lab?

9    A.    I believe I graduated over about 40 students with

10   Ph.D. degrees and dozens of post-doctoral associates have

11   worked in my laboratory.

12   Q.    Have any of them gone to work in the pharmaceutical

13   industry?

14   A.    Yes.  Many have gone into the pharma industry.

15   Q.    Have you won any awards for your research?

16   A.    I've won numerous awards for my research.

17   Q.    Can you give the Court an example?

18   A.    Yes.  Most recently I won an award from the American

19   Chemical Society that is specifically focused on lifelong

20   achievements in physical organic chemistry.  It's known as

21   the James Black Norris award.

22   Q.    How many people receive that award every year?

23   A.    One person a year.

24              MR. MAHAFFY:  Your Honor, plaintiffs offer Dr.

25   Anslyn as an expert in physical organic chemistry and

Anslyn - direct

1    analytical chemistry.

2              MR. FELDMAN:  No objection, Your Honor.

3              THE COURT:  Okay.  At some point would you tell

4    me what analytic chemistry is.

5    BY MR. MAHAFFY:

6    Q.    Can you explain what analytical chemistry is, Dr.

7    Anslyn?

8    A.    My pleasure.  It's a subdiscipline of chemistry where

9    one looks to quantitate the concentrations or the amount of

10   chemicals that are present and also characterize their

11   structures.

12   Q.    Dr. Anslyn, generally speaking, what were you asked to

13   do for this case?

14   A.    Generally speaking, I was asked to consider how a

15   POSA would predict the stability of bendamustine in a

16   variety of different solvent conditions and with various

17   antioxidants.

18   Q.    And what sorts of information did you consider in

19   forming your opinion?

20   A.    I used my education and history as a chemist as well

21   as numerous manuscripts and patents and expert reports.

22   Q.    Did you listen to the testimony of Dr. Pinal?

23   A.    Yes, I did.

24   Q.    Okay.  And, Dr. Anslyn, we'll go through your opinions

25   in detail over the coming hour, but can you provide us with

1  an overview of the conclusions that you reached in this

2  case?

3  A.    Yes.  I have about five conclusions.

4         First one is that a 90:10 PEG to PG ratio would

5  have been of concern to a POSA because of predicted

6  INSTABILITIES that would result at the nitrogen mustard

7  moiety of bendamustine.

8         The second is that 90:10 ratio would have what's

9  known as a hydroxyl content that is about the same, a little

10 bit higher than that which was in a disclosure of the Drager

11 patent.

12        Another is that I believe the POSA would have

13 thought that the use of monothioglycerol as an antioxidant

14 would have caused problems again due to reactions it could

15 have with bendamustine.

16        Fourth, there's some analytical data that has

17 diametrically opposed conclusion and the data from the

18 Drager patent uses HPLC, and I believe that would be

19 considered by the POSA more reliable than the data based on

20 using TLC that is in a document by Olthoff.

21        And then, finally, I've made a variety of

22 conclusions about what would be good models of the chemical

23 reactivity of bendamustine in other mustard-containing

24 compounds.

25 Q.   Okay.  And, Dr. Anslyn, thank you for that.  In your

1    answer you used the term moiety, I believe.  Is the nitrogen

2    mustard moiety the same as the mustard group in

3    bendamustine?

4    A.    Yes, it is.

5    Q.    Okay.  Thank you.

6    A.    Thank you.

7    Q.    And before we discuss those substantive opinions,

8    let's just quickly talk about the definition of the POSA

9    that you applied in this case.

10                Did you review the POSA definitions provided by

11   the formulators in this case, Drs. Pinal and Siepmann?

12   A.    Yes, I did.

13   Q.    Okay.  And I'm displaying a demonstrative with those

14   POSA definitions.  In forming your opinions, did you apply

15   one of those definitions of the POSA?

16   A.    I applied that of Dr. Siepmann.

17   Q.    Okay.  And would your opinions in this case have

18   differed depending on which of those definitions you

19   applied?

20   A.    No, not at all.

21   Q.    Okay.  And what priority date did you apply in

22   conducting your analysis?

23   A.    That's listed down here, January in 2010.

24   Q.    Was your opinion -- would your opinions change if you

25   instead applied the priority date of January 28, 2011?

Anslyn - direct

1  A.    No, they would not.

2  Q.    In your opinion, if the POSA team wanted to stabilize

3  the bendamustine molecule, would that team have included a

4  chemist?

5  A.    I believe absolutely, it would have.

6  Q.    Why do you say that?

7  A.    Because the issue of stability means you are trying to

8  impede unwanted or undesirable reactions.  You're trying to

9  slow those down, and naturally, when you are discussing

10  chemical reactivity, you would have a chemist as part of the

11  team.

12  Q.    Okay, Dr. Anslyn.  I want to talk about the first of

13  your opinions related to the degradation of the nitrogen

14  mustard group.

15         I'm going to direct your attention to DTX-73,

16  which is a patent of the first invention of Drager.

17         Did you review this reference for this case?

18  A.    Yes, I did.

19  Q.    Okay.  And could you -- I will next direct your

20  attention to DTX-64, which is a patent publication with a

21  first inventor of Brittain.

22         Did you review this reference in forming your

23  opinion?

24  A.    Yes, I did.

25  Q.    Okay.  I'm putting on the screen several excerpts

Anslyn - direct

1    from columns 1, 4 and 5 of DTX-73 as well as page 12 of

2    DTX-64.

3           Could you just describe for us what these

4    molecules are?

5    A.    Sure.   In the center here is the chemical structure of

6    bendamustine and the nitrogen mustard functional group is

7    shown here and a carboxylic acid is highlighted here.

8           On the right are shown various esters.   These

9    are degradants that can occur to bendamustine derived from

10   the carboxylic acid, whereas over here on the left are

11   various degradants of bendamustine that derive from the

12   nitrogen mustard functional group.

13   Q.    Okay.   And two of the degradants on the left-hand side

14   related to nitrogen mustard group are labeled HP-1 and BM-1

15   dimer.   Would the POSA have understood how HP-1 and the

16   dimer impurities were formed?

17   A.    Yes, they would have.

18   Q.    And just very generally speaking, how is that?

19   A.    The nitrogen mustard moiety forms degradants by

20   creating an intermediate that is known as an aziridinium ion

21   ring.

22   Q.    Now I'd like to direct your attention to PTX-376,

23   which is an article by Maas.

24          Did you review this paper in forming your

25   opinion?

Anslyn - direct

1    A.    Yes, I did.

2    Q.    Okay.  I'm displaying an excerpt from the second page

3    of the English translation of that article.  Again, just

4    generally speaking, what is being depicted here?

5    A.    So here again is a nitrogen mustard functional group

6    and it shows the reactions that I alluded to, the formation

7    of the aziridinium ion ring followed by a second subsequent

8    reaction where water replaces a chlorine, one of the

9    hydroxyls of water giving what's known as an alcohol.

10   Q.    And I know this is a little bit hard to read.  Did you

11   prepare a demonstrative illustrating these reactions?

12   A.    Yes, I did.

13   Q.    Okay.  I'm putting a demonstrative on the screen.

14   It's PDX-4-3.

15          Did you prepare this demonstrative?

16   A.    I did.

17   Q.    And what does it depict?

18   A.    Well, so this shows now within the context of the

19   molecule bendamustine itself the aziridinium ring formation.

20   The aziridinium ring is this structure here with these atoms

21   shaped like a triangle.

22   Q.    Okay.  And can you describe how the aziridinium ring

23   forms?

24   A.    Indeed.  This nitrogen here forms a bond to this

25   carbon, allowing or kicking out this chloride, as shown

1    here, connecting together these three atoms.

2    Q.    Okay.  And what is the plus sign near the aziridinium

3    ring?

4                 THE COURT:  Wait.  What three atoms?  So it's

5    three atoms?

6                 THE WITNESS:  Yes.

7                 THE COURT:  There's a carbon there that's of

8    another letter.  You said carbons.

9                 THE WITNESS:  They are.

10                 THE COURT:  The unmarked are carbons?

11                 THE WITNESS:  Indeed, they are.

12                 THE COURT:  Okay.  So can you repeat what you

13    said?  So the carbon is moved out.  And what happens?

14                 THE WITNESS:  So a nitrogen here makes a bond to

15    this carbon.

16                 THE COURT:  Okay.

17                 THE WITNESS:  And that chloride comes off.  So

18    if you count from this nitrogen 1, 2, 3 to that kink or

19    carbon, you would be making a ring with three atoms in that

20    ring.

21                 THE COURT:  And it would be a nitrogen and two

22    carbons?

23                 THE WITNESS:  It would be.

24                 THE COURT:  Here on the right, the CL, what is

25    that?

Anslyn - direct

1    THE WITNESS:  The CL on the right is known as a

2    chloride, and it is what happens when this chlorine atom

3    comes off of the molecule, creates a chloride, where that

4    positive here is the charge on the nitrogen.  The negative

5    there is the counter charge on the chloride.

6    THE COURT:  All right.  Sorry.  I just want

7    to --

8    MR. MAHAFFY:  No.  Please feel free to ask

9    questions.

10   BY MR. MAHAFFY:

11   Q.    And so I think you explained it, but what does that

12   plus sign on the aziridinium ring mean?

13   A.    It means there is a positive formal change on the

14   nitrogen.

15   Q.    Is the aziridinium ring stable?

16   A.    No.  The aziridinium ring is highly reactive.

17   Q.    And can the aziridinium ring engage in chemical

18   reaction?

19   A.    It engages in chemical reactions with what are known

20   as nucleophiles.

21   Q.    And can you explain to the Court what a nucleophile

22   is?

23   A.    Yes.  Sure.  Nucleophile specifically means

24   nucleus-loving, and the nuclei of atoms are positively

25   charged, so the term has come to reflect compounds that

Anslyn - direct

1    like to react with positive charges or partial positive

2    charges.

3    Q.    I'm putting up another demonstrative, which is

4    PDX-4-4.  Did you prepare this demonstrative?

5    A.    Yes, I did.

6    Q.    Can you explain what's happening in this chemical

7    reaction?

8    A.    So this is known as the aziridinium ring hydrolysis.

9    And what is happening is water is adding to this

10   three-membered ring, breaking open the ring where one of the

11   OH groups of water is attached to a carbon, creating an

12   alcohol product.

13   Q.    And, Dr. Anslyn, do you recall Dr. Pinal testifying

14   that the POSA would have been motivated to use formulations

15   of bendamustine containing PEG and PG?

16   A.    I do.

17   Q.    Now I would like to put up another demonstrative,

18   which is PDX-4-5.

19             What molecules are being illustrated in this

20   demonstrative?

21   A.    Well, here is polyethylene glycol, what we refer to as

22   PEG, and propylene glycol, abbreviated as PG.  And we could

23   see their chemical structures drawn here.

24   Q.    Would a POSA have expected that PEG and PG could act

25   with the aziridinium ring of benefit?

Anslyn - direct

1    A.    They absolutely would have expected that.

2    Q.    What portions of those molecules would react to the

3    aziridinium ring?

4    A.    So the OH portion, the hydroxyl groups in both the

5    propylene glycol and the PEG would react with the

6    aziridinium ion ring.

7    Q.    Okay.  And how did the -- you called them hydroxyl

8    groups; is that right?

9    A.    That is an OH group as shown in these diagrams.

10   Q.    Are those also sometimes called alcohol groups?

11   A.    They're called alcohol groups when they are attached

12   to carbons, yes.

13   Q.    Okay.  And they're attached to carbons on these

14   molecules?

15   A.    Indeed, they are.

16   Q.    Okay.  How do the nucleophilicities of alcohol groups

17   compare to the nucleophilicity of water?

18   A.    Well, it is context dependent, but they're quite

19   similar to one another.

20   Q.    Did the literature disclose any examples of alcohol

21   groups reacting with aziridinium rings?

22   A.    Yes, it did.

23   Q.    All right.  I'd like to direct your attention to

24   exhibit PTX-1010, which is a paper by Florea-Wang and

25   colleagues.  Is this an article you considered in forming

Anslyn - direct

1    your opinions in this case?

2    A.    Yes, it is.

3    Q.    Okay.  I'd like to display a few excerpts from this

4    article from pages 407, 412 and 413.

5              What would a POSA have understood about the

6    formation of these illustrated compounds?

7    A.    Well, the compound PAM here has a nitrogen mustard

8    analogous to that that we find in bendamustine, and what we

9    are seeing here is products that derive from reactions with

10   alcohols that are attaching those alcohols to the nitrogen

11   mustard moiety.

12   Q.    And what would this paper have taught the POSA about

13   reactions between bendamustine and PEG and PG?

14   A.    Well, that bendamustine would react with PEG and PG

15   because PEG and PG have alcohols in them.

16              MR. FELDMAN:  Objection.  I don't believe that

17   this particular reference is discussed in Dr. Anslyn's

18   report.

19              MR. MAHAFFY:  All right.  This is in his report.

20              (Mr. Mahaffy handed a binder to the Court.)

21              THE COURT:  All right.

22              MR. MAHAFFY:  The Florea-Wang paper that's

23   discussed in paragraph 47 of Dr. Anslyn's report, it's the

24   second half of the paragraph, the particular compounds that

25   are highlighted in the second-to-last sentence are compounds

Anslyn - direct

1    9, 15, 26a and 26b, which are the ones illustrated here.

2    This is a parenthetical at the very bottom of page 18.

3                THE COURT:  It looks like it's in the report to

4    me.

5                MR. FELDMAN:  I will withdraw the objection,

6    Your Honor.

7                THE COURT:  All right.

8    BY MR. MAHAFFY:

9    Q.    Okay, Dr. Anslyn.  I want to switch gears a little

10   bit.

11               THE COURT:  Before you do, I want to make sure I

12   understood the point of the question.

13               MR. MAHAFFY:  Sure.

14               THE COURT:  I got confused.  So let's go back.

15               So you had, before the objection kind of the

16   general response that a paper would have taught a POSA about

17   reactions with bendamustine, PG and specifically that it

18   would react with PEG and PG.  Do you want to follow up

19   though and take advantage of this thing that's on the screen

20   for an explanation of that or not?

21               MR. MAHAFFY:  Yes, Your Honor.

22               THE COURT:  It would be helpful.

23   BY MR. MAHAFFY:

24   Q.    All right.  So, Dr. Anslyn, can you explain how this

25   paper connects to the teaching about PEG and PG that you

Anslyn - direct

1    described?

2    A.    Yes.  My pleasure.

3              So when the nitrogen mustard forms the

4    aziridinium ion ring that was discussed earlier, it

5    undergoes reactions with what we discussed are nucleophiles,

6    such as the example I gave with water.

7              Well, the nucleophilicity of water and alcohols

8    are similar, and alcohols are present in PEG and propylene

9    glycol, and this reference is meant to teach and demonstrate

10   that, indeed, alcohols undergo reactions with that

11   aziridinium ion ring derived from the nitrogen mustard to

12   make this kind of a connection here.

13   Q.    I think I can ask a question to help.  So prior to the

14   reaction that forms the compounds 9, 15, 26a and 26b, is

15   there an OH group attached, an alcohol group attached to the

16   molecule on the right-hand side of these compounds?

17   A.    Yes.  For example, what I'm circling with the green

18   laser pointer here, the starting material would have had an

19   OH in this particular position, so it would have been an

20   alcohol.

21   Q.    And is that just like PEG and PG?

22   A.    Exactly like are in PEG and PG.

23   Q.    Okay.  Now, Dr. Anslyn, I'd like to talk about a

24   different topic, which is how fast or slow reactions can

25   occur.  Okay?

Anslyn - direct

1    Is there a term in chemistry for how quickly a

2    reaction can happen?

3    A.    That is known as the field of kinetics.

4    Q.    And just generally speaking, what determines how fast

5    a chemical reaction can occur?

6    A.    What dictates the speed of a chemical reaction is

7    what's known as the rate determining step of that reaction

8    or the activation energy of that reaction.

9    Q.    All right.  And how do chemists represent the changes

10   in energy that occur during a chemical reaction?

11   A.    We draw what are called reaction coordinate diagram.

12   Q.    When do chemistry students learn about reaction

13   coordinate diagrams?

14   A.    In freshman chemistry, but then certainly in sophomore

15   organic chemistry.

16   Q.    I'm putting up another illustration on the screen,

17   PDX-4-6.  Did you prepare this demonstrative?

18   A.    Yes, I did.

19   Q.    And what is it?

20   A.    It is an example of a reaction coordinate diagram.

21   Q.    What is on the X axis of this graph?

22   A.    The X axis is what's referred to as the reaction

23   coordinate, and it follows the progress of a reaction as it

24   goes from the reactants over to products through any

25   potential intermediates or through what are also known as

Anslyn - direct

1    transition states.

2    Q.    And did you identify these reaction stages for the

3    bendamustine reaction at the hydrogen mustard group?

4    A.    Yes, I did.

5    Q.    All right.  I'm putting up a new demonstrative, which

6    is PDX-4-7.

7              Could you explain how these stages of reactions

8    apply to the degradation of bendamustine?

9    A.    Well, so here I'm identifying bendamustine as the

10   reactants and we're going up to that high energy unstable

11   intermediate, the aziridinium ion ring has an intermediate

12   here.  That first step is the formation of the aziridinium

13   ion ring.  The second step the is the reaction with a

14   nucleophile giving a product where in this case, a product

15   is actually a degradant.

16   Q.    And in this diagram, what would determine how fast the

17   reaction would occur?

18   A.    What determines the speed of this reaction would be

19   the relative energy, which is what's shown on the Y axis as

20   potential energy.  The relative energy between reactant and

21   the highest energy peak on the diagram, referred to as the

22   transition state.

23             So, in essence, basically, the energy difference

24   that I'm showing with the green laser pointer is the

25   activation energy of the reaction.

1  Q.    And how does the activation energy of the reaction

2  relate to the speed at which the reaction happens?

3  A.    It is what dictates the speed of the reaction.  So,

4  for example, a higher activation energy.  If this barrier

5  went up higher, the reaction would be slower, or for a lower

6  activation energy -- yes, for a lower activation energy, the

7  reaction would be faster.

8  Q.    And I think you used the term rate determining step a

9  little bit earlier.  Can you explain what the rate

10  determining step of a chemical reaction is?

11  A.    Yes.  The rate determining step is the step that

12  involves the highest transition state energy on this

13  diagram.

14  Q.    Would the POSA have known the rate determining step of

15  the degradation of bendamustine at the nitrogen mustard

16  group?

17  A.    The POSA would have recognized that the rate

18  determining step is the first step, that which forms the

19  high energy aziridinium ion ring.

20  Q.    And so what would be the consequence of speeding up

21  the formation of the aziridinium ring?

22  A.    If you sped up the formation of the aziridinium ion

23  ring, it would give you more degradation.

24  Q.    In a liquid formulation, can the solvent change the

25  rate of a reaction?

Anslyn - direct

1    A.      Solvents have large effects on rates of chemical

2    reaction.

3    Q.      How do solvents affect the rates of reaction?

4    A.      So they affect rates of reaction by potentially

5    stabilizing or destabilizing the reactants or stabilizing or

6    destabilizing the transition states of the reaction.

7    Q.      I'm putting up a new demonstrative, which is PDX-4-8.

8    Did you prepare this demonstrative?

9    A.      Yes, I did.

10   Q.      And can you describe what's being illustrated in this

11   demonstrative?

12   A.      This is one case where we're looking at stabilizing

13   the transition state, so the relative energy of the

14   transition state compared to the reactant has been lowered,

15   and when lowering the energy of the transition state, it

16   will speed up this reaction.

17   Q.      Okay.  And, Dr. Anslyn, when would a chemistry student

18   learn about this concept that solvents can affect how fast

19   reactions occur?

20   A.      They learn about this also in freshman chemistry, but,

21   once again, certainly in sophomore organic chemistry.

22   Q.      Are there different parameters that measure different

23   aspects of how a solvent behaves?

24   A.      There are a variety of what are known as solvation

25   parameters.

Anslyn - direct

1   Q.     And by solvation parameters, what exactly do you mean?

2   A.     The ability of the solvent to do these kinds of

3   interactions that I'm relating to as far as stabilizing or

4   destabilizing transition states or reactants.

5   Q.     And is there one particular property or parameter that

6   always affects the reaction rate?

7   A.     No, there is not.

8   Q.     Are you aware of any literature that explicitly

9   describes which solvent parameter determines the rate of the

10  formation of the aziridinium ring?

11  A.     No, I do not.

12  Q.     Okay.  So how do the chemists go about making a

13  prediction about which solvent parameter might affect the

14  rate at which the aziridinium ring forms?

15  A.     They would look for or try to find what are closely

16  related analogous reactions.

17  Q.     Did you identify any such analogous reactions in which

18  a chemist would rely to form expectations about how

19  different solvents would affect aziridinium ring formation?

20  A.     Yes, I did.

21  Q.     And what reaction is that?

22  A.     What is known as the Menshutkin reaction.

23  Q.     All right.  I'm directing your attention to PTX-985.

24  Do you recognize this exhibit?

25  A.     Yes, I do.

Anslyn - direct

1  Q.    Okay.  All right.  I'm showing you an excerpt from

2  page 637.  What is being illustrated here?

3  A.    So this is one example of a Menshutkin reaction, where

4  a nitrogen is forming a bond to a carbon and liberating out

5  a bromide negative charge.

6  Q.    All right.  And I'm putting a new demonstrative up on

7  the screen, PDX-4-9.

8         Did you prepare this demonstrative?

9  A.    Yes, I did.

10  Q.    And what are the similarities and differences between

11  Menshutkin reactions and the formation of the aziridinium

12  ring?

13  A.    Well, both of these reactions involve a nitrogen

14  forming a bond to a carbon and kicking out what is known as

15  a halogen.  So, for example, a bromide and a chloride are

16  both halogens.

17         You can see that same reaction of a nitrogen

18  attacking or making a bond to this carbon kicking out a

19  halogen.

20         Another analogous property is that you're making

21  a positively charged nitrogen in both cases.  One thing that

22  is different about these is the top reaction occurs between

23  two molecules whereas the bottom reaction occurs within the

24  same molecule.

25  Q.    In your opinion, Dr. Anslyn, would the POSA have

1    considered Menshutkin reactions in making predictions about

2    the formation of the aziridinium ring in bendamustine?

3    A.    Yes, I believe they would have considered this because

4    it's such a close analogy.

5    Q.    I'm directing your attention to PTX-988.  Did you

6    review this article by Calado in forming your opinion?

7    A.    Yes, I did.

8    Q.    I'm putting up an abstract from the first page of this

9    article.

10         Could you describe generally the experiment that

11   Calado and colleagues conducted?

12   A.    So what Calado and colleagues did here was study the

13   Menshutkin reaction of a molecule known as triethyl amine

14   with ethyl iodide.  It is forming that same nitrogen to

15   carbon bond.

16         They analyze 20 different solvent and measured

17   the rates of those reactions and correlated those rates to

18   various solvent parameters, some of which are listed here.

19   Q.    Okay.  I now direct your attention to Table 1 on page

20   980 of this exhibit.

21         Did you note any similarities between the

22   solvents in the Calado paper and the solvent at issue in

23   this case?

24   A.    So, for example, listed here is 1,2 propane diol.

25   That is the same thing as propylene glycol.  And down here

1   at the bottom are diethylene glycol and triethylene glycol.

2   These are what you might think are small portions of

3   polyethylene glycol, PEG.

4   Q.   Now I'd like to direct your attention to equation two,

5   which is on page 902 of this paper.

6           What is this equation describing?

7   A.   So this equation that they were able to derive shows

8   that the rate of the reaction is directly proportional to

9   the solvent parameter that is known as pi star through this

10  particular proportionality constant.

11  Q.   And I think I might have misspoke.  I believe it's

12  actually equation 4; is that correct?

13  A.   Yes, it is.  Sorry.

14  Q.   Sorry about that.  And so, Dr. Anslyn, what is log K

15  in this equation?

16  A.   Log K is related to the speed of the reaction.

17  Q.   Okay.  And what is pi star?

18  A.   Pi star is one of the solvent parameters that I

19  mentioned.  It's one that nicely describes how solvents

20  stabilize the formation charges.

21  Q.   And is the aziridinium ring charged?

22  A.   Indeed.  It has a positive charge.

23  Q.   Okay.  And I'd like to quickly put up an excerpt from

24  page 149 of your textbook, PTX-985.

25          Does your textbook provide any information about

Anslyn - direct

1    the pi star value?

2    A.    Yes.  The scale known as pi star gives a good measure

3    of the extent to which solvent stabilizes ionic or polar

4    species as I alluded to with the aziridinium ion ring.

5    Q.    Let's jump back to that equation 4 from PTX-985.

6          So according to the Calado authors, what happens

7    to the rate of the Menshutkin reactions in solvents with a

8    high pi star value?

9    A.    Well, a high pi star value or a larger and larger pi

10   star value would increase the rate of the reaction.

11   Q.    And what would happen to solvents with a low pi star

12   value?

13   A.    Low pi star value therefore conversely would slow the

14   rate of the reaction.

15   Q.    Based on this information, what would the POSA have

16   predicted about bendamustine degradation at the mustard

17   group?

18   A.    That it would be sensitive to the pi star values of

19   the solvents that are being used.

20   Q.    Okay.  And in terms of high pi star value, what would

21   be predicted about --

22   A.    A high pi star value would lead to greater degradation

23   of bendamustine.

