IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CEPHALON. INC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Redacted- Public Version |
| v. | ) | |
| | ) | C.A. No. 17-1154-CFC |
| SLAYBACK PHARMA LIMITED | ) | CONSOLIDATED |
| LIABILITY CO., *et al.*, | ) | |
| | ) | ███████████████ |
| Defendants. | ) | |

## PLAINTIFFS' OPENING POST-TRIAL BRIEF ON DEFENDANTS' INFRINGEMENT OF <u>U.S. PATENT NOS. 9,265,831 AND 9,572,797</u>

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Teva Pharmaceuticals*
*International GmbH, Cephalon, Inc.,*
*and Eagle Pharmaceuticals, Inc.*

OF COUNSEL:
David I. Berl
Adam D. Harber
Martha C. Kidd
Shaun P. Mahaffy
Ben V. Picozzi
Elise M. Baumgarten
Matthew W. Lachman
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
*Attorneys for Teva Pharmaceuticals*
*International GmbH and Cephalon,*
*Inc.*

OF COUNSEL:
Daniel G. Brown
Michelle L. Ernst
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200

Kenneth G. Schuler
Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

*Attorneys for Eagle Pharmaceuticals, Inc.*

Dated: October 29, 2019

# **TABLE OF CONTENTS**

TABLE OF CONTENTS .......................................................................................i

TABLE OF AUTHORITIES .......................................................................... ii

I.     NATURE AND STAGE OF PROCEEDINGS, STATEMENT OF
       FACTS, AND SUMMARY OF ARGUMENT ...............................................1

II.    ARGUMENT.................................................................................................3

       A.    Defendants' ANDA Products Comprise a "Stabilizing Amount
             of an Antioxidant." .............................................................................3

       B.    Defendants Induce Infringement of Claim 9 of the '797 Patent. ..........7

III.   CONCLUSION..........................................................................................12

# TABLE OF AUTHORITIES

**Cases**

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
 616 F.3d 1249 (Fed. Cir. 2010) ....................................................................10

*Enzo Biochem, Inc. v. Applera Corp.*,
 599 F.3d 1325 (Fed. Cir. 2010) .......................................................................9

*In re Biogen '755 Patent Litig.*,
 C.A. No. 10-2734-CCC-JBC, 2016 WL 7340311 (D.N.J. Mar. 28, 2016).....9

*Int'l Bus. Mach. Corp. v. Priceline Grp. Inc.*,
 271 F. Supp. 3d 667 (D. Del. 2017) .................................................................9

*Lucent Techs. Inc. v. Gateway, Inc.*,
 580 F.3d 1301 (Fed. Cir. 2009) .......................................................................3

*Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*,
 934 F.3d 1334 (Fed. Cir. 2019) ......................................................................11

*Orexigen Therapeutics, Inc. v. Actavis Labs. FL, Inc.*,
 282 F. Supp. 3d 793 (D. Del. 2017) ...............................................................11

*Pernix Ire. Pain DAC v. Alvogen Malta Operations Ltd.*,
 323 F. Supp. 3d 566 (D. Del. 2018) ...............................................................11

*Summit 6, LLC v. Samsung Elecs. Co.*,
 802 F.3d 1283 (Fed. Cir. 2015) .......................................................................8

*Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*,
 785 F.3d 625 (Fed. Cir. 2015) .......................................................................10

*Warner Lambert Co. v. Apotex Corp.*,
 316 F.3d 1348 (Fed. Cir. 2003) .....................................................................10

**Statutes**

35 U.S.C. § 271(a) ...............................................................................................3

35 U.S.C. § 271(b) ...............................................................................................3

35 U.S.C. § 271(e)(2)(A) ........................................................................................3

# I. NATURE AND STAGE OF PROCEEDINGS, STATEMENT OF FACTS, AND SUMMARY OF ARGUMENT

Plaintiffs assert claims 2, 3, and 5 of U.S. Patent No. 9,265,831 (the "'831 patent"); claims 9 and 11 of U.S. Patent No. 9,572,797 (the "'797 patent"); claims 11, 18, and 22 of U.S. Patent No. 9,144,568 (the "'568 patent"); and claim 13 of U.S. Patent No. 9,597,399 (the "'399 patent") against Defendants Apotex Inc., Apotex Corp. (collectively, "Apotex"), Fresenius Kabi USA, LLC ("Fresenius Kabi"), and Mylan Laboratories Ltd. ("Mylan"). Plaintiffs also assert claim 15 of the '399 patent against Apotex and claim 13 of U.S. Patent No. 9,572,887 (the "'887 patent") against Slayback Pharma LLC ("Slayback") only.

██████████████████████████████████████████████████████

███████████████████████████████████ D.I. 318, 320. Apotex, Fresenius Kabi, and Mylan argue that (1) their ANDA Products do not contain a "stabilizing amount of an antioxidant," as required by the asserted claims of the Formulation Family (the '831 and '797 patents); and (2) they do not induce infringement of claim 9 of the '797 patent, which requires that the "bendamustine-containing composition ha[ve] less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C," because their proposed labeling does not direct physicians to store their ANDA Products for about 3

---

█ ███████████████████████████████████████████
█████████████████████████████████

1

months at about 25° C.  Neither argument has merit.

**First**, unrebutted evidence establishes that Defendants' ANDA Products contain a "stabilizing amount of an antioxidant."  The Formulation Family defines "stabilizing amount" to "include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein," PTX-308, at 3:49-54,[2] and makes clear that 5 mg/mL monothioglycerol (i.e., the amount in Defendants' ANDA Products) meets that definition, *e.g.*, PTX-308, at 3:57-4:8, 7:59-8:27, 8:29-9:2.  Both sides' experts agree that (1) manufacturers include ingredients, such as antioxidants, in a product only if they perform a specific function, and (2) antioxidants can reduce bendamustine degradation in the claimed formulations.  Several Defendants also conducted experiments demonstrating that 5 mg/mL monothioglycerol stabilizes the bendamustine in their formulations.  No Defendant offered contradictory evidence.

