IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CEPHALON. INC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Redacted- Public Version |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 17-1154-CFC |
| SLAYBACK PHARMA LIMITED | ) | CONSOLIDATED |
| LIABILITY CO., *et al.*, | ) | |
| | ) | ███████████ |
| Defendants. | ) | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

OF COUNSEL:
David I. Berl
Adam D. Harber
Martha C. Kidd
Shaun P. Mahaffy
Ben V. Picozzi
Elise M. Baumgarten
Matthew W. Lachman
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
*Attorneys for Teva Pharmaceuticals*
*International GmbH and Cephalon,*
*Inc.*

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Teva Pharmaceuticals*
*International GmbH, Cephalon, Inc.,*
*and Eagle Pharmaceuticals, Inc.*

OF COUNSEL:
Daniel G. Brown
Michelle L. Ernst
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200

Kenneth G. Schuler
Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

*Attorneys for Eagle Pharmaceuticals, Inc.*

Dated: October 29, 2019

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

I. INTRODUCTION ........................................................................................ 1

II. PROCEDURAL HISTORY .......................................................................... 2

III. FORMULATION FAMILY ........................................................................... 3

    A. Asserted Claims .................................................................................. 3

    B. POSA and Priority Date ...................................................................... 4

    C. Infringement ........................................................................................ 4

        1. "Stabilizing Amount of an Antioxidant" ................................. 5

        2. PG Ester Limitation ('797 Patent Claim 9) ............................. 7

    D. Definiteness ......................................................................................... 7

    E. Non-obviousness ................................................................................. 9

        1. The POSA Would Not Have Been Motivated to Use a Liquid Formulation. ................................................................ 11

        2. The POSA Would Not Have Been Motivated to Use a Non-Aqueous Formulation. ...................................................... 12

        3. The POSA Would Not Have Been Motivated to Use a Combination of Protic Solvents. ............................................... 14

        4. The POSA Would Not Have Been Motivated to Use PEG and PG. ....................................................................................... 18

            a. Polyol Solvents .............................................................. 19

            b. Monovalent Alcohol Solvents ....................................... 20

            c. Polyethylene Glycol (PEG) ........................................... 21

5.    The POSA Would Not Have Been Motivated to Use a 90:10 PEG:PG Ratio. ................................................26

6.    The POSA Would Not Have Been Motivated to Use an Antioxidant................................................................28

7.    The POSA Would Not Have Been Motivated to Use Monothioglycerol...........................................................30

8.    The POSA Would Not Have Had a Reasonable Expectation of Success in Achieving the Claimed Stability Limitations................................................33

9.    The POSA Would Not Have Had a Reasonable Expectation of Success in Achieving the Claimed Bendamustine Concentration. ...................................35

F.    Enablement ................................................................37

G.    The Inventors' Research.............................................38

IV.    METHOD OF ADMINISTRATION FAMILY ............................................40

A.    Asserted Claims........................................................40

B.    POSA and Priority Date ...........................................41

C.    Infringement .............................................................41

D.    Non-obviousness ......................................................42

1.    Bendamustine Concentration ...................................44

a.    Motivation.......................................................44

b.    Reasonable Expectation of Success................................45

2.    Claimed Formulation ................................................47

3.    Administration Time ................................................47

a.    Defendants' References Do Not Support Obviousness .....................................................47

    1)    Preiss 1985 (DTX-985) ...........................................47

    2)    Preiss 1998 (DTX-991) ...........................................49

    3)    Schoffski 2000a (DTX-987)..................................50

    4)    Schoffski 2000b (DTX-988) ................................51

b.    Context of Defendants' References................................53

c.    Worldwide Development of Bendamustine ..................54

d.    Clinical Practice at the Priority Date .............................56

4.    The POSA Would Not Have Been Motivated to Use the Claimed Administration Methods Due to Expected Side Effects. ..................................................................................56

a.    Phlebitis .........................................................................56

b.    Extravasation .................................................................59

c.    Nausea............................................................................59

d.    Neurotoxicity .................................................................60

5.    Administration Volumes ..........................................................61

E.    Skepticism of Method of Administration Invention ...........................62

V.    BENDEKA®'S BENEFITS SUPPORT NONOBVIOUSNESS.................65

A.    Bendeka® Saves Chair Time ...............................................................65

B.    Bendeka® Is a Commercial Success....................................................67

C.    Industry Acceptance and Praise ..........................................................69

## I. INTRODUCTION

1.     This is a consolidated action for patent infringement under Title 35, brought pursuant to the Hatch-Waxman Act, by Plaintiffs Teva Pharmaceuticals International GmbH ("Teva Pharmaceuticals"), Cephalon, Inc. ("Cephalon," and collectively with Teva Pharmaceuticals, "Teva"), and Eagle Pharmaceuticals, Inc. arising out of the filing by each of Defendants Apotex Inc. and Apotex Corp., Fresenius Kabi USA, LLC, Mylan Laboratories Ltd., and Slayback Pharma LLC of an ANDA, seeking approval to market generic versions of Plaintiffs' Bendeka® product prior to the expiration of U.S. Patent Nos. 8,609,707; 9,265,831; 9,572,796; 9,572,797; 10,010,533; 9,034,908; 9,144,568; 9,572,887; 9,597,397; 9,597,398; 9,597,399; 10,052,385; 9,000,021; and 9,579,384.[1]

2.     Bendeka® is indicated for the treatment of chronic lymphocytic leukemia and indolent B-cell non-Hodgkin lymphoma. The active ingredient is bendamustine hydrochloride. Plaintiffs sell Bendeka® pursuant to New Drug Application ("NDA") No. 208194.

3.     Eagle is the owner and assignee of all patents-at-issue, and those patents have been listed in connection with Bendeka® in FDA's Orange Book.

---

[1] All claims and counterclaims related to U.S. Patent Nos. 8,791,270 have been dismissed by stipulation. D.I. 93 (Apotex); C.A. No. 17-1201-LPS, D.I. 24 (Fresenius Kabi); C.A. No. 17-1790-LPS, D.I. 28 (Mylan); D.I. 221 (Slayback).

4. On February 13, 2015, Cephalon obtained an exclusive license to the patents-at-issue, including the right to sue for infringement, and subsequently assigned its rights to Teva Pharmaceuticals.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

6. Defendants do not dispute jurisdiction and venue.

## II.   PROCEDURAL HISTORY

7. Defendants filed ANDAs with Paragraph IV certifications to various patents listed in paragraph 1. Slayback filed a Paragraph IV certification only to the '887 patent.

8. Plaintiffs filed suits alleging that Defendants' ANDA filings with Paragraph IV certifications constitute acts of infringement. These cases were consolidated.

9. Each Defendant answered, denying infringement and alleging invalidity. Apotex, Fresenius Kabi, and Slayback filed counterclaims seeking declarations of non-infringement and invalidity.

10. Plaintiffs asserted at trial the following claims against Defendants other than Slayback:

(1) <u>Formulation Family</u>: Claims 2, 3, and 5 of the '831 patent, and claims 9 and 11 of the '797 patent;

(2) <u>Method of Administration Family</u>: Claims 11, 18, and 22 of the '568 patent, and claims 13 and (against Apotex only) 15 of the '399 patent.

11.    Plaintiffs asserted claim 13 of the '887 patent, from the Method of Administration Family, against Slayback.

## III.    FORMULATION FAMILY

### A.    Asserted Claims

12.    The asserted claims cover non-aqueous liquid compositions comprising specific amounts and ratios of bendamustine, propylene glycol ("PG"), polyethylene glycol ("PEG"), and a stabilizing amount of antioxidant, or methods of using such compositions.  PTX-308 ('831 patent); PTX-310 ('797 patent).

13.    The claims also recite stability limitations.  Claim 2 of the '831 patent requires that the composition have "less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C," PTX-308, and claim 9 of the '797 patent requires that the composition have "less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C," PTX-310.

14.    The claims also specify components and quantities.  Claim 11 of the '797 patent requires that "the antioxidant is thioglycerol or monothioglycerol," which are used synonymously.  PTX-310; Tr. 519:10-15 (Pinal).  Claim 5 of the

'831 patent requires that "the bendamustine concentration is from about 25 mg/mL to about 50 mg/mL."  PTX-308.

15.     Defendants argued that exemplary formulations having 90% PEG, 10% PG, an antioxidant, and 25 mg/mL of bendamustine—as well as the unclaimed elements sodium hydroxide and an inert gas—would have been obvious.  Tr. 493:23-494:2, 602:19-603:12 (Pinal).

**B.     POSA and Priority Date**

16.     Defendants acceded to adoption of Plaintiffs' proposed POSA definition.  *See* PDX-4-2; Tr. 1036:7-20 (Anslyn); 2014:22-2015:2 (Defendants' counsel).

17.     The POSA team would have included an individual with expertise in chemistry, familiar with concepts such as the rate-determining step and activation energy.  Tr. 1353:6-20 (Siepmann); 1037:2-11 (Anslyn); 562:1-562:22, 563:2-6 (Pinal).

18.     The undisputed priority date is January 28, 2010.  Tr. 403:7-9 (Pinal); 1352:16-21 (Siepmann); 2015:3-16 (Defendants' counsel); PTX-308 ('831 patent) at TEVABEND00000072.

**C.     Infringement**

19.     Apotex, Fresenius Kabi, and Mylan dispute that they (1) infringe the "stabilizing amount of an antioxidant" limitation and (2) induce infringement of

the "has less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C" limitation. █████████████

████████████████████████████████████████████████████████████████████

█████████

20. Defendants' ANDA Products satisfy the disputed limitations, and Defendants induce infringement because their labeling recommends, encourages, and promotes using Defendants' ANDA Products in an infringing manner.

### 1. "Stabilizing Amount of an Antioxidant"

21. Each asserted Formulation Family claim recites a "stabilizing amount of an antioxidant."

22. The written description defines a "stabilizing amount" of antioxidant to "include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein." PTX-308 at 3:49-54; Tr. 370:25-371:9 (Siepmann); 398:3-8 (Pinal). The patents further describe "suitable antioxidant concentrations," including "5 mg/mL," and "antioxidants," which include "[mono]thioglycerol." PTX-308 at 3:57-4:8; Tr. 519:12 (Pinal) ("Thioglycerol, which is the same as monothioglycerol"); 1459:20-25 (Siepmann).

23. Apotex's, Fresenius Kabi's, and Mylan's ANDA Products include 5 mg/mL of monothioglycerol as an "Antioxidant," PTX-474 at APOLIQBENDA_ANDA_0005427 (Apotex); PTX-486 at

FK_BENDA_00003243, 45 (Fresenius Kabi); PTX-007 at MYL-BEN_000248 (Mylan); Tr. 372:19-374:13 (Siepmann), which is an amount of antioxidant that the patents disclose as stabilizing. PTX-308 at 7:59-9:2 (Examples 3 and 4); Tr. 370:25-371:9, 371:15-372:18, 377:2-377:8 (Siepmann).

24. Drug manufacturers do not include ingredients, such as antioxidants, in a product unless they perform a specific function. Tr. 1579:1-6 (Siepmann); 597:25-598:4 (Pinal). The purpose of using an antioxidant in the claimed formulations would be to prevent degradation. Tr. 598:5-599:8 (Pinal).

25. Fresenius Kabi and Mylan represented to FDA that 5 mg/mL monothioglycerol was sufficient to ensure that the bendamustine in their products did not fall below specification limits, which admits that 5 mg/mL monothioglycerol is a "stabilizing amount of an antioxidant." PTX-54 at FK_BENDA_00000543 (Fresenius Kabi); PTX-201 at MYL-BEN_005258 (Mylan); Tr. 374:14-377:1, 1525:7-19, 1578:20-25 (Siepmann). Fresenius Kabi and Mylan conducted experiments using batches comprising different monothioglycerol concentrations. PTX-54 at FK_BENDA_00000541-43 (Fresenius Kabi); PTX-201 at MYL-BEN_005256-58 (Mylan); Tr. 374:14-377:1 (Siepmann). Those experiments demonstrated to FDA that 5 mg/mL monothioglycerol is sufficient to prevent the amount of bendamustine from falling

below specification in case of "variation, which can happen."  Tr. 1524:25-1525:19 (Siepmann).

## 2.    PG Ester Limitation ('797 Patent Claim 9)

26.    ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████    As a legal matter, that establishes induced infringement of that limitation, which requires only that the claimed compositions achieve that purity if stored under those conditions, not that they actually be stored by infringers under those conditions.

## D.    Definiteness

27.    Defendants contend that "stabilizing amount of an antioxidant" is indefinite.

28.    Based on the definition in the written description, the POSA would understand that a "stabilizing amount" of an antioxidant includes any amount that decreases the amount of bendamustine degradation after any time period and at any temperature.  Tr. 1485:4-1487:10, 1502:8-12, 1586:11-14 (Siepmann).  That definition is "broad," not "circular."  Tr. 1485:6-13, 1503:23-25 (Siepmann).

29.    The POSA would understand that the terms "increase" and "enhance" are synonymous as used in the definition.  Tr. 1585:20-1586:5 (Siepmann).  There is no contrary evidence.