24   Q.    And if we could go back to the demonstrative from

25   earlier that we displayed.

Anslyn - direct

1   What would the POSA have predicted would happen

2   with the high pi star value in this graph?

3   A.    So a high pi star value would speed up this reaction

4   and therefore lead to more degradation, because it is

5   stabilizing that aziridinium ion ring, and conversely

6   therefore stabilizing the transition state to its formation.

7   Q.    And would this effect of pi star on bendamustine have

8   made chemical sense to the POSA?

9   A.    Yes, I believe it would have made very good chemical

10  sense.

11  Q.    Just briefly, why do you say that?

12  A.    Because the pi star value is a good parameter at

13  correlating how stabilizing a solvent is towards creating

14  charges as what you see in this aziridinium ion ring.

15  Q.    And now I'd like to direct your attention to PTX-999.

16  Did you review this document by Marcus in forming your

17  opinion?

18  A.    Yes, I did.

19  Q.    And I'm displaying several excerpts from this document

20  from pages 145, 146, 151, and 152.

21  Could you explain what this table is

22  illustrating?

23  A.    This is listing a variety of solvent parameters where

24  the pi star parameter is highlighted.  First, various

25  different solvents.

1057

Anslyn - direct

1  Q.    Okay.  And I know there's a lot of complicated

2  chemical terms on this table, but just for the record, what

3  solvents are included in this table?

4  A.    Well, water, ethanol, benzyl alcohol, 1,2 propane

5  diol, which is PG in this case, the same thing with

6  propylene glycol, glycerol, N, N-dimethyl formamide, which

7  is DMN, N, N-diethyl acetamide, DNP, and N-methyl

8  pyrrolidine, which is NMP, and dimethyl sulfoxide is often

9  abbreviated DMSO.

10  Q.    And just a couple things, Doctor.  You said 1, 2

11  propane diol.  What is the common chemical name for that?

12  A.    Propylene glycol.

13  Q.    Okay.  Thank you.  And dimethyl -- okay.  And so now

14  I'd like to direct your attention to PTX-997.  Did you

15  review this paper in forming your opinion?

16  A.    Yes, I did.

17  Q.    All right.  Now I'm displaying an excerpt from page

18  1358 of this document.

19          Could you explain what this table is

20  illustrating?

21  A.    This is illustrating the values for a variety of

22  different polyethylene glycols, the pi star solvent

23  parameter.  Here it's PEG 2, under 200, 300, 400.

24  Q.    What is the pi star value for PEG in this value?

25  A.    1.08.

Anslyn - direct

1    Q.      And now I'm showing you both of the excerpts that we

2    just looked at in PTX-999 and PTX-997.

3              Of the highlighted solvents, which solvent has

4    the highest pi star value?

5    A.      Water has the highest pi star value, 1.09.

6    Q.      And what would the POSA have known about the stability

7    of bendamustine in pure water?

8    A.      Bendamustine is quite unstable in pure water.

9    Q.      Other than water, which solvent on this list has the

10   highest pi star value?

11   A.      The next highest value is for PEG 400.  That's 1.08.

12   Q.      Okay.  An in view of these pi star values, what would

13   the POSA have expected about degradation of bendamustine

14   at the nitrogen mustard group when using PEG 400 as a

15   solvent?

16   A.      Well, they would have been concerned about the

17   degradation because of the high pi star value.

18   Q.      And would the POSA have expected PEG 400 to function

19   more like water or more like propylene glycol like in terms

20   of degradation?

21   A.      Well, certainly more like water, because the pi star

22   values are so similar.

23   Q.      And between PEG 400 and propylene glycol, what solvent

24   would the POSA have expected to cause more degradation in

25   the nitrogen mustard group?

Anslyn - direct

1   A.      The PEG 400.

2   Q.      If the POSA wanted to minimize degradation of the

3   nitrogen mustard group, would the POSA have been motivated

4   to use PEG as a solvent?

5   A.      They would not have been motivated to do so for the

6   reasons I've been explaining.

7               THE COURT:  Is it more degradation or faster

8   degradation?

9               THE WITNESS:  They are really one and the same,

10  so the faster the reaction occurs, the more of that product,

11  which is the degradant in this case, that is created.

12  BY MR. MAHAFFY:

13  Q.      Dr. Anslyn, you understand that Dr. Pinal has opined

14  that the POSA would have been motivated to use a mixture of

15  90 percent PEG and ten percent PG; right?

16  A.      Yes.

17  Q.      What would the POSA have expected about the pi star

18  value of a solvent system with 90 percent PEG and ten

19  percent PG?

20  A.      It would be very similar to the pi star value of

21  100 percent PEG.

22  Q.      And what would the POSA have expected about

23  degradation of bendamustine at the nitrogen mustard group in

24  a formulation with 90 percent PEG and ten percent PG?

25  A.      Well, they would have predicted considerable

1    degradation at the nitrogen mustard group.

2    Q.    Last question on this topic, Doctor.  Could you just

3    summarize for the Court your opinion on this issue about the

4    POSA's motivation to use PEG with bendamustine?

5    A.    Well, I believe the POSA would not have been motivated

6    to use a mixture of 90 percent PEG and ten percent PG to

7    stabilize bendamustine because of the high pi star value for

8    that solvent system that would lead to degradation of the

9    bendamustine via the nitrogen mustard functional group.

10   Q.    Okay, Dr. Anslyn.  Now I want to talk about the second

11   opinion that you mentioned a little bit earlier.

12            Do you recall Dr. Pinal testifying that the POSA

13   would have been motivated to use a 90:10 PEG-PG formulation

14   because of its hydroxyl content?

15   A.    Yes, I do.

16   Q.    And do you agree with that opinion?

17   A.    I do not.

18   Q.    All right.  I'm putting back up some excerpts from

19   DTX-73 and DTX-64 that we looked at earlier showing the

20   degradants of bendamustine.  What reactions form the

21   degradants that are labeled PG-one and PG-two?

22   A.    PG-one and PG-two degradants are formed by the

23   reaction of propylene glycol as shown here with the

24   carboxylic acid group of bendamustine.

25   Q.    And what is the difference between PG-1 and PG-2?

Anslyn - direct

1   A.      Well, propylene glycol has two different kinds of

2   alcohol, so when it makes esters, it can make this ester

3   here or ester through the other alcohol group.

4   Q.      Okay.  And, Dr. Anslyn, what are the factors that

5   affect the rate at which an esterification reaction can take

6   place?

7   A.      Well, there's a handful of factors.  One is the pH of

8   the solution because the reaction is acid catalyzed.

9   Another is a concentration of the carboxylic acid or the

10  concentration of the alcohols that are undergoing a reaction

11  with the carboxylic acid to make the esters as well as the

12  reactivity of different alcohols.

13  Q.      With respect to the concentration of the alcohol

14  groups, how does the concentration of the alcohol groups

15  affect the speed of the esterification reaction?

16  A.      With larger concentrations of alcohol groups, the

17  speed of the reaction will increase.

18  Q.      And how does the reactivity of an alcohol group affect

19  the speed of the reaction?

20  A.      Well, more reactive alcohol groups will give you more

21  of the ester from that group than less reactive alcohol

22  groups.

23  Q.      And what determines the reactivity of a hydroxyl or

24  alcohol group?

25  A.      What determines its reactivity is the substitution of

Anslyn - direct

1     the carbon it is attached to.

2     Q.    I'm putting up a new demonstrative on the screen.

3     It's PDX-4-11.

4           Did you prepare this demonstrative?

5     A.    Yes, I did.

6     Q.    And what is this demonstrative illustrating?

7     A.    It's showing the various kinds of alcohol groups that

8     are in propylene glycol and polyethylene glycol.

9           So, for example, in propylene glycol, there is

10    an alcohol referred to as a primary alcohol, and that is a

11    definition given to a hydroxyl or OH group that is attached

12    to a carbon that is only attached to one other carbon.

13          In propylene glycol, there's a second kind of

14    alcohol where the OH is attached to a carbon, attached to

15    two other carbons.

16          In PEG, polyethylene glycol, the alcohols are

17    both primary because they're attached to a carbon only a

18    attached to one other carbon.

19    Q.   How do the reactivities of primary and secondary

20    alcohols compare?

21    A.   Primary alcohols are more reactive than secondary

22    alcohol.

23    Q.   I'm putting up an excerpt from DTX-73, which is the

24    Drager reference.

25          What would the POSA have understood from this

1063

Anslyn - direct

1    prior art disclosure in Table 2?

2    A.     So in the highlighted yellow numbers and solvent

3    system here, we're looking at an ester degradant that derive

4    from propylene glycol at the primary alcohol and a second

5    degradant that arises from reaction at the secondary

6    alcohol, PG-1 and PG-2 respectively.  And we see as expected

7    the reactivity at the primary alcohol is greater than a

8    secondary alcohol.  In this case, in a factor of about 4 to

9    1.

10   Q.     The Drager formulation also contains DMA.  Does DMA

11   contain any alcohol groups?

12   A.     It does not.

13   Q.     And have you prepared a demonstrative to illustrate

14   the esterification of PG, DMA and PEG?

15   A.     Yes, I have.

16   Q.     All right.  Let's see if we can do this.

17          So could you explain what is happening in this,

18   as this animation plays?

19   A.     Yes.  What we're doing here is representing

20   bendamustine as this green sphere.  The octagon is the

21   solvent DMA and another octagon is another solvent, which is

22   propylene glycol that has the primary or the secondary

23   alcohol.

24          The primary alcohol is more reactive and

25   therefore as the reaction occurs, you get about four times

Anslyn - direct

1   the esters at the primary alcohol than you do at the

2   secondary alcohol of propylene glycol.

3            The PEG has two primary alcohols which can react

4   with the bendamustine to give degradant, but those alcohols

5   are identical, so you can actually react with either and get

6   the same product.

7   Q.    All right.  And have you prepared an animation to

8   illustrate that in the Drager formulation?

9   A.    Yes, I have.

10  Q.    All right.  So what's being illustrated here?

11  A.    Well, so here we're having an animation where the

12  bendamustine is dissolved in solvent of the DMA and the

13  propylene glycol, and starting to look at the reactions that

14  occur giving, in essence, four times -- okay.

15  Q.    Sorry.  Try it one more time.

16  A.    It's an animation that shows the random reactions that

17  are occurring as the molecules collide with one another as

18  the bendamustine reacts with the primary or secondary

19  alcohols of propylene glycol, giving about four times the

20  amount of degradant at the primary alcohol than at the

21  secondary alcohol.

22  Q.    Okay.  Dr. Pinal testified that the POSA would have

23  used PEG because of its OH concentration.

24            Do you agree with that?

25  A.    No, I do not.

Anslyn - direct

1    Q.    Did you perform any calculations of OH group

2    concentrations accounting for Drager's disclosure about the

3    reactivity of propylene glycol in bendamustine?

4    A.    Yes, I did.

5    Q.    And generally speaking, what did you find?

6    A.    Generally speaking, I found that the hydroxyl content

7    in the Drager disclosure with the DMA and the PG to be

8    approximately the same as 90:10 PEG and PG, but the PEG-PG

9    hydroxyl content is actually slightly greater than the

10   Drager disclosure.

11   Q.    Okay.  And did you prepare a demonstrative to

12   illustrate those calculations?

13   A.    Yes, I did.

14   Q.    All right.  And what is being illustrated here?

15   A.    Well, we're taking that factor of 1.09 and .27 of the

16   relative formation of the ester from the primary alcohol and

17   the secondary alcohol and seeing that the secondary alcohol

18   is about 25 percent or .248, the fraction of reactivity of

19   the primary alcohol.

20   Q.    Okay.  And could you explain the calculations that

21   you've calculated here with respect to the Drager

22   formulation?

23   A.    Yes.  What we're doing here is trying to calculate

24   what percent of the mass of the solvent PG is actually due

25   to hydroxyl groups and weighting that with the reactivity of

Anslyn - direct

1    those hydroxyl groups.

2             So what we do is take the 17 molecular weight of

3    the OH hydroxyl that's part of the primary alcohol, divide

4    by the PG molecular mass.  Do the same for the second

5    alcohol except it is now weighted by that fraction because

6    it's less reactive and we get the weighted hydroxyl content

7    of propylene glycol to be around 28 percent.

8             If we then examine that the content of the

9    Drager disclosure is only about 34 percent PG, we would take

10   the 34, .34 multiplied by the hydroxyl content.

11            The rest of that solvent is, however, DMA that

12   has no alcohols, so we multiply by zero, and therefore the

13   hydroxyl content of the overall solvent system is about

14   nine-and-a-half percent.

15   Q.    Okay.  And just for the record, this is PDX-four-16.

16   And we'll talk about your calculation for the 90:10

17   formulation in a second, but have you prepared a

18   demonstrative that illustrates the esterification that

19   occurs in the 90/10 PEG-PG formulation?

20   A.    Yes, I have.

21   Q.    Can you explain what is being illustrated here?

22   A.    The animation again starts with bendamustine in green,

23   but now the PEG is this rectangle with the two primary

24   hydroxyls and they're still propylene glycol, and the random

25   collisions are starting to make esters with the PEG at the

Anslyn - direct

1    primary alcohol in PEG as well as esters of the propylene

2    glycol again at a ratio of about 4 to 1 of the primary over

3    the secondary alcohol of propylene glycol.

4    Q.    Okay.  And when you have conducted the same

5    calculations for the PEG-PG formulation, what result did you

6    get?

7    A.    Basically here, I'm doing exactly the same kind of

8    math that was described on the previous mathematical

9    slide and come to the conclusion that the hydroxyl content

10   of a 90:10 ratio of PEG to PG is about ten-and-a-half

11   percent.

12   Q.    So going to the comparison on PDX-4-19 what conclusion

13   did you draw from the calculations that you did?

14   A.    Well, as shown right on the screen, the weighted

15   hydroxyl content of the Drager formulation is approximately

16   the same as the 90:10 PEG to PG hydroxyl content, yet the

17   PEG to PG hydroxyl content is even a little bit greater.

18   Q.    And what impact would this have, what impact would

19   this have been expected to have on the rates of

20   esterification of the expected formulation?

21   A.    One might have expected the rate of esterification of

22   the two formulations to be about the same or maybe even a

23   little greater in the 90:10 PEG-PG.

24   Q.    How would that conclusion have affected the POSA's

25   motivation?

Anslyn - direct

1    A.      I believe in comparing these, the POSA would probably

2    just have stuck with the Drager formulation.

3    Q.      All right, Dr. Anslyn.  Now I want to talk about your

4    third opinion related to monothioglycerol.

5            Do you recall Dr. Pinal testifying that the POSA

6    would have been motivated to use monothioglycerol as an

7    antioxidant for bendamustine?

8    A.      Yes, I do.

9    Q.      Do you agree with Dr. Pinal's opinion?

10   A.      No, I do not.

11   Q.      Okay.  Dr. Anslyn, what would the POSA have understood

12   about the acidity of a bendamustine hydrochloride

13   formulation?

14   A.      Acidity of bendamustine hydrochloride formulations are

15   low, meaning they are acidic.

16   Q.      Okay.  And could you turn to PTX-647, which is an

17   article by Kasraian.

18           Did you review this article in forming your

19   opinions?

20   A.      Yes, I did.

21   Q.      All right.  And I'm putting up an excerpt from that

22   paper from page 478.

23           Could you explain the experiment that's being

24   conducted in Figure 3, which is the top right hand panel on

25   the screen?

1   A.      Here, the investigators are exploring the effect of

2   monothioglycerol as an antioxidant on this particular

3   pharmaceutical ingredient and they're examining it at pH

4   seven.  And what they are doing -- pH seven-and-a-half.

5              What they are doing is looking at how much

6   degradation has occurred by watching the percent of the drug

7   remaining as a function of time.

8              And specifically with the monothioglycerol, we

9   note that it's a reasonably straight line with the drug

10  approximately remaining at a hundred percent, meaning it's

11  not degrading, but without that antioxidant on the

12  monothioglycerol, the drug gradually degrading.

13  Q.      How do those results compare with Figure 4 of the more

14  acidic pH of 6.0?

15  A.      This is really exactly the same experiment, but all

16  they've done is lower the pH to 6.0, which means they've

17  made the solution more acidic.  And what is happening is

18  that stabilizing effect from the monothioglycerol seems to

19  be going away.

20  Q.      And what would the POSA have understood about

21  why monothioglycerol was less effective in acidic

22  formulations?

23  A.      So monothioglycerol is a thiol and it exists in two

24  ways -- as an SH group, that's the thio, for a deprotonated

25  form that is called thiolate, meaning it has a negative

Anslyn - direct

1   charge.   And it is the deprotonated negative form that is

2   the more effective antioxidant.

3                And you get more of the deprotonated form, that

4   is the more effective antioxidant, at a higher pH than you

5   do at lower pH's.

6   Q.    Okay, Dr. Anslyn.   Now I want to talk about chemical

7   reactions between monothioglycerol and bendamustine.   I'm

8   putting up PDX-4-20.   Could you describe the chemical

9   structure of monothioglycerol for the Court?

10  A.    Sure.   Monothioglycerol, as I alluded to as a thio,

11  which means it has this SH group, and then monothioglycerol,

12  we have the rest of the structure actually resembling very

13  much propylene glycol that we have seen in this case with

14  two different alcohols, one primary and one secondary.

15  Q.    Would the POSA have expected monothioglycerol to react

16  with a carboxylic group in bendamustine?

17  A.    They would have expected that because they would have

18  known that propylene glycol, which is very similar to this

19  molecule, reacts with the carboxylic acid group of

20  bendamustine, but they would have been even more concerned

21  about this thiol, because it's even more reactive group

22  towards those reactions that make esters then are either

23  alcohol.

24  Q.    Would all antioxidants engage in these reactions?

25  A.    No, they would not.

Anslyn - direct

1    Q.    Okay.  I'm directing your attention to PTX-669.  In

2    the binder we've actually included an excerpt to this

3    exhibit, which is quite long.

4              Did you review this document in forming your

5    opinion?

6    A.    Yes, I did.

7    Q.    And I'm displaying excerpts from pages 73, 75 and

8    587.

9              PTX-669.  What molecules are being illustrated

10   here?

11   A.    These are three antioxidants known as propyl gallate,

12   butylated hydroxy anisole and butylated hydroxy toluene.

13   Q.    Do these molecules contain alcohol or thiol groups?

14   A.    No, they do not.  They contain a hydroxyl group but

15   now that is attached in each of these cases to what is known

16   as a benzene ring, and hence these are not alcohols, they

17   are referred to as phenols.

18   Q.    Okay.  In terms of reactivity with a carboxylic acid

19   group in bendamustine, how do you rate phenols compared to

20   the alcohols or thiols in monoglycerol?

21   A.    Phenols have less reactivity.  They do not react as

22   rapidly as do alcohols and of all of these functional

23   groups, the thiols react the most rapidly.

24   Q.    And would the POSA have expected monothioglycerol to

25   react with the nitrogen mustard group in bendamustine?

Anslyn - direct

1    A.    They would have absolutely expected that.

2    Q.    And what groups in monothioglycerol would have been

3    expected to react with the nitrogen mustard group of

4    bendamustine?

5    A.    Both the primary alcohols, but primarily the thiol

6    group because it's the far more reactive functional group.

7    Q.    How do thiols and alcohol compare in terms of

8    reactivity?

9    A.    As I've alluded to, the thiol is the far more reactive

10   species than the alcohol.

11   Q.    And what would be the consequence of the thiol in

12   monothioglycerol when reacting with bendamustine?

13   A.    Well, when reacting through the nitrogen mustard, it

14   would give degradants of that particular functional group in

15   bendamustine, but, of course, it would also during that

16   reaction consume the monothioglycerol, therefore removing it

17   from the solution where it can play an antioxidant role.

18   Q.    Would all antioxidants react equally with bendamustine

19   at the nitrogen mustard group?

20   A.    No, they would not.

21   Q.    And how would phenols compare in terms of reactivity

22   to the nitrogen mustard group?

23   A.    The phenols would be less reactive with the nitrogen

24   mustard group than are alcohol or thiols.

25   Q.    Dr. Aslyn, what conclusion did you reach about the

Anslyn - direct

1  POSA's motivation to use monothioglycerol?

2  A.    I believe the POSA would not have been motivated to

3  use monothioglycerol because of all the chemical reactions I

4  have delineated it can undergo with bendamustine.

5  Q.    All right.   Now, Dr. Anslyn, I want to talk about your

6  opinion about the techniques for measuring various

7  impurities, analytical measurement.

8  A.    Yes.

9  Q.    Do you recall Dr. Pinal --

10          THE COURT:   How much longer are you going to be

11  on direct?

12          MR. MAHAFFY:   Probably less than ten minutes.

13          THE COURT:   Okay.

14  BY MR. MAHAFFY:

15  Q.    Do you recall Dr. Pinal opining about the Olthoff and

16  Drager stability experiments in propylene glycol?

17  A.    Yes, I do.

18  Q.    Have you reviewed the analytical techniques in those

19  papers?

20  A.    Both.   Yes, I have.

21  Q.    And what analytical techniques did Olthoff and Drager

22  use to measure impurities?

23  A.    Olthoff used what's known as thin layer chromatography

24  while Drager used high performance liquid chromatography.

25  Q.    Okay.   And how do you -- and thin layer chromatography

Anslyn - direct

1    is sometimes referred to as TLC; is that correct?

2    A.    That is correct, and high performance liquid

3    chromatography is usually referred to as HPLC.

4    Q.    Okay.  And how do TLC and HPLC differ in their

5    abilities to detect impurity?

6    A.    HPLC is by far the more reliable technique.

7    Q.    Why is that?

8    A.    Well, there's two factors.  The ability of the two

9    methodologies to separate out and do what is called resolve

10   the compounds that are in a mixture.  It's far better in

11   HPLC, but also the sensitivity of the methodology, how well

12   the methodology can detect the compounds once they have been

13   separated.  That's known as sensitivity and HPLC is far more

14   sensitive than TLC.

15   Q.    What would happen if impurity was not resolved, to use

16   the word that you just used?

17   A.    You would not even be able to detect that the impurity

18   was present.

19   Q.    Okay.  And in your opinion, would the POSA have had

20   any concerns about the TLC method used by Olthoff in

21   detecting bendamustine impurities?

22   A.    Yes, I believe they would have.

23   Q.    And, Dr. Anslyn, in your opinion, what conclusions

24   would the POSA have drawn about the stability data in

25   Olthoff in view of the measurement taken?

Anslyn - direct

1    A.    I believe they would have recognized that that

2    technique is not very reliable and would have discounted

3    it.

4    Q.    Okay.  And this is the last topic.  I would direct

5    your attention to a demonstrative on the screen, which is

6    PDX-421.

7          Could you identify these molecules for the

8    Court?

9    A.    Once again, shown here is the chemical structure

10   bendamustine, but on the side is the chemical structure of

11   cyclophosphamide.

12   Q.    All right.  And in forming your opinions, did you

13   compare the structures of bendamustine and cyclophosphamide?

14   A.    Yes, I have.

15   Q.    And do you recall Dr. Pinal testifying that the

16   nitrogen mustard groups in bendamustine and cyclophosphamide

17   are exactly the same?

18   A.    I did.

19   Q.    Do you agree with that opinion?

20   A.    No, I do not.

21   Q.    And why not?

22   A.    Well, the nitrogen mustard group in bendamustine is

23   attached to a benzene ring whereas the nitrogen mustard in

24   cyclophosphamide is attached to what's known as a

25   phosphoramide.

Anslyn - direct

1    And the phosphoramide is a very electron

2    withdrawing group.  It had been placed on the nitrogen to

3    deactivate that nitrogen towards the reactions that are

4    classic for nitrogen mustard compounds.

5    Q.    What would be the consequence of deactivating that

6    group in cyclophosphamide?

7    A.    So this particular compound, cyclophosphamide, due to

8    the deactivating group, does not undergo the reactions that

9    form the aziridinium ion ring until this compound is

10   administered in the patient.

11        So this is known as a prodrug, whereupon

12   administration, the compound is activated in the liver of

13   the patient that then allows the nitrogen mustard structure

14   to do its classic reactions that we've described.

15   Q.    And would the POSA in 2010 have been aware of these

16   differences?

17   A.    They would have.

18   Q.    Okay.  I'm putting up a reference with PTX-991.

19        Did you review this reference in forming your

20   opinions?

21   A.    Yes, I did.

22   Q.    All right.  I'm putting up an excerpt from page 147S

23   of that exhibit.  What is this reference conveying?

24   A.    Well, it's commenting on what I've just described,

25   that cyclophosphamide has an electron-withdrawing structure

Anslyn - direct

1   on it that deactivates it and that results in the agent not

2   acting as the classic nitrogen mustard, but instead it

3   starts to act after metabolic activation as I've discussed.

4   Q.    All right.  And, Dr. Anslyn, do you recall Dr. Pinal

5   testifying that the POSA would have expected bendamustine

6   and cyclophosphamide to undergo the same reaction as the

7   nitrogen mustard group?

8   A.    Yes.

9   Q.    And would the POSA have understood that hydrolysis of

10  bendamustine goes through the aziridinium ring?