**Second**, Defendants misapprehend claim 9 of the '797 patent in contesting that they induce infringement.  The claim recites a "method of treating" certain cancers comprising a single method step: "administering" the specified "liquid bendamustine-containing composition."  Contrary to Defendants' contention, the limitation requiring the claimed compositions to "have less than or equal to 0.43%

---

[2] The Formulation Family's written descriptions are not materially different for purposes of the infringement arguments addressed here.

total PG esters at about 3 months of storage at a temperature of about 25° C,"
characterizes the compositions' stability. It does not recite a method step of
storing the composition for 3 months at 25° C that must be performed by an
infringer.

## II.     ARGUMENT

Defendants infringe or induce infringement of the asserted claims. A
defendant is liable for patent infringement if it submits an ANDA "for a drug
claimed in a patent or the use of which is claimed in a patent" or "makes, uses,
offers to sell," "sells," or "imports" a patented invention. 35 U.S.C. § 271(a),
(e)(2)(A). In addition, a defendant who "actively induces infringement of a patent
shall be liable as an infringer." 35 U.S.C. § 271(b). A patentee need only prove
liability by a preponderance of the evidence, which may be circumstantial. *See
Lucent Techs. Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317-18 (Fed. Cir. 2009).

### A.     Defendants' ANDA Products Comprise a "Stabilizing Amount of an Antioxidant."

The asserted claims of the Formulation Family require the claimed
compositions to comprise a "stabilizing amount of an antioxidant." Both sides
agree that the written description defines "stabilizing amount" to "include those
amounts which increase or enhance the stability of the bendamustine in the
compositions described herein." PTX-308, at 3:49-54; Tr. 370:25-371:9
(Siepmann); 398:5-8 (Pinal). Plaintiffs' expert Dr. Juergen Siepmann testified that

that definition encompasses *any amount* of an antioxidant that decreases the amount of *bendamustine degradants* after *any time period* and at *any temperature*. *See* Tr. 1485:4-1487:10, 1502:8-12, 1586:11-14 (Siepmann). Defendants offered no alternative construction. Applying that definition, Dr. Siepmann concluded that Defendants' ANDA Products each comprise a "stabilizing amount of an antioxidant." *See* Tr. 371:10-14, 377:2-8 (Siepmann). Overwhelming and unrebutted evidence supports that testimony.

*First*, Defendants' ANDA Products each contain 5 mg/mL of the antioxidant monothioglycerol, *see* PTX-474, at APOLIQBENDA_ANDA_0005427 (Apotex); PTX-486, at FK_BENDA_00003243, 3245 (Fresenius Kabi); PTX-007, at MYL-BEN_000248 (Mylan); Tr. 372:19-374:13 (Siepmann), which the Formulation Family's written description describes as a "stabilizing amount." For example, the patents identify "suitable antioxidant concentrations," including "5 mg/mL," and "antioxidants," which, in "particularly preferred concentrations, include "[mono]thioglycerol." *See, e.g.*, PTX-308, at 3:57-4:8. Likewise, Example 3 demonstrates that adding 5 mg/mL lipoic acid to a formulation consisting of 20 mg/mL bendamustine and polyethylene glycol ("PEG") 400 decreases the amount of bendamustine degradation after 15 days at 25° C and 40° C, as compared to the same formulation without an antioxidant. *See, e.g.*, PTX-308, at 7:59-8:27; Tr. 371:15-372:18 (Siepmann). Example 4 compares formulations comprising 90%

PEG, 10% propylene glycol ("PG"), and 5 mg/mL monothioglycerol,[3] α-lipoic acid, or dihydrolopoic acid and discloses that each is a "stabilizing amount of an antioxidant" in those formulations. *See, e.g.*, PTX-308, at 8:29-9:2.

**Second**, Defendants represented to FDA that 5 mg/mL monothioglycerol functions as an "antioxidant" in their ANDA Products. *See* PTX-474, at APOLIQBENDA_ANDA_0005427 (Apotex); PTX-486, at FK_BENDA_00003243, 3245 (Fresenius Kabi); PTX-007, at MYL-BEN_000248 (Mylan); Tr. 372:19-374:13 (Siepmann). Both sides' experts agree that manufacturers do not include ingredients, such as antioxidants, in a product unless they perform a specific function. *See* Tr. 1579:1-6 (Siepmann); 597:25-598:4 (Pinal). Thus, if 5 mg/mL monothioglycerol did not stabilize the bendamustine in Defendants' ANDA Products, Defendants would not have included it or told FDA that it functioned as an antioxidant. Defendants' expert Dr. Rodolfo Pinal further testified that using an antioxidant in the claimed formulations would prevent ingredients from catalyzing "esterification" of bendamustine. *See* Tr. 598:5-599:8 (Pinal). There is therefore no evidentiary dispute that 5 mg/mL monothioglycerol increases or enhances the stability of the bendamustine in Defendants' ANDA Products, and is therefore a "stabilizing amount."

---

[3] The written description explains that thioglycerol is "also known as monothioglycerol." PTX-308, at 4:1-2.