30.     The POSA could determine objectively and easily whether a given antioxidant concentration was a "stabilizing amount" by conducting an experiment comparing the amount of bendamustine degradation with and without the antioxidant.  PTX-308 at 7:59-8:27 (Example 3); Tr. 1485:14-1486:11, 1487:11-1489:11 (Siepmann).

████  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

32.     The written description discloses that bendamustine degradation can be measured using high-performance liquid chromatography ("HPLC").  PTX-308, at 2:26-44, 2:57-3:4, 4:22-26.  Undisputed expert testimony established that HPLC, but not other techniques, reliably measures bendamustine degradation.  Tr. 1073:21-1074:22 (Anslyn); 1380:21-1380:25 (Siepmann).

33.     The written description describes "suitable antioxidant concentrations," including 5 mg/mL, and antioxidants, which include (mono)thioglycerol.  PTX-308 at 3:57-4:8.  It also discloses examples comprising "stabilizing" amounts of antioxidants.  PTX-308 at 7:59-9:2 (Examples 3-4); Tr. 371:15-372:18, 1489:23-1490:4 (Siepmann).

34.     There is no testimony that different testing conditions would provide disparate results as to whether an amount of antioxidant is "stabilizing." Tr. 1580:4-14 (Siepmann).

35.      Based on the patents' definition and disclosures, and the POSA's knowledge, the POSA could determine with reasonable certainty whether a formulation comprised a "stabilizing amount of an antioxidant." Tr. 1490:5-8 (Siepmann).

**E.     Non-obviousness**

36.     The prior art did not disclose any bendamustine formulations containing PEG. Tr. 1414:24-1415:2 (Siepmann). The prior art cited in this case likewise did not disclose any example of a liquid bendamustine formulation containing an antioxidant. Tr. 1457:5-1459:2 (Siepmann). As of the priority date, the only marketed bendamustine products were lyophilized. Tr. 579:2-7 (Pinal).

37.     Defendants nevertheless argue that the POSA would have been motivated to create a liquid, non-aqueous bendamustine composition containing 90% PEG, 10% PG, and monothioglycerol. Tr. 493:23-494:5, 488:13-16 (Pinal). Defendants arrive at this formulation by combining four references: Olthoff (DTX-94), Drager (DTX-73), Alam (DTX-56), and Boylan (DTX-63).

38.     These references would not have led the POSA to the claimed formulations. Olthoff used an outdated analytical technique and recommended

using "polyols," rather than PEG specifically.  Drager reported being unable to replicate Olthoff's results and instead recommended using "aprotic" solvents, rather than protic solvents like PEG and PG.  Alam, the only reference that actually included a formulation with both PEG and PG, concerned cyclophosphamide, which degrades very differently than bendamustine.  Boylan disclosed monothioglycerol generally, but Plaintiffs presented undisputed evidence that monothioglycerol would have been expected to degrade bendamustine.  The prior art provided no reason to combine these references.

39.     Defendants' obviousness theory ignores the numerous options for formulating bendamustine at the priority date, which indicates use of improper hindsight.  Plaintiffs' experts, Dr. Juergen Siepmann (Professor of Pharmaceuticals at the University of Lille) and Dr. Eric Anslyn (Professor of Chemistry at the University of Texas) provided largely undisputed testimony that arriving at the claimed formulations would have required making the following choices among many more desirable options: (1) a liquid injectable; (2) only non-aqueous solvents; (3) a combination of only protic solvents; (4) PEG and PG; (5) a 90:10 PEG:PG ratio; (6) an antioxidant; and (7) monothioglycerol.  The POSA would not have made these required choices without hindsight, particularly given the unpredictable nature of pharmaceutical sciences.

40.     Defendants did not argue that the POSA would have had a reasonable expectation of success in arriving at the claimed stability and bendamustine concentration limitations.  They instead argued that these limitations are "inherent" properties.  But Defendants' expert conceded that the allegedly obvious formulations did not always yield the claimed stability, precluding any inherency finding.  And the bendamustine concentration (i.e., the amount of bendamustine to add to the formulation) is a choice made by the formulator, not an inherent property.

### 1.     The POSA Would Not Have Been Motivated to Use a Liquid Formulation.

41.     The claims all require a "liquid" bendamustine composition.

42.     The POSA desired an improved bendamustine product that was stable and tolerable.  Tr. 1355:25-1356:4 (Siepmann).  The POSA would have considered numerous formulation strategies to pursue that goal, and it was unpredictable which strategies would succeed.  Tr. 1355:22-24, 1356:5-16 (Siepmann).

43.     The POSA would not have been motivated to pursue a liquid formulation, which the prior art taught to be a difficult approach.  Tr. 1362:20-1363:4 (Siepmann).  For example, most of Drager's liquid formulations were insufficiently stable, even when refrigerated, to preserve the 90% potency for two years that the POSA would have desired.  DTX-73 at JDG_BENDA_00000993;

Tr. 1360:22-1362:15 (Siepmann); PTX-667 (Remington) at TEVABEND00293321, TEVABEND00293328.

44.     Only lyophilized bendamustine products had been marketed before the priority date.  Tr. 579:2-7 (Pinal); 1356:17-1357:2 (Siepmann).  The POSA therefore would have considered improving those lyophilized products, including by reducing reconstitution time or impurities.  Tr. 1357:20-1358:3 (Siepmann).

45.     The POSA also would have been motivated to pursue oral compositions, which patients preferred and had been approved for other nitrogen mustards.  Tr. 1358:20-1359:13 (Siepmann).

46.     The POSA would have been motivated to pursue other strategies known to address the solubility and stability problems that plagued bendamustine, including polymeric implants and prodrugs.  Tr. 1359:14-1360:12 (Siepmann).

### 2.     The POSA Would Not Have Been Motivated to Use a Non-Aqueous Formulation.

47.     The POSA would not have been motivated to use only non-aqueous solvents in a liquid bendamustine formulation.  Tr. 1376:12-19 (Siepmann).  Because of its compatibility with the body, the POSA would have preferred an aqueous formulation.  Tr. 1363:17-1364:7, 1374:17-1375:1, 1421:11-13 (Siepmann); PTX-569 (Strickley) at JDG_BENDA_00003314-15.

48.     The art provided multiple strategies for stabilizing bendamustine in aqueous formulations, including adjusting pH to acidic conditions.  Tr. 1364:15-1365:10 (Siepmann); PTX-376 (Maas) at JDG_BENDA_00002264.

49.     The prior art also disclosed that increasing the chloride concentration stabilized bendamustine.  Tr. 1365:5-23 (Siepmann); PTX-376 (Maas) at JDG_BENDA_00002264.

50.     The POSA also would have considered adding a non-aqueous co-solvent to an aqueous formulation to improve bendamustine stability and solubility.  Tr. 1365:24-1366:9 (Siepmann); DTX-64 (Brittain) at JDG_BENDA_00000377-379.

51.     The POSA would also have considered using complexing agents that surround the molecule to stabilize bendamustine.  Tr. 1366:22-1367:5 (Siepmann).

52.     The POSA would have preferred aqueous formulations with pH adjustment, co-solvents, and/or complexing agents over non-aqueous formulations.  Tr. 1374:17-1375:1 (Siepmann); PTX-569 (Strickley) at JDG_BENDA_00003314-15.

53.     The POSA also would have considered other strategies used in marketed products to reduce degradation by preventing contact with water, including:

- emulsions (oil droplets), Tr. 1367:6-16, 1375:17-19 (Siepmann); PTX-569 (Strickley) at JDG_BENDA_00003314-15;

- liposomes (spheres), Tr. 1367:23-1368:6, 1375:17-19 (Siepmann); PTX-569 (Strickley) at JDG_BENDA_00003314-15;

- dendrimers, Tr. 1367:17-20 (Siepmann); and

- nanoparticles, Tr. 1368:7-19 (Siepmann); PTX-569 (Strickley) at JDG_BENDA_00003317.

54.     The liquid formulation options available to the POSA could have been used in combination.  Tr. 1368:20-23 (Siepmann); PTX-569 (Strickley) at JDG_BENDA_00003314.

55.     Given the known disadvantages of non-aqueous formulations, *see* Tr. 1368:24-1369:3 (Siepmann), the POSA would have preferred and pursued other options.

### 3.     The POSA Would Not Have Been Motivated to Use a Combination of Protic Solvents.

56.     The choice of a solvent system for a liquid, non-aqueous bendamustine composition would not have been predictable or a matter of routine experimentation.  Tr. 1376:24-1377:8 (Siepmann).

57.     The claims require the protic solvents PEG and PG.  The asserted prior art taught to minimize bendamustine degradation by using aprotic solvents (which lack OH groups).  DTX-73 (Drager) at 3:21-26.  Absent hindsight, the

14

POSA would not have ignored this teaching and used only protic solvents. Tr. 1396:25-1397:10 (Siepmann).

58.     Both Olthoff and Drager investigated the stability of bendamustine in non-aqueous solvent systems. Olthoff, a 1983 East German patent, measured the stability of ethanol and PG formulations using thin-layer chromatography (TLC) and reported no degradation at 25°C. DTX-94 at JDG_BENDA_00002313; Tr. 1377:19-1378:5 (Siepmann). Drager, filed in 2008, determined that the "results described in [Olthoff] were not reproducible." DTX-73 at 2:62-64. Drager's data showed that bendamustine in 99% PG degraded almost completely after eight weeks at 25°C and more than 20% at 5°C after one year. DTX-73 at JDG_BENDA_00000994; Tr. 1378:9-1380:5 (Siepmann). Drager concluded that a PG formulation of bendamustine was "not feasible." DTX-73 at 2:67-3:2; Tr. 1380:6-9 (Siepmann).

59.     The POSA would have credited Drager's stability data and conclusions over Olthoff's. Tr. 1380:14-1380:25 (Siepmann); 1074:19-1075:3 (Anslyn). It was undisputed that HPLC, used by Drager, is far more reliable than TLC, used by Olthoff, because of its superior sensitivity and ability to resolve impurities. Tr. 1074:4-18, 1086:17-20 (Anslyn); 1380:14-25, 1511:5-11 (Siepmann). Drager demonstrated that—contrary to Olthoff—degradation reactions occur at bendamustine's nitrogen mustard and carboxylic acid groups in

non-aqueous solvent systems to form PG esters and other degradants. DTX-73 (Drager) at 2:66-67, 8:50-67; Tr. 1060:18-1061:3 (Anslyn); 1419:18-24 (Siepmann); 566:5-12, 567:21-568:10, 569:12-570:16 (Pinal).

60.     Defendants' expert agreed that if the POSA believed the data in Olthoff to be wrong or unreliable, the POSA also would have believed Olthoff's statements based on that data to be wrong or unreliable. Tr. 570:17-571:10 (Pinal).

61.     Defendants dispute that Drager repeated Olthoff's experiment, because Drager used "99% propylene glycol." DTX-73 at JDG_BENDA_00000994; Tr. 623:14-18 (Pinal). The POSA would have understood that commercially-available PG includes a 99% pure composition. Tr. 628:12-629:19 (Pinal). Thus, the POSA would have understood that Drager used Olthoff's formulation but found its results not reproducible. Tr. 1379:16-20, 1380:10-13 (Siepmann).

62.     Drager disclosed that "nucleophiles" like water and alkylene glycols—such as PG and PEG—degrade bendamustine. DTX-73 at 4:33-37; Tr. 1381:11-18 (Siepmann). Drager disclosed exemplary degradants that form in non-aqueous solvents, including HP1, BM1 dimer, DCE, PG-1, and PG-2. DTX-73 at 4:40-5:43, 8:50-67. The POSA would have understood that HP1 and BM1 dimer are among the degradants that form at the nitrogen mustard group through an aziridinium intermediate. Tr. 1038:13-21 (Anslyn); 564:10-565:12 (Pinal). The

POSA would have understood that Drager's formulations contained additional, undisclosed impurities.  Tr. 1382:7-1383:8 (Siepmann).

63.  To minimize nucleophilic degradation, Drager taught using *aprotic* solvents with bendamustine.  DTX-73 at 3:21-26; Tr. 1381:7-10, 1383:13-20 (Siepmann).  Drager provided examples of aprotic solvents, along with data showing favorable bendamustine solubility and stability compared to PG.  DTX-73 at 3:3-20, 8:30-40; Tr. 1383:21-24, 1390:14-1391:2, 1392:1-24, 1385:6-17, 1385:22-1386:12 (Siepmann).  The POSA would have expected Drager's aprotic solvents to be tolerable.  Tr. 1391:7-19 (Siepmann).

64.  Based on Drager, the POSA would not have used only protic solvents with bendamustine.  Tr. 1393:24-1394:4 (Siepmann).  As Defendants and their expert acknowledge, Drager taught using aprotic solvents, not protic solvents alone.  Tr. 583:1-583:10 (Pinal); 1886:17-19 (Defendants' counsel).  Drager disclosed that protic solvents could be used with aprotic solvents, but that the concentration of protic solvents should be kept at 90%—and preferably lower—to limit degradation.  DTX-73 at 3:37-41, 4:18-24; Tr. 1393:3-22 (Siepmann).

65.  Drager disclosed one example formulation with an aprotic and protic solvent, containing 66% DMA and 34% PG.  DTX-73 at 3:42-43 (listing PG as protic), 8:50-67; Tr. 1394:24-1395:14 (Siepmann).  DMA had been used in marketed parenteral products, with infusion concentrations higher than Drager's.