11  A.    Yes, they would have.

12  Q.    All right.  I'm putting up a reference of PTX-993.

13  Did you review this in forming your opinion?

14  A.    Yes, I did.

15  Q.    All right.  I'm putting up a reference from page 3988.

16  At a high level, what is being detected here?

17  A.    Well, so here again is the chemical structure of

18  cyclophosphamide, and when it degrades, it is not involving

19  any aziridinium ion ring as we discussed earlier, as does

20  bendamustine.  Instead, it degrades by clipping this

21  phosphorus or breaking the phosphorus, the nitrogen bond

22  here, or that phosphorus, the nitrogen bonds and cascades

23  of reaction that could proceed after breakage of those

24  bonds.

25  Q.    Okay.  Besides these differences that we discussed in

Anslyn - direct

1    the nitrogen mustard group, do bendamustine and

2    cyclophosphamide have any other chemical differences?

3    A.    Yes.

4    Q.    What is that?

5    A.    Well, bendamustine has a carboxylic acid that can form

6    ester degradants where cyclophosphamide does not.

7    Q.    If the POSA were interested in understanding

8    bendamustine chemical reactions, would the POSA have

9    considered cyclophosphamide to be a relevant comparison?

10   A.    It would not be a relevant comparator for the reasons

11   I've described.

12   Q.    Okay.  A couple last quick questions.  Let's put up

13   PDX-4-22.

14         All right.  I direct your attention to this

15   demonstrative on the screen.  Could you identify these

16   molecules for the Court?

17   A.    Again, we see the structure of bendamustine and also

18   now, so now melphalan and chlorambucil.

19   Q.    In forming your opinions, did you consider these

20   chemical structures?

21   A.    Yes.

22   Q.    How do the activities of the nitrogen mustard group

23   see these molecules compare?

24   A.    In these molecules you would expect them to react

25   similarly, because in bendamustine, melphalan as well

1    as chlorambucil, you can see it's attached to benzene

2    rings.

3                    MR. MAHAFFY:  Thank you, Doctor.  No further

4    questions.

5                    THE COURT:  Thank you.

6                    MR. MAHAFFY:  Do you want to talk about the last

7    thing?

8                    THE COURT:  I don't recall.  Has that been

9    discussed yet?

10                    MR. MAHAFFY:  Do you want context?

11                    THE COURT:  That would help.

12                    MR. MAHAFFY:  We're going to have our formulator

13    testify later obviously, and so several of the opinions such

14    as the last one relates to some of the topics that the

15    formulator will discuss and so they're sort of interrelated,

16    but we may take about those molecules at a later point.

17                    THE COURT:  All right.  Okay.  Why don't we

18    break.  A little over two hours.

19                    Do you want to come back at ten after 3:00?

20    Does that work and we'll start cross?

21                    Doctor, you may step down.

22                    THE WITNESS:  Thank you.

23                    THE COURT:  Cross has started, so the doctor is

24    free to speak to counsel.

25                    (Short recess taken.)

1                        -  -  -

2                 (Proceedings resumed after the short recess.)

3                 THE COURT:  Please be seated.

4                 MR. FELDMAN:  Your Honor, may I approach?

5                 THE COURT:  Yes.

6                 MR. FELDMAN:  Your Honor, may I approach the

7      witness?

8                 THE COURT:  Yes.

9                 (Mr. Feldman handed exhibit books to the Court

10     and to the witness.)

11                MR. FELDMAN:  May I begin?  Steven Feldman on

12     behalf of the defendants.

13                            CROSS-EXAMINATION

14     BY MR. FELDMAN:

15     Q.    Dr. Anslyn, you are not a formulator, are you?

16     A.    I am not a formulator.

17     Q.    In fact, you've not formulated any drugs; is that

18     correct?

19     A.    I have not formulated any drugs.

20     Q.    So the opinions you are about to give are on chemical

21     reactivity; correct?

22     A.    The opinions are on chemical issues, one of which is

23     chemical reactivity.

24     Q.    Aside from the opinions you're expressing in

25     chemistry, you are not opining about the propriety of

1   using any solvent in a form of bendamustine; is that

2   correct?

3   A.    I'm not quite sure I know what propriety of the use

4   means.

5   Q.    Well, you're not acting as a formulator.  You're not

6   choosing an ingredient to put into a formulation; correct?

7   You're just offering chemical opinions about various

8   possible ingredients; is that correct?

9   A.    I am offering opinions on chemistry-related things,

10  not formulation-related issues.

11  Q.    And you're relying on Dr. Siepmann for formulation

12  opinions in this case; is that right?

13  A.    I believe counsel is using Dr. Siepmann.

14  Q.    In the report you rely on Dr. Siepmann for some of

15  your opinions as well; is that correct?

16  A.    I remember relying upon his definition of the POSA.

17  Q.    And you're only opining today about a bendamustine

18  liquid formulation that has a 90:10 PG ratio and

19  monothioglycerol?

20  A.    I have been discussing bendamustine, I mean, in PG and

21  DMA as described in Drager.

22  Q.    Okay.  But your opinions concerning obviousness in

23  this case relate only to the 90/PEG PG with

24  monothioglycerol?

25  A.    My focus has been on the 90/10 PEG to PG and

Anslyn - cross

1    monothioglycerol formulation.

2    Q.    Doctor, earlier you testified about attached groups in

3    polyol and mustard group in the bendamustine molecule; is

4    that correct?

5    A.    I specifically was discussing the attack of OH groups

6    on the aziridinium ion ring that's formed from the nitrogen

7    mustard functional group of bendamustine.

8    Q.    And when that happens, sometimes it's called

9    alcoholysis; is that correct?

10   A.    It can be referred to as alcoholysis, that is correct.

11   Q.    You said that a chemistry POSA would be concerned

12   about this type of reaction occurring; is that correct?

13   A.    A chemistry POSA would be concerned about that.

14   Q.    And you're aware that Olthoff did not report seeing

15   any alcoholysis reaction with respect to a nonaqueous liquid

16   bendamustine formulation where propylene glycol was the

17   solvent?

18   A.    I recognize that his analytical technique did not pick

19   up the formation of degradants related to the solvent

20   propylene glycol.

21   Q.    Okay.  But that's your interpretation, that's not what

22   he said; is that correct?

23   A.    I would need to look specifically at the patent.

24   Q.    Okay.  Let's put up DTX-94, please, and turn to page

25   12, which is the English translation.

Anslyn - cross

1    Now, in Olthoff it says, surprisingly, it has

2    been found that the substance bendamustine hydrochloride has

3    a sufficient solubility and particularly an extraordinarily

4    high chemical stability for the production of injection

5    solutions in monovalent alcohols, glycols and other

6    polyvalent alcohols.

7    Do you see that?

8    A.    I do see where he writes that.

9    Q.    And then he says, the stability of the solutions

10   produced according to the invention is unexpected, since

11   compounds with extreme sensitivity to hydrolysis are

12   generally also sensitive to other solvents which contain OH

13   groups.

14   Correct?

15   A.    I agree with the statement that the stability of

16   solutions -- I agree with the statement that compounds with

17   sensitivity to hydrolysis are generally also sensitive to

18   solvents containing OH groups such as alcohol.

19   Q.    Okay.  Then he goes on and just explains, as you

20   agreed before, in the case of alcohol alcohols or polyols,

21   such reactions are known as alcoholysis?

22   A.    That's correct.

23   Q.    So far so good with Olthoff; right?  His science is

24   okay there?

25   A.    Well, so the statement that says it's surprising that

Anslyn - cross

1  it has been found that the substance bendamustine

2  hydrochloride has -- I'm not discussing the sufficient

3  solubility part of that sentence, so I don't know.  And it

4  is surprising to have an extraordinarily high chemical

5  stability for the reasons I've discussed.

6  Q.    Okay.  So in 1983, that all would have been

7  surprising?

8  A.    Let me finish my answer.  I believe that his

9  analytical methodology was not sufficient to be able to

10  detect those degradants.

11  Q.    Okay.  Again, if you could answer my questions.

12  A.    I will.

13  Q.    And he goes on, if we go on now to DTX-94 at page 13.

14  It has now been found that N-mustard compounds of the

15  bendamustine hydrochloride type do not undergo an

16  alcoholysis reaction.

17            So he was looking for alcoholysis reaction and

18  he didn't see it; correct?

19  A.    He was looking for an alcoholysis reaction and he did

20  not see it.

21  Q.    Okay.  And it says, it goes on and says, the use of

22  anhydrous solvents is required in order to avoid

23  decomposition caused by the mentioned sensitivity to

24  hydrolysis.  So, again, he's aware of a potential for

25  hydrolysis and he suggests using anhydrous solvents; is that

Anslyn - cross

1  correct?

2  A.    He has said it's required in order to avoid

3  decomposition caused by the mention of sensitivity to

4  hydrolysis.

5  Q.    Okay.  And you'd agree that PEG-PG is a solvent in a

6  bendamustine formulation would be anhydrous solvents; is

7  that correct?

8  A.    PEG and PG are typically not entirely anhydrous.

9  Q.    So are they aqueous?

10  A.    I do not believe a chemist would consider them

11  aqueous, but they're typically not entirely anhydrous.

12  Q.    Okay.  And we'll talk about that later.  So there

13  could be a little bit of water in PG, for example?

14  A.    And in propylene glycol.

15  Q.    Okay.  So, again, 99 percent pure PG, one percent

16  could be water; is that correct?

17  A.    One percent could be water.

18  Q.    Okay.  And then continuing to read Olthoff, it says,

19  under these conditions, bendamustine hydrochloride, for

20  example, is chemically stable for long periods of time in

21  the mentioned group of solvents and does not form

22  monohydroxy and dihydroxy or mono-alkoxy or di-alkoxy

23  derivatives known from aqueous solutions.

24        Do you see that?

25  A.    I see where that statement is given.

Anslyn - cross

1  Q.    And, again, you dispute that because you believe that

2  Olthoff's data is unreliable; is that correct?

3  A.    I dispute that also because I believe it would have

4  been expected by the POSA to see the mon-alkoxy or di-alkoxy

5  derivative, and that agreeing with you there, I dispute

6  that the analytical technique was appropriate to detect

7  them.

8  Q.    Okay.  But you don't dispute that Olthoff, he

9  professes to have done some experimentation and didn't see

10  an alcoholysis reaction; is that correct?

11  A.    That's what he professes.

12  Q.    And what you are relying on is your theory of why

13  alcoholysis reaction might form; is that correct?  One might

14  perceive?

15  A.    I don't know if it's entirely a theory.  We know that

16  those alcoholysis reactions can occur.

17  Q.    Okay.  But your dispute with Olthoff is his testing

18  method, correct, because he used TLC?

19  A.    I believe the TLC methods that he used were not

20  appropriate for detecting these degradants.

21  Q.    And so you argued by analogy to Menshutkin reaction.

22  Did I pronounce that correctly?

23  A.    Yes.

24  Q.    Menshutkin reactions are different than aziridinium

25  rings, right, as you talked about earlier?

Anslyn - cross

1  A.    They are not absolutely identical, that is correct.

2  Q.    Okay.  And in your report, did you cite to any

3  literature that analogizes a Menshutkin reaction to an

4  aziridinium ring formation?

5  A.    Not in my report, but I believe that is a reasonably

6  obvious thing that a POSA would do, is make that analogy.

7  Q.    Okay.  In fact, during your testimony today, you

8  didn't cite to any literature that supported that connection

9  either between a Menshutkin reaction and an aziridinium

10  ring; is that right?

11  A.    Well, in beginning organic chemistry, we teach the

12  Menshutkin reaction, and right alongside of it is very

13  commonly in the textbook is listed nitrogen mustard

14  interaction.  So they're commonly tied together in

15  introductory textbook.

16  Q.    But, again, you didn't cite to any literature that

17  actually shows that; is that correct?

18  A.    I do not remember citing specifically to textbooks

19  that show that.

20  Q.    And the patent themselves don't mention anything about

21  Menshutkin reactions, do they?

22  A.    I do not recall the patents mentioning Menshutkin

23  reactions.

24  Q.    And the patent events themselves don't talk, and the

25  patents, talking about the patents-in-suit, don't mention

Anslyn - cross

```
 1   anything about pi star either, do they?
 2   A.    The patents did not discuss pi start solvent
 3   parameter.
 4   Q.    Okay.  The pi star solvent parameter is sometimes
 5   referred to sometimes as Kamlet Taft parameters?
 6   A.    It's one of three Kamlet Taft parameters.
 7   Q.    Okay.  But none of those three Kamlet Taft parameters
 8   are mentioned in any of the patents-in-suit here; is that
 9   correct?
10   A.    They are not mentioned in the patents.
11   Q.    Okay.  And since you're not a formulator, in our POSA
12   role, right, what you would do is take your theories about
13   the chemistries of these reactions to the formulator and it
14   would be up to the formulator whether or not to apply them;
15   is that correct?
16   A.    So let me make sure I understand the question.  The
17   chemist that's part of the team, that is the POSA, is
18   overall involved in assisting with the formulation.
19   Q.    Correct.  Bullet -- sorry.  Are you done?
20   A.    Please, go ahead.
21   Q.    Ultimately, it's the formulator that decides which
22   ingredients to use; is that correct?
23   A.    I have not been involved in specific formulations, so
24   I don't know the actual sequence of events that occur in a
25   formulation project.
```

Anslyn - cross

1  Q.    Right, because you never formulated a pharmaceutical

2  drug product; right?

3  A.    I have never formulated a pharmaceutical drug product.

4  Q.    Now, we talked a lot earlier, or you talked a lot

5  earlier about activation energies; is that correct?

6  A.    Yes, I did.

7  Q.    But I noticed you didn't mention anything about

8  temperature's effect on activation energy, did you?

9  A.    I did not discuss temperature.

10 Q.    But temperature does affect activation energy, doesn't

11 it?

12 A.    So temperature specifically doesn't affect activation

13 energy.  Temperature affects the rates of the reaction.  The

14 activation energies are constant as a function of

15 temperature.

16 Q.    Okay.  But if we talk about esterification, right,

17 temperature affects the rate of esterification; is that

18 right?

19 A.    Temperature does affect the rate of esterification,

20 but as I alluded to, not the activation energy.

21 Q.    Okay.  Now, let's take a look at Drager, DTX-73.  So

22 if you can please turn in your binder, or we'll put it up on

23 the screen.

24        Now, you say that you like Drager better than

25 Olthoff because it used HPLC as it's testing the analytical

Anslyn - cross

1 method instead of TLC.  Indeed, the HPLC method is more

2 reliable than TLC.

3 Q.    Okay.  Let's see what Drager says about commercial

4 storage conditions.

5              Starting at line -- page 8, line 25.  Can you go

6 there?

7              Doctor, before we go there, are activation

8 energies inherent properties of particular systems?

9 A.    Activation energies are inherent to particular

10 systems.

11 Q.    Okay.  How about solubility?  Is solubility inherent

12 to a particular system?

13              MR. MAHAFFY:  Objection.  Beyond the scope.

14              THE COURT:  The question as I see it in realtime

15 is:  Are activation energies inherent properties to

16 particular systems?  Hold on.  That's the question.

17              MR. FELDMAN:  That was the first question.  The

18 question I was asking was whether solubility was there.  I

19 can withdraw that question.

20              THE COURT:  Hold on.  The answer was:

21 Activation energies are inherent to particular systems.  I

22 will allow the question.

23              MR. MAHAFFY:  I think he withdrew the question.

24              THE COURT:  The question is:  Is solubility

25 inherent to a particular system, a follow-up?

Anslyn - cross

```
 1   BY MR. FELDMAN:

 2   Q.    Can you answer that question, Doctor?

 3                THE COURT:  If you can answer the question, you

 4   can answer the question.

 5                THE WITNESS:  To my knowledge, solubility is

 6   dependent on a particular system.

 7   BY MR. FELDMAN:

 8   Q.    So it's an inherent property of that system; correct?

 9   A.    To my knowledge, it is an inherent property of the

10   system.

11   Q.    And stability would be an inherent property of a

12   system as well?

13   A.    So a stability, to make sure we're discussing, system

14   is the experimental conditions, the compounds involved, and

15   the solvents.

16   Q.    That's correct.

17   A.    Ask me again, please.

18   Q.    Okay.  With those assumptions in mind, is stability an

19   inherent property of a system?

20   A.    Stability is --

21                MR. MAHAFFY:  I would object.  It's not clear

22   he's using inherent as a legal --

23                THE COURT:  I agree with that, but I'm going to

24   allow the question.  You can answer the question.

25                THE WITNESS:  Yes.  I did not know inherent had
```

Anslyn - cross

1  some legal special definition.  I just mean it is a property

2  of that system, all the components and the experimental

3  condition.

4  BY MR. FELDMAN:

5  Q.    Right.  I wasn't trying to mislead you.  Intrinsic --

6  it's an intrinsic property.  Right?

7  A.    It's an intrinsic property of the system.

8  Q.    All right.  And, again, temperature as we talked about

9  before affects the stability of a liquid formulation; is

10  that correct?

11  A.    Temperature will affect the stability of compound,

12  yes.

13  Q.    Okay.  And in Drager, they define certain storage

14  conditions as commercial storage conditions.

15          Do you recall that?

16          MR. MAHAFFY:  Objection.  This is completely

17  outside the scope.  He didn't testify about any of this

18  stuff.

19          THE COURT:  So I agree with that.  Now, what I

20  don't know because, again, the way you guys have phased this

21  thing, or just for fact witnesses, you can go beyond the

22  scope of cross, I mean direct?

23          MR. MAHAFFY:  I think that's just for fact

24  witnesses.

25          THE COURT:  It is?

Anslyn - cross

```
 1              MR. FELDMAN:  Your Honor, I can respond.  He's

 2      talking about stability.

 3              THE COURT:  The fact that he used stability -- I

 4      mean, I gave you a little leeway on the inherency.

 5              MR. FELDMAN:  Sure.  I appreciate it.

 6              THE COURT:  There was nothing about commercial

 7      storage in his direct examination.  The objection is

 8      sustained.  And just in case this is going to impact -- he

 9      didn't testify about it, so if you have an expert that is

10      going to testify that his failure to testify about it

11      somehow undermines his opinion, you can still do that.

12      Okay?  But it's undisputed he didn't testify about it.

13      That's why I'm not going to permit questioning about it.

14              MR. FELDMAN:  Your Honor, can I have a sidebar.

15              THE COURT:  Okay.

16              (Sidebar conference held as follows.)

17              THE COURT:  Go ahead.

18              MR. FELDMAN:  Where this is going, he has

19      criticized Olthoff as not reflecting proper analytical

20      techniques or whatever.  What I want to do is show him

21      actual data from Drager with the PG system with just

22      bendamustine, which I'm going to now show, actually shows it

23      is stable.  Therefore, it's proper to Olthoff.  And the

24      conditions under which that hatches.

25              THE COURT:  Why do you have to make -- Olthoff,
```

Anslyn - cross

1    why don't you just show him that there's data that says PEG

2    can be stable?  See what he says about it.

3                    MR. FELDMAN:  Okay.

4                    THE COURT:  All right.  You're not going to

5    object to that?

6                    MR. MAHAFFY:  Well, I'm not exactly sure what

7    he's talking about since Olthoff --

8                    THE COURT:  Wait.  I thought he's going to show

9    him Drager.

10                   MR. FELDMAN:  I'm showing him Drager.

11                   THE COURT:  That's what I'm getting at.  Is that

12   all right?

13                   MR. MAHAFFY:  Yes.  Just the data in Drager is

14   fine.

15                   MR. FELDMAN:  For the context, right, it's going

16   to show that at five degrees, it is stable.  Five degrees is

17   the storage condition for Bendeka.

18                   THE COURT:  But he didn't testify about any of

19   that.  So you can make your argument later on.

20                   MR. FELDMAN:  Right.

21                   THE COURT:  If you want --

22                   MR. FELDMAN:  I will just talk about the data.

23                   MR. MAHAFFY:  The only thing he testified about

24   Olthoff and Drager was about the analytical techniques that

25   were used.  He didn't talk about any of the data.

Anslyn - cross

1         THE COURT:  Okay.  Fair.  But he talked about

2    both of those patents and he also has conclusions.

3         MR. MAHAFFY:  Okay.

4         THE COURT:  I think it's fair game if somebody

5    wants to try to suggest there's something in the patents

6    that undermines conclusions, that's fair.

7         (End of sidebar conference.)

8         THE COURT:  Okay.

9         MR. FELDMAN:  Thank you, Your Honor.

10   BY MR. FELDMAN:

11   Q.    Let's turn to Figure 3 of Drager.  Can we pull that up

12   on the screen, too, as well?

13        Dr. Anslyn, Figure 3 of Drager is bendamustine

14   purity in 99 percent propylene glycol.

15             Do you see that?

16   A.    Yes, I see that.

17   Q.    Okay.  And you'll see that the key at the bottom says

18   that the solid circle lines are five degrees C and the open

19   circles are 25 degrees.

20             Do you see that?

21   A.    I see that.

22   Q.    Okay.  And you'll see in the top line that, in fact,

23   bendamustine PG system with 99 percent propylene glycol is

24   close to a hundred percent pure up to around 175 days.

25             Do you see that?

Anslyn - cross

1    A.    I see that.

2    Q.    And that's using HPLC analytical method?

3    A.    This is the Drager patent.  Yes, it used HPLC.

4    Q.    You wouldn't have any reason to dispute that

5    particular data, would you?

6    A.    I do not at this point in time.

7    Q.    And it doesn't seem to show very many, if any,

8    alcoholysis degradants, does it?

9    A.    I don't know what the degradants might be, you know.

10   Tiny little drop there, but I don't know what those are.

11   Q.    So whatever they are, there's not a lot of them; is

12   that correct?

13   A.    It depends on how you define a lot, but this point is

14   certainly very close to the first point.

15   Q.    And you recall that Drager sets a tolerance level

16   for -- I will strike that.

17         Can we take a look at Table 2 of Drager.  It's

18   at column 8.  Table 2.  So it's page DTX-73-10.

19         I'd like to draw your attention to the

20   66 percent DMA, 34 percent PG line.  And that's the

21   formulation you were referring to earlier in your testimony,

22   was the Drager formulation; is that correct?

23   A.    That is correct.

24   Q.    Okay.  And you see the amount of DCE degradants there

25   is .12; right?

Anslyn - cross

1   A.    I see that.

2   Q.    And DCE was one of the structures that you drew in

3   your list of possible degradants; is that correct?

4   A.    That is correct.

5   Q.    Okay.  And then just above the 66/34 line, there's

6   just straight DMA; is that correct?

7   A.    Above it, yes.

8   Q.    Right.  So that's just bendamustine with just DMA; is

9   that correct?

10  A.    That is correct.

11  Q.    Okay.  And there the amount of DCE actually goes up

12  with just DMA; is that correct?

13  A.    Yes, it does.

14  Q.    Okay.  So you found a system that has some PG in it

15  actually has a lower level of DCE than one with just DMA; is

16  that correct?

17  A.    According to this data, yes.

18  Q.    Okay.  And then HP-1 is another impurity that you

19  identified in your testimony; is that correct?

20  A.    I did discuss HP-1.

21  Q.    And for that, they're about the same?

22  A.    They are about the same.

23  Q.    Okay.  So at least PG doesn't have any detrimental

24  effect on that particular purity; is that correct?

25  A.    It does not.

1    Q.    Okay.  If we look at the BM-1 dimer.  Okay.  Again,

2    DMA is about the same as the DMA PG system, correct, for

3    that one?

4    A.    About the same.  Clearly, the DMA PG is a tad higher.

5    Q.    The PG doesn't seem to be having much of a significant

6    effect there either; is that right?

7    A.    I don't know what significant is, but it is higher in

8    the DMA PG.

9    Q.    By .01 percent; is that correct?

10   A.    That's correct.

11   Q.    Okay.  Now, is there a way to pull up the animation

12   that we had before with the 90:10 PEG-PG?  Do I need to

13   switch the button?

14            If we just run that reaction.  Not for the DMA

15   one, for the 90:10 PEG-PG.

16            Now, this is an animation that you showed the

17   Court earlier; is that right?

18   A.    Yes, it is.

19   Q.    And the really big esters, right, those are the PEG

20   esters?

21   A.    These esters here are represented as the PEG esters,

22   yes.

23   Q.    Okay.  And then the smaller ones are the PG esters; is

24   that right?

25   A.    These are the PG esters here.

1   Q.    Okay.  And you show that the PEG esters are actually

2   forming faster than the PG esters, is that right, in the

3   animation?

4   A.    Yes, the PEG esters are shown forming faster.

5   Q.    And they were actually moving faster in your animation

6   as well, weren't they?

7            THE COURT:  Just so the record is clear, did you

8   say the PEG or the PG esters are forming faster?

9   A.    The PEG, PEG.

10  BY MR. FELDMAN:

11  Q.    But at five degrees C, that's not actually what

12  happens, is it?

13  A.    I would need to see that data at the five degrees C.

14  Q.    Okay.  Did you consider any five degree C data for PEG

15  formation when you did this animation?

16           MR. MAHAFFY:  Objection.  It's not clear what

17  data he's referring to here, prior art data or some data in

18  the patent.

19           THE COURT:  Well, that's true.  If we can get

20  clarification on that.

21           The other thing, in fairness to both sides, I

22  don't know that there's any testimony as to what this

23  demonstration, the temperature at which this demonstration

24  is supposed to reflect.  Maybe you can bring both of those

25  issues out then.  What date is the witness referring to?