***Third***, Fresenius Kabi and Mylan represented to FDA that 5 mg/mL monothioglycerol was sufficient to ensure that the amount of bendamustine in their ANDA Products did not fall below specification limits. *See* PTX-54, at FK_BENDA_00000543 (Fresenius Kabi); PTX-201, at MYL-BEN_005258 (Mylan); Tr. 374:14-377:1 (Siepmann). For justification, Fresenius Kabi and Mylan conducted experiments involving batches comprising different monothioglycerol concentrations (i.e., 25%, 50%, 75%, and/or 100% of 5 mg/mL). *See* PTX-54, at FK_BENDA_00000541-43 (Fresenius Kabi); PTX-201, at MYL-BEN_005256-58 (Mylan); Tr. 374:14-377:1 (Siepmann). As Dr. Siepmann explained, those experiments demonstrated to FDA that 5 mg/mL monothioglycerol sufficed to stabilize the bendamustine in their formulations, even in case of "variation, which can happen." Tr. 1524:25-1525:6 (Siepmann).

Defendants' counsel attempted to repudiate the statements Fresenius Kabi and Mylan made to FDA by arguing that the experiments those companies performed did not directly compare formulations with and without an antioxidant, and were therefore irrelevant. *See* Tr. 1864:12-21 (Defendants' Counsel). But as Dr. Siepmann explained, the experiments demonstrated that it was "more likely than not" that Defendants' ANDA Products included a "stabilizing amount of an antioxidant." *See* Tr. 1578:3-19 (Siepmann). If a manufacturer wanted to be "a hundred percent sure" whether its product comprised a "stabilizing amount of an

antioxidant," it could conduct experiments comparing formulations with and without an antioxidant.  *See* Tr. 1485:14-21, 1578:20-25 (Siepmann).  But such a direct comparison is unnecessary where, as here, a manufacturer has good reason to believe that a given antioxidant amount is stabilizing (e.g., based on the Formulation Family's disclosures).  Fresenius Kabi's and Mylan's representations to FDA thus further support a finding that Defendants' ANDA Products comprise a "stabilizing amount of an antioxidant."  *See* Tr. 1525:7-19 (Siepmann).

Defendants offered no contrary evidence.  Defendants may wish to maintain their (equally meritless) argument that the term "stabilizing amount" is indefinite. But uncontroverted evidence establishes that Defendants' ANDA Products infringe the "stabilizing amount of an antioxidant" claim limitation.

## B.    Defendants Induce Infringement of Claim 9 of the '797 Patent.

Claim 1 of the '797 patent recites a "method of treating leukemia, Hodgkin's disease, or multiple myeloma" comprising "administering" the specified "liquid bendamustine-containing composition."  Claim 9 recites the method of claim 1, wherein the "bendamustine-containing composition has less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C." Defendants ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ contend that they do not induce infringement of claim 9 because their proposed

labeling does not recommend storing their ANDA Products for "about 3 months" at "a temperature of about 25° C." D.I. 307-4, at ¶ I.a; D.I. 320, at ¶ 3. That argument is premised on an erroneous understanding of the claim. The "PG ester" limitation characterizes the stability of the claimed compositions (i.e., the amount of impurities that the compositions have when stored for the specified time period and temperature). ██████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ Because the claim does not recite a method step requiring storage, nothing more is required.[4]

Whether a claim term recites a method step is a question of claim construction. *See, e.g.*, *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1290-91 (Fed. Cir. 2015). Here, the claim language makes clear that the "PG ester" limitation is not a method step. Claim 1 recites a one-step method: "administering" the "liquid bendamustine-containing composition." Claims 1 and 9 further require the "composition" to have certain structural characteristics, e.g., to contain PEG and PG in a certain ratio, to contain a stabilizing amount of antioxidant, and to "ha[ve] less than or equal to 0.43% total PG esters at about 3

───────────────

██████████████████████████████████████
██████████████████████████████████████
████████████████████████

months of storage at a temperature of about 25° C." But those characteristics are just that. They do not require action by an infringer. *See, e.g.*, *Summit 6*, 802 F.3d at 1290-91 (holding "being provided to" was not "a step in the claimed method," but instead "characterizes the claimed pre-processing parameters"); *Int'l Bus. Machs. Corp. v. Priceline Grp. Inc.*, 271 F. Supp. 3d 667, 682-83 (D. Del. 2017) (concluding claim term "being retrieved from the objects stored" "merely describes the characteristics of the screen display," whereas other claims recited a "storing" method step)[5]; *In re Biogen '755 Patent Litig.*, C.A. No. 10-2734-CCC-JBC, 2016 WL 7340311, at *3-9 (D.N.J. Mar. 28, 2016) (construing claim as a "one step method of 'administering'" a molecule with certain characteristics).

Had the patentee intended to require "storing" the compositions for a certain time at a certain temperature, it would have drafted the claims to recite both "administering" and "storing" method steps. Indeed, claim 1 of the '887 patent recites separate "providing," "diluting," and "administering" steps. That the patentee did not use similar drafting for the claim at issue confirms that the "PG ester" limitation is not a method step. *See, e.g.*, *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1333 (Fed. Cir. 2010).

Defendants' proposed claim construction also fails because it "renders the asserted claims nonsensical." *Becton, Dickinson & Co. v. Tyco Healthcare Grp.*,

---

[5] The patents addressed in the opinion are attached as Exhibits A and B.

*LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010).  Although claim 1 of the '797 patent

requires the composition to have "less than or equal to 0.11 % total PG esters *at*

*about 1 month of storage at a temperature of about 5° C*," claim 9, which

depends from claim 1, requires the same composition to have "less than or equal to

0.43% total PG esters *at about 3 months of storage at a temperature of about 25°*

*C*."  Under Defendants' proposed construction, which requires actual storage under

the specified conditions, the composition would need to be stored simultaneously

at different temperatures, which is impossible.  That further underscores

Defendants' misinterpretation.