Tr. 1395:23-1396:24 (Siepmann); PTX-569 (Strickley) at

JDG_BENDA_00003311 (Teniposide, 3% administered); DTX-73 (Drager) at

10:39-55 (disclosing dilution into 500 mL). Contrary to Defendants' expert's

opinion, Tr. 436:10-15 (Pinal), the POSA could have used DMA despite any

potential disadvantages. Tr. 1570:17-24 (Siepmann). Nevertheless, if the POSA

were motivated to replace the DMA in Drager's formulation, the POSA would

have used another disclosed aprotic solvent, not a purely protic solvent system

inconsistent with the teaching of Drager, the most relevant prior art. Tr. 1395:7-14

(Siepmann).

### 4. The POSA Would Not Have Been Motivated to Use PEG and PG.

66. Even the POSA using only protic solvents would not have been

motivated to choose the claimed PEG-PG solvent system. Tr. 1419:25-1420:3,

1425:17-20 (Siepmann). The POSA would have had many options, largely

ignored by Defendants, and choosing amongst them would not have been

predictable or routine. Tr. 1397:21-24, 1400:1-9, 1414:5-16 (Siepmann); PTX-568

(Nema) at 167; PTX-569 (Strickley) at JDG_BENDA_00003311; DTX-73

(Drager) at 3:40-48.

67. Drager used some solvents that had not been used in commercially

available parenteral formulations. Tr. 1391:3-6 (Siepmann); 601:15-23 (Pinal).

Given this disclosure and the known challenges of formulating bendamustine, the

POSA would have considered solvents not previously used in marketed parenteral products.  Tr. 1405:9-21 (Siepmann).

68.     There is no limit to the number of protic solvents the POSA could have combined, and the prior art disclosed formulations containing three and four co-solvents.  Tr. 1412:17-1414:4 (Siepmann); *e.g.*, PTX-569 (Strickley) at JDG_BENDA_00003305, JDG_BENDA_00003308-09 (diazepam, etoposide, teniposide).

### a.     Polyol Solvents

69.     Olthoff "propose[d] to dissolve the active substance in polyols, particularly in [PG]."  DTX-94 at JDG_BENDA_00002314.  Defendants assert that the POSA therefore would have used PEG with bendamustine.  Tr. 1883:12-1884:5 (Defendants' counsel).  The POSA would not have followed Olthoff's teaching about "polyols," as it was based on discredited data and contrary to Drager's teaching to use aprotic solvents.  Tr. 1383:13-20, 1398:3-9, 1398:22-24 (Siepmann).  But even the POSA who credited Olthoff's statement would have chosen amongst many polyols.  Tr. 1398:25-1399:7, 1406:19-18 (Siepmann); 1895:14-15 (Defendants' counsel).  Mixtures of those polyols would not have behaved predictably.  Tr. 1406:19-22 (Siepmann).

70.     The POSA could have used at least the following polyols:

- **Glycerol/Glycerin.** Tr. 1399:12-23 (Siepmann); DTX-73 (Drager) at 3:40-48; PTX-569 (Strickley) at JDG_BENDA_00003311.

- **TWEEN 20, TWEEN 40, TWEEN 80.** Tr. 1400:10-1401:19, 1405:2-8 (Siepmann); DTX-73 (Drager) at 3:40-48; PTX-569 (Strickley) at JDG_BENDA_00003311; PTX-568 (Nema) at 167.

- **Cremophor RH 40, Cremophor RH 60, Cremophor EL.** Tr. 1401:20-1403:10 (Siepmann); PTX-568 (Nema) at 167; PTX-569 (Strickley) at JDG_BENDA_00003311.

- **Solutol HS**. Tr. 1403:11-17 (Siepmann); PTX-569 (Strickley) at JDG_BENDA_00003311.

- **Butylene Glycol**. Tr. 1404:6-20 (Siepmann); PTX-669 (Rowe) at TEVABEND00293832.

- **Polybutylene Glycol, Polypropylene Glycol, Ethylene Glycol.** Tr. 1405:22-1406:8 (Siepmann); DTX-73 (Drager) at 3:40-48.

71. Apart from glycerol, Defendants' experts did not address these polyols or explain why the POSA would have ignored them.

### b.    Monovalent Alcohol Solvents

72. Defendants reject monovalent alcohols, like ethanol, based on Olthoff's statement that "[f]or pharmacological reasons and for reasons concerning the production, monovalent alcohols are of limited use for the production of

injection solutions." DTX-94 at JDG_BENDA_00002314; Tr. 412:19-21, 575:20-576:2 (Pinal). By the priority date decades later, the POSA would have known that ethanol was widely used in parenteral formulations. Tr. 1408:11-1409:21 (Siepmann); 577:6-9 (Pinal); PTX-568 (Nema) at 167. The POSA would therefore not have preferred polyols over monovalent alcohols or considered only polyols. Tr. 1409:22-1410:6 (Siepmann).

73. The POSA could have used at least the following monovalent alcohols, and Defendants' experts offered no valid reason why the POSA would have selected PEG and PG over them:

- **Ethanol.** Tr. 1408:11-1409:21 (Siepmann); PTX-568 (Nema) at 167; DTX-73 (Drager) at 3:40-48; DTX-94 (Olthoff) at JDG_BENDA_00002314.

- **Glycofurol, Ethyl Lactate.** Tr. 1411:5-17 (Siepmann); PTX-669 (Rowe) at TEVABEND00294011, TEVABEND00294052.

- **Solketal.** Tr. 1411:18-25 (Siepmann).

- **Benzyl Alcohol.** Tr. 1412:1-5 (Siepmann).

### c. Polyethylene Glycol (PEG)

74. Olthoff does not mention PEG or describe any bendamustine formulation with PEG. DTX-94; Tr. 1414:18-23 (Siepmann). Drager lists PEG as one of many protic solvents, DTX-73 at 3:40-48, but does not include PEG in any

exemplified formulation, disclose the solubility of bendamustine in PEG, or disclose the combination of PEG and PG. Tr. 1415:15-1416:6 (Siepmann).

75. The POSA would have understood that the OH groups in PEG could react with bendamustine's carboxylic acid and nitrogen mustard groups to form esters and ethers, respectively. Tr. 1416:11-23 (Siepmann); PTX-669 (Rowe) at TEVABEND00294275. The POSA would have been concerned that PEG ester degradants would have significantly different rates of elimination and distribution within the body. Tr. 1416:24-1418:12 (Siepmann); PTX-623 (Bailon) at TEVABEND00289470; PTX-642 (Haverstick) at TEVABEND00291647-48.

76. The POSA would have been concerned about PEG oxidizing. The prior art disclosed that PEG rarely was used in marketed parenteral products, in part due to "the presence or generation of peroxides" caused by PEG oxidation. Tr. 1418:13-1419:12 (Siepmann); PTX-669 (Rowe) at TEVABEND00294275; PTX-568 (Nema) at 167.

77. The POSA would have expected PEG to accelerate bendamustine degradation at the nitrogen mustard group via the formation of an unstable aziridinium ring. Tr. 1037:12-1041:16, 1058:12-17, 1060:2-9 (Anslyn); PTX-376 (Maas) at JDG_BENDA_00002265. The aziridinium ring can react with nucleophiles, such as water and alcohols like PEG and PG. Tr. 1041:17-1046:22 (Anslyn); PTX-1010 (Florea-Wang) at TEVABEND00296748,

TEVABEND00296753-54; Tr. 1381:11-18 (Siepmann); DTX-73 (Drager) at 4:33-37. Aziridinium ring formation is the "rate-determining step" in bendamustine's degradation at the nitrogen mustard group, meaning that accelerating its formation would have been expected to accelerate bendamustine degradation. Tr. 1048:2-1049:23 (Anslyn).

78.     The POSA would have considered "Menschutkin reactions" closely analogous to the reaction that forms the aziridinium ring, and the POSA would have considered Menschutkin reactions to predict the kinetics of aziridinium ring formation. Tr. 1051:8-1053:4, 1087:7-15 (Anslyn); PTX-985 (Anslyn) at TEVABEND00289422.

79.     The solvent parameter $\pi^*$ was disclosed to be directly proportional to the rate of Menschutkin reactions. Tr. 1053:5-1055:14 (Anslyn); PTX-988 (Calado) at TEVABEND00289728, TEVABEND00289731-32; PTX-985 (Anslyn) at TEVABEND00289281. The POSA would have expected that solvents with high $\pi^*$ values would increase bendamustine degradation by accelerating aziridinium ring formation. Tr. 1055:15-1056:14 (Anslyn).

80.     PEG was known to have a $\pi^*$ value of 1.08. Tr. 1057:24-25, 1058:9-11 (Anslyn); PTX-997 (Kim) at TEVABEND00291955. Water, which degrades bendamustine rapidly, has a $\pi^*$ value of 1.09. Tr. 1058:3-1058:5 (Anslyn); PTX-999 (Marcus) at TEVABEND00292130. Other solvents had lower reported $\pi^*$

values.  Tr. 1056:15-1058:11 (Anslyn); PTX-999 (Marcus) at TEVABEND00292130-31, TEVABEND00292136-37.  The POSA would have expected PEG to cause more nitrogen mustard degradation than other solvents, including propylene glycol.  Tr. 1058:1-1059:12 (Anslyn).  The POSA would have expected a solvent system with 90% PEG/10% PG to behave similarly to pure PEG and cause considerable degradation at the nitrogen mustard group.  Tr. 1059:13-1060:9 (Anslyn).

81.    Because of this expected degradation, the POSA would not have been motivated to use PEG, much less a 90:10 mixture of PEG and PG.  *Id.*; Tr. 566:21-24 (Pinal) (POSA would not use a solvent system expected to enhance substantially degradation by one or more chemical reactions).

82.    Defendants argue that Alam's disclosure of cyclophosphamide with PEG and PG would have motivated the POSA to use those solvents with bendamustine.  DTX-56 at 5:47-55; Tr. 424:23-425:1 (Pinal); 1895:8-13 (Defendants' counsel).  Though both bendamustine and cyclophosphamide are nitrogen mustards, the POSA would have understood that the structural differences between the two are relevant to their expected degradation in PEG and PG.  In particular, the nitrogen mustard group is attached to a benzene ring in bendamustine, but to a phosphoramide in cyclophosphamide.  Tr. 1075:4-1077:3 (Anslyn); PTX-991 (Fleming) at TEVABEND00290978.  Cyclophosphamide

consequently does not form the aziridinium ring in a liquid formulation before administration (*i.e.*, during storage). *Id.* Bendamustine and cyclophosphamide therefore undergo completely different hydrolysis reactions. Tr. 1077:4-1077:24 (Anslyn); PTX-993 (Gilard) at TEVABEND00291516. The POSA also would have understood that cyclophosphamide does not form esters. Tr. 1077:25-1078:6 (Anslyn). The POSA would not have viewed cyclophosphamide as a relevant comparator for bendamustine reactions, Tr. 1078:7-11 (Anslyn), and would not have considered cyclophosphamide in making a soluble, stable bendamustine formulation, Tr. 1420:10-1421:5 (Siepmann).

83. The Alam formulations would not have motivated the POSA. Subsequent prior art testing reported that Alam's 20:80 PEG-PG formulation exhibited undesirable discoloration. Tr. 1424:7-1425:5 (Siepmann); PTX-377 (Tait) at JDG_BENDA_00003345. No art disclosed using PEG and PG with bendamustine between Alam's 1989 publication and the priority date. Tr. 1425:6-14 (Siepmann).

84. The prior art did not disclose bendamustine's solubility in PEG. *Infra* ¶¶ 118-119. The POSA would have preferred to use solvents with known bendamustine solubilities, such as those in Drager. Tr. 1437:1-22 (Siepmann); DTX-73 (Drager) at 8:30-40. The POSA would not have been motivated to use PEG (or a 90:10 PEG-PG composition) because, as explained below, the POSA

would not have expected to be able to achieve a bendamustine concentration of 25 mg/mL in a 90:10 PEG-PG formulation. *See infra* ¶¶ 115-120; Tr. 1450:10-14 (Siepmann).

85. The foregoing concerns, largely undisputed by Defendants, would have dissuaded the POSA from using PEG in a liquid bendamustine formulation.

### 5. The POSA Would Not Have Been Motivated to Use a 90:10 PEG:PG Ratio.

86. The claims require particular PEG:PG ratios. The only ratio that Defendants argued was obvious was 90:10 PEG:PG. Tr. 493:17-494:5 (Pinal).

87. Even if the POSA were motivated to use PEG and PG with bendamustine, the POSA would not have used a 90:10 PEG-PG ratio. Tr. 1451:7-11 (Siepmann).

88. There was not a limited number of PEG-PG ratios; it would not have been routine to identify an optimal ratio; and it would not have been predictable that a 90:10 ratio would be suitable. Tr. 1427:17-1428:2 (Siepmann).

89. Defendants argue that Alam would have motivated the POSA to use a 90:10 PEG:PG ratio. Tr. 1898:3-7 (Defendants' counsel). Alam discloses a wide range of PEG:PG ratios, with 20:80 most preferred. DTX-56 at 4:5-17. The POSA motivated by Alam therefore would have used more PG than PEG. Tr. 1428:15-1429:11 (Siepmann).