Anslyn - cross

1   Then you can follow up with your question about temperature.

2                MR. FELDMAN:  Sure.

3   BY MR. FELDMAN:

4   Q.    Doctor, what data did you rely on to make this

5   examination?

6   A.    The Drager, I believe it was in a table you just

7   showed.

8   Q.    It was based on Table 2?

9   A.    I'd like to see it again to confirm that.

10  Q.    Okay.  Can we bring up Table 2 of Drager?

11               MR. FELDMAN:  Do you want to do it?  I don't

12  remember what the PTX number was.

13               THE WITNESS:  So that animation was based on the

14  factor of 4 to 1 that represents the reactivity of the

15  primary alcohol in PG to the secondary alcohol in PG, and

16  the primary alcohols in PEG are reacting at the same rate as

17  the primary alcohols in PG.

18  BY MR. FELDMAN:

19  Q.    Okay.  And the temperature is five degrees C; is that

20  correct?

21  A.    The temperature of this data is at five degrees C.

22  Q.    Okay.  So it's your opinion then that the PEG esters

23  at five-degree C would form faster than the PG esters at

24  five degrees C with the formulation at 90:10 PEG-PG?

25  A.    I want to see that data to feel confident of that.

Anslyn - redirect

1    Q.     Okay.  So today you're not confident that, in fact,

2    your animation was accurately depicting what the data might

3    show; is that right?

4    A.     No, I'm not necessarily saying that either.

5    Q.     Okay.  Well, what temperature were you using in your

6    animation?

7    A.     Again, the animation came from the 4 to 1 factor shown

8    here derived from this table, which was at five degrees C.

9    Q.     Okay.  But you didn't have any PEG data to rely on

10   when you made your animation; is that correct?

11   A.     I did not have PEG data to rely on.

12              MR. FELDMAN:  Nothing further, Your Honor.

13              THE COURT:  Any redirect?

14              MR. MAHAFFY:  Just one minute.

15                        REDIRECT EXAMINATION

16   BY MR. MAHAFFY:

17   Q.     Just a few quick questions.  Can we show the Olthoff

18   data and the Drager -- yes, yes.  That's exactly what I

19   want.

20              So, Dr. Anslyn, what temperature was the, was

21   experiment in Olthoff conducted at?

22   A.     Olthoff's data was conducted at 25, 50, 75 and 100.

23   Q.     Okay.  And in terms of the 25-degree data in Olthoff,

24   what kind of, how much degradation was there after eight

25   weeks at 25 degrees?

1   A.    Olthoff states there is no degradation, none.

2   Q.    Okay.  And in terms of the Drager data, when Drager

3   ran its experiment in propylene glycol at 25 degrees after

4   about 60 days, how much degradation was in the Drager

5   formulation?

6   A.    So at 25 degrees in the Drager formulation, the same

7   temperature that Olthoff is studying.  At that time period,

8   you can see that there's approximately 95 percent, I'm doing

9   my best to extrapolate to the Y axis here, of the

10  bendamustine is gone.

11  Q.    And so in your opinion, is the data from Drager and

12  Olthoff consistent or inconsistent?

13  A.    It is quite inconsistent.

14        MR. MAHAFFY:  Nothing further.  We do have

15  exhibits.

16        Did you have questions?

17        THE COURT:  I've got a lot of questions.

18        MR. MAHAFFY:  Can I enter exhibits?

19        THE COURT:  Please.

20        MR. MAHAFFY:  Okay.  We'd like to enter Exhibits

21  PTX-376, 1010, 985, PTX-988, PTX-997, PTX-999, PTX-647,

22  PTX-669, PTX-991 and PTX-993.

23        MR. FELDMAN:  No objection.

24        THE COURT:  All right.  They're admitted.

25            (PTX-376, 1010, 985, PTX-988, PTX-997, PTX-999,

1    PTX-647, PTX-669, PTX-991 and PTX-993 were admitted into

2    evidence.)

3                THE COURT:  Doctor, you may step down.

4                (Witness excused.)

5                MR. HARBER:  May I approach, Your Honor?

6                THE COURT:  Yes.

7                (Mr. Harber handed notebooks to the Court.)

8                THE COURT:  While we're waiting for the witness,

9    I just want to make two housekeeping announcements.

10               So one is, I can't believe we're going to do

11   this on one level, but I'm going to give you combined an

12   extra hour of time, so you'll at least get an extra

13   half-hour, because obviously I think to the extent my

14   inexperience factors into the delay, so I think it's fair.

15   I will give you back that time.  So you at least get an

16   extra half-hour.

17               MR. BERL:  Thank you, Your Honor.

18               MS. STAFFORD:  Thank you, Your Honor.

19               THE COURT:  All right.  The second thing is, I'm

20   going to allow you to file next week by close of business

21   Tuesday chronologies.

22               Now, I'm not looking for briefs; I am looking

23   for chronologies.  I'm going to limit you, it's a somewhat

24   arbitrary decision, to 30, dates, and that doesn't mean you

25   have to have 30 dates, but it would really be helpful if

1   somebody put a timeline together of what they think are

2   critical dates.  And I know there's some timelines a little

3   bit in the openings, but I'm talking about a timeline.

4           For instance, the professor just testified that

5   priority, since the two different priority dates have no

6   materiality at least for him, but they may be for you all.

7   And you can pick what you think what are the most important

8   dates.  So you can have a date and then you can have a very

9   short summary of what the date, why it's important.

10           MR. BERL:  And I assume you don't want a

11   characterization of the evidence or documents.  Just the

12   document and what it is?

13           THE COURT:  I mean, I'm going to leave it to you

14   somewhat.  Here's what I'm going to do though.  If I get

15   something along the lines of Dr. Yates' BE-3, I won't read

16   it.

17           Was it Dr. Yates who had the 175 pages that we

18   had to go through yesterday and find?

19           So the Y person would have a pretty succinct

20   chronology that I would find really helpful, especially in

21   looking at the events and figuring out how they are

22   relevant.

23           So things like dates in particular, prior art.

24   Dates of particular activity in the laboratories or dates of

25   discussions with FDA.  Whatever it is, you can pick.  I'm

Derendorf - direct

1    sure each side will have a different 30 dates, I'm going to

2    guess, so it would be interesting to see.

3              So you can file them simultaneously, and then do

4    you want to say 5:00 o'clock -- actually, I will give you

5    the evening of Tuesday.

6              So what poor associate has to stay up late?  Is

7    it going to be 9:00 o'clock Tuesday?

8              MS. STAFFORD:  10:00.

9              10:00 p.m. next Tuesday you can each file your

10   chronologies.

11             MR. FELDMAN:  Thank you, Your Honor.

12             MS. STAFFORD:  Thank you very much.

13             MR. HARBER:  Your Honor, the plaintiffs call as

14   their next witness Dr. Hartmut Darendorf, and he'll be

15   testifying as to the obviousness with respect to the method

16   of administration, limitations of the second family of

17   patents.

18             THE COURT:  Thank you.

19                 . . HARTMUT DERENDORF, having been

20        duly sworn/affirmed as a witness, was examined

21        and testified as follows. .

22   BY MR. HARBER:

23   Q.   Dr. Derendorf, can you please introduce yourself to

24   the Court?

25   A.   Yes.  My name is Hartmut Derendorf, and I'm a

Derendorf - direct

1    distinguished professor emeritus at the University of

2    Florida.

3    Q.    What's your educational background?

4    A.    I was born in Germany and studied pharmacy in Germany.

5    Got my Bachelor's and Ph.D. at the University of Muenster,

6    then came to the United States as a post-doc and did the

7    post-doctoral training at the University of Florida.

8    Q.    In what year did you obtain your Ph.D.?

9    A.    In 1979.

10   Q.    And what did you do after obtaining your Ph.D.?

11   A.    Yes.   I came to Florida for a two-year post-doc with

12   plans to go back to Germany, but then received an offer to

13   join the faculty in 1983, and I'm still on the faculty

14   today.

15   Q.    What title did you have at the University of Florida

16   since 1983?

17   A.    I started as an assistant professor and then moved up

18   the ranks, associate professor, full professor, and then

19   distinguished professor and also served as department chair

20   for over 20 years.

21   Q.    What is the subject of your teaching and research at

22   the University of Florida?

23   A.    I'm a clinical pharmacologist and my specialty is

24   pharmacokinetics and pharmacodynamics.

25   Q.    Do you conduct research as part of your job at the

Derendorf - direct

1    University of Florida?

2    A.    I do.

3    Q.    What is the focus of your research?

4    A.    The focus is always to find the best dose and dosage

5    regimen to give a drug to a patient.

6    Q.    And have you ever worked on designing administration

7    protocols for drugs?

8    A.    I have.

9    Q.    How many times in your career?

10   A.    I do a lot of consulting for pharmaceutical companies,

11   so in the hundreds.

12   Q.    And we've heard so far in the trial about oncologists

13   and formulators.  What is the role of a pharmacologist or a

14   pharmacokineticist in the process of designing

15   administration protocol for a drug?

16   A.    This is always a team effort and there's so many

17   different aspects that come into the picture.  The

18   pharmacokineticist is the one who really focus on

19   identifying and justifying the optimum dose and dosage

20   regimen.

21   Q.    How many drugs have you been involved in planning a

22   protocol administration for?

23   A.    Again, in the hundreds.

24   Q.    Have you ever been involved in finding an

25   administration protocol for an IV drug?

1   A.    Yes.

2   Q.    And in what capacity, the work that we've just been

3   discussing, do you do all of that work in your role as a

4   professor at the University of Florida?

5   A.    Yes.   I do have an active research program.   We do a

6   lot of studies, clinical studies at the University of

7   Florida, but I also do a lot of consulting with companies

8   where I'm part of that decision-making of identifying the

9   ultimate dose.

10  Q.    You mentioned clinical studies.   Have you had a role

11  in designing clinical studies in your career?

12  A.    I have conducted clinical studies.   I've served as

13  a principal investigator on clinical studies in healthy

14  volunteers and I've participated in many clinical studies.

15  Q.    How many clinical studies have you been involved in

16  over the course of your career?

17  A.    Probably 20, 30, something like that.

18  Q.    Are you a member of any professional organizations?

19  A.    I'm a member of a number of professional organizations

20  and also served as president, for example, of the American

21  college of clinical pharmacology, one of the leading

22  societies in clinical pharmacology.   I have been also

23  president of the International Society of Anti-Infective

24  Agents and a member of many other societies.

25  Q.    Have you ever published any peer-reviewed papers in

Derendorf - direct

1   your career?

2   A.    I have.

3   Q.    Approximately how many?

4   A.    About 500.

5   Q.    And have you ever given any invited presentations in

6   your field?

7   A.    I have.

8   Q.    About how many?

9   A.    Approximately a thousand.

10  Q.    And have you published any books?

11  A.    I have.

12  Q.    What type of books and about how many have you

13  published?

14  A.    Both textbooks and handbooks and more than ten.  And

15  I've published both German textbooks and international

16  English textbooks.

17  Q.    Do any of your publications or textbooks address

18  protocols for IV drugs?

19  A.    Yes.

20  Q.    Do you edit any academic journals?

21  A.    I do.  I'm the associate editor of the Journal of

22  Clinical Pharmacology and also associate editor of some

23  other journals and am on the editorial board of a number of

24  journals.

25  Q.    Have you received any professional awards in your

1  year?

2  A.    I have.  I was fortunate to receive the Career

3  Achievement Award of the American College of Clinical

4  Pharmacology, American Association of Pharmaceutical

5  Scientists, and the American Association of Pharmacy.

6  Q.    If we can put up PTX-892, please.

7          Dr. Derendorf, is this a true and accurate copy

8  of your C.V. as of the date of your expert report?

9  A.    It's an accurate copy.  However, I don't think it's

10  the last version.  I always update my C.V. continuously, but

11  I think that was the one I submitted at the time of my

12  expert report.

13          MR. HARBER:  At this time, Your Honor,

14  plaintiffs tender Dr. Derendorf as an expert in clinical

15  pharmacology, pharmacokinetics and pharmacodynamics.

16          MS. STAFFORD:  No objection, Your Honor.

17          THE COURT:  All right.

18          MR. HARBER:  Now, I notice Your Honor is

19  correct, this is a little tedious in the presentation, but I

20  will do it.  Can we put up PDX-2-2.

21          THE COURT:  Wait, wait.  We're good.

22          MR. HARBER:  No.  I was just -- I'm sorry.

23  BY MR. HARBER:

24  Q.    Dr. Derendorf, I will be asking you some opinions

25  today about asserted claims 11, 18 and 22 of the '586

1    patent, claims 13 and 15 of the '399 patent, and claim 13 of

2    the '887 patent.

3             What priority date have you used for purposes of

4    your analysis?

5    A.    The dates are mentioned on the slide.  July 2012 and

6    March 2012.

7    Q.    I believe Dr. Thirman and Dr. Yates testified

8    yesterday that the dates that they used for their analysis

9    was March 20th, 2012.  Would it make a difference to your

10   analysis if that date were used?

11   A.    It does not make a difference, no.

12             MR. HARBER:  Your Honor, we forgot to bring it

13   up.

14             THE COURT:  Thank you.

15   BY MR. HARBER:

16   Q.    Could you go to PDX-2-3, please.

17             So in particular, Dr. Derendorf, I want to ask

18   your opinion about the, what I would, from a method of

19   administration limitations in these patents related to the

20   treatment, the time, the cycles, volume and concentration in

21   these claims that are highlighted in this slide.

22             Are those the limitations on which you provided

23   opinions in this case?

24   A.    That's correct.

25   Q.    And we'll get into detail obviously, but as a general

Derendorf - direct

1   matter, what are your opinions as to whether or not these

2   limitations are obvious?

3   A.    My opinion is that these were not obvious.

4   Q.    And let's look at PDX-2-4.  Doctor, up in this slide

5   is the definition of person of ordinary skill in the art

6   that has been put forward in this case.

7             What is the perspective that you would be -- are

8   bringing to this team?

9   A.    Yes.  I think this method of administration issue is

10  clearly a dose and dosing regimen related issue, which is

11  the core of pharmacokinetics and pharmacodynamics, so I

12  think an expert in that field would be appropriate.  That

13  brought me to this definition that's on that slide.

14  Q.    Let's look at PDX-2-5.  Have you reviewed defendants'

15  or, in particular, Dr. Thirman's definition of person of

16  ordinary skill in the art?

17  A.    I have, yes.

18  Q.    And would your opinion be different if that definition

19  were to be adopted?

20  A.    No.

21  Q.    All right.  Now, Dr. Derendorf, we've been talking a

22  little bit about pharmacokinetics and pharmacodynamics.  Can

23  you explain what is pharmacokinetics?

24  A.    Yes.  Pharmacokinetics is what the body does to a

25  drug.

Derendorf - direct

1          When you give a drug to a patient, it's

2   absorbed, it gets distributed in the body, metabolized

3   chemically and excreted.  All of these events then result in

4   a concentration profile that reflects these processes.  And

5   pharmacokinetics is the field of these concentrations.

6   Q.    What is pharmacodynamics?

7   A.    Pharmacodynamics is what the drug does to the body.

8   So the effects and side effects, the good and the bad.

9   Q.    And how do these relate, pharmacokinetics and

10  pharmacodynamics?

11  A.    They go hand in hand.  You need to understand the

12  concentration effect relationship and -- the concentration

13  produces the effects, both again the good and the bad and

14  you would understand these relationships.

15  Q.    Now, with the Court's permission, I would like to ask

16  Dr. Derendorf to step down and please illustrate on the flip

17  chart some of the basic concepts we've heard about so far

18  relating to PK in the case?

19          THE COURT:  Sure.

20          (The witness left the witness stand and

21  approached the easel.)

22          MS. STAFFORD:  Maybe I will just stand over

23  here.

24          THE COURT:  Why don't you pull a chair over

25  here.

Derendorf - direct

1    MS. STAFFORD:  That works.

2  BY MR. HARBER:

3  Q.    Go ahead, doctor.

4  A.    So when we start pharmacokinetics, we have a new

5  compound, know nothing about it.  Usually the first study is

6  to give an intravenous administration and the reason we do

7  this, with the intravenous administration, we know all of

8  the dose is that we have will end up in the bloodstream, a

9  hundred percent.

10          And so we do this and then after the

11  administration, we take a blood sample from the subject.

12          So initially, right after the administration,

13  the concentration will be very high because all of the doses

14  in the blood, we measure our first data point, which will be

15  the highest point we get and we call it Cmax, maximum

16  concentration.

17          This is when we get a bolus administration, and

18  bolus means, again, we give the whole dose quickly into the

19  bloodstream.

20          And then we just follow the concentration and

21  usually we get a biphasic profile --

22          THE COURT:  Why is it called bolus?

23          THE WITNESS:  Because bolus is in one piece.

24          THE COURT:  Is the bolus, is it a tool?

25          THE WITNESS:  It's a Latin word.

Derendorf - direct

1          THE COURT:  It's a Latin word?

2          THE WITNESS:  Yes.

3          THE COURT:  Go ahead.  Thanks.  Sorry.

4          THE WITNESS:  And so we get a biphasic, and the

5    reason for that is when the concentration drops, the drug

6    distributes into the tissue of the body.  That caused the

7    rapid decrease and then the tissues and the blood

8    equilibrate.  It slows down.  The slope changes.  We call

9    this the elimination phase.  We call this the distribution

10   phase.  That will give us the first idea about the kinetic

11   properties.  How long does it stay in the body?  What's the

12   half-life you can derive from a kinetic parameters,

13   distribution, all numbers that then help us later on to find

14   the right dose.

15   BY MR. HARBER:

16   Q.   And is the bolus the only way to give a drug

17   intravenously?

18   A.   Well, sometimes we can't do that.  I mean, that's the

19   preferred investigational way to study that, but sometimes

20   the Cmax value is allowed to say for it to go and that's

21   when we would consider infusions.

22          It still is intravenous administration.  We

23   still inject into the bloodstream, we still get all of it

24   into the blood.  The speed it is given is different and that

25   will change that outcome.  So we give an infusion, then we

Derendorf - direct

1  start at zero.   The concentration goes up until the end of

2  the infusion.   That will be our highest concentration.

3  Until then, it drops the same way did from the bolus.   But

4  the Cmax now is lower than here.   The total amount of drug

5  that gets into the body is still the same, but we avoided

6  that high Cmax.

7  Q.    And I should ask you before I move on:   Is there --

8  well, first, let me ask you.   On the bottom chart, how would

9  that chart and the Cmax change if you shortened or

10  lengthened the infusion time?

11 A.    Yes.   If we still are unhappy with that Cmax and like

12 to lower it, one way to do it would be to get an even slower

13 longer infusion, and what we would get then would be an

14 increase that would be more shallow, would reach the Cmax at

15 a later point that would be lower, and then we would have

16 the elimination, or we can do the opposite.   We can give an

17 infusion that's a little more rapid and then we get a C for

18 an increase, a higher Cmax, and we would have an

19 elimination.   So the infusion time, the duration of infusion

20 will have a direct impact on the Cmax.

21 Q.    And what is the relevance of a Cmax to side effects

22 and safety?

23 A.    Many drugs there is a relationship.   Many drugs,

24 there's a relationship with the activity.   It's not just the

25 side effect it can affect the desired activity for some

Derendorf - direct

1    drugs.

2    Q.    Can you explain what the effect would be using the

3    chart?

4    A.    Again, the shorter the infusion time, the shorter the

5    duration of the infusion, the higher the Cmax, and

6    vice-versa.

7    Q.    Right.  So does a higher or lower -- how does a higher

8    or lower Cmax relate to side effects?

9    A.    If there is a correlation with the Cmax and the

10   safety, then the higher Cmax would increase the likelihood

11   of undesired effect.

12   Q.    Thank you, Doctor.  You can take your seat.

13   A.    Okay.

14              (The witness resumed the witness stand.)

15   BY MR. HARBER:

16   Q.    Are all of the concepts that you just illustrated

17   concepts that the person of ordinary skill in the art would

18   have been familiar with at the priority date?

19   A.    Yes.

20   Q.    And let's look at PTX-1021.  What is this document?

21   A.    This is a textbook that I contributed to and it just

22   came out, the new edition just came out last month and I'm

23   the primary author now and it's used a lot in medical school

24   and pharmacy schools.

25   Q.    Let's look at page 271.  What's it disclosing?

Derendorf - direct

1    A.     Short-term infusions it gives what I just explained.

2    Short-term infusions are used to cause, if the

3    administration were too rapid, the incidence of adverse

4    events can increase.

5    Q.     At the bottom line I've highlighted here, it says,

6    slow administration is required to avoid precipitation of

7    the drug in the vein, phlebitis and systemic toxicity.  What

8    is systemic toxicity?

9    A.     We really need to differentiate in general, two kinds.

10    When you give the drug intravenously, there's two kinds of

11    toxicity.  There's the systemic, which is the toxicity in

12    the whole body, because you have the drug in the blood, all

13    over the body.  That's called systemic toxicity versus the

14    local toxicity, which is you inject at the injection site.

15          When you inject the drug, the concentration that

16    you put there can have an effect on that site.  That would

17    be called a local toxicity.  And both are affected by the,

18    by the weight and the concentration that's injected.  The

19    example here is precipitation.  If you have a precipitation

20    of the drug in the vein, that can cause phlebitis, which

21    would be a local toxicity.

22    Q.     Now, with respect to bendamustine specifically, did

23    you consider any publications that addressed the

24    relationship between infusion time and side effects as of

25    the priority date?

Derendorf - direct

1  A.    Yes.

2  Q.    Let's look at DTX-988, which is the Schoffski 2000b

3  reference.

4          Can you explain the portion that's highlighted

5  here, doctor?

6  A.    Yes.   This publication looked at bendamustine, and it

7  said that the infusion duration and dose fractionation

8  appear to affect the toxicity profile of this particular

9  drug, of bendamustine.

10  Q.    In conjunction with the principles that you just

11  explained on the chart, what would the person of ordinary

12  skill in the art have understood from this disclosure before

13  the priority date?

14  A.    Well, this concept would apply here, that the longer

15  the infusion, the less likelihood of side effects.

16  Q.    Now, we heard Dr. Thirman and Dr. Yates testify about

17  two reference, Preiss 1985 and 1998.   Let's look at Preiss

18  1985, which is DTX-985.

19          What kind of study is this, Doctor?

20  A.    Yes.   This is a pharmacokinetic study.   This is one,

21  very similar to the one that I just described on the board.

22  This was the first, to my knowledge, the first

23  pharmacokinetic study of bendamustine at the time and it did

24  exactly what I described.   They gave an IV bolus and

25  followed the pharmacokinetics.

Derendorf - direct

1    Q.    What is a pharmacokinetic study?

2    A.    You want to learn about the disposition of the drug,

3    so what happened to the drug when it's in the body and

4    again, you derive these pharmacokinetic parameters,

5    half-life and distribution, that will summarize that

6    information and help you to then later on.

7    Q.    How does that relate to the chart you just drew?

8    A.    It's the top chart.  It's exactly what's in the top

9    chart.

10   Q.    And how does the design, let me ask you this:  Would a

11   person of ordinary skill in the art before the priority date

12   understand the PK study is measuring safety?

13   A.    No.  It's not intended to assess safety.  Of course,

14   you always want to do any work with volunteers or patients.

15   You worry about safety and you always observed and also

16   report your subjects, too, but it's not the purpose of a

17   pharmacokinetic study.

18   Q.    How is the design of a pharmacokinetic study different

19   from the design of a study that is a measure of safety?

20   A.    This Preiss is a good example.  These are usually

21   small studies.  Seven patients participated in the study,

22   but that's okay for a pharmacokinetic study.  You learn a

23   lot about the pharmacokinetics in seven subjects.  It's not

24   okay to come up with a general statement about the safety of

25   the drug.  You can describe what happened to your seven

Derendorf - direct

1    subjects and they did and that is very reasonable, but,

2    again, it's not a general safety information.

3    Q.    Now, would the person of ordinary skill in the art

4    have understood that just because side effects didn't show

5    up in a sample size of seven, that you wouldn't -- that they

6    wouldn't appear if you gave the drug more widely?

7    A.    No.

8    Q.    Now, for, I think you mentioned before, for IV drugs,

9    how is the drug typically administered in a PK study?

10   A.    In a bolus.

11   Q.    And why are bolus injections used in PK studies?

12   A.    Because it's the cleanest way.  You don't have any,

13   any competing pathways.  For example, if you get the drug

14   orally, then you have to worry about the oral uptake.  If

15   you give it, all of this is avoided when you get the bolus

16   of a drug intravenously and you only deal with the

17   distribution and elimination.

18   Q.    Let's look at PTX-1018.  What is this document?

19   A.    That's another very commonly used textbook by Shargel.

20   Q.    Let's go to page 53.  Can you explain what this is

21   disclosing, Doctor?