 Stripped of its erroneous claim construction, Defendants' non-inducement

defense fails as a matter of law.  To be liable, a party must have "specific intent

and action to induce infringement." *Takeda Pharm. U.S.A., Inc. v. W.-Ward*

*Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015) (quoting *Warner Lambert Co. v.*

*Apotex Corp.*, 316 F.3d 1348, 1364 (Fed. Cir. 2003)).  Under that standard, a

generic applicant is liable for inducement if its proposed labeling "encourages,"

"recommends," or "promotes" infringement of that claim.  *See Takeda Pharm.*,

785 F.3d at 631.

 Applying these principles, courts routinely find inducement even where a

generic applicant's proposed labeling does not recite the composition-related

limitations in the claims.  For example, in *Orexigen Therapeutics, Inc. v. Actavis*

*Labs. FL, Inc.*, 282 F. Supp. 3d 793, 815-16 (D. Del. 2017), *rev'd in part on other grounds sub nom. Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1334 (Fed. Cir. 2019), Judge Andrews held that a generic applicant induced infringement of a method of treatment comprising administering a composition with a specific dissolution profile. *Id.* at 816. The court explained that, even though the applicant's proposed labeling did not mention the claimed profile, the "claimed method requires administering a product with specific properties" and the applicant "kn[ew] that the tablets meet all of the claim limitations and, through its proposed label, encourage[d] patients to administer the tablets." *Id.*

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ the same result obtains here. *See also Pernix Ire. Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp. 3d 566, 585-86 (D. Del. 2018) (finding inducement where defendant's proposed labeling directed "the use of [defendant's] product for the treatment of pain," which satisfied "the pharmacokinetic limitations of the claims," even though the labeling did not recite them).

## III.    CONCLUSION

For the foregoing reasons, the Court should enter judgment that Defendants

infringe or induce infringement of each of the asserted claims.

<table>
<tr><td></td><td><em>/s/ Karen E. Keller</em></td></tr>
</table>

|  |  |
|---|---|
|  | John W. Shaw (No. 3362) |
|  | Karen E. Keller (No. 4489) |
| OF COUNSEL: | Nathan R. Hoeschen (No. 6232) |
| David I. Berl | SHAW KELLER LLP |
| Adam D. Harber | I.M. Pei Building |
| Martha C. Kidd | 1105 North Market Street, 12th Floor |
| Shaun P. Mahaffy | Wilmington, DE 19801 |
| Ben V. Picozzi | (302) 298-0700 |
| Elise M. Baumgarten | jshaw@shawkeller.com |
| Matthew W. Lachman | kkeller@shawkeller.com |
| WILLIAMS & CONNOLLY LLP | nhoeschen@shawkeller.com |
| 725 Twelfth Street, N.W. | *Attorneys for Teva Pharmaceuticals* |
| Washington, DC 20005 | *International GmbH, Cephalon, Inc., and* |
| (202) 434-5000 | *Eagle Pharmaceuticals, Inc.* |
| *Attorneys for Teva Pharmaceuticals* | |
| *International GmbH and Cephalon, Inc.* | |

OF COUNSEL:
Daniel G. Brown
Michelle L. Ernst
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200

Kenneth G. Schuler
Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Kenneth G. Schuler
Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

*Attorneys for Eagle Pharmaceuticals, Inc.*

Dated: October 29, 2019

## CERTIFICATION BY COUNSEL

Pursuant to the Court's Order of September 30, 2019 (D.I. 337), I hereby

certify that this document consists of no more than 2,455 words and is printed in

14-point font.

/s/ *Karen E. Keller*

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on October 29, 2019, this

document was served on the persons listed below in the manner indicated:

### BY EMAIL

Jeremy S. Cole
Damien Nicholas Tancredi
FLASTER/GREENBERG P.C.
1201 N. Orange Street, Suite 301
302-351-1910
Wilmington, DE 19801
jeremy.cole@flastergreenberg.com
damien.tancredi@flastergreenberg.com
*Attorneys for Apotex Inc.*
*and Apotex Corp.*

James M. Lennon
DEVLIN LAW FIRM LLC
1306 N. Broom Street, 1st Floor
Wilmington, DE 19806
(302) 449-9010
jlennon@devlinlawfirm.com
*Attorney for*
*Mylan Laboratories Limited*

Steven E. Feldman
Sherry L. Rollo
Daniel R. Cherry
John D. Cravero
HAHN LOESER & PARKS LLP
125 South Wacker Drive
Suite 2900
Chicago, IL 60606
(312) 637-3010
sfeldman@hahnlaw.com
srollo@hahnlaw.com
dcherry@hahnlaw.com
jcravero@hahnlaw.com
*Attorneys for Apotex Inc.*
*and Apotex Corp.*

Jeffrey A. Cohen
FLASTER & GREENBERG, P.C.
1810 Chapel Avenue West
Cherry Hill, NJ 08002
(856) 661-1900
jeffrey.cohen@flastergreenberg.com
*Attorneys for Apotex Inc.*
*and Apotex Corp.*

Dennis D. Gregory
WILSON SONSINI GOODRICH
 & ROSATI PC
1301 Avenue of the Americas
40th Floor
New York, NY 10019
(212) 497-7764
dgregory@wsgr.com

Nicole Stafford
Shyamkrishna Palaiyanur
Anjali Deshmukh
WILSON SONSINI GOODRICH
 & ROSATI PC
900 South Capital of Texas
Highway
Las Cimas IV, Fifth Floor

*Attorney for Mylan Laboratories Limited*

Austin, TX 78746
(512) 338-5402
nstafford@wsgr.com
spalaiyanur@wsgr.com
adeshmukh@wsgr.com
*Attorneys for Mylan Laboratories Limited*

Rhyea Malik
WILSON SONSINI GOODRICH
  & ROSATI PC
12235 El Camino Real
San Diego, CA 92130
(858) 350-2300
rmalik@wsgr.com
*Attorney for Mylan Laboratories Limited*