90.     Defendants also argue that Drager teaches (*sub silencio*) to "minimize" OH groups, motivating the POSA to use a 90:10 ratio of PEG:PG.  *See* Tr. 1888:1-8, 1899:24-1900:8 (Defendants' counsel).  Drager's teaching was to use an *aprotic* solvent with bendamustine to avoid degradation by nucleophiles like PEG, not to use PEG.  *Supra* ¶¶ 63-65.  Defendants cite no prior art connecting overall bendamustine degradation to OH group concentration.  Tr. 1429:12-22 (Siepmann).

91.     The timing of Defendants' "OH group" theory indicates it is a product of hindsight.  Defendants did not advance this theory in their notice letters, initial invalidity contentions, or interrogatory responses.  Tr. 1431:12-1432:10 (Siepmann).  Rather, Defendants raised the theory in their final invalidity contentions, after depositions where the inventor discussed hydroxyl content to explain (*post-factum*) certain stability data.  Tr. 1432:11-1433:12 (Siepmann); 800:12-802:21 (Buxton); PTX-721 (Def. Ltr.) at 4.

92.     The POSA would have understood that multiple factors affect the esterification rate, not just hydroxyl content.  Tr. 1061:4-12 (Anslyn).  Drager's data confirmed that PG's primary alcohol esterifies bendamustine four times faster than its secondary alcohol.  DTX-73 at 8:50-67; Tr. 1062:19-1063:9 (Anslyn); 589:5-590:8 (Pinal).  PEG contains two primary alcohols.  Tr. 1062:6-18 (Anslyn).  When the relative reactivity of the alcohols is considered, the hydroxyl content in a

90:10 PEG:PG formulation (10.44%) is *higher* than Drager's formulation containing 66:34 DMA:PG (9.48%).  Tr. 1067:12-17 (Anslyn) (citing PDX-4-19).  The POSA thus would not have been motivated by relative hydroxyl contents to switch from Drager's formulation to a 90:10 PEG:PG formulation.  Tr. 1067:18-1068:2 (Anslyn).

93.     Defendants asserted that viscosity concerns would have motivated the POSA to make a 90:10 PEG:PG formulation, rather than 100% PEG.  Tr. 441:14-25 (Pinal).  This argument assumes, contrary to the evidence, a motivation to use predominately PEG.  Defendants offered no evidence about the viscosity of a 90:10 PEG:PG formulation or any prior art teaching of viscosity concerns for similar formulations.  Moreover, the POSA would not have known whether using 10% PG would have solved any hypothetical viscosity concern.  Tr. 1451:3-6 (Siepmann).  The POSA would not have been motivated by viscosity concerns to use a 90:10 PEG:PG formulation.

### 6.     The POSA Would Not Have Been Motivated to Use an Antioxidant.

94.     All claims require an antioxidant.  Defendants' expert testified that the POSA would have been motivated to use an antioxidant to prevent PEG oxidation and the resulting increased bendamustine esterification.  Tr. 484:15-485:20 (Pinal).

95.     The prior art would not have motivated the POSA to use an antioxidant.  Tr. 1458:9-14 (Siepmann).

96.     None of the four approved injectable products containing PEG in the prior art included an antioxidant.  Tr. 1454:24-1455:17 (Siepmann); 600:4-6 (Pinal); PTX-722 (Ativan); PTX-718 (Busulfex); PTX-720 (Robaxin); PTX-569 (Strickley) at JDG_BENDA_00003308 (VePesid).  Defendants offered no evidence that the POSA would have expected a composition of bendamustine, PEG, and PG to be more prone to oxidation than those formulations.  The POSA who did not expect a PEG-PG solvent system to oxidize would not have added an antioxidant.  Tr. 1451:23-1452:8 (Siepmann).

97.     The POSA who did expect the PEG-PG solvent system to oxidize would have avoided the offending solvent.  Tr. 1451:15-22 (Siepmann).  Formulators prefer simple formulations and avoid excipients they expect to introduce problems that require additional excipients.  Tr. 1452:9-19 (Siepmann).

98.     The prior art discouraged using antioxidants and suggested their use only if other options failed.  Tr. 1452:20-1453:21 (Siepmann); PTX-629 (EU Guidelines) at TEVABEND00290713, TEVABEND00290720; PTX-391 (Broadhead) at JDG_BENDA_00000415.  That standard was not satisfied for the claimed formulations.  Tr. 1453:22-24 (Siepmann).  The POSA would have preferred other options for addressing potential oxidation-related degradation, including sparging, closure devices, excluding light, and inert gas overlays.  Tr. 1453:25-1454:2, 1455:18-1456:25 (Siepmann).  Olthoff taught several of these

options for bendamustine formulations. *Id.*; DTX-94 at JDG_BENDA_00002314. The POSA also could have increased the formulation's pH to address oxidation-driven esterification. Tr. 1456:2-11 (Siepmann).

99. Olthoff's liquid bendamustine formulations with PG or ethanol had no antioxidant. DTX-94 at JDG_BENDA_00002313; Tr. 1457:5-12 (Siepmann). Olthoff used an antioxidant with solid bendamustine powder, but it failed to prevent oxidation. DTX-94 at JDG_BENDA_00002311; Tr. 1457:13-1458:1 (Siepmann). Neither Alam nor Drager used an antioxidant in their exemplary or preferred formulations. Tr. 1458:2-1458:23 (Siepmann).

100. Using an antioxidant to solve an oxidation problem is not simple or predictable. Antioxidants can react with the drug or excipients, and there is no reliable method of predicting antioxidant efficacy. Tr. 1454:5-20 (Siepmann); PTX-599 (Akers) at JDG_BENDA_00006119.

### 7. The POSA Would Not Have Been Motivated to Use Monothioglycerol.

101. Claim 11 of the '797 patent requires the antioxidant monothioglycerol, which Defendants argue the POSA would have chosen because it is "commonly used" in injectable products. Tr. 488:13-16 (Pinal).

102. The prior art would not have motivated the POSA to use monothioglycerol in a liquid PEG-PG bendamustine formulation. Tr. 1465:25-1466:3 (Siepmann); 1068:5-10, 1072:25-1073:4 (Anslyn).

103.   The POSA would have expected bendamustine and monothioglycerol to react and accordingly would not have chosen that antioxidant.  Tr. 1070:6-1073:4 (Anslyn); 1465:18-24 (Siepmann).

104.   Monothioglycerol contains two alcohol groups and a thiol group.  Tr. 1070:6-14 (Anslyn).

105.   The POSA would have expected the alcohol and thiol groups to react with bendamustine's carboxylic acid and nitrogen mustard groups.  Tr. 1042:24-1043:6, 1045:24-12, 1070:15-23, 1071:24-1072:6 (Anslyn).  The POSA would have understood that thiols are more reactive than alcohols in these reactions.  Tr. 1072:2-12 (Anslyn).

106.   These reactions degrade both bendamustine and monothioglycerol, reducing the amounts of those molecules available to achieve their functions.  Tr. 1072:11-17 (Anslyn).

107.   The POSA would have understood that not all antioxidants would react with bendamustine as readily as monothioglycerol.  Many antioxidants contain "phenols," which are less reactive than monothioglycerol's alcohols and thiol. Tr. 1071:1-23, 1072:18-24 (Anslyn).  Drager identified multiple phenol-based antioxidants that the POSA would have considered.  DTX-73 at 7:7-9; Tr. 1460:1-19, 1461:9-12 (Siepmann).  None of the antioxidants Drager discussed contain thiol groups. Tr. 1460:12-14 (Siepmann).

108.    The POSA would not have expected monothioglycerol to stabilize bendamustine formulations.  The prior art taught that monothioglycerol was not effective in acidic compositions.  Tr. 1068:16-1070:5 (Anslyn); PTX-647 (Kasraian) at TEVABEND00291937-38 (monothioglycerol decreased degradation at pH 7.5, but provided no effect at acidic pH 6.0).  Liquid bendamustine formulations are acidic.  Tr. 1068:11-15 (Anslyn); DTX-94 (Olthoff) at JDG_BENDA_00002311 (pH of 2.4 to 3.0).

109.    Defendants argue that Boylan taught that monothioglycerol is "commonly used."  Tr. 488:13-24 (Pinal).  Boylan did not indicate that monothioglycerol is preferred, DTX-63 at JDG_BENDA_00000349, and would not have motivated the POSA to use monothioglycerol with bendamustine.  Tr. 1463:16-1464:4 (Siepmann).  The POSA would have preferred to use an antioxidant Drager disclosed as suitable for bendamustine specifically.  Tr. 1461:1-12 (Siepmann).  Further, the POSA would have understood that monothioglycerol was one of many available antioxidants, and not among the most frequently used.  Tr. 1461:13-25 (Siepmann); PTX-568 (Nema) at 168.  Nema's list of seventeen antioxidants was not comprehensive—other antioxidants such as alpha tocopherol, methionine, sulfur dioxide, and sodium thiosulfate were available by the priority date.  Tr. 1462:9-22 (Siepmann); PTX-669 (Rowe) at TEVABEND00293786, TEVABEND00294191, TEVABEND00294473, TEVABEND00294426.

110. Defendants argue that the POSA would have avoided acidic antioxidants and therefore used monothioglycerol. Tr. 487:20-488:8 (Pinal). But the POSA would not have excluded antioxidants due to their acidity, because the prior art disclosed that acidic formulations could stabilize bendamustine's nitrogen mustard group. Tr. 1464:5-11 (Siepmann); PTX-376 (Maas) at JDG_BENDA_00002264. Even excluding acidic antioxidants, the POSA would not have been left with a small set of options. Tr. 1464:12-15 (Siepmann).

111. During cross-examination of Dr. Siepmann, Defendants suggested that Tait (PTX-377) provided reason to use monothioglycerol. Tr. 1546:25-1547:18. Defendants' experts did not testify about Tait. Tait concerns ifosfamide, which does not contain a carboxylic acid or nitrogen mustard group and therefore does not degrade by the same pathways as bendamustine. Tr. 1464:22-24, 1465:15-17 (Siepmann); PTX-991 (Fleming) at TEVABEND00290977-78; *see* Tr. 1076:18-1077:3 (Anslyn) (discussing cyclophosphamide). Tait did not use monothioglycerol in its stability experiments. PTX-377 at JDG_BENDA_00003347; Tr. 1465:11-14 (Siepmann).

### 8. The POSA Would Not Have Had a Reasonable Expectation of Success in Achieving the Claimed Stability Limitations.

112. Claim 2 of the '831 patent (PTX-308) requires that the composition have "less than or equal to 0.18% total PG esters at about 12 months of storage at a temperature of about 5° C." Claim 9 of the '797 patent (PTX-310) requires that

the composition have "less than or equal to 0.43% total PG esters at about 3 months of storage at a temperature of about 25° C." Plaintiffs offered undisputed testimony that the POSA, in view of Drager, would not have expected the claimed formulations to achieve those stability levels. DTX-73 at JDG_BENDA_0000994, 2:66-67, 8:52-67; Tr. 1468:23-1471:8 (Siepmann).

113. Instead of adducing evidence of a reasonable expectation of success, Defendants argued that the stability limitations are inherent properties of the claimed formulations. Tr. 512:10-14, 522:14-19 (Pinal). That assertion was not borne out by the evidence at trial, which reflected that not all formulations with the claimed ingredients and ratios necessarily have less than 0.18% total PG esters at about 12 months of storage at 5°C or less than 0.43% total PG esters at about 3 months of storage at 25°C. Tr. 1466:18-1467:2 (Siepmann). For example, certain batches with the claimed ingredients and ratios but without sodium hydroxide, have more than 0.43% total PG esters after 3 months at 25°C. Tr. 532:1-532:16, 541:17-25 (Pinal); 1467:7-8 (Siepmann); DTX-1349 (Palepu 2013) at Fig 4A.

114. Defendants also argued that the claimed stability profiles are inherent properties of their allegedly obvious formulations, which include unclaimed elements, such as sodium hydroxide. Tr. 489:17-25 (Pinal); 523:14-20, 526:21-23 (Defendants' counsel). But the "obvious formulations" Dr. Pinal identified include formulations with different excipients and concentrations. Tr. 608:16-25 (Pinal);

1467:9-23 (Siepmann). Dr. Pinal conceded that those formulations do "not necessarily" have the claimed stability profile of less than 0.43% PG esters after three months at 25°C; rather, "it would depend." Tr. 613:2-614:5, 616:5-19, 617:4-21 (Pinal); 1468:6-22 (Siepmann). The stability limitations therefore are not inherent.

### 9. The POSA Would Not Have Had a Reasonable Expectation of Success in Achieving the Claimed Bendamustine Concentration.

115. Claim 5 of the '831 patent requires a bendamustine concentration of about 25 mg/mL to about 50 mg/mL. Defendants adduced no testimony that the POSA would have expected success in achieving that concentration based on the prior art.

116. Due to safety concerns, the POSA would have wanted the bendamustine to remain completely dissolved, including in refrigerated conditions. Tr. 1434:13-1435:9, 1449:22-25 (Siepmann); 591:19-592:7 (Pinal); PTX-667 (Remington's) at TEVABEND00293319. To avoid precipitation, the bendamustine concentration must remain below the formulation's bendamustine solubility limit. *See* Tr. 593:23-594:4 (Pinal); 1435:10-25, 1472:17-20 (Siepmann).