22   A.    Yes.  It states that an IV bolus injection is the

23   simplest way, also the cleanest way to study the

24   pharmacokinetics of a drug, but then it also points out that

25   this is mainly useful for investigational drugs and

Derendorf - direct

```
 1   pharmacokinetics investigation whereas for clinical

 2   practice, often that's not desirable because of the safety

 3   issues.  An infusion is preferred.

 4   Q.   Now, in Preiss 1985, would the person of ordinary

 5   skill in the art have understood at the priority date, that

 6   the three-minute infusion that was used in that study was

 7   appropriate for use in clinical practice because that's how

 8   bendamustine was delivered in that study?

 9   A.   Yes.  That is clearly not the intention of the study

10   and I don't think anybody would interpret it that way.

11   Q.   I believe you answered yes to my question.  Let me ask

12   it again.

13   A.   Okay.

14   Q.   So the record is clear.  Would the person of ordinary

15   skill in the art have believed at the priority date, that

16   the three-minute infusion in Preiss 1985 was appropriate for

17   use in clinical practice because it had been used in that

18   study?

19   A.   No.

20   Q.   Now, turning back to Preiss 1985, what is the

21   description of the types of patients who participate in the

22   study?

23   A.   Yes.  There were seven patients and they all were

24   cancer patients but with different kinds of cancer, so not a

25   homogeneous population.
```

Derendorf - direct

1   Q.      Would that have affected any safety conclusions that a

2   person of ordinary skill in the art could have drawn from

3   the study?

4   A.      It adds to the complexity and the variability of the

5   study, but, again, the conclusion is the same.  There is no

6   general safety statement that can be derived from this.

7   This is just describing how these seven subjects did in the

8   study.

9   Q.      And let's look at the conclusion or one of the

10  conclusions of the Preiss study that Dr. Thirman testified

11  about yesterday, where it says, despite the high dosage,

12  only rather mild side effects occurred.

13          Dr. Thirman discussed this sentence yesterday.

14  What, in your view, would the person of ordinary skill in

15  the art have taken from this observation in light of the

16  purpose of Preiss 1985 at the priority date?

17  A.      Again, the information is that the seven patients in

18  the studies did okay.  They had mild side effects.  There

19  were some that were described, nausea and vomiting.  Some

20  others, they were not as frequent, but that is as far as it

21  goes.  It's not a generalization, not a general statement on

22  the safety of the compounds.

23          MR. HARBER:  Your Honor, this is DTX-985.

24          THE COURT:  Yes.

25  BY MR. HARBER:

Derendorf - direct

```
 1    Q.      Now, I'd like to move on to Preiss 1998 now, Doctor,

 2    which is DTX-991.  This is another study that Dr. Thirman

 3    and Dr. Yates testified about yesterday.

 4              Can you explain where this study was, where this

 5    paper was published?

 6    A.      Yes.  It was published in a Congress Proceedings

 7    booklet of the Seventeenth International Cancer Congress,

 8    which took place in Rio Di Janeiro, Brazil.

 9    Q.      Is that the same as a peer-reviewed journal?

10              MS. STAFFORD:  Objection, Your Honor.

11    Foundation.

12              THE COURT:  Well --

13              MS. STAFFORD:  I don't believe he has any

14    knowledge of this particular Congress and whether it was

15    peer-reviewed.  We've seen it.

16              THE COURT:  Okay.  Well, he has been tendered as

17    an expert in the field.  He has got international

18    experience.  He has got a prestigious position at a

19    prestigious university.  These are international

20    publications.  I think there's foundation for him to

21    testify.

22              MS. STAFFORD:  Thanks, Your Honor.

23              THE COURT:  Go AHEAD.

24              THE WITNESS:  Thank you.  As I mentioned, I have

25    presented approximately a thousand presentations, many in
```

Derendorf - direct

1    international conferences, and I don't think I ever had a

2    submission to a conference where there was a peer review of

3    my abstract.  I mean, there is a thumbs up or down

4    acceptance -- not acceptance, based on the topic.

5              But a peer review, you've got to understand, or

6    journal is a very detailed scrutiny of the content, and good

7    journals really are proud of their review process.  So I'm

8    an associate editor of the Journal of Clinical Pharmacology,

9    so this is close to my heart.  This has not happened with

10   these kinds of Congress proceedings.

11   BY MR. HARBER:

12   Q.    Let's look at page 1638 of the reference, Doctor.

13   What was the purpose of the Preiss 1998 study?

14   A.    Yes.  There were two parts of it.  The first part

15   again was a pharmacokinetic study, which was quite

16   challenging, because the investigators looked to identify

17   and measure metabolite of bendamustine, and this is not

18   easy.  They had to develop an analytical method.  But they

19   were successful and reported that in what I consider very

20   nice, very nice pharmacokinetic study.

21              And then there was a second part that was added

22   or presented, which was the estimation of maximum tolerated

23   dose in two different dosing regimens.

24   Q.    What type of patients were part of this study?

25   A.    Again, different types of cancers, so there was not a

Derendorf - direct

1  homogeneous patient population.

2  Q.    And if we look, I want to look at the sentence right

3  above where it says materials and methods.

4        It says here, the purpose of the present study

5  was the investigation of the clinical pharmacology and

6  definition of the DLT (dose limiting toxicity) and of the

7  MTD (maximum tolerated dose).

8        Doctor, what is a maximum tolerated dose?

9  A.    Maximum tolerated dose is the highest dose that you

10 can ethically administer to a patient.

11 Q.    Is that the same thing as a recommended dose for

12 clinical use?

13 A.    No, it's not.

14 Q.    And what is a dose limiting toxicity?

15 A.    That is the event that is telling you that you can't

16 go any higher.

17 Q.    I'm sorry.  And is that a dose or is that an event?

18 A.    It's an event.

19 Q.    Did you hear Dr. Thirman testify yesterday that the

20 dose limiting toxicity was a dose that was above the maximum

21 tolerated dose?

22 A.    I did.

23 Q.    Is that correct?

24 A.    I was a little surprised about that.  I don't think it

25 was correct.

Derendorf - direct

1   Q.    Now, if we look to Figure 2, the study, this chart,

2   can you explain what this is showing, doctor?

3               MS. STAFFORD:  Your Honor, I would just ask if

4   the witness could speak up.  I didn't hear his last answer

5   at all much it's so fast, I couldn't hear it.

6               THE COURT:  All right.  Is that microphone on?

7               THE WITNESS:  I don't even know where it is.

8   Oh, here.  Okay.

9               THE COURT:  His microphone is on.

10              MS. STAFFORD:  I don't know.  I couldn't hear.

11              THE WITNESS:  I will be happy to repeat.  Okay.

12  Is this better?  Can you hear me?

13              THE COURT:  Yes, that's good.

14              THE WITNESS:  Okay.

15              MS. STAFFORD:  Yes.

16              THE WITNESS:  Okay.

17  BY MR. HARBER:

18  Q.    So for Figure 2, can you explain what's being

19  disclosed here?

20  A.    Yes.  These are the different doses that were

21  administered for the two regimens.  On the left you have a

22  four-day regimen, which was a dose was given every day for

23  four days, four consecutive days, and on the right, it was

24  just a single dose.  So one single dose was administered.

25              The toxicity grade based on the original

Derendorf - direct

1    definition and the increase in doses on the X axis.  And as

2    you see, although there's a lot of variability overall as

3    you would expect as you increase the dose, the toxicities

4    goes up and the MTD's are identified for the four-day

5    administration.  85 per mg meter squared, that is per day,

6    so the total dose times four would be 340 meters squared.

7    For the single dose, it's 215.

8    Q.    Why is the maximum tolerated dose different for those

9    different schedules?

10   A.    Because the maximum tolerated dose depends on the

11   dosing regimen that's administered.

12   Q.    And would the person of ordinary skill in the art have

13   known anything about the administration of bendamustine over

14   two days based on these data?

15   A.    No.

16              MS. STAFFORD:  Objection.  Your Honor, that's

17   not in the report.

18              MR. HARBER:  Paragraph 75 and 76.

19              THE COURT:  All right.  A copy of the report,

20   please.

21              (Mr. Harber handed a notebook to the Court.)

22              MS. STAFFORD:  Your Honor, I don't see what

23   these paragraphs teach about.

24              THE COURT:  Mr. Harber, I don't see it.

25              MR. HARBER:  I believe what this paragraph is

Derendorf - direct

1  saying is a person of ordinary skill in the art takes the

2  Treanda label which takes a two-day schedule and says you

3  wouldn't know that is safe based on these data, which is to

4  say it doesn't provide --

5         THE COURT:  We're going to end up telling the

6  witness what to say.

7         MR. HARBER:  Sorry.

8         THE COURT:  Do you want to really pursue this?

9  I will have to have a sidebar.  I don't see it.

10         MR. HARBER:  I can rephrase the question.

11         THE COURT:  All right.  I'm going to sustain the

12  objection.  Go ahead.

13  BY MR. HARBER:

14  Q.   Dr. Derendorf, would the administration schedule

15  that is in the Treanda label have -- would a person of

16  ordinary skill in the art have understood that the

17  administration schedule in the Treanda label was safe based

18  on these data?

19  A.   No.  The administration schedule in the Treanda label

20  was not studied.

21  Q.   And what is that schedule?

22  A.   It's two consecutive days.

23  Q.   And how many cycles of treatment were given in Preiss

24  1998?

25  A.   Just one.

1    Q.    And is the number of cycles of treatment relevant to

2    the maximum tolerated dose?

3    A.    I would think so.

4    Q.    Would the person of ordinary skill in the art have

5    been able to conclude anything about the safety of the

6    infusion in Preiss when given on multiple cycles based on

7    the data in the study?

8              MS. STAFFORD:  Objection.  Think that's outside

9    the scope of his report as well.

10             MR. HARBER:  Paragraph 181.

11             MS. STAFFORD:  What was the question again?

12   Make sure I have it.

13             MR. HARBER:  I believe it was, would the person

14   of ordinary skill in the art be able to conclude anything

15   about the safety of the infusion in Preiss when given in

16   multiple cycles based on these data.

17             THE COURT:  Okay.  Let's go to sidebar.

18             (Sidebar conference held as follows.)

19             THE COURT:  All right.  Let's try to keep your

20   voices low.

21             So I don't see in the paragraph.  However, the

22   question seems to me is perfectly consistent with a number

23   of questions that have been put to this witness, and I have

24   to confess, I am confused about something, and I'm going to

25   give you both a chance to address my confusion as opposed to

Derendorf - direct

1    having me scour the record and try to figure it out.

2              So I understand this witness is testifying that

3    these pharmacokinetics studies cannot be relied upon for any

4    conclusion regarding safety.

5              MR. HARBER:  Not necessarily a conclusion, but

6    that you wouldn't -- in light of I think the rest of the

7    testimony is going to show in light of what was available in

8    2012, you wouldn't go back.

9              MS. STAFFORD:  I think we would disagree.

10             THE COURT:  They disagree.

11             MS. STAFFORD:  By this time he had been using it

12   in Germany for 20 years.  They are German authors.  They be

13   had been approved.  They had a lot more information.

14             THE COURT:  Okay.

15             MS. STAFFORD:  It's not the average PK study at

16   the very outset and you don't have an approved drug that has

17   ever been given to humans.  That's why it does relate to

18   safety.

19             THE COURT:  I guess my point is that the

20   witness, as far as I understood his testimony, has already

21   testified that PK studies are not studies from which POSA's

22   should draw conclusions about safety.

23             MS. STAFFORD:  That's just in general.  That's

24   not in the contexts the of Preiss and not in the context --

25   you typically don't do that in the context of a drug that

1    has already been approved for 20 years.

2              THE COURT:  Okay.  Do you dispute the notion

3    then that just, that in general, PK studies are not relied

4    upon for safety?

5              THE WITNESS:  I disagree with that.

6              THE COURT:  You do disagree with that?

7              MS. STAFFORD:  I do.  I think I do disagree with

8    that in general.

9              THE COURT:  Okay.

10             MR. HARBER:  Can I, Your Honor?

11             THE COURT:  So your question, it seems to me,

12   it's almost a follow-up.  I thought his answer to any

13   questions was going to be, I'm not going to rely on this for

14   safety, period, because as I've already expressed.  Isn't

15   that the point of your question?

16             MR. HARBER:  Right.  There's an additional

17   point.  I believe it's disclosed right here.  The person of

18   ordinary skill in the art would not have understood that

19   bendamustine was --

20             MS. STAFFORD:  Where is that?

21             MR. HARBER:  In the repeated cycles.  A POSA

22   would not have understood Preiss to disclose that

23   bendamustine did not have unwanted toxicity as it was

24   administered in practice.  That's exactly what I asked

25   him.

Derendorf - direct

1        MS. STAFFORD:  I don't think that was it.

2        THE COURT:  Well, I do think that.  It's close,

3   that's for sure.  KI am going to allow the question.  I'm

4   just going to allow the question.

5        (End of sidebar conference.)

6   BY MR. HARBER:

7   Q.    I will re-ask my question, Dr. Derendorf.  Would the

8   person of ordinary skill in the art have been able to

9   conclude anything about the safety of the infusion in Preiss

10  when given in multiple cycles?

11  A.    That was not studied, no.

12  Q.    And let's look at the asserted claims of the '568

13  patent.  Can you explain what is being shown here?

14  A.    Yes.  They are two different regimens that are claimed

15  for two different indications.  It's dosing on days 1 and 2

16  of a 21-day cycle, and for CLL, it's again on days 1 and 2

17  of a 28-day cycle.

18  Q.    And so the claims here, claim 18 discloses a method of

19  administering bendamustine to treat indolent B cell

20  non-Hodgkin's lymphoma, and claim 11 is a method of claim 1

21  where bendamustine is administered to treat chronic

22  lymphocytic leukemia.

23        At the priority date, would the person of

24  ordinary skill in the art have known the number of cycles

25  and doses used to treat these diseases?

1    A.    No.

2    Q.    Would they have known the, in clinical practice, the

3    number of cycles?

4    A.    Yes, yes, I'm sorry.  I misunderstood your question.

5    Q.    Where was that disclosed?

6    A.    In the Treanda label.

7    Q.    Let's take a look at DTX-848, which is the Treanda

8    label.  Can you explain what's shown here, Doctor?

9    A.    Yes.  That is the dosing recommendation in the Treanda

10   label for the same two indications that we just looked at.

11   And these are the same days, day 1 and 2 of the 28 and

12   21-day cycle.  But, of course, the infusion times are

13   different, 30 minutes and 60 minutes.

14   Q.    And if you can look back, you can look back to the

15   '568 patent claims we were looking at a moment ago.  Is

16   Preiss 1998 directed to treating either CLL or NHL?

17   A.    No.

18   Q.    Does Preiss 1998, does it disclose any information

19   about two-day administration?

20   A.    No.

21   Q.    Does Preiss 1998 disclose any information about

22   repeated cycles of bendamustine?

23            MS. STAFFORD:  Objection, Your Honor.  Leading.

24            THE COURT:  I'm sorry?

25            MS. STAFFORD:  Objection, leading.  Giving

1   leeway.

2                  THE COURT:  I don't know how else you could ask

3   this question.  Overruled.  I mean, he has --

4                  MS. STAFFORD:  You can ask him what Preiss

5   teaches about the dosing regimens.

6                  THE COURT:  If the answer is going to be yes,

7   I'm not going to let him lead.  Just tell us what it is.

8   Overruled.

9   BY MR. HARBER:

10  Q.    Does Preiss 1998 disclose any information about

11  bendamustine used in repeated cycles?

12  A.    No.

13  Q.    Let's look back at page 1640 of Preiss 1998.

14                 I believe Dr. Thirman relied yesterday, and

15  perhaps Dr. Yates as well, on the observation here that only

16  mild toxicity even at high doses was observed in the Preiss

17  1998 study.

18                 Would the person of ordinary skill in the art at

19  the priority date have believed that the three to ten minute

20  infusion of bendamustine used in Preiss 1998 was safe to

21  treat cancer using the schedules in the claims?

22  A.    No.

23  Q.    Why not?

24  A.    Well, again, this was -- the information given was not

25  sufficient that one would conclude that, that general

1   statement.

2   Q.    Now, the research, the two papers we've looked at,

3   Preiss 1985 and Preiss 1998, how was that research funded,

4   Doctor?

5   A.    Well, the original development came out of East

6   Germany and was actually a government funded research and

7   was one of the few drugs that came out of East Germany that

8   they were very proud of.  After the reunification, West

9   German company, Ribosepharm, got the rights and developed

10  that product.

11  Q.    And so what were the relationship of these two papers

12  to the old East German company, which I believe was

13  Jenapharm?

14  A.    Right.

15  Q.    What was the relationship of these two papers?

16  A.    These were funded and reported by Ribosepharm.  Some

17  of the authors, also the employees of Ribosepharm.

18  Q.    And did Ribosepharm after these two references fund

19  additional research relating to the drug?

20  A.    Yes.

21  Q.    And I realize this is timely given what Your Honor,

22  has requested, but with permission to approach, Your Honor,

23  I would like to start a timeline?

24          THE COURT:  All right.  And, by the way, this

25  timeline is going to be helpful, I think.  I find timelines

Derendorf - direct

1    very helpful.

2              Let me be very specific what I'm envisioning for

3    the submission next week.  Basically a chart, two columns.

4    Okay.  I'm looking at it.  The left column, just the dates.

5    You get the 30 days.  Then you get a box for each date on

6    the right and you fill in the event.  So it will be, you

7    know, June 1st, 2000 whatever, publication of blank.  It

8    will be something like that.  All right?  Thank you.  Go

9    ahead.

10   BY MR. HARBER:

11   Q.    So, Doctor, the first study you testified about Preiss

12   1985, what year was that?

13   A.    That was --

14   Q.    Trying not to be leading.

15   A.    It was 1985.

16   Q.    And what was the --

17   A.    The second --

18   Q.    The duration.  Sorry.  What was the duration of the

19   infusion in that study?

20   A.    It was three minutes.

21   Q.    And the second paper that you talked about, what was

22   the year of that publication?

23   A.    That was 1998.

24   Q.    And what the duration of that?

25   A.    Three to ten minutes.

Derendorf - direct

1   Q.    Let's take a look at DTX-987.  This is the Schoffski

2   2000a reference that was discussed by Dr. Thirman yesterday.

3              What is this study, Doctor?

4   A.    Yes.  This is another investigation of the repeated

5   administration of short infusion bendamustine from

6   investigators from the University of Hanover, but also

7   applied contribution from Ribosepharm and another co-author

8   from the company.

9   Q.    And Dr. Merkle who is highlighted here from

10  Ribosepharm, was he also an author on the Preiss 1998?

11  A.    He was, yes.

12  Q.    And the title here refers to administrations of short

13  infusions of bendamustine.  What is that referring to?

14  A.    Thirty-minute infusion.

15  Q.    And why do the authors call 30 minutes a short

16  infusion?

17  A.    That word is used for all kinds of durations, so you

18  have to always look what they mean.  In this case, they

19  meant 30 minutes.  They considered that short.  I guess they

20  would think that is the shortest you can go.

21  Q.    And let's go to page 45.  Now, Dr. Thirman testified

22  about this sentence yesterday:  In accordance with the

23  three-minute single IV infusion data, our 30-minute infusion

24  schedule also resulted in dose limiting dryness of mouth and

25  fatigue, and we also found a case of cardiac toxicity.

1    I believe that Dr. Thirman testified that this

2    sentence was disclosing that the safety data in this

3    Schoffski 2000a paper were consistent with the safety data

4    in the earlier Preiss 1998 study.

5        Do you agree with that?

6    A.    No.   I think it's -- I have a different read of the

7    word accordance.   What it does say is that there were some

8    side effects that were observed in both studies, that is

9    correct, but it doesn't mean that all of the side effects of

10   the first study were also the side effects in this study.

11   So that's a very different interpretation.

12   Q.    Is this sentence comparing the overall toxicity

13   profile for the three-minute and 30-minute infusions?

14   A.    No.   Again, it points out there were some that were in

15   both studies.

16   Q.    Is it comparing the overall quantity of side effects

17   in the Preiss study and this one?

18   A.    No.

19   Q.    Is it comparing the severity of side effects overall

20   in the Preiss study and this one?

21   A.    No.

22   Q.    Now, there's another paper by Schoffski in 2000,

23   Schoffski 2000b, which is DTX-988.

24        Doctor, what is this study?

25   A.    Yes.   This is another study looking at dosing regimens

Derendorf - direct

1    of bendamustine by the same author, Schoffski.

2    Q.    And you've highlighted here Dr. Merkle on this?

3    A.    Yes.

4    Q.    Ribosepharm.  He's also an author?

5    A.    Yes.

6    Q.    What administration protocol is used in this study?

7    A.    Again, 30 minutes were administered in this study.

8    Q.    And, again, let's turn to page 733 of this study.

9    There's a similar sentence at the top:  In accordance with

10   our previous Phase 1 data, the weekly 30-minute infusion of

11   BM in our current trial was associated with

12   non-hematological DLT, such as mouth dryness and fatigue,

13   and we also documented some sporadic evidence of cardiac

14   toxicity at recommended dose.

15              Do you see that?

16   A.    Yes.  And that I think is the same language as in the

17   previous reference and the word accordance with used.  But I

18   think it's even clearer here, that it was not meant that the

19   complete side effect catalogue of the two studies in

20   agreement, because if you go to the, to the last sentence of

21   that paragraph, it clearly points out there were some side

22   effects that were missing where you give the drug as a

23   30-minute infusion.

24   Q.    What would the person of ordinary skill in the art

25   have concluded about the safe administration protocol for

Derendorf - direct

1    bendamustine as the priority date based on this disclosure

2    in Schoffski 2000b?

3    A.     That it would be safer to give it over 30 minutes.

4    Q.     Why?

5    A.     Well, it says so.  That you would not observe

6    confusion or other signs of neurotoxicity.

7    Q.     And would the person of ordinary skill in the art have

8    been motivated to give an infusion of bendamustine in a

9    shorter period than 30 minutes at the priority date based on

10   this disclosure?

11   A.     No.

12              MR. HARBER:  Your Honor, may I approach the

13   timeline again then?

14              THE COURT:  Yes.

15   BY MR. HARBER:

16   Q.     So these papers are both from 2000; is that correct?

17   A.     Yes.

18   Q.     And what was the infusion duration that was used for

19   bendamustine during those studies?

20   A.     Thirty minutes.  Thirty minutes.

21   Q.     Now, are you aware of any other studies by the Preiss

22   authors in addition to the ones we've already looked at?

23   A.     Yes.

24   Q.     Let's look at PTX-268.  What is this document, Doctor?

25   What is this document?

Derendorf - direct

```
 1   A.      This is a poster that was presented at a conference

 2   looking at, again, bendamustine dosing in patients with

 3   renal disease.

 4   Q.      And what is the --

 5              MS. STAFFORD:  Your Honor, I think we may have

 6   an objection to this.  This was not in the disclosures.  I'm

 7   not sure he reviewed this.

 8              MR. HARBER:  We switched.

 9              MS. BAUMGARTEN:  I was on the meet and confer.

10   We met and conferred.  They objected to one of our exhibits

11   that had the exact same substance as this document, so we

12   agreed to substitute in this version of the document instead

13   of the abstract containing the exact same information

14   because that was actually what he cited in his expert

15   report.  So it was a compromise between the parties is why

16   he's using this document.

17              MR. HARBER:  We changed.

18              MS. STAFFORD:  Okay.

19              THE COURT:  So the objection is withdrawn.  A

20   lot of lawyers.  It's understandable.  So, all right.

21              MS. BAUMGARTEN:  That's why I had to explain.

22   BY MR. HARBER:

23   Q.      What is the date of this poster, Doctor?

24   A.      2012, I believe.  I think.  I can't read it.

25   Q.      This was the 2003?
```

1   A.   2003.  Yes, I'm sorry.

2   Q.   And the -- let's look at the administration protocol

3   that's used in this study.  What is it?

4   A.   Yes.  It was 120 milligrams per meter squared to days

5   1 and 2 of the four weekly interval over 30 minutes.

6   Q.   What would a person of ordinary skill in the art

7   take from the fact that the Preiss authors did not use the

8   three to ten-minute infusions that were in their earlier

9   studies?

10  A.   They were the only ones where there was a record of

11  having given the shorter infusion and they now used

12  30 minutes, so I would conclude that they have understood,

13  or agreed that that would be the safer way to administer the

14  drug.

15  Q.   I will add this to the timeline now.

16  A.   2003.

17  Q.   Now, we've been talking about a series of studies by

18  Ribosepharm and research associate with Ribosepharm.  Did

19  Ribosepharm have a product that was the on market before the

20  priority date?

21  A.   They did.

22  Q.   Let's look at DTX-982.  What is this document?

23  A.   This is the product monograph of this compound,

24  ribomustin that was on the market.

25  Q.   And what is -- is a product monograph the same as a

Derendorf - direct

1    label?

2    A.    It's sort of.  Mm-hmm.

3    Q.    And what is the date of this document?

4    A.    I think 2005, maybe.

5              MR. HARBER:  Can you blow it up?

6              THE WITNESS:  Yes.  There it is.  2005.

7    BY MR. HARBER:

8    Q.    And let's look at Section 2.6 on page 9 of the label.

9              First, let me ask you about this label.  What is

10   the relationship between the product and company in this

11   label and the research that we've been looking at?

12   A.    These are the same scientists that are involved in

13   developing the product and publishing these papers.

14   Q.    What is the recommended protocol in the Ribomustin

15   label?

16   A.    30 to 60 minutes.

17   Q.    In what volume of fluid?

18   A.    500 milliliters.

19   Q.    The previous studies we looked at, some of them relate

20   to neurotoxicity and other side effect.

21             Does this label provide other reason to use the

22   30 to 60-minute infusion?

23   A.    Yes, it does.

24   Q.    Let's look at page 62.  So this is Section 7.8.

25   A.    We mentioned earlier we had systemic.  It would be a

Derendorf - direct

1   good example of the systemic toxicity.  Here in the label

2   now, they bring into discussion the local irritation and

3   state that this occasionally, especially after intravenous

4   bolus injection can occur for this drug, bendamustine.