Bobby Delafield
Aden Allen
WILSON SONSINI GOODRICH
  & ROSATI PC
900 South Capital of Texas Highway
Las Cimas IV, Fifth Floor
Austin, TX 78746
(512) 338-5432
bdelafield@wsgr.com
aallen@wsgr.com
*Attorneys for Mylan Laboratories Limited*

Brian E. Farnan
Michal J. Farnan
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com
*Attorneys for Defendant Fresenius Kabi USA, LLC*

Arun John Mohan
SCHIFF HARDIN LLP
666 Fifth Avenue, Suite 1700
New York, NY 10103
(212) 745-9536
amohan@schiffhardin.com
*Attorney for Defendant Fresenius Kabi USA, LLC*

Kevin M. Nelson
Imron T. Aly
SCHIFF HARDIN LLP
233 S. Wacker Dr., Suite 7100
Chicago, IL  60606
(312) 258-5500
knelson@schiffhardin.com

Neal C. Belgam
Eve H. Ormerod
SMITH, KATZENSTEIN, & JENKINS LLP
The Brandywine Building
1000 West Street, Suite 1501
P.O. Box 410

ialy@schiffhardin.com
*Attorneys for Defendant*
*Fresenius Kabi USA, LLC*

Wilmington, DE 19899
302-652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com
*Attorneys for Defendant*
*Slayback Pharma Limited Liability*
*Company*

Constance S. Huttner
Frank D. Rodriquez
James P. Barabas
Beth C. Finkelstein
WINDELS MARX LANE &
MITTENDORPH, LLP
One Giralda Farms, Suite 100
Madison, NJ  07940
chuttner@windelsmarx.com
frodriguez@windelsmatx.com
jbarabas@windelsmarx.com
bfinkelstein@windelsmarx.com
*Attorneys for Slayback Pharma Limited*
*Liability Company*

*/s/ Karen E. Keller*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Teva Pharmaceuticals*
*International GmbH, Cephalon, Inc., and*
*Eagle Pharmaceuticals, Inc.*

# Exhibit A



US005796967A

# United States Patent [19]

## Filepp et al.

[11] **Patent Number:** 5,796,967

[45] **Date of Patent:** Aug. 18, 1998

[54] **METHOD FOR PRESENTING APPLICATIONS IN AN INTERACTIVE SERVICE**

[75] Inventors: **Robert Filepp.** Springfield, N.J.; **Kenneth H. Appleman.** White Plains; **Alexander W. Bidwell.** New York, both of N.Y.; **Allan M. Wolf.** Ridgefield; **James A. Galambos.** Westport, both of Conn.; **Sam Meo.** New York, N.Y.

[73] Assignee: **International Business Machines Corporation.** Armonk, N.Y.

[21] Appl. No.: **158,031**

[22] Filed: **Nov. 26, 1993**

### Related U.S. Application Data

[60] Division of Ser. No. 388,156, Jul. 28, 1989, Pat. No. 5,347,632, which is a continuation-in-part of Ser. No. 328, 790, Mar. 23, 1989, abandoned, which is a continuation-in-part of Ser. No. 219,931, Jul. 15, 1988, abandoned.

[51] Int. Cl.⁶ ..................................... **G06F 13/00**
[52] U.S. Cl. .............. **395/339;** 395/200.08; 395/200.09
[58] Field of Search ...................................... 395/155–159, 395/161, 160, 200.03, 200.04, 200.05, 200.08, 601, 326, 329–335, 339–349, 352–354, 356–357

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,821,211 | 4/1989 | Torres ....................................... | 395/357 |
| 4,949,248 | 8/1990 | Caro ..................................... | 395/200.09 |
| 4,953,159 | 8/1990 | Hayden et al. ..................... | 395/200.04 |
| 5,050,105 | 9/1991 | Peters .................................... | 395/346 |
| 5,220,657 | 6/1993 | Bly et al. ............................. | 395/153 |
| 5,280,583 | 1/1994 | Nakayama et al. ....................... | 395/153 |

### OTHER PUBLICATIONS

McGregor. "Designing User Interface Tools for the X Window System". Compcon Spring '89 IEEE Computer Society Int'l Conference, pp. 243–246., 1989.

Dunwoody et al. "A Dynamic Profile of Window System Usage". Computer Workstations Conference. pp. 90–99., 1988.

Gancarz. "Uwm: A User Interface for X Windows". Usenix Association Summer Conference Proceedings. 1986.

Scheifler et al. "The X Windows System". ACM Transactions on Graphics, vol. 5, No. 2, pp. 79–709., Apr. 1986.

Microsoft Windows version 2.0 user's guide. pp. 88–91., 1987.

"Microsoft Windows—Version 2.0". 1987. (Book 1; p. viii–xiii; Book 4, pp. 36,37,83).

*Mastering Windows™ 3.0* by Robert Cowart. 1990, pp. 6–27.

*Primary Examiner*—Joseph H. Field
*Attorney, Agent, or Firm*—Paul C. Scifo

[57] **ABSTRACT**

A method for presenting applications in an interactive service featuring steps for generating screen displays of the service applications at the reception systems of the respective users. Steps are provided for generating the application displays as screens having a plurality of partitions, the partitions being constructed from reusable elements. In accord with the method, the screens include at least a first partition at which an application may be presented and a second, concurrently displayed partition including command functions for managing the display. The method further includes steps for providing command functions that facilitate random navigation to new applications with a variety of different procedures which the user can choose from. In (preferred) one form, the functions are presented as a command bar located at the bottom of the screen. Further, the method includes steps for opening and closing windows on the display to enable presentation of additional data relating to the presented applications. Still further, the method includes steps for providing additional partitions for concurrently displaying other applications, which may include advertising.