117. The solubility of bendamustine was known to decrease as a function of temperature in at least some solvents. Tr. 592:25-593:15 (Pinal). To account

for temperature fluctuations, the POSA would have required a bendamustine solubility of at least 32.5 mg/mL in refrigerated conditions, in order to use 25 mg/mL bendamustine.  Tr. 1435:10-1436:24 (Siepmann).

118.   The prior art did not disclose bendamustine's solubility in PEG or in a PEG-PG mixture.  Tr. 1437:1-7 (Siepmann).  Defendants did not adduce testimony that the POSA would have expected a 90:10 PEG-PG formulation to provide a solubility of 25 mg/mL or 32.5 mg/mL.  Tr. 449:21-463:6 (striking testimony).

119.   Acknowledging bendamustine's solubility in PEG or a PEG-PG mixture was unknown, Defendants rely on internal, non-prior art Eagle data to argue that the POSA would have expected to achieve a bendamustine concentration of 25 mg/mL.  Tr. 480:22-481:12 (Pinal); 1439:3-6 (Siepmann). Even the POSA with access to these data would not have expected to achieve the requisite bendamustine concentration of 32.5 mg/mL at any temperature or 25 mg/mL at refrigerated conditions.  Tr. 1449:7-1450:14 (Siepmann);  592:8-21 (Pinal) (no opinion about refrigerated solubility).

120.   Defendants argue that the claimed bendamustine concentration is an inherent property of the formulation.  Tr. 1903:15-1904:8 (Defendants' counsel). But the concentration of bendamustine—how much bendamustine to use—is the formulator's decision, not a chemical or biological property of the formulation.  Tr. 1449:2-6 (Siepmann).  For example, the bendamustine concentration recited in

36

claim 5 of the '831 patent does not necessarily result from the preparation of the formulations of its claims 1-3. Tr. 1447:25-1449:1 (Siepmann).

**F.      Enablement**

121.     Defendants argue that if the stability limitations are not inherent, they are not enabled. Tr. 524:17-24, 526:16-527:1 (Defendants' counsel). The only testimony Defendants adduced on this issue was that the patents do not explicitly instruct the POSA to use sodium hydroxide in the claimed formulations, Tr. 542:6-15 (Pinal), and that certain formulations without sodium hydroxide exhibited high levels of impurities, *e.g.*, Tr. 531:13-25 (Pinal).

122.     Defendants fail to establish non-enablement. Defendants adduced no evidence that *any* experimentation would be required to achieve the stability limitations, much less *undue* experimentation. Moreover, the patent itself discloses formulations satisfying the stability limitations. PTX-308 ('831 patent) at TEVABEND00000077 (Table 6).

123.     Even had Defendants established that the claimed inventions require sodium hydroxide, it is undisputed that the POSA would have added sodium hydroxide upon encountering impurities caused by acidic PEG batches. Tr. 490:12-491:10 (Pinal); 361:9-363:5 (Palepu).

### G. The Inventors' Research

124.    The research of the inventors, Drs. Nagesh Palepu and Christopher Buxton, is not prior art.  However, their work confirms the unpredictability of formulating bendamustine.

125.    The inventors' goal was to create a liquid bendamustine formulation that would remain stable for 24 months.  Tr. 261:16-18 (Palepu).

126.    Consistent with Dr. Siepmann's testimony, the inventors used aqueous solutions with chloride added.  Tr. 267:6-13, 270:6-14, 275:25-276:7 (Palepu); PTX-761 (July report) at EGL-BENDEKA_00192601.  Chloride ions did not sufficiently stabilize bendamustine.  Tr. 272:6-14, 274:24-275:2 (Palepu); PTX-761 (July report) at EGL-BENDEKA_00192604-05.

127.    The inventors investigated changing the pH of an aqueous formulation to stabilize bendamustine.  Tr. 273:17-274:17 (Palepu); PTX-761 (July report) at EGL-BENDEKA_00192601, EGL-BENDEKA_00192604.

128.    The inventors also investigated whether co-solvent systems of ethanol and water could stabilize bendamustine.  Tr. 275:22-276:21 (Palepu); PTX-761 (July report) at EGL-BENDEKA_00192604-05.  The foregoing strategies improved stability, but not sufficiently.  *Id.*

129.    The inventors subsequently attempted to use formulations of only organic solvents, including lactic acid, ethanol, propylene glycol, glycerol, benzyl

alcohol, DMSO, PEG 400, and glycofurol.  Tr. 279:10-280:16, 291:17-293:5

(Palepu); PTX-761 (July report) at EGL-BENDEKA_00192606-09; PTX-591

(October report) at EGL-BENDEKA_00190466-67.  The stability of these

formulations was unpredictable.  Tr. 279:10-281:17 (Palepu); ██████████

████████████████████████████████████████████████████████

████████████████████

130.    The inventors did not confine themselves to solvents previously used

in marketed products.  *E.g.*, Tr. 280:18-281:11 (Palepu) (inventors used DMSO,

which was not previously used).

131.    *After* obtaining data from their experiments with PEG 400, Dr. Buxton

hypothesized that the reduction of alcohol groups improved stability, although this

hypothesis did not explain all the data.  Tr. 293:23-295:9 (Palepu);  778:21-779:4,

780:2-8, 800:12-802:21 (Buxton); PTX-591 (October report) at EGL-

BENDEKA_00190471-72.

132.    The inventors found that PG reacted with bendamustine's nitrogen

mustard group to form an "ether."  Tr. 305:5-306:1 (Palepu); PTX-588 (December

report) at EGL-BENDEKA_00139337.

133.    The inventors used liquid chromatography/mass spectrometry

(LCMS) and their chemistry expertise to identify a "deschlorethyl" degradant that

led them to use an antioxidant.  Tr. 278:10-279:1, 288:4-22, 295:10-296:14, 297:6-

8 (Palepu); 798:21-799:2 (Buxton); PTX-591 (October report) at EGL-

BENDEKA_00190472.  Drager reported the deschloroethyl degradant, DTX-73 at

5:1-10, but did not use an antioxidant in the exemplified formulations.  Tr.

1458:15-23 (Siepmann).

134.    The first formulation the inventors prepared using PEG and PG was

"BDM 62," the 62nd formulation prepared.  Tr. 304:13-20 (Palepu).  The first

formulation with monothioglycerol, PEG, and PG was "BDM 77."  306:2-10,

306:16-24, 307:21-23 (Palepu).

## IV.    METHOD OF ADMINISTRATION FAMILY

### A.    Asserted Claims

135.    The '568 patent (PTX-312) claims 11, 18, and 22 and '887 patent

(DTX-9) claim 13 recite methods of treating chronic lymphocytic leukemia (CLL)

or indolent B cell non-Hodgkin's lymphoma (NHL).  The parties agree the POSA

would have understood that administering bendamustine to treat CLL or NHL

meant dosing based on the Treanda® Label: days 1 and 2 of a 21-day cycle up to

six cycles (for CLL) or a 28-day cycle up to eight cycles (for NHL).  Tr. 739:13-19

(Thirman); 1133:12-1134:13 (Derendorf); DTX-848 (Treanda® Label).

136.    The claims require administering bendamustine in about 15 minutes

or less, with many ('568 patent claims 11, 18, '399 patent claims 13, 15) claiming

about 10 minutes or less.  PTX-312 ('568 patent); DTX-13 ('399 patent); DTX-9 ('887 patent).

137.    The claims require administering a volume of 100 ml or less, with many ('568 patent claims 11, 18, '399 patent claim 15, '887 patent claim 13) claiming about 50 ml.  PTX-312 ('568 patent); DTX-13 ('399 patent); DTX-9 ('887 patent).

138.    Some claims specify a bendamustine concentration.  PTX-312 ('568 patent, claim 22: "about 2.19 mg/ml to about 5.59 mg/ml"); DTX-13 ('399 patent, claim 13: "about 5.6 mg/ml").

### B.    POSA and Priority Date

139.    The parties do not dispute Plaintiffs' proposed POSA definition. PDX-2-4; Tr. 1112:4-20 (Derendorf); 1293:22-1294:9 (Agarwal); 1233:1-17 (Leoni); 2014:22-2015:2 (Defendants' counsel).

140.    The priority date is March 20, 2012, for '568 patent claim 22 and July 10, 2012, for '568 patent claims 11 and 18 and '887 patent claim 13.  Tr. 2015:3-16 (Defendants' counsel); PDX-2-2, PDX-2-7.

### C.    Infringement

141.    ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████

#### D. Non-obviousness

142. At the priority dates, bendamustine had been used clinically for decades, and in multiple countries, but was never indicated for administration in less than 30 minutes or in a volume of less than 250 mL. PTX-542 (Japan) at TEVABEND00295051; DTX-848 (U.S.); PTX-348 (Europe); Tr. 1249:15-1251:9 (Leoni); 701:2-702:18 (Thirman).

143. Defendants contend that the asserted claims are obvious based on a combination of Palepu 2011 (DTX-984), Treanda® Label (DTX-993), Preiss 1985 (DTX-985), Preiss 1998 (DTX-991), Schoffski 2000a (DTX-987), Schoffski 2000b (DTX-998), and Barth (DTX-1004). Apotex and Slayback also rely on Glimelius (DTX-79) and Olthoff (DTX-94). Defendants argued that Preiss 1985 and 1998 reported administering bendamustine in 10 minutes or less in a pharmacokinetic study (Preiss 1985) and in a pharmacokinetic and Phase I study (Preiss 1998). Defendants contend that Barth teaches a lower bendamustine administration volume, Tr. 682:15-682:2 (Thirman), and that the "faster infusion then is also associated with smaller volume," Tr. 1909:21-22 (Defendants' counsel). Defendants argue that the claimed concentrations are the "natural result" of the claimed formulation. Tr. 1847:21-1848:6 (Defendants' counsel).

144. Despite disputing that shorter infusion confers any meaningful benefit, Tr. 1751:16-20, 1765:18-21 (Thirman), Defendants' motivation theory,

based on the testimony of oncologist Michael Thirman and pharmaceutical consultant John Yates, was that convenience advantages would have motivated the POSA to administer bendamustine in a short duration and low volume. Tr. 696:7-25 (Thirman); 842:15-22 (Yates).

145.  If all else were equal, the POSA generally would have considered shorter duration and smaller administration volumes convenient and desirable. But all else was not equal. The POSA would have weighed the expected benefits and risks and concluded that the prior art as a whole taught that shorter infusion times, higher concentrations, and lower volumes would produce undesirable side effects. Paired with Defendants' contention that any advantages are minimal, the POSA would not have had reason to incur the safety risks expected from practicing the claimed inventions. This conclusion is substantiated by the testimony of Dr. Hartmut Derendorf, Distinguished Professor Emeritus at the University of Florida; Dr. Lorenzo Leoni, a biochemist who developed bendamustine in the United States; and Dr. Ashwani Agarwal, an oncologist who treats patients with bendamustine.

146.  The POSA would not have had a reasonable expectation of success in making and administering the claimed formulations in the claimed volumes and concentrations.

### 1. Bendamustine Concentration

#### a. Motivation

147.   Claim 22 of the '568 patent (PTX-312) requires a bendamustine concentration of "about 2.19 mg/ml to about 5.59 mg/ml," and claim 13 of the '399 patent (DTX-13) requires "about 5.6 mg/ml."  Defendants adduced no evidence that the POSA would have been motivated to administer bendamustine at these concentrations.

148.   The prior art Treanda® Label taught that the bendamustine concentration should be 0.2-0.6 mg/ml.  DTX-848 at JDG_BENDA_00014040. The POSA would have understood that this concentration was based on prior art rabbit tolerability studies in Treanda®'s Approval Package, PTX-350.  Tr. 1160:14-1161:13, 1162:23-1163:8 (Derendorf); PTX-973 (Leong) at TEVABEND00292034 n.26; PTX-589, PTX-590 (Sundaram e-mail and presentation) at EGL-BENDEKA_00183290; Tr. 102:9-21 (Tarriff).  Those studies tested bendamustine concentrations of 0.6 and 1.0 mg/mL (in addition to lower concentrations), and observed that the incidence and severity of local side effects increased as concentration increased.  PTX-350 at EGL-BENDEKA_00201425-27; Tr. 1320:3-1321:15 (Agarwal).  The POSA would have understood that the Treanda® Label's recommendation to administer 0.6 mg/mL reflected that a higher concentration would be unacceptable.  Tr. 1161:14-1164:21 (Derendorf).

Based on the expectation of increased local side effects, the POSA would not have been motivated to use the claimed bendamustine concentrations. Tr. 1163:13-1164:7 (Derendorf).

149. Defendants introduced no contrary evidence. Dr. Thirman did not review any FDA documents concerning the reason for the concentration in the Treanda® Label. Tr. 706:12-707:2. And Dr. Yates testified that there was "a very limited amount of inflammation" in the Treanda® Approval Package's rabbit study, but did not address the POSA's motivation to administer the far higher claimed concentrations. Tr. 852:13-855:21.[2]

### b. Reasonable Expectation of Success

150. The POSA would have known that administering intravenous infusions containing particulates was dangerous and would have been motivated to keep concentrations below the bendamustine refrigerated and room temperature solubility limits. *Supra* ¶ 116 ; Tr. 1434:6-19, 1472:6-20, 1474:9-22 (Siepmann); 591:16-23 (Pinal); DTX-848 (Treanda® Label) at JDG_BENDA_00014041.