5   However, if you reduce the, you know, we can reduce these

6   effects by administering the drug over longer infusion time,

7   30 to 60 minutes.

8           MR. HARBER:  Can I add this to the timeline?

9           THE COURT:  Sure.  You don't have to ask me.

10  BY MR. HARBER:

11  Q.    So we're in 2005 now?

12  A.    30 to 60.

13  Q.    Dr. Derendorf, looking at Preiss 1985 and Preiss 1998

14  in context, what conclusion would the person of ordinary

15  skill in the art reach about the acceptable infusion time

16  for bendamustine at the priority date here in 2012?

17  A.    Yes.  Well, these disclosures and recommendations

18  reflect the thinking of the team that was developing the

19  compound, and clearly, with time, the recommendations are

20  longer and longer infusion times, completely consistent

21  about what we stated about the expected safety profile.

22  Q.    Would the person of ordinary skill in the art have

23  thought at the priority date in 2012 that the

24  administration, duration used in the two early Preiss PK

25  studies were safe administration infusions for treatment of

1    cancer in view of all the other publications that were

2    available by then?

3    A.    No.  And, again, this is -- we looked at later Preiss

4    disclosures from the same author and it's the same thing.

5    They changed their mind.  Well, actually, Preiss never,

6    never stated that it was a recommended infusion time for any

7    patient.

8    Q.    So I want to turn back to the ribomustin label that's

9    on the screen here.

10          The portions that we're looking at, you talked

11   about this before.  Local irritations and thrombophlebitis

12   occur occasionally, especially after intravenous bolus

13   injection.  These side effects can be reduced by

14   administering bendamustine over 30 to 60 minutes.

15          Does the Ribomustin data provide any information

16   for thrombophlebitis and phlebitis?

17   A.    Yes.

18   Q.    Let's look at the statement.  I believe it's on 21.

19   What's being shown here, Doctor?

20   A.    Yes.  This is a table that goes back to publication by

21   Ruffert, who looked at a number of different toxicities, and

22   lists them here in -- and their severity in terms of the WHO

23   grades, and rather than just the last row, the phlebitis,

24   which was reported in 35.4 percent of these patients.

25   Q.    And how would a person of ordinary skill in the art

1    have understood that this observation the from Ruffert data

2    related to the recommendation in Section 7.8 of the label?

3    A.    The section 7.8 describes this, that these local

4    irritations and thrombophlebitis occurs especially after

5    intravenous bolus injection and said they can be reduced by

6    giving the drug over 30 to 60 minutes.

7    Q.    Now, does the Ribomustin label say anything about

8    Vincristine when delivering the results?

9    A.    No.  The study that this comes from administered a mix

10   of three compounds.  That's not in that table.

11   Q.    And we'll talk about that in a minute.

12   A.    Yes.

13   Q.    But does the ribomustin label say that this

14   thrombophlebitis and phlebitis in Ruffert is only observed

15   or only relevant in the presence of Vincristine?

16   A.    No.

17   Q.    Does Section 7.8 about local irritations say anything

18   about Vincristine at all?

19   A.    It does not.

20   Q.    Now, let's look at the Ruffert reference that Dr.

21   Thirman talked about yesterday.

22   A.    Mm-hmm.

23   Q.    PTX-260.  Can you please explain what is being studied

24   in this paper, Dr. Derendorf?

25   A.    Yes.  This is the study that is the source of the

1   table that we just looked at in the label.  It is a study

2   that has looked at the usefulness and dosing of

3   bendamustine, as it says in the title, when it replaces

4   cyclophosphamide in the COP treatment scheme.

5              And it states clearly what the purpose was of

6   the study.  If you go down to the third point there to find

7   out which type and the quantity of side effects with

8   Cytostasan.  Cytostasan is the trade name of bendamustine.

9   So that is the purpose of the study, to look at bendamustine

10  effects.

11  Q.    Now, let's look at Table 2 from the Ruffert reference.

12  And this is another table that Dr. Thirman discussed

13  yesterday.

14             Now, I believe Judge Connolly asked us

15  yesterday, but you notice here that it lists short-term

16  infusion for bendamustine, which is Cytostasan, and lists IV

17  for Vincristine and Prednisolone.

18             Can you explain what a person of ordinary skill

19  in the art would understand this to be?

20  A.    This is a little confusing table.  The differences in

21  Vincristine and prednisolone were given in bolus

22  administration.

23             THE COURT:  I'm sorry.  You spoke --

24             THE WITNESS:  I'm sorry.  They were given as IV

25  bolus administration, so they were given over a very short

Derendorf - direct

1  time whereas the bendamustine was given over one hour, which

2  they call here short-term.

3          Again, this is another use of short, 60 minutes

4  here, but that is clearly spelled out that it was given over

5  one hour.  And it was given on days 1 to 5.

6          What is not stated in the table unfortunately,

7  but if you read the context of the paper, is that

8  bendamustine also was given in a bolus in that study.  It

9  becomes clearer when you read the results, but that's not

10  listed in the table.

11  BY MR. HARBER:

12  Q.   Let me ask you a second time.  Is bendamustine --

13  bendamustine is listed here as the short-term infusion.  Is

14  there any other drug in the study that's described as being

15  delivered as a short-term infusion?

16  A.   No.

17  Q.   And I believe you just said this.  Even though it's

18  not listed here, would the person of ordinary skill in the

19  art have understood based on this reference that

20  bendamustine was delivered another way in the study as

21  well?

22  A.   Well, not on the basis of this table, but if you read

23  the whole reference, then you would understand that, yes.

24  Q.   And let's take a look --

25          MS. STAFFORD:  Objection.  Where is that in his

Derendorf - direct

1    report?

2                THE COURT:  Actually, here is the thing.  As

3    long as the article is in the report and he has discussed

4    the table, I'm going to allow him to talk about this.

5                MS. STAFFORD:  I am not objecting about him

6    talking about the table, but I'm not sure it's in his report

7    that he said bendamustine is also given as a bolus.

8                THE COURT:  That's a different question.

9                MS. STAFFORD:  Exactly.

10               THE COURT:  But here what it is.  I prompted

11   this because I asked the question because I didn't

12   understand why the table, and this is in response to

13   something Dr. Thirman testified.

14               So just because we're at least in part a truth

15   seeking body, I'm going to allow --

16               THE COURT:  Your Honor, I will withdraw the

17   objection.  I did not realize there was a meet and confer on

18   this issue allowing the scope of his report.

19               THE COURT:  All right.

20               MS. STAFFORD:  I will withdraw that.

21               THE COURT:  And Dr. Thirman is going to come

22   back.  He can testify about it, too.

23               MS. STAFFORD:  Exactly, Your Honor.

24               THE COURT:  Okay.

25               MR. HARBER:  I'm not sure I remember what the

1    last question was.

2              THE COURT:   He was going to talk about the fact

3    in another part of the article it talks about different

4    types.

5              MR. HARBER:   That's right.   Can we go to the

6    next page, please.

7    BY MR. HARBER:

8    Q.   Dr. Derendorf, can you walk us through what's shown

9    here?

10   A.   Yes.   Well, let's look at Table 7.   And in that table

11   seven, under phlebitis, there are -- can you blow this up a

12   little?   Actually, I can see it.

13             There are five patients with double asterisks

14   where they experience some phlebitis and it says after IV

15   bolus.   Okay.

16             So can we now go back to the previous -- yes,

17   okay.

18             So table 7 it says in the text on the bottom is

19   a side effect of Cytostasan, which is bendamustine therapy,

20   as shown in table 7.   So that clearly says Table 7 refers to

21   bendamustine.   So there are patients in there that after a

22   bolus administration have thrombophlebitis.

23             And then further it says, the relatively high

24   percentage of cases of phlebitis after intravenous bolus

25   injection is problematic and which are much less frequently

1    observed when using short-term infusions.

2             So this implies that if you switch from a bolus

3    to a short-term infusion, there is a change in the incidence

4    of phlebitis.  All of this in a paragraph that starts

5    talking about the side effects of bendamustine.

6             So we're talking about, or they are talking

7    about bendamustine here much there's no other way to

8    interpret this.  And that also then implies that

9    bendamustine was given as an intravenous bolus injection.

10   That's my read of it.

11   Q.    And is there any corroboration before the priority

12   date that corroborates that read, Doctor?

13   A.    Yes.  The label we just looked at sees it the same

14   way.  The general label, the Ribomustin label.

15   Q.    Let's just look at the Ribomustin label.  Doctor, is

16   the table that's reported here on the Ribomustin label, is

17   that table from Ruffert?

18   A.    Yes.  These are the same numbers.

19   Q.    What would the person of ordinary skill in the art

20   have understood about what drug a person of -- the side

21   effects would be attributed to based on the reproduction of

22   this table in the Ribomustin label?

23   A.    Well, we just look at the original paper, and it says

24   Table 7 shows the side effects of bendamustine, so that's

25   clearly spelled out in the paper.

Derendorf - direct

1   Q.      What about the fact that it's reproduced in the label?

2   Does that corroborate?

3   A.      Well, that's just, that doesn't change, doesn't change

4   the numbers or the fact.

5   Q.      And how does the conclusion in Section 7.8 about local

6   irritations, how does that conclusion relate to the

7   conclusion that we just looked at in the Ruffert reference?

8   A.      It's exactly the same conclusion, and, again, in that

9   paragraph that reports the side effect of bendamustine,

10  that's the title of the paragraph.  There's no word about

11  Vincristine or Prednisolone.  In that paragraph it says if

12  you switch from an IV bolus to a short-term infusion, these

13  side effect frequency changes.  So that's the only way to,

14  to read it.

15  Q.      What does the Ribomustin label instruct to be done

16  with bendamustine infusion duration as a result of the

17  information reported in Ruffert?

18  A.      To go to 30 to 60 minutes to reduce the side effects.

19  Q.      And what conclusion would the person of ordinary skill

20  in the art have drawn from the Ruffert data in the

21  Ribomustin label before the priority date?

22  A.      Would mean longer infusion times.

23  Q.      Would the person of ordinary skill in the art have

24  been motivated to use a ten-minute infusion of bendamustine

25  based on the statements we just looked at in Ruffert and the

Derendorf - direct

1   Ribomustin label?

2   A.     No.

3   Q.     Why not?

4   A.     Well, it would be not safe.

5   Q.     Now, Doctor, did you review other references that are

6   relevant in your view to whether a person of ordinary skill

7   in the art would have had had a motivation to practice the

8   claimed administration protocol at the priority date?

9   A.     Yes.

10  Q.     Let's take a look at the Owen reference, DTX-1001.

11  What is this paper, Doctor?

12  A.     Yes.  This is a data analysis where this group, Dr.

13  Owen looked at the pharmacokinetics, the drug concentrations

14  that were measured in a clinical trial, and tried to

15  correlate with both efficacy and safety.  So a

16  pharmacokinetics, pharmacodynamic model approach.

17  Q.     And let's look at page 1046 of the reference.  Can you

18  explain what's being described here?

19  A.     Yes.  He looked at the number of efficacy and safety

20  parameters and found that nausea would, the likelihood or

21  incidence of nausea correlated statistically significantly

22  with the Cmax, and that was in spite of the fact that in the

23  study, antiemetics were given.

24        Antiemetics are drugs that prevent you from

25  getting nauseous, and all of these drugs were administered

Derendorf - direct

1   still.   It was possible to show that there was a correlation

2   between Cmax and nausea.

3   Q.     And if we can look to page 1047, which is the next

4   page of the article.

5          Can you explain what's being discussed here?

6   A.     Yes.   So in the previous slide, what was established

7   again was a statistically significant correlation showing

8   that as Cmax goes up, the likelihood of nausea goes up.

9          When Dr. Owen had established that, then he

10  tried to dig a little deeper and see if he could come up

11  with a quantitatively relationship that would allow him to

12  make a more specific prediction.   When he had a certain Cmax

13  value, what is the likelihood of nausea.   And for that you

14  do mathematical modeling, and he did that and was

15  successful.

16         And in an example here he states, for a patient

17  with a Cmax of value of five milliliter, the probability of

18  nausea is 68 percent.   When the Cmax goes up top 6.56, then

19  it is 81 percent.   So these are the kinds of quantitative

20  predictions that these models allows you to make.

21  Q.     And we're looking at here, is this a different

22  observation than the one we looked at in the previous page

23  about the statistically significant relationship between

24  Cmax and nausea?

25  A.     Yes.   That first correlation is completely independent

1    from this modeling.

2    Q.    And the last sentence in the paragraph here says, the

3    area under the receiver-operator characteristic (ROC) curve

4    was 0.63, indicating an adequate fitting and marginally

5    predictive model.

6              What would the person of ordinary skill the in

7    art understand from that?

8    A.    This is not a perfect model.  There's a lot of noise

9    in the data.  And so .63, to give you a reference, if you

10   have a number of .5, that would mean you wouldn't have any

11   correlation.  If you have 1, it would be perfect.

12             So .63, he calls it adequate but it's marginal

13   predictive.  So it's not perfect.

14   Q.    And does this sentence, that observation apply to the

15   report on the previous page about the statistically

16   significant relationship between Cmax and nausea?

17   A.    No.  That had .013.  That's highly significant.

18   Q.    And based on what's reported in Owen, would the

19   person of ordinary skill in the art at the priority date

20   have been motivated to infuse bendamustine in ten minutes or

21   less?

22   A.    No.

23   Q.    Why?

24   A.    Well, because they were worried about increased

25   incidence of nausea.

Derendorf - direct

1    Q.    Would that be true even in the presence of antinausea

2    medication?

3    A.    Well, that's the way it was studied, so, yes.

4    Q.    Now, are the findings that Owen reported found

5    anywhere else before the priority date?

6    A.    Yes.

7    Q.    And let's look at the Treanda label, DTX-848.

8          Doctor, can you explain what's shown here?

9    A.    Yes.   In 12.4, pharmacokinetics, pharmacodynamics,

10   there's a statement that refers to the Owen analysis.   A

11   correlation was observed between nausea and bendamustine

12   Cmax.

13   Q.    Would a person of ordinary skill in the art have

14   understood the statement we're looking at here in 12.4

15   referring to the Owen report?

16   A.    Yes.

17   Q.    What was the significance of the fact that the Owen

18   finding was reported in the label for bendamustine before

19   the priority date?

20   A.    Well, it would have been reviewed by FDA and they

21   thought it was appropriate to put it in the label.

22   Q.    Now, one of the other references that Dr. Thirman and

23   Dr. Yates talked about yesterday is a reference by Barth and

24   I want to ask you some questions about that.   This is

25   DTX-1004.

Derendorf - direct

1     Now, can you explain what this document is,

2  doctor?

3  A.   Yes.   This is a German oncology pharmacy journal, and

4  this reference is, it's really an editorial and a review by

5  Dr. Barth.

6  Q.   Okay.   And let's look at the portion now that

7  defendants' experts testified about yesterday.

8     Now, first, I want to ask you about this.   You

9  heard Dr. Thirman, I believe, say that in Germany, the

10  practice was to infuse bendamustine in a smaller volume than

11  500 milliliters.

12     Would a person of ordinary skill in the art have

13  understood that that is what Barth is saying?

14  A.   No.   Barth -- first of all, this is not a study.   This

15  is a recommendation well, theoretical recommendation, and

16  you see the words can be, so he didn't do this.   He didn't

17  try this.   He's just thinking out loud, that maybe one could

18  try that or do that.   And then goes through these volumes

19  that would result and discusses those.

20  Q.   And can we go back to the first call-out and let's

21  look at the bottom.   If you can blow up the bottom box.

22  A.   Yes.

23  Q.   The whole box, please.

24     THE COURT:   What page is that from, the can be

25  reduced?

1159

Derendorf - direct

1    MR. HARBER:   Page 5 the page then is 8047.   And

2    it's the bottom couple paragraphs of the left paragraph.

3    THE COURT:   Okay.   Thank you.

4    BY MR. HARBER:

5    Q.    Now, Dr. Siepmann is going to address the statements

6    in here relating to solubility, Dr. Derendorf, even at the

7    volume Barth suggests for administering, when Barth suggests

8    that the volume can be reduced, what volume is he talking

9    about here?

10   A.    Yes.   He goes through actually a calculation for a

11   patient with a two-meter squared.   The surface area.   That

12   would result in 36 milliliters of the drug solution that

13   then would be added to an infusion bag and then the smallest

14   bag size would be a hundred, where that would fit, so that

15   would, the end result will be a total volume of

16   136 milliliters.

17   Q.    Does Barth tell you it can be reduced beyond that?

18   A.    No.

19   Q.    If we go back, can we look at the top box again?

20        Doctor, even in suggesting that the volume for

21   bendamustine can be reduced, does Barth suggest that the

22   infusion time can be reduced?

23   A.    He does not at all.   Only he mentions the 30-minute

24   infusion time.

25   Q.    So what would the person of ordinary skill in the art

Derendorf - direct

1    have taken from this at the prior art data?

2    A.    He's thinking maybe one could reduce the volume but

3    he's not questioning the infusion time.

4    Q.    And if you go back to the middle section.  It says, it

5    is unclear why the American prescribing information

6    specifies 500 milliliters of .9 percent NaCl or a final

7    concentration of 0.2 to 0.6 milligrams per millimeter is

8    unclear.

9              Doctor, would the person of ordinary skill in

10   the art at the priority date have been unclear why the

11   American prescribing information recommended that

12   concentration?

13   A.    No.  There's a good reason for that.

14   Q.    Let's look at PTX-350.  Let's look at the Treanda

15   label first, DTX-848.  Can you tell us what this section is

16   here, Doctor?

17   A.    Yes.  This is the instruction on how to produce the

18   infusion and it said that the resulting final concentration

19   in the infusion bag should be within .2 to .6 milligrams per

20   milliliter.

21   Q.    Was there publicly available information about why

22   that concentration was determined or how it was determined?

23   A.    Yes.

24   Q.    Let's take a look now at PTX-350.  What is this

25   document?

Derendorf - direct

1   A.    This is the FDA review of Treanda.

2   Q.    And was this available to the public before the

3   priority date?

4   A.    Yes.   The FDA publishes these packages.

5   Q.    And let's look PTX-973.   Can you explain what is shown

6   here?

7   A.    This is a review article on bendamustine and it's an

8   example of, you know, what is reviewed, what is decided.

9   Q.    And was this available before the priority date?

10  A.    Yes.

11  Q.    And to be clear, the footnote 26, the document that is

12  cited here, is that PTX-350?

13  A.    Yes.

14  Q.    Now, if we can put up on the screen the statement we

15  looked at in the Treanda label, which is DTX-848, and page

16  125 and 126 of PTX-350.

17          Can you explain what's being shown in this

18  comparison, Doctor?

19  A.    Yes.

20          MS. STAFFORD:   If he could switch to the exhibit

21  you're looking at.

22          MR. HARBER:   Sorry.   On the left is 848, which

23  is the label, and on the right is PTX-350, which is the

24  Treanda approval packet.

25          MS. STAFFORD:   Okay.

Derendorf - direct

1   MR. HARBER:  Pages 125 and 126.

2   MS. STAFFORD:  125 and 126 on the right?

3   MR. HARBER:  Yes.

4   THE WITNESS:  What was done here was an animal

5   study that looks at the worst case scenario of a

6   perivascular injection.  Of course, the drug is not intended

7   to be injected perivascular, which is not inside the vein,

8   but connects to it, and that could happen and that could

9   cause toxicity.  So they did this in rabbits on purpose and

10  looked at different bendamustine concentrations between .1

11  and 1 milligram per milliliter.

12  Q.   And the top box here, the top chart, what is this

13  showing?

14  A.   This shows the concentrations of bendamustine that

15  were investigated and that was compared on the left, where

16  it says vehicle, so that there's no drug in there.

17  Q.   And what is the bottom box?

18  A.   It also was injected into the arteries, which again

19  was not an intended injection, but to see what happens when

20  you inject these concentrations in the artery.

21  Q.   What were the concentrations that were tested here?

22  A.   .02, .6.

23  Q.   And from these data in PTX-350, what would the person

24  of ordinary skill in the art have understood about the

25  instructed concentration in the Treanda label before the

Derendorf - direct

1    priority date?

2    A.    If you look at, the numbers are the numbers where you

3    had animal events that were reported.  This microscopic,

4    it's the logical investigation.  And you see that when the

5    concentration increased from .2 to .6 then the numbers go up

6    and by one day, even higher.  So that was the source of that

7    point, 2 to .6 maximum concentration recommends that's in

8    the label.  So it's based on that study.

9    Q.    Now, I want to look at two of the asserted claims

10   here.  If we can bring those up.  On the left we have claim

11   22 of the '568 patent.  On the right we have claim 13 of the

12   '399 patent, which are asserted here.

13         What are the -- let's start with claim 13 of the

14   '399 patent.  What is the bendamustine concentration that's

15   claimed here?

16   A.    5.6 milligrams per milliliter.

17   Q.    And what's the bendamustine concentration that's

18   claimed in claim 22 of the '568 patent?

19   A.    2.19 to 5.59 milligrams per millimeter.

20   Q.    How do those concentrations compare to the

21   concentrations that were studied and recommended in the

22   Treanda label and approval packet?

23   A.    They're an order of magnitude higher.

24   Q.    And would the person of ordinary skill in the art have

25   been motivated to use the claimed concentration in claims 13

1   of '399 patent and claim 22 of the '568 patent at the

2   priority date?

3   A.     No.

4   Q.     Why not?

5   A.     Because they're much higher than those that were

6   studied that were associated with undesired events.   That's

7   what happened.

8   Q.     Dr. Derendorf, based on the prior art as a whole at

9   the priority date, would the person of ordinary skill in the

10  art have been motivated to make and use the bendamustine

11  treatment methods in claim 11, 18 and 22 of the '568 patent,

12  claims 13 and 15 of the '399 patent, and claim 13 of the

13  '887 patent?

14  A.     No, not based on the prior art.

15  Q.     Why not?

16  A.     Because it would have -- it was thought that it would

17  be unsafe to do so.

18  Q.     Without the benefit of hindsight, would the person of

19  ordinary skill in the art have thought the claimed method in

20  those patents would have been safe at the priority date?

21  A.     No.

22              MR. HARBER:  Thank you, Doctor.

23              THE COURT:  Do you want to take a break?

24              THE WITNESS:  Whatever you prefer.

25              THE COURT:  I understand we have been going

Derendorf - direct

1    for about two hours.  Do you want to maybe take a little

2    break?

3                    MS. STAFFORD:  A break would be fine.

4                    MR. HARBER:  I don't know how much cross is

5    planned.  It would be nice if we could finish with the

6    witness and go home today.

7                    THE COURT:  I agree, but I'm not going to

8    prejudice the defense.  We'll try.  You can go to, like,

9    6:45.  Is that within, or do you want to just -- do you have

10   a plan, a thought?

11                   MS. STAFFORD:  I would like to finish today.  I

12   just don't know.

13                   THE COURT:  You don't know.  All right.  So do

14   you want seven minutes, eight minutes?

15                   MS. STAFFORD:  Yes.  It would be like to have a

16   five or ten-minute break to go to the restroom.

17                   THE COURT:  We're going to break for ten

18   minutes.  We'll be back in ten minutes.

19                   You may step down.

20                   THE WITNESS:  Thank you.

21                   (Short recess taken.)

22                        -  -  -

23                   (Proceedings resumed after the short recess.)

24                   THE COURT:  All right.  Please be seated.  And

25   the witness may take the stand.

                            Derendorf - cross

1                      MS. STAFFORD:  Your Honor, may I approach and

2       hand up binders?

3                      THE COURT:  Please.

4                      (Ms. Stafford handed binders to the Court and to

5       the witness.)

6                      THE WITNESS:  Thank you.

7                              CROSS-EXAMINATION

8       BY MS. STAFFORD:

9       Q.    Hi, Doctor.

10      A.    Hello.

11      Q.    My name is Nicole Stafford.  I'm here representing

12      Mylan.  We've never met before; right?

13      A.    No.

14      Q.    Now, you're not an M.D., are you?

15      A.    I'm not.

16      Q.    So then you're not an oncologist either?

17      A.    I'm not.

18      Q.    And you've never treated cancer patients?

19      A.    I have not.

20      Q.    And you've never administered bendamustine or any

21      other IV drug, have you?

22      A.    No.

23      Q.    And you've never treated anyone for phlebitis, have

24      you?

25      A.    No.

Derendorf - cross

1   Q.    You've never treated anybody for thrombophlebitis?

2   A.    No.

3   Q.    And you're not a formulator?

4   A.    I am a pharmacist and I have worked very closely with

5   formulators, so I do have some experience in formulation.

6   Q.    But you're not a formulator and you're not providing

7   any opinions on formulation, are you?

8   A.    That's correct.

9   Q.    In fact, in your report, you don't provide any

10  opinions on formulation.  You rely on Dr. Siepmann for

11  that?

12  A.    That is correct.

13  Q.    And you've been holding academic positions since at

14  least 1983; is that correct?

15  A.    Yes.

16  Q.    And prior to forming the opinions provided in your

17  report, you did not read the expert reports of plaintiffs'

18  oncologist, Dr. Agarwal, did you?

19  A.    Prior to?

20  Q.    To forming the opinions that you provided in your

21  report.