**17 Claims, 16 Drawing Sheets**



SPECIFIC DISPLAY SCREEN EXAMPLE

field location. Display manager **461** also has access to the field buffer as indexed by its PEV number.

The input data are available to TBOL interpreter **438** for subsequent processing. When the cursor is in a partition, only the PEVs for that partition are accessible to the RS virtual machine. After the input from the user is complete (as indicated by a user action such as pressing the RETURN key or entry of data into a field with an action attribute), RS **400** enters the Process Event state (E) via transition (4).

For purposes of this example, let us assume that the user enters the digit "5" in input field **270**. A transition is made to the process event state (E). Keyboard manager **434** and display manager **437** perform a number of actions, such as the display of the keystroke on the screen, the collection of the keystroke for input, and optionally, the validation of the keystroke, i.e. numeric input only in numeric fields. When the keystroke is processed, a return is made to the wait for event state (D). Edit attributes are specified in the field definition segment.

Suppose the user inputs a "6" next. A transition occurs to the PE state and after the "6" is processed, the Wait for Event (D) state is reentered. If the user hits the "completion" key (e.g., ENTER) the Process Event (E) state will be entered. The action attributes associated with field **272** identify this as a system event to trigger post-processor program object <ABCJ>. When the interpretive execution of program object <ABCJ> is complete, the wait for event state (D) will again be entered. The user is then free to enter another value in the input field, or select a command bar function and exit the apples application.

While this invention has been described in its preferred form, it will be appreciated that changes may be made in the form, construction, procedure and arrangement of its various elements and steps without departing from its spirit or scope.

What we claim is:

**1.** A method for presenting interactive applications on a computer network, the network including a multiplicity of user reception systems at which respective users may request a multiplicity of available applications, the respective reception systems including a monitor at which the applications requested can be presented as one or more screens of display, the method comprising the steps of:

a. generating a screen display at a respective reception system for a requested application, the screen display being generated by the respective reception system from data objects having a prescribed data structure, at least some of which objects may be stored at the respective reception system, the screen display including a plurality of partitions, the partitions being constructed from objects, the objects being retrieved from the objects stored at the respective reception system, or if unavailable from the objects stored at the respective reception system, then from the network, such that at least some of the objects may be used in more than one application;

b. generating at least a first partition for presenting applications; and

c. generating concurrently with the first partition at least a second partition for presenting a plurality of command functions, the command functions including at least a first group which are selectable to permit movement between applications.

**2.** The method of claim **1** wherein the data structure of the objects includes a header and one or more data segments and wherein generating the second partition includes providing the first group of command functions with a first subgroup of command functions which are selectable to permit random movement between applications.

**3.** The method of claim **2** wherein the objects are stored at the respective reception systems in accordance with a predetermined plan, and wherein providing the first subgroup of commands includes providing a command for causing the user to be presented with a t least one procedure for navigating to a new application.

**4.** The method of claim **2** wherein the predetermined plan for storing objects at the respective reception systems includes providing the objects with a storage control parameter in their respective headers, and wherein providing the first subgroup of command functions includes providing at least one command for causing the user to be presented with a plurality of different procedure for navigating to a new application.

**5.** The method of claim **4** wherein the object storage controle parameter is dependent on the currency of the object data, and wherein providing the navigation procedures includes enabling the user to enter a character string at the reception system to randomly search the available applications for a desired application.

**6.** The method of claim **4** wherein providing the navigation procedures includes enabling the user to access an index of available applications from which a desired application may be selected.

**7.** The method of claim **4** wherein providing the navigation procedures includes enabling the user to access a directory of application subject matter from which a desired application may be selected.

**8.** The method of claim **4** wherein providing the navigation procedures includes enabling the user to access a physical analogy of the available applications from which a desired application may be selected.

**9.** The method of claims **5, 6, 7** or **8** wherein providing the navigation procedures to a new application includes presenting a window in the display in which the user is presented with multiple, interactive command functions to effect navigation.

**10.** The method of claim **2** wherein the objects are stored at the respective reception systems in accordance with a predetermined plan, and wherein providing the first subgroup of command functions includes providing at a command for enabling the user to progress through a sequence of applications previously designated.

**11.** The method of claim **10** wherein the predetermined plan for storing objects at the respective reception systems includes providing the objects with a storage control parameter in their respective headers, and wherein providing the user with a command for progressing through a sequence of applications includes enabling the user to adjust the application sequence.

**12.** The method of claim **1** further including generating at least a third screen partition concurrently with the first and second screen partitions for presenting a second application and wherein the data structure of the objects includes a header and one or more data segments.

**13.** The method of claim **12** wherein the objects are stored at the respective reception systems in accordance with a predetermined plan, and wherein the predetermined plan for storing objects at the respective reception systems includes providing the objects with a storage control parameter in their respective headers, and wherein presenting a third screen partition includes presenting the second application as advertising.

**14.** The method of claim **1** further including generating one or more window partitions that overlays at least a portion of the application partition, the one or more windows for presenting data associated with the application displayed

and wherein the data structure of the objects includes a header and one or more data segments, and wherein the objects are stored at the respective reception systems in accordance with a predetermined plan, which includes providing the objects with a storage control parameter at their respective headers.

15. The method of claim 14 wherein generating window partitions includes providing the window partitions with fields for conducting interactive procedures associated with an underlying application.

16. The method of claim 15 wherein generating window partitions includes providing the window partitions with interactive fields for conducting transactional procedures.

17. The method of claim 1 wherein generating the first and second screen partitions includes generating the respective partitions at fixed, predetermined regions of the display screen, the second partition being arranged as a command bar and wherein the data structure of the objects includes a header and one or more data segments, and wherein the objects are stored at the respective reception systems in accordance with a predetermined plan, which includes providing the objects with a storage control parameter at their respective headers.