151. Bendamustine's admixture solubility depends on its solubility in PEG, PG, and saline; the ratio of those ingredients; and temperature. Tr. 1472:21-1473:6, 1474:23-1475:2 (Siepmann); 594:5-12 (Pinal). But bendamustine's

---

[2] Dr. Yates is a professional witness with limited relevant experience who has testified repeatedly for Apotex. Tr. 908:17-913:12. His testimony previously has been rejected because it "stretche[d] credulity." *Id.*

solubility in saline was unknown, and the POSA would have expected that it would be lower than bendamustine's solubility in water. Tr. 1473:7-9 (Siepmann); 595:11-17 (Pinal). Moreover, the POSA would have expected bendamustine's solubility in a PEG, PG, saline admixture to decrease, more than linearly, with increasing quantities of saline. Tr. 594:13-595:10 (Pinal). The POSA therefore would not have been able to predict bendamustine's solubility in a mixture of 90:10 PEG:PG, diluted in saline. Tr. 1483:14-16 (Siepmann). The experts agreed that the POSA would have needed to experiment to determine whether a particular diluted bendamustine concentration was possible. Tr. 1473:16-19 (Siepmann); 595:18-597:10 (Pinal). Data from such solubility experiments were not in the prior art. Tr. 597:13-21 (Pinal). Without it, the POSA would not have expected to achieve a 5.6 mg/mL bendamustine concentration in a composition of 90:10 PEG-PG. Tr. 1473:20-1474:4 (Siepmann).

152. Defendants' cited art provides no reasonable expectation of success. Olthoff's formulations did not include PEG; the exemplified formulation only had a concentration of 2.5 mg/mL; and Olthoff claim 1 did not specify a bendamustine concentration or a diluent. DTX-94; Tr. 1477:11-1479:1 (Siepmann). Barth disclosed no data, no dilution volumes under 100 mL, and no PEG formulations. Tr. 1479:4-1480:7 (Siepmann); DTX-1004 (Barth). The final concentration of Barth's hypothetical admixture is far below 5.6 mg/mL. Tr. 1480:8-23, 1580:15-

1581:19 (Siepmann). Glimelius (DTX-79) does not even discuss bendamustine. Tr. 916:17-917:25 (Yates); 1480:24-1481:14 (Siepmann).

### 2. Claimed Formulation

153. The POSA would not have been motivated to use the formulations recited in the asserted claims in the claimed volumes.

154. Bendamustine's solubility in the combination of PEG, PG, and saline was unknown. *Supra* ¶ 151. The POSA would have used a formulation with a known, high solubility, such as those in Drager. Tr. 1481:15-1482:9 (Siepmann); DTX-73 (Drager) at 8:30-40. The POSA would not have wanted to use a small infusion volume with the 90:10 PEG-PG formulation, because there was no indication in the prior art that bendamustine would be sufficiently soluble in the diluted formulation. *Id.* Defendants' experts did not testify to the contrary.

### 3. Administration Time

#### a. Defendants' References Do Not Support Obviousness

155. Defendants rely on certain early references to establish the safety of short bendamustine infusions. For the reasons below, those references would not have provided a motivation or reasonable expectation of success in using the claimed inventions.

##### 1) Preiss 1985 (DTX-985)

156. The POSA would have known that Preiss 1985 was a pharmacokinetic study, DTX-985 at JDG_BENDA_00002379; Tr. 1119:16-25 (Derendorf), and

would not have reached conclusions about safety based on it.  Tr. 1120:10-1121:2 (Derendorf).  Preiss 1985 was not designed to evaluate the safety of different infusion durations.  Tr. 724:7-12 (Thirman).  The POSA would not "have believed . . . that the three-minute infusion in Preiss 1985 was appropriate for use in clinical practice because it had been used in that study."  Tr. 1122:14-19, 1123:9-22 (Derendorf).

157.   Preiss 1985's "goal" "was to obtain initial data on the pharmacokinetics of Cytostasan [bendamustine] after its intermittent i.v. and oral administration to humans."  DTX-985 at JDG_BENDA_00002379; Tr. 722:11-16 (Thirman).  The POSA would have understood that the "preferred investigational way" to study pharmacokinetic properties is bolus injection.  Tr. 1114:3-1116:6, 1121:8-1122:3 (Derendorf); PTX-1018 (Shargel) at TEVABEND00292029; PTX-1021 (Rowland & Tozer) at 271-72.

158.   Preiss 1985 tested only seven patients with various cancers.  DTX-985 at JDG_BENDA_00002379; Tr. 723:16-724:3 (Thirman); 1122:20-1123:8 (Derendorf).  The POSA would not conclude that side effects would not be present in a larger population based on a study in seven patients.  Tr. 1121:3-7 (Derendorf).  The non-homogeneous patient population adds to the complexity and variability of the study.  Tr. 1122:20-1123:8 (Derendorf).

159. Preiss 1985 does not discuss how it collected side effect information, including the number or timing of observations, the side effects being observed, or a grading system. Tr. 724:14-728:16 (Thirman). It does not specify which of the seven patients in the study had side effects or distinguish between IV and oral side effects. Tr. 728:8-20 (Thirman).

160. Preiss 1985 was not directed to a method of treating CLL or NHL, DTX-985 at JDG_BENDA_00002379, as specified in the claims, and did not use the claimed treatment schedule, *supra* ¶ 135.

### 2) Preiss 1998 (DTX-991)

161. Preiss 1998 was a pharmacokinetic and Phase I study. It was not designed to study the safety of different infusion durations. Tr. 730:22-731:1, 731:8-21 (Thirman). The POSA would not have "believed that the three to ten minute infusion of bendamustine used in Preiss 1998 was safe to treat cancer using the schedules in the claims," because "the information given was not sufficient" to reach that conclusion. Tr. 1135:18-1136:1 (Derendorf).

162. A "purpose" of Preiss 1998 "was the investigation of the clinical pharmacology and definition of the DLT (dose limiting toxicity) and of the MTD (maximum tolerated dose)" of bendamustine. DTX-991 at JDG_BENDA_00006919. The POSA would have understood that MTD is not a recommended dose. Tr. 1126:8-13 (Derendorf); 926:25-927:14 (Yates).

163.    Preiss 1998 was not directed to treating CLL or NHL.  Tr. 1134:14-17 (Derendorf).

164.    Preiss 1998 does not disclose information about administering bendamustine on two consecutive days.  DTX-991 at JDG_BENDA_00006920, Fig. 2; Tr. 1127:18-1128:15, 1134:18-20 (Derendorf).

165.    Preiss 1998 does not disclose information about administration over repeated cycles.  Tr. 1135:10-12 (Derendorf).  The POSA would understand that side effects typically are more severe in subsequent cycles.  Tr. 737:12-20 (Thirman).

166.    Preiss 1998 was conducted in patients with various cancers.  Tr. 1125:24-1126:1 (Derendorf).  This nonhomogeneous population makes it more difficult to draw safety conclusions.  Tr. 1122:20-1123:8, 1125:24-1126:1 (Derendorf).

167.    Preiss 1998 does not report when the side effects were monitored, or how many times side effect information was collected from patients.  DTX-991.

### 3)    Schoffski 2000a (DTX-987)

168.    Schoffski 2000a reported administering bendamustine for 30 minutes on days 1 and 8 of a 4-week cycle.  DTX-987 at JDG_BENDA_00003202.

169.    Unlike the Preiss references, Schoffski 2000a reported how toxicity was assessed, including the time and method of observation.  Tr. 744:4-745:4 (Thirman).

170.    Schoffski 2000a reported that it observed *some* side effects similar to those in Preiss 1998, but did not compare the overall incidence or severity of side effects between the two infusion protocols.  DTX_987 at JDG_BENDA_00003206-07; Tr. 1138:21-1139:21 (Derendorf).

171.    Schoffski 2000a attributed the "[d]ifferences in the observed toxicity profile of bendamustine with other published data" to its use of "the very detailed NCI CTC criteria" while other studies used "WHO standards or reported without any further specification," and that "[t]he toxicity of the short infusion schedule [30 min] was strictly monitored on a weekly basis, in contrast to most other published data."  DTX-987 at JDG_BENDA_00003207.  Preiss 1998 used the WHO criteria.  DTX-991 at JDG_BENDA_00006919-20, Fig. 2.  Preiss 1985 reported side effects without "further specification," and neither Preiss study reported weekly monitoring, *supra* ¶¶ 159, 167.

#### 4)      Schoffski 2000b (DTX-988)

172.    Schoffski 2000b reported weekly 30-minute bendamustine infusions in solid tumor patients.  DTX-988 at JDG_BENDA_00003209.  The POSA would

have understood Schoffski 2000b to recommend a 30-minute infusion. Tr. 1140:24-1141:11 (Derendorf).

173. Schoffski 2000b "addressed the relationship between infusion time and side effects as of the priority date," reporting that both "the infusion duration and dose fractionation appear to affect the toxicity profile." Tr. 1118:22-1119:15 (Derendorf); DTX-988 at JDG_BENDA_00003210. The POSA would have understood that for bendamustine, "the longer the infusion, the less likelihood of side effects." Tr. 1118:22-1119:15 (Derendorf).

174. Schoffski 2000b described similar information to Schoffski 2000a regarding collecting side effect information. DTX-988 at JDG_BENDA_00003210; Tr. 748:2-9 (Thirman).

175. Schoffski 2000b states that "[i]n accordance with our previous phase I data [in Preiss 1998], the weekly 30-min infusion of [bendamustine] in our current trial was associated with non-haematological DLT such as mouth dryness and fatigue and we also documented some sporadic evidence of cardiac toxicity at recommended dose." DTX-988 at JDG_BENDA_00003213. Schoffski 2000b makes clear that the 30-minute infusion did not have the same side effect profile as the shorter infusion in Preiss 1998. Schoffski 2000b stated that it did not "observe confusion or other signs of neurotoxicity when giving the drug as a repeated 30-min i.v. infusion," *id.*, while Preiss 1998 reported "disorientation" and a

"vegetative neurotoxic effect," DTX-991 at JDG_BENDA_00006920-21.  Thus,

Schoffski 2000b reported that the 30-minute infusion had a safer toxicity profile

than the Preiss 1998 infusion.  Tr. 1140:8-1141:6 (Derendorf).

### b.    Context of Defendants' References

176.    The POSA would have known that the research group behind Preiss

1985 and Preiss 1998 continued to research bendamustine, and recommended

longer infusion times for clinical treatment.  Tr. 1136:2-1136:20, 1141:16-1142:3,

1142:23-1144:6, 1145:13-1146:7 (Derendorf).  In particular, like Schoffski 2000a

and 2000b—conducted by the same research group as Preiss 1985 and 1998—

Preiss 2003 (PTX-268) reported administration over 30 minutes in repeated cycles.

PTX-268; Tr. 1141:21-1143:15 (Derendorf).  The POSA would have thus

understood that the Preiss studies' authors believed that infusing in 30 minutes or

more was the safer way to administer bendamustine.  Tr. 1143:6-14 (Derendorf);

926:25-927:14 (Yates).  Dr. Thirman attempted to locate publications describing

bendamustine infusions in under 30 minutes and found only Preiss 1985 and 1998.

Tr. 704:8-11, 705:1-6.

177.    The Preiss and Schoffski scientists were associated with the company

that developed Ribomustin in Germany.  Tr. 1143:17-1144:13 (Derendorf).  The

POSA would have looked to the German regulatory information, the Ribomustin

Monograph (DTX-982), in deciding how to administer bendamustine. Tr. 1235:6-1236:3, 1239:3-14 (Leoni).

178.  The Ribomustin Monograph recommended a 30 to 60 minute infusion in 500 mL. DTX-982 at JDG_BENDA_0000009; Tr. 1144:14-18 (Derendorf).

179.  The Ribomustin Monograph provided a reason for this infusion time: local toxicity. Tr. 1146:8-1154:4 (Derendorf). It reproduced Ruffert Table 7, *infra* ¶ 186, DTX-982 at JDG_BENDA_0000021, and concluded that "[l]ocal irritations and thrombophlebitis occur occasionally, especially after intravenous bolus injection. These side effects can be reduced by administering bendamustine over 30 to 60 minutes," *id.* at JDG_BENDA_0000062. The POSA would have understood the Ribomustin Monograph to teach that bendamustine should be administered over 30-60 minutes to avoid toxicity. Tr. 1152:11-1154:4 (Derendorf).

### c.  Worldwide Development of Bendamustine

180.  Bendamustine's worldwide development further confirms that, absent hindsight, the POSA would have expected that a 10-minute infusion was unsafe. Tr. 1249:8-14 (Leoni). Companies around the world conducted independent research into developing a commercial bendamustine product. This research was a natural, pre-litigation, pre-priority date experiment reflecting how scientists viewed the prior art, and all administered bendamustine over at least 30 minutes, diluted in

at least 250 mL.  Tr. 1247:8-1248:8, 1249:15-1251:9 (Leoni); PTX-542 (Japan) at

TEVABEND00295051; DTX-848 (U.S.); PTX-348 (Europe); Tr. 701:2-702:18

(Thirman).