22  A.    No.

23  Q.    And you did not speak with Dr. Agarwal in forming the

24  opinions of your report; is that correct?

25  A.    I did not.

Derendorf - cross

1    Q.    And I believe that with respect to the demonstratives,

2    PDX-2-4 and 2-5, you highlight in there the areas that you

3    felt like you were providing expertise relating to

4    pharmacology and pharmaceutical science and

5    pharmacokinetics; is that correct?

6    A.    Pharmacokinetics and pharmacodynamics.

7    Q.    Right.  Now, I would like to turn first to some of

8    your opinions on Ruffert.

9          Do you recall discussing Ruffert?

10   A.    I do.

11         MS. STAFFORD:  Could you please pull up PTX-260.

12   BY MS. STAFFORD:

13   Q.    And could you please refer to PTX-260.  It's the

14   Ruffert article.  I believe you gave the position that you

15   thought that Ruffert discloses using bendamustine by itself

16   as a bolus?

17   A.    No, I did not say that.

18   Q.    So you would agree with me that Ruffert only discloses

19   using bendamustine in combination with Vincristine; is that

20   correct?

21   A.    That would be my read of it, yes.

22   Q.    And if you are giving a drug as part of a combination

23   with two other drugs, you can't be certain as to which of

24   those drugs or that particular combination maybe is uniquely

25   causing any particular side effect, can you?

Derendorf - cross

1    A.    I don't agree.  If you have, if you have two drugs

2    that you administer and you keep one the same and you change

3    the other, and then things change, and then the change is

4    due to the change that you did, not to the one that you kept

5    the same.

6    Q.    Well, Ruffert never -- well, Ruffert says I believe on

7    page TEVANBEND  294653, top right column, 63.  Sorry, 53.

8    Top right column, top paragraph.

9          So Ruffert itself says that the Cytostasan

10   regimen in table 2 was adapted to the COP regimen.

11   A.    Yes.

12   Q.    The COP regimen is a regimen that employed a different

13   chemotherapeutic agent in combination with Prednisolone and

14   Vincristine?

15   A.    Correct.

16   Q.    And if you look at table 2, blow that up, there's only

17   one regimen provided in table 2; is that correct?

18   A.    Yes.

19   Q.    And it refers to Cytostasan as a short-term infusion;

20   is that correct?

21   A.    It did, but I think I've made clear --

22   Q.    And --

23   A.    Can I --

24   Q.    Sure.

25   A.    I made clear that I don't think that table is accurate

1170

Derendorf - cross

1 and accurately describes what was done in that reference.

2 Q.    But table 2 itself only refers to giving Cytostasan as

3 a short-term infusion?

4 A.    That's correct.

5 Q.    Whereas with respect to Vincristine and Prednisolone,

6 it indicates that those are IVs; right?

7 A.    Yes, that's what the table says, but we discussed

8 that.

9 Q.    You're not a doctor, are you?

10 A.    I am a doctor.

11          MR. HARBER:  I'm sorry, Your Honor.  The witness

12 did not finish the answer to his question.

13          THE COURT:  Go ahead.

14          THE WITNESS:  I am a doctor.

15 BY MS. STAFFORD:

16 Q.    You're not a medical doctor?

17 A.    I'm not a medical doctor.

18 Q.    You've never prescribed Vincristine, have you?

19 A.    No.

20 Q.    Based on your experience, you know that Vincristine is

21 a notorious vesicant?

22 A.    I know that.

23 Q.    And a vesicant would cause phlebitis?

24 A.    It could.

25 Q.    For the COP regimen, the chemotherapeutic agent is

Derendorf - cross

1    cyclophosphamide?

2    A.    Yes.

3    Q.    And so in Ruffert they're making an analogy or they're

4    providing a regimen where they're substituting in

5    bendamustine for cyclophosphamide in the regimen that

6    they're proposing; is that correct?

7    A.    Yes, that is correct.

8    Q.    Now, I would like you to turn to the ribomustin label,

9    DTX-982.  And I believe you testified about a couple of

10   different pages on this, but I'd like you to turn to --

11   let's see.  Let's turn to Section 6, DTX-982-02, page 20 of

12   the DTX number.

13              THE COURT:  So I think that's not in the cross

14   exam book, but it is in the direct.

15              MS. STAFFORD:  It's in the direct exam.

16              THE WITNESS:  I don't have it either.

17              MS. STAFFORD:  Starved it's in the direct

18   examination.  It should be up there.  DTX-982.  It may be in

19   the cross-exam.

20              THE COURT:  No, it's not.

21              THE WITNESS:  Okay.  I think I've got it.

22   BY MS. STAFFORD:

23   Q.    Are you there, sir?

24   A.    Yes.

25   Q.    You see that 6.1 is talking about treating

1    non-Hodgkin's lymphoma?

2    A.    Yes.

3    Q.    And then there's a section that 6.1.1, indolent

4    lymphoma; is that correct?

5    A.    Yes.

6    Q.    And there's a reference to Ruffert 98; is that

7    correct?

8    A.    Yes.

9    Q.    And Ruffert 98 is the document, PTX-260, that we were

10   just talking about; is that correct?

11   A.    Yes.

12   Q.    And I believe you testified that you thought that the

13   data that went into ribomustin monograph came from Ruffert?

14   A.    The data?

15   Q.    The data that's disclosed in 6.1.1 of the ribomustin I

16   think is the monograph, product monograph.  The data that's

17   ensuing after the section I just pointed you to is coming

18   from Ruffert?

19   A.    That's correct.

20   Q.    If you see under patient characteristics, there's an

21   indication that they took ten patients with low grade

22   histology and certain notifications of different conditions

23   and all patients were treated, most of them with a the

24   CHOP-like regimen; is that correct?

25   A.    Yes.

Derendorf - cross

1   Q.    And a CHOP regimen is a particular type of regimen

2   that uses a particular combination of drugs to fight cancer;

3   is that correct?

4   A.    Yes.

5   Q.    And then under treatment regimen, there's a reference

6   to, again, one regimen; is that correct?

7   A.    Yes.  It's two different doses.

8   Q.    That's a good correction.  So two different doses.  In

9   one dose its bendamustine at 60 milligrams per meter square,

10  in parentheses (one hour), or a hundred milligrams per meter

11  square, IV on days 1 through 3; is that correct?

12  A.    Yes.

13  Q.    On Vincristine and Prednisolone, there's a particular

14  dose that's used; is that right?

15  A.    You know, now that you mentioned, I hadn't really

16  thought about it.

17  Q.    Could you answer my question?

18  A.    I'm trying to.

19  Q.    There's a record for vincristine an Prednisolone?

20  A.    I wasn't finished with answering the question before.

21  I just noticed it says one hour for the 60, but it doesn't

22  say one hour for the hundred.

23  Q.    It doesn't say what the time is, does it?

24  A.    Right.  I wonder why that is.

25  Q.    It does say that Vincristine and Prednisolone; is that

Derendorf - cross

1    correct?

2    A.    Yes, yes.   That could be the bolus that we were --

3    Q.    You're speculating right?   You're speculating.

4    Right?

5    A.    I don't know if that's the case.   I just observed it.

6    Q.    You don't have any independent knowledge as to what

7    that stands for?

8    A.    You were present when I saw it.   I hadn't seen this

9    before, to be honest.

10   Q.    If you go to the next section right before the table,

11   it talks about using it as a comparison as a first line

12   therapy.

13             Do you see that?

14   A.    No.   Where are you?

15   Q.    The next paragraph.   It says BOP versus COP?

16   A.    Okay.   Okay.

17   Q.    And BOP is again bendamustine, Vincristine and

18   Prednisolone?

19   A.    Yes.

20   Q.    And COP is a cyclophosphamide, Vincristine and

21   Prednisolone?

22   A.    That's correct.

23   Q.    And it's reporting the data for the BOP and providing

24   side effects; is that correct?

25   A.    Yes.

Derendorf - cross

1  Q.   And for all of those side effects, those were in

2  patients that had been given Vincristine; is that correct?

3  A.   Yes.

4  Q.   Now, if you go to the next page, 22, where it talks

5  about treatment regimens, do you see that?

6  A.   Yes.

7  Q.   And there, for BOP, they indicate that the BOP regimen

8  is 60 milligrams IV on days 1 through 5; is that correct?

9  A.   Correct.

10  Q.   And they don't say one hour there, do they?

11  A.   No.

12  Q.   And so there's no indication that in that table, that

13  that dosing regimen would be a bolus?

14  A.   It doesn't say.

15  Q.   It doesn't say.

16       And if you go to the next page on toxicities,

17  talking about acute toxicities, there's a discussion that

18  says, in conclusion, BOP is an effective and safe treatment

19  in advanced indolent lymphomas.  The results are in line

20  with other international studies.

21       Do you see that?

22  A.   I do.

23  Q.   And there's no indication there about any difference

24  or any different regimens that were provided for giving

25  bendamustine in that section; is that correct?

Derendorf - cross

1    A.    Correct.

2    Q.    Thank you.

3          Now, I think we had a little bit of discussion

4    about Preiss on your direct.

5          Do you recall that?

6    A.    Yes.  We had a discussion?

7    Q.    I didn't have a discussion.  I think you had a

8    discussion with your counsel?

9    A.    Oh.

10   Q.    I stand corrected.

11   A.    Okay.

12   Q.    Now, you're not indicating that there's something

13   wrong or suspect about the data in Preiss 1985, for example,

14   are you?

15   A.    I have done many studies like the Preiss 85 study, and

16   I think he's the great pharmacokineticist, and the study was

17   done properly and the pharmacokinetics parameters reported

18   are valid.  I don't see anything wrong with that part.

19   Q.    And with respect to Preiss 1998, he wasn't any worse

20   than a pharmaco kineticist in the 13 years that ensued?

21   A.    Absolutely.  The first part of that paper, the

22   metabolite characterization, very nicely done.

23   Q.    So the papers were nicely done, nice designs.  You're

24   not meaning to imply there's something unreliable about the

25   science that's disclosed, are you?

Derendorf - cross

A.      The pharmacokinetics in the papers were very nicely

done.  Again, as we discussed, and also the statements about

the safety of the -- it's totally appropriate.  What I

cannot see from the paper is the general statement about the

safety of that regimen or the drug in general.

Q.      But you indicated that you knew that the authors of

the Preiss '85 and Preiss '98 were working with the company

that had been selling the approved bendamustine formulation

in Eastern Germany for 10 or 20 years by the time the papers

came out?

A.      Keep in mind Eastern Germany did not have the same

standard of regulatory oversight as we have it now or it was

at the time even in West Germany or the U.S.

        You know, the fact that you have a drug that is

used in patients where not even a pharmacokinetic study had

been done is unthinkful today.  But that happened there.

And different country, different times.

        MS. STAFFORD:  Your Honor, I would move to

strike that answer as unresponsive.  If you could instruct

the witness.

        My question is:  Was he aware that the

authors the Preiss '95 and '98 articles were associated with

and had been with the company that had been selling the

approved bendamustine formulation in East Germany for some

10 to 20 years.

1    THE COURT:  All right.

2    THE WITNESS:  I didn't, I didn't --

3    THE COURT:  Hold on.

4    THE WITNESS:  I'm sorry.

5    THE COURT:  I'm going to overrule the objection.

6    Your question was a rebuttal question to the witness'

7    response and he then was justifying his initial response, so

8    overruled.  I'm not going to strike it.

9    MS. STAFFORD:  Okay.

10   BY MS. STAFFORD:

11   Q.   Now, you, yourself, in forming your opinions in this

12   case with respect to pharmacokinetics, you actually rely

13   upon the pharmacokinetics data that's in the Preiss '85

14   article; is that correct?

15   A.   As I stated, I think it's valid data.

16   Q.   And I think you drew a picture on the white, you drew

17   a demonstrative that kind of described your views with

18   respect to how changing infusion time would change Cmax.

19   A.   Correct.

20   Q.   Do you recall that?

21   A.   I did.

22   Q.   And I'd like to put up on the screen Figure 1 at

23   paragraph 168 of the report.

24        And although you didn't talk about this part on

25   direct, you actually used Preiss' data to perform a

Derendorf - cross

1    quantitative analysis; is that correct?  Using a PK model

2    that you actually developed?

3    A.     No, it's not a model that I developed.  It's a model

4    that is available to everybody in the -- it's a very common

5    model.  And I used the parameters from the Preiss study to

6    make the point that I also made earlier today, that if you

7    increase the infusion time, that the Cmax concentration will

8    decrease.  And I used his parameters to make it applicable

9    to bendamustine.

10            We could have used PK parameters from any other

11   study that has been reported.  We get the same set of

12   figures there, so that was my intention.

13   Q.     But you chose in your report to rely upon the PK

14   properties that were disclosed in Preiss '85 in a simulation

15   that you created?

16   A.     That is correct.

17   Q.     And you used, I stand corrected, a model for that

18   simulation that was described in the prior art to the

19   patent?

20   A.     Yes.

21   Q.     To the Family patent.  Rowland and Towzer?

22   A.     Yes.

23   Q.     You did that assuming a 100-milligram per meter square

24   dose; correct?

25   A.     Yes.

Derendorf - cross

```
1    Q.    And you assumed that you were administering that to

2    a person of, an average BSA or body surface area of about

3    1.7?

4    A.    Yes.

5    Q.    And you did three separate administration times?

6    A.    Yes.

7    Q.    One at ten minutes, one at 30 minutes and one at

8    60 minutes; is that correct?

9    A.    Yes, that's correct.

10   Q.    And then you calculated what you thought the Cmax

11   should be?

12   A.    Simulated.

13   Q.    Yes.  Simulated?

14   A.    Yes.

15   Q.    And you reported this in milligrams per liter, so

16   like, for example, for the ten-minute infusion, you

17   calculated Cmax of 7.3 milligrams per liter.

18   A.    That's what it says.

19   Q.    And that was your calculation or the results of your

20   simulation?

21            MR. HARBER:  Objection, Your Honor.  That's not

22   what the document says.  I don't know if the witness can see

23   it.

24            MS. STAFFORD:  It says 7.3 milligrams per liter.

25            MR. HARBER:  That's for 30 minutes.
```

Derendorf - cross

1    MS. STAFFORD:  I correct it, thank you, for

2  30 minutes.

3  BY MS. STAFFORD:

4  Q.    So for a 30-minute infusion, you calculated a Cmax of

5  7.3 milligrams per liter; is that correct?

6  A.    That's what it says.

7  Q.    That's my mistake.  I apologize for that.

8                 And it was your view as of the priority

9  date a POSA could have calculated Cmax of bendamustine for

10  different time period based on prior art methods such as

11  Preiss and known simulation techniques; is that correct?

12  A.    Yes, but I want to clarify, this was not, the

13  intention is not this is a precise way to predict exactly

14  what concentration was.  My point was to illustrate what

15  happens when you change the infusion time.  How the change

16  of these shapes change when you prolong the infusion time in

17  a visual way.

18                 That was my intention and the parameters, they

19  were taken from Preiss, but it's not the intention to claim

20  that there is a method that you can precisely predict the

21  Cmax for any given dose.

22  Q.    But you thought this was reliable when you submitted

23  your report; is that correct?

24  A.    Yes.  I think it is reliable.

25  Q.    You're aware of a concept called area under the curve?

Derendorf - cross

1    A.    Yes.

2    Q.    You would agree with me that regardless of the time of

3    administration, the area under each of those three curves

4    shown in Figure 1 would be the same?

5    A.    Assuming that we have linear pharmacokinetics, which

6    seems to be the case for this drug, I agree.

7    Q.    Now I would like to look at Owen for just a second,

8    which is DTX-1001.

9          Do you have that in front of you, sir?

10   A.    It's in which one?

11   Q.    It should be in both.

12   A.    Okay.

13   Q.    I think it's in both.

14   A.    This one?

15   Q.    It's in both.

16   A.    I've got it.  Okay.  Yes.

17   Q.    And Owen is a retrospective analysis of data that was

18   collected in a prior study that used Treanda; is that

19   correct?

20   A.    That is correct.

21   Q.    And the study from which Owen draws its data wasn't

22   designed to study the effect of Cmax or other PK values on

23   adverse events; is that correct?

24   A.    Well, I mean, they did take the blood samples in the

25   study, so that means the pharmacokinetics analysis was part

Derendorf - cross

1    of the study design.

2    Q.    Yes, but it wasn't -- it wasn't designed specifically

3    to look at the effect of Cmax or other PK values on adverse

4    events?

5    A.    That's correct.

6    Q.    Now, I think you testified that you believe, and that

7    Owen says that bendamustine, as bendamustine Cmax increases,

8    the predicted probability of nausea also increases; is that

9    correct?

10   A.    Correct.

11   Q.    And Owen looked at a number of safety and efficacy end

12   points and nausea was the only safety or efficacy end point

13   that Owen found to be significantly related to bendamustine

14   exposure; is that right?

15   A.    Yes.

16   Q.    So Owen did not find a relationship between Cmax and

17   fatigue, for example?

18   A.    Not statistically significant.

19   Q.    And Owen did not find a relationship between Cmax and

20   neutropenia.

21   A.    He did not.

22   Q.    And Owen didn't find a relationship between Cmax and

23   vomiting; is that correct?

24   A.    Correct.

25   Q.    And a total of 74 percent of the patients analyzed by

1   Owen experienced at least one incidence of nausea; is that

2   correct?

3   A.    I don't remember the number, but it was fairly high,

4   yes.

5   Q.    So you don't disagree that it could be 74 percent?  Do

6   you want to look at DTX-1001-0008?

7   A.    Here we go.

8   Q.    Eighty percent of the patients from which the data was

9   used had received antiemetic therapy; is that correct?

10  A.    That makes it even more remarkable that he did find

11  it.  One would think it would make it harder to show that

12  relationship, but he could show it in spite of the

13  antiemetic therapy.

14  Q.    Owen doesn't tell you which patients received

15  antiemetic therapy?

16  A.    No.

17  Q.    Owen doesn't use the entirety of the data from the

18  study from which he drew the data to make these analysis?

19  A.    Yes, there was an explanation for that, that he had

20  blood samples that expired.  They were not analyzed in time

21  and therefore he did not consider them, or he didn't

22  consider the patients that gave those blood samples.

23  Q.    So there's some set of patients, and we don't know

24  which ones, that he doesn't include in this analysis?

25  A.    Yes.  It was a relatively small number, but, yes.

Derendorf - cross

1    Q.    And if you look at, I believe your counsel directed

2    you to Figure 6, the top part of Figure 6.

3    A.    Yes.

4    Q.    And if you look under that, there's a mathematical

5    relationship?

6    A.    Yes.

7    Q.    That Owen says correlates Cmax to the probability of

8    nausea; is that correct?

9    A.    Yes.

10   Q.    And you could have used the Cmax values that you

11   determined by your simulation to determine probabilities of

12   nausea and the differences in probabilities of nausea based

13   on Owen's mathematical correlation; is that correct?

14   A.    What was your question?

15   Q.    So you could have taken the Cmax value that you

16   predicted based on your PK parameter that was in paragraph,

17   Figure 1, paragraph 68 of your report, and you could have

18   plugged them into this mathematical formulation.

19   A.    I understand your question now.  No, you cannot,

20   because this comes from completely different -- this comes

21   from the study and with the different -- these correlations

22   are not absolute.  You cannot link from a single dose study

23   based on Preiss, plug it into this analysis that comes from

24   this study here and make a reliable prediction.  I would not

25   dare to do that.

Derendorf - cross

1    Q.     But aren't all the patients in the study from which

2    Owen drew his data, didn't they all receive the same dose?

3    A.     They did, but, of course, the Cmax, you know, the

4    dosing regimen was -- I think it was an hour.

5    Sixty minutes, yes.  So this was from a 60-minute infusion.

6           So, so the correlation with the Cmax, it's not

7    an instantaneous one.  It reflects, you know, the whole

8    exposure and time course ever exposure.

9           So you cannot always -- for some, you can,

10   actually.  It depends on the individual drug, have a direct

11   link between the magnitude of the Cmax or whatever

12   parameter, AUC.  Often it is dependent on the schedule and

13   the way the drug is given, because the, when you change the

14   time course of how you give the drug, the link between where

15   you measure in the plasma, that's where the Cmax comes from

16   and the concentration at the time of the effect or side

17   effect is not, it's not a constant one.

18          So you cannot always extrapolate from one study

19   to another.  So I would not, I would not claim that the

20   single dose simulations that I did would allow me to make

21   any kind of predictions here.

22   Q.     Well, you'd agree with me that Dr. Owen tried to

23   quantify the relationship between Cmax and probability of

24   nausea, and he does that in the calculation that's provided

25   below this figure?

1   A.   Exactly right for the study that he analyzed.

2   Q.   And the study he used is a single dose study; is that

3   correct?

4   A.   Yes.

5   Q.   Okay.  Now, if you look at the data that is actually

6   given in that figure, if I read this correctly, the

7   probability of nausea is the Y axis; is that correct?

8   A.    Actually, I take that back.  The study was not a

9   single dose study.  The study was on, it was, according to

10  the label, days 1 and 2 of a -- so it was not a single dose

11  study.

12  Q.   The same dose was given to all the patients; is that

13  correct?

14  A.   The same dose was given to all the patients.

15  Q.   Okay.

16  A.   That's correct.

17  Q.   The probability of nausea is the Y axis?

18  A.   Yes.

19  Q.   The Cmax is the X axis?

20  A.   The Cmax is the X axis.

21  Q.   That's in nanograms per milliliter?

22  A.   Yes.

23  Q.   You did your simulation, you got I think milligrams

24  per milliliter?

25  A.   Yes.

Derendorf - cross

1    Q.    If you were looking at 7.3 milligrams per liter, that

2    would be the same thing as 7,300 milligrams per mL?

3    A.    That would be correct, yes.

4    Q.    With respect to where Owen gets his data, every

5    patient receives the same?

6    A.    For the Owen's study, this is perfectly appropriate to

7    do.

8    Q.    And the variabilities of Cmax ranges from below 4,000

9    upwards of 10,000?

10   A.    Yes.  The individual of Cmax is indicated on the

11   lines.

12   Q.    And if you were to believe Owen his model would

13   predict 20 percent nausea even if no bendamustine was given;

14   is that correct?

15   A.    Yes.

16   Q.    And the, if you look to the data points, if I

17   understand it, data points that are closest to 0 on the X

18   axis, those have the lowest Cmax's starting at around 3,000

19   or 4,000?

20   A.    The Cmax, yes, from low to high, from left to right.

21   Q.    All the way to the right, that's the data point on the

22   right, is the highest are Cmax?

23   A.    10,000.

24   Q.    Those data point circles, he does some grouping of the

25   individual patient values.  He doesn't tell you how.  He

Derendorf - cross

1   does some grouping and he takes the median of each group and

2   that becomes the circle?

3   A.    Yes.   It's unfortunate that he doesn't disclose how

4   exactly.   There are many different ways how this can be

5   done.   It's not -- it's not in the paper.

6   Q.    Right.   And the second lowest Cmax value, second point

7   from the second point from the left, do you see that up

8   there on the screen?

9   A.    Yes.

10  Q.    That actually under Owen's analysis has the highest

11  probability of nausea; is that correct?

12  A.    What you are describing here is the variability in the

13  data and that is very common in these studies.   So --

14             THE COURT:  Doctor --

15             THE WITNESS:  I'm sorry.

16             THE COURT:  No, no.  The suggestion, when she

17  asks a question like that, answer it and you can explain it.

18  We'll get out of here a lot faster.  She had a question.  Is

19  she right?

20             THE WITNESS:  I understand.  Sorry.

21             THE COURT:  All right.  So do you remember the

22  question?

23             THE WITNESS:  I do remember the question.

24             THE COURT:  Was she right?

25             THE WITNESS:  No.

Derendorf - cross

1    THE COURT:  Well --

2    THE WITNESS:  This is not -- well, she's right

3    in the way that in these studies, you have a lot of noise,

4    and this is --

5    THE COURT:  So she's correct in her summary of

6    why that, of the significance of that circle above the

7    graph, above the line, or the curve, I should say?

8    THE WITNESS:  Then I need to hear the question

9    again, please.

10   BY MS. STAFFORD:

11   Q.    Sure.  The second data point, the point that has the

12   second lowest Cmax has the highest probability of nausea

13   under Owen's analysis?

14   A.    Again, these are Vin numbers, and again I don't know

15   how they did it.  The individual numbers are all shown on

16   the bottom and they go into the model and I don't know

17   exactly how it is.

18        There are multiple ways of doing it, but the

19   point, I totally agree with you, show you the uncertainty of

20   this model.  This is not a perfect model, clearly.  The

21   points are not on the line, but it also shows that as Cmax

22   goes up, the probability goes up.

23        So it's not a -- it doesn't go the other way.

24   And the statistical analysis that he did independent of this

25   model was, indeed, statistically significant.  So the

Derendorf - cross

1    qualitative relationship that if Cmax goes up, nausea goes

2    up, that is established.  The quantitative precise

3    prediction is marginal or he calls it adequate.  It is

4    certainly not perfect.

5    Q.    Now, if I were to take the number that you calculated

6    for a hundred milligram dose, 30-minute, 7300 nanograms per

7    mL and use Owen's figure to try to guesstimate a prediction

8    of nausea, I would end up something close to 80 percent

9    nausea; right?