* * * * *

# Exhibit B



US007072849B1

(12) **United States Patent**
Filepp et al.

(10) **Patent No.:** **US 7,072,849 B1**
(45) **Date of Patent:** **Jul. 4, 2006**

(54) **METHOD FOR PRESENTING ADVERTISING IN AN INTERACTIVE SERVICE**

(75) Inventors: **Robert Filepp**, White Plains, NY (US);
**Alexander W. Bidwell**, New York, NY
(US); **Francis C. Young**, Pearl River,
NY (US); **Allan M. Wolf**, Ridgefield,
CT (US); **Duane Tiemann**, Ossining,
NY (US); **Mel Bellar**, New York, NY
(US); **Robert D. Cohen**, Pouyhquag,
NY (US); **James A. Galambos**,
deceased, late of Westport, CT (US);
**Kenneth H. Appleman**, Brewster, NY
(US); **Sam Meo**, Carmel, NY (US)

(73) Assignee: **International Business Machines
Corporation**, Armonk, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **08/158,025**

(22) Filed: **Nov. 26, 1993**

**Related U.S. Application Data**

(60) Division of application No. 07/388,156, filed on Jul.
28, 1989, now Pat. No. 5,347,632, which is a con-
tinuation-in-part of application No. 07/328,790, filed
on Mar. 23, 1989, now abandoned, which is a con-
tinuation-in-part of application No. 07/219,931, filed
on Jul. 15, 1988, now abandoned.

(51) **Int. Cl.**
*G06Q 30/00* (2006.01)

(52) **U.S. Cl.** ...................................... **705/14**

(58) **Field of Classification Search** ............... 364/401;
395/600, 144, 153, 200, 250, 201, 207, 210,
395/214, 611, 613, 614, 615, 762, 779, 782,
395/133, 135, 507, 327, 339, 340, 343, 346,
395/200.09, 445, 460
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,653,001 A * 3/1972 Ninke ........................ 395/132

(Continued)

FOREIGN PATENT DOCUMENTS

| JP | 573167 | * | 1/1982 |
| JP | 3204259 | * | 9/1991 |

OTHER PUBLICATIONS

"Trintex Sets Prodigy Pricing; Telaction Reports New Cable
System Affiliate"; *IDP Report*; v 9 Issue:n4 p. 2(2); Apr. 1,
1988; Dialog(file 648, 06639981).*

(Continued)

*Primary Examiner*—Donald L. Champagne
(74) *Attorney, Agent, or Firm*—Connolly Bove Lodge &
Hutz LLP; Douglas Lefeve

(57) **ABSTRACT**

A method for presenting advertising in an interactive service
provided on a computer network, the service featuring
applications which include pre-created, interactive text/
graphic sessions is described. The method features steps for
presenting advertising concurrently with service applica-
tions at the user terminal configured as a reception system.
In accordance with the method, the advertising is structured
in a manner comparable to the service applications enabling
the applications to be presented at a first portion of a display
associated with the reception account and the advertising
presented at a second portion. Further, steps are provided for
storing and managing advertising at the user reception
system so that advertising can be pre-fetched from the
network and staged in anticipation of being called for
presentation. This minimizes the potential for communica-
tion line interference between application and advertising
traffic and makes the advertising available at the reception
system so as not to delay presentation of the service appli-
cations. Yet further the method features steps for individu-
alizing the advertising supplied to enhance potential user
interest by providing advertising based on a characterization
of the user as defined by the users interaction with the
service, user demographics and geographical location. Yet
additionally, advertising is provided with transactional
facilities so that users can interact with it.

**25 Claims, 16 Drawing Sheets**



buffer is indexed by its PEV number, which is the same as the field number assigned to it during the formation of the page element. Keyboard manager **434** determines for each keystroke whether the keystroke corresponds to an input event or to an action or completion event. Input events are logical keystrokes and are sent by keyboard manager to display manager **461**, which displays the data at the input field location. Display manager **461** also has access to the field buffer as indexed by its PEV number.

The input data are available to TBOL interpreter **438** for subsequent processing. When the cursor is in a partition, only the PEVs for that partition are accessible to the RS virtual machine. After the input from the user is complete (as indicated by a user action such as pressing the RETURN key or entry of data into a field with an action attribute), RS **400** enters the Process Event state (E) via transition (4).

For purposes of this example, let us assume that the user enters the digit "5" in input field **270**. A transition is made to the process event state (E). Keyboard manager **434** and display manager **437** perform a number of actions, such as the display of the keystroke on the screen, the collection of the keystroke for input, and optionally, the validation of the keystroke, i.e. numeric input only in numeric fields. When the keystroke is processed, a return is made to the wait for event state (D) Edit attributes are specified in the field definition segment.

Suppose the user inputs a "6" next. A transition occurs to the PE state and after the "6" is processed, the Wait for Event (D) state is reentered. If the user hits the "completion" key (e.g., ENTER) the Process Event (E) state will be entered. The action attributes associated with field **272** identify this as a system event to trigger post-processor program object <ABCJ>. When the interpretive execution of program object <ABCJ> is complete, the wait for event state (D) will again be entered. The user is then free to enter another value in the input field, or select a command bar function and exit the apples application.

While this invention has been described in its preferred form, it will be appreciated that changes may be made in the form, construction, procedure and arrangement of its various elements and steps without departing from its spirit or scope.