181.    In the United States, Salmedix developed Treanda®, approved in

2008.  Tr. 1246:13-23 (Leoni).  The prescribing information recommended

infusion over 30 minutes (CLL) or 60 minutes (NHL), diluted in 500 mL.  Tr.

706:6-15 (Thirman).

182.    Salmedix undertook the same analysis of the prior art in the early

2000s that the experts undertook in this case, and concluded that bendamustine

should be delivered over at least 30 minutes in 500 mL.  Tr. 1251:10-1252:9,

1252:23-1257:18 (Leoni); PTX-516 (Salmedix Investigator's Brochure) at

TEVABEND00011130-31, TEVABEND00011150.  Salmedix considered the prior

art, including Preiss 1985, Preiss 1998, Schoffski 2000a, and Schoffski 2000b.  Tr.

1253:13-1261:4, 1280:13-1283:23 (Leoni); PTX-516 (Salmedix Investigator's

Brochure) at TEVABEND00011149, TEVABEND00011181; DTX-987 (Schoffski

2000a); DTX-988 (Schoffski 2000b).  Salmedix considered a shorter infusion

advantageous for patients, but rejected it due to the potential for toxicities,

including the local toxicity Ruffert described.  Tr. 1257:19-1261:4 (Leoni);

*compare* PTX-516 (Salmedix Investigator's Brochure) at TEVABEND00011150,

*with* PTX-260 (Ruffert) at TEVABEND00294654.  Dr. Leoni's testimony is

persuasive evidence of how the POSA, without hindsight, would have evaluated the prior art.

183.    In Europe, Napp Oncology developed Levact®, approved in 2010. PTX-348.  The prescribing information recommended infusion over 30 to 60 minutes  in 500 mL.  PTX-348 at EGL-BENDEKA_00083570.

184.    In Japan, Symbio developed Treakism®, whose prescribing information recommended infusion over 60 minutes in 250 mL.  PTX-542 at TEVABEND00295051; Tr. 1246:5-1248:8 (Leoni).

### d.    Clinical Practice at the Priority Date

185.    Clinical practice at the priority date was trending away from the claimed inventions, towards longer infusion times.  Tr. 1297:9-1298:4 (Agarwal). A review article published by bendamustine experts "communicat[ed] the latest consensus" from 2010-2014 and reported that "acute infusion-related events" are less common with 60-minute infusions and that "diluting the drug in 500 ml of normal saline" minimizes the risk of "chemical-related phlebitis."  PTX-522 (Cheson 2016) at TEVABEND00290058, TEVABEND00290067; Tr. 1298:5-1299:14 (Agarwal).

### 4.    The POSA Would Not Have Been Motivated to Use the Claimed Administration Methods Due to Expected Side Effects.

#### a.    Phlebitis

186.    The POSA would have expected a shorter infusion to increase phlebitis (vein inflammation) and thrombophlebitis (clots in the vein).  Tr. 1314:7-1315:12 (Agarwal).  Ruffert (PTX-260) taught that a short infusion increased phlebitis and thrombophlebitis.  Tr. 1147:20-1152:10 (Derendorf).  Ruffert reported a study of NHL patients treated with bendamustine substituted for cyclophosphamide in a preexisting treatment regimen of cyclophosphamide, vincristine, and prednisolone.  PTX-260 at TEVABEND00294653; Tr. 1147:20-1152:10, 1169:6-15 (Derendorf).  Ruffert reported the "side effects of Cytostasan® therapy" in Table 7, which showed that 35.4% of patients had phlebitis, and 5 patients with grade 2 or 3 phlebitis had "thrombophlebitis (after IV bolus)."  PTX-260 at TEVABEND00294654.  Ruffert concluded that "[t]he relatively high percentage (35.4%) of cases of phlebitis after intravenous bolus injection is problematic and [] are much less frequently observed when using short-term infusions [60 minutes]."  *Id.*

187.    Dr. Thirman testified that the phlebitis in Ruffert was caused by vincristine, not bendamustine.  Tr. 691:2-692:14.  But Ruffert is a paper about bendamustine administration, with a title and conclusion about bendamustine, and the POSA would have understood it to report bendamustine's side effects.  Tr. 1151:8-1152:10 (Derendorf).  Ruffert reports that bendamustine, not vincristine, was administered by the "short-term infusion" (defined as up to 60 minutes)

disclosed as safer than the bolus. PTX-260 at TEVABEND00294653-54. An oncologist with experience administering vincristine would have understood that bendamustine caused the increased rate of phlebitis Ruffert reported. Tr. 1317:6-1319:13 (Agarwal).

188. The Ribomustin Monograph (DTX-982) cited Ruffert's data and concluded that bendamustine bolus injections caused phlebitis and thrombophlebitis. *Supra* ¶ 179; Tr. 1146:8-1147:16, 1151:8-1154:4 (Derendorf). It does not report that vincristine caused the observed phlebitis. Tr. 1146:8-1147:19 (Derendorf). Dr. Thirman did not "focus" on the Ribomustin Monograph in forming his opinion. Tr. 703:5-16, 754:22-755:10 (Thirman).

189. Salmedix's 2005 Investigator's Brochure summarized information relevant to bendamustine's clinical administration, cited Ruffert, and reported that "[a]lthough some phlebitis has been seen after intravenous injection of bendamustine HCl, this was much reduced after implementation of a short-term infusion (30 minutes) versus the earlier bolus schedules of administration." Tr. 1252:5-9, 1252:23-1253:8, 1255:8-22, 1257:4-18, 1258:18-1259:21 (Leoni); PTX-516 at TEVABEND00011127, TEVABEND00011183. This confirms that the POSA reviewing Ruffert would have understood that shorter, bolus administration of bendamustine, not vincristine, caused phlebitis. Tr. 1253:13-1255:22, 1258:18-1259:25 (Leoni).

190.    The POSA would have considered phlebitis and thrombophlebitis serious side effects.  Thrombophlebitis can cause a pulmonary embolism, which can lead to a stroke.  Tr. 1315:4-12 (Agarwal).  Treating thrombophlebitis requires blood thinners, which can increase bleeding risks.  Tr. 1315:13-23 (Agarwal).  Based on the risk of phlebitis, the POSA would not have been motivated to pursue a ten-minute bendamustine infusion.  Tr. 1153:5-1154:4 (Derendorf); 1297:9-1297:14, 1319:10-13 (Agarwal); PTX-522 (Cheson 2016) at TEVABEND00290067.

### b.    Extravasation

191.    The POSA would have expected that increasing bendamustine concentration would increase the severity of extravasation events (damage to tissue around the vein), providing another reason not to make the claimed invention.  Tr. 1321:18-1322:11 (Agarwal).

### c.    Nausea

192.    Shortening the infusion time for bendamustine to 10 minutes would increase $C_{max}$ (maximum plasma concentration), which was understood to increase the likelihood of nausea  Tr. 680:20-681:6, 711:14-712:21 (Thirman); 1115:16-1116:6, 1156:18-1157:21 (Derendorf); DTX-848 (Treanda® Label) at JDG_BENDA_0014049.  This relationship between $C_{max}$ and nausea was reported in the FDA approved Treanda® Label, DTX-848, and the peer-reviewed Owen

paper (DTX-1001).  Tr. 1154:10-1157:21 (Derendorf).  The correlation between bendamustine $C_{max}$ and nausea holds even after antiemetic therapy.  DTX-1001 at JDG_BENDA_00007984; Tr. 1154:10-1157:3 (Derendorf).

193.  Patients consider nausea to be among the most concerning side effects of chemotherapy.  PTX-963 (Coates) at TEVABEND002902015; Tr. 1308:22-1310:7 (Agarwal).  Further, nausea leads to noncompliance, which can reduce efficacy.  Tr. 1308:1-21 (Agarwal).  The POSA would not have been motivated to pursue the claimed invention due to the risk of increased nausea.  Tr. 1310:1-7 (Agarwal).

### d.    Neurotoxicity

194.  The POSA would have expected that shortening infusion time would increase the risk of neurotoxicity.  Tr. 1140:24-1141:6 (Derendorf); 1310:8-1313:10 (Agarwal).  Preiss 1998 reported "disorientation" and a "vegetative neurotoxic effect" after administration over 3-10 minutes.  DTX-991 at JDG_BENDA_00006920-21.  Schoffski 2000b contrasted its findings with Preiss 1998, stating it "did not observe confusion or other signs of neurotoxicity when giving the drug as a repeated 30-min i.v. infusion."  DTX-988 at JDG_BENDA_00003213.

195.  The prior art reported that neurotoxicity was a serious side effect of bendamustine.  PTX-521 (Cheson 2009); Tr. 1310:8-1314:1 (Agarwal).  The

POSA would not have been motivated to pursue a 10-minute infusion given the reported increased risk of neurotoxicity. Tr. 1314:2-6 (Agarwal); 1140:24-1141:11 (Derendorf).

### 5. Administration Volumes

196. The POSA would have not have had a motivation to administer, or reasonable expectation of success in administering, bendamustine in the claimed volumes. Despite a general desire for more convenient administration, the consensus was moving towards higher volume administration due to safety and solubility concerns. *Supra* ¶ 185.

197. Defendants rely on two references discussing lower volumes, but neither establish a reasonable expectation of success. Glimelius, DTX-79, does not disclose any bendamustine administration. Tr. 841:3-842:22 (Yates). Barth suggests only hypothetical smaller volumes, the smallest of which is 136 mL— well above the claimed volumes. DTX-1004 at JDG_BENDA_00008047; Tr. 1157:22-1159:18 (Derendorf). Further, Barth discloses that those volumes should be administered over 30 minutes, Tr. 759:3-760:5 (Thirman), confirming that infusion time and volume are not necessarily connected. DTX-1004 at JDG_BENDA_00008047; Tr. 1159:20-1160:3 (Derendorf).

## E. Skepticism of Method of Administration Invention

198. The claimed administration methods were met with skepticism until Eagle established their safety and feasibility using tests not available in the prior art.

199. On February 12, 2012, an Eagle consultant reported his discussion with nurses, who expressed concern that "a final product more concentrated than the range [0.2-0.6 mg/ml used in Treanda®] would likely increase localized side effects." DTX-959 at EGL-BENDEKA_00121350; Tr. 186:10-24 (Tarriff).

200. Teva also questioned the invention's local irritation risk and initially declined a licensing opportunity (before Eagle's clinical study results). Tr. 155:9-160:3 (Tarriff); PTX-752. Eagle's Board was similarly skeptical. Tr. 107:2-110:22 (Tarriff); DTX-1158.

201. In December, 2012, Dr. Palepu expressed concern that a shorter infusion of bendamustine could cause "adverse effects." PTX-729; Tr. 113:16-114:4 (Tarriff); 283:5-23 (Palepu).

202. On February 19, 2012, Dr. Sundaram circulated a PowerPoint presentation, which reproduced the Treanda® Approval Package's local tolerance data, and concluded that the concentration may be "[l]imited by perivenous findings." PTX-589, PTX-590 at EGL-BENDEKA_0018290-92. Dr. Sundaram also investigated bendamustine's admixture solubility, and concluded that

"[d]ilution into 100 mL is not possible" for Eagle's formulation.  *Id.* at EGL-BENDEKA_00183295; Tr. 93:3-95:1, 102:3-10 (Tarriff); 1475:24-1477:6 (Siepmann).

203.   Dr. Sundaram later oversaw experiments demonstrating that dilution of Eagle's formulation into 50 mL of diluent was possible.  Tr. 104:18-25 (Tarriff).

204.   In April 2012, Eagle conducted a non-public rabbit study finding that bendamustine formulations with concentrations up to 25 mg/mL were "well tolerated" when administered intravenously.  PTX-726 (Eagle Board Presentation) at EGL-BENDEKA_00145388-89; Tr. 105:22-107:1, 245:14-19 (Tarriff).

205.   In August 2012, Eagle conducted another non-public rabbit study, which concluded that the 50 mL infusion product had "manageable" perivascular effects.  *Id.*

206.   In January 2013, Eagle asked FDA for permission to conduct two clinical studies of a 3-minute and 10-minute infusion, respectively.  DTX-1041 (Eagle FDA Packet) at EGL-BENDEKA_00140142-44; PTX-950 (Pre-IND Meeting Request) at EGL-BENDEKA_00109550.  In support, Eagle submitted its non-public rabbit study results and conclusions and a non-public pharmacokinetic Monte Carlo simulation.  DTX-1041 (Eagle FDA Packet) at, EGL-BENDEKA_00140153-54, EGL-BENDEKA_00140160-61; Tr. 105:17-21 (Tarriff).

207. Eagle relied on its rabbit studies to address local irritation. DTX-1041 (at EGL-BENDEKA_00140241-47. Eagle reported to FDA that infusing bendamustine at concentrations of 3.2 to 25 mg/mL resulted in "no test-article related venous irritation effects." *Id.* at EGL-BENDEKA_00140153. Eagle then concluded on that basis: "Therefore, the higher bendamustine HCl concentrations of Eagle's proposed product (0.5-5.6 mg/mL for the IV infusion, and 12.5 mg/mL for the IV push) are expected to be well tolerated upon intravenous administration." *Id.*

208. Eagle's submission also included a "Review of Published Literature on Bendamustine HCL Exposure Levels in Humans." DTX-1041 at EGL-BENDEKA_00140310. The review compared the $C_{max}$ reported in prior art studies, including Preiss 1985 and Preiss 1998 (the latter via its report in Schoffski 2000a and 2000b) to *simulated* $C_{max}$ values for Eagle's proposed infusions, *id.*, from a non-public Monte Carlo simulation Eagle commissioned from Australian university researchers, *id.* at EGL-BENDEKA_00140286-309.