10   A.    With all due respect, you cannot do that.  That is

11   completely different.  They're two completely different

12   studies.  You simply cannot plug this number into this

13   model.  I would not do that.

14   Q.    So this model is basically unreliable to use for any

15   purposes, including analyzing your predicted Cmax's; is that

16   correct?

17   A.    It is not applicable to my simulation.  It is, I think

18   very valuable, because it shows that for a given study

19   design, there is this correlation.

20          Now, keep in mind also, it was only one infusion

21   time that was used here, so the spread is sort of modest.  I

22   mean, again, it would be even nicer to have different

23   infusion times and then you would have a much bigger spread

24   of Cmax's and hopefully, this correlation could be shown

25   much clearer.  That's not the case.  He had to work with

Derendorf - cross

1   whatever he had.  And within that study, there is a modest

2   possibility to do this kind of model.  I agree, it's not

3   perfect by any means, but it is what it is.

4   Q.   So you really couldn't use the Owen analysis and model

5   to look at a single dose or single cycle study like the

6   Preiss 1985 reference; is that correct?

7   A.   Well, you could do it -- I mean, first of all, you can

8   do it for the conclusion that there is a relationship.  That

9   is, that is clearly established.

10           I would not use it to make precise predictions.

11   They come with a huge uncertainty and probably are not as

12   useful.  I agree with you on that point.

13   Q.   Okay.  So you agree.

14           Could you please --

15   A.   On that point.

16   Q.   -- to DTX-1041 in your in your binder?

17   A.   I'm sorry?

18   Q.   1041?

19   A.   Yes.

20   Q.   And that's a document you've seen before, is that

21   correct, a set of documents?

22   A.   I'm not sure if I've seen the whole document.  I've

23   seen parts of it, I believe.

24   Q.   And you were here the other day when I believe Dr.

25   Yates was testifying and your counsel, Mr. Harber,

Derendorf - cross

1     represented to the Court that this was, this packet was

2     submitted to FDA; is that correct?

3  A.     I was here.

4  Q.     Okay.  Thank you.

5            And --

6            MR. HARBER:  I would just object to my

7  statements obviously aren't in evidence and I'm not sure

8  that's what I represented to the Court.

9            THE COURT:  I think what she was doing, which

10  was quite clever actually, she was able to get on the record

11  evidence because she had a witness testify that you said.  I

12  guess that's actually, all it gets on the evidence is that

13  Mr. Harber said it.

14            MS. STAFFORD:  Starved yes.

15            THE COURT:  Fair enough.  Is it in dispute?

16            MR. HARBER:  I don't know about this particular

17  document.  I believe there are parts of it that were

18  submitted.  My statements aren't evidence.

19            THE COURT:  I agree.  I thought that was clever.

20            MS. STAFFORD:  The disputed materials with the

21  FDA.

22            THE COURT:  Maybe I should take back that hour I

23  gave you because it's undisputed that this document went to

24  the FDA.  Does somebody want to stand up and tell me.

25  BY MS. STAFFORD:

Derendorf - cross

1     Q.     Now, Eagle in its communications with FDA also relied

2     upon the Preiss reference, didn't it?

3     A.     I mentioned the Preiss reference, yes.

4     Q.     Okay.  And if you could go to DTX-1041 at 0166.  And

5     just to inform the Court and the other side, there were some

6     numbering issues.  Some of the versions of DTX-1041 have a

7     problem.  We'll make sure that the version that you have is

8     correct, such as this one.

9     A.     166?

10    Q.     Yes.

11    A.     Yes.  This I have not seen.

12    Q.     So you've not seen the Monte Carlo spot simulation

13    study that was submitted to FDA that your counsel talked

14    about in opening?

15    A.     That's correct.

16    Q.     Do you know what a Monte Carlo study is?

17    A.     I do.  I know of the study, but I have not seen the

18    study report.

19    Q.     So you didn't consider this study in forming your

20    opinion?

21    A.     I did consider that modeling was done and that Eagle

22    was aware of the model results.  What I'm saying is I have

23    not seen this, literally this final report here that you are

24    showing me right now.

25    Q.     Go down to DTX-1041_0166.  That paragraph under 4.5

Derendorf - cross

1  where it's discussing the simulated probability of nausea.

2  A.   Page 166?

3  Q.   Yes.  You can see there, this is a study that was

4  submitted to FDA.

5  A.   Yes.

6  Q.   The Monte Carlo study that you heard about.

7  A.   Yes.

8  Q.   The very last sentence, the study is saying, of note,

9  Preiss, et al., administered bendamustine at relatively high

10  doses of 4.2 to 5.5 milligrams per kilogram at a

11  three-minute infusion in patients and reported mild to

12  moderate adverse events?

13  A.   Yes.

14  Q.   So Eagle reported this to the FDA?

15  A.   Yes.

16  Q.   Okay.  If you could go to DTX-1041, page 20, or 0020,

17  under the section pharmacokinetics, and this is the leading

18  background material as part of the same package as an

19  attachment that went to FDA.  There's a discussion under

20  pharmacokinetics.

21  A.   Yes.

22  Q.   And the statement is, the predicted clinical AUC of

23  the Eagle product is expected to be comparable to that of

24  the RLD Treanda, as they are both true solutions

25  administered via the IV route.

Derendorf - cross

1    Do you see that?

2    A.   Yes, I do.

3    Q.   And so Eagle is telling FDA that they would expect the

4    AUC to be the same for their product as for Treanda?

5    A.   Yes.

6    Q.   In the next sentence, there's a discussion of the

7    pharmacokinetics modeling study, attachment 7-A, which is

8    the Monte Carlo study we just showed you a little bit of; is

9    that correct?

10   A.   Yes.

11   Q.   And it indicates that Eagle is telling FDA that they

12   believe the transient increase in Cmax resulting from faster

13   administration is only about twofold versus the current

14   Treanda 30-minute infusion.

15   Do you see that?

16   A.   Yes.  That's a strange choice of words much there is

17   no transient increase in Cmax.  Cmax is given at one time

18   point.

19   Q.   But that's what Eagle decided to tell FDA, and then

20   they go on to say, or tell FDA that they don't believe that

21   any additional non-toxicology or pharmacokinetic studies are

22   planned.

23   A.   That's their read of it, yes.

24   Q.   And, in fact, were you aware that Eagle told FDA that

25   the predicted Cmax for its faster infusion product is within

 1   the range of bendamustine exposures demonstrated to be

 2   comparable in clinical experience.

 3   A.     Where is that?

 4   Q.     Go to page 179 of this exhibit.

 5   A.     Yes, I see it.  Yes, that's what they say.

 6   Q.     And at the very bottom under conclusion.

 7   A.     Mm-hmm.  Yes.

 8   Q.     And if you go to the previous page -- maybe go up a

 9   few pages, go up a few pages, the beginning of this

10   document.

11           Yes.  Go back there.  That one, where it says

12   review of the public literature on bendamustine exposure,

13   exposure, that's the published literature that was provided

14   to the FDA; is that correct?

15   A.     Yes.

16   Q.     And under the introduction, they include similar

17   conclusions.  That the predicted increase in Cmax for

18   Eagle's infusion and/or an IV push product is within the

19   range of clinical experience; is that correct?

20   A.     Yes.

21   Q.     And now if you can go a little bit further down on

22   that page under IV push administration studies.

23           Eagle is relying upon the Preiss 1985 report

24   pharmacokinetics as evidence that the, a short three-minute

25   infusion would have suitable pharmacokinetics tolerability.

1    A.    Yes.  I don't think it's appropriate again for the

2    reasons I mentioned earlier, that you cannot directly

3    compare the magnitude of the Cmax of different

4    administration patterns, so that would need to be

5    assessed.

6    Q.    So you think Eagle is misleading FDA in this

7    statement?

8    A.    Eagle was, I think --

9    Q.    I will withdraw the question.

10            THE COURT:  All right.  You withdrew it.  Fine.

11            MS. STAFFORD:  Okay.

12   BY MS. STAFFORD:

13   Q.    Well, do you think Eagle is misleading FDA then?

14   A.    Misleading?  I understand Eagle was the inventor, so

15   it doesn't really reflect the prior art, what they're

16   presenting here.  And had additional information like that

17   modeling that would not be an accurate reflection of the

18   prior art.

19   Q.    Well, they go on to say that the reported Cmax values

20   range, provide a certain range, which compares reasonably

21   well with the predicted Cmax value for three-minute slow IV

22   push dose administration; is that correct?

23   A.    Yes.  And, again, within the study, that whole concept

24   that we discussed, that you use lower infusion, get lower

25   Cmax's.  That makes it safer.  All of that is absolutely

Derendorf - cross

1  present in the prior art, but you cannot go and have an IV

2  bolus Cmax and compare that with a 60-minute multiple dose

3  study Cmax.  That is, that is -- it may, it may be okay, but

4  I don't think that has been established.  Within the study,

5  within a given dosing regimen, if we change the infusion

6  time, yes, but between studies that is a bit -- it would not

7  be scientifically appropriate.

8  Q.    But they go on to say, and they argue to FDA that the

9  short duration infusion of bendamustine appears to have been

10  well tolerated in the Preiss study.  And that a dose of

11  215 milligrams per meter squared has always been reported in

12  the literature as a clinically tolerated dose for bolus

13  administration of bendamustine?

14  A.    We discussed that.  The 215 milligrams per meter

15  squared, it was clear from the Schoffski reference, that was

16  not a recommended dose.  The recommended dose was a

17  30-minute infusion of much, much lower doses.  So that is

18  not a proper representation of what Schoffski said.

19  Q.    But that's what Eagle is telling FDA that Schoffski

20  and Preiss are saying?

21  A.    Yes.

22  Q.    Okay.  And then just briefly, you're aware of Monte

23  Carlo analyses?

24  A.    Yes.

25  Q.    And those weren't invented by Eagle, were they?

Derendorf - cross

1    A.    No.

2    Q.    Those were developed in the 1940s by a famous

3    mathematician?

4    A.    Oh, it has been around for a long, long time.

5    Q.    As of the priority date, there are a number of

6    packages that you could buy that would help you run a Monte

7    Carlo simulation and a number of companies you could hire to

8    do one; right?

9    A.    Yes.  It's a tool.

10   Q.    Tool.  Now, if you could please turn to DTX-1041 at

11   168.  I believe that's the right page.  It's DTX_1041_0168.

12   Is that the right one?

13            If you could please turn to, I believe it's

14   Eagle Bendeka.  The Bates number.  I think the one you

15   pulled up actually has this numbering problem.

16   A.    I don't find it here.  Put it up on the screen maybe.

17            THE COURT:  It's in the cross-examination book.

18            THE WITNESS:  Okay.

19            THE COURT:  There are two different versions.

20            THE WITNESS:  Yes, yes.  So ten?

21            MS. STAFFORD:  I believe it's DTX-1041, 168.

22   It's the relatively large variability.

23            THE WITNESS:  I've got it.

24            MS. STAFFORD:  Bill, can you pull that up on the

25   screen?

1            THE WITNESS:  Mm-hmm.

2            MS. STAFFORD:  I believe it's paragraph 3 on

3    that page.

4    Q.    You see Eagle is saying AUC might be an equally good

5    predictor of the probability of nausea; is that correct?

6    A.    Yes, but Owen had looked into that.  Owen could not

7    establish a relationship between AUC and nausea.  He could

8    only establish a relationship between Cmax and nausea.

9    Q.    In this Monte Carlo report that was submitted to FDA

10   though, the report is telling FDA that the relatively large

11   variability and the relationship between bendamustine and

12   Cmax and the probability of nausea reported by Owen should

13   be noted; right?

14   A.    Right.

15   Q.    So they're noting the high variability that we just

16   looked at?

17   A.    Yes.

18   Q.    And they are saying, maybe you should look at Cmax or

19   AUC instead.

20   A.    Well, they did look at Cmax and Owen also looked at

21   AUC and did not, it was not a statistically significant

22   relationship.  So I don't know why they think it might be

23   equally good.  That's not what Owen found.

24   Q.    That's what Eagle was telling FDA, to get approval of

25   the drug product.

1  A.     Is this the authors of the report or is this Eagle who

2  makes that statement?

3  Q.     This is the Monte Carlo simulation report that was

4  submitted by Eagle to FDA.

5  A.     Yes.  It is what it says on the screen.

6  Q.     Okay.  And if you could please turn to page -- and if

7  you could go to, I believe it's Eagle Bendeka 140303.  I

8  think it's the same page, maybe.  The bottom of the page,

9  the conclusions.

10         Do you see where the Monte Carlo report that was

11  submitted to FDA indicates that the predicted Cmax and AUC

12  values were highly correlated?

13  A.     Yes.

14  Q.     And if you could turn to page, gee, I hope it's the

15  right page number, 169.

16         THE COURT:  Okay.  But for the record, because I

17  think there are multiple iterations of this.

18         MS. STAFFORD:  Yes.

19         THE COURT:  You're referring now to, read the

20  last numbers.

21         MS. STAFFORD:  The Bates page number is 140304.

22         THE COURT:  All right.

23         THE WITNESS:  There is a -- there is a reason

24  for this.

25  BY MS. STAFFORD:

Derendorf - cross

1  Q.    I have not asked a question yet.  I just asked you to

2  turn to that page.

3  A.    I thought you did.

4  Q.    No.  I asked you to turn to the page.  We're trying to

5  make sure we get to the right page.

6  A.    Okay.

7  Q.    You see in the last sentence, Eagle is telling the,

8  FDA that if AUC determined the probability of nausea, the

9  linear PK model by Owen would predict the same probability

10  of nausea for all durations of infusion?

11  A.    Yes, but they didn't.  AUC did not show up

12  significantly as a predictor of nausea in Owen.  If it did,

13  then it would, but it didn't, so it doesn't.

14  Q.    If you go to the -- if you go to the previous sentence

15  on that same paragraph, Bill.  Sorry.  The previous

16  sentence.

17         There's a discussion of their results saying a

18  higher probability of nausea with a predicted for shorter

19  infusion durations compared to 60 minutes but only slightly

20  higher compared to a 30-minute infusion based on Cmax and

21  Owen; is that correct?

22  A.    Yes.  And your question is?

23  Q.    Do you agree with me, that that is what they reported

24  to FDA?

25  A.    I do.

Derendorf - cross

```
 1   Q.     You would agree with me that bendamustine has a very

 2   short half-life?

 3   A.     Yes.

 4   Q.     And that means it's going to be eliminated fairly

 5   quickly?

 6   A.     Yes.

 7   Q.     And you would agree that looking at Preiss 1998 for a

 8   single dose infusion, that there was no disorientation shown

 9   at -- and this is, I'm sorry, Preiss 1998, DTX-991.  Would

10   you look at Figure 2.

11              Preiss shows there's no disorientation at

12   155 milligrams per meter squared; is that correct?  The

13   single dose?

14   A.     Oh, what dose?  I'm sorry.

15   Q.     For the -- it's hard to read.

16   A.     Yes.  Okay.  That bar is very low, yes.

17   Q.     Okay?

18   A.     I agree.

19   Q.     Now, looking at phlebitis, you never treated anybody

20   for phlebitis, have you?

21   A.     No.

22   Q.     And you would agree with me that a POSA would not be

23   able to determine if there was a small risk increase or

24   large risk increase of phlebitis assuming there's any

25   correlation at all; is that correct?
```

Derendorf - cross

1   A.      The risk?  Well, there are ways that you can assess

2   the risk and usually these are pre-clinical studies, animal

3   studies like the one that we've seen with the, you know,

4   early with the rabbit studies, where you can investigate

5   these kind of local toxicities.  It wouldn't be ethical to

6   do it in people.

7   Q.      But there's no way you can quantify the level of risk

8   of phlebitis?

9   A.      That's not true.

10  Q.      Could you go to your deposition transcript.  I believe

11  it's in the binder.

12          Well, let me ask one more question and we'll go

13  there.  You would agree with me that if you are switching or

14  moving from a 30-minute infusion time to a ten-minute

15  infusion time of bendamustine, a POSA as of the priority

16  date would not be able to determine if there would have been

17  an expectation of a small risk increase or a large risk

18  increase with respect to phlebitis?

19  A.      The magnitude of the increase?  There is evidence in

20  the prior art that showed the infusion time would increase

21  the risk of phlebitis.

22  Q.      But you don't know whether -- there's no information

23  as to whether that would be a large or small degree?

24  A.      On the number?  No, there's not.

25  Q.      Now, you're not a treating physician; is that correct?

Derendorf - redirect

1    A.    No.

2    Q.    Or an oncologist.  So your view of the various pieces

3    of prior art that you discussed are not from the perspective

4    of a treating physician; right?

5    A.    Right.

6            MS. STAFFORD:  Thank you.  No further questions.

7            THE COURT:  Redirect?

8            MR. HARBER:  Just a few minutes, Your Honor.

9                    REDIRECT EXAMINATION

10   BY MR. HARBER:

11   Q.    Dr. Derendorf, I want to ask you a few questions about

12   DTX-1041.  This is one of the documents counsel asked you

13   about.

14   A.    Yes, mm-hmm.

15   Q.    Now, there may have been some confusion.  There was

16   some reference to a study, an analysis that Eagle had

17   commissioned in there that Ms. Stafford was asking you

18   about.

19   A.    The Monte Carlo analysis.

20   Q.    Right.  Was that a study that Eagle had commissioned

21   in?

22   A.    I understand that was the case, yes.

23   Q.    Is that a study that was in the prior art?

24   A.    No.

25   Q.    Was that a study that was publicly available?

1    A.    **No.**

2    Q.    **And the document, DTX-1041, if you turn to, it's page**

3    **106, which is the Bates end 241.**

4              **MR. HARBER:  Can you magnify the top part of**

5    **that, please?**

6    **BY MR. HARBER:**

7    Q.    **Is this another document that Eagle submitted to the**

8    **FDA as part of the packet?**

9    A.    **Yes.**

10   Q.    **And what is this, Doctor?**

11   A.    **This is a --**

12             **MS. STAFFORD:  Objection, Your Honor.  I mean,**

13   **this is beyond the scope of the cross.  He started going**

14   **into the details of the rabbit study.**

15             **THE COURT:  So here's where we are.  I mean, a**

16   **couple things.**

17             **You asked, Ms. Stafford, you did ask was the**

18   **witness familiar with the Monte Carlo simulation study, and**

19   **his first response was, I've never seen it, never read it.**

20   **That's my recollection.**

21             **And then you proceeded to ask him all of these**

22   **questions about it.  Now, there was no objection, but you**

23   **did ask, and --**

24             **MS. STAFFORD:  I will withdraw my objection.**

25   **It's get getting late in the day.**

Derendorf - redirect

1    THE COURT:  I'm cognizant for what it's worth, I

2  get that the Monte Carlo simulation study is not part of the

3  prior art.  So just so you will know, to the extent I said I

4  think I would find admissions probative with respect to

5  prior art, it's only with respect to stuff that really is in

6  the prior art, but I'm going to let you go.  I'm going to

7  give you some leeway.  Keep in mind we have to get out of

8  here by 6:45.

9    MR. HARBER:  Of course, Your Honor.

10  BY MR. HARBER:

11  Q.    Let me set some context, Dr. Derendorf.  You were

12  shown a document that was a literature review and asked some

13  questions about it by Ms. Stafford?

14  A.    Yes.

15  Q.    That was part of this package?

16  A.    Yes.

17  Q.    Ms. Stafford did not show you about this part of the

18  package; right?

19  A.    No.

20  Q.    What is this?

21  A.    It's a rabbit study to look into local tolerance.

22  Q.    And is this a study that Eagle had commissioned?

23  A.    Yes.

24  Q.    Was this publicly available before the priority date?

25  A.    No.

Derendorf - redirect

1    Q.    Was this part of the prior art?

2    A.    No.

3    Q.    And do you have an understanding generally of what

4    Eagle looked at in this study?

5    A.    It was to support their new formulation.

6    Q.    And did it -- was there safety information in the

7    study about Eagle's proposed formulation?

8    A.    Yes.

9    Q.    And would that information have been available to the

10   person of ordinary skill in the art before the priority

11   date?

12   A.    No.

13   Q.    Was it available to Eagle at the time it was making

14   the statements in this packet to the FDA?

15   A.    Yes.

16   Q.    I want to ask some questions about DTX-1001, which is

17   Owen.

18   A.    Yes.

19   Q.    And if we can -- if we can go to the last, page 10.

20           Ms. Stafford asked you some questions about the

21   fact that nausea was the only parameter in that study that

22   was observed to have a statistically significant

23   relationship to Cmax.  And if we can please blow up the

24   first full paragraph on the left-hand column there.

25           Dr. Derendorf, can you explain what is being

Derendorf - redirect

1    disclosed here in the highlighted portions of the paragraph?

2    A.    Yes.  And that's what I referred to earlier.  This was

3    a, only a single dose.  Everybody got the same dose.

4    Everybody had the same duration of infusion, so the range of

5    exposures is relatively narrow.

6              So in order to show these relationships, this

7    exposure response relationship both for efficacy and safety,

8    really, you like to have a larger range so you can detect

9    the relationships.  So that was to do with the very narrow

10   range of exposures that were present in the study, and

11   that's what that first sentence says.

12   Q.    And would the person of ordinary skill in the art in

13   light of this disclosure in Owen have understood that the

14   lack of statistically significant relationships for the

15   other parameters would mean that a person of ordinary skill

16   in the art wouldn't expect more phlebitis, for example, when

17   moving from a 30 to 60-minute infusion to a ten-minute

18   infusion?

19   A.    Yes.  The lack of significant relationship doesn't

20   mean they were absent.  They were not able to show and

21   establish this correlation from the data that they had, from

22   the narrow range of data they had from the study.

23   Q.    Now, Ms. Stafford also asked you if the half-life for

24   bendamustine was short.

25              Do you recall that?

Derendorf - redirect

1   A.     Yes.

2   Q.     Does that -- how does that relate to the findings in,

3   say, Preiss 1998 that the maximum tolerated dose is very

4   different for different schedules?  Would that undermine

5   that conclusion?

6               MS. STAFFORD:  Objection to scope and leading.

7               THE COURT:  Well, it's definitely not leading

8   because I don't know what the answer is.

9               MS. STAFFORD:  The very end of it.

10              THE COURT:  You did ask this question about the

11  duration.  I will let it go.

12              THE WITNESS:  Yes.  I mean, this is -- it's an

13  old drug with a lot of unknown properties, and one of them

14  in the '98 Preiss study was actually, and there was a reason

15  they looked into the metabolite.  The metabolites hang

16  around longer than the drug and they could play a role.

17  There's some statement that they could contribute to

18  efficacy and/or safety, and that may be one of the reasons

19  why these inconsistencies occur.

20              So this is not clear, at least it's not clear to

21  me what the reasons are for these differences, but the

22  four-day administration and the single day administration in

23  Preiss, the dose limiting specificities are different and

24  it's not clear why.

25  BY MR. HARBER:

Derendorf - redirect

1   Q.    Does a short half-life mean a shorter infusion is

2   desirable or that a person of ordinary skill in the art

3   would have understood that a shorter infusion is desirable

4   at the priority date?

5   A.    It means that, all that is, that means the drug has a

6   very short exposure, and that indeed, you could with an

7   appropriate infusion, you could lengthen the exposure.  It

8   would have much more effect than it would for a long

9   half-life drug, where the duration of infusion doesn't make

10  much difference.

11  Q.    I guess what I am asking is, is the fact that

12  bendamustine has a short half-life, would that have caused

13  someone to think that a shorter infusion time would be

14  better for the drug?

15  A.    No.

16  Q.    Why not?

17  A.    Well, there's no rationale for that that I can think

18  of.

19              MR. HARBER:  I have no further questions, Your

20  Honor.  Just move some documents in evidence.

21              THE COURT:  Okay.  Let's do it on Tuesday.

22              I have one question.  I will give anybody an

23  opportunity if they think they want to ask a follow-up,

24  because if they don't, I'm not going to be factoring it into

25  any decision I make.  I'm just curious.

Derendorf - redirect

```
 1              In the FDA document that we've been talking
 2      about, there are some tables that report microscopic
 3      findings of testing of rabbits.  And it says in parentheses,
 4      (male and females combined).
 5              Does rabbit testing that's used in determining
 6      questions that the FDA asked about efficacy or safety, does
 7      it matter if the rabbit is male or female?  That could have
 8      an effect on how people interpret the data?
 9              THE WITNESS:  Ell, yes, sometimes that matters.
10              THE COURT:  Really?  Okay.  All right.  All
11      right.
12              Before you go, a couple of housekeeping matters.
13      There's a naturalization ceremony in the building on Tuesday
14      morning, so it is going to be very challenging to get in on
15      time, and yet even though I did give you the extra hour,
16      we've got to watch the time.  I do really want to start
17      right at 9:00, so please all make an effort to get to the
18      building early.  Okay?
19              And what you can all do, too, is if you get here
20      and you happen to get in early for some reason, my staff
21      will be here.  They're usually running in and out.  If you
22      all said, hey, we're ready to go at an earlier time and we
23      can, we will do that.  But we'll plan on 9:00 o'clock.  All
24      right?
25              And then is there anything else before, that we
```

Derendorf - redirect

1     need to resolve before Tuesday?

2              MR. HARBER:  Nothing from plaintiffs.

3              THE COURT:  Have a good weekend.  Oh, and the

4     doctor is excused.

5              (Witness excused.)

6              (Court recessed at 6:32 p.m.)

7                    -   -   -