We claim:

1. A method for presenting advertising obtained from a computer network, the network including a multiplicity of user reception systems at which respective users can request applications, from the network, that include interactive services, the respective reception systems including a monitor at which at least the visual portion of the applications can be presented as one or more screens of display, the method comprising the steps of:

a. structuring applications so that they may be presented, through the network, at a first portion of one or more screens of display; and

b. structuring advertising in a manner compatible to that of the applications so that it may be presented, through the network, at a second portion of one or more screens of display concurrently with applications, wherein structuring the advertising includes configuring the advertising as objects that include advertising data and;

c. selectively storing advertising objects at a store established at the reception system.

2. The method of claim **1** wherein storing advertising objects at the reception system includes replenishing the store of advertising objects from the network when the store of advertising objects falls below a predetermined level.

3. The method of claim **2** wherein storing advertising objects at the reception system includes storing advertising

object identifications at the reception system, and wherein the storing of advertising object identification is based on an establishing of a characterization for the respective reception system users.

4. The method of claim **3** wherein establishing the characterization for the respective reception system users includes basing the characterization at least in part on the applications requested by the respective users.

5. The method of claim **3** wherein establishing the characterization for the respective reception system users includes basing the characterization at least in part on the demographic data for the respective users.

6. The method of claim **3** wherein establishing the characterization for the respective reception system users includes basing the characterization at least in part on data concerning the geographical location of the respective user's reception system.

7. The method of claim **3** wherein establishing the characterization for the respective reception system users includes basing the characterization at least in part on a combination of data concerning user application requests, user demographics and geographical location of the respective user's reception system.

8. A method for presenting advertising in a computer network, the network including a multiplicity of user reception systems at which respective users can request applications that include interactive services, the method comprising the steps of:

a. compiling data concerning the respective users;

b. establishing characterizations for respective users based on the compiled data; and

c. structuring advertising so that it may be selectively supplied to and retrieved at the reception systems for presentation to the respective users in accordance with the characterizations established for the respective reception system users, wherein structuring advertising includes supplying advertising data to the reception system and storing a predetermined amount of the advertising data in a store established at the respective reception systems.

9. The method of claim **8** wherein supplying advertising data to the reception system includes pre-fetching advertising data from the network when the store of advertising data falls below a predetermined level.

10. The method of claim **9** wherein pre-fetching advertising data is dependent on the size of the advertising data store.

11. The method of claim **10** wherein storing advertising data at the reception system includes maintaining a list identifying the advertising data to be presented.

12. The method of claim **8** wherein the supplying of advertising data to the reception system for presentation includes the reception system requesting advertising data from the network when advertising data sought to be presented is unavailable at the reception system.

13. A method for presenting advertising in a computer network, the network including a multiplicity of user reception systems at which respective users can request applications that include interactive services, the respective reception systems including a monitor at which at least the visual portion of the applications can be presented as one or more screens of display, the method comprising the steps of:

a. structuring applications so that they may be presented at a first portion of one or more screens of display;

b. configuring the advertising as objects that include advertising data,

c. structuring the advertising objects in a manner compatible to that of the applications so that advertising data from an advertising object may be presented at a second portion of one or more screens of display concurrently with applications, and;

d. selectively storing advertising objects at a store established at the reception system.

**14**. A method for presenting advertising obtained from a computer network, the network including a multiplicity of user reception systems at which respective users can request applications from the network that include interactive services, the respective reception systems including a monitor at which at least the visual portion of the applications can be presented as one or more screens of display, the method comprising the steps of:

a. structuring applications so that a user requested application may be presented, through the network, at a first portion of one or more screens of display;

b. separately structuring the advertising in a manner compatible to that of the applications so that advertising may be presented, through the network, at a second portion of one or more screens of display concurrently with any one of a plurality of user requested applications,

c. configuring the advertising as objects that include advertising data, and

d. selectively storing advertising objects at a store established at the reception system.

**15**. The method of claim **14** wherein storing advertising objects at the reception system includes replenishing the store of advertising objects from the network when the store of advertising objects falls below a predetermined level.

**16**. The method of claim **15** wherein storing advertising objects at the reception system includes storing advertising object identifications at the reception system, and wherein the storing of advertising object identification is based on an establishing of a characterization for the respective reception system users.

**17**. The method of claim **16** wherein establishing the characterization for the respective reception system users includes basing the characterization at least in part on the applications requested by the respective users.

**18**. The method of claim **16** wherein establishing the characterization for the respective reception system users includes basing the characterization at least in part on the demographic data for the respective users.

**19**. The method of claim **16** wherein establishing the characterization for the respective reception system users

includes basing the characterization at least in part on data concerning the geographical location of the respective user's reception system.

**20**. The method of claim **16** wherein establishing the characterization for the respective reception system users includes basing the characterization at least in part on a combination of data concerning user application requests, user demographics and geographical location of the respective user's reception system.

**21**. A method for presenting advertising obtained from a computer network, the network including a multiplicity of user reception systems at which respective users can request, from the network, applications that include interactive services, the method comprising the steps of:

a compiling data concerning the respective users;

b. establishing characterizations for respective users based on the compiled data; and

c. structuring advertising separately from the applications so that the advertising may be selectively supplied, through the network, to and retrieved at the reception systems for presentation to the respective users along with a requested application in accordance with the characterizations established for the respective reception system users,

wherein supplying advertising data to the reception system includes storing a predetermined amount of the advertising data in a store established at the respective reception systems.

**22**. The method of claim **21** wherein supplying advertising data to the reception system includes pre-fetching advertising data from the network when the store of advertising data falls below a predetermined level.

**23**. The method of claim **22** wherein pre-fetching advertising data is dependent on the size of the advertising data store.

**24**. The method of claim **23** wherein storing advertising data at the reception system includes maintaining a list identifying the advertising data to be presented.

**25**. The method of claim **21** wherein the supplying of advertising data to the reception system for presentation includes the reception system requesting advertising data from the network when advertising data sought to be presented is unavailable at the reception system.

\* \* \* \* \*