209. FDA rejected Eagle's "plan to evaluate the IV push method of administration," because it was "concerned about safety risks of infusion reactions that may be exacerbated by rapid infusion of Bendamustine." PTX-746 at EGL-BENDEKA_00146354. FDA allowed Eagle to test its proposed 10-minute

infusion, but required Eagle to use the highest dose.  *Id.*; Tr. 111:8-113:15

(Tarriff).

210.    Eagle's clinical study measured both bioequivalence and safety.

DTX-1041 (Eagle FDA Submission) at EGL-BENDEKA_00140156, EGL-

BENDEKA_00140158.  FDA stated that additional clinical studies may be

necessary "based on the results of the bioequivalence study."  *Id.* at EGL-

BENDEKA_00140175.

## V.    BENDEKA®'S BENEFITS SUPPORT NONOBVIOUSNESS

211.    ████████████████████████████████████████████

████████████████████████████████████████████████

Bendeka® is an embodiment of the asserted claims, for the same reason

Defendants infringe.  *Supra* Section III.C; DTX-031 at EGL-

BENDEKA_00002370; PTX-338 at 2.

### A.    Bendeka® Saves Chair Time

212.    At the priority date, there was a need to shorten wait times for cancer

treatments.  Tr. 1303:20-1304:10 (Agarwal).  Bendeka® shortened the

recommended infusion time from 30 or 60 minutes to 10 minutes.  Tr. 1299:24-

1300:12 (Agarwal).  This time savings is meaningful to patients.  Tr. 1300:15-

1302:3, 1304:5-10, 1307:5-14 (Agarwal).

213. The advantages of Bendeka® are most significant in busy community health centers, where the vast majority of CLL and NHL patients receive treatment. Tr. 1294:10-1296:9, 1303:20-1307:14 (Agarwal); PTX-1132 (Tang); DTX-496 (Bendamustine Brand Plan) at TEVABEND00106825 ("BENDEKA attributes align with busy/high volume practices"); PTX-967 (Hendershot); PTX-912 (Gabriel).

214. Dr. Agarwal practices at a community health center. Tr. 1288:15-1289:1 (Agarwal). Dr. Thirman practices in a research hospital, which generally treats later-stage patients. Tr. 717:12-17, 720:22-721:23 (Thirman). Bendeka® is particularly useful for practices like Dr. Agarwal's, which treats more early-stage cancer patients who are still working. *See* Tr. 1300:15-1302:3 (Agarwal).

215. Dr. Thirman disputes that Bendeka® saves time, because bendamustine is co-administered with other fluids or medications. Tr. 1765:18-1766:6, 1781:14-22. But Bendeka® is only co-administered on some days. Tr. 645:16-646:5, (Thirman); 1302:7-21 (Agarwal). That Bendeka® saves time is confirmed by marketing and reports that highlight Bendeka®'s shorter infusion time. DTX-496 (2016 Bendamustine Brand Plan) at TEVABEND00106833-34; DTX-821 (2015 Bendamustine Brand Plan) at TEVABEND00106857; PTX400A (Bendeka® Ad) at TEVABEND00280685-86; PTX-272 (VA Publication) at 2.

216. Defendants cite FDA's rejection of Orphan Drug Exclusivity for Bendeka®, which applied a regulatory standard, rather than reflecting patient or practitioner experiences. DTX-981; Tr. 1335:11-1336:19, 1341:21-1342:12 (Agarwal).

**B.     Bendeka® Is a Commercial Success**

217. Since its launch in 2016, Bendeka® has sold over $2 billion. Tr. 1637:13-14 (Brooks). Bendeka® has been a success in the market and the patented benefits have been important contributors to that success. Tr. 1648:7-16 (Jarosz).

218. Within the bendamustine market, Bendeka® is a success, obtaining over 90% of sales. Tr. 1659:8-1660:1 (Jarosz). Liquid Treanda®, another liquid bendamustine product that was commercially available after the priority date but before Bendeka®'s launch, contained DMA, which caused an undesired interaction with drug preparation devices. Tr. 982:1-20, 987:20-988:5 (Rainey); 1617:7-1621:11, 1626:6-21 (Brooks); PTX-954 (Rainey email). Bendeka®'s favorable attributes (including no DMA) have contributed to it out-performing Liquid Treanda®. Tr. 1657:7-1660:6, 1666:8-1667:1, 1669:9-15 (Jarosz).

219. Bendeka® competes against Belrapzo®, which is identical except for the administration protocol. Bendeka®'s sales are five to ten times greater than Belrapzo®, indicating that the market prefers Bendeka®'s infusion protocol. Tr. 1654:2-18, 1656:23-1657:6, 1668:6-21 (Jarosz).

220.    Bendeka®'s attributes, including its 10-minute infusion time, help it compete against oral products.  Tr. 1639:6-1640:1 (Brooks).  Before Bendeka®'s launch, Treanda® sales were declining.  Bendeka® stabilized the market based, in part, on its infusion time.  Tr. 1640:12-1641:8 (Brooks).

221.    Bendeka®'s sales relate to the patented features.  Tr. 1665:13-1671:9 (Jarosz).  Teva has successfully advertised patented features (the 10-minute infusion, the 50 mL volume, DMA free, multiple diluents, improved stability, and multi-dose vial).  PTX-400A (Bendeka® Ad); Tr. 1633:14-1635:6 (Brooks); 1643:13-1644:21 (Siepmann); 1669:16-1670:25 (Jarosz).

222.    Teva's choice to license Bendeka® and pay Eagle a portion of the profit for each Bendeka® sale, when it could keep all profits from Treanda®, supports Bendeka®'s commercial success.  PTX-408 (license); Tr. 1660:10-1661:6 (Jarosz); 1629:10-1631:4 (Brooks); 1812:6-11 (Stec).  Teva agreed to pay Eagle $30,000,000 upfront, significant milestone payments, and up to a 25% royalty. PTX-408 at TEVABEND00106679-80.

223.    The reasons Teva licensed Bendeka® included its improved administration time and lack of DMA.  Tr. 1735:24-1736:24 (Ruffolo).[3]  The licensed patents expire shortly after Teva's patent on Liquid Treanda®.  PTX-308

---

[3] There is no evidence that Eagle, which had been sued for infringement, could have launched Bendeka® absent the license.  Tr. 1736:25-1737:24 (Ruffolo).

('831 patent); DTX-73 (Drager).  Thus, the license's value stems from Bendeka®'s marketplace value, rather than additional patent life.

224.   Defendants' ANDAs further demonstrate Bendeka®'s superiority.  If Bendeka® had no value over Treanda®, Defendants would not have developed Bendeka® generics after already having other bendamustine products.  Tr. 1661:10-1665:12 (Jarosz); PTX-73 (Fresenius Kabi Email) at FK_BENDA_00018923 ("we need to go after the new formulation of Bendeka to be competitive"); PTX-81 (Fresenius Kabi Board Presentation) at FK_BENDA_00022126 ("Patient chair time is reduced from $\approx 45$ minutes to 10 minutes with Bendeka").

### C.     Industry Acceptance and Praise

225.   The patents-in-suit highlight certain benefits of the claimed formulations and methods, particularly the elimination of the need to reconstitute, "[s]horter infusion times," and "smaller infusion volumes."  PTX-308 at 1:51-53; PTX-312 at 1:54-57.

226.   These benefits have been praised, including in publications.  Tr. 1303:20-1307:14 (Agarwal); PTX-912 (Gabriel); PTX-272 (VA Publication) at 2 ("Bendeka . . . provides many practical advantages to . . . Treanda, namely the lack of need for reconstitution . . . [and] short infusion time . . . .").

/s/ Karen E. Keller
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Teva Pharmaceuticals
International GmbH, Cephalon, Inc., and
Eagle Pharmaceuticals, Inc.*

OF COUNSEL:
David I. Berl
Adam D. Harber
Martha C. Kidd
Shaun P. Mahaffy
Ben V. Picozzi
Elise M. Baumgarten
Matthew W. Lachman
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

*Attorneys for Teva Pharmaceuticals
International GmbH and Cephalon, Inc.*

OF COUNSEL:
Daniel G. Brown
Michelle L. Ernst
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200

Kenneth G. Schuler
Marc N. Zubick
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

*Attorneys for Eagle Pharmaceuticals, Inc.*

Dated: October 29, 2019

## CERTIFICATION BY COUNSEL

Pursuant to the Court's Order of September 30, 2019 (D.I. 337), I hereby

certify that this document consists of no more than 12,479 words and is printed in

14-point font.

/s/ *Karen E. Keller*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on October 29, 2019, this document

was served on the persons listed below in the manner indicated:

### BY EMAIL

Jeremy S. Cole
Damien Nicholas Tancredi
FLASTER/GREENBERG P.C.
1201 N. Orange Street, Suite 301
302-351-1910
Wilmington, DE 19801
jeremy.cole@flastergreenberg.com
damien.tancredi@flastergreenberg.com
*Attorneys for Apotex Inc.*
*and Apotex Corp.*

James M. Lennon
DEVLIN LAW FIRM LLC
1306 N. Broom Street, 1st Floor
Wilmington, DE 19806
(302) 449-9010
jlennon@devlinlawfirm.com
*Attorney for*
*Mylan Laboratories Limited*

Steven E. Feldman
Sherry L. Rollo
Daniel R. Cherry
John D. Cravero
HAHN LOESER & PARKS LLP
125 South Wacker Drive
Suite 2900
Chicago, IL 60606
(312) 637-3010
sfeldman@hahnlaw.com
srollo@hahnlaw.com
dcherry@hahnlaw.com
jcravero@hahnlaw.com
*Attorneys for Apotex Inc.*
*and Apotex Corp.*

Jeffrey A. Cohen
FLASTER & GREENBERG, P.C.
1810 Chapel Avenue West
Cherry Hill, NJ 08002
(856) 661-1900
jeffrey.cohen@flastergreenberg.com
*Attorneys for Apotex Inc.*
*and Apotex Corp.*

Dennis D. Gregory
WILSON SONSINI GOODRICH
  & ROSATI PC
1301 Avenue of the Americas
40th Floor
New York, NY 10019
(212) 497-7764
dgregory@wsgr.com

Nicole Stafford
Shyamkrishna Palaiyanur
Anjali Deshmukh
WILSON SONSINI GOODRICH
  & ROSATI PC
900 South Capital of Texas Highway
Las Cimas IV, Fifth Floor
Austin, TX 78746

*Attorney for Mylan Laboratories Limited*

Rhyea Malik
WILSON SONSINI GOODRICH
 & ROSATI PC
12235 El Camino Real
San Diego, CA 92130
(858) 350-2300
rmalik@wsgr.com
*Attorney for Mylan Laboratories Limited*

Brian E. Farnan
Michal J. Farnan
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com
*Attorneys for Defendant*
*Fresenius Kabi USA, LLC*

Kevin M. Nelson
Imron T. Aly
SCHIFF HARDIN LLP
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
(312) 258-5500
knelson@schiffhardin.com
ialy@schiffhardin.com
*Attorneys for Defendant*
*Fresenius Kabi USA, LLC*

(512) 338-5402
nstafford@wsgr.com
spalaiyanur@wsgr.com
adeshmukh@wsgr.com
*Attorneys for Mylan Laboratories Limited*

Bobby Delafield
Aden Allen
WILSON SONSINI GOODRICH
 & ROSATI PC
900 South Capital of Texas Highway
Las Cimas IV, Fifth Floor
Austin, TX 78746
(512) 338-5432
bdelafield@wsgr.com
aallen@wsgr.com
*Attorneys for Mylan Laboratories Limited*

Arun John Mohan
SCHIFF HARDIN LLP
666 Fifth Avenue, Suite 1700
New York, NY 10103
(212) 745-9536
amohan@schiffhardin.com
*Attorney for Defendant*
*Fresenius Kabi USA, LLC*

Neal C. Belgam
Eve H. Ormerod
SMITH, KATZENSTEIN, & JENKINS LLP
The Brandywine Building
1000 West Street, Suite 1501
P.O. Box 410
Wilmington, DE 19899
302-652-8400
nbelgam@skjlaw.com
eormerod@skjlaw.com
*Attorneys for Defendant*

*Slayback Pharma Limited Liability Company*


Constance S. Huttner
Frank D. Rodriquez
James P. Barabas
Beth C. Finkelstein
WINDELS MARX LANE &
MITTENDORPH, LLP
One Giralda Farms, Suite 100
Madison, NJ  07940
chuttner@windelsmarx.com
frodriguez@windelsmatx.com
jbarabas@windelsmarx.com
bfinkelstein@windelsmarx.com
*Attorneys for Slayback Pharma*
*Limited Liability Company*

*/s/ Karen E. Keller*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Teva Pharmaceuticals*
*International GmbH, Cephalon, Inc., and*
*Eagle Pharmaceuticals, Inc.*